# EXHIBIT A

# *3 Nimmer on Copyright § 8D.06*

***Nimmer on Copyright > CHAPTER 8D Moral Rights***

## § 8D.06 Visual Artists Rights Act of 1990

It has been noted above that, at accession to the Berne Convention, Congress remained studiously neutral on the general subject of moral rights.[1] History did not stop, of course, upon Berne accession.[2] In 1990, Congress revisited the issue of moral rights that had played so prominently in the BCIA's declaration of absolute neutrality on the questions of attribution and integrity. After receiving extensive testimony from the affected industries,[3] Congress abandoned neutrality in favor of federal legislation implementing moral rights in a limited sphere,[4] *viz.* in the realm of certain visual arts.[5] Outside that sphere, however, Congress made clear its antipathy to the expansion of copyright law to embrace general moral rights.[6] The new law,[7] entitled the Visual Artists Rights Act of 1990,[8] became effective on June 1, 1991.[9] As of that date, therefore, the bifocal approach adumbrated above[10] dictates a moral rights inquiry along two axes. For works of visual arts, analysis should proceed with the federal and state statutes treated below.[11] For copyrightable creations apart from works of visual arts (as for artworks that do not meet the statutory definition of "works of visual arts"), the analysis should focus on the generalized principles treated above.[12]

**[A] Scope of Application**

---

[1] See *§ 8D.02[C] supra*.

[2] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 8 (1990) ("adherence to the Berne Convention did not end the debate about whether the United States should adopt artists' rights laws"). In fact, Congressional proposals to implement artists' rights date back to 1979. *Id.* For an historical retrospective, see M. Price, *Resuscitating a Collaboration with Melville Nimmer: Moral Rights and Beyond* (Cardozo School of Law Occasional Paper No. 3, 1998).

[3] Over 1200 pages of hearings and prepared statements are contained in *Moral Rights in Our Copyright Laws,* Hearings Before the Subcommittee on Patents, Copyrights and Trademarks of the Committee of the Judiciary, United States Senate, 101st Cong., 1st Sess. (1989) [hereinafter cited as: "S. Hrg. 101-694."] This testimony relates both directly to moral rights, and indirectly to the issue of who is "in control" under the work for hire doctrine. See *§ 5.03 supra.*

[4] Included in the legislative rationale, as reflected in the House Report, is a quotation from this treatise's criticism above of the manner in which the BCIA skirted moral rights. See H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 10 n.22 (1990) (Treatise quoted).

[5] Although Congress thereby bolstered moral rights for the sake of "greater harmony with laws of other Berne countries," it did not thereby admit antecedent failure to comply with the Berne Convention. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 10 (1990). The line is a fine one: "While this title is not necessary for this country's adherence to the Berne Convention, … it certainly strengthens our commitment to that convention." 136 Cong. Rec. H13313 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier). The Supreme Court has commented, "Section 106A is analogous to Article 6*bis* of the Berne Convention for the Protection of Literary and Artistic Works, but its coverage is more limited." *Quality King Distribs., Inc. v. L'Anza Research Int'l, Inc., 523 U.S. 135, 149 (1998)*.

[6] "This legislation covers only a very select group of artists." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990). See generally *id.* One commentator proposes modeling right of publicity protection on VARA. See Roberta Rosenthal Kwall, *Preserving Personality and Reputational Interests of Constructed Personas Through Moral Rights: A Blueprint for the Twenty-First Century*, *2001 U. Ill. L. Rev. 151*.

[7] Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, tit. VI, ***104 Stat. 5089***. See *§ 2A.09[B][1] supra*, discussing other copyright bills

**[1] Works of Visual Art.**

The Visual Artists Rights Act of 1990 begins by defining a new category: "work of visual art."[13] Works meeting the statutory definition include a "painting,[14] drawing, print,[15] or sculpture."[16] Any such item that exists solely in a unique original[17] meets the statutory criteria.[18] Works in multiple copies also qualify provided that they are issued "in a limited edition of 200 copies or fewer[19] that are signed and consecutively numbered[20] by the author."[21] Thus, an original painting need not be signed or numbered; however, if produced in two copies, both must bear the artist's signature and a consecutive number[22] placed by the artist[23] in order to qualify as a "work of visual art."

In the case of a sculpture[24] of which more than one original exists, protection likewise subsists, provided that it is a limited edition "in multiple cast, carved, or fabricated sculptures of 200 or fewer."[25] Again, the further *proviso* applies that all the copies be "consecutively numbered by the author and bear the signature or other identifying mark[26] of the author."[27]

Also eligible as a "work of visual art" is a "still[28] photographic image."[29] However, photos meet the statutory criteria only if "produced for exhibition purposes,"[30] thereby disqualifying the vast majority of products resulting when someone snaps a camera's shutter.[31] As long as the initial purpose of the photograph's production is for any type of exhibition,[32] subsequent use for nonexhibition purposes will not divest the work of its protected status.[33] Again, for protection to attach here, the subject exhibition photograph must exist either in a single original "or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author."[34] Moreover, even if in a single original, unlike the previous category of paintings *et al.,* the subject photograph must be signed by the author.[35]

In the first case arising under the Visual Artists Rights Act of 1990 with respect to photographs,[35.1] the court had to adjudicate whether the plaintiff's works were "produced for exhibition purposes only" as required under the statute. Defendant artist had asked plaintiff photographer to take photos at a friend's home to use

---

enacted by the same piece of legislation.

[8] Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, Sec. 601, ***104 Stat. 5089*** (short title).

[9] *Id.* Sec. 610(a).

[10] See *§ 8D.02[A] supra*.

[11] Apart from the instant discussion, see *§§ 8D.07–8D.09 infra*.

[12] See *§§ 8D.03–8D.04 supra*.

[13] ***17 U.S.C. § 101 (1991)***. This definition is "a critical underpinning of the limited scope of the bill." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990).

[14] "The term 'painting' includes murals, works created on canvas, and the like." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990).

[15] "Similarly, the term 'print' includes works such as lithographs, serigraphs, and etchings." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990). Photographs, however, are not included, as they are treated separately. *Id.*

[16] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 1.

[17] The term "original" is used throughout this section as a noun, meaning that from which a copy is made. By contrast, the adjectival use of the term "original"— meaning not simply imitative—pertains throughout the rest of this treatise. See *§ 2.01[A][1] supra.*

[18] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 1.

as studies for paintings that defendant intended to create.[35.2] After plaintiff took the photos, he reviewed them with the artist and turned over possession of them to her—at which point she incorporated them into a work of her own creation. Under those facts, the court concluded that it would be impossible for plaintiff to show[35.3] that his photographic prints had been "produced for exhibition purposes only"; instead, they were primarily produced to help defendant with her project.[35.4] Although the possibility remained that plaintiff could still characterize his *negatives* as having been "produced for exhibition purposes only,"[35.5] the court rejected their status as being irrelevant to *prints* subsequently produced from them.[35.6]

* * *

Staid courts confronting *avant-garde* artists may run into problems at the margin in evaluating whether a work qualifies.[36] The plaintiff bears the burden of proof on this, as all other issues affecting the *prima facie* case.[37] The legislative history suggests that courts "use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition."[38] In addition, the materials and media used are not dispositive.[39]

Even if a work meets the foregoing criteria, it nonetheless does not count as a "work of visual art" if it was made as a work for hire[40] or if it is not otherwise eligible for copyright protection.[41] Reasons a particular work could be otherwise ineligible for protection may range from unprotected national status of the artist[42] of a published work to forfeiture through lack of notice[43] to unconsented adaptation of an underlying work.[44] Therefore, general copyright doctrine is inextricably implicated in the analysis of artists' rights.[45]

The foregoing limitations have already circumscribed the definition of works of visual arts. But Congress wished to go even further in limiting the scope of the Visual Artists Rights Act of 1990.[46] Therefore, also statutorily ineligible for protection are the following:

(i) any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;

---

[19] The limitation to 200 or fewer copies "is a familiar concept in the artistic community. Limited editions, as opposed to reproductions, are comprised of multiple originals of the same work." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 12 (1990). See *§ 8D.08[A]* *infra* (comparable provision of New York law geared at multiples of 300).

[20] Ironically, these marking and numbering requirements resurrect a type of formality, notwithstanding that mandatory copyright notice was jettisoned incident to Berne accession. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 12 (1990) ("the Committee does not intend to create a rigid requirement akin to the copyright notice required by earlier copyright laws"). See *§ 7.02[C][3]* *supra.*

[21] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 1. Inherent in such signing and numbering is a "pledge … that replication of the work is to be limited." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 12 (1990). In fact, the pledge is backed by state fraud laws, which prohibit later additions to a limited edition. *Id.* at 13. The practice in the artistic community is, after the run is concluded, for artists to "break their molds, strike their plates, or otherwise destroy the materials" for making additional copies. *Id.*

[22] "Courts should be flexible in determining whether the placement of the numbering and marking is adequate to serve the purposes described above. Artists need not deface the work itself in numbering and marking. For example, placement on the back of the work or on the matting surrounding it is sufficient." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 13 (1990).

[23] What if the artist's signature and a consecutive number are present, but the latter was affixed by the artist's assistant? That scenario does not meet the plain language of the statute: "consecutively numbered *by the author.*" Yet given how circumscribed the statute already is as set forth below, it is to be hoped that courts will exercise some flexibility, to avoid wholly eviscerating the force of the statute. A more difficult question is what if the work is issued in a limited edition of 200, and the artist's signature is missing from just two copies. Again, a tension arises between the plain language of the statute and the hope that rights will not be lost from insubstantial variation.

[24] "The term 'sculpture' includes, but is not limited to, castings, carvings, modelings, and constructions." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990).

(ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container.[47]

In addition to those materials, "any portion or part of any item" described in those clauses cannot qualify as a "work of visual art."[47.1]

Consonant with the above limitations, cases have held ineligible putative works of visual art consisting of posters,[47.2] promotional items (even for non-commercial purposes),[47.3] and advertising.[47.4] The category of "applied art" has been interpreted not to include works incorporated into a building.[47.5] The rationale of that holding was later extended to a school bus converted into a replica of a 16-century Spanish galleon.[47.6] The Ninth Circuit articulated the standard that "applied art" (which is disqualified from protection as a "work of visual art") applies "where the object initially served a utilitarian function and the object continues to serve such a function after the artist made embellishments or alterations to it."[47.7] It extended that test "both where a functional object incorporates a decorative design in its initial formulation, and where a functional object is decorated after manufacture but continues to serve a practical purpose."[47.8] Conversely, it denied that status to "a piece of art whose function is purely aesthetic or a utilitarian object which is so transformed through the addition of artistic elements that its utilitarian functions cease."[47.9] Gauged by that standard, the elaborate mobile art in question failed to qualify as a "work of visual art."[47.10]

One case held that use of a photo of a sculpture in a brochure did not render the artwork itself into an advertisement.[47.11] The limitation of "works of visual art" to unique exemplars or limited editions of no more than 200 copies precludes efforts to qualify note cards and mass-produced lithographs; Judge Easterbrook noted that this disability pertains, even if defendant invoked it "to produce kitsch [that] had damaged [plaintiff's] reputation."[48]

The efforts to honor Queen Catherine of Braganza (after whom the Borough of Queens is named) by erecting a giant statue in her honor on the East River foundered due to the alleged involvement of that daughter of Portugal, together with her husband, Charles II of England, in the infamous slave trade.[48.1] The

---

[25] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 1. See [National Ass'n for Stock Car Auto Racing, Inc. v. Scharle, 356 F. Supp. 2d 515, 529 (E.D. Pa. 2005)](), *aff'd unpub*., [184 Fed. Appx. 270 (3d Cir. 2006)]() (holding multiple computer designs for trophy ineligible for protection).

[26] Unlike the other categories treated above, sculptural works need not be signed by the author as long as the author places thereon an "identifying mark," given "the nature of these works." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 13 (1990). Nonetheless, sculptural works, like the other categories, do need to be consecutively numbered when issued in limited editions. *Id.*

[27] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 1.

[28] Not included are "moving" images, such as those taken from motion pictures and other audiovisual works. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990). Such moving images, in fact, are expressly excluded, as set forth below. See *id.*

[29] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 2. Included in the definition are "both positives (for example, prints, contact sheets, and transparencies such as slides) and negatives (negative photographic images or transparent material used for printing positives) of a photograph." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990).

[30] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 2.

[31] "For example, many photographs are produced for use by newspapers and magazines and for other nonexhibition purposes and are specifically excluded by the definition of covered photographs." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990).

[32] The location and nature of the exhibition are irrelevant. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 12 (1990).

controversy erupted after sculptor Audrey Flack had produced part of a 35-foot clay model of the envisioned 35-foot bronze sculpture. When that model was damaged, Flack filed suit. On the one hand, the clay sculpture qualified as a one-of-a-kind work of visual art, hence seeming to attract protection under the Visual Artists Rights Act of 1990. But, on the other hand, it was admittedly a "model" for a later-contemplated bronze, thereby falling within the enumeration just quoted of items ineligible for protection. The court resolved that conundrum by adverting to the custom of the artistic community, in which " 'models' such as the clay sculpture are considered works of art in their own right."[48.2] On that basis, it held that the clay artwork enjoyed artists' rights protection.

On the other hand, a wrecked 1988 Oldsmobile won less recognition. Michael Kleinman, operator of numerous Plant K outlets, habitually celebrated store openings "with a 'car bash,' a charity event at which the public pays for the privilege of sledgehammering a car to a 'smashed wreck.' "[48.3] He decorated one such post-demolition product as a cactus planter, adorning it in bright colors with the slogan "make love not war."[48.4] Those efforts won him a citation for violation of a city ordinance aimed at "junk vehicles."[48.5] Kleinman challenged the city's abatement order as a violation of the *First Amendment*;[48.6] the Fifth Circuit validated it as a content-neutral safety ordinance, tailored to achieve the city's legitimate interests.[48.7] It also rejected his claim regarding destruction of a work of recognized stature,[48.8] affirming the district court's ruling that the car-planter served as an advertisement for Kleinman's store, disqualifying it from protection given that it served as "advertising" or "promotional" material.[48.9]

**[2] Artists' Rights.**

The genus "works of visual art" differs from all pre-existing categories in Section 102(a) of the Act, such as "pictorial, graphic, and sculptural work" (into which category all "works of visual art" are subsumed).[49] For, unlike the categories of Section 102(a), this new genus does not set forth a protectible "work of authorship;"[50] instead, it carves out certain already protected works[51] to confer on them, and on them alone,[52] a new species of rights[53] involving attribution and integrity.[54] Following the legislative history, this

---

[33] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 12 (1990). Thus, although the exception reproduced below disqualifies magazine reproductions, a subsequent magazine reproduction of a protected exhibition photograph does not divest the work of protection. *Id.*

[34] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 2.

[35] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ 2. The reason for the extra stringency is to distinguish between covered photographs and the more numerous class of photos produced for nonexhibition purposes, which are presumably unsigned. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 13 (1990). The photographer's signature also provides notice to the public that artists' rights may be applicable. *Id.* By contrast, the public should have no problem identifying single originals of paintings and other covered artworks, even without the artist's signature. *Id.*

[35.1] *Lilley v. Stout, 384 F. Supp. 2d 83, 86 & n.1 (D.D.C. 2005) (Treatise cited)*.

[35.2] *Id. at 84*. The later failure of the pair's personal relationship led to the litigation. *Id*.

[35.3] It also appeared that plaintiff had failed to sign the photo, which would be an alternative basis on which he could have lost eligibility under the statute. *Id. at 89 n.5*.

[35.4] Although the intent that the works serve as studies did not *per se* invalidate them from protection under VARA, *id. at 88*, plaintiff's turning over possession of those discrete photographs to defendant belied his later claim to have produced them solely for exhibition purposes, *id. at 88–89*.

[35.5] Note that a negative is produced when the camera shutter is clicked; one or more prints are produced only much later. *Id. at 87*. Both can be eligible under VARA. *Id*. Inasmuch as the statute contains the word "produced," the court concluded that "it seems more reasonable that the intent or purpose of the author be examined as of the time the unique work in question is 'produced.' " *Id*.

treatise refers to those rights collectively as "artists' rights."[55] They are a type of moral right,[56] albeit limited in works to which they apply and in breadth of application, as set forth below.

In recognition of their link more to the author's personality than pocketbook,[57] moral rights stand in contrast to economic rights.[58] Accordingly, the newly created artists' rights are independent of copyright ownership rights.[59] Ownership of both rights vests initially in the work's author upon creation. But whereas rights of copyright ownership are freely transferable,[60] artists' rights are inalienable.[61] That conclusion flows from the conceptualization of such rights as personal to the artist, arising out of the creative process.[62]

Another distinction bears noting. As previously explained, the copyright categories of Section 102(a) pertain to conceptual creations.[63] By contrast, the above definition of "works of visual art" refers solely to physical items. To illustrate, a "pictorial work"[64] could be portrayed on canvas, in a magazine, on a billboard, or on a computer screen; but a "work of visual art" can consist only of the artist's original "painting" and limited edition supervised copies, all other representations of the same image being definitionally ineligible. This distinction imparts an almost antipodal contrast between copyright and artists' rights.[65] The former, being concerned with conceptual types, attaches widely and can thus be characterized as volatile—an artist's copyright can be violated in a city with which she has no contact through such evanescent means as a radio broadcast, performance of a play, or display on a cathode ray tube.[66] By contrast, artists' rights, being rooted to concrete objects, are forever fixed to limited points of attachment,[66a] and thus can be characterized as tactile—an artist's rights can be violated in a city only when her protected artwork is physically transported there, and the violation occurs always in propinquity to the protected object.

