1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3

   JAMES HAYDEN,               Case No. 1:17-cv-2635
4                            Cleveland, Ohio
           Plaintiff,
5

        vs.                  MONDAY, MARCH 16, 2020
6

   2K GAMES, INC., et al.,
7

           Defendants.
8

9

     TRANSCRIPT OF TELEPHONIC ORAL ARGUMENT PROCEEDINGS
10       BEFORE THE HONORABLE JONATHAN D. GREENBERG
           UNITED STATES MAGISTRATE JUDGE
11

12

   APPEARANCES *(telephonically)*:
13

14   For the Plaintiff:      Daniel J. McCullen, *Esquire*
                          Andrew W. Alexander, *Esquire*
15

16   For the Defendants:     Dale M. Cendali, *Esquire*
                          David T. Movius, *Esquire*
17                         Joshua L. Simmons, *Esquire*

18

19

20
   Chief Court Reporter:   Sarah E. Nageotte, RDR, CRR, CRC
21                         United States District Court
                         801 West Superior Avenue
22                       Court Reporters 7-189
                         Cleveland, Ohio 44113
23                       (216) 357-7186

24

25    Proceedings recorded by mechanical stenography, transcript
        produced with computer-aided transcription.

1          (Telephonic proceedings commenced at 11:20 a.m.)

2                              - - -

3          THE COURT:  Hello.  Good morning.

4          Counsel, we're here in 17-cv-2635, Hayden versus 2K

11:22:00   5    Games, Inc., et al.

6          The matter currently pends before the Honorable

7    Christopher A. Boyko.  It's been referred to this Court for

8    a discovery dispute.  It's been ongoing.

9          I'm going to give each side 15 minutes to present

11:22:13  10    their argument and then I will issue a ruling.

11          I would ask defendants to please take a couple minutes

12    and respond to correspondence the Court received in response

13    to defendant's letter.

14          Mr. Simmons, will you be speaking on behalf of

11:22:32  15    defendants?

16                    MR. SIMMONS:  Yes, Your Honor.

17                    THE COURT:  So I'd ask you to give me a little

18    bit of a response to that letter, and then you can tell me

19    anything else you think is pertinent.

11:22:43  20          Why don't you go first, go ahead, Mr. Simmons.

21                    MR. SIMMONS:  Thank you, Your Honor.

22          As Your Honor is aware, on our conferences leading up

23    to this hearing, it is our position that discovery -- our

24    discovery is related to -- both the rules, 16.1 and 37.1,

11:23:03  25    are clear that when you are in the middle of fact discovery,

1    discovery needs to be served such that all discovery is

2    received by -- before the close of fact discovery, which was

3    January 31st, and that you cannot bring disputes to the

4    Court more than ten days after the discovery period is over.

11:23:22  5    On both scores, plaintiffs did not comply with those

6    rules.  We did receive the letter that they sent 30 minutes

7    ago responding to those issues for the first time to the

8    Court, and we don't think that those change anything.

9    First of all, it doesn't answer the question provided

11:23:42 10   by the local rule.  We've -- which is you can't raise these

11   disputes after the -- so long after the close of fact

12   discovery.

13   We think those rules are in place to make sure that

14   the -- that things proceed in an orderly fashion.  It's now

11:23:58 15   more than a month, month and a half, after the close of fact

16   discovery and we don't think this changes anything.

17   Moreover, they rely heavily on the idea that this --

18   these issues came up in the course of depositions that

19   occurred in January, but that's not the case.  There were

11:24:13 20   documents produced as early as I believe August, certainly

21   by November, on which their -- their discovery disputes

22   rely, and so, they were in possession of the facts that they

23   are now bringing to the Court and merely waited to the last

24   minute to bring those requests.

11:24:29 25   So, fundamentally, we do not agree that their disputes

1    are timely or that this Court should enforce them.

