UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES HAYDEN, | ) | Case No. 1:17-cv-02635 |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| vs. | ) | **PUBLIC REDACTED VERSION** |
| | ) | |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

**MOTION AND BRIEF IN SUPPORT TO EXCLUDE THE EXPERT TESTIMONY OF DR. E. DEBORAH JAY**

For the reasons set forth below, Plaintiff James Hayden hereby moves the Court to preclude Defendants (2K Games, Inc. and Take-Two Interactive Software, Inc., collectively "Take-Two") from presenting, relying on, or otherwise submitting the opinions of Dr. E. Deborah Jay set forth in her NBA 2K Video Game Survey Report and the results from her survey (Exhibit A) in this case.

**I.  INTRODUCTION**

Take-Two's survey expert, Dr. E. Deborah Jay was asked to design a survey to determine "whether the tattoos on LeBron James, Danny Green, or Tristan Thompson were a reason why consumers bought an NBA 2K video game." (Ex. A, Jay Report, p. 1.) The Jay survey, however, is designed to *avoid* finding that answer. First, the survey defies well-known guidelines regarding open-ended questions, which results in vague and ambiguous responses from which Dr. Jay improperly concludes that the Hayden Tattoos[1] were *not* a reason respondents bought the

---

[1] "Hayden Tattoos" refer to the tattoos that Mr. Hayden inked on LeBron James, Danny Green, and Tristan Thompson that are at issue in this case.

2K games.[2] But Dr. Jay cannot reliably justify her conclusion based on these open-ended responses. Second, Dr. Jay's "follow-up" close-ended question, which asked respondents to choose which features among a list of 20 were a reason they bought the 2K games, remarkably *omitted* tattoos as an option. The survey as a whole fails to test for the conclusion Dr. Jay draws: that "none of the 520 individuals interviewed for the NBA 2K Survey said the tattoos on LeBron James, Danny Green, or Tristan Thompson were one of the reasons why they bought an NBA 2K video game." (Ex. A, p. 1.) Dr. Jay's methodology can, at best, identify the top reasons the respondents bought the NBA 2K games; it is not a reliable survey to determine if the Hayden Tattoos were *a* reason. What is more, Dr. Jay's conclusion is built on the assumption that a respondent who purchased the 2K games because of *all* the NBA players' tattoos—a distinct possibility from the Jay Survey results—*does not count* as an individual that bought the 2K games for the Hayden Tattoos. This renders her survey and her conclusion, at a minimum, highly confusing for a jury and unduly prejudicial. For all these reasons, Dr. Jay's opinions and her survey results should be excluded.

## II. LAW AND ARGUMENT

Although Federal Rule of Evidence 702 allows an expert witness to testify in the form of an opinion, the testimony must be both relevant and reliable to be admissible. The trial court thus acts as the "gatekeeper" in determining whether purported expert testimony meets this standard of relevance and reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (holding that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable"). The gatekeeping requirement is "to make certain that an expert,

---

[2] "2K games" refers to Take-Two's NBA 2K video games that were the topic of the Jay Survey: NBA 2K14, 2K15, 2K16, 2K17, 2K18, 2K19, 2K20, and 2K Mobile. (Ex. A, pg. 2.)

whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Dr. Jay's survey methodology and opinions fail to stand up to the intellectual rigor exercised by survey experts and reflected in well-known survey treatises.

At the outset, the purported expert must be "qualified . . . by knowledge, skill, experience, training or education." Fed. R. Evid. 702. And in determining whether the expert testimony is both relevant and reliable, courts, including the Sixth Circuit, routinely assess four criteria rooted in FRE 702 that must be met:

1. The expert's scientific, technical, or other specialized knowledge must help the trier of fact to understand the evidence or to determine a fact in issue.
2. The expert testimony must be based on sufficient facts or data.
3. The expert testimony must be the product of reliable principles and methods.
4. The expert must have reliably applied the principles and methods to the facts of the case.

*Hamilton County Emergency Comms. District v. Level 3 Comms., LLC*, 845 Fed. Appx. 376, 383 (6th Cir. 2021) (*quoting* Fed. R. Evid. 702(a)–(d)); *see also Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020). If purported expert testimony does not meet one of these criteria, it must be excluded under *Daubert* and Rule 702. *Hamilton Cty.*, 845 Fed. Appx. at 383. The Jay Survey and opinions fail an all accounts.

