**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES HAYDEN,<br><br>                 Plaintiff,<br><br>v.<br><br>2K GAMES, INC. and TAKE-TWO<br>INTERACTIVE SOFTWARE, INC. ,<br><br>                 Defendants. | CASE NO. 1:17-cv-02635-CAB |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

### TABLE OF CONTENTS

SUMMARY OF ARGUMENT .................................................................................... 1

STATEMENT OF MATERIAL FACTS ................................................................... 4

    I.     THE TATTOOS.................................................................................. 4

    II.    TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES ................................. 7

    III.   TAKE-TWO'S USE OF THE TATTOOS IN *NBA 2K* ......................... 8

    IV.  PLAINTIFF AND THE MARKET FOR TATTOOS ........................... 9

ARGUMENT ....................................................................................................... 11

    I.     TAKE-TWO'S USE OF THE TATTOOS WAS FAIR ....................... 11

        A.    Factor One: Take-Two's Use Is Transformative and Its Profits Are Not Attributable to the Tattoos ................................. 11

            1.    Take-Two's Use of the Tattoos Is Transformative ...................... 11

            2.    The Commercial Use Sub-factor Is Of Little Weight Here .......... 15

        B.    Factor Two: The Tattoos Are Not Creative and Were Published............. 15

        C.    Factor Three: Take-Two's Copying Was Reasonable In Light of Its Purpose................................................................. 17

        D.    Factor Four: Take-Two Has Not Harmed the Tattoos' Markets............... 18

    II.    TAKE-TWO'S USE OF THE TATTOOS WAS AUTHORIZED....................... 21

    III.   TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS* ................................ 24

    IV.  TWO OF THE TATTOOS ARE UNPROTECTABLE AND, IN ANY CASE, PLAINTIFF CANNOT SHOW SUBSTANTIAL SIMILARITY .......... 27

    V.    PLAINTIFF IS NOT ENTITLED TO CERTAIN REMEDIES.......................... 29

CONCLUSION .................................................................................................. 30

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander v. Take-Two Interactive Software, Inc.*,
  489 F. Supp. 3d 812 (S.D. Ill. 2020) ........................................................................ 1, 23, 25

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) .................................................................................................. 18

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ......................................................................................... 15, 18

*B2B CFO Partners, LLC v. Kaufman*,
  787 F. Supp. 2d 1002 (D. Ariz. 2011) ............................................................................. 30

*Bell v. Worthington City Sch. Dist.*,
  No. 18 Civ. 961, 2020 WL 2905803 (S.D. Ohio June 2, 2020) .................................. 17, 18

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ................................................................................. *passim*

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) .............................................................................................. 20

*Bouchat v. Balt. Ravens Ltd. P'ship*,
  737 F.3d 932 (4th Cir. 2013) ............................................................................... *passim*

*Bouchat v. Balt. Ravens Ltd. P'ship*,
  No. 08 Civ. 397, 2011 WL 5445947 (D. Md. Nov. 9, 2011) ........................................... 20

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ........................................................................................................... 11

*Castle v. Kingsport Publ'g Corp.*,
  No. 19 Civ. 92, 2020 WL 7348157 (E.D. Tenn. Dec. 14, 2020) ......................... 12, 15, 17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................................... 11

*Compass Homes, Inc. v. Trinity Health Grp., Ltd.*,
  No. 13 Civ. 647, 2016 WL 3406054 (S.D. Ohio June 21, 2016) .................................... 29

*Consumers Union of U.S. v. Gen. Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983) ........................................................................................... 16

*Durham Indus., Inc. v. Tomy Corp.*,
    630 F.2d 905 (2d Cir. 1980).................................................................................16

*Dyer v. Napier*,
    No. 04 Civ. 408, 2006 WL 680551 (D. Ariz. Mar. 16, 2006) .................................30

*EarthCam, Inc. v. OxBlue Corp.*,
    49 F. Supp. 3d 1210 (N.D. Ga. 2014).....................................................................30

*Est. of Smith v. Cash Money Records, Inc.*,
    253 F. Supp. 3d 737 (S.D.N.Y. 2017)....................................................................20

*Foad Consulting Grp., Inc. v. Azzalino*,
    270 F. 3d 821 (9th Cir. 2001) ................................................................................22

*Gloster v. Relios, Inc.*,
    No. 02 Civ. 7140, 2006 WL 1804572 (E.D. Pa. June 28, 2006) ............................30

*Google LLC v. Oracle America, Inc.*,
    141 S. Ct. 1183 (2021).........................................................................2, 15, 18, 21

*Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*,
    345 F.3d 922 (6th Cir. 2003) .................................................24, 25, 27, 29

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
    590 F. Supp. 2d 625 (S.D.N.Y. 2008).....................................................................26

*Great Minds v. FedEx Office & Print Servs., Inc.*,
    886 F.3d 91 (2d Cir. 2018)....................................................................................21

*Hofheinz v. Discovery Commc'ns, Inc.*,
    No. 00 Civ. 3802, 2001 WL 1111970 (S.D.N.Y. Sept. 20, 2001).........................13

*I.A.E., Inc. v. Shaver*,
    74 F.3d 768 (7th Cir. 1996) ............................................................................22, 23

*ITOFCA, Inc. v. MegaTrans Logistics, Inc.*,
    322 F.3d 928 (7th Cir. 2003) .................................................................................24

*Johnson v. Jones*,
    149 F.3d 494 (6th Cir. 1998) ..........................................................................21, 29

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ..........................................................................13, 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ..........................................................................12, 16

*LimeCoral, Ltd. v. CareerBuilder, LLC,*
    889 F.3d 847 (7th Cir. 2018) ...............................................................24

*Mahavisno v. Compendia Biosci., Inc.,*
    164 F. Supp. 3d 964 (E.D. Mich. 2016)................................................22

*Mason v. Montgomery Data, Inc.,*
    967 F.2d 135 (5th Cir. 1992) ................................................................29

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)..............................................................................11

*Matthew Bender & Co., Inc. v. West Publ'g Co.,*
    158 F.3d 693 (2d Cir. 1998)...................................................................1

*MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.,*
    89 F.3d 1548 (11th Cir. 1996) ..............................................................27

*Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.,*
    935 F. Supp. 490 (S.D.N.Y. 1996)........................................................13

*Murphy v. Lazarev,*
    589 F. App'x 757 (6th Cir. 2014) .........................................................21

*Nat'l Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio,*
    15 F.3d 559 (6th Cir. 1994) ..................................................................11

*New Name, Inc. v. The Walt Disney Co.,*
    No. 07 Civ. 5034, 2008 WL 5587487 (C.D. Cal. July 23, 2008) ..........30

*Núñez v. Caribbean Int'l News Corp.,*
    235 F.3d 18 (1st Cir. 2000)...................................................................17

*Photographic Illustrators, Corp. v. Orgill, Inc.,*
    953 F. 3d 56 (1st Cir. 2020).................................................22, 23, 24

*Psychopathic Recs., Inc. v. Anderson,*
    No. 08 Civ. 13407, 2009 WL 2591385 (E.D. Mich. Aug. 24, 2009) .....27

*Reinicke v. Creative Empire, LLC,*
    38 F. Supp. 3d 1192 (S.D. Cal. 2014)...................................................23

*Sandoval v. New Line Cinema Corp.,*
    147 F.3d 215 (2d Cir. 1998)..................................................................26

*Sarl Louis Feraud Int'l v. Viewfinder Inc.,*
    627 F. Supp. 2d 123 (S.D.N.Y. 2008)..............................................14, 20

*Sartor v. Walters*,
  No. 06 Civ. 11, 2006 WL 3497856 (W.D. La. Dec. 5, 2006)..................................30

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ........................................................................16, 17

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
  709 F.3d 1273 (9th Cir. 2013) ...............................................................................12

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
  449 F. Supp. 3d 333 (S.D.N.Y. 2020)............................................................ *passim*

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
  No. 16 Civ. 724, 2016 WL 4126543 (S.D.N.Y. Aug. 2, 2016) .............................29

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
  No. 16 Civ. 724, 2018 WL 1626145 (S.D.N.Y. Mar. 30, 2018) .....................25, 26

*Stephens v. Hayes*,
  374 F. App'x 620 (6th Cir. 2010) ..........................................................................11

*Subafilms, Ltd. v. MGM–Pathe Commc'ns Co.*,
  24 F.3d 1088 (9th Cir. 1994) ...................................................................................1

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014)...............................................................12, 15, 18, 19

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
  953 F.3d 638 (9th Cir. 2020) .................................................................................17

*Wilchombe v. TeeVee Toons, Inc.*,
  555 F.3d 949 (11th Cir. 2009) ...............................................................................24

**Statutes**

17 U.S.C. § 103.................................................................................................27, 28

17 U.S.C. § 106.......................................................................................................21

17 U.S.C. § 412.......................................................................................................29

17 U.S.C. § 501.......................................................................................................21

17 U.S.C. § 504.......................................................................................................29

**Rules**

Fed. R. Civ. P. 56(a) ..............................................................................................11

## <u>SUMMARY OF ARGUMENT</u>

Tattoos are forms of self-expression as they are permanent parts of one's likeness, like scars and freckles.  As they are part of the body, *any* realistic depiction of a tattooed person, whatever the visual medium, will necessarily show their tattoos.  *What* to get tattooed is up to the inked person, and meaningful to them.  For LeBron James, Tristan Thompson, and Danny Green (the "NBA Players"), three professional NBA basketball players, their tattoos are personal and permanent parts of their appearance.  As Mr. James explained, "my tattoos are part of my body and my likeness, and I have the right to have my tattoos visible when people or companies depict what I look like."  Decl. of LeBron James ("James Decl.") ¶ 10.

