# EXHIBIT 11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


JAMES HAYDEN,                    CASE NO: 1:17CV2635

          Plaintiff,

           v.

2K GAMES, INC., et al.,

          Defendants.

------------------------------



                Deposition of JAMES HAYDEN

                    Cleveland, Ohio

        Wednesday, October 30, 2019 - 9:04 a.m.








Reported by:

Angela Nixon, RMR, CRR

Job No.: 26345

1                  MR. MCMULLEN:  Objection.

2    A.        Yes.

3    Q.        Would you agree that tattoos are personal?

4                  MR. MCMULLEN:  Objection.

5    A.        I think so.

6    Q.        Tattooing's been around for a long time, right?

7    A.        Yes.

8    Q.        Am I right that a lot of modern tattoos are based

9    on prior designs?

10                 MR. MCMULLEN:  Objection.

11   A.        No.

12   Q.        Have you ever heard of tribal tattoos?

13   A.        Yes.

14   Q.        What are tribal tattoos?

15   A.        It's just a style of tattooing.

16   Q.        What does the word tribal refer to?

17                 MR. MCMULLEN:  Objection.

18   A.        Typically a dark design of some sort.

19   Q.        In your experience, does the term tribal often

20   refer to Maori or designs inspired from that culture?

21                 MR. MCMULLEN:  Objection.

22   A.        I'm not sure.

23   Q.        Okay.  When -- is it true that people often get

24   tattoos depicting things that have personal significance to

25   them?

 1   you that you needed the permission of the person who

 2   tattooed you before photographs of you could be taken?

 3   A.        Rephrase that question if you could.

 4   Q.        Sure.  When you got your tattoos, did any

 5   tattooist ever tell you that you needed to get their

 6   permission before you appeared showing your tattoos in

 7   photographs or television or video games or anything?

 8            MR. MCMULLEN:  Objection.  You can answer if

 9   you're able.

10   A.        I don't remember.  I don't think so.

11   Q.        Have you ever sought permission from any

12   tattooist before posting pictures of yourself with your

13   tattoos?

14   A.        No.

15   Q.        Have you ever gotten the permission of any

16   tattooist before appearing in any videos or commercials

17   showing your tattoos?

18            MR. MCMULLEN:  Objection.

19   A.        Could you say that again?

20   Q.        Can you read it back?

21            (Whereupon the court reporter read back the

22            previous question.)

23   A.        No.

24   Q.        Have you appeared in videos or commercials

25   showing your tattoos?

Page 47

```
 1   A.          Okay.

 2   Q.          So Mr. Hayden, how did it come about that you

 3   first inked a tattoo on Mr. James?

 4   A.          I was contacted by his friend.

 5   Q.          What friend?

 6   A.          Rich Paul.

 7   Q.          And what did he say to you?

 8   A.          LeBron wants a tattoo by you.

 9   Q.          And what happened next?

10   A.          We set up a time.

11   Q.          And was this in 2007?

12   A.          I think so.

13   Q.          So what happened on the acquainted time?

14   A.          We came up with a tattoo and drew it on with a

15   Sharpie, red Sharpie and a black one, and then we looked at

16   in the mirror, and he said it's cool, and we did it.

17   Q.          Okay.  So did Mr. James come into your studio at

18   Focused Tattoos?

19   A.          Yes.

20   Q.          And was anyone with him?

21   A.          Yes.

22   Q.          Who was with him?

23   A.          His -- Rich Paul.

24   Q.          Anyone else?

25   A.          Maybe a few other associates, I'm not sure who
```

Page 49

1   Q.        Do you ever go to Cavs games when LeBron was
2   playing?
3   A.        Yes.
4   Q.        You knew that he was the first overall draft pick
5   to the Cavs in 2003, right?
6   A.        I heard.
7   Q.        Have you ever heard the phrase greatest of all
8   time?
9   A.        Yes.
10  Q.        Is that a phrase that refers to Mr. James?
11            MR. MCMULLEN:  Objection.
12  A.        I don't know.
13  Q.        At the time that you first inked Mr. James, did
14  you understand that he was a very successful basketball
15  player?
16            MR. MCMULLEN:  Objection.
17  A.        I heard he was, yeah.
18  Q.        You knew he was a celebrity, right?
19            MR. MCMULLEN:  Objection.
20  A.        I don't know as far as celebrity status.  I knew
21  he was a really good athlete.
22  Q.        You knew that he was a star player for the Cavs,
23  right?
24            MR. MCMULLEN:  Objection.
25  A.        Or he was starting for the Cavs, yeah.

1    Q.        And you knew that LeBron James appeared in public

2    basketball games, right?

3    A.        NBA, ESPN, yeah.

4    Q.        I mean you knew that -- that -- that basketball

5    playing games are played in an -- in an arena and fans come

6    and watch them, right?

7    A.        Typically.

8    Q.        And you were one of those people, right?

9    A.        One of those people who what?

10   Q.        Would sometimes go to an arena and watch a Cavs

11   game?

12   A.        Sometimes.

13   Q.        And you knew that professional basketball games

14   are often on television, right?

15   A.        Sometimes they are.

16   Q.        And you knew that -- so when you inked Mr. James,

17   you knew that he was often on television, right?

18   A.        Yes.

19   Q.        And when you inked him you knew that he often

20   appeared in advertising and merchandise, right?

21             MR. MCMULLEN:  Objection.

22   A.        I didn't know that.

23   Q.        Did you ever -- when you went to a game did you

24   ever see T-shirts and things like that being sold with the

25   players' likenesses?

Page 52

1    chance at that I promise you.

2    A.        Yes, ma'am.

3    Q.        So let me show you what's been marked as Exhibit

4    3 to this deposition.  Is that a photograph of Mr. James

5    showing the first tattoo that you inked on him?

6    A.        Yes.

7    Q.        Is that -- is it fair to refer to that as the

8    Gloria tattoo?

9    A.        Yes.

10   Q.        How many sessions did it take to ink the Gloria

11   tattoo on Mr. James?

12   A.        One.

13   Q.        How long did it take?

14   A.        I'm not sure.

15   Q.        Was it half hour, an hour, can you approximate it

16   in any way?

17   A.        Over an hour.

18   Q.        How much did Mr. James pay you to ink the Gloria

19   tattoo?

20   A.        I can't remember, it's been a while ago.

21   Q.        Can you approximate how much?

22             MR. MCMULLEN:  Objection.

23   A.        Yeah, I can't remember.

24   Q.        Was this the first celebrity you ever inked?

25             MR. MCMULLEN:  Objection.

1    A.          I can't remember if he was or not, tattooing him.

2    Q.          Would you -- can you approximate in any way if I

3    -- how much you would have charged him to do the Gloria

4    tattoo?

5                MR. MCMULLEN:  Objection.

6    A.          It's hard to approximate.

7    Q.          Well, let's say I walked in today and said I

8    would like this same Gloria tattoo inked on me, and it

9    would take about an hour to do, how much would you charge

10   me?

11   A.          Take about an hour to do --

12               MR. MCMULLEN:  Objection.

13   A.          It wouldn't take an hour to do, probably took a

14   little longer.  I'm not sure how much I'd charge you until

15   I drew it out with my Sharpies.

16   Q.          Well, would you charge $10,000?

17               MR. MCMULLEN:  Objection.

18   A.          Maybe, maybe not.

19   Q.          You've only charged $600 at most for a tattoo?

20   A.          Uh-huh.

21   Q.          So would you -- did you charge Mr. James a

22   dollar, or did you --

23   A.          I can't remember what I charged him.

24   Q.          If I walked in today and said I would like that

25   same tattoo, what would you charge me?

