# **EXHIBIT 12**

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

JAMES HAYDEN,

        Plaintiff,

  -vs-                  CASE NO. 1:17CV2635

2K GAMES, INC., et al.,

        Defendants.

_____

Deposition of BERNARDINO TOVANCHE

Cleveland, Ohio

Wednesday, January 29, 2020 – 7:36 p.m.

Reported by:

Pamela S. Greenfield, RDR, CRR

Job No: 26860

1   idea that I can roll with.  I'll ask them
2   questions like what's your background and what
3   are the things you like."
4  A. Sure.
5  Q. You see that?
6     So why do you ask them questions like what's
7   your background or what are things that you like?
8  A. I don't remember asking what's your background.
9   I don't even know why I would ask that question
10  so maybe that was something that was misquoted,
11  honestly.  I don't know why I would want to even
12  ask that question.
13     It's not relevant to a tattoo really
14  necessarily.  Unless they want to get something
15  that's like a family crest or something like
16  that.  I don't think that I would ask that
17  question, but I would ask what are, what are the
18  things that you like.  I might ask what kind of
19  things that they want to get inked on their body,
20  sure, if they're not sure.
21 Q. Okay.  So why, why would you ask them what kinds
22  of things they like?
23 A. Well, if I, if I'm going to tattoo something on
24  somebody, I have to have some sort of idea of
25  which route to go with with an idea.

Page 34

1 Q. So why do you want to know what they like?
2             MR. ALEXANDER: Objection.
3     Incomplete hypothetical.
4 A. Why do I want to know what they would like?
5    Well, they're -- if they don't have an idea, I
6    have to have some sort of idea of what to tattoo
7    on them so I have to ask, start asking questions,
8    you know, what kind of things interest you, what
9    do you like.  Like what do you want to get
10   tattooed.  What is the tattoo for, is it for
11   anything.
12 Q. What do you mean "is it for anything"?
13 A. Like are you getting it for any specific reason.
14 Q. Do you find that a lot of people get tattoos for
15   specific reasons?
16            MR. ALEXANDER: Objection.
17    Calls for speculation.
18 A. Sometimes.  I mean I'm, I will ask questions just
19   to try to figure out what they're trying, why did
20   you walk through the door.  What kind of tattoo
21   do you want.
22 Q. And that's because the tattoo is going on their
23   body, right?
24            MR. ALEXANDER: Objection.
25    Foundation.  Calls for speculation.

Page 36

1 Q. You see that?
2 A. Yeah.
3 Q. Would you agree with me that people get tattoos
4     for very personal reasons?
5              MR. ALEXANDER: Objection.
6          Calls for speculation.
7 A. Sometimes.
8 Q. Well you state here that people get things for
9     very personal reasons, right?
10 A. They do sometimes, yeah, for sure.
11 Q. And you have a few tattoos for personal reasons,
12     right?
13 A. I do, and I have some that are, that don't have
14     anything to do with anything.
15 Q. Well, you have the name of your father, who
16     passed away?
17 A. I don't have his name, no. I have his portrait.
18 Q. His portrait.
19     And you have a tattoo for your mother?
20 A. I have her portrait.
21 Q. Do you have any other personal tattoos?
22 A. I have a few personal ones and then some of them
23     that are just things that I like.
24 Q. Have you tattooed a lot of portraits?
25 A. A few. I wouldn't say a lot necessarily.

Page 117

1          Foundation.
2    A.   I have no idea.
3    Q.   Would you recognize it if you saw it?
4    A.   Probably not.
5                    MS. MEANS:  I'm going to mark
6         Exhibit 9 for the record.
7                       -  -  -  -
8         (Thereupon, Defendants' Exhibit 9, 5/20/08
9         Trademark Principal Register 3,429,884, was
10        marked for purposes of identification.)
11                      -  -  -  -
12   Q.   So this is a trademark registration for a logo
13        for The Venetian hotel.  Do you see that?
14   A.   Okay.  Uh-huh.
15   Q.   Do you see the image above the words "The
16        Venetian"?
17   A.   Yeah.
18   Q.   Do you see it's a lion holding a shield?
19   A.   Yes.
20                   MR. ALEXANDER:  Objection.
21        Mischaracterizes the document.
22   A.   Yeah.  He's holding something, yeah.
23   Q.   It looks like he's holding something like a
24        shield, right?
25   A.   Something like that, yeah.

