# EXHIBIT 13

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

JAMES HAYDEN,

       Plaintiff,

  -vs-                  CASE NO. 1:17CV2635

2K GAMES, INC., et al.,

       Defendants.

_____

Deposition of JONATHON HAYDEN

Cleveland, Ohio

Wednesday, January 29, 2020 - 9:08 a.m.

Reported by:

Pamela S. Greenfield, RDR, CRR

Job No: 26855

Page 22

1    going to ink on a client's body, right?
2  A. Sometimes.
3  Q. And when you sketch out a tattoo that you're
4    going to put on a client's body, do you show it
5    to the client before you tattoo it on their body?
6              MR. ALEXANDER: Objection.
7         Incomplete hypothetical. Calls for
8         speculation.
9  A. Sometimes.
10 Q. And those times when you show it to the client,
11    do you get their permission to move forward with
12    tattooing the design you've sketched out on their
13    body?
14              MR. ALEXANDER: Same objection.
15         Vague.
16 A. It all depends.
17 Q. If a client said, "I don't want that design on my
18    body," would you still tattoo it on their body?
19 A. No.
20 Q. If a client said, "Yes, I like the design that
21    you have sketched out," would you then proceed to
22    put it on their body?
23 A. Yes.
24 Q. And when you put it on their body, would you try
25    and tattoo it as close as possible to the sketch

Page 49

1  Q.  Can you remember any instance where you've told a
2      client that they cannot be shown in a photograph
3      without your permission?
4                  MR. ALEXANDER: Objection. Vague
5          and ambiguous.
6  A.  I can't remember.
7  Q.  So you cannot remember any instance when you
8      asked a client to receive your permission before
9      they can be shown in a photograph?
10                 MR. ALEXANDER: Objection. Vague
11         and ambiguous.
12 A.  I can't remember.
13 Q.  Other than the football players Chase Young and
14     James Laurinaitis, have you tattooed any other
15     football players?
16 A.  I can't remember at this time.
17 Q.  Other than Chase Young and James Laurinaitis,
18     have you tattooed any other professional
19     athletes?
20 A.  Yes.
21 Q.  What other athletes have you tattooed?
22 A.  Ryan Shazier. And I can't remember at this,
23     anybody else at this time.
24 Q.  Who is Ryan Shazier?
25 A.  He was a football player.

Page 54

1  Q. How many clients did you tattoo yesterday?
2  A. I'm not sure. It was a busy -- I run a tattoo
3     shop, so I'm not sure.
4  Q. Well how many clients did you personally tattoo
5     yesterday?
6  A. One.
7  Q. And did you tell that person that he or she
8     needed your permission before he or she could be
9     shown in a photograph that shows the tattoo you
10    tattooed?
11 A. Never had that kind of conversation.
12 Q. And have you ever had that kind of conversation
13    with anyone?
14 A. Not sure.
15              MR. ALEXANDER: Objection. Calls
16         for speculation.
17 Q. In the past week, have you tattooed more than one
18    client?
19 A. I think so.
20 Q. Did you tattoo anybody two days ago?
21 A. Two days ago? Not sure.
22 Q. How many clients have you tattooed approximately
23    in the past month?
24 A. Not sure.
25 Q. Would it have been more or less than ten?

Page 55

1  A.  Not sure.
2  Q.  Would it have been more or less than two?
3  A.  It would be more than two.
4  Q.  Would it be more or less than five?
5  A.  Not sure.
6  Q.  Would it be more or less than three?
7  A.  I'm not sure.
8  Q.  So in the past month you may have only tattooed
9      three people?
10 A.  No.  I tattooed, yeah, probably more than three
11     people for sure.
12 Q.  And did you tell any of those people that they
13     needed your permission before they can be shown
14     in a photograph that shows the tattoo you gave
15     them?
16                   MR. ALEXANDER:  Objection.  Form.
17 A.  Conversation never came up.
18 Q.  And you never raised that conversation, right?
19 A.  Not sure.
20 Q.  You said the conversation never came up, right?
21                   MR. ALEXANDER:  Objection.  Form.
22 A.  Don't remember.
23 Q.  Have you ever asked a client -- strike that.
24      Do any of your clients need your permission
25     to be depicted in a video game that shows the

Page 59

1          speculation.  Legal conclusion.
2    A.   I don't know.
3    Q.   Well, you are paid to tattoo people, right?
4    A.   Sometimes.
5    Q.   Sometimes you, sometimes you are paid to put a
6         tattoo on somebody?
7    A.   Yes.
8    Q.   And when somebody pays you for a tattoo, do you
9         agree that they are also paying for the right to
10        be seen in public with the tattoo you gave them?
11                  MR. ALEXANDER:  Objection.  Vague.
12             Calls for a legal conclusion.  Incomplete
13             hypothetical.
14   A.   I don't know.
15   Q.   But you can't remember a situation when you told
16        a client that they cannot appear in a photograph,
17        right?
18   A.   I don't know.  No, I don't remember that.
19   Q.   Have you ever expected a client to come back to
20        you and ask you for permission to appear in
21        media?
22   A.   I can't remember.
23                  MR. ALEXANDER:  Objection.  Vague.
24   Q.   So you may have expected a client to come back to
25        you for permission before they could appear in

