# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JAMES HAYDEN,

        Plaintiff,

v.

2K GAMES, INC. and TAKE-TWO
INTERACTIVE SOFTWARE, INC. ,

        Defendants.

CASE NO. 1:17-cv-02635-CAB

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S
MOTION TO EXCLUDE ANY TESTIMONY, ARGUMENT OR EVIDENCE
<u>REGARDING THE SURVEY AND RELATED OPINIONS OF H. TOLGA BILGICER</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ................................................................................. 3

ARGUMENT ........................................................................................................ 4

    I.      THE BILGICER SURVEY IS IRRELEVANT AND WILL MISLEAD
          THE JURY ............................................................................................... 5

    II.     THE BILGICER SURVEY IS UNRELIABLE ......................................... 6

         1.     The Bilgicer Survey was Leading and Suggestive ..................................... 7

         2.     The Bilgicer Survey Encourages Guessing ................................................ 9

         3.     The Bilgicer Survey Does Not Use a Control .......................................... 11

    III.    THE BILGICER SURVEY DOES NOT SHOW THAT THE TATTOOS
          AT ISSUE MOTIVATED PURCHASED OF NBA 2K ..................................... 13

CONCLUSION ..................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.L.S. Enters., Inc. v. Robinson Outdoor Prods., LLC*,
    No. 1:14 Civ. 500, 2016 WL 4260066 (W.D. Mich. May 13, 2016) .......................................5

*Abrams v. Nucor Steel Marion, Inc.*,
    694 F. App'x 974 (6th Cir. 2017).............................................................................................4

*Am. Home Prods. Corp. v. Johnson & Johnson*,
    654 F. Supp. 568 (S.D.N.Y. 1987)..........................................................................................8

*Balsley v. LFP, Inc.*,
    691 F.3d 747 (6th Cir. 2012) ...................................................................................................6

*Citizens Fin. Grp., Inc., v. Citizens Nat. Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004)......................................................................................................7

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993)...............................................................................................................1, 4

*Edmonson v. RCI Hospitality Holdings, Inc.*,
    No. 16 Civ. 2242, 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) .........................................10

*Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*,
    661 F. Supp. 971 (S.D. Ohio 1987) .........................................................................................7

*Hubbard v. Midland Credit Mgmt., Inc.*,
    No. 1:05 Civ. 0216, 2009 WL 454989 (S.D. Ind. Feb. 23, 2009) ...........................................9

*Innovation Ventures, LLC v. N2G Distrib., Inc.*,
    No. 08 Civ. 10983, 2011 WL 6010206 (E.D. Mich. Nov. 30, 2011) ................................9, 11

*Innovation Ventures, LLC v. NVE, Inc.*
    90 F. Supp. 3d 703 (E.D. Mich. 2015)...................................................................................13

*Kargo Glob., Inc. v. Advanced Mag. Publishers, Inc.*,
    No. 06 Civ. 550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ................................................7

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999)..................................................................................................................4

*Leelanau Wine Cellars, Ltd. v. Black & Red*,
    452 F. Supp. 2d 772 (W.D. Mich. 2006) .................................................................................5

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ....................................................................5

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm.*
    *Co.*,
    290 F.3d 578 (3rd. Cir. 2002) ............................................................................12

*On Davis v. Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) ................................................................................6

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ...............................................................................6

*Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*,
    No. 04-73923, 2006 WL 897254 (E.D. Mich. Apr. 5, 2006) ..................................5

*Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*,
    No. 06 Civ. 0034, 2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006) ...........................13

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) ..............................................................................11

*Siewertsen v. Worthington Indus., Inc.*,
    783 F. App'x 563 (6th Cir. 2019) .........................................................................4

*Solid Oak Sketches v. Take-Two Interactive Software, Inc.*,
    449 F. Supp. 3d 333 (S.D.N.Y. 2020) ..................................................................3

*Souza v. Exotic Island Enters., Inc.*,
    No. 18 Civ. 9448, 2021 WL 3501162 (S.D.N.Y. Aug. 9, 2021) ..........................10

*Starter Corp. v. Converse, Inc.*,
    170 F.3d 286 (2d Cir. 1999) ................................................................................5

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (6th Cir. 2010) ...............................................................................4

*Taylor v. Meirick*,
    712 F.2d 1112 (7th Cir. 1983) .............................................................................6

*Toth v. 59 Murray Enters., Inc.*,
    No. 15 Civ. 8028, 2019 WL 95564 (S.D.N.Y. Jan. 3, 2019), *aff'd in relevant*
    *part* 987 F.3d 233 (2d. Cir. 2021) ...................................................................9, 10

*United States v. Geiger*,
    303 F. App'x 327 (6th Cir. 2008) .........................................................................5