To illustrate, imagine a painting produced in Boston by a Massachusetts artist, sold to a New York collector, the copyright in which is reserved to the artist's Vermont niece. Unauthorized reproduction of the work in Seattle could violate the copyright, giving rise to a potential infringement suit by the niece. No activity in Seattle could violate the artists' rights as long as the painting itself remains in New York; but an attribution or integrity violation by the owner in New York could give rise to an artists' rights action by the Boston artist.

---

> Thus, plaintiff Lilley's intent when clicking the shutter of his camera and creating the negatives is irrelevant to his claim. His probably different purpose in developing the negatives to produce the prints is the real issue. Were they "produced for exhibition purposes only"?

*Id. at 88*.

[35.6] *Id. at 89 n.4*. "Otherwise, one could avoid the specific intent requirement (not to mention the signing and numbering requirement) for all still photographic images—regardless of the number of prints subsequently produced—merely by claiming VARA protection in the photographic negative from which the numerous prints were made." *Id*.

[36] See Statement of Peter H. Karlen, in S. Hrg. 101-694, *op. cit.* N. 3 *supra, at 105* ("the work consisted of sand that had been separately gathered, bottled, and meticulously labeled by the artist").

[37] See *§ 12.11* *infra.* "In general, for example, a photographer will have the burden of showing that a photographic image is produced for exhibition purposes and a printmaker who creates a limited edition must show that the edition consists of 200 or fewer copies." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 13 (1990).

[38] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990).

[39] *Id.*

[40] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ B. See *Carter v. Helmsley-Spear, Inc., 852 F. Supp. 228, 233–35 (S.D.N.Y. 1994)* (unfettered artistic freedom plus copyright ownership in artist uncharacteristic of employment relationship), *later opinion*, *861 F. Supp. 303, 313 (S.D.N.Y. 1994)*, *rev'd*, *71 F.3d 77, 87 (2d Cir. 1995)* (putting off "for another day deciding whether copyright ownership is probative of independent contractor status"), *cert. denied*, ***517 U.S. 1208 (1996)***.

[41] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ C. The purpose of this provision is to avoid conferring on works freely available in the copyright public domain any newly-created artists' rights. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990).

At the abstract (or perhaps fustian) level,[66.1] traditional copyright law protects art; by contrast,[66.2] the Visual Artists Rights Act[67] protects artifacts.[67.1]

### [B] Attribution Right

#### [1] Scope of Rights.

The Visual Artists Rights Act of 1990 adds a new Section 106A to the current Act, creating artists' rights parallel to the economic rights contained in Section 106.[67.2] Specifically, Section 106A confers upon artists several types of attribution rights with respect to their works of visual arts. The purpose of these rights is both to provide basic fairness to artists and to "promote the public interest by increasing available information concerning artworks and their provenance, and by helping ensure that information is accurate."[68] These attribution rights are of three types, one affirmative ("to claim") and two negative ("to prevent").

First, the author has the right to claim authorship.[69] Thus, the artist may demand that her name be used in conjunction with a display of the work.[70] The question arises whether a private collector who displays a painting to a few close friends at home commits an attribution violation through omission of the artist's name. Neither the text nor the legislative history addresses whether it is only a public display of the work that is implicated. Nor can guidance be gleaned from the limitation of the general copyright display right to public displays,[71] given that the Section 106A artists' rights are distinct from the Section 106 rights of copyright ownership.[72] Perhaps the simplest response is to sidestep the inquiry, given that, as a practical matter, litigation against the private collector is unlikely to ensue.[73]

Second, in addition to that attribution right, the author enjoys the right to prevent use of her name as the author of a work that she did not in fact create.[74] It is worth noting that such an anti-attribution right comports with Berne Convention strictures.[75] It would seem that forging an artist's signature on a piece falls afoul of this aspect of the attribution right.[75.1]

---

[42] See *§ 5.07 supra.*

[43] See *§ 7.14[A][1] supra*. Note that, although that consequence applies only to works first pub-

lished before March 1, 1989, and although the Visual Artists Rights Act of 1990 is only applicable after June 1, 1991, nonetheless it applies to pre-existing artworks retained by the author. See *§ 8D.06[E] infra*. It is possible for an artist to have published a work (with or without the requisite notice) and yet to have still retained legal title to the sole original, as for example, by authorizing reproductions of posters. See *§ 4.03[B] supra*.

[44] See *§ 3.06 supra.*

[45] Although such general copyright doctrine is a threshold to analysis of artists' rights, the rights themselves are distinct from the normal incidents of copyright ownership. See *§ 8D.06[A][2] infra.*

[46] As stated by Representative Markey, "I would like to stress that we have gone to extreme lengths to very narrowly define the works of art that will be covered. This legislation covers only a very select group of artists." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990) (ellipses omitted).

[47] ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ A.

[47.1] *Id.* ¶ (A)(iii). But a new and independent work of collage art composed of snippets from such materials is not excluded. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990).

[47.2] See *Peker v. Masters Collection, 96 F. Supp. 2d 216, 221–222 (E.D.N.Y. 2000)*.

[47.3] See *Pollara v. Seymour, 206 F. Supp. 2d 333, 337 (N.D.N.Y. 2002)*, *aff'd*, *344 F.3d 265, 270 (2d Cir. 2003)* (mural intended solely to promote charitable even).

Third, the author may prevent use of her name as the author of a work of visual art that—although she might have created it—has been subject to a "distortion, mutilation, or other modification[76] of the work which would be prejudicial to … her honor or reputation."[77] What acts meet the statutory requirement of being "prejudicial?"[77.1] According to the legislative history, the standard "must of necessity be flexible;"[78] although there can be no *per se* rule, "modification of a work of recognized stature will generally establish harm to honor or reputation."[79] Therefore, "the best approach to construing the term 'honor or reputation' in [the bill] is to focus on the artistic or professional honor or reputation of the individual as embodied in the work that is protected."[80] Under the Congressional view, this standard is *not* analogous to reputation in a defamation case—"any evidence with regard to the latter is irrelevant."[81]

In addition to the foregoing three species of attribution right, which echo aspects of Continental moral rights theory,[82] the House Report contends that the right to claim authorship also includes the right to publish anonymously or pseudonymously.[83] That proposition likewise finds support in Continental theory, as well as in the context of the Berne Convention.[84] Nonetheless, given that the U.S. law explicitly allows an artist to prevent use of her name in conjunction with her work only when the work has been distorted in a prejudicial manner, the doctrine of *ejusdem generis* would seem to preclude the general reference to "claiming authorship" from conferring on an artist the right to prevent use of her name in conjunction with her work even when the work has *not* been distorted. Accordingly, given Congress' drafting, the legislative history's reliance on this aspect of Berne Convention jurisprudence appears misplaced.[85]

On the subject of Continental theory, it bears repetition that the French *droit à la paternité*, godfather (if not direct *grandpère*) of the instant attribution right, has five aspects.[85.1] Three find direct reflection in the Visual Artists Rights Act of 1990; a fourth is considered in the previous paragraph. The remaining right is the artist's "right to prevent others from being named as the author of his work."[85.2] Does that aspect of the matter find recognition in this 1990 amendment?

It does not. Among the menu of five potential attribution rights,[85.3] Congress legislated only three of them here. That choice reverberates outward—in particular, it served as one basis for the Supreme Court's ruling

---

[47.4] See *Rivera v. Mendez and Co., 824 F. Supp. 2d 265, 268 (D.P.R. 2011)*; *Teter v. Glass Onion, Inc., 723 F. Supp. 2d 1138, 1158 (W.D. Mo. 2010)*. In *Teter*, the ad on defendant's website included a watermark over the electronic image. See *§ 12A.09[C][1]* *infra* (discussing watermarks in different context). The court held that utilization to be a responsible advertising practice, protecting the subject works from unlawful copying. *723 F. Supp. 2d at 1158*.

[47.5] See *Carter v. Helmsley-Spear, Inc., 71 F.3d 77, 85 (2d Cir. 1995)*, *cert. denied*, ***517 U.S. 1208, 116 S. Ct. 1824, 134 L. Ed. 2d 930 (1996)***. The court reached that interpretation to harmonize with the explicit statutory provisions that govern artworks incorporated into buildings. See *§ 8D.06[C][3]* *infra*.

[47.6] See *Cheffins v. Stewart, 825 F.3d 588, 593 (9th Cir. 2016)* ("We agree in large part with the Second Circuit's analysis"). Dubbed *La Contessa*, the vehicle was used to give rides at Burning Man—and as a venue for musical performances, weddings, poetry readings, and acrobatics shows at that festival in the desert. *Id. at 591, 595*. Later moved to private property, it sat unmoved for years—until ultimately defendant "intentionally burned the wooden structure of the *La Contessa* so that a scrap metal dealer could remove the underlying school bus from his property." *Id*.

[47.7] *Id. at 594*. Unquestionably, the school bus underlying *La Contessa* "served the utilitarian function of transportation." *Id. at 595*.

[47.8] *Id. at 594*. One judge championed a different standard. "In determining whether a work is 'applied art,' the right question to ask is whether the primary purpose of the work as a whole is to serve a practical, useful function, and whether the aesthetic elements are subservient to that utilitarian purpose." *Id. at 598* (McKeown, J., concurring). She concluded that, under either standard, the bus/galleon in question was ineligible for protection, given that its considerable artistic expression was secondary to its role of transporting "revelers from party to party within Nevada's Black Rock desert." *Id. at 603*. It may, therefore, be asked when this variant standard would produce different results. Her concurrence invokes the fact that

> Tracy Emin's *My Bed*, displayed at the Tate Britain, incorporates Emin's real bed as a "monument to the heartache of a relationship breakdown." The bed arguably retains its original utilitarian function—it remains a bed, and could still be slept

that the particular prong that Congress did not legislate in this precise posture of visual rights could not be a general background feature of U.S. law, applicable across the board to all types of works.[85.4]

The statute does not make any provision to redress *violation* of any of the foregoing three attribution rights. That legislative silence stands in contrast to the comparable integrity rights treated below.[86] Perhaps the implication is that whereas an integrity violation could give rise to a monetary recovery, failure to attribute is remediable solely through injunction.[87] If that conclusion were intended, Congress certainly could have expressed its intent less obliquely.[87.1] In any event, though, the First Circuit has adopted this interpretation.[87.2]

**[2] Exceptions.**

An exception to the attribution right immunizes from liability "any reproduction, depiction, portrayal, or other use of a work in, upon, or in any connection with any item described in subparagraph (A) or (B) of the definition of 'work of visual art.' "[88] The reference to subparagraph (A)[89] is to the enumeration of ineligible items quoted above,[90] starting with "any poster, map, globe" and ending with any "packaging material and container."[91] Working through this language, the result is that a depiction of a protected work of visual art upon a poster or map (or other such item) need not be accompanied by the artist's name.[91.1] Moreover, if the artist's name is erroneously invoked in that context, the anti-attribution right does not attach. The legislative history explains,

> For example, a newspaper, book, or magazine may include a photograph of a painting or a piece of sculpture. A motion picture may include a scene in an art gallery. The exclusion from the definition of a work of visual art would be of little or no value if these industries could be held liable under section 106A for the manner in which they depict, portray, reproduce, or otherwise make use of such a work. Moreover, because such actions do not affect the single or limited edition copy, imposing liability in these situations would not further the paramount goal of the legislation: to preserve and protect certain categories of original works of art.[92]

---

> in—but it is no longer meant or used for this utilitarian purpose. Rather, like the Bayeux tapestries, *My Bed* is now appreciated and viewed as a work of creative expression and, when viewed as a whole, the utilitarian object has become part of a visual art piece.

*Id. at 601* (footnote omitted).

[47.9] *Id. at 594*. Many decorative elements with undeniable artistic qualities were added to the galleon, including its hand-crafted figurehead. *Id. at 591*. But it still retained its functional aspects, and in fact was ultimately banned from the Burning Man festival because of its unsafe driving practices. *Id. at 595*.

[47.10] Plaintiffs lost their federal count on summary judgment, *id. at 591–92*, notwithstanding that "they testified passionately about *La Contessa*'s beauty and the artistic expression they felt it embodied," *id. at 603*. In addition, they went to trial on state law claims (such as conversion). Not only did the jury rule against them, *id. at 591–92*, but their rejection of an offer of judgment made under Nevada law obligated them to pay defendant's attorney's fees, *id. at 597*.

[47.11] See *Martin v. City of Indianapolis, 982 F. Supp. 625, 631–632 (S.D. Ind. 1997)*, *aff'd on other grounds*, *192 F.3d 608 (7th Cir. 1999)*.

[48] *Lee v. A.R.T. Co., 125 F.3d 580, 583 (7th Cir. 1997)*.

[48.1] *Flack v. Friends of Queen Catherine Inc., 139 F. Supp. 2d 526, 528–530 (S.D.N.Y. 2001)*.

[48.2] *Id. at 533*.

[48.3] *Kleinman v. City of San Marcos, 597 F.3d 323, 324 (5th Cir. 2010)*.

[48.4] *Id. at 324*.

This language makes clear that the exception for all items enumerated in subparagraph (A)—running from motion pictures to magazines to electronic publications—is intended to be expansive. As an example, its inclusion of "advertising" and "packaging material" would mean that a moving company could send out flyers and could sell boxes imprinted with a portrayal of a statue carved by artist *X*; both uses would escape liability under the Visual Artists Rights Act of 1990,[93] even if coupled with the omission of any artist's name from the flyer and the incorrect use of artist *Y*'s name on the box.[94] A museum could sell attributed postcards of artist *Z*'s work,[95] cropping it in ways offensive to the artist. A gallery could produce a catalog[96] for its exhibition of 150 works by artist *W* and wholly omit *W*'s name.[97]

Also excepted under subparagraph (B) are all works for hire, meaning that the foregoing exception extends to any reproduction upon or in any connection with any work for hire. The result is that, to the extent that one can imagine items not covered by subparagraph (A) — an architectural monument for example—a reproduction thereon of an artwork is exempt, if that item (the monument) is a work for hire. Arguably, that provision is unnecessary, as even if the artwork were reproduced on a monument that is not a work for hire, the clear thrust of the Visual Artists Rights Act of 1990, limited to artifacts, would seem to preclude liability.[98]

What uses remain, notwithstanding the above capacious exceptions? As already noted, the Visual Artists Rights Act of 1990 protects artifacts.[99] The attribution right comes into play in relation to any covered artifact, *i.e.,* the original artwork and its limited editions. For example, when an original[100] qualifying painting is on display at a gallery, the artist's right to claim authorship confers a right to have her name accompany the painting at the gallery. When an original qualifying photograph is hung in a museum, one who is not the photographer can prevent his name from accompanying the photo at the museum.[101] When an original qualifying mural painted on the wall of a church has been half-effaced such that the remainder is prejudicial to the artist's reputation, she may suppress use of her name on or adjacent to the mural on the church's wall.[102]

---

[48.5] *Id. at 325*.

[48.6] See *Chap. 19E* *infra*.

[48.7] *Id. at 328*. Note that the locality did not order Kleinman to destroy the subject auto, but simply to enclose it from public view.

[48.8] See *§ 8D.06[C][1][b]* *infra*.

[48.9] *597 F.3d at 329.*

[49] See H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 11 (1990). The overlap between works of visual art and pictorial, graphic, and sculptural work is complete as a matter of fact but not as a matter of logical necessity. That is, every "painting, drawing, print, or sculpture," and "still photographic image"—which exhausts the eligible candidates for "work of visual art"—all happen to fall within the category of pictorial, graphic, and sculptural work. See *§§ 2.08[B][1]–[3]* *supra*. For that reason, the Visual Artists Rights Act of 1990 added § 113(d) to pre-existing ***17 U.S.C. § 113***, dealing with the scope of exclusive rights in pictorial, graphic, and sculptural works. Nonetheless, if Congress were to choose years hence to define, for example, a "laser dancing image" as an "audiovisual work" and simultaneously as a "work of visual art," no resulting cross-category tension would upset the statutory scheme.

[50] *Cheffins v. Stewart, 825 F.3d 588, 600 (9th Cir. 2016)* (McKeown, J., concurring) (Treatise quoted). Note that the Visual Artists Rights Act of 1990 was enacted simultaneously with the Architectural Works Copyright Protection Act. See *§ 2A.09[B][1]* *supra.* Nonetheless, it is only the latter amendment that added a new category of works to ***17 U.S.C. § 102(a)***.