2         Nevertheless, in the spirit of trying to find a path

3    forward, defendants did respond fully to all of the

4    discovery requests they served; that's two sets of requests

11:24:47  5    for -- two sets equaling I think 12 requests for production,

6    three new interrogatories, three new requests for

7    admissions.  We responded to all of them.

8         We only are here dealing with a subset of those issues

9    because plaintiffs passively are admitting that we have

11:25:07  10   responded sufficiently to those requests.

11        As for the requests that they brought to the Court, we

12   think that those requests should be denied, again, because

13   the -- they're too late, but also because we've already

14   searched 20 custodians for documents, produced over 6,000

11:25:26  15   additional pages, we produced even more pages in response to

16   the request that they produce, and these new requests would

17   go even further.

18        The -- they requested, just to go through them,

19   telemetry data which comes from a database which is not sort

11:25:46  20   of kept in a way that could be produced.

21        Now, the parties did meet and confer this morning and

22   we agreed to go back and look at a -- whether some more

23   narrowing requests of documents could be produced or

24   information could be produced there, but we're not sure

11:26:01  25   whether that's even possible because they're now asking now

1    for average per month, day and month, and we just don't know

2    if that's probable.

3         Moreover, on the telemetry data, the request is for by

4    player, and as we discussed on prior calls, there is no

11:26:20  5    database on the per player information.

6         We have nothing to produce in response to the

7    requests.  We're trying to work with them, but we just can't

8    do what they're asking for in the requests.

9         The communications with NBA properties or the NBA

11:26:35 10   players with respect to the copyright issue, that issue is

11   not relevant to the facts before this Court.  That issue

12   involves a -- did not involve a real-world tattoo on a

13   real-world player.  It involved a custom design that's

14   involved in a different part of the game.  It's completely

11:26:51 15   irrelevant to the case.

16        And what we think they're really trying to do is go

17   beyond what's relevant to try to tee up issues that could

18   keep discovery going long into the -- into the future.

19        On the tattoo bug reports request, we had a discussion

11:27:08 20   with plaintiff's counsel this morning where they offered to

21   narrow that request to two custodians, Michael Stauffer and

22   Corie Zhang.  We think they chose those custodians because

23   they're the people who most use the -- or are involved with

24   the tattoo -- with bugs in the games.

11:27:26 25        And so, we did a quick search of the --

1    back-of-the-envelope search.  From the -- from our search

2    from just, you know, ten minutes ago, and just -- even just

3    narrowing to them, we're looking at thousands of documents,

4    and that would be incredibly burdensome for us to produce.

11:27:45  5        And the bug reports aren't even relevant, because we

6    went back to confirm that the bug reports for the three

7    players related to the tattoos in this case were related --

8    were already produced, so they're asking for tattoo bug

9    reports for non-players not related to this case and tattoos

11:28:05  10   not related to this case which would require us to review

11   thousands of documents.  We think that's too burdensome.

12        On interrogatory number 14, which is about the music

13   licenses, the parties came to Ohio, they met in person, they

14   discussed the scope of production related to licensing.

11:28:21  15   Music licenses were specifically released.  We explained

16   that there are too many of them to produce and are not

17   relevant to these tables.

18        And as Your Honor may recall, we were concerned at the

19   time because they were asking for all of our licenses, and

11:28:36  20   we said music's not like an image, and it's certainly not

21   like a tattoo, it's not like an image.  We did produce about

22   a hundred of our licenses for them as a result of that.

23        We see interrogatory number 14 as an attempt to get

24   around that agreement and force us to have those -- review

11:28:53  25   those music licenses and provide them the terms they're

1    looking for.