### A. Dr. Jay disregards well known guidelines meant to ensure that open-ended questions are reliable—a fatal flaw in her methodology.

The Jay survey begins with two open-ended questions, which Dr. Jay claims are the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮ and ends the survey with two additional open-ended questions. Yet Dr. Jay failed to account

3

for the inherent, well-documented flaws in open-ended survey questions, which pervade the responses. The Jay survey's first two open-ended questions ask,

- A1: "What were the <u>main reasons</u> why you bought an Nba 2K video game?" and
- A2: "What were the <u>other reasons</u>, if any, you bought an NBA 2K video game?"

(Ex. A, Jay Report, Appx. D-12, Questions A1, A2.) And after excluding a significant portion of the respondents through a flawed series of intermediary questions, the Jay survey concludes by asking two more open-ended questions to a select subset of the 520 respondents:

- C2: "Which NBA player or players' depiction was a reason why you bought an NBA 2K video game?" and
- C4: "What features or aspects were important to depict of these NBA players' appearance[]?

(*Id.*, Appx. D-16, 17, Questions C2, C4.) As explained in more detail in Sections B and C below, these questions elicited responses that clearly manifest the known problems with open-ended questions and render the Jay survey *incapable* of substantiating the conclusions Dr. Jay draws from them.

First, open-ended questions should only be used for determining the *main* reasons customers purchased the Accused Games. (*See* Ex. C, Bilgicer Rebuttal Report, ¶ 19–25; Ex. D Lenzo Rebuttal Report, ¶ 59.) This is recognized in the Reference Guide on Survey Research that Dr. Jay herself cites multiple times: "Open-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondent's mind, but closed-ended questions are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives." (Ex. E, Reference Guide on Survey Research, Shari Diamond ("Diamond"), at 253.) *See also*, *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F.

4

Supp. 2d 940, 955 (N.D. Ill. 2009). Dr. Jay relies on open-ended questions (A1 and A2) as her "most reliable indicator" of her conclusion that no one purchased the NBA 2K games because of the Hayden Tattoos. But at best, Dr. Jay can only conclude that the Hayden Tattoos were not a *main* reason people bought the 2K games. (*See* Ex. C, Bilgicer Rebuttal Report, ¶¶ 19–25.)

Second, the interviewer must be able to follow-up on open-ended responses. Otherwise, they are of limited value "because they depend entirely on the respondent to answer fully and do not provide the opportunity to probe or clarify unclear answers. (Ex. E, Diamond at 263–264.) As shown in more detail below, most respondents offered vague, ambiguous, and very high-level, responses for their reasons for purchasing the 2K games. Without further probing, it is *impossible* to rule out that the Hayden Tattoos were a reason people bought the game. (*See* Lenzo Rebuttal Report, ¶¶ 58–63.)

Third, categorizing open-ended questions requires "a detailed set of instructions so that decision standards are clear and responses can be scored consistently and accurately." (Ex. E, Diamond at 268.) *See also, e.g.*, *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 608 (S.D.N.Y. 2007). Dr. Jay provides no such instructions on how she categorized the open-ended responses. As explained further below, Dr. Jay categorized *many* responses as support for her claim that no one bought the games because of the Hayden Tattoos, despite many broad responses *admittedly* encompassing player tattoos. These methodological errors render the Jay survey seriously flawed. It should thus be excluded. *See Jacobs v. Fareportal Inc.*, 8:17-cv-362, 2020 WL 6587245, at *10 (D. Neb. May 29, 2020) ("surveys that are seriously flawed warrant exclusion").

5

**B. Dr. Jay's open-ended questions were not suitable or reliable to accomplish her purported task.**

As a survey expert would predict, Dr. Jay's open-ended questions returned short, minimal (and often very vague) responses. Of the 520 respondents, only 19 (3.65%) listed three or more reasons for purchasing the game in Question A2. (Ex. C, Bilgicer Rebuttal, ¶ 24.) These answers are simply not helpful in determining *all* the reasons the respondents purchased the games. (*See* Bilgicer Rebuttal, at ¶¶ 19–25.) This is precisely the concern identified in the Reference Guide on Survey Research, where such questions are only expected to provide "what comes first to a respondent's mind." (Ex. E, Diamond, at 253.) ██████████████████████████

█████████████████████████████████

████████████████████████████████████

███████████████████████[3]█████████████████

████████████

Not only do the limited number of responses indicate that respondents weren't providing *all* the reasons they purchased the 2K games (*see* Ex. C, Bilgicer Rebuttal Report ¶ 24), without any further probing, many of these vague, ambiguous, high-level responses simply fail to rule out the prospect that the respondents bought the 2K games because of the Hayden Tattoos.