*Solid Oak Sketches, LLC v. 2K Games, Inc.* is directly on point.  449 F. Supp. 3d 333, 343–45 (S.D.N.Y. 2020).  There, Solid Oak asserted that it was copyright infringement to depict NBA players with their tattoos in the same *NBA 2K* video games at issue here.  Solid Oak sought to upend the expectations of tattooed players depicted in *NBA 2K*, who understood that they would be permitted to display their tattoos as part of their likenesses.  The *Solid Oak* court granted summary judgment for Take-Two on multiple independent grounds, holding that NBA players, including Mr. James, may be accurately depicted with their tattoos in *NBA 2K*.  Specifically, it found that such use was (a) fair, (b) authorized, and (c) *de minimis*.[1]

Like *Solid Oak*, based on the undisputed facts in this record, Plaintiff's claim fails as a matter of law for four independent reasons.[2]  ***First***, Take-Two's depiction of the Tattoos is fair

---

[1]  The only other case involving the accurate depiction of people with tattoos is *Alexander v. Take-Two Interactive Software, Inc.*, where the Court denied summary judgment.  489 F. Supp. 3d 812 (S.D. Ill. 2020).  *Alexander*, however, did not even address *Solid Oak*, and involved a WWE wrestling game implicating distinct factual and legal issues that are not at issue here, including what the court viewed as a factual dispute surrounding the creation of those tattoos and uncertainty of the existence of the *de minimis* use defense in the Seventh Circuit.

[2]  As Plaintiff's direct infringement (Count I) claim fails, its indirect infringement (Count II) claim necessarily fails too.  *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998); *Subafilms, Ltd. v. MGM–Pathe Commc'ns Co.*, 24 F.3d 1088, 1092 (9th Cir. 1994).

use, as each of the four fair use factors favors Take-Two:

- As to the first factor (the "purpose and character of the use"), Take-Two uses the six tattoos at issue (the "Tattoos") for a different, transformative purpose.  Whereas Plaintiff's purpose was to adorn the NBA Players' bodies with their self-expression, Take-Two's purpose was to accurately portray the players.  Moreover, two of the Tattoos are covered by the players' jerseys, and all of the Tattoos appear smaller than they do in real life, appear only fleetingly, among innumerable other elements, and always on the bodies of the NBA Players.

- As to the second factor (the "nature of the work"), the Tattoos are, at best, entitled to thin copyright protection as they were created at the direction and approval of the players, comprise common tropes, and were copied from pre-existing works.

- As to the third factor (the "amount and substantiality of the portion used"), depicting the Tattoos was necessary to achieve Take-Two's purpose of creating a realistic game.  Even so, as noted above, the Tattoos appear smaller than they appear in real life, are hard to make out, and the two largest are covered up by the players' jerseys such that they are unidentifiable.

- As to the fourth factor (the "effect of the use on the potential market"), there is no market for accurately depicting tattoos in a video game—no witness in this case has ever heard of a tattoo licensed for such use—so their inclusion in *NBA 2K* does not harm a cognizable market.  Nor is there a potential market as NBA players have appeared in *NBA 2K* with their tattoos since at least 2001, without payment to or objection from tattooists.  Further, as the Supreme Court recently confirmed in *Google LLC v. Oracle America, Inc.*, this factor must "take into account the public benefits the copying will likely produce."  141 S. Ct. 1183, 1206 (2021).  Here, Plaintiff admits that he has not lost any sales, whereas Take-Two's use of the Tattoos has created an important new creative product that would not exist otherwise.

Plaintiff is attempting to chill tattooed people's ability to depict themselves as they wish in media.

**Second**, Take-Two's use was authorized.  The NBA Players licensed their likenesses to the National Basketball Association ("NBA") and NBA Players Association ("NBAPA").  The NBA and NBAPA in turn licensed the likenesses to Take-Two.  The NBA Players had the right to grant such permission based on an implied license provided when Plaintiff inked them.  As each player explains, and as is confirmed by tattoo expert Dr. Nina Jablonski, when a client is inked, both client and tattooist reasonably expect that the tattoo becomes part of the client's likeness, and the client is then free to disseminate his likeness without returning to the tattooist for permission.  Strikingly, at Plaintiff's deposition, he testified that when his clients leave his tattoo parlor, they "**can go about their life as they wish without needing to run back to the tattooist for permission**."  Decl. of Miranda Means ("Means Decl.") Ex. 11 (Pl.'s Tr.) 156:8–13.  Plaintiff never told the NBA Players that they would need his permission to show their tattoos, and they in fact *did* display their tattoos in numerous media outlets, including video games, without any objection from Plaintiff.

**Third**, the Tattoos are a *de minimis* part of *NBA 2K* as they are hard to observe.  When users play, they choose from hundreds of players, such that Messrs. Green, James, and Thompson often will not appear.  Even when Messrs. James and Thompson are selected, their chest tattoos are covered by their jerseys.  And the remaining tattoos are smaller than in real life because of the TV size on which *NBA 2K* typically is played.  They also are blurry, obstructed, and accompanied by so many other game elements that the ordinary user will perceive them as visual noise, contributing to realism, but not a focus.[3]

---

[3]    Plaintiff stresses the possibility to zoom in, but the only evidence is that an ordinary user would not do so.

**Fourth**, the Lion Tattoo and Brother's Keeper Tattoo are unprotectable as Plaintiff inked them from preexisting works—the Sistine Chapel, the Bible, and a playing card.  And they are on the players' chests, covered by jerseys in the game, such that there is no substantial similarity.

**Finally**, in addition to Plaintiff's claim failing on the merits, his request for statutory damages and attorney's fees should be dismissed.  As this Court previously held, the Copyright Act forecloses such remedies for "any infringement of copyright commenced after first [publication] of the work and before the effective date of its registration."  MTD Op. (Dkt. 17) 10.  Here, as the copyrights were registered *after* the purported infringement began, the remedies are barred.  Although this Court indicated that discovery was needed to assess whether *NBA 2K* should be viewed holistically or if each annual release is a distinct act of purported infringement, *id.* at 11, discovery has established that the series should indeed be viewed holistically.

Plaintiff is attempting to change copyright law to wrest control of the NBA Players' likenesses away from them (after the tattoos became permanent parts of their appearance), and create novel liability for the accurate and consensual depiction of tattooed people that the tattooist knew would be depicted.  Thus, Take-Two respectfully requests that this Court grant its motion, dismiss Plaintiff's claims, and hold that he is not entitled to statutory damages or fees.

## STATEMENT OF MATERIAL FACTS

### I.     THE TATTOOS

The NBA Players have been professional basketball players for the NBA since 2003, 2009, and 2011 respectively.  James Decl. ¶ 2; Decl. of Daniel Green ("Green Decl.") ¶ 2; Decl. of Tristan Thompson ("Thompson Decl.") ¶ 2; Means Decl. Ex. 33 (NBA Player Profiles).  Each athlete regularly appears in media bearing their various tattoos, including the Tattoos at issue. *Id.*; Means Decl. Ex. 11 (Pl.'s Tr.) 50:1–7.  Their Tattoos reflect their personal expression and identity.  James Decl. ¶ 9; Thompson Decl.¶ 4; Green Decl. ¶ 4; Decl. of Nina Jablonski

("Jablonski Decl.") ¶ 47; Means Decl. Ex. 11 (Pl.'s Tr.) 139:16–19.[4]

In 2007, at Mr. James' request, Plaintiff inked Mr. James' mother's name, "Gloria," alongside a crowned lion on Mr. James' right arm (top right)  ("Gloria Tattoo") to cover up a pre-existing tattoo of a lion.  James Decl. ¶ 6; Means Decl. Ex. 11 (Pl.'s Tr.) 56:11–17.  Next, in 2008, at Mr. James' request, Plaintiff inked a lion on Mr. James' chest (middle right) ("Lion Tattoo") by copying a lion from a playing card that Mr. James provided.  James Decl. ¶ 8; Means Decl. Exs. 11 (Pl.'s Tr.) 81:25–82:13; 12 (Tovanche Tr.) 117:12– 119:13.  Then, at Mr. James' request, Plaintiff inked five stars (bottom right) ("Shoulder Stars Tattoo") across Mr. James' left shoulder.  James Decl. ¶ 7; Means Decl. Exs. 11 (Pl.'s Tr.) 72:8–10; 12 (Tovanche Tr.) 129:4–130:9.