1              MR. MCMULLEN:  Objection, asked and answered.

2    A.       I'm not sure what I would charge you.  You'd have

3    to walk in and we'll find out.

4    Q.       Well, you knew what you did with Mr. James, he

5    came in and -- and he talked to you, and you sketched it

6    out you said, and you put it on him and then you inked it,

7    right?

8    A.       Yes.

9    Q.       All right.  So if you did that same thing today,

10   what would you have charged him?

11             MR. MCMULLEN:  Objection.

12   A.       If LeBron walked in and got the same tattoo?

13   Q.       Correct.

14   A.       $600.

15   Q.       Did you actually charge him 600?

16             MR. MCMULLEN:  Objection.

17   A.       I don't remember.

18   Q.       Isn't it true that you charged him a lot less

19   than $600?

20             MR. MCMULLEN:  Objection.

21   A.       Not sure.

22   Q.       Do you have any records of how much you charged?

23   A.       No.

24   Q.       So you can't approximate in any way, you have no

25   recollection of how much you charged him for the Gloria

Page 56

1   A.          Say -- did he want what?

2   Q.          Did he tell you he wanted to honor his mom?

3   A.          He didn't tell me that.

4   Q.          Did he tell you why he wanted his mom's name?

5   A.          No.

6   Q.          Did you assume that he wanted to honor his -- he

7   wanted to have his mom's name tattooed on him because that

8   was important to him?

9               MR. MCMULLEN:  Objection.

10  A.          Possibly.

11  Q.          Now, I -- what directions did Mr. James give you

12  in designing the tattoo?

13              MR. MCMULLEN:  Objection.

14  A.          He wanted his mom's name.

15  Q.          Did he say anything else about where he wanted

16  the tattoo?

17  A.          On his right arm.

18  Q.          Did he say why he wanted it there?

19  A.          Did he say why he wanted it, no.

20  Q.          Did he ask you to tattoo it there to cover up an

21  old lion tattoo that was already on that spot?

22  A.          I suggested that.

23  Q.          And did you, in fact, cover that up?

24  A.          Yes.

25  Q.          Who tattooed the original lion that was there?

1    Q.          And did you take any photographs or videos of

2    this process?

3    A.          I can't remember.

4    Q.          So after you drew it on Mr. James, then he looked

5    in the mirror, is that right?

6    A.          Somewhere down the line, correct, yes.

7    Q.          Okay.

8    A.          Somewhere in there.

9    Q.          What -- what else happened somewhere in there,

10   what do you mean somewhere in there?

11   A.          After you draw it, and then typically you take a

12   look at the tattoo.

13   Q.          Okay.  And did he approve the tattoo before --

14   A.          Absolutely.

15   Q.          Now, when you inked this Gloria tattoo on

16   Mr. James, did you tell him that he couldn't let anyone

17   depict him on television with his tattoos without getting

18   your permission?

19   A.          No.

20   Q.          Did you tell him that he could not let anyone

21   depict him on merchandise with his tattoo showing without

22   getting your permission?

23   A.          No.

24   Q.          Did you tell him he could not let anyone include

25   his image in a video game with his tattoo showing without

1   getting your permission?

2              MR. MCMULLEN:  Objection.

3   A.         No.

4   Q.         Did you tell him he could not let someone

5   reproduce his likeness without getting your permission?

6   A.         No.

7   Q.         Did Mr. James sign anything at any of these

8   sessions you had with him?

9   A.         I can't remember.

10  Q.         Do you --

11  A.         Autographs.

12  Q.         Autographs.  Did you get an autograph of

13  Mr. James?

14  A.         No.

15  Q.         Were -- did other people at the shop get

16  autographs?

17  A.         Maybe.

18  Q.         Did you give him any paperwork to sign?

19             MR. MCMULLEN:  Objection.

20  A.         I think so.

21  Q.         Okay.  Well, let's take a look at what has been

22  marked as Exhibit 5.  What is Exhibit 5?  And it bears the

23  Bates Number Hayden 1944?

24             MR. MCMULLEN:  Counsel, just one second just to

25  make sure.  This is 5 you said?

Page 62

```
 1              MS. CENDALI:  Correct.

 2              MR. MCMULLEN:  Okay.

 3              MS. MEANS:  These have been premarked.

 4              MR. MCMULLEN:  Got you.

 5   BY MS. CENDALI:

 6   Q.        What is Exhibit 5 a copy of?

 7   A.        It's the release form for Focused Tattoo.

 8   Q.        Is this a form that you require clients to sign?

 9   A.        Now we do, yeah.

10   Q.        When did you start using this form?

11   A.        Maybe two years ago.

12   Q.        Does Ohio have any laws that require tattoo

13   parlors to have clients sign a -- some form of medical

14   consent?

15   A.        Yes.

16              MR. MCMULLEN:  Objection.

17   BY MS. CENDALI:

18   Q.        Is this form intended to comply with that?

19   A.        Yes.

20   Q.        Prior to this form, would you have an earlier

21   version?

22   A.        I think so, yes.  Absolutely.

23   Q.        And was a version of this form signed by

24   Mr. James?

25   A.        I think so.
```

1    Q.        Do you recall it looking like this one, Exhibit

2    5?

3    A.        I can't remember.

4    Q.        Do you recall any differences between it and the

5    one you gave to Mr. James?

6    A.        I -- I can't recall any differences.

7    Q.        Do you have any idea if there were any

8    differences?

9    A.        It's been a long time, I can't remember.

10   Q.        Who drafted Exhibit 5?

11   A.        Dino Tovanche.

12   Q.        And do you have a copy of any forms that

13   Mr. James or any of the other players at issue signed?

14   A.        No.

15             MR. MCMULLEN:  Objection.

16             MS. CENDALI:  I call for the production of copies

17   of any past versions of the forms that existed from the

18   time that Mr. James signed the Gloria -- the Gloria tattoo

19   was inked on Mr. James forward.

20                  (Whereupon the court reporter read back the

21                  previous statement.)

22             MS. CENDALI:  And to be clear, I -- I want copies

23   of any forms that Focused Tattoos used in its shop and gave

24   customers that would have included any of the athletes at

25   issue in this case, okay?

Page 64

```
 1   A.          If we can find them.

 2   Q.          Well, was this generated on a computer?

 3   A.          This was made two years ago.

 4   Q.          Okay.  Were the earlier forms made on a computer?

 5   A.          Ten years ago?

 6   Q.          Yes.

 7   A.          I don't even know if we have those computers

 8   anymore.

 9   Q.          Were they originally made on a computer?

10   A.          I think so.

11   Q.          Do you keep copies of the forms that your

12   customers sign?

13   A.          For two years.

14   Q.          And is that because that's what the law requires?

15   A.          Yes.

16   Q.          And -- so now let's look -- let's look -- is it

17   your best recollection that essentially the same form

18   reflected in Exhibit 5 has been -- was in use in 2007?

19               MR. MCMULLEN:  Objection.

20   A.          Could you say that again, ask that again?

21   Q.          Sure.  Is it your best recollection that roughly

22   the same form was used in 2007 when you inked Mr. James?

23               MR. MCMULLEN:  Objection.

24   A.          I don't know, I'd have to find out somehow.

25   Q.          Well, can you --
```

1  A.        The forms are -- you know, it's ten years

2  difference, so the forms are -- those are older forms.

3  Q.        Can you -- sitting here today, can you tell me

4  any differences between the form that you said Mr. James

5  signed and Exhibit 5?

6            MR. MCMULLEN:  Objection both to form and to the

7  fact that that question assumes facts not in evidence.