Page 118

1  Q.  And he has a tail that sort of wraps around his
2       leg, right?
3               MR. ALEXANDER: Objection.
4       Vague.
5  A.  Yeah.
6  Q.  And the lion also has a single wing, right?
7               MR. ALEXANDER: Objection.
8       Vague. Mischaracterizes the document.
9  A.  This lion on The Venetian, yes, it does.
10  Q.  And the lion's facing the viewer, right?
11              MR. ALEXANDER: Objection.
12      Vague. Mischaracterizes the document.
13  A.  The lion is facing, yeah, I mean you can see his
14      face. Is that what you're saying?
15  Q.  Uh-huh.
16  A.  Yes.
17  Q.  And looking back at the sketch in 206, this is a
18      lion with a single wing, right?
19  A.  Yes.
20  Q.  And he's holding a shield?
21              MR. ALEXANDER: Objection.
22      Vague.
23  Q.  Or something like a shield?
24  A.  Yeah.
25              MR. ALEXANDER: Objection.

1        Form.
2   Q.   And the lion has a tail that sort of wraps around
3        his leg, right?
4                    MR. ALEXANDER: Objection.
5        Form. Mischaracterizes the document.
6   A.   Yes.
7   Q.   And the lion is facing the viewer?
8                    MR. ALEXANDER: Objection.
9   Q.   His head is turned towards the viewer?
10                   MR. ALEXANDER: Objection.
11       Form. Vague. Mischaracterizes the
12       document.
13  A.   You can see his face, yes.
14  Q.   Do you recognize the image in The Venetian
15       trademark registration? Have you seen it before?
16  A.   Maybe on-line.
17  Q.   When would you have seen it on-line?
18  A.   Oh, I don't know.
19  Q.   Is this the image that Mr. Hayden used as a
20       reference when inking the lion tattoo on
21       Mr. James?
22                   MR. ALEXANDER: Objection.
23       Form. Foundation.
24  A.   I don't know. I have no idea.
25  Q.   Did Mr. Hayden ever mention to you a playing card

Page 129

1      can't see the other one. It's hard to see.
2 Q.  And were you present when this tattoo was inked?
3 A.  I don't remember.
4 Q.  So you don't remember anything about this tattoo
5      being inked?
6                MR. ALEXANDER: Objection. It
7        mischaracterizes the witness' testimony.
8 A.  I don't remember if I was there.
9 Q.  Did you hear about it?
10 A.  Yes.
11 Q.  What did you hear about it?
12 A.  Well, Jim talked about it as being like a five
13      star general tattoo.
14 Q.  What do you mean "a five star general tattoo"?
15                MR. ALEXANDER: Objection.
16        Calls for speculation. Foundation.
17 A.  I'm not really sure what he meant by it but it's
18      a five star -- he said it's a five star general
19      tattoo like.
20 Q.  What did you understand that to mean?
21 A.  Like he's a leader I guess.
22 Q.  Is that a tattoo, a five star general tattoo, is
23      that something you've seen before?
24                MR. ALEXANDER: Objection.
25        Vague.

Page 130

1  A.  Something I've seen before?  I suppose, yeah.
2  Q.  In what context?
3  A.  I don't know.  I've seen, I've seen lots of
4      tattoos.
5  Q.  So this is just one of the many tattoos you've
6      seen before?
7  A.  I mean I've, I've seen five stars on people
8      before.  I don't really know what the meaning was
9      behind them necessarily but...
10 Q.  So do you know who was present when Mr. James had
11     this tattoo inked?
12              MR. ALEXANDER:  Objection.
13         Vague.
14 A.  I don't remember.
15 Q.  Just for the record I'm going to refer to the
16     five star tattoo as the star tattoo.
17 A.  Okay.  That's fine.
18 Q.  So you don't know who was present when the star
19     tattoo was inked?
20 A.  I don't remember.  I don't remember if I was
21     present.
22 Q.  Do you remember how long it took to ink this
23     tattoo?
24              MR. ALEXANDER:  Objection.
25         Calls for speculation.  Foundation.