Page 72

1         MR. ALEXANDER: Objection. Form.
2         Vague and ambiguous.
3    A.   I do recall a few times.
4    Q.   Which are the few times that you recall?
5    A.   I can't remember.
6    Q.   You just said you do recall a few times?
7    A.   Yes. I can't remember when or who.
8    Q.   Are the times that you recall the same times
9         where you were presented with a release form?
10        MR. ALEXANDER: Objection to form.
11        Vague and ambiguous.
12   A.   I can't remember.
13   Q.   And did you always give permission for people to
14        appear in the media with the tattoos you inked
15        showing?
16        MR. ALEXANDER: Objection. Form.
17   A.   I can't remember.
18   Q.   Can you recall a single time that you withheld
19        permission for a client to appear in media?
20        MR. ALEXANDER: Objection. Form.
21        Calls for a legal conclusion.
22   A.   Yeah, I can't remember.
23   Q.   So of the 100-plus clients you have tattooed in
24        your career, it's fair to say you cannot remember
25        a single instance when you did not give anyone

Page 73

1        permission to appear in media with the tattoos
2        you inked showing?
3                    MR. ALEXANDER: Objection. Vague.
4              Form. Asked and answered.
5    A.  Yeah, I don't know.
6    Q.  So that's a no, you can't remember?
7    A.  It's I don't know. I don't know what, if I gave
8        them permission or not gave them permission. I
9        don't, I don't, I don't know.
10   Q.  Sitting here today, you cannot tell me about a
11       single instance when you did not give someone
12       permission to appear in media?
13                   MR. ALEXANDER: Objection. Asked
14             and answered.
15   A.  I don't know.
16   Q.  So you don't know if you know? I don't
17       understand the answer. I'm sorry.
18   A.  I don't understand the question.
19   Q.  So sitting here today, it's fair to say you
20       cannot identify any instance where you withheld
21       permission for somebody to appear in a
22       photograph?
23                   MR. ALEXANDER: Objection. Asked
24             and answered. Form. Mischaracterizes his
25             testimony.

Page 93

1  Q. I asked you where does your opinion come from
2     that tattoos are subject to copyrights?
3  A. I'm not sure where it comes from. It's just an
4     opinion.
5  Q. You don't know how you came to that conclusion?
6  A. I do not know.
7  Q. Do you have any opinion on whether athletes
8     should be allowed to appear on magazine covers
9     with their tattoos showing?
10              MR. ALEXANDER: Objection. Vague
11         and ambiguous. Form.
12 A. No, not at this particular point, no, time.
13 Q. Do you object to athletes appearing on magazine
14    covers with tattoos that you inked being shown?
15              MR. ALEXANDER: Objection. Vague.
16         Calls for speculation. Incomplete
17         hypothetical.
18 A. Not sure.
19 Q. Have you ever objected to an athlete that you've
20    tattooed being shown in any media with the
21    tattoos you inked showing?
22              MR. ALEXANDER: Objection. Form.
23         Vague and ambiguous.
24 A. Not sure.
25 Q. Can you remember any instance where you objected

Page 94

1      to an athlete being shown with a tattoo that you
2      inked in a form of media?
3             MR. ALEXANDER: Objection. Form.
4         Vague and ambiguous.
5 A. I can't remember.
6 Q. I'm going to hand a document to you.
7             MR. ILARDI: Can we please mark
8         this as Defendants' Exhibit 1.
9             - - - -
10     (Thereupon, Defendants' Exhibit 1, Subpoena
11       to Testify, was marked for purposes of
12       identification.)
13            - - - -
14 Q. I've just handed you a document that states at
15      the top United States District Court for the
16      Northern District of Ohio and it says "Subpoena
17      to Testify At a Deposition in a Civil Action."
18      Do you see that?
19 A. Civil action. Yes.
20 Q. Have you ever seen this document before?
21 A. Yes.
22 Q. When did you see this document?
23 A. It was delivered to my house. I can't remember
24      when.
25 Q. Is it your understanding that you're here today

Page 127

1           can't answer that.
2    Q.    Well, you agree that this is not a hypothetical
3           form.  It's a real form, right?
4    A.    This is a real form, but your question with this
5           form is hypothetical.
6    Q.    Every client has to initial this form, right?
7    A.    Yes.
8    Q.    Every client has to initial, "I agree that said
9           tattoo is correctly drawn to my specifications,"
10          right?
11   A.    Right.
12                    MR. ALEXANDER:  Objection.
13   Q.    What does it mean when it says "correctly drawn
14          to my specifications"?
15   A.    Correctly drawn to their specifications.  That's
16          what it means.
17   Q.    Correctly drawn where?
18                    MR. ALEXANDER:  Objection.  Lack
19              of foundation.
20   A.    What do you mean, "where"?
21   Q.    Correctly drawn on the client's body?
22   A.    I'm not sure.  Each client is different.
23   Q.    Correctly drawn on a piece of paper?
24                    MR. ALEXANDER:  Objection.  Lack
25              of foundation.