*Universal Studios, Inc. v. Nintendo Co.*,
    746 F.2d 112 (2d Cir. 1984)................................................................5, 7

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) ......................................................7

*Vista Food Exch., Inc. v. Vistar Corp.*,
    No. 03 Civ. 5203, 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005)..........................11

*Vital Pharms., Inc. v. Monster Energy Co.*,
    2021 WL 3371942 (S.D. Fla. Aug. 3, 2021)..........................................12

*Warner-Lambert v. Schering-Plough Corp.*,
    91 Civ. 5079, 1991 WL 221107 (S.D.N.Y. 1991)..................................9

*Wells Fargo & Co. v. WhenU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003)........................................7, 8, 11

**Rules**

Fed. R. Evid. 403 ...........................................................................5

Fed. R. Evid. 702 ...........................................................................4

**Other Authorities**

J. Thomas McCarthy, *6 McCarthy on Trademarks* § 32:172 (5th ed.)..........................7

Defendants Take-Two Interactive Software, Inc. and 2K Games, Inc. (collectively, "Take-Two") respectfully submit this memorandum of law in support of their motion to exclude all testimony, argument, or evidence regarding the survey and related opinions of Plaintiff James Hayden's ("Plaintiff") expert, H. Tolga Bilgicer.

## PRELIMINARY STATEMENT

The Court should exclude the survey designed and conducted by H. Tolga Bilgicer (the "Bilgicer Survey") because it is irrelevant, prejudicial, and methodologically unsound, and thus fails to meet the requirements laid out by the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  Exclusion is proper for three reasons.

***First***, the Bilgicer Survey asked the wrong question.  The relevant question is whether consumers purchased *NBA 2K* for the six tattoos Plaintiff inked on three NBA Players, Danny Green, LeBron James, and Tristan Thompson.  Knowing that consumers did not purchase the game for these six tattoos, Plaintiff decided not to test that question at all.  Instead, Plaintiff hired an inexperienced expert to devise a survey that merely tested whether consumers bought *NBA 2K* for tattoos generally.  The fact that Messrs. Green, James, and Thompson are NBA players with tattoos does not mean that asking about tattoos generally shows whether consumers purchased *NBA 2K* for *their* tattoos in particular.  If, for example, a respondent answers "I like the books" in response to a survey question "Why do you buy from Bookstore A?," that says nothing about *which* books the respondent cares about.  In other words, the respondent could despise *Jane Eyre*—just because it is a book does not mean it is motivating purchases from Bookstore A.  Likewise, even if someone purchased *NBA 2K* for tattoos generally, this does not tell us whether the person purchased *NBA 2K* for the tattoos Plaintiff actually inked, as opposed to other tattoos about which no tattoist has objected.  Given that hundreds of NBA players have tattoos,

1

Plaintiff's survey results tell us nothing about whether people bought *NBA 2K* for the tattoos Plaintiff actually inked. They are therefore irrelevant and only serve to confuse the jury.

***Second***, the Bilgicer Survey does not even provide an accurate measure of whether people bought *NBA 2K* for tattoos *generally*, because the survey is so methodologically flawed that the results are unreliable and irrelevant. Unlike Take-Two's survey expert, Dr. Deborah Jay, who used an accepted, credited survey methodology, Dr. Bilgicer used a methodology that has never been accepted by any court. And for good reason—it runs afoul of basic principles of survey methodology. Instead of asking open-ended questions, Dr. Bilgicer asked closed-ended, leading questions. By planting the idea of tattoos and their relevance in respondents' minds, the Bilgicer Survey artificially inflated the amount that response was chosen, yielding completely unreliable results. Compounding this error, Dr. Bilgicer did not give respondents the opportunity to respond "don't know" to key survey questions, meaning that if they did not know the answer or were not sure, they were forced to randomly guess. And Dr. Bilgicer—fatally—did not use a control. In surveys for litigation, a control is similar to a control you would see in pharmaceutical testing or a "controlled experiment." Its purpose is to determine whether there is something about the survey design that is affecting the results—without it, Dr. Bilgicer had no mechanism to filter out guessing, leading, or other sources of "noise" in the survey.

***Third***, Dr. Bilgicer's conclusions are misleading and not supported by the survey results. Dr. Bilgicer's conclusion that tattoos motivated sales of *NBA 2K* is contradicted by the fact that, even after his extreme departure from accepted survey methodology (which was designed to inflate the value respondents allocated to tattoos), respondents allocated <u>no</u> or <u>very little</u> value to "realistic tattoos on the NBA Players." Dr. Bilgicer admitted at his deposition that tattoos on <u>all</u>

of the NBA players (again, not just the six tattoos actually at issue, two of which are covered up by the players' uniforms) accounted for <u>less than 1% of the overall value of</u> *NBA 2K*.