[51] Works that are not otherwise protected by copyright are ineligible to qualify as works of visual art. ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ C.

### [C] Integrity Right

#### [1] Extent of Right

##### *[a] General Right to Prevent Distortion, Mutilation, or Other Modification.*

Section 106A, added by the Visual Artists Rights Act of 1990, confers upon authors of works of visual arts, in addition to the above attribution rights, the right "to prevent any intentional[103] distortion, mutilation, or other modification of that work."[104] However, even if intentional, not every such act is actionable. To give rise to an integrity violation, the subject distortion, mutilation, or modification must be prejudicial[105] to the artist's honor or reputation.[106] One cannot make an end run around the limitations of Section 106A by reading the Copyright Act's antecedent adaptation right[106.1] broadly, so as to encompass any modification of a copyrightable work, even though it may fail to qualify as a work of visual art.[107]

The statutory language—"distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation"—is susceptible of a reading whereby the requisite prejudice applies only to "modification," not to the antecedents of "distortion" or "mutilation." Though not without ambiguity, the better view under the Berne Convention,[108] from which this language is drawn, is that prejudice applies in all three instances.[108.1]

##### *[b] Right to Prevent Destruction of Works of Recognized Stature.*

In addition,[109] the artist possesses the right "to prevent any destruction of a work of recognized stature."[110] That last phrase means that pedestrian artworks, even if destroyed, raise no cause of action under the statute.[111] One court has commented that "recognized stature" need not rise to the level of a

---

[52] *17 U.S.C. § 106A(a)*.

[53] That these rights constitute a new species can be seen from the amendments to *17 U.S.C. § 501(a)*, the provision defining copyright infringement. Whereas prior to the Visual Artists Rights Act of 1990, that section held liable "an infringer of the copyright," the amended language now reads "an infringer of the copyright or right of the author, as the case may be." In addition, the 1990 amendment states: "[A]ny reference to copyright shall be deemed to include the rights conferred by section 106A(a)." *17 U.S.C. § 501(a)*.

[54] See *§§ 8D.06[B]–8D.06[C]* *infra*.

[55] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 5, 8 (1990). This language is drawn, of course, from the name of the law itself: the Visual Artists Rights Act of 1990. It is not, however, incorporated into the text of the statute, which refers instead to "right of the author" and "the rights conferred by section 106A(a)." *17 U.S.C. § 501(a)*. See N. 53 *supra.*

[56] "These rights are analogous to those protected by Article 6bis of the Berne Convention, which are commonly known as moral rights." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 5 (1990). Despite some varying contours, the legislative history states that "it may still be useful to refer to various authoritative sources on Berne for a description of the nature and importance of these rights." *Id.* at 15 (Treatise cited).

[57] See *§ 8D.01[A]* *supra*.

[58] Beyond safeguarding society's cultural heritage by helping to "preserve artworks intact for all of us to enjoy," H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990), artists' rights are designed also to safeguard the reputation, honor, and livelihood of the artist. *Id.*

[59] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990). These new rights are set forth in *17 U.S.C. § 106A*. The economic rights of the copyright owner, by contrast, are enumerated in ***17 U.S.C. § 106***.

Picasso, Chagall, or Giacometti.[111.1] Another accepted affidavits, articles, and evidence of awards to bestow that status on a sculpture.[111.2] In terms of motivation for this provision, Congress explained that it enacted this provision in reaction to the outrageous behavior of "two Australian entrepreneurs who cut Picasso's 'Trois Femmes' into hundreds of pieces and sold them as 'original Picasso pieces.' "[111.3]

Can a work be "of recognized stature" even if it was unknown prior to its destruction? Several courts have postulated that had the entrepreneurs cut up a previously unknown Picasso, rather than "Trois Femmes," the outrage would have been no less.[111.4] In theory, those decisions allow the work's stature to "be 'recognized' by experts after the destruction of the work."[111.5] Implicit in that manner of proceeding is that "stature" is gauged after a work's creation—an unknown artist named Pablo might create an undistinguished work, but if he is later recognized as The Great Picasso by the time that the work is destroyed, then that destruction has caused the loss of a work "of recognized stature."

In one such case, a public interest group hired plaintiff to create a long mural on paper; without a permit to do so, the group installed the mural one evening on poles at the Empire State Building. Before the public could view it the next day, defendant state officials removed it, severely damaging it in the process.[111.6] Thus, the issue whether the unviewed mural could qualify as "of recognized stature" had to be reserved for trial.[111.7] As that trial ultimately unfolded, plaintiff lost.[111.8] Notwithstanding its artistic merit, plaintiff's mural "was intended solely as a display piece for a one-time event."[111.9] Accordingly, it was never destined to achieve "recognized stature" in the artistic community.[111.10]

In a parallel case, a couple hired sculptor Linda Scott to install a 6,000 pound steel swan in the back yard of their home.[111.11] When they ultimately sold their house, its purchaser insisted that the couple remove the sculpture.[111.12] They did so, then offered to give the sculpture to Scott, but she insisted that they pay to move it to a museum, which they declined to do.[111.13] Notwithstanding Scott's local notoriety, her placement of the swan sculpture in a private party's inaccessible back yard[111.14] precluded it from gaining recognized stature.[111.15] Not being Picasso, she lost.

---

[60] See *Chap. 10* *infra*.

[61] See *§ 8D.06[D]* *infra*. As previously noted, France treats such moral rights not only as inalienable, but also as perpetual and imprescriptible. See *§ 8D.01[A]* *supra*. For Berne Convention minimum standards in this arena, see *§ 8D.01[B]* *supra*.

[62] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 19 (1990). See *§ 8D.01[A]* *supra*.

[63] See *§ 2.03[C]* *supra.* For instance, a "literary work" may be embodied in a book, papyrus, CD-ROM, slide strip, etc. *Id.*

[64] ***17 U.S.C. § 102(a)(5)***.

[65] It bears emphasizing that this contrast does not pertain in general between copyright and moral rights. See *§§ 8D.01[A]*, *8D.03*–*8D.04 supra*.

[66] See *§§ 8.14*, *8.20 supra*.

[66a] *Cheffins v. Stewart, 825 F.3d 588, 598 (9th Cir. 2016)* (McKeown, J., concurring) (Treatise cited) ("narrow subset" of works protected by copyright).

[66.1] "[T]he VARA exemptions provide incidental protection only to appropriationists while simultaneously depriving visual artists of a cause of action against them." Note, *Visual Artists' Rights in a Digital Age,* *107 Harv. L. Rev. 1977, 1991 (1994)*. Note that VARA does not itself address the implications of digital technology. *Id. at 1991 n.93*.

[66.2]

> But if one day it were possible to replicate every nuance of color, every brushstroke, and every detail of the canvass of the *Mona Lisa*, the difference between the original and the copy would have antiquarian value (just as in the world of rare books the more valuable copy between two copies of the same edition is the one signed by the author) but not semiotic value.

It has been held that a work capable of being repaired *ipso facto* has not been "destroyed."[111.16] In any event, the anti-destruction right[111.17] attaches regardless of the putative destroyer's mental state.[111.18]

One might think that graffiti occupies the opposite position of the spectrum from great art—but one court recognized "exterior aerosol art"[111.19] as capable of qualifying for the requisite recognized stature.[111.20] The case concerned 5Pointz (a place in Queens where the five New York boroughs come together), a 200,000 square foot warehouse that became a celebrated tourist attraction after being adorned by numerous "high-end works by internationally recognized aerosol artists."[111.21] When rezoned as 1,000 residences, there was no feasible engineering way to preserve the existing buildings—which were duly destroyed.[111.22] One of the salient features about the project was that the artists invited to 5Pointz knew all along that it was temporary.[111.23]

Plaintiff's expert opined that "New York City as a whole would be diminished" by the work's removal.[111.24] By contrast, "an art history professor of impeccable academic credentials" testified for the defense that, despite the recognition of the site as a whole, no particular artwork located there had achieved the necessary stature.[111.25] The court expressed sympathy for the view that at least some of the 24 destroyed works may have been of recognized stature—but deferred decision for trial.[111.26] It noted that monetary damages,[111.27] if awarded, would compensate the artists for their losses.[111.28] It also seemed to relish the role of metacritic[111.29] by weighing the utility of destruction with regard to the public interest in new apartments and affordable housing,[111.30] at the same time that it acted as art patron by incentivizing defendants to commission more works from plaintiffs.[111.31]

### *[c] Injunction and Damages.*

In addition to the foregoing two statutory abilities "to prevent,"[111.32] the statute goes on to classify any prohibited integrity act as "a *violation* of that right." Thus, an intentional and prejudicial mutilation is an integrity violation,[112] remediable through not only an injunction, but damages[112.1] as well.[112.2] However, with respect to destruction, the pertinent integrity right amounts to a "violation" only if intentional or grossly negligent,[113] whereas it has been noted above that the right "to prevent" destruction requires no

---

Umberto Eco, *Kant and the Platypus* 212 (1997).

[67] The legislative history describes "the paramount goal of the legislation" as "to preserve and protect certain categories of *original* works of art." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 17–18 (1990) (emphasis added). See 8D.06[A][1] N. 17 *supra.* Further on this subject, it quotes Professor Ginsburg:

> The bill recognizes the special value inherent in the original or limited edition copy or a work of art. The original or few copies with which the artist was most in contact embody the artist's "personality" far more closely than subsequent mass produced images. Accordingly, the physical existence of the original itself possesses an importance independent from any communication of its contents by means of copies. Were the original defaced or destroyed, we would still have the copies, we would all know what the work looked like, but, I believe, we would all agree that the original's loss deprives us of something uniquely valuable.

*Id. at 12*.

[67.1] One could posit that VARA simply protects physical items, and thus is wholly discontinuous from the Copyright Act's protection of idealized types. See *§ 2.03[A]* *supra*. But the Supreme Court has declined to reason that (1) VARA is limited to physical artifacts, and (2) therefore it exerts no effect on statutes affording protection to intangibles. *Rather, in Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003)*, the unanimous Court focused on the limited application of VARA's attribution right, and thereupon drew conclusions for the appropriate berth of the Lanham Act. *Id. at 34–35*. See *§ 8D.03[A][2][b]* *supra*.

[67.2] See *Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 34–35 (2003)*.

[68] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990).

[69] *17 U.S.C. § 106A(a)(1)(A)*.

mental state. Presumably, therefore, an artist faced with impending destruction[114] of her work of recognized stature through simple negligence[114.1] could, given advance notice, secure an injunction to halt that destruction, whereas after the fact no relief would lie.[114.2]

**[2] General Exceptions.**

Several exceptions apply to the integrity right. First, to the extent that a modification of a work of visual art results from "the passage of time or the inherent nature of the materials,"[115] there is no integrity violation of the "distortion, mutilation, or modification" type.[116] However, this exception does not extend to the destruction of a work of recognized stature.[117] Second, to the extent that a modification of a work of visual art results from "conservation, or … the public[118] presentation,[118.1] including lighting and placement, of the work," there is no integrity violation of either type.[119] However, this exception is vitiated to the extent that the modification is caused by gross negligence.[120] That standard is satisfied when the defendant's behavior is "flagrant, grossly departing from the ordinary standard of care."[120.1] As a pleading matter, one can avoid dismissal of complaints regarding conservation efforts by simply alleging the requisite mental state.[120.2]

Last, a third exception to the integrity right is coterminous with the exception to the attribution right described above.[121] Thus, just as a poster, map, or moving company box is exempt from the artist's attribution right, so such uses are immune from liability as integrity violations.

**[3] Exception for Artworks Incorporated into Buildings.**

An elaborate statutory exception applies to works of visual art that are incorporated into or made part of a building.[122] Whenever the incorporation of the work of visual art into a building is such that "removing the work from the building[123] will cause the destruction, distortion, mutilation, or other modification of the work,"[124] the integrity right is inapplicable, provided that the artist appropriately consented (as elaborated below) to the installation of the work in the building.[125]

---

[70] The House Report does not explain the contours of this right. See H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990). Under the identical language of the Berne Convention, the right is similarly undefined. With regard to the latter, one commentator states that "common sense suggests that the easiest way of doing this is for each copy of an author's work to carry his name in an obvious place, for example, on the title page or at the head of the work, in the case of a written work, or at the bottom, in the case of an artistic work." S. Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works: 1886–1986* 467 (1987).

[71] ***17 U.S.C. § 106(5)***.

[72] See *§ 8D.06[A][2]* *supra*. Cf. *§ 8D.06[C][2]* *infra* (statutory exception for integrity violations incident to "public presentation").

[73] See S. Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works: 1886–1986* 467 (1987) (the right to claim authorship "is fundamental to the way in which the author's work *is presented to the public*") (emphasis added).

[74] *17 U.S.C. § 106A(a)(1)(B)*.

[75] See *§ 8D.01[B]* *supra*.

[75.1] One convoluted case appears to decide to the contrary. The case began as a dispute between an artist and her gallery; after their relationship soured, the latter retained and sold prints created by the former, to make up for sales to cover a monthly advance, which never materialized. *Giddings v. Vision House Prod., Inc., 584 F. Supp. 2d 1222, 1224 (D. Ariz. 2008)*. The artist sued for copyright infringement, and belatedly changed her theory to include moral rights in order to make up for deficient registration. *Id. at 1225–1226*. See *§ 7.16[B][1][b][i]* *supra*. The court denied plaintiff's application to amend the complaint as futile: "Plaintiff has not alleged that Defendants falsely attributed her work to another artist—she is alleging that they forged her signatures on the prints." *584 F. Supp. 2d at 1227*. The court apparently did not recognize that such forging would seem to squarely violate the artist's anti-attribution right.

To the extent that the owner removes the artwork from the building, the foregoing exception clearly applies. Is it further applicable in other circumstances? For instance, imagine that an artwork *could* not be removed from a building without its demolition, but that the owner of the building did *not* in fact wish to remove it; could the owner under those circumstances mutilate the work in a manner prejudicial to the artist's reputation and keep it on public display in order to humiliate the artist? The statutory language as drafted includes that activity within the exception. Nonetheless, it is to be hoped that courts will effectuate the intent behind the legislation and limit the exception to instances in which the owner actually attempts to remove the artwork from the building.

By contrast, what of a work of visual art that is incorporated into a building but that *can* be removed without causing its distortion, mutilation, or other modification? In such cases, removal of the work from the building in a fashion that causes distortion, mutilation, or other modification does violate the artist's integrity right, unless the artist fails to assert that right.[126] Failure to assert may occur in two ways.

First, the owner of the building may proceed with such removal without implicating the integrity right if the owner makes "a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art."[127] For these purposes, "a diligent, good faith attempt" shall be presumed[128] to have occurred, if the building owner sends "such notice by registered mail to the author at the most recent address of the author[129] that was recorded with the Register of Copyrights."[130]

Second, if the owner does succeed in notifying the artist, nonetheless the owner may proceed with such removal if "the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal."[131] To the extent that the artist does respond within 90 days and pays for removal of the artwork from the building, the artist reclaims title to the tangible piece.[132]

To be effective, the consent contemplated above must have occurred in one of two ways. Consents given on or after June 1, 1991,[133] must be evidenced by a written instrument "that is signed by the owner of the building and the author and that specifies that installation of the work may subject the work to destruction,

---

[76] Prior to amendment by the Senate, the House version of the bill imposed the additional requirement that the modification be undertaken intentionally or negligently. 136 Cong. Rec. H13313 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier).

[77] *17 U.S.C. § 106A(a)(2)*.

[77.1] See Richard J. Hawkins, *Substantially Modifying the Visual Artist Rights Act: A Copyright Proposal for Interpreting the Act's Prejudicial Modification Clause*, *55 UCLA L. Rev. 1437 (2008)*; Xiyin Tang, *The Artist as Brand: Toward a Trademark Conception of Moral Rights*, *122 Yale L.J. 218 (2012)*.

[78] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 15 (1990).

[79] *Id.* at 16.

[80] *Id.* at 15. Expert testimony on the subject should be permitted. *Id.* at 16.

[81] *Id.* at 15. Query whether Article 6*bis* of the Berne Convention is to the contrary. See S. Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works: 1886–1986* 470 (1987) (in contrast to "moral or spiritual interests," an author's "honor and reputation" are "analogous to the kind of personal interests which are protected by actions for defamation").

[82] See *§ 8D.01[A] supra*.

[83] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990), *quoting Final Report of Ad Hoc Working Group on U.S. Adherence to the Berne Convention,* 10 Colum.-VLA J. L. & Arts 550 (1986).

[84] *Id., quoting* World Intellectual Property Organization, *Guide to the Berne Convention* (1978). See *§ 8D.01[A] supra*.

[85] See *§ 8D.01[B] supra*.