2         Again, those licenses have confidentiality provisions.

3    I believe there's about -- there's a hundred or more of

4    them.  And again, having to go through those and produce --

11:29:06    5    and produce the information simply does not follow from the

6    conversation and negotiation that was conducted before Your

7    Honor or -- or in Ohio.

8         As to the fifth issue, the exemplary licenses for

9    influencers' likenesses, this morning plaintiffs have

11:29:26 10    narrowed that request to just one influencer likeness for

11    Chris Brickley.  We are -- we still don't think that that is

12    a relevant license to produce.  This is an influencer not an

13    NBA player.  It's a completely different scenario.

14         And I have not had a chance to review that license to

11:29:45 15    see what the confidentiality provisions are.  But we still

16    don't think it's relevant because it doesn't have to do with

17    these NBA players or these tattoos.  It's not going to shed

18    any light on the issue.

19         On the final request, request for queue score

11:30:01 20    information, we informed plaintiff this morning, when we

21    sort of provided a proposed grand compromise, that we would

22    produce the queue score data if they would agree to drop

23    some of these request.  We tried to reach an agreement.  We

24    didn't.

11:30:13 25         Nevertheless, Your Honor, we are willing to conduct a

1    search for queue score information for these three NBA

2    players, which is what plaintiffs have requested, so we

3    believe that issue at least is moot, and if there are

4    documents responsive to that, we will produce them.

11:30:29  5         But that's where we stand on the six issues.  Again,

6    this is -- fundamentally, this is a question of civil

7    procedure and we think this -- we think -- we think that can

8    be decided on that issue alone, that there are rules, both

9    federal civil procedure rules and local rules, they should

11:30:47  10   have consequences.  Plaintiffs should have raised these

11   issues before.

12        Our clients have already produced thousands of

13   documents from 20 custodians, sat for -- eight different

14   people have sat for depositions.  We think that fact

11:31:02  15  discovery should end.  The parties can move on to expert

16   discovery.  And -- and opening this can of worms is only

17   going to result in the parties coming back before Your Honor

18   when we produce more information and plaintiffs decide

19   that's not enough and they want more.

11:31:17  20        And so, for those reasons, we would respectfully

21   request that the discovery dispute be denied and that we

22   not -- that defendants not be required to provide additional

23   information and documents.

24                  THE COURT:  Mr. Simmons, thank you for the

11:31:34  25  argument.

1          But let me ask you:  Do you think that your stance is

2     watered down at all by the continuing conversations up to

3     and including your agreement to produce the queue score

4     data?

11:31:48  5          MR. SIMMONS:  We don't, Your Honor, because

6     we -- we were trying -- what we were trying to do is reach

7     agreement.

8          As you're aware, that Your Honor, you know, wants the

9     parties to work together, we were hoping by producing some

11:32:00 10    documents in response to the requests instead of just saying

11     it's too late and saying no, that we would at least be able

12     to moot some of the issues.

13          We think it would be unfair for the Court to say,

14     well, you tried to -- you answered the responses anyway and

11:32:17 15    that's -- that puts you in a worse position, in that we

16     should have just said immediately, on January 31st, too late

17     and we're not going to respond at all.

18          I mean, I think that sets us up for a bad incentive in

19     this Court.

11:32:30 20          THE COURT:  Very well.

21          Who will be arguing on behalf of plaintiffs?

22          MR. McMULLEN:  Your Honor, this is Dan

23     McMullen.

24          May I address the procedural issue first and then

11:32:38 25    allow Mr. Alexander to address the contents of our requests

1       and our attempts to narrow them?

2                       THE COURT:  Sure.

3                       MR. McMULLEN:  So, Your Honor, as you will

4       doubtless recall, the parties, with the Court's insistence,

11:32:53 5      spent many hours together back in November attempting to

6       resolve numerous outstanding discovery issues for

7       information we were not receiving up to that point, and

8       after those hours of negotiations, reached an agreement that

9       was memorialized in an e-mail which included, in pertinent

11:33:14 10     part, a statement that fact discovery deadline is extended

11      to January 31, 2020 to allow reasonable follow up with

12      regard to currently pending discovery or based on new

13      information that comes to light.  That was what the parties

14      agreed back in November.

11:34:10 15         Defendants' counsel have explicitly, and in writing to

16      the Court, acknowledged that that included follow-up

17      discovery after the depositions were taken.