Most of the open-ended responses were neither confirmatory nor contradictory of tattoo realism being a reason respondents bought the 2K games. (Ex. D, Lenzo Rebuttal Report, ¶ 60; *See also*, Ex. C, Bilgicer Rebuttal Report, ¶¶ 19–25.) ████████████████████████

---

[3] As explained below, Jay's "follow-up" questions do not actually probe or seek to clarify the vague and ambiguous open-ended responses—they are simply different questions—and they utterly fail to cure the flaws in her open-ended questions.

6

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ For example, respondents answered with responses like the following:

- "I like it." (Ex. A, Appx. G-1, 1013004743);
- "I love the 2K series and buy it every year" (*id.* at 1014006853);
- "It's cool" and "I like basketball" (*id.* at 1016609979);
- "To play the video game that I enjoyed" (*id.* at 1014034623).

In fact, 32% of respondents (~166) said they bought the game because they like basketball, sports, or sports video games. (Ex. A, Table 3, p. 12.) Two respondents who explicitly identified *the appearance of LeBron James* as a reason they bought the 2K games responded to Question C3 (i.e., the important features or aspects of LeBron James's appearance that drove their purchase) by saying "LeBron" and "The physical characteristics [of LeBron]." (*Id.*, Appx. G-1, 1018523181, 1014816135.) This scenario is, again, a well-known flaw related to open-ended questions, highlighted in the Reference Guide on Survey Research. Without the "opportunity to probe or clarify unclear answers" "open-ended questions are generally of limited value." (Ex. E, Diamond, 263–264.) Dr. Jay did *not* probe or clarify these vague responses—yet she counted them as indicating the respondent did *not* buy the 2K games because of the Hayden Tattoos, even though these responses regarding Lebron James' appearance strongly support a conclusion that the Hayden Tattoos are important to the respondent's purchasing decision.

Not only do many of the responses leave open the possibility that the respondents bought the game because of the Hayden Tattoos, but many of the responses also even *suggest* the Hayden Tattoos or tattoos in general were a reason they bought the 2K games. For example, according to Dr. Jay's categorization, 9% of respondents (~47 respondents) listed "graphics" and 2% (~10 respondents) listed "realism" as reasons they bought the game. (Ex. A, Table 3, p. 12.)

7



Again, Dr. Jay surmised that these responses support her conclusion that respondents did *not* buy the game because of the Hayden Tattoos. But she simply does not know that—it is pure speculation. These inferential leaps are unwarranted, render her conclusions unreliable, and require exclusion. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) (excluding expert report because expert ruled out possible causes of disease based on speculation).

Moreover, Dr. Jay's unwarranted conclusions based on these vague responses are yet another symptom of her flawed methodology. "Coding of answers to open-ended questions requires a detailed set of instructions so that decision standards are clear and responses can be scored consistently and accurately." (Ex. E, Diamond, at 268.) Dr. Jay failed to provide *any*–let alone detailed—instructions on how she categorized her responses.[4] This is best highlighted by the respondent who identified LeBron James's "physical characteristics" as a reason for buying the 2K games, yet Dr. Jay, without explanation, categorized this response as not indicating the Hayden Tattoos were a reason for purchase. The lack of clear, detailed criteria for categorizing the open-ended responses is cause for exclusion. *See, e.g.*, *Malletier*, 525 F. Supp. at 611.

---

[4] If Jay claims that her criteria was simply that none of the responses explicitly stated "tattoos" or "LeBron James," "Danny Green," or "Tristan Thompson," for all the reasons stated herein, this criteria renders her conclusion simply unwarranted, as she *cannot* rule out the possibility that many of the responses did subsume the Hayden Tattoos.

### C. Dr. Jay's close-ended questions do not cure these problems and are themselves *incapable* of supporting Dr. Jay's ultimate conclusions.