Around 2012, Plaintiff inked additional flames (top right) ("Fire Tattoo") on Danny Green's arm at Mr. Green's request around a pre-existing tattoo of a basketball player with flames around his image, done by a different tattooist. Green Decl. ¶¶ 5–6; Means Decl. Exs. 11 (Pl.'s Tr.) 91:3–14; 93:3–94:11; 22 (Pl.'s Resp. 1st Interrogs.) No. 1.  Later, at Mr. Green's request, Plaintiff inked clouds on Mr. Green's right inner arm (middle right) ("Scroll Tattoo") around a pre- existing scroll tattoo with the names of Mr. Green's brothers, done by a different tattooist.  Green Decl. ¶ 7; Means Decl. Ex. 11 (Pl.'s Tr.) 98:21–99:1, 99:23–100:10. Finally, in or around 2012, at Tristan Thompson's request, Plaintiff inked the words "My Brother's Keeper" and an image of two fingers touching (bottom right) ("Brother's Keeper Tattoo") on Mr. Thompson's chest.  Thompson Decl.



---

[4]   *See also* Means Decl. Exs. 11 (Pl.'s Tr.) 31:3–5; 12 (Tovanche Tr.) 33:21–34:21, 36:3–14.

¶ 5; Means Decl. Ex. 11 (Pl.'s Tr.) 112:24–113:15.

Each of the Tattoos was selected and approved by the NBA Players.  James Decl. ¶ 5; Thompson Decl. ¶¶ 6–7; Green Decl. ¶ 8; Means Decl. Exs. 22 (Pl.'s Resp. 1st Interrogs.) No. 1; 11 (Pl.'s Tr.) 75:8–22, 95:13–16; 13 (Hayden Tr.) 127:8–11, 22:17–23.  And each of the Tattoos was paid for by the NBA Players.  Means Decl. Ex. 22 (Pl.'s Resp. 1st Interrogs.) No. 1.

When Plaintiff inked the NBA Players, he knew that they were professional basketball players who would appear on television with their tattoos.  *Id.* Ex. 11 (Pl.'s Tr.) 47:11–14, 49:13–17, 50:16–17, 91:25–92:9, 113:8–25, 114:12–15.  Consistent with tattoo industry practice, Plaintiff agreed that, when clients leave his tattoo parlor, they "**can go about their life as they wish without needing to run back to the tattooist for permission**."  *Id.* at 156:8–13.  He also admitted that he did not tell the NBA Players that they would need his permission to appear in video games with the Tattoos.  *Id.* Exs. 11 (Pl.'s Tr.) 60:15–61:5, 156:3–7; 26 (Pl.'s Resp. Am. RFA) Nos. 231–233.  Plaintiff has never "told a player that they needed [his] permission before appearing on television playing basketball," never "told the NBA that they needed [his] permission to depict players on television playing NBA games showing their tattoos," and has never "done anything to try to stop that."  *Id.* Ex. 11 (Pl.'s Tr.) 148:21–149:1.  Indeed, Plaintiff has never told any player that the player needed permission to appear in any media.  *Id.* at 148:17–20, 152:3–7; *id.* Ex. 26 (Pls. Resp. Am. RFA) Nos. 188, 190, 192, 194, 196, 202.

The NBA Players understood that they could display the Tattoos on their bodies and allow others to depict their likenesses with their Tattoos.  James Decl. ¶ 10; Thompson Decl. ¶ 11; Green Decl. ¶ 11; Jablonski Decl. ¶¶ 34–40.  Other tattooists, including Plaintiff's own colleague, Bernardino Tovanche, agree that clients do not need their tattooists' permission to show their tattoos in real life and in media.  Jablonski Decl. Exs. 3 (Cornett Decl.) ¶¶ 16, 22; 5

(Wright Decl.) ¶ 6; 7 (G. Glatstein Decl.) ¶ 11; 8 (C. Alexander Tr.) 66:2–8; Means Decl. Ex. 12 (Tovanche Tr.) 165:9–20; 168:23–169:6. Indeed, Plaintiff himself has tattoos and has never asked permission from a tattooist before appearing in photographs, videos, or commercials showing the tattoos on his body. Means Decl. Ex. 11 (Pl.'s Tr.) 39:4–23. And Dr. Jablonski confirmed that it is industry practice that, "[o]nce a tattoo has been inked on a client's skin, the tattooist exercises no control over it because the tattoo itself is part of the client's body." Jablonski Decl. ¶ 34.

## II.  TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES

Take-Two creates *NBA 2K*, a series of basketball simulation video games. Decl. of Alfredo Brody ("Brody Decl.") ¶ 2; Means Decl. Ex. 27 (Pl.'s Resp. 2d RFA) No. 242. As explained by Take-Two's Vice President, Head of Global Sports Marketing, Alfredo Brody, *NBA 2K* is a realistic depiction of NBA basketball and includes a number of elements that appear in real world NBA basketball. Brody Decl. ¶¶ 3–4; Means Decl. Exs. 14 (Argent Tr.) 57:16–22; 19 (Brody Tr.) 60:7–14; 1–5 (*NBA 2K* gameplay videos); 6–10 (*NBA 2K16, NBA 2K17, NBA 2K18, NBA 2K19, NBA 2K20*, respectively). As explained by Take-Two's video game expert, Dr. Ian Bogost, in *NBA 2K*, the "player's typical experience will involve looking at the basketball court in a manner similar to that of a television viewer or a fan watching the game from the stands." Decl. of Ian Bogost ("Bogost Decl.") ¶ 56; Means Decl. Ex. 14 (Argent Tr.) 80:11–18, 82:1–7; 15 (Hsieh Tr.) 60:16–25. As can be seen from recordings of *NBA 2K* gameplay, Means Decl. Exs. 1–5, "[a]s plays take place, including shots, throw-ins, free-throws, substitutions, fouls, and other ordinary actions of the sport, the camera view adjusts accordingly, in a manner similar to the way a television broadcast of the sport might appear." Bogost Decl. ¶ 58. Users "play action-oriented bouts of simulated basketball, either alone against the computer or with other people," and can choose in each game from over 400 current and retired

NBA players to form teams to play against other teams.  Bogost Decl. ¶ 54; Brody Decl.¶ 5.

Other realistic visual elements include "the movement and behavior of the crowd, the coaches, the referees, team members on the bench," and contextual events and situations like live and televised professional basketball.  Bogost Decl. ¶ 60.  *NBA 2K* also includes auditory components such as realistic announcers and sportscasters, cheering crowds, buzzers, and other elements meant to mimic a real basketball game.  Bogost Decl. ¶¶ 60–61; Brody Decl.¶ 4.

## III.     **TAKE-TWO'S USE OF THE TATTOOS IN *NBA 2K***

To depict the NBA Players, Take-Two obtained a license to portray their likenesses in the game from the NBA and the NBAPA, which were licensed by the NBA Players.  Brody Decl.¶ 10; Means Decl. Exs. 14 (Argent Tr.) 32:19–35:24; 34–35 (NBA & NBAPA Contracts).[5]  The Tattoos are "part of" the players' likenesses, and Take-Two had the right to show the players as they look in real life, including their tattoos.  Means Decl. Ex. 20 (Thomas Tr.) 132:21–133:14.[6]

To serve its artistic purpose of simulating NBA basketball, Take-Two accurately replicates the likenesses of the NBA Players precisely, including their height, build, skin, hair, facial features, and tattoos.  Brody Decl.¶ 5; Means Decl. Exs. 16 (Zhang Tr.) 28:4–22, 101:10–14; 21 (Stauffer Tr.) 22:22–23:4, 23:16–25, 124:3–8.  Plaintiff himself admitted that the NBA Players would not "look like themselves" without their tattoos, and that, "to depict the player realistically you would have to have his tattoos on him."  Means Decl. Ex. 11 (Pl.'s Tr.) 142:9–143:3.  NBA players have been depicted in *NBA 2K* games with the tattoos they bear in real life since at least *NBA 2K2*, which was released in 2001.  Brody Decl.¶ 8; Means Decl. Exs. 23

---

[5]  *Id.* Exs. 20 (Thomas Tr.) 94:21–95:8 ("Since we started making NBA games in 1997, it has been part of our agreement that we're allowed to depict the NBA players, the NBA arenas, and their trademarks in the game."); 14 (Argent Tr.) 36:21–37:4 (describing Take-Two's agreement with the NBA and NBAPA).

[6]  *Id.* Exs. 14 (Argent Tr.) 36:1–37:4, 140:6–22, 141:11–22 ("We've always understood that we had the rights to the players and the teams and the logos, likenesses, everything."); 19 (Brody Tr.) 44:13–45:7.

(Defs.' 2d Am. Resp. Interrogs.) No. 3; 20 (Thomas Tr.) 123:2–125:1.

The NBA Players are "scanned" into *NBA 2K* using "photogrammetry," which involves simultaneously taking hundreds of digital photographs of a player's body from different angles to create a resulting "texture map."  Brody Decl. ¶¶ 5–7; Means Decl. Exs. 17 (Dawson Tr.) 18:15–19, 46:23–47:17, 49:21–50:6, 68:18–22; 20 (Thomas Tr.) 89:12–90:10; Bogost Decl. ¶¶ 20–24, Exs. 6–8.  Software then "wraps" the skin around a 3D model of that player, resulting in a realistic depiction similar to what would be captured by a digital camera.  Means Decl. Ex. 17 (Dawson Tr.) 79:19–80:8; Bogost Decl. ¶¶ 24–26, Exs. 9–10; Brody Decl.¶ 5.  The process captures a players' detailed likeness, from facial features, to build, to "scars, stretch marks, [and] moles" to anything else on the photographed skin.  Means Decl. Ex. 18 (Friesch Tr.) 30:4–14.