8  A.        Right.

9  Q.        Did Mr. James sign a medical consent form or not?

10  A.        I can't remember.

11  Q.        Did you give him one?

12  A.        I can't remember.

13  Q.        And you knew that the law requires you to have

14  clients sign medical consent forms, right?

15  A.        Yeah.

16  Q.        But you don't know whether you gave one to

17  Mr. James or not, is that right?

18  A.        I can't remember.

19  Q.        And if you did give him the form that you were

20  using back then, what's your best recollection as to

21  whether it had differences between Exhibit -- that form and

22  Exhibit 5?

23            MR. MCMULLEN:  Objection, asked and answered.

24  A.        I can't recollect what the differences are.

25  Q.        Do you know if there even were any differences?

Page 66

1   A.         I'm not sure.

2   Q.         All right.  So let's take a look at Exhibit 5.

3   And it lists at the top any medical conditions or

4   contagious diseases.  There's a place for the person to

5   fill that out, is that right?

6   A.         For medical conditions, yes.

7   Q.         And then under that it says initial each below,

8   and it says (Reading,) I hereby certify that, to the best

9   of my knowledge, this information is correct.  Do you see

10  that?

11  A.         Yes.

12  Q.         Okay.  So is it your understanding in giving your

13  clients this form they're supposed to initial the different

14  statements here to show that they agreed with them?

15  A.         Yes.

16  Q.         And one of those statements is, (Reading:) I

17  agree that said tattoo is correctly drawn to my

18  specifications, do you see that?

19  A.         Uh-huh.

20  Q.         And the customer's supposed to initial that

21  that's true, correct?

22  A.         Yes.

23  Q.         And was this statement in your form at the time

24  that Mr. James had the Gloria tattoo inked on him?

25             MR. MCMULLEN:  Objection.

Page 67

1   A.          I can't remember.

2   Q.          Do you have any reason to believe it wasn't?

3               MR. MCMULLEN:  Objection.

4   A.          I can't -- I don't remember the sheet.

5   Q.          Well, why do you have on your form, (Reading:) I

6   agree that said tattoo is correctly drawn to my

7   specifications?

8               MR. MCMULLEN:  Objection.

9   A.          Since this was made two years ago we want to make

10  sure that the client is getting the tattoo that he wanted

11  to get.

12  Q.          And when you said to my specifications, what's

13  that a reference to?

14              MR. MCMULLEN:  Objection.

15  A.          To my specifications, I guess on the client's

16  behalf, that it's made to their specifications.

17  Q.          And the form also has information on it, one of

18  -- one of the things they're supposed to initial is that,

19  (Reading:) I understand that said tattoo is permanent.  Do

20  you see that?

21  A.          Yes.

22  Q.          And why did you want to include that statement?

23              MR. MCMULLEN:  Objection.

24  A.          You want to let the client know that it's

25  permanent.

Page 68

```
 1    Q.        Why?

 2              MR. MCMULLEN:  Objection.

 3    A.        Because it's not going to come off tomorrow.

 4    Q.        Is it because that's an important thing for them

 5    to know?

 6              MR. MCMULLEN:  Objection.

 7    A.        Possibly.

 8    Q.        The form also asks people to initial that,

 9    (Reading:) I understand there is always a possibility of

10    scarring/keloiding.  Do you see that?

11    A.        Keloiding, uh-huh.

12    Q.        Why did you choose to include that?

13    A.        Tattoos could scar or keloid.

14    Q.        And why did you think it was important to tell

15    customers that?

16    A.        It seemed to be a common issue.

17    Q.        Did you -- did you think that might be important

18    to them, it's something they should know about?

19              MR. MCMULLEN:  Objection.

20    A.        If it's on this paper, maybe.

21    Q.        Did you want to make sure people understood what

22    was -- what the deal was when they got their tattoo?

23              MR. MCMULLEN:  Objection.

24    A.        I guess so.

25    Q.        So there's nothing on this form that says
```

Page 69

1    anything about your permission is needed for them to appear

2    in media showing their tattoos, right?

3    A.          Rephrase that.

4    Q.          There's nothing in this form, Exhibit 5, that

5    puts your customers on notice that your permission would be

6    needed before they appear in public with their tattoos, or

7    in any form of media like television, movies, video games,

8    right?

9                MR. MCMULLEN:  Objection.

10   A.          There's no -- you're asking me if there's any

11   form of a release?

12   Q.          I'm asking you whether there's anything in this

13   document, Exhibit 5, that puts a customer on notice that

14   warns them that they need to go back to you for permission

15   before appearing in media like television or video games?

16               MR. MCMULLEN:  Objection.

17   A.          No.

18   Q.          And you don't recall giving Mr. James anything in

19   writing telling him that, right?

20               MR. MCMULLEN:  Objection.

21   A.          No.

22   Q.          Do you -- did Mr. James ever sign any forms when

23   he had tattoos inked at your shop?

24               MR. MCMULLEN:  Objection.

25   A.          I can't remember.

1              MR. MCMULLEN:  Objection.

2    A.        Yes.

3    Q.        Can we refer to that as the lion tattoo?

4    A.        If you want to.

5    Q.        Okay.  Is that the next tattoo you inked on

6    Mr. James?

7    A.        No.

8    Q.        What was the next tattoo you inked on Mr. James?

9    A.        There was five stars across the shoulder, left

10   shoulder, upper left.

11   Q.        Okay.  And when did you ink that on Mr. James?

12   A.        I assume -- I think it was a few weeks or a week

13   after he did the Gloria -- the right arm.

14   Q.        Okay.  Let me -- let's put Exhibit 6 aside for a

15   minute, and let me show you what's been marked as Exhibit

16   8.

17              Is Exhibit 8 a photograph of Mr. James showing a

18   five star shoulder tattoo?

19   A.        Yes.

20   Q.        Did you ink that tattoo on Mr. James?

21   A.        Yes.

22   Q.        And this was a few weeks after you had inked the

23   Gloria tattoo, is that right?

24   A.        Maybe the same week, I'm not sure.  I can't

25   remember.

Page 75

1  a cool way to think about it though.

2  Q.        Did you have a conversation with him about how he

3  was a star so stars would be good --

4            MR. MCMULLEN:  Objection.

5  Q.        -- to pick?

6            MR. MCMULLEN:  Sorry.

7  A.        I don't remember that.

8  Q.        Well, what can you recall, if anything, about the

9  conversations, if any, you had with him when this star

10  design was being made?

11  A.        I pulled out the Sharpies, I'm going to draw

12  something cool on you, tell me if you like it.

13  Q.        And did he approve it?

14  A.        It's on his arm.

15  Q.        So he approved it, right?

16  A.        Yes.

17  Q.        And he approved where it was going to be, and he

18  approved the design, correct?

19            MR. MCMULLEN:  Objection.

20  A.        Yes.

21  Q.        And then you inked it, right?

22  A.        Yeah.

23  Q.        And when you inked this design on Mr. James, you

24  don't recall whether you gave him any papers to sign,

25  right?

Page 76

1   A.         I can't remember.

2   Q.         Pardon me?

3   A.         I can't remember.  I'm sorry, I've got to adjust

4   this chair.  Does this drop back?  Does it recline?

5              MR. MCMULLEN:  I don't remember whether it does

6   or not.

7   A.         Go ahead.

8   Q.         How much -- tell me when you're ready.

9              How much did you charge Mr. James for the star

10  design?

11  A.         I can't remember.

12  Q.         Is it fair to say this is a pretty simple tattoo?

13             MR. MCMULLEN:  Objection.

14  A.         No.

15  Q.         Can you approximate in any way how much you would

16  have charged him?