1           Assumes facts.  Form.
2  A. Why wouldn't I tell my client that I needed, that
3     they needed permission to appear in a video game?
4     I guess I wouldn't assume that any of my clients
5     are going to appear in any video games.  I don't
6     know.
7  Q. Do you have clients who appear on Instagram?
8  A. Yes.
9  Q. Why wouldn't you tell one of your clients that
10    they need your permission before they can appear
11    on Instagram?
12              MR. ALEXANDER:  Objection.
13        Incomplete hypothetical.  Calls for
14        speculation.  Assumes facts.
15 A. Why wouldn't I tell one of my clients that they
16    needed my permission?  I, I guess that's not
17    something I would tell them.
18 Q. Why not?
19 A. They're allowed to show my artwork, but that's,
20    that's about it.
21 Q. It's your understanding that they're allowed to
22    do that?
23              MR. ALEXANDER:  Objection.
24        Form.
25 A. They're, I mean they can -- it's not something

1  A.  Do they need --
2                MR. ALEXANDER:  Form.  Vague.
3  A.  Do they need permission from their tattooist?
4  Q.  Right.
5  A.  I mean I'm, I'm not sure.  I mean this is a, if
6      a, if something is going to be exploited for
7      financial gain, then that's something different
8      than just showing a picture on Instagram.
9  Q.  Is it, would you say that showing a, showing
10     LeBron James in a basketball game, in an NBA
11     basketball game, would you say that that is
12     something that would require the tattooist's
13     permission first?
14               MR. ALEXANDER:  Objection.
15        Form.  Vague.  Calls for a legal
16        conclusion.  Incomplete hypothetical.
17 A.  So showing LeBron game -- like on TNT playing
18     basketball?
19 Q.  Sure.
20 A.  Would that be something that would require like
21     a, you're saying for the, a release of his
22     tattoos?  Is that what you're saying?
23 Q.  Do you think that before Mr. James can ever
24     appear in a basketball game, he needs to go back
25     to his tattooists and get their permission every

1     single time?

2               MR. ALEXANDER: Objection.

3       Incomplete hypothetical. Form. Calls for

4       speculation and legal conclusion.

5  A.  Does he, does he need to come back and get

6     permission to appear on TV every time, no.

7  Q.  Would you agree with me that it would be bad for

8     your tattoo business if your clients thought that

9     after they were tattooed, they would have to

10    decide whether they could be depicted in media?

11             MR. ALEXANDER: Objection.

12      Calls for speculation.

13  A.  I -- would I, would I agree with that? That

14    before they can, before they can release their --

15    I don't know how that would even work out. I

16    don't know. I don't know if I'd agree with you

17    or not on that honestly.

18  Q.  Well, do you think it would be bad for business

19    if clients thought they couldn't post photographs

20    of themselves on-line?

21             MR. ALEXANDER: Objection.

22      Incomplete hypothetical. Form.

23  A.  If clients thought that they couldn't post their,

24    would it be bad? I'm not sure if it would be

25    bad. I mean...

Page 182

1  A. Have any of my clients come back and asked me?
2  Q. Let me rephrase.
3     Have you ever heard of a client of a
4     tattooist asking permission of their tattooist
5     before appearing in any form of media?
6              MR. ALEXANDER: Objection.
7     Form.
8  A. That I'm not sure about. I don't know.
9     Possibly. I don't know. I don't know if
10    anyone's come back and asked Jim or not for sure,
11    so I can't say for sure whether or not that
12    happened.
13 Q. But sitting here today you can't think of a
14    specific scenario where that happened?
15 A. No, not specifically, no.
16 Q. And have you ever asked a client to sign a
17    copyright agreement with you before you inked
18    that client?
19 A. No.
20             MR. ALEXANDER: Objection.
21    Form. Calls for a legal conclusion.
22 Q. Have you ever asked a client to sign a copyright
23    agreement with you after you inked them?
24             MR. ALEXANDER: Same objections.
25 A. I have not, no.