## FACTUAL BACKGROUND

On May 20, 2021, esteemed survey expert, Dr. Deborah Jay submitted her opening expert report (the "Jay Report") on behalf of Take-Two, in which she presented findings from a survey (the "Jay Survey") that she conducted to determine the reasons consumers purchased *NBA 2K*. Means Decl. Ex. A (Jay Report).  The Jay Survey is nearly identical to a survey that was credited in a highly similar case involving tattoos, *Solid Oak Sketches v. Take-Two Interactive Software, Inc.*, 449 F. Supp. 3d 333 (S.D.N.Y. 2020), and the results were consistent with that survey.  On July 1, 2021, purportedly in response to the Jay Report, Dr. Bilgicer submitted an expert report on behalf of Plaintiff (the "Bilgicer Report") presenting the results of the Bilgicer Survey and criticizing the Jay Report.  Means Decl. Ex. B (Bilgicer Report).

The Bilgicer Survey consists of 10 closed-ended questions purportedly designed to determine "whether the realistic tattoos on the avatars of NBA players were a reason that consumers purchase Accused Games and to evaluate consumers' additional preferences in relation to these games."  Means Decl. Exs. B (Bilgicer Report) Appx. C, ¶ 47; C (Bilgicer Tr.) 155:6–9.[1]  On August 13, 2021, Dr. Jay submitted a supplemental report (the "Jay Supplement") explaining the flaws in Dr. Bilgicer's survey and refuting his criticisms of her own survey.  *Id.* Ex. D (Jay Supplement).

---

[1]    Questions 1 and 2 asked respondents why they purchased *NBA 2K* from a closed list of options and had respondents allocate 100 points across the chosen reasons. Respondents who selected "realism of the NBA players" in response to Question 1, were asked Questions 3 and 4, which queried which features of realistic NBA players were a reason they purchased *NBA 2K* and had them allocate 100 points across the chosen reasons.  Questions 5 and 6 asked how often survey respondents use four *NBA 2K* features and menu options. Questions 7 and 8 asked how often survey respondents play with ten NBA players and ten teams in *NBA 2K*. Finally, Questions 9 and 10 ask survey respondents when they typically purchase *NBA 2K* and whether they purchase it for themselves or others.

This case is Dr. Bilgicer's first time ever submitting an expert report for litigation.  *Id.*

Ex. C (Bilgicer Tr.) 24:21–25.  He has never before had a survey accepted by a court, nor has he

ever previously been admitted as an expert on survey methodology.  *Id.* 25:4–10.  Dr. Bilgicer

has never published any articles or books about survey methodology or how to conduct a proper

survey.  *Id.* Exs. B (Bilgicer Report, Appx. A); C (Bilgicer Tr.) 40:10–41:5; 41:21–23.  He has

never spoken at a bar association or even taught a class on survey methodology.  *Id.* 42:11–16.

## ARGUMENT

The Court is entrusted with a "gatekeeping obligation" to ensure that any proffered expert

testimony meets the requirements of reliability under Fed. R. Evid. 702 and that it is not unfairly

prejudicial under Fed. R. Evid. 403, either of which may be grounds for inadmissibility.  *Tamraz*

*v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010); *see also Kumho Tire Co., Ltd. v.*

*Carmichael*, 526 U.S. 137, 149 (1999) ("[T]he trial judge must determine whether the testimony

has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"); *Daubert*,

509 U.S. at 592-93 (the court considers "whether the reasoning or methodology underlying the

testimony is scientifically valid and [] whether that reasoning or methodology properly can be

applied to the facts in issue").  Because expert testimony has the potential to be both powerful

and misleading, courts need to exercise a greater control over experts than lay witnesses.  *See*

*Daubert*, 509 U.S. at 595.  To be admissible, an expert's opinion must be "the product of reliable

principles and methods" that are generally accepted in the relevant discipline.  Fed. R. Evid.

("FRE") 702; *Siewertsen v. Worthington Indus., Inc.*, 783 F. App'x 563, 575 (6th Cir. 2019);

*Abrams v. Nucor Steel Marion, Inc.*, 694 F. App'x 974, 981 (6th Cir. 2017).