[85.1] See *§ 8D.01[A] supra*.

distortion, mutilation, or other modification, by reason of its removal."[134] Following the artist's execution of such an agreement, the legislative history comments that it "in effect extends to all subsequent owners of that building."[135] Alternatively, consents given before June 1, 1991, require simply that "the author consented to the installation of the work in the building ..."[136] Given that the statutory requirement of a written instrument applies only to consents occurring on or after the effective date of the amendment, presumably an oral grant suffices if given before that date. The legislative history states that Congress did not wish to upset "valid understandings of the law as it existed at the time of those installations ..."[137]

The first published case to apply any portion of the Visual Artists Rights Act of 1990 did not arise until 1994.[137.1] The district court preliminarily enjoined removal of a sculptural installation in the lobby of defendant's building, given that: (1) such removal would cause the work's destruction; (2) the work was installed after June 1, 1991; and (3) plaintiffs evidently gave no written consent of the type contemplated above.[137.2] The district court later granted a permanent injunction, although not to the extent of ordering defendant to allow plaintiff to "finish" the work on defendant's premises.[137.3] The Second Circuit's complete reversal—holding the subject building installation ineligible for protection given its preparation on a work for hire basis[137.4]—means that few precedential decisions[137.5] have defined the contours of the Visual Artists Rights Act of 1990.[137.6]

**[4] Site-Specific Art.**

David Phillips, a well-known sculptor, created 27 sculptures for placement in Eastport Park, Boston. *Phillips v. Pembroke Real Estate, Inc.*[137.7] inquired whether those sculptures, as part of the park's re-landscaping, entailed an artists' rights violation. The subject sculptures included

---

85.2 *Id*.

85.3 See *§ 8D.01[A] supra*.

85.4 See *§ 8D.02[D][6] supra*, discussing *Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003)*.

86 See *§ 8D.06[C][1][a] infra*.

87 See *§ 14.06 infra.*

87.1 *Massachusetts Museum of Contemporary Art Found., Inc. v. Büchel, 593 F.3d 38, 55 (1st Cir. 2010)* (paragraph of Treatise quoted).

87.2 "We agree with Nimmer's surmise that VARA does not provide a damages remedy for an attribution violation." *Massachusetts Museum of Contemporary Art Found., Inc. v. Büchel, 593 F.3d 38, 55 (1st Cir. 2010)*. After duly noting that Congress provided differently for attribution rights from integrity rights, *id. at 55*, it added that "Congress may have concluded that artists could obtain adequate relief for the harms of false attribution by resorting to the Copyright Act and other traditional claims," *id. at 56*.

88 *17 U.S.C. § 106A(c)(3)*.

89 ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ A. The text below discusses ¶ B in the context of the work for hire doctrine.

90 See *§ 8D.06[A][1] supra*.

91 In addition, as noted in *§ 8D.06[A][1] supra*, any portion or part of any item thus ineligible is likewise ineligible to serve as a "work of visual art."

91.1 *Berrios Nogueras v. Home Depot, 330 F. Supp. 2d 48, 51 (D.P.R. 2004) (Treatise quoted)*.

92 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 17–18 (1990).

93 For potential liability of that scenario under other federal laws or state laws, see *§ 8D.06[F][3][b] infra*.

> fifteen (15) abstract sculptures, and twelve (12) realistic bronze sculptures of crabs, shrimp, and frogs. Pursuant to the East Port park Stonework Agreement with Pembroke executed in June of 1999, Phillips also selected and directed the placement of mosaic paving stones, granite feature strips, and rough stone walls at the base of the sculpture "Chords." He personally carved finished granite for "Chords," the centerpiece of the Park. Phillips worked with a stone mason to select and place the rough quarried stone covered with lichen from Maine. He also designed the granite path culminating in the bronze medallion, the "outpost sculptures," and the free flowing curve motifs. He specially selected the large granite stones that he used as part of his sculptures to reflect the large granite stones along Boston Harbor. [¶] Phillips believes that his sculptures and related stone work are works of visual art specifically designed for Eastport Park and are meaningful only if they remain in Eastport Park.[137.8]

This case posed the question whether, as opposed to "plop-art," there is legal protection for pieces that derive their meaning from the surrounding environment.[137.9] It tests whether preserving the artwork itself is inadequate if the work is moved, inasmuch as "the location defines the art."[137.10]

The first question is what qualifies as "visual art." Without questioning that each of the individual 27 sculptures would so qualify, defendant resisted plaintiff's notion that all of Eastport Park was one gigantic artwork. The court likewise rejected that expansive notion.[137.11] On the other hand, the court deemed it likely that plaintiff could prove that "Chords" and several other aligned sculptures united to form one integrated work of visual art.[137.12]

But plaintiff's labors were only beginning. The question remained whether Phillips could prevail under either the Visual Artists Rights Act of 1990 or under the parallel Massachusetts law.[137.13] As to the federal statute, the district court denied relief on the basis of the following provision:

> The modification of a work of visual art which is the result of … the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, … unless the modification is caused by gross negligence.[137.14]

The legislative history confirms that "removal of a work from a specific location comes within the exclusion because the location is a matter of presentation."[137.15] To the same effect is the legislation's adoption

---

94 Of course, such activities would be permitted only if authorized by the copyright owner. See ***17 U.S.C. § 106(1)***. But the point is that even when the owner of economic rights has so authorized, the artist retains an attribution right pursuant to the Visual Artists Rights Act of 1990, except to the extent covered by the broad exception described in the text. *17 U.S.C. § 106A*. See *§ 8D.06[D]* *infra*.

95 Postcards presumably qualify for the exclusion either as "applied art" or as a "merchandising item." See ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ A.

96 A catalog presumably qualifies for the exclusion as a "book," "periodical," or "similar publication." See ***17 U.S.C. § 101*** (definition of "work of visual art"), ¶ A.

97 Artists' rights are designed to "in no way interfere with ordinary commerce in works of art by art dealers, auction houses, and others similarly situated." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 14 (1990).

98 See *§ 8D.06[A][2]* *supra*.

99 See *§ 8D.06[A][2]* *supra*.

100 See *§ 8D.06[A][1]* N. 17 *supra*.

101 Presumably, given that a nonexhibition photograph does not qualify as a "work of visual art," the same individual lacks the right under the Visual Artists Rights Act of 1990 to prevent his name from accompanying such a photo. Query what rights that individual enjoys under other federal and state laws. See *§ 8D.06[F]* *infra*.

102 Cf. *Crimi v. Rutgers Presbyterian Church, 194 Misc. 570, 89 N.Y.S.2d 813 (Sup. Ct. N.Y. County 1949)*. See Merryman, *The Refrigerator of Bernard Buffet,* 27 Hastings L. J. 1023, 1034–1037 (1976).

103 Under the original House bill, even negligent instances of mutilations *et al.* would have been actionable. 136 Cong. Rec. H13313 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier).

against the background of "the widely-publicized dispute between the General Services Administration and the artist Richard Serra over the removal of Serra's 'site-specific' piece 'Tilted Arc.' "[137.16] Inasmuch as the new law did not explicitly redress that situation, it would seem that Congress did not wish to embrace site-specific art within its protection.

The remaining cause of action concerned the "rarely-litigated Massachusetts Art Preservation Act ('MAPA') … ."[137.17] In the context of granting a preliminary injunction, the court concluded that MAPA's lack of any "public presentation" exception comparable to VARA's meant that plaintiff had shown a reasonable likelihood of success.[137.18] But later, the district court certified the matter to the Supreme Judicial Court of Massachusetts.[137.19] That body issued an advisory[137.20] opinion[137.21] against protection for site-specific art.[137.22] Although MAPA forbids physical destruction of qualifying artworks, it "does not protect it against the conceptual destruction or decontextualization that may result from the removal of those components from the physical environment in which they have been placed."[137.23] Rather, the statute is not violated by such removal, assuming that the "components of site-specific art can be extracted from their surroundings without physical damage to them."[137.24]

The Court acknowledged that site specificity had become a "rallying cry" of public artists and public art administrators, but identified the phenomenon as of recent origin.[137.25] Interpreting what the legislature had in mind when it passed MAPA in 1984, the Court decided that it was not then in the *avant garde*.[137.26] A contrary interpretation, moreover, would undermine MAPA's solicitude for the rights of property owners who commission works that become attached to real property.[137.27]

> If the Legislature intended to include the type of site-specific art at issue here within MAPA's protections, it would entail a radical consequence for owners of land, that the Legislature directly averted for owners of buildings. Specifically, rights afforded artists would encumber private and public

---

[104] *17 U.S.C. § 106A(a)(3)(A)*. See *Cort v. St. Paul Ins., 311 F.3d 979, 985 (9th Cir. 2002) (Treatise cited)*, discussed in *§ 19C.07[B][2] infra*.

[105] This provision is analogous to the standard that pertains under the Berne Convention. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 15 (1990). See *§ 8D.01[B] supra*. " 'Prejudice' is commonly understood to mean 'injury or damage due to some judgment of another.' " *Carter v. Helmsley-Spear, Inc., 861 F. Supp. 303, 323 (S.D.N.Y. 1994)*, *rev'd*, *71 F.3d 77 (2d Cir. 1995)*, *cert. denied*, **517 U.S. 1208, 116 S. Ct. 1824, 134 L. Ed. 2d 930 (1996)**.

[106] "An artist's professional and personal identity is embodied in each work created by that artist. Each work is a part of his/her reputation. Each work is a form of personal expression …" H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 15 (1990). See *§ 8D.06[B][1] supra*.

[106.1] ***17 U.S.C. 106(2)***. See *§ 8.09 supra.*

[107] *Lee v. A.R.T. Co., 125 F.3d 580, 583 (7th Cir. 1997)*. Instead, the inquiry under ***17 U.S.C. 106(2)*** must be cabined within the traditional analysis of derivative works. See *§ 3.03[B][1]* N. 37 *supra.*

[108] S. Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works: 1886–1986* 472–473 (1987).

[108.1] *Massachusetts Museum of Contemporary Art Found., Inc. v. Büchel, 593 F.3d 38, 53 (1st Cir. 2010)* (paragraph of Treatise quoted).

[109] Under the original House bill, the two provisions were combined. 136 Cong. Rec. H13313 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier). Note that this anti-destruction right is not recognized under the Berne Convention, given the argument that following destruction of a work there is no impact on the artist's reputation. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 16 (1990). See S. Ricketson, *The Berne Convention for the Protection of Literary and Artistic Works: 1886–1986* 470 (1987). Congress concluded, to the contrary, that such destruction does harm the artist's reputation, as well as occasioning a loss to society. *Id*.

[110] *17 U.S.C. § 106A(a)(3)(B)*. Originally, the entire integrity right applied only to works of recognized stature. The House discarded that standard, given "the fact that, throughout history, many works now universally acknowledged as masterpieces

> land with restrictions lasting for the life of the artist plus fifty years, without the need for such restrictions to be recorded in a registry of deeds. We do not lightly read such an intent into a legislative act given the recognized legislative policy of disparaging land restrictions (especially unrecorded ones), the common-law doctrine disapproving the long-term burdening of property, and the corollary judicial practice of construing statutory provisions regarding land restrictions in favor of freedom of alienation.[137.28]

In this manner, the opinion vindicates protection of fine art from "physical rather than conceptual harm."[137.29] Without understating the harm occasioned by decontextualization, the Court concluded that the balance struck by the state legislature in 1984 included no such solicitude.[137.30]

At that point, the matter returned to federal court. Not being able to make headway under MAPA, plaintiff concentrated his fire on the federal side. The First Circuit addressed solely the question of rights under the Visual Artists Rights Act.[137.31] It affirmed denial of the claim, but for different reasons:

> Without in any way diminishing our respect for the district court's careful handling of this difficult case, we find its analysis of VARA's relationship to site-specific art unpersuasive. By definition, site-specific art integrates its location as one of its elements. Therefore, the removal of a site-specific work from its location necessarily destroys that work of art. Here, the district court concluded that VARA recognized site-specific art as a type of integrated art, and then concluded that VARA treats site-specific art the same way that it treats other integrated art. However, a work of integrated art, unless it is a site-specific work, is not destroyed by removal from its location.
>
> By concluding that VARA applies to site-specific art, and then allowing the removal of site-specific art pursuant to the public presentation exception, the district court purports to protect site-specific art under VARA's general provisions, and then permit its destruction by the application of one of VARA's exceptions. To us, this is not a sensible reading of VARA's plain meaning. Either VARA recognizes site-specific art and protects it, or it does not recognize site-specific art at all.[137.32]

---

have been rejected and often misunderstood by the general public at the time they were created." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 15 (1990). Nonetheless, it was restored at enactment, but solely with respect to the anti-destruction right. Accordingly, "a doting mother [cannot] sue her child's kindergarten teacher for throwing out her child's finger-painting." *L.A. Times*, Mar. 8, 1990, at Part B, p. 10, col. 1, *quoting* Hirshhorn Museum deputy director.

[111] The House Report relies on the compelling need for an anti-destruction right, citing the case of a then-unknown artist whose 1962 New York World's Fair sculpture was sold for scrap. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 16 (1990). Ironically, that destruction would still be permitted, given the final contours of the Visual Artists Rights Act of 1990, limited to works of recognized stature. That result nonetheless finds justification in the fact that "far more works of art … have not stood the test of time than those that have stood the test of time." Statement of Marc F. Wilson in S. Hrg. 101-694, *op. cit.* N. 3 *supra,* at 137. Indeed, it is not uncommon for artists who have lost in a juried exhibition simply to abandon their work and leave "the art museum stuck with the problem of caring for it, storing it, and so forth." *Id.* at 137–138.

[111.1] *Carter v. Helmsley-Spear, Inc., 861 F. Supp. 303, 325 (S.D.N.Y. 1994)*. The court itself shunned the role of art critic, but ineluctably found itself acting as a metacritic. *Id. at 325, 326 n.13*. But even that status became moot upon reversal based on the work-for-hire status of the artwork there at issue. *71 F.3d 77 (2d Cir. 1995)*, *cert. denied*, ***517 U.S. 1208, 116 S. Ct. 1834, 134 L. Ed. 2d 930 (1996)***.

[111.2] *Martin v. City of Indianapolis, 982 F. Supp. 625, 630-631 (S.D. Ind. 1997)*. Affirming, a divided panel agreed with the district court that newspaper and magazine articles showed the work to be newsworthy, and that those articles fell within a hearsay exception as they were not offered for the truth of the proffered comments. *192 F.3d 608, 613 (7th Cir. 1999)*. The court introduced its opinion by noting, "We are not art critics, do not pretend to be and do not need to be to decide this case." *Id. at 610*. The dissent, who was likewise by his own admission not an art critic, felt that summary judgment could not lie as the "plaintiff cannot satisfy his burden of demonstrating recognized stature through old newspaper articles and unverified letters, some of which do not even address the artwork in question." *Id. at 615, 616* (Manion J., dissenting).

[111.3] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 17 (1990). A later opinion invokes various cases of "art murder," such as the painting over of Kent Twitchell's mural. See *Cheffins v. Stewart, 825 F.3d 588, 598 & n.2 (9th Cir. 2016)* (McKeown, J., concurring) (although $1.1 million paid in settlement, not establishing precedent), citing Charles Cronin, *Dead on the Vine: Living*

Citing the same concerns noted by the state court decision about "dramatically affect[ing] real property interests,"[137.33] the First Circuit concluded that "VARA does not apply to site-specific art at all."[137.34]

Some years later, the Seventh Circuit confronted a claim arising out of plaintiff's installation of "two enormous elliptical flower beds, each nearly as big as a football field, featuring a variety of native wildflowers and edged with borders of gravel and steel."[137.34a] The cause of action under the Visual Artists Rights Act of 1990 was the "the main event."[137.34b] But, inasmuch as that amendment covers only works already subject to copyright protection, the court examined that aspect first.[137.34c] It concluded that the installation lacked adequate fixation and was therefore unprotected under the statute.[137.34d] At that point, it became unnecessary to address the topic of visual rights, but the court decided anyway to add "a few words of caution about … the issue of VARA and site-specific art."[137.34e]

After reviewing the First Circuit's *Phillips* resolution described above, the opinion questioned that interpretation. It noted first that the statute is silent whether the protection for "works of visual art" extends to site-specific art.[137.34f]

> Second, *Phillips*'s all-or-nothing approach to site-specific art may be unwarranted. Site-specific art is not necessarily destroyed if moved; modified, yes, but not always utterly destroyed. Moreover, some of VARA's protections are unaffected by the public-presentation exception. An artist's right of integrity can be violated in ways that do not implicate the work's location or manner of public presentation; site-specific art—like any other type of art—can be defaced and damaged in ways that do not relate to its public display. And the public-presentation exception does nothing to limit the right of attribution, which prevents an artist's name from being misappropriated.[137.34g]

Finally, it deemed the exception for buildings[137.34h] inapplicable on the facts presented.[137.34i] In the posture of the case, though, those general observations were expressly "not dispositive" so the court did "not decide whether VARA is inapplicable to site-specific art."[137.34j]

---

and Conceptual Art and VARA, 12 Vand. J. Ent. & Tech. L. 209 (2010). It also notes the case of the plumber/artist whose sculpture of plumbing fixtures and scrap wiring generated VARA litigation "when the 'junk' was removed." Id. at 601 & n.9, citing Note, *The "Recognized Stature" Standard in the Visual Artists Rights Act*, 68 Fordham L. Rev. 1935 (2000).