18          When plaintiff attempted to schedule depositions of

19      fact witnesses of defendants, we were continually put off.

11:34:10 20     We attempted many times to schedule those depositions in

21      December and defendants declined to provide dates, they

22      never provided any dates until December 17th, and then those

23      were for dates in January.  They repeatedly said there's

24      plenty of time to depose the fact witnesses in months to

11:34:10 25     come and only provided dates for depositions in January.

1    Accordingly, plaintiff took the depositions of the

2    defendants' fact witnesses on the dates we were provided,

3    the last of those occurring on January the 30th.  On

4    January 31st, the next day, plaintiffs served the follow-up

11:34:32  5    discovery that was based on the new information that came to

6    light through those, just as the parties had agreed.

7    The argument that the defendants are raising now that

8    magically somehow we don't --

9    THE COURT:  Mr. McMullen, let's forego the

11:34:50  10    hyperbole, sir.

11    MR. McMULLEN:  Yes, sir.

12    So the Court will doubtless recall that on

13    January 25th, when we had a telephone conference, that Your

14    Honor asked if there were any other pending discovery

11:35:01  15    matters or open matters of disputes at that point, and we

16    explained that there was still pending discovery requests to

17    which the defendants had not yet responded.

18    And I -- the suggestion was then made by defendants'

19    counsel that somehow we were magically to have disputed

11:35:16  20    already discovery items in dispute, and I asked

21    specifically:  Do plaintiffs have to somehow intuit what the

22    defendants' responses are going to be and object on that

23    basis?  And Your Honor pointedly said:  No, I'm not going to

24    require you to put your Carnac hat on and predict the

11:35:35  25    future.

1          Accordingly, defendants, as was explained to the Court

2     at that time, they served their last discovery responses on

3     March the 2nd.  Three days later, we identified numerous

4     deficiencies in those responses.  Within less than 24 hours,

11:35:52  5     12 hours I think, defendants refused to provide any

6     additional discovery in response and we memorialized those

7     disputes the very next day in our letter to the Court dated

8     March the 6th.

9          As to the content of those, in our efforts to narrow

11:36:09 10     our requests to find some common ground with defendants'

11     counsel, as previously noted, I'll invite Mr. Alexander to

12     explain to the Court where we are.

13               THE COURT:  Mr. Alexander.

14               MR. ALEXANDER:  Good morning, Your Honor.

11:36:21 15     Thank you, Your Honor.

16          So this morning we did -- we had a call with

17     defendants' counsel and we -- we tried to reach common

18     ground on these six issues.  We did make some progress, and

19     I think we are moving in the right direction.

11:36:40 20          I think two of these will need to be addressed by the

21     Court due to the issues, but, you know --

22               THE COURT:  What -- let's start with the good

23     news.

24          Which ones do you think -- which four do you think you

11:36:54 25     agree on?

1             MR. ALEXANDER:  So --

2             THE COURT:  I didn't hear a lot of agreement

3       from the defendants.

4             MR. ALEXANDER:  The defendants agreed that

11:37:01 5       they would -- would produce documents related to the queue

6       scores of the players at issues.

7                 THE COURT:  Mr. Simmons, is that correct?

8                 MR. SIMMONS:  Yes, Your Honor.

9                 THE COURT:  All right.  So that is no longer

11:37:15 10      an issue?

11                MR. SIMMONS:  Correct.

12          This is Mr. Simmons.

13                THE COURT:  Right.  I was talking to Mr.

14      Alexander.

11:37:22 15        That's no longer an issue, Mr. Alexander?

16                MR. ALEXANDER:  No, Your Honor.

17                THE COURT:  Okay.  So now we're down to five.

18          What are the other three that there's no issue on?

19                MR. ALEXANDER:  The telemetry data, we had --

11:37:39 20      it's -- a little bit of background to the telemetry data

21      request.