In Dr. Jay's (untimely and improper) Supplemental Report and in her deposition, she claims her "follow-up" questions cure the obvious shortfalls in her open-ended questions. (*See* Ex. F, Jay Suppl. Report, pp. 8–9; Ex. B, Jay Dep., 84:12–15, 85:12–17.) But the subsequent questions in the Jay survey (*i.e.*, Questions B1–C4) do not probe or seek to clarify any of the vague answers that her open-ended questions elicited. Moreover, they introduce *even more* flaws that highlight the real purpose of the survey: to *avoid* finding out if the Hayden Tattoos were a reason respondents bought the 2K games.

███████████████████████████████████████████

███████████████████████████████████ But these questions, like her open-ended questions, *avoid* the central question her survey purportedly seeks to test. For example, her closed-ended question B1 lists 20 features in the 2K games (23 options in total)[5] and asks the respondents to identify any that were a reason they bought a 2K game. (Ex. A, Appx. D-13, Question B1.) As an initial matter, this is too many options. When a respondent is presented this many options, "it may be impossible for respondents to keep all the possibilities and requirements in mind; as a result, part of the meaning may end up being ignored." (Ex. C, Bilgicer Rebuttal Report, ¶ 29, quoting *Survey Methodology*.) Moreover, amongst these 23 options, Dr. Jay remarkably (purposefully) *omits* "tattoos" as an option.[6] Indeed, Dr. Jay does not

---

[5] Dr. Jay purports to include a fictitious XTJ feature as a "control" and subtracts the percentage of respondents that selected this feature (9%) from the percentage that each *other* item was selected by *all* respondents. *See* Ex. A, pg. 16. This improperly *includes* the responses from these individuals that guessed and then improperly subtracts 9% across all responses—even the responses from individuals that did *not* guess. This is another critical flaw in Dr. Jay's methodology. (Ex. C, ¶¶ 35–37.)

[6] Jay claims that including "tattoos" as an option would be leading. Not only is this wrong, but when designing a survey for a *plaintiff* in a patent infringement case, Jay notably included the name of the feature at issue ("the drop-down calendar") amongst a list of other features in assessing how often respondents used the drop-down calendar feature. *See Lucent Technologies, Inc. v. Microsoft Corp.*, Case No. 07-CV-2000 (S.D. Cal.); (Ex. G, Jay *Lucent* Opinion Excerpt, p. 12, Question C2a; Ex. B, 43:22–47:12.) This is telling.

mention the word "tattoo" *a single time* in her entire survey. Instead, she includes the option: "[t]he depiction of the NBA players' face, body or other aspects of their appearance." *Id.* This option was chosen by 27% (~140 respondents) of the respondents. But identifying this response merely led the respondents to a series of confusing questions that ultimately precluded a significant portion of the respondents from being able to identify the Hayden Tattoos as a reason for purchase.

Put simply, the Jay survey precludes respondents who bought the game because of the appearance of *all* the NBA players from identifying the Hayden Tattoos as a purchase reason. In Question B1, if a respondent identified the players' appearance as a reason they bought the 2K games, they were then asked Question C1: "Was the depiction of the appearance of *any particular* NBA player or players a reason why you bought an NBA 2K video game?" (Ex. A, Appx. D-16, Question C1 (emphasis added).) If they answered "Yes" to this question, they were then given the opportunity to submit the identity of that player or players and submit the particular features about those players that were important to them.[7] But if a respondent answered "No" to Question C1, the respondent did not get to answer the subsequent questions and the survey was over. This is a critical error because the respondents who answered "No" to C1 bought the game because of *all* the NBA players' appearance. This is the only logical conclusion based on their earlier response to B1. (*See* Ex. D, ¶ 62.) Yet Dr. Jay's survey, by design, *cannot* discern whether these respondents bought the game because of the Hayden Tattoos.

---

[7] Respondents who answered "Yes" to C1 were asked C2: "Which NBA player or players' depiction was a reason why you bought an NBA 2K video game?" (*Id.*, Question C2.) Here, respondents could identify the players at issue in an open-ended response, and many did. Five percent of respondents (26) identified LeBron James's appearance as a reason they bought the game. (*Id.* at p. 21.) Next, those respondents were asked if any "particular features or aspects" were important to depict—if they answered "Yes," they were then asked to identify those features in an open-ended question.