As the Tattoos appear only when the NBA Players are depicted, when the user does not select them from the hundreds of available players, the Tattoos do not appear.  Brody Decl. ¶¶ 11–12; Bogost Decl. ¶¶ 77–80.  Given the average screen size on which *NBA 2K* is played, the Tattoos appear smaller in *NBA 2K* than they do in real life and are often obstructed by clothing and armbands, out of focus, or difficult to notice among the rapid movements of the basketball game.  Bogost Decl. ¶¶ 93, 107; Means Decl. Ex. 17 (Dawson Tr.) 98:21–99:4.  Thus, "no matter the camera configuration or zoom, the ordinary player will perceive the Tattoos as a kind of visual noise creating realism in the environment and the character."  Bogost Decl. ¶ 97.

## IV.  PLAINTIFF AND THE MARKET FOR TATTOOS

Despite the fact that NBA players have appeared with their tattoos in *NBA 2K* since at least 2001, no tattooist has ever demanded payment for tattoos in the game until Plaintiff.[7]

---

[7]   In *Solid Oak*, the claim was not brought by the tattooists but by a company that bought the rights to the tattoos from them for what they believed was an unrelated purpose—those tattooists submitted declarations disagreeing with Solid Oak's position.  Jablonski Decl. Exs. 3–5 (Solid Oak Tattooists Decls.).

Brody Decl. ¶ 21.  None of the witnesses in this case, including Plaintiff's own experts, are aware of a market for tattoos in video games.  Bogost Decl. ¶ 9; Jablonski Decl. ¶¶ 61–69; Decl. of James Malackowski ("Malackowski Decl.") App'x A, at 30–32 ("Mr. Hayden has not identified evidence showing that a market exists for licensing to video games . . . .").  Plaintiff's expert, Dr. Lenzo, has not observed any market for tattoos having formed in the two decades *NBA 2K* has been depicting tattoos.  Means Decl. Ex. 30 (Lenzo Tr.) 263:16–264:4.

Plaintiff admitted that he has never "licensed a tattoo for a video game" or been "approached" for a license for video games, and he is "not aware of any tattooist who has licensed tattoos for inclusion in a video game."  *Id.* Exs. 11 (Pl.'s Tr.) 173:6–10, 177:24–178:6; 28 (Pl.'s Resp. RFA) No. 240.  Indeed, prior to this lawsuit, he "never attempted to license tattoos for use in video games."  *Id.* Ex. 11 (Pl.'s Tr.) 177:24–178:2.[8]  Jon Hayden, Plaintiff's brother and another professional tattooist, similarly could not remember any instance in which he told someone they needed his permission before appearing in a photograph or ever objected to an athlete being shown in media with tattoos he inked.  Means Decl. Ex. 13 (Hayden Tr.) 49:7–12, 54:4–11, 55:8–17, 59:15–18, 72:13–73:9, 93:25–94:5.  Other tattooists similarly have never heard of requiring permission to be depicted in media.  Jablonski Decl. Ex. 7 (Glatstein Decl.) ¶ 12; Means Decl. Ex. 12 (Tovanche Tr.) 182:3–19.  And Plaintiff testified that he does not know of any lost customers, revenue, income, or licensing opportunities from the depiction of the Tattoos in *NBA 2K*.  *Id.* Ex. 11 (Pl.'s Tr.) 208:10–211:1, 212:4–16.

---

[8]    Although Plaintiff produced a handful of releases (not licenses) for some tattoos, ***none*** of them are for video games and many do not even concern tattoos inked on people.  Bogost Decl. ¶ 117 n.96; Means Decl. Exs. 24 (Pl.'s Resp. 2d Interrogs.) No. 17; 36 (Pl.'s Tr. Exs. 26, 31, 33, 35, 36, 38, 39, 41, and 42).  Also, most of them were either unsigned or signed *after Solid Oak* and this litigation commenced, which raised a cloud on accepted practices.  As Dr. Bogost explained, unlike the video game industry, in the film and television industry it is not uncommon to obtain releases, even if the releases would not be necessary.  Bogost Decl. ¶ 117 n.96.

## ARGUMENT

Courts grant summary judgment if there is "no genuine dispute as to any material fact" and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant informs "the district court of the basis for its motion" and the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then, the non-moving party must present evidence establishing disputed issues as to material facts. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Conclusory allegations and unsupported speculation are insufficient. *See id.*

## I.   TAKE-TWO'S USE OF THE TATTOOS WAS FAIR

Courts regularly dismiss copyright claims on summary judgment under the doctrine of fair use. *See*, *e.g.*, *Nat'l Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio*, 15 F.3d 559, 561 (6th Cir. 1994) (affirming finding of fair use on summary judgment); *Stephens v. Hayes*, 374 F. App'x 620, 624 (6th Cir. 2010) (same). As the *Solid Oak* court concluded, "no reasonable fact finder could determine that Defendants' use of the Tattoos in *NBA 2K* was not fair use." 449 F. Supp. 3d at 350. The same is true here based on this case's undisputed facts.

### A.   Factor One: Take-Two's Use Is Transformative and Its Profits Are Not Attributable to the Tattoos

The first fair use factor requires consideration of two main sub-factors: (1) transformative use, and (2) commercial use. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578–79 (1994).

#### 1.   Take-Two's Use of the Tattoos Is Transformative

The Supreme Court has said that a work is transformative where, instead of "supersed[ing] the objects of the original creation," it "adds something new, with a further purpose or different character." *Id.* at 579 (internal quotation marks omitted). It can be "transformative in function or purpose [even] without altering or actually adding to the original

work."  *Castle v. Kingsport Publ'g Corp.*, No. 19 Civ. 92, 2020 WL 7348157, at *5 (E.D. Tenn.

Dec. 14, 2020) (quoting *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d

Cir. 2014)).  Each of the considerations used by courts to determine transformativeness, *Bill

Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609–611 (2d Cir. 2006), supports

Take-Two.  We discuss each consideration in turn.

      Different Purposes.  The first consideration is "whether the two works have different

purposes."  *Solid Oak*, 449 F. Supp. 3d at 347; *Lexmark Int'l, Inc. v. Static Control Components,

Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (first factor favored fair use where works were used for

"[different] purposes").  Courts have held that using visual works to depict real world people or

events is a different purpose than the work's original, expressive purpose, supporting a finding of

transformativeness.  For example, using Grateful Dead concert posters as "historical artifacts to

document and represent the actual occurrence of Grateful Dead concert events" was a different

purpose from the posters' original "artistic expression and promotion[al]" value.  *Bill Graham*,

448 F.3d at 609.  Similarly, showing a logo "as part of the historical record" was different from

the logo's original purpose "as the brand symbol for the team."  *Bouchat v. Balt. Ravens Ltd.

P'ship*, 737 F.3d 932, 940 (4th Cir. 2013) (transformative to use, "not for its expressive content,

but rather for its factual content" and as a "historical guidepost"); *SOFA Ent., Inc. v. Dodger

Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (using *Ed Sullivan Show* clip "as a biographical

anchor" within the fictional musical *Jersey Boys* constituted transformative use).

      Here, Plaintiff explicitly admits that "[p]layer accuracy . . . including having accurate

tattoos" was "an important factor in the Accused Games' 'realism.'"  Means Decl. Ex. 25 (Pl.'s

Suppl. Resp. Interrogs.) No. 20; *Solid Oak*, 449 F. Supp. 3d at 347.  This use is different from

Plaintiff's purpose of inking requested tattoos on players as "a reflection of [their] personal

expression." Jablonski Decl. ¶ 42; *supra* 4.  And the fact that the NBA Players are professional basketball players makes this transformative purpose stronger.  *See Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (use of film footage depicting Muhammed Ali was transformative, due to his status as a "figure of legitimate public concern").[9]

Size of the Reproductions.  It is well-recognized that when a work is shown at a reduced size, this favors transformativeness.  *Solid Oak*, 449 F. Supp. 3d at 347 (finding tattoos appearing at 4.4% to 10.96% actual size in *NBA 2K* favored fair use).  In *Bill Graham*, the concert posters reproduced in the book were just small enough to "permit readers to recognize the historical significance of the posters," but not as large as the originals.  448 F.3d at 611.  As the defendant "used the minimal image size necessary to accomplish its" purpose, the use was transformative.  *Id.*  Similarly, in *Kelly v. Arriba Soft Corp.*, although the defendant "made exact replications of Kelly's images," they were "smaller [and] lower-resolution" making it less likely that they would substitute for the original works.  336 F.3d 811, 818 (9th Cir. 2003).

Dr. Bogost calculated that, when the NBA Players' real-life sizes are compared to their in-game sizes on the average game screen, the Tattoos appear "1.11–10.3% the size."  Bogost Decl. ¶ 76.  Plaintiff even admits that the players, and by extension the Tattoos, are "smaller than they are in real life."  Means Decl. Ex. 11 (Pl.'s Tr.) 161:20–162:3.