17             MR. MCMULLEN:  Objection.

18  A.         I can't approximate.

19  Q.         Do you know whether he paid you at all or whether

20  you did it for free to say that you inked Mr. James?

21             MR. MCMULLEN:  Objection.

22  A.         I think he paid me.

23  Q.         Okay.  Other than being some number less than

24  $600, can you give me any estimate for what you charged?

25             MR. MCMULLEN:  Objection.

1    A.          Usually through Rich Paul, his agent.

2    Q.          All right.  So let's go back to Exhibit 6, the

3    lion tattoo.  Is this the next tattoo you inked on

4    Mr. James?

5    A.          I think so, yes.

6    Q.          Okay.  When was that tattoo inked on him?

7    A.          After his Olympics tour.  I think 2008.

8    Q.          Okay.  How much did he pay you to ink this?

9    A.          I can't remember.

10   Q.          You can't approximate at all how much it would

11   be?

12   A.          I can't approximate.

13   Q.          And you can't approximate what you would charge

14   me if I walked in today and wanted the same tattoo?

15   A.          Nope.

16   Q.          How many sessions did it take to ink the lion

17   tattoo on Mr. James?

18   A.          One.

19   Q.          Did it only take one session to ink the stars

20   tattoo too?

21   A.          Yes.

22   Q.          Were the same people present at this -- at this

23   session?

24   A.          I can't remember.

25   Q.          Did Mr. James bring anything into your shop to

Page 82

1   show what he wanted the lion tattoo to look like?

2             MR. MCMULLEN:  Objection.  I'm sorry, go ahead.

3   A.        It was a reference card, like a playing card.

4             THE COURT:  A what card?

5   A.        Playing, like a playing card.

6   Q.        Did he come into your shop with a playing card

7   that depicted a lion?

8   A.        Yeah.

9   Q.        And did he ask you to put -- ink that lion on

10  him?

11  A.        He said do something like this.

12  Q.        And did you say okay?

13  A.        Yes.

14  Q.        Did you know that one of Mr. James nicknames was

15  Lion?

16  A.        No.

17            MR. MCMULLEN:  Objection.

18  BY MS. CENDALI:

19  Q.        So in inking the lion tattoo on Mr. James, you

20  tried to copy the playing card that he gave you, right?

21            MR. MCMULLEN:  Objection.

22  A.        I didn't try to copy.

23  Q.        You didn't try to copy?

24  A.        I wanted to come up with my own design, style of

25  it.

Page 83

1    Q.        So just to be clear, did -- are you saying that

2    you didn't copy how the wings would be placed on the lion

3    from the playing card?

4              MR. MCMULLEN:  Objection.

5    A.        Yes.

6    Q.        Are you saying that you didn't come up with the

7    idea of the lion's body position on the playing card?

8              MR. MCMULLEN:  Can we hear that back, please?

9              (Whereupon the court reporter read back the

10             previous question.)

11             MR. MCMULLEN:  Objection.

12   A.        I'm not saying that.

13   Q.        Isn't it true that you copied the body position

14   of the lion on the playing card when you inked the tattoo?

15             MR. MCMULLEN:  Objection.

16   A.        I don't remember the playing card.  I just

17   remember the tattoo.

18   Q.        Well, you knew that he came in and had the

19   tattoo --

20   A.        Uh-huh.

21   Q.        Excuse me.  You knew that Mr. James came in and

22   showed you the playing card, and he said, according to you,

23   that he wanted a tattoo like this, right?

24             MR. MCMULLEN:  Objection.

25   A.        Similar.

Page 91

1   Q.        Did you understand that Mr. Green was a

2  professional basketball player when you inked him?

3   A.        Yes.

4   Q.        Let me show you what's been marked as Exhibit 9.

5  Is Exhibit 9 a photograph of Mr. Green's arm showing a

6  tattoo you inked on him?

7   A.        Looks like it.

8   Q.        Do you refer to that as the flame tattoo?

9   A.        Yes.

10  Q.        Can you approximate what year you inked this on

11  him?

12  A.        I can't remember when I did this.

13  Q.        Was it after 2010 or earlier?

14  A.        Maybe after.  I can't remember.

15  Q.        But it was after you had inked Mr. James, right?

16  A.        Yes.

17  Q.        And it was -- and this was -- the flame tattoo is

18  the first one you inked on Mr. Green, correct?

19  A.        I don't know if it's the first one.  I'm not

20  sure.

21  Q.        What -- what do you think might have been the

22  first one?

23  A.        He has a few of them.  I don't know which one I

24  did first.  I'm not sure.

25  Q.        Okay.  But the point is, is it fair to say that

1   when you did -- when you inked the various tattoos on

2   Mr. Green, you knew from the beginning that he was a

3   professional basketball player?

4   A.          Yes.

5   Q.          Okay.  And -- and you knew that as a professional

6   basketball player he would be appearing on television and

7   in newspapers, et cetera, showing his tattoos, right?

8             MR. MCMULLEN:  Objection.

9   A.          Yes.

10  Q.          And am I correct at no time did you tell

11  Mr. Green that he needed your permission before having his

12  likeness depicted with his tattoos?

13            MR. MCMULLEN:  Objection.

14  A.          Say that again, please.

15            MS. CENDALI:  Could you read it back?

16                 (Whereupon the court reporter read back the

17                  previous question.)

18            MR. MCMULLEN:  Objection.

19  A.          Yes.

20  Q.          All right.  So going back to Exhibit 9, the fire

21  tattoo, did you ink that whole tattoo, or did you modify

22  any preexisting elements?

23  A.          Both.  Yes to both questions.

24  Q.          Okay.  So can you explain the -- what the process

25  was to ink this tattoo on Mr. Green?

Page 93

1    A.        The process is for me to use a Sharpie to produce

2    the image that I tattoo.

3    Q.        Okay.  So when Mr. -- did Mr. Green make an

4    appointment to have a tattoo inked on him with you?

5    A.        Yes.

6    Q.        Okay.  And when he came in, did he tell you what

7    he had in mind for this tattoo?

8              MR. MCMULLEN:  Objection.

9    A.        I think so.

10   Q.        What do you recall him saying?

11   A.        Make it look good.

12   Q.        Okay.  Did he say what he wanted you to do?

13   A.        No.

14   Q.        Did he say where he wanted the tattoo?

15   A.        Where it's pictured at.

16   Q.        Which is his left arm, is that right?

17   A.        Left upper shoulder.

18   Q.        Okay.  So was there already a tattoo on his left

19   upper shoulder?

20   A.        Yes.

21   Q.        What was on there originally?

22   A.        An outline form of this basketball player.

23   Q.        So he already had that basketball player inked by

24   somebody else, is that right?

25             MR. MCMULLEN:  Objection.

Page 94

```
 1    A.          Yes.

 2    Q.          Do you know who that was?

 3    A.          Who what was?

 4    Q.          Who the tattooist was that inked him?

 5    A.          No, I don't.

 6    Q.          Did you then add to the tattoo that the first

 7    tattooist did?

 8    A.          Yes.

 9    Q.          And did you add more shading and detail to the

10    original tattoo?

11    A.          Yes.

12    Q.          And did you ask the permission of the first

13    tattoo artist before doing that?

14    A.          No.

15    Q.          Did you think you needed to ask his permission?

16                MR. MCMULLEN:  Objection.

17    A.          No.

18    Q.          Why not?

19    A.          I don't know.

20    Q.          Did you think if it was okay with Mr. Green,

21    that's all you needed?

22                MR. MCMULLEN:  Objection.

23    A.          I guess so.

24    Q.          Is the basketball player depicted on the arm, did

25    you understand that to be a likeness of Mr. Green or some
```

1   generic player?