These standards are imperative for surveys, which originally were inadmissible due to

concerns about the use of sampling and their status as hearsay.  *See* Federal Judicial Center,

*Reference Manual on Scientific Evidence* (3d ed. 2011)) at 363 ("*Reference Manual*").  After the

4

passage of Fed. R. Evid. 703, however, the issue for surveys became: "Was the poll or survey conducted in accordance with generally accepted survey principles, and were the results used in a statistically correct way?"  *Id.* at 364; *see also A.L.S. Enters., Inc. v. Robinson Outdoor Prods., LLC*, No. 1:14 Civ. 500, 2016 WL 4260066, at *1 (W.D. Mich. May 13, 2016) (describing principles of survey reliability) (citing *Leelanau Wine Cellars, Ltd. v. Black & Red*, 452 F. Supp. 2d 772, 777-78 (W.D. Mich. 2006) aff'd 502 F.3d 504 (6th Cir.)).  Survey evidence that is so flawed that its results are unreliable is inadmissible.  *See*, *e.g.*, *Universal Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding an unreliable survey that used leading questions which "beg[] the answer"); *Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08 Civ. 10983, 2011 WL 6010206, at *5 (E.D. Mich. Nov. 30, 2011) (excluding unreliable survey); *Powerhouse Marks LLC v. Chi Hsin Impex, Inc.*, No. 04-73923, 2006 WL 897254, at *4 (E.D. Mich. Apr. 5, 2006) (excluding unreliable survey).

## I.  THE BILGICER SURVEY IS IRRELEVANT AND WILL MISLEAD THE JURY

Like all evidence, a survey must be relevant to be admissible, and the Court may exclude expert evidence if its probative value is outweighed by its prejudicial effect.  Fed. R. Evidence 403; *United States v. Geiger*, 303 F. App'x 327, 329 (6th Cir. 2008) (excluding testimony that was potentially misleading to the jury because it did not account for certain costs); *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 297 (2d Cir. 1999) (affirming district court finding that "a survey may be kept from the jury's attention entirely by the trial judge if it is irrelevant to the issues."); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 597 (S.D.N.Y. 2007) (excluding irrelevant survey evidence that did not test correct stimulus).

Plaintiff's copyright claim concerns six specific tattoos on LeBron James, Danny Green, and Tristan Thompson.  Dkt. 33.  The relevant question is therefore whether any consumers

5

purchased *NBA 2K* for the tattoos <u>on these three players</u>.[2]  Hundreds of NBA players have

tattoos,[3] but tattoos on those other players are not relevant, as Plaintiff does not claim to own a

copyright in them.  As he admitted during his deposition, however, Dr. Bilgicer did not ask about

tattoos on the specific NBA players at issue in the Bilgicer Survey, Means Decl. Ex. C (Bilgicer

Tr.) 93:12–17, 97:8–21, (Q: "So you were not asked to determine whether any specific tattoos

were a reason consumer purchased the NBA 2K games, right?"  A: "That's correct, my

assignment was about the realism of the tattoos on avatars of NBA players."), nor did he

calculate what percentage of people purchased *NBA 2K* for the tattoos on the players at issue, *id.*

at 99:6–12 (Q: "Did you calculate anywhere in your report numerically what percentage of

people purchased the game because of the specific tattoos on these players at issue in this case?"

A: "In my report, I do not have a specific calculation on that point.").  Instead, the Bilgicer

Survey only tested whether consumers purchased *NBA 2K* for the tattoos generally.  It would be

confusing and misleading to put these results in front of the jury, as these results relate to works

that are not at issue.  This alone is grounds for exclusion.

## II.    THE BILGICER SURVEY IS UNRELIABLE

Where a survey methodology is "fundamentally flawed" such that "the danger of undue

prejudice far outweighed the limited probative value of the survey, especially for a jury," the

survey may be excluded on this basis alone.  *See, e.g., Citizens Fin. Grp., Inc., v. Citizens Nat.*

---

[2]    This question is relevant to the alleged causal relationship revenues and the purported infringement, which is
     Plaintiff's burden to prove.  *See Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012) (finding it is the
     copyright owner's burden to prove gross revenues and demonstrate a "reasonable relationship" between gross
     revenues and the alleged infringement); *see also Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700, 712 (9th
     Cir. 2004) (finding the copyright owner bears the burden of showing a causal nexus between revenues and
     infringement); *On Davis v. Gap, Inc.,* 246 F.3d 152, 160 (2d Cir. 2001) (same); *Taylor v. Meirick,* 712 F.2d
     1112, 1122 (7th Cir. 1983) (same).

[3]    Plaintiff's expert estimated that about 50% of about 450 players in NBA 2K have tattoos, totaling an estimated
     "high hundreds or single thousands" of tattoos in the game. Means Decl. Ex. E, (Malkiewicz Dep. Tr.) 218:5–
     219:1.

*Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004) (rejecting argument that methodological flaws go only to weight, not admissibility).  Dr. Bilgicer designed the Bilgicer Survey using a methodology that has never before been credited by a court, and which departs significantly from established survey principles.  Three major flaws in the Bilgicer Survey make it inadmissible, independently and collectively.