[111.4] Scott v. Dixon, 309 F. Supp. 2d 395, 400 (E.D.N.Y. 2004); Pollara v. Seymour, 150 F. Supp. 2d 393, 397 n.8 (N.D.N.Y. 2001).

[111.5] 150 F. Supp. 2d at 397.

[111.6] The court declined to carve out an exception that would allow destruction of works illegally placed on premises. Id. at 396 n.4. It also refused to accord defendants qualified immunity, given plaintiff's allegation that they acted willfully in destroying the mural. Id. at 398–399.

[111.7] Id. at 396 n.7.

[111.8] Pollara v. Seymour, 206 F. Supp. 2d 333 (N.D.N.Y. 2002).

[111.9] Id. at 336.

[111.10] Id. at 337. Alternatively, the court dismissed the work as "promotional" and therefore outside the scope of VARA's protection. Id. at 337. See § 8D.06[A][1] *supra*. The Second Circuit affirmed. 344 F.3d 265 (2d Cir. 2003). The concurrence would hold that "a work that has never been exhibited cannot, as a matter of law, be a work of recognized stature." Id. at 271 (Gleeson, J., concurring).

[111.11] Scott v. Dixon, 309 F. Supp. 2d 395, 396–397 (E.D.N.Y. 2004).

**[5] Unfinished Installation.**

The Massachusetts Museum of Contemporary Art undertook, at its own expense, to construct "Training Ground for Democracy," an installation the size of a football field, conceptualized by Swiss artist Christoph Büchel—but gave up when the artist compounded his vague directions with unreasonable financial and logistical demands.[137.35] Of course, from the artist's point of view, the museum was compromising his integrity through failing to follow his instructions,[137.36] and then violating his rights by allowing visitors to the museum to pass by his work, in its uncompleted state (about 80% finished) covered by tarpaulins, which failed to obscure it completely.[137.37] The district court denied that the statute afforded any relief to the unfinished work at issue in the litigation:

> When an artist makes a decision to begin work on a piece of art and handles the process of creation long-distance via e-mail, using someone else's property, someone else's materials, someone else's money, someone else's staff, and, to a significant extent, someone else's suggestions regarding the details of fabrication—with no enforceable written or oral contract defining the parties' relationship—and that artist becomes unhappy part-way through the project and abandons it, then nothing in the Visual Artists Rights Act or elsewhere in the Copyright Act gives that artist the right to dictate what that "someone else" does with what he has left behind, so long as the remnant is not explicitly labeled as the artist's work. No right of artistic "attribution" or "integrity," as those terms are conceived by VARA, is implicated, let alone violated in these circumstances.[137.38]

But the First Circuit reversed.[137.39]

At the outset, the panel characterized the facts under review as "the ultimate how-not-to guide in the complicated world of installation art."[137.40] Unlike the district court, the appellate court believed that factual questions precluded summary judgment. If completed, "Training Ground for Democracy" would have been a sculptural work eligible for protection under the Visual Artists Rights Act of 1990.[137.41] The question

---

111.12 *Id. at 398*.

111.13 *Id. at 398–399*.

111.14 Twelve-foot hedges made the contents of the back yard invisible from the public street. *Id. at 397*.

111.15 *Id. at 400*. "When determining whether a work of art is of recognized stature under VARA, it is not enough that works of art authored by the plaintiff, other than the work sought to be protected, have achieved such stature. Instead, it is the artwork that is the subject of the litigation that must have acquired this stature." *Id*.

111.16 *Flack v. Friends of Queen Catherine Inc., 139 F. Supp. 2d 526, 534 (S.D.N.Y. 2001)*.

111.17 "Those who harbor individual-autonomy-oriented views of the ***First Amendment*** will have a more difficult time countenancing restrictions on property destruction that may have expressive consequences. From an individual rights perspective, it is difficult to see why Lady Churchill's right to destroy a portrait she and her husband detest shouldn't be given as much protection as the artist's right to have his portrait preserved." Lior Jacob Strahilevitz, *The Right to Destroy*, *114 Yale L.J. 781, 829 (2005)* (footnote omitted).

111.18 Under the mental state envisioned by the bill in its House version, the destruction right was triggered by an intentional or negligent act, which had to be directed at the artwork. Thus, a fire caused to collect insurance on the artwork would have been actionable, whereas a fire caused by forgetting to turn off the coffee pot would not have been. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 16 (1990). That peculiar feature did not survive to enactment.

111.19 *Cohen v. G & M Realty L.P., 988 F. Supp. 2d 212, 214 (E.D.N.Y. 2013)*.

111.20 This opinion followed the two-tiered standard set forth in the lower court opinion in *Carter v. Helmsley-Spear* (which was cited above):

remained whether, even in its unfinished state, it so qualified. Given that the 1990 amendment forms part of the larger Copyright Act, the court looked to the general definition in the statute for when a work is "created," which in turn depends on fixation, and specifically provides that "where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time."[137.42] On that basis, the First Circuit concluded that the Visual Artists Rights Act protects fixed but unfinished works."[137.43]

The First Circuit conceded that a jury could indeed rule in the museum's favor.[137.44] But, on the record, it believed that factual issues remained based on which a jury could also rule the opposite.[137.45] Specifically, by continuing work on "Training Ground for Democracy" over Büchel's express objections, the museum may have violated his integrity right.[137.46]

In terms of the artist's alternative claim that the museum's display of the installation covered by tarpaulins also violated his integrity right, the First Circuit affirmed dismissal. Although the installation may have looked different with tarpaulins partially covering it, that display by itself cannot reasonably be deemed an intentional act of distortion or modification of the artistic creation.[137.47] Even if the museum was deliberately trying to communicate its anger with Büchel "by juxtaposing his unfinished work with the successful artistic collaborations depicted in its new exhibition," the court concluded that "a finding that the Museum's covering of the installation constituted an intentional act of distortion or modification of Büchel's artistic creation would stretch VARA beyond sensible boundaries."[137.48]

As a third alternative, Büchel maintained that the mere act of exhibiting "Training Ground for Democracy" in its unfinished state violated his integrity right. The district court had categorically rejected artist's rights for unfinished works; this argument attempted, in stark contrast, to clothe such works with absolute rights against their display. The First Circuit relied on the absence of a right of divulgation in the Visual Artists Rights Act of 1990 to reject this claim.[137.49] It ruled, instead, that any right an artist has to withhold display of his artwork must be found outside the bounds of this 1990 amendment.[137.50] Turning to copyright law

---

(1) the visual art in question has "stature," *i.e.* is viewed as meritorious, and

(2) this stature is "recognized" by art experts, other members of the artistic community, or by some cross-section of society.

*Id. at 217*, quoting *861 F. Supp. at 325*.

111.21 *988 F. Supp. 2d at 219*. Such was the site's celebrity that plaintiff Cohen

> personally conducted hundreds of school tours a year, which sold out months in advance, for students from as far as Canada. As he testified, there were also corporate and VIP tours; moreover, 5Pointz is listed in *Time Out New York* "as a New York must-see," and is in 150 tour guide books.

*Id.*

111.22 *Id. at 220*.

111.23 *Id. at 227* ("he always knew that the buildings were coming down"). That consideration moved the court to note: "In a very real sense, plaintiffs' have created their own hardships." *Id. at 227*.

111.24 "It's a major tourist attraction for Long Island City. *** [I]t's a drawing point for artists and art lovers to come from all over the world to see." *Id. at 223*.

111.25 *Id. at 221*. She did, however, concede that a given work could qualify if produced by the likes of "internationally recognized aerosol artist Banksy." *Id.*

111.26 *Id. at 226*.

111.27 No injunction was available in this case, as the artwork had been destroyed. *Id. at 226* ("the Court wished it had the power to preserve them"). See *8D.06[C][1][c] infra*.

proper,[137.51] the appellate court determined that contested issues of fact[137.52] precluded dismissal of Büchel's claim for traditional copyright infringement via violation of his display right.[137.53]

**[D] Exercise, Transfer, and Waiver**

The Visual Artists Rights Act of 1990 creates artists' rights that are personal rights, independent of traditional copyright. Thus, the artist may assert the attribution and integrity rights even after parting with copyright ownership.[138] In addition, the artists' rights differ in kind from the balance of economic rights belonging to copyright owners.[139] They are exempt[140] from the prerequisite of registration to file suit[141] and to recover statutory damages or attorneys' fees.[142] Criminal penalties are inapplicable to their violation.[143]

Most strikingly, it is only the artist of a work of visual art who may assert the Section 106A attribution and integrity rights in the work.[144] By contrast, any copyright proprietor of a given work—whether or not the work's author—may assert the reproduction and other rights in the work conferred by Section 106. In fact, after the author parts with copyright ownership, the proprietor may sue the author for violation of the Section 106 rights in the work.[145] By contrast, the Section 106A artists' rights are inalienable.[146]

Though not subject to transfer, artists' rights may be waived.[147] Popular lore holds that artists who leave their garrets to peddle their wares in the harsh world of commerce can hope for no more than a few pennies, even (or especially) in exchange for a timeless *capolavoro.*[148] The fear therefore arises that, by allowing artists to waive their artists' rights, business reality will reduce those rights to the vanishing point. Though cognizant of that "imbalance in the economic bargaining power of the parties"[149] and the concomitant threat that the pressure towards "routine waivers of the rights will eviscerate the law,"[150] Congress nonetheless chose to make artists' rights waivable.[151] In reaching that result, Congress considered paramount the interests of preserving "normal commercial practices."[152] Congress believed that even under a scheme that prohibited waivers *de jure,* waivers would still occur *de facto,* and that better protection is afforded to artists "under a regime requiring specificity of waivers than under one where an ideologically pure no-waiver law is rarely in fact observed."[153]

---

[111.28] 988 F. Supp. 2d at 226–27 ("paintings generally are meant to be sold").

[111.29] See N. 111.1 *supra*.

[111.30] 988 F. Supp. 2d at 227.

[111.31] After praising the City Planning Commission for "requiring 3,300 square feet of the exterior of the new buildings to be made available for art," the opinion ended:

> Defendants can do even more. They can make much more space available, and give written permission to Cohen to continue to be the curator so that he may establish a large, permanent home for quality work by him and his acclaimed aerosol artists. For sure, the Court would look kindly on such largesse when it might be required to consider the issue of monetary damages; and 5Pointz, as reincarnated, would live.

Id. at 227.

[111.32] See § 8D.06[C][1][a]–[b] *supra*.

[112] 17 U.S.C. § 106A(a)(3)(A).

[112.1] One court remarks that statutory damages in this context are equitable in nature, and therefore outside the Supreme Court's ruling, see § 14.04[C][2] *infra*, that the amount of statutory damages be tried to a jury. See Pollara v. Seymour, 150 F. Supp. 2d 393, 399 n.10 (N.D.N.Y. 2001). Given that the subject footnote proceeded in conclusory fashion regarding an issue raised by neither party, it scarcely seems definitive.

[112.2] Massachusetts Museum of Contemporary Art Found., Inc. v. Büchel, 593 F.3d 38, 53 (1st Cir. 2010) (Treatise quoted). That opinion rejects one commentator's assertion that intentional distortions are actionable even without proof of harm to the artist's honor or reputation. Id. at 54 n.15.

Despite that capitulation to business realities over "the best recognition of moral rights [that] would countenance no waivers,"[154] to avoid (or at least monitor) such potential evisceration, the Visual Artists Rights Act of 1990 directs the Register of Copyrights to conduct a study[155] on the extent to which these artists' rights are waived and to report the results to Congress within five years.[156]

To be effective, a waiver must be reflected in a written instrument signed by the artist, expressly agreeing to the waiver, and specifically identifying the work and uses of the work to which the waiver applies.[157] These requirements should be strictly construed.[157.1] Of course, the waiver is inapplicable to works outside or uses exceeding its scope.[158] Amplifying that provision, the legislative history states that the law "does not permit blanket waivers."[159] The legislative history further postulates that "a waiver applies only to the specific person to whom waiver is made."[160] That prohibition on transfer of waivers presumably flows from the inalienability of artists' rights—it is arguable that the recipient of a waiver, by subsequently conveying it to another, has engaged in a prohibited "transfer." Nonetheless, in a different posture, the legislative history approves transfer of a waiver *vis-à-vis* a certain structure.[161]

In some other ways, artists' rights and copyright fall into the same framework.[162] Both copyright and artists' rights are subject to a fair use defense.[163] Both are subject to the full scope of remedies,[164] including monetary damages[165] and injunctive relief.[166] Artists' rights may be asserted independently of ownership of the physical embodiment of the work,[167] like copyright.[168] Of course, transfer of copyright ownership or of physical ownership does not constitute a waiver of artists' rights.[169]

Conversely, to the extent a waiver is executed, it does not transfer copyright ownership or physical ownership "[e]xcept as may otherwise be agreed by the author in a written instrument signed by the author."[170] That language could be interpreted to mean that the only way an artist can part with physical ownership of, for instance, a sculpture that qualifies as a "work of visual art" is through a signed written instrument. When combined with the pre-emptive force of the Visual Artists Rights Act of 1990, the implication would be that a state law permitting oral transfers of statuary is inapplicable to this hypothetical fact pattern.[171] Such an unanticipated result would be unfortunate.[171.1]

---

113 *17 U.S.C. § 106A(a)(3)(B)*.

114 As noted above, the provisions for redressing attribution violations are far more ambiguous. See *§ 8D.06[B][1] supra*.

114.1 "Though no case has as yet interpreted [the statute], the clear language limits recovery for destruction of visual arts to intentional or grossly negligent destruction." *Lubner v. City of Los Angeles, 45 Cal. App. 4th 525, 531, 53 Cal. Rptr. 2d 24 (1996)*.

114.2 Note also the ruling, under the Federal Tort Claims Act, denying relief for extraterritorial destruction of an artwork. *Leonardo v. United States, 55 Fed. Cl. 344, 354 (2003)*. See *§ 12.01[E][1] infra*.

115 *17 U.S.C. § 106A(c)(1)*.

116 *Id.,* referring to *17 U.S.C. § 106A(a)(3)(A)*. Under the original House bill, such activities would still have been actionable if the product of gross negligence. 136 Cong. Rec. H13314 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier).

117 *17 U.S.C. § 106A(a)(3)(B)*.

118 The original House bill did not differentiate between public and private presentations. 136 Cong. Rec. H13314 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier).

118.1 For a decision construing the public presentation requirement in the context of site-specific art, see *§ 8D.06[C][4] infra*.

119 ***17 U.S.C. § 106(c)(2)***. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 17 (1990). The presentation exception extends to "a Canadian shopping center that temporarily bedecked a sculpture of geese in flight with ribbons at Christmas time." *Id.* at 17.

120 ***17 U.S.C. § 106(c)(2)***.

Also, like traditional copyright ownership,[172] the authors of a joint work of visual art are co-owners of the rights in the work.[173] Therefore, a valid waiver of rights by one joint author waives the applicable rights for all authors.[174] It makes limited sense to apply this provision to waivers of the integrity right—if co-artists *F*, *G* and *H* create a mural, and *F*[175] consents to a specified modification, that waiver is rendered a nullity if *G* or *H* can file suit for the very same modification.[176] But it makes little sense to apply this provision to waivers of the attribution right—even if *F* waives the right to be identified as the mural's creator, that is no reason to omit credit for *G* and *H*.[177] Nonetheless, both the language and intent of the statute extend such waivers to the attribution right.[178]

### [E] Commencement and Duration

The Visual Artists Rights Act of 1990, enacted on December 1, 1990, became effective on June 1, 1991.[179] The six-month delay was designed to provide adequate notice to those in possession of covered artworks of the newly created artists' rights.[180] The law applies to works created on or after that date[181] and also to eligible works created previously but "title[181.1] to which has not, as of such effective date, been transferred from the author."[182] What if 200 copies of a limited edition artwork were created, five of which were sold before June 1, 1991 and the balance of which remained with the artist as of that date? Any solution to this unaddressed problem will pose unsatisfactory anomalies, involving either problems of proof, or disparate treatment of seemingly identical artworks, or both. Given the link between the Visual Artists Rights Act of 1990 and physical artifacts, probably the best that can be posited is that the protection of the law should apply to the 195 retained copies and not to the five copies that were sold.[183]

Because the Visual Artists Rights Act of 1990 applies to some works created prior to its enactment, the question arises how to treat antecedent violations of artists' rights. The law specifically exempts from its application any violation of the integrity right that occurred before its effective date.[184] Strangely, however, it leaves unaddressed how to treat previous attribution violations, creating a negative pregnant that Congress

---

[120.1] *Hunter v. Squirrel Hill Assocs., L.P., 413 F. Supp. 2d 517, 519–520 (E.D. Pa. 2005)*. In that case, plaintiff's wall mural was damaged by roof work, in which defendant failed to remove drain covers or to properly seal the seams, even after plaintiff's warning from a view of initial damage. *Id. at 518*. But the jury was not called upon to determine whether those facts constituted gross negligence, inasmuch as plaintiff's delay in filing suit for over three years occasioned dismissal under the statute of limitations. *Id. at 520–521*. See *§ 12.05* *infra*.