22          Defendants produced some advertisements that made

23      claims about the frequency with which the players at issue

24      are used in the games.  For example, one advertisement said

11:37:56 25      something along the lines of --

                          1          THE COURT:  I'm having a hard time

                          2   understanding you.  Could you either pick up the phone or

                          3   speak more clearly?

                          4          MR. ALEXANDER:  Sure.  My apologies.

        11:38:07          5          THE COURT:  That's not your fault, but we're

                          6   stuck with doing this by telephone, so I need you to just

                          7   take your time and speak more clearly.

                          8          MR. ALEXANDER:  Sure.

                          9      So the telemetry data requests were based on some

        11:38:22         10   documents that defendants produced.  They were

                         11   advertisements that made claims, for example, players tried

                         12   to take down the King -- referring to LeBron James -- I

                         13   think it was some 50,000 times a day, and other claims along

                         14   those line.

        11:38:43         15      And during the answering at depositions as to whether

                         16   those claims were based on any data, internal data that

                         17   defendants had, and the deponent said, yes, that they keep

                         18   track of this stuff called -- and they call it telemetry

                         19   data.  So we made a request for that underlying data.

        11:39:00         20      And this morning, defendants asked us to kind of

                         21   clarify exactly what we want, and we did.  We made our -- a

                         22   more particular request.  And they said they would take that

                         23   back and see whether the database could give us that

                         24   information.

        11:39:18         25          So --

1          THE COURT:  Let me interrupt you.  Let me

2    interrupt you.

3          Mr. Simmons, is that what you were discussing earlier,

4    that you did the back-of-the-envelope calculation of

11:39:28  5    thousands of documents that were responsive to that request?

6          MR. SIMMONS:  No, Your Honor.

7          The thousands of documents relate to the third issue,

8    tattoo bug reports.

9          THE COURT:  Sorry.

11:39:37 10    Okay.  Did you -- while I have you on the line, have

11    you made any kind of preliminary request for the telemetry

12    data?

13          MR. SIMMONS:  So that discussion occurred this

14    morning, about 30 minutes ago, so we have not been able to

11:39:48 15    find out the answer to the question yet, but it -- as long

16    as I --

17          THE COURT:  No.  No.  No.  Sorry.

18    Go ahead, Mr. Andrews -- Mr. Alexander.  I'm sorry.

19          MR. ALEXANDER:  Sure.

11:40:01 20    So that's where we stand on the telemetry data

21    request.

22          The other one I think we are -- we're close on is the

23    influencer agreement requests.  We narrowed that request

24    this morning to just seek one -- the agreement for one

11:40:24 25    influencer, his name is Chris Brickley.  Defendants said

1    that they would talk to the client I believe this morning to

2    see if that was doable.

3              THE COURT:  I believe this is one of the

4    things that they were unhappy with and brought up to me is

11:40:41  5    the relevance of that request.

6         Could you tell me about that?

7              MR. ALEXANDER:  Sure, Your Honor.

8         Defendant produced some communication and they --

9    they -- some of their witnesses testified during deposition

11:40:59 10    that for this -- this influencer is an NBA trainer who is

11    heavily tattooed, and he's also reproduced in the asserted

12    games, and there is documents and testimony that showed that

13    there were concerns at Take-Two about reproducing some of

14    these tattoos.  The tattoos at issue were celebrity

11:41:27 15    likenesses and logos.  And there's also testimony from

16    defendants that they did have an agreement to show the

17    player's likeness.

18         So we believe that if the defendant -- it's one of

19    defendants' defenses in this case that they have the right

11:41:44 20    to show plaintiff's copyrighted tattoos because they have an

21    agreement with the players at issue to show their likeness.

22         I think that the conduct here shows that defendants

23    acknowledge that there may be other third-party IP rights

24    related to an individual's likeness.

11:42:10 25              THE COURT:  All right.  What's the next issue?

1        I'll have Mr. Simmons comment on that when you're

2   done.

3        What else?

4             MR. ALEXANDER:  So the tattoo --

11:42:18   5             THE COURT:  I think the -- I think, at least

6   by my list on these, there's one more of the original six

7   that there's agreement on.