10

This error also highlights an unwarranted assumption that Dr. Jay makes, which renders her survey even more unreliable. Dr. Jay does not consider respondents that bought the game for *all* the NBA players' appearances as relevant. This is because Dr. Jay does not consider a respondent who bought the game for *all* the NBA players' tattoos as buying the game for the Hayden Tattoos. For example, one respondent explicitly listed "tattoos" as particularly important. (Ex. A, Appx. H-3, 1018977419.) But Dr. Jay curiously dismissed this response



This is clearly nonsensical. Dr. In other words, *yes*, it's possible, but it is not relevant to Dr. Jay. Dr. Jay is purposefully excluding—or at minimum ignoring—respondents who purchase the game for the appearance of *all* NBA Players, and, even more importantly, respondents who purchased the game for all the *tattoos* in the game (Ex. B, 144:22–145:2).[9]

---

[8] This analogy is wholly inapplicable to a video game like NBA 2K. NBA 2K is not a "menu" of features (where customers select some features at the exclusion of others when making their purchase decision). Rather, NBA 2K is a *bundle* of features, including realistic tattoos.

[9] Purported expert testimony may be excluded under Rule 403, which "permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

11

The Jay survey simply lacks the inferential power to justify Dr. Jay's conclusion: that no one bought the 2K games because of the Hayden Tattoos. (*See* Ex. D, Lenzo Rebuttal Report, ¶¶ 60–62.) Take this hypothetical: A respondent, in fact, buys the 2K games because he likes the graphics and/or realism, which includes the fact that he can see the real tattoos on, not a particular player, but *all* the NBA players (this, of course, includes the Hayden Tattoos). In response to Questions A1 and A2 he inputs "realism" and/or "graphics" as the "main" and/or "other" reasons he bought the 2K games. Stopping here for a moment, as of Questions A1 and A2, the Jay survey mistakenly fails to account this respondent as buying the 2K games for the Hayden Tattoos. Moving on, in response to B1, he selects "The depiction of the NBA players' face, body or other aspects of their appearance" as a reason why he bought the 2K games. But when he gets to Question C1 (Was the depiction of the appearance of any particular NBA player or players a reason why you bought an NBA video game?), he answers "No" because he bought the game for the tattoos on *all* the players—not one or two in particular. At this point, the respondent has no further questions and the survey has *mistakenly failed* to identify him as someone who bought the game because of the Hayden Tattoos. The methodological flaws that allow this error (lack of inferential power)[10] pervade Dr. Jay's survey and could manifest in a variety of ways.

---

misleading the jury . . . .'" *Daubert*, 509 U.S. at 595. In fact, courts have "more control over experts than over lay witnesses" in assessing the applicability of Rule 403 because of the risk that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* (*quoting* Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 1388 F.R.D. 631). In addition to being fatally flawed and thus unreliable, Dr. Jay's survey at minimum will confuse the jury, be unduly prejudicial, and should thus be excluded under Rule 403.

[10] *See* Ex. D, Lenzo Rebuttal, ¶¶ 58–59.

12

## III. CONCLUSION

Dr. Jay's ultimate conclusion, that "none of the 520 individuals interviewed for the NBA 2K Survey said the tattoos on LeBron James, Danny Green, or Tristan Thompson were one of the reasons why they bought an NBA 2K video game" (Ex. A, p. 1), does not follow from her survey results. The survey methodology, in fact, does not even test for this conclusion because it is impossible to rule out the possibility that respondents bought the game because of the Hayden Tattoos. (*See* Ex. C, ¶¶ 19–25; Ex. D, ¶ 58.) Dr. Jay's survey and corresponding opinions should be excluded because the survey's numerous, compounding flaws render it wholly unreliable. At minimum, Dr. Jay's conclusion and survey results are misleading and confusing and should be excluded under Federal Rule of Evidence 403 as being more prejudicial than probative.

Dated: October 25, 2021                      Respectfully submitted,

By: */s/ Andrew Alexander*
John S. Cipolla (Ohio Bar No. 0043614)
Daniel McMullen (Ohio Bar No. 0034380)
Andrew Alexander (Ohio Bar No. 0091167)
Dustin Likens (Ohio Bar No. 0097891)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
aalexander@calfee.com
dlikens@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

## CERTIFICATE OF SERVICE

  I hereby certify that on October 25, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

                 */s/ Andrew Alexander*
                 One of the attorneys for Plaintiff