Minimizing Expressive Value.  The third consideration is "whether the expressive value of the reproduced material is minimized," which looks not only at size, but also the context in which the work appears and whether it minimizes the expressive value.  In *Solid Oak*, the court found that "myriad other auditory and visual elements" in *NBA 2K* "minimized" their expressive value.  449 F. Supp. 3d at 348.  Similarly, in *Bill Graham*, the book included a "prominent

---

[9]   Take-Two's transformative use of the Tattoos is not lessened by *NBA 2K* being an entertainment property.  *See Hofheinz v. Discovery Commc'ns, Inc.*, No. 00 Civ. 3802, 2001 WL 1111970, at *4 (S.D.N.Y. Sept. 20, 2001).

timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book."  448 F.3d at 611.  Moreover, the images were "displayed at angles," such that the overall layout "ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain."  *Id.*  Likewise, in *Bouchat*, the logo was "used only fleetingly and insignificantly . . . limiting its expressive value."  737 F.3d at 941.  And, in *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, the court noted that the argument for "transformative use is stronger" where a "three-dimensional, life-sized" work was reduced to a smaller, 2D image imbued with the defendant's own creative expression.  627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008).

Here, *NBA 2K* is a "virtual world that mirrors the real world as closely as possible, while giving players an immersive and entertaining experience," Bogost Decl. ¶ 50, with "many components, including graphics, characters, a fictitious plot, gameplay, and music."  *Solid Oak*, 449 F. Supp. 3d at 341 (alteration omitted).  "[W]hen the Tattoos are depicted, they appear among a plethora of other visual and auditory elements, including other tattoos."  Bogost Decl. ¶ 76.  In addition to there being a "mass of other visual features shown on screen," the Tattoos are often blocked, blurry, far away, moving, or out of frame.  Brody Decl. ¶ 14–17; *see infra* 24.  Far from being prominent, they are just "visual noise creating realism" but not making a visual impact, akin to hairstyles or facial features, Bogost Decl. ¶ 97, and "subordinated to the display of the court and the players in competition."  *Id.* ¶ 90.

Proportion of Copied Material.  The fourth consideration is "the proportion of copied material" in relation to the whole work.  *Solid Oak*, 449 F. Supp. 3d at 347.  In *Bill Graham*, the images totaled less than "one-fifth of one percent of the book."  448 F.3d at 611.  Likewise, in *Bouchat*, in the "vast majority of its appearances," the logo was "present for fractions of a

- 14 -

second, and [could] be perceived only by someone who [was] looking for it." 737 F.3d at 940.

Here, the Tattoos are a tiny fraction of *NBA 2K*. In terms of data, they are, at most, "0.00515% of *NBA 2K*." Bogost Decl. ¶ 113; Brody Decl.¶ 18. In terms of visuals, they often do not appear. *Supra* 8. When they do, they are dwarfed by the "plethora of other visual and auditory elements (including other tattoos) in *NBA 2K*." Bogost Decl. ¶ 7. The Tattoos certainly are far less of *NBA 2K* than the 0.2% that supported transformative use in *Bill Graham*.

As each of these considerations favors Take-Two, its use of the Tattoos is transformative.

### 2. The Commercial Use Sub-factor Is Of Little Weight Here

The Supreme Court has recognized that "many common fair uses are indisputably commercial," and whether a "use was a commercial endeavor . . . is not dispositive," particularly where the use is transformative. *Google*, 141 S. Ct. at 1204. Indeed, *Solid Oak* gave commercial use little weight as the tattoos were indistinguishable in gameplay and "consumers do not buy" *NBA 2K* for tattoos. 449 F. Supp. 3d at 348. That is the case here, where two of the tattoos are covered by jerseys and the remainder are hard to pick out. *Infra* 24. Dr. Deborah Jay, an esteemed survey expert, submitted a survey that showed that "there is no link between the sales of the *NBA 2K* video games and their depiction of the tattoos" on the NBA Players. Decl. of Deborah Jay Ex. A, at 8. This factor does not weigh against fair use. *Swatch*, 756 F.3d at 83 ("little weight" for commercial use given attenuate link from defendant's gain to its copying).

For the foregoing reasons, the first fair use factor weighs in favor of fair use.

### B. Factor Two: The Tattoos Are Not Creative and Were Published

The second fair use factor considers "whether the work was (1) 'factual or creative' and (2) published or unpublished." *Castle*, 2020 WL 7348157, at *6. Although the "second factor has rarely played a significant role in the determination of a fair use dispute," *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015), it favors Take-Two here.

*First*, any creativity of the Tattoos is thin at best, as the Tattoos are unoriginal.  A work is not original if it is a "mere reproduction of a [prior] work of art in a different medium."  *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir. 1980).  Further, under the doctrine of *scènes à faire,* elements that are "standard, stock, or that necessarily follow from a common theme or setting" are not protectable.  *Lexmark*, 387 F.3d at 535 (alterations omitted).

Here, each Tattoo was copied from pre-existing works or used common tattoo elements.  As Mr. James' Lion Tattoo is a direct copy of a playing card with the Venetian logo on it, *supra* 4, Plaintiff holds no copyrights in it.  *See infra* 27.  As Mr. Thompson's Brother's Keeper Tattoo copies (a) a Biblical phrase and (b) Michelangelo's *Creation of Adam*, Plaintiff also holds no copyrights.  *Supra* 4, *infra* 28.  And as Plaintiff's remaining tattoos merely use the common elements of stars, clouds, flames, or lions, and two are merely minor additions to pre-existing tattoos, *supra* 4; Jablonski Decl. ¶ 56, they are unprotectable *scènes à faire*.

Moreover, any creativity must be weighed against the fact that Take-Two copied the Tattoos to depict real-world subject matter realistically.  *See Consumers Union of U.S. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) (copying plaintiff's work "in the interest of accuracy" did not weigh against fair use); *Bouchat*, 737 F.3d at 943 (where use is related to work's role as "historical facts, then the creative nature of the work matters much less than it otherwise would" (internal quotation marks omitted)).  Plaintiff conceded that *NBA 2K* is more realistic with the Tattoos.  Means Decl. Ex. 25 (Pl.'s Suppl. Resp. Interrogs.) No. 20.

*Second*, the Tattoos were published.  4th Am. Compl. (Dkt. 33) Exs. C–H.  "Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred."  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013).  This is "a critical element of its 'nature'" as copying "even a substantial quantity of a published work

may be within the fair use doctrine." *Bell v. Worthington City Sch. Dist.*, No. 18 Civ. 961, 2020 WL 2905803, at *7 (S.D. Ohio June 2, 2020). Where a work is widely disseminated, as is the case here, it favors fair use. *Seltzer*, 725 F.3d at 1178 (image on Internet and L.A. streets); *Kelly*, 336 F.3d at 820 (photographs posted on the Internet); *Bell*, 2020 WL 2905803, at *8 (work's "widely published nature" weighs in favor of fair use). This factor supports Take-Two.

### C.  Factor Three: Take-Two's Copying Was Reasonable In Light of Its Purpose

"The third factor asks whether the amount and substantiality of the portion of the work used was reasonable in relation to the purpose of the copying." *Id.* For some purposes, "copying the entirety of a work is sometimes necessary to make a fair use of the image." *Castle*, 2020 WL 7348157, at *7. Moreover, courts consider whether the copied material is "embedded" in a "larger, transformative" work. *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 651 (9th Cir. 2020). Here, the Tattoos are 2D images used to depict real life accurately, so using less than the whole would defeat Take-Two's purpose of realism. *Supra* 8. And the Tattoos are just one small part of a much larger work composed of numerous other elements. Thus, this factor does not weigh against fair use. *See Bouchat*, 737 F.3d at 949; *Seltzer*, 725 F.3d at 1178; *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000).

Moreover, it is well-established that when images are reproduced in a "reduced size," the "visual impact of their artistic expression is significantly limited," which indicates that the use "is tailored to further [the defendant's] transformative purpose." *Bill Graham*, 448 F.3d at 613. Where, as here, the copyrighted work is displayed in its entirety but at "the minimal image size and quality necessary to ensure" that it can be recognized as a "historical artifact[]," this factor does not weigh against fair use. *Id.*; *supra* 11. Moreover, two of the tattoos are covered by jerseys and unidentifiable, *infra* 27, and two are merely minor additions to pre-existing tattoos, and are difficult to pick out. *Supra* 5. Thus, the third factor favors fair use.

### D.  **Factor Four: Take-Two Has Not Harmed the Tattoos' Markets**

The fourth factor considers "whether the copying can be used as a substitute for the plaintiff's original work."  *Bell*, 2020 WL 2905803, at *9 (alterations and internal quotation marks omitted).  This concern is "absent" where the copy and original do not compete.  *Id.* Moreover, "any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014).  Further, this factor must "take into account for public benefit the copying will likely produce," balancing any "dollar amounts likely lost" with the benefits from the "creative production of new expression."  *Google*, 141 S. Ct. at 1206.