2          MR. MCMULLEN:  Objection.

3   A.       I have no idea.

4   Q.       So how did it come about that flames were

5   included?

6   A.       A red Sharpie and my hand, my art work, I just of

7   of -- just drew it on him.

8   Q.       Okay.  But did you have a conversation with

9   Mr. Green about whether to include flames around this

10   figure?

11   A.       After I drew it on him and he took a look in the

12   mirror.

13   Q.       Did he approve the tattoo before you inked it on

14   him?

15          MR. MCMULLEN:  Objection.

16   A.       Yes.

17   Q.       And it says hold my own in letters at the top,

18   correct?

19   A.       Yes.

20   Q.       Did you ink those on Mr. -- no, it says I hold my

21   own, am I reading it correctly now?

22   A.       Yes.

23   Q.       And was the phrase I hold my own already inked on

24   Mr. Green when you worked on him?

25   A.       Yes.

1   the flame tattoo, how much did you charge Mr. Green for

2   that?

3   A.        I can't remember.

4   Q.        Can you approximate in any way how much?

5   A.        No.

6   Q.        It was some number under $600, but beyond that

7   you can't approximate, is that right?

8             MR. MCMULLEN:  Objection.

9   A.        Nope.

10  Q.        And if I came in today and wanted you to do the

11  same work, you couldn't approximate how much that would --

12  you would charge me, right?

13  A.        Not until I drew on you with a Sharpie.

14  Q.        So -- so when customers come in today and they

15  ask you to do tattoos, do you tell them you can't give them

16  a price quote -- quote until you draw the proposed design

17  on their arm?

18  A.        Right.

19            MR. MCMULLEN:  Objection.

20  BY MS. CENDALI:

21  Q.        Now, was the tattoo inked on Exhibit 9, the flame

22  one, done in one session?

23  A.        Yes.

24  Q.        And was the scroll tattoo in Exhibit 10 done in

25  one session?

1   A.          Yes.

2   Q.          And who was present when the scroll tattoo in

3   Exhibit 10 is done?

4   A.          I don't remember.

5   Q.          Do you recall if there was anyone there other

6   than you and Mr. Green?

7   A.          I think customers in the shop maybe.

8   Q.          But no specific people you can recall?

9   A.          No.

10  Q.          And what about with Exhibit 9, the flame tattoo,

11  was anyone else there other than you and Mr. Green?

12  A.          No, I can't remember.

13  Q.          And with regard to the scroll tattoo, did -- what

14  did Mr. Green say to you about what he wanted that tattoo

15  to look like?

16              MR. MCMULLEN:  Objection.

17  A.          I can't remember the exact words, he wanted to

18  make it look good.

19  Q.          Well, did he tell you what -- anything about what

20  his general idea was for the tattoo?

21              MR. MCMULLEN:  Objection.

22  A.          No, not that I remember.

23  Q.          Well, when you inked the scroll tattoo on

24  Mr. Green, was there already some preexisting tattoo on his

25  arm?

1              MR. MCMULLEN:  Objection.

2    A.        Yes, the scroll was outlined, and the names were

3    outlined.

4    Q.        So the names Rashad, DeVonte and Donte, those

5    were already inked on Mr. Green when you added the scroll,

6    right?

7    A.        The art work, yes.

8    Q.        And did you understand that those were names of

9    Mr. Green's family members?

10   A.        I think they -- yes.

11   Q.        Did you understand that those were his kids?

12   A.        The who?

13   Q.        That those were his children?

14   A.        No.

15   Q.        Who do you understand the names to be?

16   A.        I'm not sure who they are, I think his brothers.

17   Q.        And did he talk to you about those -- or his

18   brothers' names and he --

19   A.        I think so.

20   Q.        Did he give you the impression that he wanted to

21   honor his brothers by putting their names on his arm?

22             MR. MCMULLEN:  Objection.

23   A.        I guess so.

24   Q.        So did Mr. Green tell you that he wanted to

25   emphasize the names more by putting a scroll around them?

Page 112

1    A.        I forgot.

2    Q.        And how was it decided -- did Mr. Green say to

3    you what symbols he wanted inked on him?

4    A.        Yes.

5    Q.        What did he say?

6    A.        He told me what symbols he wanted.  I forgot what

7    symbols they were.

8    Q.        And then you did that then, correct?

9    A.        Yes.

10   Q.        Were there any other tattoos that you inked on

11   Mr. Green?

12   A.        I can't remember.

13   Q.        How did it come about that you first inked

14   Tristan Thompson?

15   A.        How did it come about?  He came into the shop to

16   get a tattoo.

17   Q.        It hadn't been set up in advance?

18   A.        I don't remember how it was set up.

19   Q.        Did you know Mr. Thompson before he came into the

20   shop?

21   A.        No.

22   Q.        Did anyone come in with him?

23   A.        I can't remember.

24   Q.        Let me show you what's been marked as Exhibit 11.

25   Is this a photograph of Mr. Thompson's front chest

Page 113

1    depicting a tattoo you inked on him?

2    A.        Looks like it.

3              MR. MCMULLEN:  Excuse me, counsel, did you say

4    this is Exhibit 11?

5              MS. CENDALI:  Yes, Defendant's Exhibit 11.

6              MR. MCMULLEN:  Thank you.

7    BY MS. CENDALI:

8    Q.        And did you ink the whole tattoo, or was there

9    any preexisting ink on him?

10   A.        I inked the whole tattoo.

11   Q.        And you understood -- was this tattoo inked in

12   2012?

13   A.        Maybe.

14   Q.        Was it approximately that time?

15   A.        I think so.

16   Q.        You understood that he was a professional

17   basketball player at that time, right?

18   A.        Yes.

19   Q.        And you knew that he had signed an $82 million

20   contract with the Cleveland Cavaliers, right?

21             MR. MCMULLEN:  Objection.

22   A.        I didn't know that.

23   Q.        Well, you knew he was a celebrity, right?

24             MR. MCMULLEN:  Objection.

25   A.        I didn't know that.

1   Q.        Well, you knew he was a famous basketball player,

2   right?

3             MR. MCMULLEN:  Objection.

4   A.        I didn't know that.

5   Q.        Did you think that Tristan Thompson was a famous

6   basketball player?

7             MR. MCMULLEN:  Objection.

8   A.        I think he is now.

9   Q.        And you don't think he was in 2012?

10            MR. MCMULLEN:  Objection.

11  A.        I don't know.

12  Q.        Well, you knew that he appeared on television,

13  right?

14            MR. MCMULLEN:  Objection.

15  A.        Yes.

16  Q.        So how much did Mr. Thompson pay you to ink

17  the my brother's keeper tattoo?

18  A.        I can't remember.

19  Q.        And other than it being less than $600, can you

20  approximate in any way how much you charged him?

21            MR. MCMULLEN:  Objection.

22  A.        No, I can't.

23  Q.        And if I came in today with my brother and asked

24  you to ink a tattoo on him like that, you couldn't give me

25  an estimate in advance, right?

Page 116

1           MR. MCMULLEN:  Objection.

2    A.       I can't remember that.

3    Q.       Do you remember talking to him about how his

4    brother Amari Thompson (phonetic) suffers from epilepsy?

5           MR. MCMULLEN:  Objection.

6    A.       I can't remember.

7    Q.       Did he say anything to you about how he wanted

8    this to refer to his brother and that he wanted to refer to

9    him taking care of his brother?

10   A.       No, I don't remember that.

11   Q.       So you don't know one way or the other if you had

12   a conversation with him about why he wanted my brother's

13   keeper tattooed on him?

14   A.       We had a conversation, but I just can't remember

15   what the conversation was about.