### 1.    The Bilgicer Survey was Leading and Suggestive

One of the key issues "in assessing the validity of a survey [that] the judge should take into account" is "whether the questions asked were clear and not leading."  Federal Judicial Center*, Manual for Complex Litigation* § 11.493 (4th ed. 2004)) at 103.  "A survey is not reliable if it suggests to the respondents an answer that would not otherwise have occurred to them."  *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767–8 (E.D. Mich. 2003); *see also* J. Thomas McCarthy, *6 McCarthy on Trademarks* § 32:172 (5th ed.); *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (finding plaintiff could not rely on survey in part because it included an "obvious leading question") *Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 661 F. Supp. 971, 983 (S.D. Ohio 1987) (refusing to consider survey that used leading questions). The fact that a survey is leading is grounds for inadmissibility.  *See, e.g.*, *Kargo Glob., Inc. v. Advanced Mag. Publishers., Inc.*, No. 06 Civ. 550, 2007 WL 2258688, at *11-*12 (S.D.N.Y. Aug. 6, 2007); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448 (E.D. Va. 2017) (excluding survey because it used leading questions); *see also* Means Decl. Ex. C (Bilgicer Tr.) 118:10–16 (admitting that "a properly designed survey should, you know, do its best to minimize it or eliminate the demand effects.").

All of the questions in the Bilgicer Survey were closed-ended, Means Decl. Ex. C (Bilgicer Tr.) 155:6–9, despite the fact that it is "is well recognized that closed-end or multiple-choice questions are inherently suggestive and invite guessing."  *See Am. Home Prods. Corp. v.*

*Johnson & Johnson*, 654 F. Supp. 568 (S.D.N.Y. 1987).[4]  Moreover, the questions were highly

suggestive.[5]  For example, Question 3 asks: "Which of the following items (that are relevant to

how realistic the NBA players are), if any, were a reason why you bought the *NBA 2K* game?"

This question is leading because it "informed survey respondents that each of the answer choices

for this question (including tattoos) was 'relevant to how realistic the NBA players are' and,

therefore, should be valued."  Means Decl. Ex. D (Jay Supplement) at 24.  In *Wells Fargo & Co.*,

the court found that a similar survey was improperly leading where it informed respondents of a

connection they would not otherwise have made between pop-ups and websites.  293 F. Supp. 2d

at 754, 768.  Similarly here, without Dr. Bilgicer instructing respondents that tattoos are relevant

to the realism of NBA players, respondents would not necessarily have made this connection.

Moreover, as Dr. Jay explains, merely asking about a feature or attribute may lead

consumers to be reminded of that feature, Means Decl. Ex. D (Jay Supplement) at 24, so raising

the subject of tattoos in a list of answer choices, as the Bilgicer Survey does in Question 3 and 4,

was highly suggestive.  *See* Reference Manual at 392 (noting that closed-ended questions can be

a "reminder respondents of options they might not otherwise consider").  This was particularly

slanted, as Dr. Bilgicer only included ***five*** possible NBA player attributes to choose from in

---

[4]   As Dr. Jay explains in her Supplemental Expert Report, closed-ended questions do not provide an opportunity or space for a respondent to add an answer that may not have been included in the answer choices, and when responding to that question, the respondent may simply settle on an option rather than give the best response. Means Decl. Ex. D (Jay Supplement) at 7; Groves, Robert M. et. al., *Survey Methodology* (2009) (finding that "respondents satisfice rather than optimize; they pick the answer that is good enough, not necessarily the one that is the best.").

[5]   While these methodological flaws served to benefit Plaintiff, they may have also been due to Dr. Bilgicer's lack of survey experience. Dr. Bilgicer consistently demonstrated that he does not fully understand the meaning of a "leading question" or "demand effects," answering that a "leading question will be when a question is sort of hinting the purpose of the survey" and failing to come up with a single example of a leading question. Means Decl. Ex. C (Bilgicer Dep. Tr.) 153:21–154:10. At one point, he stated that a demand effect is "essentially when survey respondents are trying to understand what the purpose of the survey is." *Id.* 118:1–4. The literature, however, makes clear that a leading question is one that is suggestive of the answer, not just a question that hints at the "purpose" of a particular survey. *See* Reference Manual at 392.

response to Question 3 (and, by extension, Question 4).  These were primarily related to NBA player appearance, drawing respondents' attention to *that* aspect of realism, and excluding lots of other attributes of the NBA players that could contribute to realism, such as the players' strength, agility, shooting, defense, or rebound skills.  The Bilgicer Survey even excluded other attributes of their appearance, such as expressions, gestures, or the depiction of and number on the NBA player's jerseys.  In a similar case, *Warner-Lambert v. Schering-Plough Corp.*, the court refused to rely on the results of closed-ended survey questions where the "format and wording" of the questions "limit[ed] respondents' answer to potentially inadequate or specious alternatives," and were "essentially, leading questions."  No. 91 Civ. 5079, 1991 WL 221107, at *2 (S.D.N.Y. 1991).  Likewise here, by only listing a narrow set of options, Questions 3 and 4 were leading and suggested to survey respondents that the realism of the NBA players was based ***more*** on appearance (including tattoos) than other attributes.  Means Decl. Ex. D (Jay Supplement) at 25.