[120.2] See *Flack v. Friends of Queen Catherine Inc., 139 F. Supp. 2d 526, 535 (S.D.N.Y. 2001)*. Sculptor Audrey Flack complained that, after her clay mock-up had been damaged, her assistant was hired to repair it. The court rebuffed her efforts to claim destruction of her artwork (it was only damaged) or the casting of a bronze without her permission (there is no such right). But as to the instant claim, even though the court agreed that the conservation exception applied, it had to deny the motion to dismiss because of the allegation of gross negligence. *Id*.

[121] *17 U.S.C. § 106A(c)(3)*. See *§ 8D.06[B][2]* *supra*.

[122] ***17 U.S.C. § 113(d)***. This provision is drawn from the similar provisions of California law. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 19 (1990). See *§ 8D.07[B]* *infra*.

[123] Under the Architectural Works Copyright Protection Act, the right to destroy a building, as contrasted with an artwork in the building, is reserved to the owner of the physical structure, not the owner of the structure's copyright. See *§ 2A.09[B][4][b]* *supra.*

[124] ***17 U.S.C. § 113(d)(1)(A)***. *Carter v. Helmsley-Spear, Inc., 852 F. Supp. 228, 235 (S.D.N.Y. 1994)*, held that disassembly of a sculptural installation from a lobby would cause the interrelationship of the parts to lose their coherence, thereby "destroying the work." For that purpose, the court held that the various separate pieces combined to form "a single work of art whose elements are interrelated." *861 F. Supp. 303, 314 (S.D.N.Y. 1994)*. Though sustaining the "finding of singleness … based on determinations of witness credibility as well as the district court's own inspection of the artwork," the Second Circuit reversed on appeal. *71 F.3d 77, 84 (2d Cir. 1995)*, *cert. denied*, ***517 U.S. 1208, 116 S. Ct. 1834, 134 L. Ed. 2d 930 (1996)***. See *Pavia v. 1120 Ave. of the Americas Assocs., 901 F. Supp. 620, 628 (S.D.N.Y. 1995)* (four related bronzes can qualify as "a single piece").

[125] ***17 U.S.C. § 113(d)(1)(B)***.

intended such violations to be actionable. Nonetheless, given the general doctrine that copyright statutes do not apply retroactively,[185] it would seem that those too are nonactionable, notwithstanding Congress' bizarre drafting in failing to address that category.[186]

Under the original House bill, the duration for artists' rights in both pre-existing and newly created works was to be (consistent with the Berne Convention)[187] equivalent to the duration of economic rights.[188] As enacted, too, for works of visual art created before June 1, 1991, but title to which was retained by the artist, the Section 106A artists' rights in such works (both as contemplated by the House and as enacted by the full Congress) last for as long as the Section 106 copyright in the work.[189] By contrast, as to works of visual art created on or after that date, the law as enacted embodies changes to the original bill, via language inserted by the Senate.[190] The attribution and integrity rights for those works last not for a set term of years[190.1] following the author's death,[191] as do economic rights,[192] but instead endure "for a term consisting of the life of the author."[193]

The result of this further bizarre drafting is that Congress failed to accomplish its goal of establishing a "uniform federal law."[194] Instead, it created two different measures of the federal term, depending on when in an artist's career a given piece is executed—whether before or during the pendency of VARA. The copyright term applicable to a qualifying painting created in 1980, whose artist died in 2000, will last until 2070;[195] that 1980 painting will therefore enjoy integrity and attribution rights for most of the current century.[196] By contrast, a 1992 painting by the same artist saw its artists' rights cease at the artist's death in 2000.[197] Therefore, pre-existing works may paradoxically achieve a far longer term of artists' rights protection than works created during the pendency of the Visual Artists Rights Act of 1990. No explanation other than sloppy draftsmanship presents itself for this state of affairs.[198]

It gets worse. As will be explained below, Congress decided not to pre-empt *post mortem* moral rights asserted under state law.[198.1] As a consequence, not only did Congress fail to establish "uniform federal law," it also spawned different federal terms followed by optional (and differing) state terms.[198.2] The result is a crazy quilt of

---

[126] ***17 U.S.C. § 113(d)(2)***. See H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 20 (1990).

[127] ***17 U.S.C. § 113(d)(2)(A)***. See *Leicester v. Warner Bros., 232 F.3d 1212, 1234–1235 (9th Cir. 2000)* (Fisher, J., dissenting).

[128] Because this is a mere presumption, other nonenumerated means presumably exist to discharge the obligation of "a diligent, good faith attempt." However, one who eschews the statutory presumption acts at the peril that a court of competent jurisdiction will later hold the actual attempt made to fall short of diligence and good faith.

[129] How long need the building owner thereafter wait before construing the artist's nonreply as failure to assert the artist's rights? Perhaps the 90-day standard set forth below should be imported here as well.

[130] ***17 U.S.C. § 113(d)(2)***. For these purposes, the Visual Artists Rights Act of 1990 creates a system of recordation. ***17 U.S.C. § 113(d)(3)***. See *§ 7.25 supra.*

[131] ***17 U.S.C. § 113(d)(2)(B)***.

[132] ***17 U.S.C. § 113(d)(2)***. In general, artists' rights are distinct from physical ownership. See *§ 8D.06[D] infra*.

[133] The Visual Artists Rights Act of 1990 became effective on that date. See *§ 8D.06[E] infra*.

[134] ***17 U.S.C. § 113(d)(1)(B)***. The purpose of this provision is to fully apprise the artist of the relevant circumstances. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 20 (1990).

[135] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 20 (1990). This construction stands in contrast to the House Report's general posture *vis-à-vis* transfers of waivers. See *§ 8D.06[D] infra*.

[136] ***17 U.S.C. § 113(d)(1)(B)***.

[137] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 20 (1990).

potential protection. Moreover, that is not all. Returning to the federal rights (such as the one in the 1980 painting), it remains unclear who can control them during the final 70 *post mortem* years. Under the original House bill noted above, which expressly contemplated application after the artist's death, *post mortem* artists' rights would "vest in the person to whom such rights pass by bequest of the author or by the applicable laws of intestate succession."[198.3] But after the Senate amendment, that provision was deleted. Accordingly, we are left with a statute that grants artists' rights to the author exclusively,[198.4] bars her from transferring them,[198.5] but also purports to recognize them after her lifetime. There is no straightforward method[198.6] of reconciling these aporias.[198.7]

As with traditional economic rights,[199] the artists' right term for a joint work endures for a term consisting of the life of the last surviving artist.[200] Also, like generally applicable copyright terms,[201] artists' rights protection for both joint and solitary works runs until the end of the calendar year in which it would otherwise expire.[202]

### [F] Exclusivity and Pre-emption

#### [1] Legal Provisions.

Starting June 1, 1991, the Visual Artists Rights Act of 1990 is the exclusive vehicle for asserting "all legal or equitable rights that are equivalent to any of the" attribution and integrity rights discussed above.[203] This exclusive impact is limited to "works of visual art to which the rights conferred by section 106A apply."[204] After that date, "no person is entitled to any such right or equivalent right in any work of visual art under the common law or statutes of any State."[205]

The foregoing pre-emption is subject to several limitations. First, causes of action that arise from undertakings commenced prior to June 1, 1991, are saved from pre-emption.[206] Second, activities violating legal or equitable rights that are *not* equivalent to the attribution and integrity rights discussed above are not pre-empted.[207] Third, inasmuch as the Visual Artists Rights Act of 1990 applies only to works of visual art,

---

137.1 *Carter v. Helmsley-Spear, Inc., 852 F. Supp. 228 (S.D.N.Y. 1994), later opinion, 861 F. Supp. 303 (S.D.N.Y. 1994)*.

137.2 Because a written waiver by the artist would allow removal of the subject artwork, the court rejected a constitutional challenge to the amendment under the ***Takings Clause***. *Id. at 237*; *later opinion*, *861 F. Supp. 303, 326–328 (S.D.N.Y. 1994)*.

137.3 *Carter v. Helmsley-Spear, Inc., 861 F. Supp. 303, 329 (S.D.N.Y. 1994)*. *Accord* *Flack v. Friends of Queen Catherine Inc., 139 F. Supp. 2d 526, 535 (S.D.N.Y. 2001)*.

137.4 See *§ 8D.06[A][1] supra*.

137.5 *71 F.3d 77 (2d Cir. 1995)*, *cert. denied*, ***517 U.S. 1208116 S. Ct. 1824, 134 L. Ed. 2d 930 (1996)***. See *Pavia v. 1120 Ave. of the Americas Assocs., 901 F. Supp. 620 (S.D.N.Y. 1995)* (VARA inapplicable).

137.6 As of a decade after its enactment, the only solid candidate is *Martin v. City of Indianapolis, 192 F.3d 608 (7th Cir. 1999)*.

137.7 *288 F. Supp. 2d 89 (D. Mass. 2003)*.

137.8 *Id. at 94*.

137.9 *Id. at 95*. Plaintiff's art expert testified,

> Beginning at least with the last third of the 20th century, and continuing through the present, the notion of sculpture has undergone a radical redefinition. In essence, sculpture has come off its pedestal, functioning in the space in and around its site, and playing an integral role in defining that space.

*Id*.

137.10 *Id. at 95*.

rights inhering in other copyrightable items also remain unaffected. Finally, "activities violating legal or equitable rights which extend beyond the life of the author" are not pre-empted.[208] That nonpre-emption of state *post mortem* moral rights entitlements avoids an issue of Berne Convention incompatibility.[209]

In the first published decision to confront these issues, the court's literal application of the above language produced an unanticipated result.[209.1] The plaintiff complained of the disassembly in 1988 of his large, four-part bronze sculpture.[209.2] Because the alleged mutilation of his art[209.3] took place long before enactment of the federal amendment, but its display continued well past June 1, 1991, the court confronted the question of first impression—does a mutilation "occur"[209.4] once or is it a continuous occurrence "as long as the altered piece is displayed."[209.5] Given Congressional solicitude not to render past conduct retroactively infringing, the court adopted the former construction, holding the subject conduct nonactionable under the Visual Artists Rights Act of 1990.[209.6]

That ruling threatened to set the artist's rights backwards,[209.7] given that the federal enactment canceled antecedent rights under the New York statute.[209.8] Although the savings clause quoted above leaves pre–1991 causes of action unpre-empted, New York's own statute of limitations foreclosed plaintiff from relief for those activities.[209.9] Specifically, New York law limited plaintiff to relief for conduct that occurred after 1992, by which time federal law pre-empted state relief. Nonetheless, the court focused on the exact language of the federal statute, which pre-empts "any cause of action from undertakings commenced before the effective date" of June 1, 1991.[209.10] The display of the mutilated sculpture was an undertaking that commenced in 1988. Further, unlike the gloss on the federal statute reached above, the New York statute forbids "display in a place accessible to the public," thus apparently giving rise to a continuous occurrence tort.[209.11] Under the highly unusual facts presented, the court therefore allowed the state, but not the federal, cause of action to go forward.[209.12]

**[2] Unanswered Questions.**

---

137.11 *Id. at 99*. Many elements of the park owed their origins to people other than plaintiff, including a renowned landscape architect. "Substantial areas of the Park are unrelated to Phillips' sculpture and not integrated with it (for example, the area adjacent to the pergola or the area near the office building)." *Id*.

137.12 *Id. at 98*.

137.13 See *§ 8D.09* *infra*.

137.14 *17 U.S.C. § 106A(c)(2)*. See *§ 8D.06[C][2]* *supra*. The court rejected application of the separate provision of VARA applicable to removal of artworks from buildings, inasmuch as the instant provision was more on-point. *288 F. Supp. 2d at 100*. See *§ 8D.06[C][3]* *supra*.

137.15 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 12 (1990).

137.16 *288 F. Supp. 2d at 100*. "Despite 'le droit moral,' Congress adhered to 'chacun a son gout' (each one to his taste) by declining to require the public presentation of art." *Id*. For more on Serra, see *§ 8D.02[D][1]* N. 52 *supra*.

137.17 *288 F. Supp. 2d at 100*.

137.18 *Id. at 102*.

137.19 An issue not addressed in the case was federal pre-emption of state rights comparable to those accorded by VARA. See *§ 8D.06[F][1]* *supra*. Instead, defendant's sole constitutional challenge appears to have been under the ***First Amendment***. See *288 F. Supp. 2d at 103–104*.

137.20 As set forth in the previous footnote, the courts failed to grapple with the question of federal pre-emption. It would seem that, regardless of how Massachusetts defined the contours of MAPA, no relief could be granted thereunder to Phillips during his lifetime. See *§ 8D.06[F][1]* *supra*.

A host of questions arises in response to the foregoing provisions. First, assuming that an artwork is produced in 201 copies, or in 200 copies signed by the author but with a few missing the requisite numbering, that work does not qualify as a "work of visual art."[210] Does this anomaly imply that rights in such work are not pre-empted? On the one hand, the language of the statute limits pre-emption to "works of visual art to which the rights conferred by section 106A apply." Given that the hypothetical painting does not fall within the definition of "work of visual art," it is outside the plain meaning of the statute. Yet a policy argument could be constructed for the opposite conclusion, as it would be ironic for such unqualifying works to claim possibly greater remedies under state law than qualifying works receive under the Visual Artists Rights Act of 1990 itself. Accepting that argument, a gloss could be placed on the statute[211] that all "pictorial, graphic, or sculptural works,"[212] or all "artworks" in the lay sense, are subject to pre-emption. On the other hand, the legislative history disfavors such a gloss, applying the definition mechanically: "[T]he new Federal law will not preempt State causes of action relating to works that are not covered by the law, such as … *photographs produced for non-exhibition purposes … .*"[213]

Second, does this exclusive thrust extend to other federal laws, or is it limited, as is pre-emption in the general copyright sphere, to invalidating state laws?[214] The statute provides explicitly that any and all rights that are equivalent to those conferred under Section 106A "are governed exclusively by section 106A and section 113(d) and *the provisions of this title* relating to such sections."[215] It would seem to follow from the emphasized words that, in the realm of works of visual art, rights in the nature of attribution and integrity must be vindicated under the Copyright Act or not at all. Yet the very next sentence in the statute extends pre-emption only to "the common law or statutes *of any state.*"[216] Congress' failure to contemplate the impact of the Visual Artists Rights Act of 1990 upon other federal laws again precludes any neat solution.[217] If the first sentence is followed literally, general provisions relating to attribution and integrity rights in copyrightable works, even if rooted in the Lanham Act or other provisions of federal law, may not be invoked for artworks.[218] Given the very circumscribed nature of the rights conferred by the Visual Artists

---

137.21 *Phillips v. Pembroke Real Estate, Inc., 443 Mass. 110, 819 N.E.2d 579 (2004)*. An interlocutory appeal from the federal action was stayed pending resolution of the certified question. *819 N.E.2d at 582*.

137.22 The Court began by noting that the term was used as a "catchall phrase" with different meanings.

> In some works of site-specific art, the landscape provides the context necessary to give full meaning to otherwise free-standing crafted objects. In other works, such as "earthworks," the artwork is completely inextricable from its site because it is literally made from and imbedded in nature. The facts of this case present the former and not the latter type of site-specific art.

*Id. at 580* (internal quotation marks and footnote omitted).

137.23 *Id. at 581*.

137.24 *Id. at 581*.

137.25 *Id. at 583* ("'radical redefinition' of sculpture").

137.26 *Id. at 583*.

137.27 *Id. at 584*. Cf. *§ 8.06[C][3] supra* (comparable feature embodied into VARA).

137.28 *Id. at 584–585* (internal quotation marks and footnote omitted).

137.29 *Id. at 586*.

137.30 *Id. at 586*. The Court was likewise unimpressed with the drafting differences between MAPA, on the one hand, and VARA and the comparable California law, on the other. See *id. at 586 n.13*.