8        Which one is that?

9             MR. ALEXANDER:  Well, the tattoo bug reports,

11:42:32  10   I think we were making progress on that, but it sounds like

11   defendants did go back -- and this is the issue that they

12   said now that they have thousands of e-mails that would be

13   responsive to this, and I think the -- the argument at this

14   point comes down to relevancy.  It does seem to be their

11:42:53  15   main argument here that these documents aren't relevant.

16             THE COURT:  At least from what I heard from

17   Mr. Simmons is there's a question of the reasonableness of

18   them to go through thousands of documents.

19        So why don't you tie that up and let me know what you

11:43:12  20   think here.

21             MR. ALEXANDER:  I think the relevance of these

22   documents is that one -- one of defendants' defenses in this

23   case is that the tattoos aren't observable in the game, it's

24   that de minimis use argument, that users can't see them, and

11:43:32  25   that's one reason why the usage is not -- is not copyright

1      infringement.

2          In these documents, they show the extent -- the extent

3      and the length to which defendants go to make sure that

4      these tattoos are observable in the game.  They -- there's

11:43:51  5      testimony from defendants that the -- that each summer, at

6      least each summer, they -- they issue these tattoo bug

7      analyses and they make sure that any bugs that relate to

8      whether these tattoos can be seen in the game are fixed,

9      and, you know, they can -- that the users will be able to

11:44:10  10      see these tattoos in the game.

11          So I think it gets right at one of their defenses in

12      this case.

13              THE COURT:  All right.  Do you have a comment

14      on the two outstanding requests that appeared not to have

11:44:25  15      any common ground?

16              MR. ALEXANDER:  Yes, Your Honor.

17          The music licenses, we did agree in November, on

18      November 12th, before the Court, we agreed to not require

19      production of these music licenses in light of -- it was a

11:44:45  20      compromise.  We understood that defendants' position was

21      this was going to be an extremely burdensome undertaking.

22      They were going to have to clear confidentiality clauses in

23      these agreements with their parties, so we agreed that

24      defendants would not have to produce these licenses.

11:45:01  25          That said, we never agreed that these weren't

1    relevant.  We never agreed to exclude the information about

2    music licenses from the case at all.  I mean, I think these

3    are -- these are comparable licenses to what would be at

4    stake in this case.  They're copyright licenses for use of

11:45:19  5    third-party content to show -- to be used in the games.

6         And we -- so we tried to get this information in less

7    burdensome means.  We noticed the topic for a 30(b)(6)

8    deposition, that was on some music licenses, and

9    defendants -- the defendants' 30(b)(6) witness that was

11:45:42  10   designated for this topic could not testify to the questions

11   we asked about the music licenses.

12        So -- so in the follow-up discovery request we served

13   as interrogatory, and which also seeks to avoid the burden

14   of going and getting these third-party confidentiality

11:45:58  15   clearances, it asks generally for the amount that defendants

16   have paid per year for music licenses to play the music in

17   the games, and it asks for the royalty rate at issue to

18   show -- to play the music in the games.

19        The compromise, also this morning, we told defendants

11:46:18  20   that if it's easier, less burdensome, we would accept the

21   average royalty rate per game instead of each individual

22   royalty rate per game.

23        So it's our position on the music licenses is that we

24   never excluded the information in the case.  We've tried to

11:46:36  25   get it through less burdensome means, and including the

1       dispute now which is an interrogatory response.

2                       THE COURT:  What else?  There's one more?

3                       MR. ALEXANDER:  Yeah.  The copyright issue.

4            There's a document that defendants produced that it's

11:46:53  5   a weekly check-in document internal to their art department,

6       and it makes a comment that -- it says:  Chris is also

7       addressing feedback from the NBA for the new tattoos to be

8       updated to avoid copyright issues.