In conducting this analysis, it cannot be overemphasized that Plaintiff's own experts have admitted that they have not seen "any documents that suggest anyone was buying *NBA 2K* as a substitute for having a tattoo inked."  Means Decl. Exs. 31 (Malkiewicz Tr.) 44:14–44:24; 30 (Lenzo Tr.) 276:14–276:16 ("I can't think of any reason why buying a video game would be a substitute for getting a tattoo . . . .").  These admissions are critical as fair use exists where the parties' works are not substitutes for each other.  *See Authors Guild v. Google, Inc.*, 804 F.3d at 214 (fair use where use does not "serve as a substitute"); *HathiTrust*, 755 F.3d at 95 (fair use "must not excessively damage the market for the original by providing . . . a substitute"); *Solid Oak*, 449 F. Supp. 3d at 350 ("[U]se of the Tattoos in *NBA 2K* could not 'deprive the rights holder of significant revenues' because potential purchasers of the Tattoo designs are unlikely to 'opt to acquire the copy in preference to the original.'").

Plaintiff cannot claim a potential market for the use of the Tattoos made by Take-Two. Courts warn that "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." *Swatch*, 756 F.3d at 91 (emphasis in original).  To "guard against this vice of circular reasoning,"

- 18 -

the factor four inquiry is limited "to a use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Id.* (internal quotation marks omitted).  "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder." *Bill Graham*, 448 F.3d at 614.[10]

The undisputed facts support a finding that video games are not a reasonable, traditional, or likely to develop market for tattoos.  ***First***, Take-Two minimally uses the Tattoos to realistically depict the NBA Players.  *Supra* 8.  "The video game industry would not reasonably anticipate licensing the Tattoos" for this purpose.  Bogost Decl. ¶ 120; *see also Bouchat*, 737 F.3d at 943 (market harm unlikely where use "transient and fleeting" or for "its factual, and not its expressive, content").  ***Second***, a "tattooist would not want to encumber his or her clients by" requiring a license under these circumstances.  Jablonski Decl. ¶¶ 47, 65 (tattoo industry norm is not to "seek to control their tattoos as they appear on their clients."); *supra* 9.  Indeed, as Dr. Jablonski explains, "tattooists anticipate and welcome the idea that the tattoos they ink will appear in all manner of commercial products," because "most success in the industry is based on referrals and word-of-mouth."  Jablonski Decl. ¶ 66.  Requiring a license would inhibit clients from sharing and displaying their tattoos, and hurt business.  *Id.* ¶¶ 43, 66.

***Third***, Plaintiff's own conduct shows that a market is unlikely to develop.  Plaintiff conceded that (a) he has never "licensed a tattoo for a video game," and he is "not aware of any tattooist who has licensed tattoos for inclusion in a video game,"  Means Decl. Ex. 11 (Pl.'s Tr.) 173:6–10; (b) prior to this lawsuit, he "never attempted to license tattoos for use in video

---

[10]  Plaintiff hired an expert to speculate as to whether such a market could form as Plaintiff is willing to license the Tattoos.  Means Decl. Ex. 29 (Lenzo Rpt.) ¶ 102.  That, however, is not a proper basis for arguing market harm.

games," *id.* at 177:24–178:2; and (c) no one had ever approached him seeking permission to license tattoos he inked on real people for video games, *id.* at 178:3–6.  Likewise, other tattooists have explained that video game companies do not need licenses from them.  Jablonski Decl. Exs. 3–5.  These admissions are fatal to Plaintiff's case.  *See Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006) (admission that copyright owner had "never licensed any of her photographs for" the use made by defendant weighed in favor of fair use); *Est. of Smith v. Cash Money Records, Inc.*, 253 F. Supp. 3d 737, 752 (S.D.N.Y. 2017) (fourth factor favored fair use where "Plaintiffs never attempted to establish a market for licensed derivative uses . . . until Defendants used the recording on the Album"); *Viewfinder*, 627 F. Supp. 2d at 136 (market harm "undermined by the fact that plaintiffs do not themselves sell or license photos of their designs to the media").[11]

Thus, video game expert Dr. Bogost, tattoo expert Dr. Jablonski, and economist Mr. Malackowski confirmed that video games are not a reasonable, traditional, or likely to be developed market for the Tattoos.  Bogost Decl. ¶ 9; Jablonski Decl. ¶¶ 46–47; Malackowski Decl. App'x A, at 31.  And Plaintiff's own expert is "not aware of existing licenses for" such use.  Means Decl. Ex. 29 (Lenzo Rpt.) ¶ 64.  As "Plaintiff is trying to create a market in this case that has never existed before and would not be reasonable or likely to be developed based on the customs and practices of the tattoo industry," Jablonski Decl. ¶ 61, this factor supports fair use.

Finally, in addition to Plaintiff's inability to show cognizable harm to an existing or potential market, the public benefit from including real-world Tattoos in *NBA 2K* is paramount in this analysis.  As discussed above, Plaintiff admits he has lost no sales.  *Supra* 9.  By contrast, *NBA 2K* is an extremely creative basketball simulation game that Plaintiff admits would not be

---

[11]   A market also is unlikely to develop because Plaintiff has not obtained the players' publicity or trademark rights, which it needs to commercialize the Tattoos.  *Cf. Bouchat v. Balt. Ravens Ltd. P'ship*, No. 08 Civ. 397, 2011 WL 5445947, at *2 (D. Md. Nov. 9, 2011) (lack of harm due to copyright holder being "limited (perhaps totally) in his commercial use of the [copyrighted work] by virtue of Defendants' trademark rights").

realistic without the Tattoos.  Means Decl. Ex. 11 (Pl.'s Tr.) 142:9–143:3.  As Mr. Brody explained, if Plaintiff "prevails in this lawsuit, it would create a significant restriction on Take-Two's (and the rest of the video game industry's) ability to make realistic video games."  Brody Decl. ¶ 22.  It simply would be "impossible to identify all of the tattooists, much less negotiate with them."  *Id.* ¶ 23.  It would impact any industry that seeks to accurately depict real people with their tattoos, from film to photography to television.  And it would also impede self-expression by limiting people's ability to show permanent parts of their body; "[p]eople who get tattoos to express themselves would suddenly be unable to show them confidently," without fearing a lawsuit from a tattooist.  *Id.* ¶ 24.  Thus, Take-Two's use is fair because it promotes the creation of new works as required by the Constitution, instead of suppressing them.  *See Google*, 141 S. Ct. at 1208 (fair use where copyright would harm the public by increasing costs and creating other difficulties for the creation of new works).

## II.  <u>TAKE-TWO'S USE OF THE TATTOOS WAS AUTHORIZED</u>

Plaintiff's claim also fails as Take-Two's use was authorized.  As the Copyright Act prohibits only unauthorized use, 17 U.S.C. §§ 106, 501, a "copyright owner waives the right to sue . . . for uses of copyrighted material that are authorized."  *Great Minds v. FedEx Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018).  Here, the NBA Players gave the NBA and NBAPA the right to license their likenesses (including the Tattoos) to third parties, which they in turn licensed to Take-Two.  James Decl. ¶ 13; Green Decl. ¶ 15; Thompson Decl. ¶ 13; Means Decl. Exs. 20 (Thomas Tr.) 132:9–133:2; 34–35 (NBA & NBAPA Contracts); Brody Decl. ¶ 10.

Moreover, Plaintiff impliedly licensed the NBA Players to allow others to depict their tattoos as part of their likenesses.  Copyright law recognizes that a license "may be granted orally, or may be implied from conduct."  *Murphy v. Lazarev*, 589 F. App'x 757, 765 (6th Cir. 2014) (quoting *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998)).  Thus, courts regularly

dismiss copyright claims on summary judgment where the use was authorized, even impliedly. *See*, *e.g.*, *Mahavisno v. Compendia Biosci., Inc.*, 164 F. Supp. 3d 964, 968–69 (E.D. Mich. 2016). A license is implied when "[1] a person (the licensee) requests the creation of a work, [2] the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and [3] the licensor intends that the licensee-requestor copy and distribute his work." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996); *Solid Oak*, 449 F. Supp. 3d at 346 (implied license created where tattooist created tattoo at player's request). As to the ***first*** and ***second*** prongs, there is no dispute that each Tattoo was created and inked on the NBA Players' skin at the players' requests, so these are readily satisfied. *Supra* 5.

As to the ***third*** prong, the undisputed facts make Plaintiff's intent manifest. In analyzing this prong, courts consider, among other things:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts [] providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Photographic Illustrators, Corp. v. Orgill, Inc.*, 953 F. 3d 56, 61 (1st Cir. 2020).

Here, each factor supports Take-Two. ***First***, inking the Tattoos was a discrete transaction. The NBA Players requested the tattoo, paid for it, and left; there was no ongoing relationship. Green Decl. ¶ 5; Thompson Decl. ¶ 7; James Decl. ¶¶ 5–8, 10–11; Means Decl. Ex. 11 (Pl's Tr.) 52:18–54:17, 76:9–23. Plaintiff admits that, when the players left his shop, they could go about their lives without returning for permission. *Supra* 6. This supports an implied license. *See Foad Consulting Grp., Inc. v. Azzalino*, 270 F. 3d 821 (9th Cir. 2001) (license where architect hired for discrete task, not ongoing project).