16   Q.       Are you aware that The Bible has the phrase my

17   brother's keeper in it?

18           MR. MCMULLEN:  Objection.

19   A.       I'm not.

20   Q.       Are you familiar with the story of Cain and Able?

21   A.       Yes.

22   Q.       Did you know that Cain replied at one point, am I

23   my brother's keeper?

24           MR. MCMULLEN:  Can we hear that back, please?

25              (Whereupon the court reporter read back the

1          previous question.)

2   A.        You saying it now refreshes my memory a bit.

3   Q.        So you didn't invent the phrase my brother's

4   keeper, right?

5             MR. MCMULLEN:  Objection.

6   A.        I don't know.

7   Q.        Well, you didn't -- you aren't the -- you weren't

8   the person who came up with the phrase my brother's keeper,

9   is that true?

10            MR. MCMULLEN:  Objection.

11  A.        I don't know.

12  Q.        Well, you either know or don't know.  Did you

13  come up and invent the phrase my brother's keeper or not?

14            MR. MCMULLEN:  Objection.

15  Q.        How could you not know that?

16            MR. MCMULLEN:  Objection.  Asked and answered.

17            MS. CENDALI:  Please, please stop objecting until

18  I'm done, counsel.  You keep -- are all over this

19  transcript objecting in the middle of my questions?

20            MR. MCMULLEN:  Respectfully, counsel, sometimes

21  you pause and trail off for a very long time before you

22  finish your question so it's hard to tell when you are

23  done.  I will try to do better if you will make your pauses

24  shorter.

25            MS. CENDALI:  I don't think the record is correct

Page 139

1   Q.          Let me put it this way, let me strike that.

2   A.          Yeah --

3   Q.          Was it your understanding with the player that

4   you were inking these designs for them, and them alone,

5   that these were their personal designs that you would not

6   put on other people?

7               MR. MCMULLEN:  Objection.

8   A.          These are my original designs.  That's all I can

9   say to that.

10  Q.          And you never put them on anybody else, right?

11  A.          No.

12  Q.          So you never, for any of the designs you inked on

13  Mr. James, Mr. Green or Mr. Thompson, you never inked any

14  of those designs on anyone else, right?

15  A.          No.

16  Q.          And isn't that, in part, because those designs

17  were personal to those people?

18              MR. MCMULLEN:  Objection.

19  A.          I assume so.

20  Q.          Would it have been odd to put Mr. Green's

21  brothers' names on somebody else?

22              MR. MCMULLEN:  Objection.

23  A.          Would it be odd to put Mr. Green's names on

24  somebody else?  Are there other people involved here with

25  the same names?

1           MR. MCMULLEN:  Objection.

2    A.      Would I agree -- say that again.

3    Q.      Sure.  Would you agree that without his tattoos,

4    Mr. James wouldn't look like he looks in real life?

5    A.      Rephrase that question, please.

6    Q.      What's wrong with it?

7    A.      I don't understand how you're asking me.  Just

8    rephrase it if you could.

9    Q.      Would you agree with me that Mr. James wouldn't

10   look like himself without his tattoos?

11   A.      That he wouldn't look like himself?

12           MR. MCMULLEN:  Objection.

13   BY MS. CENDALI:

14   Q.      Right.

15   A.      He wouldn't look like himself without his

16   tattoos.

17   Q.      And would you agree that Mr. Green and

18   Mr. Thompson wouldn't look like themselves without their

19   tattoos?

20           MR. MCMULLEN:  Objection.

21   A.      I don't think they would look like theirselves

22   with the -- without tattoos.

23   Q.      So if you wanted to depict the player

24   realistically, you would agree that you would want to

25   include their tattoos, right?

Page 143

1          MR. MCMULLEN:  Objection.

2     A.        To depict the player realistically you would have

3     to have his tattoos on him.

4     Q.        Okay.

5          THE WITNESS:  Is there a bathroom down here?  Is

6     there one down here?

7          MS. CENDALI:  Would you like to take a break?  So

8     off the record.

9          VIDEOGRAPHER:  Off the record at 12:24.

10          (A brief recess was taken.)

11          VIDEOGRAPHER:  On the record.  This is beginning

12    of disc two in the deposition of James Hayden.  Time is

13    12:37.

14    BY MS. CENDALI:

15    Q.        Mr. Hayden, I'd like to show you what's been

16    marked as Defendant's Exhibit 21, which is a copy of a New

17    York Times article.  And I'm just going to ask you about

18    the photograph on the first page.  Is that a picture of

19    LeBron James showing his Gloria tattoo?

20          MR. MCMULLEN:  Objection.

21    A.        It's very small picture here.  Looks like LeBron

22    James, yeah.

23    Q.        And -- and the Gloria tattoo is one you inked on

24    his right shoulder, correct?

25    A.        Yes.

1   was talking about television I wasn't talking about playing

2   a video game on a television screen.  My question to you

3   is, is it your position that it -- that when a player

4   appears on television playing basketball in an NBA game, or

5   at a news conference about an NBA game, that they need your

6   permission to be depicted with your tattoos?

7           MR. MCMULLEN:  Objection, calls for a legal

8   conclusion.

9   A.          In regular life form, no, but in NBA 2K form,

10  avatar form, yes.

11  Q.          Okay.  So in regular life, if I'm just tuning in

12  a Cavs or Lakers or Raptors game, players that you would

13  have inked playing would not need your permission, is

14  that --

15          MR. MCMULLEN:  Objection.

16  A.          I don't know.

17  Q.          Okay.  Have you ever told a player that they

18  needed your permission before appearing on television

19  playing basketball?

20  A.          No.

21  Q.          Have you ever told the NBA that they needed your

22  permission to depict players on television playing NBA

23  games showing their tattoos?

24  A.          No.

25  Q.          Have you ever done anything to try to stop that?

1    A.          No.

2    Q.          So is it your position that Mr. James would need

3    your permission before being depicted with his tattoos in

4    merchandising?

5              MR. MCMULLEN:  Objection, calls for legal

6    conclusion.

7    A.          I don't know.

8    Q.          Do you believe this is your position, this isn't

9    your legal theory, I'm asking you do you contend, is it

10   your position that he should not be able to do that without

11   asking your permission?

12             MR. MCMULLEN:  Objection.

13   A.          It's copyright law, I -- I'd be speculating.

14   Q.          I'm not asking you what the law is.  I'm asking

15   you, have you ever objected to Mr. James appearing in

16   merchandise showing his tattoos?

17             MR. MCMULLEN:  Could I hear that back, please?

18                  (Whereupon the court reporter read back the

19                   previous question.)

20   A.          Have I ever objected to him being in merchandise?

21   Q.          Showing his tattoos, yes.

22   A.          Just with Warner Brothers.

23   Q.          And what specifically with regard to Warner

24   Brothers are you referring to?

25   A.          The reuse of the tattoos.

Page 152

1   permission, right?

2   A.          No.

3   Q.          Okay.  Have you ever told anyone they could not

4   have a player in a movie showing their tattoos without your

5   permission?

6               MR. MCMULLEN:  Objection.

7   A.          No.

8   Q.          Now, you were talking about what you believe was

9   a distinction between avatars and other reproductions of a

10  person, right?

11  A.          Uh-huh.

12  Q.          So in a movie, someone isn't an avatar, right?

13              MR. MCMULLEN:  Objection.

14  A.          I don't know.

15  Q.          Well, what distinction, if any, do you draw

16  between somebody appearing in a movie showing their tattoos

17  and appearing in a video game showing their tattoos?

18  A.          If they're computer -- computer-generated images

19  they're not.

20  Q.          And that's the -- the -- what is it about being

21  Avatar that you believe requires your permission as opposed

22  to a photograph, a video or a movie?