   **2.     The Bilgicer Survey Encourages Guessing**

   In a survey with closed-ended questions, the inclusion of a "don't know" answer choice is critical because "[b]y signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply."  Reference Manual at 390.  Failing to include a "don't know" option in response to a closed-ended question leads to speculation and guessing.  *Hubbard v. Midland Credit Mgmt., Inc.*, No. 1:05 Civ. 0216, 2009 WL 454989, at *3 (S.D. Ind. Feb. 23, 2009) (finding that failure to include a "don't know/not sure" option tended to "force" answer where the survey participant had "no basis to do more than speculate or guess").  Thus, courts regularly exclude surveys that "fail[] to provide survey takers with the opportunity to indicate lack of knowledge or an instruction for participants not to guess."  *Toth v. 59 Murray Enters., Inc.*, No. 15 Civ. 8028, 2019 WL 95564, at *8 (S.D.N.Y. Jan. 3, 2019), *aff'd in relevant part* 987 F.3d 233 (2d. Cir.

2021); *see also Innovation Ventures*, 2011 WL 6010206, at *4 (finding that a survey that did not include a "don't know" option was "flawed and unreliable" and "not appropriate material to assist the jury"); *Souza v. Exotic Island Enters., Inc.*, No. 18 Civ. 9448, 2021 WL 3501162, at *10-11 (S.D.N.Y. Aug. 9, 2021) (excluding survey that did not offer a "don't know" answer choice);  *Edmonson v. RCI Hospitality Holdings, Inc.*, No. 16 Civ. 2242, 2020 WL 1503452, at *8 (S.D.N.Y. Mar. 30, 2020) (excluding a survey that "failed to include an option to indicate a lack of knowledge or understanding," and calling the failure a "fatal defect[]").

Dr. Bilgicer did not include a "don't know" option in response to key survey questions.[6] This is not some minor methodological flaw; where questions are confusing or misleading, failing to provide this option is a "fatal defect."  *See Toth*, 2019 WL 95564, at *10.  That is precisely the case here.[7]  For example, Question 2 of the Bilgicer Survey used a complicated "constant sum" methodology that required respondents to allocate 100 points to as many as ***nine*** different features in *NBA 2K*.  Similarly, Question 4 required respondents to allocate 100 points to ***six*** different features.  The Bilgicer Survey thus placed a high cognitive burden on respondents.  Means Decl. Ex. D (Jay Supplement) at 27–28.  These were the key questions on

---

[6]    While the questionnaire included in the Bilgicer Report shows an instruction "Our next questions are about the NBA 2K video game(s) that you bought. We would like to assure you that we are only interested in your opinions and beliefs. If you do not know the answer to a question or do not have an opinion or belief, please indicate this," this instruction does not appear in screenshots that Dr. Bilgicer provided showing how the survey actually appeared on respondents' screens.  *See* Means Decl. Exs. F (Bilgicer Report, Web Screenshots); C (Bilgicer Dep. Tr.) 63:20–64:17.  Therefore, it does not appear that respondents ever even received this instruction.  Even if they did, because the majority of questions did not include a space to say "don't know," respondents had no way of indicating when they did not know the answer to a question or did not have an opinion or belief in response to a question.

[7]    The other questions in the Bilgicer Survey without this option, Questions 5–10, are also confusing and designed to encourage guessing.  Question 9 (which asks when respondents typically buy *NBA 2K*) does not provide respondents any space to indicate that they do not know *or* that none of the above apply, meaning they must select something even if none of the options are applicable.  Question 10 (which asks whether respondents typically buy *NBA 2K* for themselves or others) does not include a space to say "do not know" and also does not include a space to say "both," meaning that respondents are forced to choose between two options that could both be true, and guess at a question they might not know the answer to at all.

which Dr. Bilgicer relied in reaching his conclusions regarding the importance of tattoos; given how complicated they are, one would expect that some respondents would not know how to allocate points among the various pre-described elements of the game. Dr. Bilgicer himself even admitted that for "complicated, technical questions," he would "expect" respondents to "click on 'don't know.'" *Id.* Ex. C (Bilgicer Tr.) 156:24–157:10. He also anticipated that respondents would struggle with the math and potentially be unable to answer the constant sum questions because he instructed his programmers to "Force the sum of points to be 100." *Id.* Ex. B (Bilgicer Report) Appx. C. Respondents could not proceed without responding to these critical questions, yet Dr. Bilgicer did not provide any way for respondents to indicate "don't know" in response, thereby forcing respondents who could not answer to guess or randomly allocate points if they wanted to finish the survey and receive compensation. *Id.* (Bilgicer Tr.) 84:23–25, 90:7–24; 197:21–198:5. The Bilgicer Survey thus "effectively required the respondents to express a specific opinion, even if they did not have an opinion, by specifically *not* offering the respondents the opportunity to give 'not sure' as a response," and therefore should be excluded. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002).