Rights Act of 1990, that construction could well represent a backwards step for the protection of artists' rights, and should therefore be disfavored.[219]

Third, what rights are *equivalent* to the artists' rights of integrity and attribution? Presumably, the right to prevent others from wrongfully challenging authorship is sufficiently far afield from the attribution artists' rights conferred—namely to claim authorship, to prevent false listing of authorship, or to prevent use of a name as an author of a distorted version[220]—that no pre-emption would lie for that cause of action.[221] What about a state attribution right that gives an author the right to claim not only authorship but also a listing of honorific titles and academic distinctions? Or a state integrity right that prohibits modifications even when not prejudicial to the artist's honor or reputation?[222] A score of variants could be posed, the answers to all of which must await development of case law based on the spare statutory language. Construction of this provision should presumably follow the general jurisprudence of copyright pre-emption.[223]

Fourth, given the savings clause for activities beyond the life of the author, and given that some rights conferred under the Visual Artists Rights Act of 1990 outlast the author's life, are rights during such time period cumulative?[224] Returning to the hypothetical 1980 painting to which the artist retained title, both its copyright and its artists' rights protection last until 2050.[225] State law protection equivalent to the artists' rights is pre-empted during the artist's lifetime. But following the artist's death in 2000, that pre-emption ceases. The result is that from 2000 until 2050, the same work is subject to protection under the Visual Artists Rights Act, under other federal laws such as the Lanham Act, and under applicable state law, such as the California Art Preservation Act.[226] Given that Congress failed to specify who owns the *post mortem* right, the possibility presents itself that conflicting claimants will assert rights under federal law and under the laws of several states.[227]

---

[137.31] *Phillips v. Pembroke Real Estate, Inc., 459 F.3d 128 (1st Cir. 2006)*.

[137.32] *Id. at 140* (footnote omitted).

[137.33] *Id. at 142*.

[137.34] *Id. at 143*.

[137.34a] *Kelley v. Chicago Park Dist., 635 F.3d 290, 291 (7th Cir. 2011)*.

[137.34b] *Id. at 291*.

[137.34c] See *§ 8D.06[A][1] supra*.

[137.34d] *635 F.3d at 302–06*. The court called this aspect "novel and test[ing] the boundaries of copyright law." *Id. at 291*. For a discussion of those aspects of the case, see *§§ 2.03[B]*, *2A.05[A] supra*.

[137.34e] *635 F.3d at 306*.

[137.34f] *Id. at 306*.

[137.34g] *Id. at 307*.

[137.34h] See *§ 8D.06[C][3] supra*.

[137.34i] *635 F.3d at 307*. Defendant in the case argued that the building exception did apply "because the garden is located on top of the Monroe Street parking garage and accommodates the air vents that provide ventilation to the garage below." *Id. at 307 n.8*. The opinion criticized that position as "something of a reach." *Id.* ("Wildflower Works is not 'incorporated into or 'made part of' the parking garage; it is situated on top of it.").

[137.34j] *Id. at 307*.

### [3] A Giant Step Backwards?

#### *[a] Retreat from State Artists' Rights Statutes.*

During deliberations of the Visual Artists Rights Act of 1990, an artist complained that his artwork, directing attention to the AIDS epidemic, was the subject of selective reproduction into a pamphlet attacking NEA funding of artworks.[228] The pamphlet "copied fourteen fragments of plaintiff's work which [defendant] believed most offensive to the public" because of their explicit sexual nature.[229] The artist prevailed under the New York Artists' Authorship Rights Act.[230] In so ruling, the court rejected defendant's argument that his offensive cropping left plaintiff's original artifact undisturbed.

> To the contrary, because the intent of the bill was to protect not only the integrity of the artwork, but the reputation of the artist, the spirit of the [New York] statute is best served by prohibiting the attribution to an artist of a published or publicly displayed altered reproduction of his original artwork. * * * In fact, the mass mailing of an altered photographic reproduction is likely to reach a far greater audience and cause greater harm to the artist than the display of an altered original, which may reach only a limited audience.[231]

That logic is compelling, as is the court's conclusion that "[t]o hold otherwise would eviscerate any protection under the Statute … since someone wanting to alter his work could simply copy from the catalogue rather than the original work."[232]

Despite being compelling, that logic may also now be irrelevant. For pre-emption of the New York law means that the artist may now file suit solely under the 1990 federal law, under which he will be denied any relief by virtue of his original artifact remaining undisturbed. This actual case neatly demonstrates the harm to artists from the Visual Artists Rights Act of 1990.[233]

---

[137.35] *Massachusetts Museum of Contemporary Art Found., Inc. v. Büchel, 565 F. Supp. 2d 245, 246–247 (D. Mass. 2008)*. Before shutting down the exhibition, the museum expended $300,000 on materials and labor. *Id. at 254*.

[137.36] The artist's Swiss nationality detracted not a whit from his Anglo-Saxon imperatives, expressed via email to the museum staff. In them, he complained about "playing the bitch … because of all the fuck ups and delays," adding "I really don't need more shit spilled on me." *Id. at 252*.

[137.37] *Id. at 247*. The district court initially allowed the museum to exhibit the partially completed installation with a posted disclaimer, not mentioning Büchel's name but subject to his input. *Id. at 248*. But the museum decided to dismantle it instead. *Id*.

[137.38] *Id. at 248*. The district court commented that Congress failed to include within VARA the type of divulgation right accorded by France, Germany, and Italy. *Id. at 257*. For the First Circuit's thoughts on this topic, see text accompanying N. 137.49 *infra*.

[137.39] *593 F.3d 38 (1st Cir. 2010)*.

[137.40] *Id. at 41*, quoting *Boston Globe* article.

[137.41] *Id. at 48 n.7*.

[137.42] *Id. at 51*, quoting ***17 U.S.C. § 101***.

[137.43] *593 F.3d at 51*. That logic validates protecting a work that has been completed enough to itself show sufficient originality to qualify for copyright protection. Let us imagine a block of marble destined to be carved into a *pietà*. Even if the production is unfinished as a whole, if the grieving mother has been fully sculpted and herself would be subject to copyright protection, then it makes sense for VARA's rights to attach.

But the language of the opinion could be read far more expansively: VARA "must be read to protect unfinished, but 'fixed,' works of art that, *if completed*, would qualify for protection under the statute." *Id. at 51* (emphasis added). Taken literally, if a sculptor has only chipped one indentation into the chunk of marble eventually intended to be carved into a full *pietà*, it is still something

***[b] Collateral Effects.***

Long before passage of the Visual Artists Rights Act of 1990, a seller of portable toilets used the slogan "Here's Johnny," advertising its product as "The World's Foremost Commodian." Comedian Johnny Carson readily prevailed against that company for breaching his right of publicity.[234] Had the company instead emblazoned its trucks with the slogan "Our Johns Are Art" together with a grossly cropped painting by Jasper Johns, that artist, presumably, would have similarly prevailed.[235]

Given Congress' bolstering of visual artists' rights through its elaborate 1990 amendment, Mr. Johns should be armed with additional causes of action against the putative potty purveyor: His full name is omitted from the reproduction; the painting, recognizably Johns' own, has been distorted through cropping; it is also being displayed in a grossly unsavory context, prejudicial to the reputation of a fine artist. If any utilization should be unambiguously actionable under the Visual Artists Rights Act of 1990, this should be it.[236] But it is not. For the original artifact mimicked on the toilet truck may still stand undisturbed on display at the National Gallery. Although that original painting qualifies as a work of visual art, which at its *situs* in Washington demands appropriate attribution and freedom from distortion, the image on the truck is both "applied art" and "advertising," hence doubly outside the scope of protection.[237]

In this outrageous hypothetical,[238] therefore, the 1990 amendment furnishes no benefit, remitting Mr. Johns to his relief under previous law.[239] Turning to that right of publicity action under state law, Mr. Johns may confront a pre-emption defense by virtue of the 1990 amendment. As previously noted, the Visual Artists Rights Act of 1990 has become the exclusive vehicle to vindicate "all legal or equitable rights that are equivalent to any of the rights conferred by section 106A with respect to works of visual art to which the rights conferred by section 106A apply … ."[240] In some gross sense, a right of publicity action implicates a right akin to attribution, inasmuch as it is concerned with the right to use one's name and persona.[241] In addition, the subject cause of action arises over an artwork reproduction that is itself

---

that "*if completed*, would qualify for protection under the statute," meaning that it must be protected even in its current rudimentary stage, which itself would fail to qualify for copyright protection.

Such a result hardly seems intended by the greater thrust of the opinion; nor is that result required under the facts presented. Indeed, it is undercut by the later holding that "VARA protects the moral rights of artists who have 'created' works of art within the meaning of the Copyright Act even if those works are not yet completed." *Id. at 52*. The first sculptor has already created a work of art protected under copyright, the second has not yet done so. It would seem that the language of the holding governs, meaning that the earlier *dictum* (that is quoted above) should be disregarded.

137.44 *Id. at 57, 59*. One outside curator visited the "defaced" exhibition and pronounced it among the best works he had seen in recent years. *Id. at 60 n.21*.

137.45 *Id. at 59*. "The record permits the inference that, even during his time as an artist-in-residence at MASS MoCA, Museum staff members were disregarding his instructions and intentionally modifying 'Training Ground' in a manner that he did not approve." *Id. at 57*. Some email further evidenced the museum's knowledge that, by ignoring Büchel's input, it was taking the risk of falling afoul of his artist's rights:

> Pointing out that the show was advertised as a Büchel in the Museum's schedule, [one staffer] stated that when reviewers came, "the question will be 'what is it?' … and if it's reviewed as a Büchel we're in deep shit."

*Id. at 58*. One reviewer called the installation "Crap Under Wrap." *Id. at 60*.

137.46 *Id. at 60*. The panel was at pains to dispel the museum's parade of horribles from its ruling.

> The Museum warns that, under Büchel's interpretation, "no one other than the artist himself … may ever perform any work in fabricating visual art unless that specific task has been authorized by the artist." We disagree. Although the artist's vision must govern, that principle does not prevent collaboration at the implementation level so long as the artist's vision guides

immune from liability under the Visual Artists Rights Act of 1990. For both those reasons, a superficial reading of the statute could lead to pre-emption of Mr. Johns' previously cognizable claim.

Nonetheless, it is submitted that the pre-emption defense should be roundly rejected, notwithstanding the superficial argument summarized above.[242] The offending truck panel does not itself qualify as a work of visual art, notwithstanding that the original in the National Gallery on which it was based may so qualify. In addition, the right of publicity, although dealing with an individual's name like the attribution right, arises primarily to negate a commercial endorsement, and typically, has no nexus to any artwork (as illustrated by the Johnny Carson case on which Mr. Johns' hypothetical lawsuit would be predicated). The latter reason alone should suffice to reject the defense. No matter how inartfully drafted, the Visual Artists Rights Act of 1990 was designed to advance artists' rights, not to obliterate them.

If a court were actually to adopt an erroneous interpretation of pre-emption along the superficial lines sketched above, Mr. Johns would have suffered catastrophically. Hopefully, the courts will protect authors from Congress' drafting vagaries and that result will never occur.[243] Yet Congress' failure to address scenarios such as the above in unambiguous terms means that, at a minimum, Mr. Johns will be forced to shoulder the burden of negating a nonfrivolous pre-emption defense in the above hypothetical. To that extent, even if he ultimately prevails, his interests nonetheless will have suffered by virtue of enactment of the Visual Artists Rights Act of 1990. As such, the 1990 amendment, as played out in the above hypothetical, represents a step backwards for artists' rights.[244]

---

> that implementation. Here, Büchel alleges a campaign of intentional distortion and modification to his work which Museum personnel repeatedly ignored his express wishes. Our holding that the summary judgment record precludes an affirmance of the district court on this claim may serve as a cautionary tale to museums contemplating similar installations in the future—guiding them to document the terms of their relationship and obtain VARA waivers where necessary—but it does not prevent museums or other collaborators from working cooperatively with artists on such non-traditional artworks.

*Id. at 60–61*. On such waivers of artist's rights, see *§ 8D.06[D]* *infra*.

137.47 *593 F.3d at 61*. "To conclude otherwise would be to say that, even if all had gone well, the Museum would have been subject to a right-of-integrity claim if it had partially covered the work before its formal opening to prevent visitors from seeing it prematurely." *Id*.

137.48 *Id. at 61–62*. The right of integrity "protects the artist from distortions of his work, not from disparaging commentary about his behavior." *Id. at 62*.

137.49 *Id. at 62*. See *§ 8D.05[A]* *supra*.

137.50 *593 F.3d at 62*.

137.51 In addition to the display argument to be confronted momentarily, one paragraph of plaintiff's 52-page brief advanced his argument that the museum had violated his adaptation right. *Id. at 65*. See *§ 8.09* *supra*. Because the "law applicable to derivative work claims, particularly as it intersects with VARA's protection for works of visual art, is complex," the court determined Büchel's undeveloped argument on the subject to be so perfunctory as to waive the claim. *593 F.3d at 65* (citations omitted).

137.52 To prevail, Büchel would have to show that he owned the copyright to "Training Ground for Democracy," that the museum displayed it to the public without his authorization, see *§ 8.20[A]* *supra*, and that the museum was not the owner of the physical embodiment of the installation, see *§ 8.20[B]* *supra*. Viewing the evidence in the light most favorable to the artist, a reasonable jury may have ruled in Büchel's favor as to each issue. *593 F.3d at 63–64*.

137.53 *Id. at 64–65*.

138 *17 U.S.C. §§ 106A(a)*, *106A(e)(2)*.

139 See *§ 8D.06[A][2]* & N. 53 *supra*.

140 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 22 (1990) ("moral rights are particularly inapt subject matters for imposition of formalities").

141 *17 U.S.C. § 411(a)*. See *§ 7.16[B][1][a]* *supra.*

142 *17 U.S.C. § 412*. See *§ 7.16[C]* *supra.* Note that the Visual Artists Rights Act of 1990 effectuated these amendments to both Sections 411(a) and 412.

143 *17 U.S.C. § 506(f)*. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 22 (1990). See *§ 15.01* *infra.*

144 *17 U.S.C. § 106A(b)*.

145 *Fantasy, Inc. v. Fogerty, 654 F. Supp. 1129, 1132 (N.D. Cal. 1987)*. See *§§ 10.15[A][3]*, *12.02 infra*.

146 *17 U.S.C. § 106A(e)(1)* ("may not be transferred"). "[A]n assignment or transfer of these rights to third parties would be contrary to the personal nature of the rights …" H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 19 (1990).

147 *17 U.S.C. § 106A(e)(1)*. See Cotter, *Pragmatism, Economics, and the* Droit Moral, *76 N.C. L. Rev. 1 (1997)*.

148 *Fisher v. Witmark, 318 U.S. 643, 656 (1943)* ("so sorely pressed for funds that they are willing to sell their work for a mere pittance"); Merryman, *The Wrath of Robert Rauschenberg,* 40 J. Copr. Soc'y 241, 260 (1992). See *§ 9.02* *infra*. For a parallel point in the resale context, see *§ 8C.04[A][1]* N. 8 *supra*. For more development of this point, see § 20.05[F][1] *infra*.

149 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 22 (1990). In exceptional cases, the bargaining power may be reversed, and artists' interests may be able to secure extended protection for *droit moral*. See *Museum Boutique Intercontinental, Ltd. v. Picasso, 880 F. Supp. 153, 157, 168 (S.D.N.Y. 1995)*, *later proceeding*, *886 F. Supp. 1155 (S.D.N.Y. 1995)*.

150 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 18 (1990).

151 Note that the more general moral rights under the Berne Convention (which extend beyond the visual arts treated herein) do not require to the contrary. See *§ 8D.01[B]* *supra*.

152 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 18 (1990).

153 *Id.* The reasons for expecting *de facto* flouting of the law are not explored.

154 *Id.*

155 A previous study submitted to Congress shortly before enactment of the Visual Artists Rights Act of 1990 noted that the parallel California statute protecting works of fine art contains no waiver provision "because it was thought that waiver would

undercut the rights granted to artists under the statute." Register of Copyrights, *Technological Alterations to Motion Pictures* 97 (1989). See *§ 8D.07[A] infra*.

[156] Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, Sec. 608(a), ***104 Stat. 5089***. See H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 22 (1990). Concurrently, the Register of Copyrights is directed to study possible implementation of a federal *droit de suite* and to report the results to Congress within eighteen months. *Id.* Sec. 608(b). See *§ 8C.04[A][1] supra*.

[157] *17 U.S.C. § 106A(e)(1)*. See *§ 28.06 infra*.

[157.1] *Martin v. City of Indianapolis, 982 F. Supp. 625, 636 (S.D. Ind. 1997) (Treatise quoted)* (artist's agreement executed prior to passage of VARA authorizing its removal held not to apply to its destruction), *aff'd*, *192 F.3d 608 (7th Cir. 1999)*. The dissent on appeal warned that municipalities allowing the erection of sculptures must henceforth require advance waivers of artist's rights: "If not, once destroyed, art of questionable value may acquire a minimum worth of $20,000.00 under VARA." *Id. at 616* (Manion J., dissenting).

[158] *17 U.S.C. § 106A(e)(1)*. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 19 (1990).

[159] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 19 (1990).

[160] *Id. at 18–19*.

[161] See *§ 8D.06[C][3]* N. 135 *supra*.