9            So this document shows that the NBA had a concern

11:47:12 10   about the tattoo in the game, particularly a copyright issue

11      concern.  And we deposed the author of this document and she

12      did not have very clear information on it, but she did say

13      that -- she did suggest that this was a copyright

14      infringement related issue.

11:48:01 15       And what we're trying to do here is just get some

16      information to identify what this issue is about.  It seems

17      relevant given that this is a copyright infringement case

18      about tattoos, you know, this -- documents related to this

19      issue could show either their thoughts on how copyright

11:48:01 20   infringements relate to tattoos or the NBA's thoughts on how

21      this relates to tattoos.

22           Defendants at this point have not offered to search

23      for these documents to determine whether, in fact, that this

24      isn't relevant.  They're relying, just as we are, on this

11:48:10 25   ambiguous deposition testimony that does not -- certainly

1    does not rule out that these documents are relevant.  From

2    the face of it, these documents do seem relevant.

3                 THE COURT:  Mr. Simmons, you were commenting

4    that you want to respond.

11:48:30  5         Go ahead.

6                 MR. SIMMONS:  Thank you, Your Honor.

7         Just to take things in turn, the telemetry data issue

8    exemplifies our timing problem.  The PowerPoint presentation

9    that plaintiffs are referencing that led them to the request

11:48:44  10   on telemetry data is not an advertisement.  It's a

11   PowerPoint, an internal PowerPoint on potential advertising

12   that was produced in August.

13        And so, you know, just to go back to my major theme,

14   they had it since August.  They didn't follow up on it until

11:49:00  15   January.  And that's why we think, in all cases, discovery

16   should be denied.

17        Nevertheless, if Your Honor feels that the local rule

18   doesn't apply here, which we think it does, you know, we

19   are -- we can go back and see what the telemetry database

11:49:18  20   can do.  But it's not a single document.  It's a -- it's a

21   database.  So we are not supposed to be required by the

22   federal rules to create new documents for requests for

23   productions.

24        So, you know, we're trying to reach a compromise.  We

11:49:33  25   compromised as much as we can.  Again, we think that that

1      should be denied.

2            On the Chris Brickley influencer agreement, it's not a

3      basketball player.  It's not about -- it's not at all

4      relevant to this case.  The got testimony from the many

11:49:51  5      deponents that were deposed on it.  And we had the

6      e-mails -- and we have e-mails that were dealing with this

7      issue.  We don't think that the agreement should have to be

8      produced at this point.  It simply is not relevant to

9      whether these three NBA players have six tattoos.  There's

11:50:10 10      no connection there.

11            On the tattoo bug reports, as Your Honor indicated,

12      our back-of-the-envelope calculation has the number of

13      documents that we'd have to review at nearly a thousand.  We

14      do think that the burden is too high for a request that has

11:50:26 15      questionable relevance, particularly when any tattoo bug

16      reports about the three players at issue already have been

17      produced, as we confirmed this morning.

18            In addition, plaintiff already had deposition

19      testimony on those subjects.  And so, again, we think they

11:50:42 20      already have that information.

21            On the music license, we fundamentally disagree with

22      their interpretation of the agreement.  As Your Honor will

23      recall, when the parties came before the Court, the

24      plaintiffs had requested all licenses.  The agreement that

11:50:55 25      was reached was that we would release art-related licenses

but specifically not music licenses.  We think this is an
attempt to circumvent that.

And, in fact, when they served their 30(b)(6) notice,
we told them at that point that we thought that the music
licenses went too far, and we negotiated that 30(b)(6) --
those 30(b)(6) topics extensively.  They did not come to the
Court at this time.  We don't think that they should be
rewarded for not raising issues promptly.

We think the music licenses have no relevance to, you
know, our art-based tattoo licenses.  We don't even think
the art licenses we produced were relevant, but certainly
this goes too far afield.

And, finally, on the copyright issue that Mr.
Alexander was referencing, they deposed the author of that
document.  Her testimony, which appears in our March 13th,
2020 letter, was clear, that this is a -- an issue that does
not involve real-world tattoos on NBA players.  Instead, it
was about this custom design on a completely different
issue.