***Second***, it is undisputed that Plaintiff did not have written contracts disclosing that tattoos

could be used only with his future permission.  Means Decl. Exs. 11 (Pl.'s Tr.) 62:6–69:21, 155:14–19; 37 (Pl.'s Tr. Ex. 5).  This further supports an implied license.  *See Reinicke v. Creative Empire, LLC*, 38 F. Supp. 3d 1192, 1200 (S.D. Cal. 2014) (implied license as no "conduct or written contract" required plaintiff's "permission" or "future involvement").

**Third**, Plaintiff's conduct indicated that further use of the tattoos without his involvement was permissible.  This was critical in the *Solid Oak* decision, where the court emphasized that the NBA players "were neither requested nor agreed to limit the display or depiction of the images tattooed on their bodies."  449 F. Supp. 3d at 346 (tattooists did not limit use of tattoos even though they knew players were likely to appear "in public, on television, in commercials, or in other forms of media").  Here, despite knowing that the NBA Players were famous, Plaintiff admitted that he has never "told a player that they needed [his] permission before appearing on television playing basketball," nor has he ever "told the NBA that they needed [his] permission to depict players on television playing NBA games showing their tattoos," and he has never "done anything to try to stop that."  Means Decl. Ex. 11 (Pl.'s Tr.) 156:3–13, 148:21–149:1.  And the Messrs. Green, James, and Thompson appeared in *NBA 2K* with their Tattoos since at least 2011, 2013, and 2014 respectively, without any objection from Plaintiff and without being informed that they needed his permission.  *Supra* 5.[12]

This undisputed conduct indicated that use of the material without the creator's involvement or consent was permissible, which further supports the finding of an implied license.  *See Photographic*, 953 F.3d at 66 (lack of objection supported summary judgment on implied license defense); *I.A.E.*, 74 F.3d at 777 (delivery of designs "without any warning that

---

[12]  The *Alexander* court denied summary judgment because it was "unclear whether Alexander and Orton discussed permissible forms of copying and distributing the tattoo works."  489 F. Supp. 3d at 820.  Here, there is no dispute as to what was said (and unsaid), as both Plaintiff and Mr. Tovanche confirmed it.  *Supra* 5.

their further use would constitute copyright infringement" supported finding of license);

*LimeCoral, Ltd. v. CareerBuilder, LLC*, 889 F.3d 847, 851 (7th Cir. 2018) (copyrighted work

conveyed without "a limitation imposed on the license at the time the[] work[] w[as] delivered"

impliedly granted to defendant all of the rights of plaintiff as a copyright holder).[13]

The existence of an implied license also is consistent with industry practice.  *See*

*Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (music industry practice

determined implied license); *Photographic*, 953 F.3d at 65 ("nature of the business" made it

"obvious" plaintiff wanted defendant to use work, *i.e.*, implied license).  Dr. Jablonski explained

that the practice is that "[o]nce a tattoo has been inked on to the client's skin, the tattooist

exercises no control over it because the tattoo itself is part of the client's body."  Jablonski Decl.

¶ 30.[14]  Tattooists and clients "intend the client to be free to display the tattoo himself or herself

and be permitted to license to others the ability to display the tattoo."  *Id.* ¶ 32.  Other tattooists,

including Mr. Tovanche, agree that this is the industry standard.  *Supra* 9.  Thus, the NBA

Players "are free to authorize the use or dissemination of their … likeness in whatever way they .

. . see fit without the necessity of seeking permission from the tattooist."  Jablonski Decl. ¶ 32.

## III.     **TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS***

The third reason that Plaintiff's copyright claim fails is that Take-Two's use is *de*

*minimis*.  In the Sixth Circuit, courts regularly grant summary judgment on *de minimis* use

where, as here, the alleged work and accused work are undisputed, as *de minimis* use is a

question for the court.  *Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 924

---

[13]   "[C]onsent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license[.]"  *ITOFCA, Inc. v. MegaTrans Logistics, Inc.*, 322 F.3d 928, 940 (7th Cir. 2003).

[14]   These industry norms are further evidenced by the fact that, in *Solid Oak*, the claim was not brought by the tattooists.  In fact, the tattooists submitted declarations explaining that they disagreed with Solid Oak's position on the rights of the players.  Jablonski Decl. Exs. 3–5 (Solid Oak Tattooists Decls.).

(6th Cir. 2003) (affirming grant of summary judgment).  Courts consider "the amount of the copyrighted work that was copied, as well as the observability of the copyrighted work in the allegedly infringing work."  *Id*.  "Observability is determined by the length of time the copyrighted work appears in the allegedly infringing work, as well as the prominence in that work as revealed by the lighting and positioning of the copyrighted work."  *Id*.[15]

*Solid Oak* concluded that *NBA 2K*'s use of tattoos is *de minimis* as the "average game play is unlikely to include the players with the Tattoos and that, even when such players are included, the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of rapidly moving figures in groups of player figures"; when tattoos "do appear during gameplay," they "are significantly reduced in size"; and the "quick and erratic movements up and down the basketball court make it difficult to discern" tattoos.  449 F. Supp. 3d at 343–45.

The same facts and reasoning apply here: the Tattoos are not observable in the ordinary play of *NBA 2K* for multiple reasons.  ***First***, as Dr. Bogost explained, "in the average game of *NBA 2K*," the NBA Players and by extension the Tattoos "will not appear" as of the over 400+ NBA players available, only "two teams of 5 on-court players each" will be selected.  Bogost Decl. ¶¶ 76, 79; Means Decl. Ex. 31 (Malkiewicz Tr.) 63:19–23.  Indeed, it is undisputed that "the Tattoos only appear in NBA 2K as they are inked on the NBA Players."  Bogost Decl. ¶ 78; Means Decl. Ex. 11 (Pl.'s Tr.) 158:13–15 (admitting that, "in the *NBA 2K* games, the tattoos . . . only appear on the players who bear them in real life").  Thus, Take-Two's use is even less than cases where *de minimis* use was found despite a work *always* appearing.  *See Gordon*, 345 F.3d at 924 (use of work that appears every time commercial is shown *de minimis*).

***Second***, even in the limited instances when the three players are selected, unlike an NBA

---

[15]   The *Alexander* court denied summary judgment, questioning whether "the Seventh Circuit recognizes this defense."  489 F. Supp. 3d at 823.  The Sixth Circuit clearly does.  *See Gordon*, 345 F.3d at 923–25.

game, each quarter in *NBA 2K* lasts only a few minutes.  Brody Decl.¶ 15.  As the *Solid Oak*

court observed, such "stopwatch-in-hand observations" often are decisive in *de minimis* use

decisions.  *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2018 WL 1626145, at

*4 (S.D.N.Y. Mar. 30, 2018) (citing *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 216 (2d

Cir. 1998) (1.5 minutes is *de minimis* use), and *Gottlieb Dev. LLC v. Paramount Pictures Corp.*,

590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008) (3.5 minutes is *de minimis* use)).

  ***Third***, the other observability factors weigh in favor of *de minimis* use.  Dr. Bogost's

unrebutted calculation is that the Tattoos are depicted "1.11–10.3% the size that they appear in

real life" due to the average screen size that *NBA 2K* is played on.  Bogost Decl. ¶ 83.  On the

rare occasion the Tattoos are depicted, they are surrounded by a host of visual and auditory

elements, including the arena, court, cheerleaders, crowds, commentators, buzzers, squeaking

shoes, music, and others elements.  Means Decl. Ex. 28 (Pl.'s Resp. RFA) Nos. 20–30.  The

observability of the Tattoos is further lessened by the fact, conceded by Plaintiff's expert, that

numerous other game elements—like "uniforms," other "players," and "referees"—cause tattoos

to be "obstructed from view," *id.* Ex. 31 (Malkiewicz Tr.) 64:1–65:8, the fact that they are

depicted among many other tattoos on the NBA Players, *id.* at 23:14–25, and the fact, conceded

by Plaintiff, that the NBA Players "move around quickly and jump and run and block as if

they're playing basketball."  *Id.* Exs. 11 (Pl.'s Tr.) 165:10-13; 31 (Malkiewicz Tr.) 63:8–18;

Bogost Decl. ¶ 96.  Moreover, as Mr. Brody explained, the NBA Players often move amongst

other players and are blocked by them, their tattoos may appear blurry and out of focus as they

move, the camera distance makes them difficult to see, and they will not always be in frame as

the camera moves to follow the action.  Brody Decl. ¶ 16.  Combined, these elements make it

such that "the ordinary player will perceive the Tattoos as a kind of visual noise creating realism

in the environment and the character."  Bogost Decl. ¶ 97.[16]

In addition to being a tiny part of *NBA 2K*'s audio-visual display, the Tattoos are a fractional piece of its program.  The game files that include the Tattoos comprise, at most, 0.00515% of *NBA 2K's* game data, Bogost Decl. ¶ 113; Brody Decl.¶ 18,[17] and Plaintiff's expert did not offer any competing estimate of the file size.  Means Decl. Ex. 34 (Malkiewicz Tr.) 245:4–9.  This too weighs in favor of a finding of *de minimis* use.  *See MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548, 1560 (11th Cir. 1996) (no infringement as protectable elements "were not of such significance to the overall program to warrant an ultimate finding of substantial similarity").  Moreover, the Lion Tattoo and Brother's Keeper Tattoo are covered up almost entirely, *see infra* 28, and the Fire Tattoo and Scroll Tattoo were additions to pre-existing tattoos*, supra* 5, making these Tattoos barely "observable," if at all.  *Gordon*, 345 F.3d at 924.