23              MR. MCMULLEN:  Before you respond can I hear that

24  question back, please?

25                     (Whereupon the court reporter read back the

1    sure how they're doing it.  I'd like to find out more about

2    that.  I'm a tattoo artist.

3    Q.        Right.  But you say that the problem you have

4    with avatars is that that's computer generated, I'm asking

5    you --

6    A.        My images are -- that I have copyrights to are --

7    are computer generated.

8    Q.        Right.  But are -- aren't computers used to

9    generate how people look in movies and photographs too?

10            MR. MCMULLEN:  Objection.

11   A.        I don't know.

12   Q.        You don't know?

13   A.        No, I don't know.

14   Q.        Have you ever asked a client to sign a copyright

15   agreement before you inked them?

16   A.        A client to sign a copyright agreement before I

17   ink them?

18   Q.        Yes.

19   A.        No.

20   Q.        Have you told the players involved in this case

21   that when you -- let me rephrase.

22            When you inked the tattoos on Mr. James,

23   Mr. Thompson and Mr. Green, did you tell the players that

24   you were claiming copyrights of the tattoos you put on

25   their bodies?

Page 156

1          MR. MCMULLEN:  Objection.

2    A.        No.

3    Q.        And when you inked Mr. Thompson, Mr. Green and

4    Mr. James, you didn't tell them that they would need your

5    permission to appear in video games showing their tattoos,

6    right?

7    A.        No.

8    Q.        Is it fair to say that in the tattoo industry,

9    that when a client leaves the tattooist's parlor he or she

10   can go about their life as they wish without needing to run

11   back to the tattooist for permission?

12          MR. MCMULLEN:  Objection.

13   A.        I guess so.

14   Q.        So I believe you said you've gone to NBA

15   basketball games and you've watched them on TV from time to

16   time, is that right?

17   A.        Yes.

18   Q.        And I -- I believe you said that you didn't

19   actually play the video games yourself at issue in this

20   case but that you watch others play them for you, to show

21   you what they look like, is that fair?

22          MR. MCMULLEN:  Objection.

23   A.        I've held the -- the thing before, but it's not

24   something I -- it's not in my bag.

25   Q.        But you looked into how the players were depicted

Page 158

1    player options?

2    A.         Okay, I didn't know that.

3    Q.         Well, you -- did you understand that the -- that

4    Mr. Green, Mr. Thompson and Mr. James were just one of many

5    players available in the game to be played?

6               MR. MCMULLEN:  Objection.

7    A.         I guess so, yeah.

8    Q.         And did you understand that if someone was

9    choosing to play the game with, say, the New York Knicks,

10   sadly, the players you inked would not appear at all?

11              MR. MCMULLEN:  Objection.

12   A.         I'm not sure.

13   Q.         Well, would you agree with me that in the NBA 2K

14   games, the tattoos that you inked only appear on the

15   players who bear them in real life?

16              MR. MCMULLEN:  Objection.

17   A.         I think so.

18   Q.         But, like, this isn't the situation, as far as

19   you know with the NBA 2K Games, that I could take a tattoo

20   that was on LeBron and put it on Kyrie Irving?

21   A.         You can do that?

22   Q.         No.  No.  As far as you know, that you can't take

23   a tattoo from one player and put it on a different player,

24   right?

25              MR. MCMULLEN:  Objection.

Page 161

1  Q.          And the NBA 2K Games have real world managers in

2  them and not made up people, right?

3              MR. MCMULLEN:  Objection.

4  A.          I don't know.

5  Q.          Now, I mean, is it fair to say that they -- from

6  your looking at the NBA 2K Games, that Take-Two was trying

7  to be realistic in how it presented basketball?

8              MR. MCMULLEN:  Objection.  Can we hear that back,

9  please?

10                 (Whereupon the court reporter read back the

11                  previous question.)

12             MR. MCMULLEN:  Objection.

13 A.          Trying to be realistic, I guess so.

14 Q.          And, now, I believe you had testified earlier

15 that when you play an NBA 2K video game, your game counsel

16 is hooked up to a screen so that the -- television, so that

17 you're seeing the video game on your TV, is that right?

18             MR. MCMULLEN:  Objection.

19 A.          Yes.

20 Q.          And when -- is it fair to say when NBA players

21 appear on a television screen, they're smaller than they

22 are in real life?

23 A.          On the screen?

24 Q.          Yeah.

25 A.          In comparison to a person standing there --

Page 162

1    Q.        Yeah.

2    A.        -- next to the screen?

3    Q.        Yeah.

4    A.        Yeah.

5    Q.        Like, a player might be only a couple inches tall

6    when you're looking at him on the television screen, and in

7    real life they may be almost 7 feet tall, right?

8    A.        Yeah.

9    Q.        And when they're presented on a smaller -- it

10   means the tattoos are smaller too, right?

11   A.        They're proportional to the avatar.

12   Q.        Right.  And so if the tattoos are smaller, would

13   you agree with me they're hard to make out?

14             MR. MCMULLEN:  Objection.

15   A.        I wouldn't agree with you on that.

16   Q.        Well, didn't you just talk about Exhibit 21, the

17   picture of Mr. James in the New York Times article, and I

18   asked if that was your tattoo that you had inked on his

19   shoulder, and didn't you see it was hard to make out

20   because it was small?

21             MR. MCMULLEN:  Objection.

22   A.        I didn't say that.  I said it looks like it.

23   Q.        Didn't you say it was hard to make out because it

24   was small?

25   A.        I thought I said it looks like it.

1  Q.       So you think it's just as easy to make out a

2  tattoo on a player shown on a mobile device as it would be

3  if they were standing in this room today?

4            MR. MCMULLEN:  Objection.

5  A.       The avatars are that clear, yes.

6  Q.       Okay.  And would you agree with me that when

7  someone plays the NBA 2K Game, the players move around the

8  court?

9  A.       Yes, they move around.

10  Q.       And they can move around quickly and jump and run

11  and block as if they're playing basketball, right?

12            MR. MCMULLEN:  Objection.

13  A.       I guess so, yeah.

14  Q.       And isn't it true that when, just like in real

15  life, when players run and jump and move, it can make it

16  harder to depict the tattoos?

17            MR. MCMULLEN:  Objection.

18  A.       Ask me that again.

19  Q.       Sure.  Isn't it true, just in -- just like in

20  real life, when someone who has a tattoo is running around

21  a basketball court, it can make it hard to see that tattoo?

22  A.       I don't know.

23            MR. MCMULLEN:  Can you read that back?

24            MS. CENDALI:  He already answered the question.

25  A.       I don't agree with that.

```
 1              VIDEOGRAPHER:  On the record at 2:26.
 2   BY MS. CENDALI:
 3   Q.         Mr. Hayden, do you understand you're still under
 4   oath?
 5   A.         Yes.
 6   Q.         Have you ever licensed a tattoo for a video game?
 7   A.         No.
 8   Q.         Do you know of any other tattooist who has
 9   licensed a tattoo for a video game?
10   A.         I don't know if there's any that have.
11   Q.         None that you know of?
12   A.         Not that I know of.
13   Q.         Are you familiar with a company called Solid Oak
14   Sketches?
15   A.         I've heard of Solid Oak.
16   Q.         What do you know about them?
17   A.         Just that they are -- I guess they're in -- in
18   court with 2K for a similar case.
19   Q.         Did you understand that they filed the first
20   lawsuit against the video game claiming that the tattooists
21   needed to be compensated before including the tattoo on a
22   real live person in a game?
23              MR. MCMULLEN:  Objection.
24   A.         I didn't know they were the first.
25   Q.         And you knew they file such a lawsuit, right?
```

1          MR. MCMULLEN:  Objection.

2   A.          Rephrase that question if you could.

3   Q.          Sure.  Was Solid Oak the -- what gave you the

4   idea about suing Take-Two for use of the tattoos on the

5   avatars?