### 3. The Bilgicer Survey Does Not Use a Control

Because "[e]very measure of opinion or belief in a survey reflects some degree of error," such as guessing, demand effects, or other sources of noise, "[c]ontrol groups and… control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question." Reference Manual at 401. Courts have held that a survey that fails to use a control may be "excluded from evidence altogether." 6 McCarthy on Trademarks §32:187 (2021); *Wells Fargo & Co. v. Whenu.com, Inc.*, 293 F. Supp. 2d 734, 754 (E.D. Mich. 2003) (finding that without a control "to account for the effects of 'noise'. . . the survey's results are uninterpretable."); *Innovation Ventures*, 2011 WL 6010206, at *5 (excluding

survey in part because it did not include an adequate control); *Vista Food Exch., Inc. v. Vistar Corp.,* No. 03 Civ. 5203, 2005 WL 2371958, at *7 (E.D.N.Y. Sept. 27, 2005) (excluding survey that did not use a proper control); *see also* Means Decl. Ex. C (Bilgicer Tr.) 117:3–14 (A: "So I will agree as a survey expert that as a survey designer it's -- a survey should be designed to eliminate guessing.").

Perhaps because Dr. Bilgicer does not fully understand how survey controls work,[8] the Bilgicer Survey does not use a control group[9] or a proper control question.  A control question is a question that includes a fictitious feature or attribute amongst a list of possible answers; the purpose is to calculate the rate at which "respondents select features or attributes merely because the survey asked about those features or attributes."  *Id.* Ex. D (Jay Supplement) at 16.  It is widely accepted that, when administering a survey that uses a control question, the percentage of survey respondents who selected the control or fictitious feature should be subtracted from the percentage who selected the other features or attributes in the survey.  *See, e.g.*, 6 McCarthy §32:187 (2021) ("[T]here is sometimes 'general background noise' in survey figures and a control is necessary to identify this… These must be filtered out through control questions... The net rate of confusion is the raw confusion rate minus the rate produced by the control question."); *Vital Pharms., Inc. v. Monster Energy Co.*, 2021 WL 3371942, at *22 (S.D. Fla. Aug. 3, 2021) (finding that it was proper to subtract noise from survey results); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 591 (3rd. Cir. 2002) (same).

---

[8]    When Dr. Bilgicer was asked about controls during his deposition, he struggled to define it and answer basic questions about the purpose of controls.  *See, e.g.*, *id.* 114:19–115:1.

[9]    *Id.* 132:16–19 (Q: "Do you have a control group in your survey?"  A: "I do not have a control group in my survey.").  Dr. Bilgicer could not answer straight-forward questions as to whether he included control questions in his survey, *see, e.g.*, *id.* 141:1–14, but as discussed below, he did not.

Dr. Bilgicer **did not do this**.  Instead, in Question 1, he included a fictitious feature and simply terminated the survey for anyone who selected that feature.  Means Decl. Ex. B (Bilgicer Report) Appx. C.  During his deposition, Dr. Bilgicer contended that this was in place to identify which respondents were "not paying any attention."  *Id.* Ex. C (Bilgicer Tr.) 122:21–123:2.  This is simply not a control.  "When survey respondents who select the fictitious feature are excluded from the survey results before they can complete the entire survey, there is no way to determine the percentage who selected other features or attributes due to guessing, demand effects, or other sources of noise."  *Id.* Ex. D (Jay Supplement) at 16–17.  And after these respondents were excluded from Question 1, Dr. Bilgicer did not include a fictitious feature in Questions 2–10 of the Bilgicer Survey at all.  *Id.* at 32; *Id.* Ex. C (Bilgicer Tr.) 127:10–13.  So he did nothing to eliminate noise in these questions.  Take-Two has not located a *single case* in which this peculiar methodology has been credited, nor was Dr. Bilgicer able to identify a case, resource, or *any* basis for choosing to eliminate qualified survey respondents who selected the fictitious feature, rather than calculating a rate of noise.  *Id.* 143:10–15, 145:16–149:10.