[162] The Visual Artists Rights Act of 1990 specifically legislates that its enactment "does not authorize any governmental entity to take any action or enforce restrictions prohibited by the ***First Amendment to the United States Constitution***." Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, Sec. 609, ***104 Stat. 5089***. Though no comparable provision is found in the current Act, the *Supremacy Clause of the Constitution* imports the same result. See 136 Cong. Rec. H13313 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier). See *§ 19E.04* N. 1 *infra.*

[163] *17 U.S.C. § 106A(a)*. See *§ 13.05[H][5] infra.* Note that the Visual Artists Rights Act of 1990 amended the fair use provision of the current Act to refer explicitly to § 106A. See ***17 U.S.C. § 107***.

[164] See *Chap. 14 infra*.

[165] See *Martin v. City of Indianapolis, 4 F. Supp.2d 808 (S.D. Ind. 1998)* (maximum award of $20,000 for non-willful infringement), *28 F. Supp.2d 1098, 1102 (S.D. Ind. 1998)* (no special damage scheme applicable to VARA), *aff'd*, *192 F.3d 608 (7th Cir. 1999)*. On the questionable status of damages for attribution violations, see *§ 8D.06[B][1] supra*.

[166] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 22 (1990).

[167] *17 U.S.C. § 106A(e)(2)*.

[168] See *§ 10.09[A] infra.*

[169] *17 U.S.C. § 106A(e)(2)*.

[170] *17 U.S.C. § 106A(e)(2)*.

[171] See *§ 8D.06[F][1] infra*.

[171.1] Note that California law has been construed not to require a written agreement for sale of a sculpture. *Chamberlain v. Cocola Assoc., 958 F.2d 282 (9th Cir. 1992)*.

[172] See *§§ 6.09–6.10 supra*.

[173] *17 U.S.C. § 106A(b)*. See H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 17 (1990) (tenants in common).

[174] *17 U.S.C. § 106A(e)(1)*. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 7, 19 (1990).

[175] Of course, *F* must account to *G* and *H* for any compensation received. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 19 (1990). See *§ 6.12[B]* *supra.*

[176] Of course, it would have been possible to craft the law such that modification could occur only upon waiver by all three creators. Although that hypothetical approach would cause artists' rights to diverge from American copyright treatment of joint works in general, it would better harmonize with worldwide copyright schemes on the issue of joint works. See *§ 6.10[D]* *supra.*

[177] One commentator calls this scheme "the least attractive rule" from among the various options that Congress could have adopted. Karlen, *Joint Ownership of Moral Rights.* 38 J. Copr. Soc'y 242, 257 (1991). The visual artists rights laws of New Mexico and Massachusetts, by contrast, apparently grant moral rights to each individual artist. *Id.* at 249. See *§ 8D.10* *infra*.

[178] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 19 (1990).

[179] Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, Sec. 610(a), ***104 Stat. 5089*** (statute becomes effective six months after enactment).

[180] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 23 (1990).

[181] Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, Sec. 610(b)(2), ***104 Stat. 5089***.

[181.1] The reference to "title" was substituted in the Senate amendment; under the original House bill, the reference was to "copyright." 136 Cong. Rec. H13314 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier). Given that the artists' rights conveyed under the Visual Artists Rights Act of 1990 apply essentially to physical items, rather than conceptual categories, the change is well-taken. Cf. *id.* ("This amendment in fact avoids takings clause arguments, and in this respect is salutary."). See *§ 8D.06[A][2]* *supra.*

[182] Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, Sec. 610(b)(1), ***104 Stat. 5089***. See *Martin v. City of Indianapolis, 982 F. Supp. 625, 638 (S.D. Ind. 1997)* (sculpture prepared in 1987, but title retained by sculptor), *4 F. Supp.2d 808, 809 (S.D. Ind. 1998)* (contract identified plaintiff as "owner of the sculpture"), *aff'd on other grounds*, *192 F.3d 608 (7th Cir. 1999)*.

[183] See *§ 8D.06[A][2]* *supra*.

[184] Act of Dec. 1, 1990, ***Pub. L. No. 101-650***, Sec. 610(b)(2), ***104 Stat. 5089***. By the same token, the legislative history states that "acts that would otherwise violate the right of integrity but that occurred before the effective date will not give rise to a cause of action under the proposed law." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 23 (1990). See *Pavia v. 1120 Ave. of the Americas Assocs., 901 F. Supp. 620, 628 (S.D.N.Y. 1995)*.

[185] See Overview *supra.* See generally *§ 1.11* *supra.*

[186] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 18 n.46 (1990) ("The bill does not, however, apply to acts committed before the date of enactment.").

[187] See *§ 8D.01[B]* *supra*.

[188] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 18 (1990).

[189] *17 U.S.C. § 106A(d)(2)*. The statute specifies that the artists' rights in this instance "*shall be coextensive with,* and shall expire at the same time as, the rights conferred by section 106." *Id.* It is difficult to discern any meaning for the italicized phrase independent of expiration, referenced in the succeeding phrase.

[190] 136 Cong. Rec. H13314 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier).

[190.1] The term was 50 years p.m.a. when the Visual Artists Rights Act of 1990 was enacted. See *§ 9.08* *infra.* Later, the Sonny Bono Copyright Term Extension Act extended that term to 70 years p.m.a. See *§ 9.11[B][1][a]* *infra.* Given that the drafting in 1990 cross-referenced the general term of economic rights the 20-year extension applies in this context as well. See *17 U.S.C. § 106A(d)(2)* ("shall expire at the same time as, the rights conferred by section 106"). Unfortunately, when Congress adjusted a great many features of copyright duration in the context of the Sonny Bono Copyright Term Extension Act, it neglected to redress the anomaly noted in the text of differing terms for discrete works of visual art. See Act of Oct. 27, 1998, ***Pub. L. 105-298, 112 Stat. 2827***.

---

191 The original House bill, by contrast, provided for just such a term. See 136 Cong. Rec. H13314 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier).

192 See *§ 9.10[A][1]* *infra.*

193 *17 U.S.C. § 106A(d)(1)*. More technically, the term runs to the end of the calendar year in which the author dies. *17 U.S.C. § 106A(d)(4)*.

194 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 21 (1990). "A single Federal system is preferable to State statutes or municipal ordinances on moral rights because creativity is stimulated more effectively on a uniform, national basis." *Id., quoting* the Register of Copyrights.

195 See *§ 9.10[A][1]* *infra.*

196 *17 U.S.C. § 106A(d)(2)*. Note that, in order to qualify, the subject 1980 painting must not have had its title transferred by the artist before the effective date of VARA. *Id*.

197 *17 U.S.C. § 106A(d)(1)*.

198 The disparity results from the intentional amendment of *17 U.S.C. § 106A(d)(1)*, with respect to subsequently created works, without adverting to the parallel provision of *17 U.S.C. § 106A(d)(2)*, with respect to pre-existing works.

198.1 See *§ 8D.06[F][1]* *infra*.

198.2 See *§ 8D.10* *infra*.

198.3 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 3 (1990). See *id. at 19* (state law governs).

198.4 *17 U.S.C. § 106A(b)*.

198.5 *17 U.S.C. § 106A(e)(1)*.

198.6 Perhaps the least unsatisfactory alternative is to follow the construction contained in the House bill, notwithstanding that Congress actually deleted it. See *§ 8D.06[F][2]* *infra*.

198.7 Wendy Gordon playfully suggests to this writer, "No judge should interpret Section 106A as giving rights beyond the artist's death. The statute should either fall completely, on grounds of insanity, or the insane parts (all the inconsistencies that result from attempting to extend beyond the author's death) must be severed and dropped."

199 See *§ 9.10[A][3]* *infra.*

200 *17 U.S.C. § 106A(d)(3)*.

201 See *§ 9.11[A]* *infra.*

202 *17 U.S.C. § 106A(d)(4)*.

203 *17 U.S.C. § 301(f)(1)*.

204 *Id.*

205 *Id.* *Pavia v. 1120 Ave. of the Americas Assocs., 901 F. Supp. 620, 629 (S.D.N.Y. 1995)* (holding pre-empted claim of "interference with copyright").

206 *17 U.S.C. § 301(f)(2)(A)*.

207 *17 U.S.C. § 301(f)(2)(B)*.

Copyright 2018, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

[208] *17 U.S.C. § 301(f)(2)(C)*.

[209] Under the Berne Convention, moral rights should ideally last as long as economic rights; nonetheless, an exception allows for no *post mortem* moral rights to exist in those nations that, "at the moment of their ratification" of the Convention, provide for no such rights. Berne Convention (Paris text), art. 6*bis* (2). See *§ 8D.01[B] supra*. Congress had previously concluded, upon Berne ratification, that moral rights sufficient to comply with Berne do exist in this country, based in part upon state laws. H. Rep. (BCIA), p. 38. See *§ 8D.02[D][1] supra*. Accordingly, to take such pre-existing *post mortem* rights found in state law and to limit them at a time subsequent to Berne adherence would call into question our compliance with the foregoing Berne Convention provision. 136 Cong. Rec. H13314 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier). For that reason, concurrent with its limitation of artists' rights to the life of the author, the Senate amendment discussed above (see *§ 8D.06[E] supra*) also preserved *post mortem* state moral rights laws from pre-emption. 136 Cong. Rec. H13314 (daily ed. Oct. 27, 1990) (statement of Rep. Kastenmeier). See *§ 8D.06[E] supra*. "By so doing, we leave undisturbed the pre-existing law based upon which the Berne Implementation Act of 1988 dealt with the general question of artists' rights." *Id.*

[209.1] *Pavia v. 1120 Ave. of the Americas Assocs., 901 F. Supp. 620 (S.D.N.Y. 1995)*.

[209.2] *Id. at 624*. Defendants moved parts of the sculpture from the New York Hilton to the Hippodrome Parking Garage. *Id*.

[209.3] Ownership of the sculpture continued to belong to the artist, thus making it eligible for protection under VARA, notwithstanding its antecedent creation. See *§ 8D.06[E]* N. 182 *supra*.

[209.4] See *§ 8D.06[E]* N. 184 *supra*.

[209.5] *901 F. Supp. at 628*.

[209.6] *Id. at 629*.

[209.7] See *§ 8D.06[F][3][a] infra*.

[209.8] See *§ 8D.08 infra*. As set forth above, pre-emption is avoided for activities that take place beyond the author's lifetime. But given that plaintiff was unfortunately (for these purposes) still alive, that circumstance did not help.

[209.9] Pavia filed his complaint on February 23, 1995. The pertinent statute of limitations is three years. *N.Y. Arts. & Cult. Aff. Law § 14.03(4)(b)*. See *901 F. Supp. at 625*.

[209.10] *17 U.S.C. § 301(f)(2)(A)*.

[209.11] *N.Y. Arts. & Cult. Aff. Law § 14.03(1)*. See *901 F. Supp. at 625*.

[209.12] The bizarre upshot is that, during the time that federal rights were supposed to be exclusive, plaintiff was allowed to urge claims solely under state law! Yet given the welter of contradictory urges that underlay the enactment of VARA (*e.g.*, simultaneous protection under state and federal law for dead artists only, see N. 209 *supra*), one cannot discount the court's conclusions, which hew very close to the statutory language.

[210] See *§ 8D.06[A][1] supra*.

[211] Previously, in the context of pictorial, graphic, and sculptural works, we have noted an analogous argument and counter-argument concerning the scope of federal preemption. See *§ 2A.08[H][3][c]* & N. 681 *supra.*

[212] As already noted, all "works of visual art" fall into the copyright category of "pictorial, graphic, or sculptural works." See *§ 8D.06[A][1] supra*.

[213] H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 21 (1990) (emphasis added). The legislative history also questionably contends: "[T]he law will not preempt a cause of action for a misattribution of a *reproduction* of a work of visual art … ." *Id.* (emphasis added). See *§ 8D.06[F][3][a] infra*.

[214] See *§ 1.01[D] supra.*

215 *17 U.S.C. § 301(f)(1)* (emphasis added).

216 *17 U.S.C. § 301(f)(1)* (emphasis added).

217 When statutes are ambiguous, resort may be had to the legislative history. Unfortunately, that history sheds no light here. On the one hand, it refers solely to pre-emption of state causes of action. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 21 (1990). But on the other hand, the same report contains language arguably disavowing by implication simultaneous reliance on the Copyright Act and on the Lanham Act or other schemes: "[T]he enactment of a *uniform federal law* … ;" "*A single federal system* is preferable to State statutes or municipal ordinances on moral rights because creativity is stimulated more effectively on a uniform, national basis." *Id.* (emphasis added).

218 See *§§ 8D.03*–*8D.04* *supra*. "[T]he unauthorized use of a copyrighted work of art by a well known artist on packaging might be likely to confuse consumers [under the Lanham Act] as to the artist's sponsorship or endorsement of the product." ***Mulberry Thai Silks v. K & K Neckwear, Inc., 897 F. Supp. 789, 792 (S.D.N.Y. 1995)***.

219 See *§ 8D.06[F][3]* *infra*.

220 See *§ 8D.06[B][1]* *supra*.

221 See *§ 8D.05[C][1]* *supra*.

222 The legislative history comments that such laws would be pre-empted. H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 21 (1990).

223 H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 21 (1990). See *§ 1.01[B]* *supra.*

224 This problem arises because, as previously noted, the Senate changed the bill from its original structure, which conveyed one uniform federal right for the artist's lifetime and for 50 years thereafter. See *§ 8D.06[E]* & N. 194 *supra*. The result has been to undermine the legislative goal. See H.R. Rep. No. 101-514, 101st Cong., 2d Sess. 9–10 (1990) ("Artists, lawyers, courts, and even the owners of works deserve a single set of rules on this subject.")

225 See *§ 8D.06[E]* *supra*.

226 See *§ 8D.07[A]* *infra* (*post mortem* rights under California law pass to heirs for fifty years).

227 See *§ 8D.06[E]* & N. 197 *supra*.

228 *Wojnarowicz v. American Family Ass'n, 745 F. Supp. 130 (S.D.N.Y. 1990)*. See *id. at 136 n.2* (commenting on VARA as pending federal bill).

229 *Id. at 134*.

230 See *§ 8D.08* *infra*.

231 *745 F. Supp. at 137–38*.

232 *Id. at 138 n.5*.

233 An ameliorative construction would be to hold plaintiff's New York cause of action nonpre-empted, even after 1991. See *§ 8D.06[F][2]* N. 213 *supra*. The problem with that construction is that it reduces the federal 1990 amendment almost to uselessness; for plainly, plaintiff in this case is attempting to vindicate legal or equitable rights equivalent to those conferred by the Visual Artists Rights Act of 1990. See *§ 8D.06[F][1]* *supra*. See also *§ 8D.06[F][3][b]* *infra*.

234 *Carson v. Here's Johnny Portable Toilets, Inc., 698 F.2d 831 (6th Cir. 1983)*.

235 It is assumed that, as in the actual Johnny Carson case, the plaintiff did not consent to this exploitation.

236 Of course, Mr. Johns has not lost copyright protection by virtue of enactment of the Visual Artists Rights Act of 1990. But under given circumstances, copyright may be unavailing. For instance, the copyright may have been assigned, either explicitly or

End of Document

by virtue of the common law presumption upon sale of some older artworks. See § 10.09[B][1] *infra*. Or the copyright for the work may have expired or become forfeit. Note that loss of copyright protection, in the normal course of events, would not diminish entitlement to relief under the right of publicity.

[237] See § 8D.06[A][1] *supra*.

[238] Note that claims of art authorship may be implicated in a variety of legal contexts. See Galerie Furstenberg v. Coffaro, 697 F. Supp. 1282 (S.D.N.Y. 1988) (bilking investors out of $32.5 million through fraudulent certificates of authenticity of counterfeit works by Salvador Dali held actionable under RICO).

[239] Of course, the conduct described would constitute a moral rights violation under Berne Convention jurisprudence. World Intellectual Property Organization, *Guide to the Berne Convention* 41 (1978).

[240] 17 U.S.C. § 301(f)(1). See § 8D.06[F][1] *supra*.

[241] See generally J. T. McCarthy, *The Rights of Publicity and Privacy* (1993).

[242] Admitting that “the conclusion to be drawn from the text of the statute is not at all clear,” Professor Gorman’s conclusion is in accord. Gorman, *Visual Artists Rights Act of 1990,* 38 J. Copr. Soc’y 233, 240 (1991). Likewise germane is his conclusion that “the federal act is not an unmixed blessing for artists.” *Id.*

[243] “The legislation should be regarded as an initial, extremely tentative step toward a federal regime for moral rights, a step that required considerable comprising [sic] in order to gain the acquiescence of industries (and certain conservative Senators) strongly opposed to such a regime. Viewed in this light, some of the legislation’s truly embarrassing drafting becomes understandable, if not still regretted.” Editors, *The 101st Congress: A Review of Amendments to the Copyright Act,* 37 J. Copr. Soc’y 462, 466 (1990). “Mistakes and all, VARA is still arguably the most important legislation for artists ever enacted in the United States, and its sponsors deserve credit just for getting it passed over the objections and criticisms of user groups.” Karlen, *What’s Wrong with VARA: A Critique of Federal Moral Rights*, 15 Comm/Ent 905, 928 (1993).

[244] See also § 8D.06[F][3][a] *supra*.