We think that forcing us to go back, search for and
produce documents on such a tangential topic would not be --
is not a balanced approach to discovery when we've already
collected from 20 people and produced thousands of
documents.

THE COURT:  Mr. Alexander, do you agree with

1    the characterizations of the copyright issue that it's a

2    custom design issue not a tattoo issue?

3                    MR. ALEXANDER:  Well, it's a custom design

4    tattoo in the game, and the NBA had an issue with this

11:52:38  5    tattoo and it suggested that -- the deposition testimony

6    suggested that their concern was the copyright infringement

7    concern, and we -- that is really the scope of the

8    information we have been able to --

9                    THE COURT:  What specifically are you asking

11:52:56 10    for?

11                    MR. ALEXANDER:  We would like documents

12    related to communications with the NBA related to this

13    copyright issue identified in this particular document.

14                    THE COURT:  Mr. Simmons, how difficult would

11:53:16 15    it be to come up with a royalty rate average?

16                    MR. SIMMONS:  Your Honor, it would be quite

17    difficult because we'd have to go through the hundreds of

18    music licenses to determine what that rate is.  I'm not even

19    sure that they are based on a royalty rate.

11:53:31 20        So it would require review of every single music

21    license that we have to even come up with that number.  It's

22    not something that just exists.

23                    THE COURT:  How many licenses are we talking

24    about, your best guess?

11:53:43 25                    MR. SIMMONS:  I know that there's over a

1    hundred.  It may be much higher than that.  I don't have

2    that number on -- I think it's about 300, something around

3    300.

4                THE COURT:  All right.  Is there anything

11:53:53  5    further on behalf of the plaintiff?

6                MR. ALEXANDER:  Yes, Your Honor.

7         I just want to say the 300 documents to review, I --

8    we don't see that as unduly burdensome.  In fact, in

9    connection with the third-party subpoenas, we had just spent

11:54:14 10    considerable time, you know, reviewing these documents,

11    these e-mails that the -- the third parties had already

12    reviewed, and we confirmed that there was nothing there.

13         So, you know, we don't think it's unreasonable to

14    require defendants to review 300 documents to respond to

11:54:33 15    this interrogatory.

16                THE COURT:  Anything further on behalf of the

17    defendants?

18                MR. SIMMONS:  Yes, Your Honor.

19         This isn't just a question of reviewing documents.

11:54:42 20    It's the confidentiality provisions.  It's the -- it's going

21    through them and creating a rate that I don't think actually

22    exists.  So it's not -- it's not a simple task.  We think

23    that it's burdensome.  And as I already indicated, it's not

24    relevant.  The rate for music has nothing to do with

11:55:02 25    tattoos.

1          And I would just add on the prior, the copyright

2     issue, it's a custom design, it's not a real-world person's

3     tattoo, so we think those are different.

4               THE COURT:  So do the parties agree that they

11:55:14  5     have come to an agreement as it relates to the queue score

6     data requests?

7          Mr. Alexander?

8               MR. ALEXANDER:  We believe so.

9               THE COURT:  Mr. Simmons?

11:55:21  10               MR. SIMMONS:  Yes, Your Honor.

11               THE COURT:  So there's five issues the Court

12     has to rule on; is that correct?

13               MR. ALEXANDER:  Yes, Your Honor.

14               THE COURT:  Very well.  I'll issue a ruling

11:55:31  15     shortly.

16          Thank you for the arguments.

17          Please be safe.

18                              - - -

19          (Proceedings concluded at 11:55 a.m.)

20

21

22                    **C E R T I F I C A T E**

23          I certify that the foregoing is a correct transcript
       of the record of proceedings in the above-entitled matter
24     prepared from my stenotype notes.

25          */s/ Sarah E. Nageotte*              *3/22/2020*
            SARAH E. NAGEOTTE, RDR, CRR, CRC          DATE