## IV.      TWO OF THE TATTOOS ARE UNPROTECTABLE AND, IN ANY CASE, PLAINTIFF CANNOT SHOW SUBSTANTIAL SIMILARITY

Plaintiff cannot state a claim with regard to the Lion Tattoo and Brother's Keeper Tattoo for two more reasons.  ***First***, they were copied from preexisting material and, thus, are not protectable.  The Lion Tattoo was copied, without authorization, from another source, and "protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully."  17 U.S.C. § 103(a); *see Psychopathic Recs., Inc. v. Anderson*, No. 08 Civ. 13407, 2009 WL 2591385, at *2

---

[16]   Plaintiff may argue that it is possible to pause and zoom in on the Tattoos, but that would true of any visual work, and accepting that hypothetical scenario would eviscerate the *de minimis* use doctrine.  And, as Dr. Bogost explained, this is simply not how people play *NBA 2K*.  Means Decl. Ex. 32 (Bogost Tr.) 167:15–21 ("[M]y work in this case was about the visibility of the tattoos in ordinary circumstances to a player, not whether it's possible to contort and manipulate the game into one in which the most visible rendition of a portion of the tattoos of a specific player can be made the focus of attention.").  Plaintiff did not offer any rebuttal expert testimony from a video game expert regarding how people play *NBA 2K*.

[17]   And at most 0.015% of *NBA 2K Mobile's* game data.  Bogost Decl. ¶ 113; Brody Decl.¶ 18.

(E.D. Mich. Aug. 24, 2009).  As Plaintiff admitted, LeBron James "c[a]me into [Plaintiff's] shop with a playing card that depicted a lion" and asked Plaintiff to ink something "similar" to it on his chest.  Means Decl. Ex. 11 (Pl.'s Tr.) 82:6–8, 83:21–25.  That playing card was from the Venetian Resort, James Decl. ¶ 8, and as shown below, Plaintiff merely copied its logo:

| Venetian Resort Logo[18] | Plaintiff's Lion Tattoo[19] |
|---|---|
|  | |

Similarly, the Brother's Keeper Tattoo was copied from public domain material and, thus, is not original to Plaintiff.  With regard to such derivative works, protection extends "only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material."  17 U.S.C. § 103(b).  Here, the entire tattoo is composed of preexisting elements, as there can be no dispute that this tattoo was copied from Michelangelo's *Creation of Adam* that is painted in the Sistine Chapel, and the phrase "My Brother's Keeper" from the Bible.  Plaintiff admits that the Sistine Chapel was "among the sources of inspiration."  Means Decl. Ex. 22 (Pl.'s Resp. 1st Interrogs.) No. 1.  And he admitted that the phrase "am I my brother's keeper" comes from the Biblical story of Cain and Able.  *Id.* Ex. 11 (Pl.'s Tr.) 116:20-117:2.  Plaintiff contributed little material, if any, to the tattoo, and thus does not have protection for it.

**Second**, setting aside that all of the Tattoos are difficult to observe, *supra* 24, *NBA 2K* cannot be substantially similar to the two chest Tattoos because they are blocked by player

---

[18]     Means Decl. Ex. 38 (Pl.'s Tr. Ex. 7, Trademark Reg. No. 3,429,884).

[19]     *Id.* Ex. 39 (Pl.'s Copyright Applications) at 26 (Deposit for Lion Tattoo).

jerseys.  Indeed, as shown even in the unnaturally cropped and zoomed-in images that Plaintiff

selected for his Complaint (¶ 135), these two Tattoos cannot be seen in the game.  As the design

cannot be seen, Plaintiff cannot prove substantial similarity.  *Gordon*, 345 F.3d at 924.



| Zoom-In of LeBron James in *NBA 2K* | Zoom-In of Tristan Thompson in *NBA 2K* |

## V.      **PLAINTIFF IS NOT ENTITLED TO CERTAIN REMEDIES**

Plaintiff's claims for statutory damages and attorney's fees fail as he did not register the

Tattoos until after the alleged infringement commenced.  17 U.S.C. § 412.  This Court already

decided that Plaintiff cannot obtain these remedies for *NBA 2K16*.  MTD Op. 10.  As to the

remaining editions, Section 412 "leaves no room for discretion" and precludes these remedies so

long as "***the first act in a series of acts*** constituting continuing infringement" occurred prior to

registration.  *Johnson*, 149 F.3d at 505–06 (emphasis added); *see also Mason v. Montgomery

Data, Inc.*, 967 F.2d 135, 143 (5th Cir. 1992) (Congress' intended remedies be denied "for all of

that defendant's infringements . . . if one of those infringements commenced prior to

registration").[20]  That is because "when the same defendant infringes on the same protected work

in the same manner as it did prior to the work's registration, the post-registration infringement

constitutes the continuation of a series of ongoing infringements."  *Solid Oak Sketches, LLC v.

2K Games, Inc.*, No. 16 Civ. 724, 2016 WL 4126543, at *3 (S.D.N.Y. Aug. 2, 2016); *see also

Compass Homes, Inc. v. Trinity Health Grp., Ltd.*, No. 13 Civ. 647, 2016 WL 3406054, at *9–11

---

[20]     This is consistent with the fact that a plaintiff may collect only "***an*** award of statutory damages for ***all
infringements*** involved in the action, ***with respect to any one work***, for which any one infringer is liable."  17
U.S.C. § 504(c)(1) (emphasis added).  As Section 504 includes all alleged infringements of a work, it "would be
inconsistent to . . . read section 412 to treat each infringement separately."  *Mason*, 967 F.2d at 144.

(S.D. Ohio June 21, 2016) (construction plans "alter[ed]," "converted . . . into computer-generated plans and further refined" from pre-registration plans were "continuing infringement"); *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1240 (N.D. Ga. 2014) (infringement of construction specification and new versions of it was continuing infringement), *aff'd*, 703 F. App'x 803 (11th Cir. 2017).[21]

Here, although this Court previously indicated that "further discovery is required to determine whether the *NBA 2K* games constitute a 'series of acts constituting infringement,' or 'separate, distinct acts of infringement,'" MTD Op. 11, it is now ***undisputed*** that each version of *NBA 2K* is the "the same basketball simulation game," using "the Tattoos in the same way in each edition." Bogost Decl. ¶ 49 n.46; Brody Decl. ¶ 11; Means Decl. Ex. 31 (Malkiewicz Tr.) 112:18–113:5 (Plaintiff's expert admits "before and after registration, Take-Two used the tattoos in the same way"). Thus, these remedies are not available because (1) the Tattoos were all inked by 2012, *supra* 4, (2) the first game accused of infringement, *NBA 2K16*, was released around September 29, 2015, and all of the Tattoos were in that game before this lawsuit was filed (and much earlier, *supra* 23), 4th Am. Compl. ¶¶ 109–12, and (3) Plaintiff did not apply for copyright registrations in the Tattoos until September 2016 and August 2017, at least one year after *NBA 2K16* was released, Means Decl. Ex. 39 (Pl.'s Copyright Applications). As the *NBA 2K* series is continuing in nature, statutory damages and attorney's fees are not available.

## CONCLUSION

Take-Two respectfully requests that the Court grant its motion for summary judgment.

---

[21] *See also B2B CFO Partners, LLC v. Kaufman*, 787 F. Supp. 2d 1002, 1012 (D. Ariz. 2011); *New Name, Inc. v. The Walt Disney Co.*, No. 07 Civ. 5034, 2008 WL 5587487, at *5 (C.D. Cal. July 23, 2008); *Sartor v. Walters*, No. 06 Civ. 11, 2006 WL 3497856, at *4 (W.D. La. Dec. 5, 2006); *Gloster v. Relios, Inc.*, No. 02 Civ. 7140, 2006 WL 1804572, at *4 (E.D. Pa. June 28, 2006); *Dyer v. Napier*, No. 04 Civ. 408, 2006 WL 680551, at *3 (D. Ariz. Mar. 16, 2006).

Dated:  New York, NY
        October 25, 2021

/s/ Dale M. Cendali

Dale M. Cendali (admitted *pro hac vice)*
Joshua L. Simmons (admitted *pro hac vice*)
Chris Ilardi (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.*

## <u>L.R. 7.1(F) CERTIFICATION</u>

In accordance with Local Rule 7.1(f), I hereby certify that this case is on the standard track, that the Defendants have received prior approval from the Court to file a memorandum in support of their Motion for Summary Judgment that can be up to thirty (30) pages in length, and that the foregoing memorandum complies with the applicable page limitation of thirty (30) pages.


*/s/ Dale M. Cendali*
*Attorney for Defendants 2K Games, Inc. and*
*Take-Two Interactive Software, Inc.*