6          MR. MCMULLEN:  Objection.

7   A.          No, not -- not overall format of it.  I think the

8   thing was that -- I think it was brought to my attention

9   that Solid Oak Sketches was using my designs as well as 2K,

10  which prompted me to look into the -- into the situation a

11  little bit more.

12  Q.          And what do you mean it prompted you to look into

13  the situation?

14  A.          Well, I have copyrights for the designs, and I

15  guess Solid Oak Sketches might have been trying to use

16  those in their case against 2K or whatever it was, but --

17  Q.          So did you know that they were pressing a case

18  against 2K about the tattoos, and did you think that you

19  could do the same thing?

20          MR. MCMULLEN:  Objection.

21  A.          No, I -- I'm sorry.

22          MR. MCMULLEN:  Go ahead.

23  A.          No.

24  Q.          Okay.  Well, prior to filing this lawsuit, did

25  you ever make any attempts to license tattoos that you

1   inked on real people for video games?

2   A.          No.

3   Q.          Has anyone ever approached you about seeking

4   permission to license tattoos you inked on real people for

5   video games?

6   A.          No.

7   Q.          In addition to Solid Oak, are you aware that a

8   tattooist named Alexander has filed a lawsuit against

9   Take-Two?

10  A.          No, I'm not.

11  Q.          Let me show you what's been marked as Exhibit 26,

12  a document baring the Bates Number Hayden 851 through 853,

13  which has a date at the top of July 13, 2009 between Nike

14  and Jimmy Hayden.  Do you go by Jimmy, Mr. Hayden, a lot?

15  A.          Yes, I do.

16  Q.          And was this agreement actually signed and

17  entered into?  The copy that we were given doesn't have a

18  signature.

19  A.          Yes, it was.

20  Q.          And this agreement was about you doing designs on

21  three pairs of shoes, is that right?

22  A.          Correct.

23  Q.          And were these new designs by you, or were these

24  existing designs that you had inked on a player?

25              MR. MCMULLEN:  Objection.  Go ahead.

1    A.       Well, I'm not sure of the total but it was more

2    than one mannequin, more than three mannequins.

3    Q.       Okay.  But for each mannequin you received a lump

4    sum, right?

5            MR. MCMULLEN:  Objection.

6    A.       Yes.

7    Q.       Okay.  You weren't receiving a percentage of

8    sales from the Nike stores, right?

9    A.       Not that I know of.

10    Q.       How have you been harmed by Take-Two's depiction

11    of Mr. James, Mr. Green and Mr. Thompson?

12            MR. MCMULLEN:  Objection.

13    A.       I own copyrights to those designs, and they were

14    illegally redone, recreated on avatars in the game.  It's

15    hurtful from a financial standpoint and also as an artist

16    that I wasn't respected thoroughly from this company.

17    Q.       Have you lost any customers as a result?

18            MR. MCMULLEN:  Objection.

19    A.       I don't know.

20    Q.       You don't know of any, right?

21    A.       Maybe there is, maybe is not, I don't know.

22    Q.       So you're under oath here today, and I'm asking

23    you right now, as far as you know have you lost any

24    customers as a result of Mr. James, Mr. Green and

25    Mr. Thompson appearing in the NBA games?

Page 209

1          MR. MCMULLEN:  Objection.

2    A.        NBA 2K Games?

3    Q.        Correct.

4    A.        I don't know.

5    Q.        You're not aware of any customers that you've

6    lost, correct?

7          MR. MCMULLEN:  Objection.

8    A.        You just don't become aware of people that you're

9    losing, you just don't have them.  You're just not aware so

10   you just don't know.

11   Q.        No, that's not true.

12   A.        That's very true.

13   Q.        Someone could say I'm not going to go to you, I'm

14   going to go to another tattooist because I don't like you.

15   So I'm asking you, do you know of any customer who is not

16   going to you as a result of Take-Two replicating --

17   A.        Infringement.

18   Q.        -- the likenesses of Mr. James, Mr. Green and

19   Mr. Thompson in the NBA 2K Games?

20          MR. MCMULLEN:  Objection.

21   A.        I'm not aware of any -- any clients that don't --

22   that do not want to come to me because of Take-Two's

23   infringing behavior.

24   Q.        Have you lost any income as a result of

25   Take-Two's use of these players as they look in real life?

Page 210

1           MR. MCMULLEN:  Objection.

2    A.        I don't know.

3    Q.        You're not aware of any income that you've lost,

4    correct?

5    A.        I'm not sure.

6           MR. MCMULLEN:  Objection.

7    BY MS. CENDALI:

8    Q.        You don't know of any lost income as you sit here

9    today, isn't that true?

10          MR. MCMULLEN:  Objection.

11   A.        My -- I don't know.

12   Q.        You're not aware of any, correct?

13          MR. MCMULLEN:  Objection.

14   A.        I don't know.

15   Q.        Can you point me to any lost income that you have

16   suffered as a result of the players appearing in games?

17          MR. MCMULLEN:  Objection.

18   A.        I don't know if I've lost revenue from the

19   players playing in the games, the video games.

20   Q.        Could you please tell me what your factual basis

21   is, if any, of any claim that you have lost revenue as a

22   result of them appearing in the games?

23          MR. MCMULLEN:  Objection.

24   A.        I don't know.

25   Q.        You're not able to provide any factual basis, is

Page 211

1    that your testimony?

2    A.          Right now I don't know.

3    Q.          Okay.  So you don't have -- right now you can't

4    give me any facts relating to any lost income, is that

5    true?

6                MR. MCMULLEN:  Objection.

7    A.          I don't know right now.

8    Q.          Sir, if we have to resume your deposition we

9    will.

10   A.          I don't know.

11   Q.          I'm asking you very clearly a question --

12   A.          Uh-huh.

13   Q.          -- are you aware of any lost income as a result

14   of them appearing in the games, yes or no?

15               MR. MCMULLEN:  Objection.

16   A.          Let me think about this.  How would I know what

17   revenue I've lost?

18   Q.          Somebody would -- would say I'm not doing a deal

19   with you.

20   A.          Maybe they -- maybe it's unspoken, maybe it's

21   just not --

22   Q.          Well, either you would know it or you don't know

23   it.  Do you know --

24   A.          No, there's --

25   Q.          -- of any facts --

```
 1   A.         It's a gray area, it's a very vague question.

 2   Q.         Move to strike as nonresponsive.  It's obvious

 3   that you're being evasive.

 4              My question is what you know.  Do you know,

 5   sitting here today, of any lost income, do you have any

 6   facts with regard to any lost income as a result of these

 7   players appearing in the video game, either you know

 8   something or you don't?

 9              MR. MCMULLEN:  Objection.

10   A.         I guess not, not right now.

11   Q.         Have you lost any licensing opportunities as a

12   result of Take-Two's depiction of the players in the game?

13              MR. MCMULLEN:  Objection.

14   A.         Licensing as in what?

15   Q.         Any licensing whatsoever.

16   A.         Not that I know of.

17   Q.         How much money do you think Take-Two should pay

18   you?

19              MR. MCMULLEN:  Objection.

20   A.         I'm not sure.

21   Q.         Do you have any thoughts as to how much money you

22   think Take-Two should pay you and why?

23   A.         I'm not sure at this point, not right now.

24   Q.         So you have -- so you can't answer about how much

25   you think you should be owed; is that right?
```