This flaw is worsened by the fact that Dr. Bilgicer used leading questions that encouraged guessing and speculation.  *See Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*, No. 06 Civ. 0034, 2006 WL 2588002, at *23 (S.D.N.Y. Sept. 6, 2006) (finding closed-ended question can create biases that "can be mitigated through the use of a control question.").  In *Innovation Ventures, LLC v. NVE, Inc.*, for example, the court excluded a survey that used an improper control where it also relied on leading questions and did not properly inform survey participants that "don't know" was an acceptable answer.  90 F. Supp. 3d 703 (E.D. Mich. 2015).  That is exactly the case here, and the Court should also exclude this survey.

## III. THE BILGICER SURVEY DOES NOT SHOW THAT THE TATTOOS AT ISSUE MOTIVATED PURCHASED OF NBA 2K

Even after he used a deeply flawed methodology designed to inflate the importance of tattoos in the survey results, Dr. Bilgicer's survey results do not support the conclusion that tattoos motivated sales of *NBA 2K*.

***First***, the results of the Bilgicer Survey show that, at most, tattoos represent less than 1% of the value of *NBA 2K*.  To see why, it is important for the Court to understand how Dr. Bilgicer structured the constant-sum scale portion of the survey (Questions 2 and 4).  In response to Question 2, which asked respondents to assign point values to the reasons they had selected for purchasing *NBA 2K*, the average number of points allotted to "realism of the NBA players" was only 12.57 points out of 100.  Means Decl. Ex. B (Bilgicer Report).  Most respondents, therefore, did not assign 100 points to "realism of the NBA players" in response to Question 2.  Still, in Question 4, Dr. Bilgicer asked the survey respondents who had assigned ***any*** points to realism of the NBA players, regardless of how few, to allocate 100 points to a subset of components of realism of the NBA players.  Almost all of the respondents who answered Question 4 (220 respondents) were therefore asked to allocate ***more*** points to specific components of realism of the NBA players than they assigned to it *overall*.  *Id.* Ex. D (Jay Supplement) at 30.

When the results are adjusted to account for the fact that 181 people did not value realism of the NBA players at all, and that the majority of the 220 who selected realism of the NBA players as a reason they purchased the game gave it a value far less than 100, *id.* at 30–31, the value of all of the tattoos on all of the NBA players was, at most, <u>less than 1% of the overall value of the *NBA 2K* games</u>.  *Id.* Ex. C (Bilgicer Tr.) 224:3–9 (Q: And you've concluded that the relative importance of all of the tattoos in the game to the 401 respondents in your survey is 0.99 out of 100, correct? A: So based on this methodology, and you know, using the entire sample size, correct, that's the conclusion I come to.)  Nowhere is this fact included in the tables in the

Bilgicer Report.  Buried in one section is the line, "I found that the relative importance of tattoos in the Accused Games is 0.99 points," but Dr. Bilgicer does not explain that .99 represents less than 1% of the overall value of *NBA 2K*.

**Second**, even this low number is inflated.  As explained above, Dr. Bilgicer did not use a control to account for noise in the Bilgicer Survey.  *Supra* 9–13.  And Dr. Bilgicer used leading questions to inflate the value respondents assigned to tattoos.  *Supra* 7–9.  Moreover, the Bilgicer Survey never asked about whether respondents purchased *NBA 2K* for the specific tattoos on Mr. Green, James, and Thompson at issue. *Supra* 5–7.  Even a less than 1% estimation of the value of tattoos therefore *vastly* overstates the value of the six tattoos in the *NBA 2K* games.

**Third**, Questions 5–10 in the Bilgicer Survey are irrelevant and simply do not support the conclusion that people purchased *NBA 2K* for the NBA players' tattoos, let alone the specific tattoos on Messrs. Green, James, and Thompson.  These questions asked about whether and how often consumers play with certain game features or players, as well as whether consumers purchased *NBA 2K* for themselves or for someone else.  Dr. Bilgicer did not ask *why* consumers play with certain features or players, or whether they use certain features because of the tattoos.  Means Decl. Ex. B (Bilgicer Report) Appx. C.  None of these questions ask about the reasons consumers purchased *NBA 2K*.  *Id.*  Dr. Bilgicer could not even explain the *purpose* of Questions 5–10 when asked repeatedly about them during his deposition.  *Id.* Ex. C (Bilgicer Tr.) 106:25–110:18.  Including these questions is just another sign of how out of step the Bilgicer Survey is with accepted practice.

## CONCLUSION

For the foregoing reasons, Take-Two respectfully requests that the Court exclude any testimony, argument or evidence regarding or relating to the Bilgicer Survey.

Dated:  New York, NY
October 25, 2021

*/s/ Dale M. Cendali*

Dale M. Cendali (admitted *pro hac vice)*
Joshua L. Simmons (admitted *pro hac vice*)
Chris Ilardi (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and
Take-Two Interactive Software, Inc.*