**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES HAYDEN, | CASE NO. 1:17-cv-02635-CAB |
| Plaintiff, | |
| v. | |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS**
**2K GAMES, INC. AND TAKE-TWO INTERACTIVE**
**SOFTWARE, INC.'S MOTION TO EXCLUDE TESTIMONY,**
**ARGUMENT OR EVIDENCE REGARDING THE EXPERT**
**REPORTS AND OPINIONS OF MICHAL A. MALKIEWICZ**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

ARGUMENT .............................................................................................................. 4

    I.      MALKIEWICZ'S OPINIONS CONCERNING HOW USERS
           INTERACT WITH *NBA 2K* AND THE TATTOOS' IMPACT ON
           SALES SHOULD BE EXCLUDED ....................................................... 5

           A.     Malkiewicz Is Not Qualified To Testify as an Expert about How
                  Frequently the Tattoos Are Depicted in *NBA 2K* ......................................... 5

           B.     Malkiewicz's Opinions about the Specific Relationship between
                  the Tattoos and Take-Two's Sales Are Methodologically Unsound
                  and Not Reliable ............................................................................ 6

    II.     MALKIEWICZ'S OPINIONS CONCERNING ALLEGED PROFITS
           ATTRIBUTABLE TO REALISTIC DEPICTIONS OF TATTOOS
           SHOULD BE EXCLUDED ................................................................. 9

           A.     Malkiewicz's Disgorgement Analysis Is Contrary to the Copyright
                  Act ................................................................................................ 9

           B.     Malkiewicz's Partial Apportionment Analysis Is Improper .................... 11

    III.   MALKIEWICZ'S OPINIONS CONCERNING A PURPORTED
           RELATIONSHIP BETWEEN TAKE-TWO'S REVENUE FROM
           VIRTUAL CURRENCY AND THE DEPICTION OF THE TATTOOS
           SHOULD BE EXCLUDED ................................................................. 14

CONCLUSION ........................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Balsley v. LFP, Inc.*,
　691 F.3d 747 (6th Cir. 2012) ............................................................................10, 14

*Berry v. City of Detroit*,
　25 F.3d 1342 (6th Cir. 1994) ......................................................................................5

*Best v. Lowe's Home Ctrs., Inc.*,
　563 F.3d 171 (6th Cir. 2009) ......................................................................................7

*Burgett v. Troy-Bilt LLC*,
　579 F. App'x 372 (6th Cir. 2014) ..............................................................................5

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,
　754 F.2d 826 (9th Cir. 1985) ....................................................................................12

*Daubert v. Merrell Dow Pharms.*,
　509 U.S. 579 (1993)................................................................................................1, 4

*ECIMOS, LLC v. Carrier Corp.*,
　971 F.3d 616 (6th Cir. 2020) ....................................................................................11

*Navarro v. Procter & Gamble Co.*,
　501 F. Supp. 3d 482 (S.D. Ohio 2020) ..........................................................6, 8, 9, 10

*Nelson v. Tenn. Gas Pipeline Co.*,
　243 F.3d 244 (6th Cir. 2001) ......................................................................................6

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
　676 F.3d 521 (6th Cir. 2012) ......................................................................................6

*Popovich v. Sony Music Ent., Inc.*,
　No. 02 Civ. 359, 2005 WL 5990223 (N.D. Ohio May 9, 2005)................................6

*Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*,
　338 F. App'x 329 (4th Cir. 2009) ............................................................................14

*Satija v. Permanent Gen. Assurance Corp. of Ohio*,
　No. 13 Civ. 82, 2014 WL 1664557 (N.D. Ohio Apr. 25, 2014)........................14, 15

*In re Scrap Metal Antitrust Litig.*,
　527 F.3d 517 (6th Cir. 2008) ......................................................................................5

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
    309 U.S. 390 (1940)......................................................................................12

*Sigler v. Am. Honda Motor Co.*,
    532 F.3d 469 (6th Cir. 2008) .......................................................................5

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (6th Cir. 2010) .......................................................................4

*Thornton v. J Jargon Co.*,
    580 F. Supp. 2d 1261 (M.D. Fla. 2008).....................................................14

*Thoroughbred Software Int'l, Inc. v. Dice Corp.*,
    488 F.3d 352 (6th Cir. 2007) .....................................................................12

**Statutes**

17 U.S.C. § 504(b) ...............................................................................2, 9, 11

**Rules**

FRE 702 ...................................................................................................4

Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively, "Take-Two") submit this memorandum of law in support of their motion to exclude Plaintiff James Hayden ("Plaintiff") from relying on certain testimony, argument, or evidence relating to the opinions of Plaintiff's damages expert, Michal A. Malkiewicz ("Malkiewicz").

## PRELIMINARY STATEMENT

Plaintiff offers Malkiewicz as a damages expert to present a partial and improperly inflated disgorgement of profits calculation to the jury.  Although all of Malkiewicz's opinions are incorrect and unsupported, this Motion seeks to exclude three specific categories of opinions that violated Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

*First*, Malkiewicz offers opinions as to the alleged frequency that users of the video games *NBA 2K16*, *NBA 2K17*, *NBA 2K18*, *NBA 2K19*, *NBA 2K20*, *NBA 2K21*, and *NBA 2K Mobile* (collectively, "*NBA 2K*") would view six tattoos in which Plaintiff alleges he holds copyrights ("the Tattoos") that appear on three NBA players—LeBron James, Danny Green, and Tristan Thompson ("the NBA Players")—in real life and in *NBA 2K*.  But Malkiewicz admitted that he is not an expert in video games.  Decl. of Chris Ilardi, dated October 22, 2021, ("Ilardi Decl.") Ex. A (Malkiewicz Tr.) 263:4–7.  Thus, he is not qualified to opine on how the average user interacts with *NBA 2K*.  Moreover, Malkiewicz's testimony is inadmissible for the additional reason that it is based on the assumption that players with higher in-game and real-life ratings will appear more frequently in *NBA 2K* than players with lower ratings.  He, however, has done nothing to test this supposition, and then he improperly uses it to argue that Plaintiff is entitled to more of Take-Two's profits because somehow the ratings show that the Tattoos have a greater impact on *NBA 2K*'s profits.  Given that Malkiewicz is unqualified to provide these opinions and they are based on mere assumptions, the opinions are unreliable.

1

***Second***, Malkiewicz offers an opinion that purports to apportion Take-Two's profits attributable to the alleged infringement of Plaintiff's copyrights in the Tattoos.  His analysis, however, contravenes the Copyright Act's disgorgement analysis.  Under 17 U.S.C. § 504(b), there is a three-step process: (1) calculate the amount of revenue reasonably related to the alleged infringement, (2) deduct expenses, and (3) apportion the remaining amount between non-infringing and infringing activity.  Malkiewicz does not follow this process.  Instead, he first apportions Take-Two's revenues, and then deducts some expenses.  By reversing and truncating the analysis, he disregards the statutory requirement that he analyze "the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b).  The practical effect is that he artificially inflated his numbers to include deductible expenses and profits not attributable to the Tattoos.  Moreover, an independent basis to exclude Malkiewicz's opinion is that he improperly stops short of a true disgorgement analysis: he purports to analyze Take-Two's profits attributable to the depiction of *all* tattoos in *NBA 2K*—which Malkiewicz admits numbers in the "high hundreds" or "single thousands"—not just the six Tattoos at issue here.  Ilardi Decl. Ex. A (Malkiewicz Tr.) 218:5–11, 18–19.  The resulting partial apportionment is therefore not reliable and has the propensity to mislead the jury.

***Third***, Malkiewicz opined that Take-Two's revenue from sales of virtual currency ("VC") should be included in his disgorgement figure.  VC, however, is sold to consumers only after they purchase *NBA 2K* and cannot be used to purchase the Tattoos.  Thus, it is not related to the alleged infringement, and Malkiewicz cannot offer any opinion on the amount of this revenue that is related to the Tattoos.

2

## **FACTUAL BACKGROUND**

On May 27, 2021, Plaintiff served Malkiewicz's opening report.  In it, Malkiewicz opined that Plaintiff was entitled to monetary relief in the form of disgorgement of Take-Two's profits from the sales of *NBA 2K*.  *Id.* Ex. B (Malkiewicz Rpt.) ¶ 9.  To reach his opinions, he included not only Take-Two's revenue from sales of *NBA 2K*, but also its separate revenues from VC, which is something that *NBA 2K* users can purchase to more quickly unlock features of the game.  *Id.* Ex. A (Malkiewicz Tr.) 188:10–11.  VC, however, cannot be used to purchase the Tattoos.  *Id.* 189:8–11.  From this total revenue number, he then claimed to calculate Take-Two's profits by deducting Take-Two's expenses, including its Internal Development, External Development, Marketing & COOP, Marketing Team, and Publishing & G&A expense categories.  *Id.* Ex. B (Malkiewicz Rpt.) Schs. 3–4, 9.

The same day that Malkiewicz served his opening report, Take-Two served the report of its damages expert, James Malackowski, who had concluded that, even if Plaintiff could establish that the Tattoos were infringed by *NBA 2K*, Plaintiff is not entitled to damages, as there is no evidence that he suffered actual harm, and *NBA 2K*'s profits are not attributable to including the Tattoos in the game.  *Id.* Ex. C (Malackowski Rep.) 4–5.

On July 1, 2021, Plaintiff served Malkiewicz's rebuttal report.  In it, Malkiewicz presented a brand new calculation of Take-Two's profits allegedly attributable to the depiction of the Tattoos in *NBA 2K*.  ***First***, before deducting *any* costs, he apportioned Take-Two's revenue allegedly attributable to realistic depictions of *all* tattoos in *NBA 2K*, not just the six Tattoos at issue, by multiplying Take-Two's total revenues from sales of *NBA 2K* by 1.06% (which he called "the average value of realism of tattoos factor").  The percentage is based on the opinions of Plaintiff's survey expert, Dr. Bilgicer.  *Id.* Ex. D (Malkiewicz Reb. Rpt.) ¶ 38.  Malkiewicz referred to this calculation as "the incremental revenues that Defendants realized from sales of

3

Accused Games that can be attributed to the realistic depictions of NBA player tattoos on digital avatars." *Id.* ¶ 43.  **Second**, from his calculation of "incremental revenues," he deducted a subset of Take-Two's expenses, choosing not to deduct "costs associated with Internal Development, External Development, Marketing & COOP, Marketing Team, and Publishing & G&A expense categories." *Id.* ¶ 49.

By *first* applying the alleged 1.06% apportionment factor to the alleged "incremental revenue" value and *then* deducting expenses, Malkiewicz increased his profits calculation by 22% more than had he applied this same factor to the profit number he presented in his opening report. *Compare* Ilardi Decl. Ex. B (Malkiewicz Rpt.) ¶ 11, Table 2 (multiply "Gross Profits" calculation by 1.06%), *with*, *id.* Ex. D (Malkiewicz Reb. Rpt.) ¶ 51.

## ARGUMENT

The Court is entrusted with a "gatekeeping role" to ensure that any proffered expert testimony meets the requirements of reliability under FRE 702 and that it is not unfairly prejudicial under Fed. R. Evid. 403, either of which may be grounds for inadmissibility. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 668 (6th Cir. 2010); *Daubert*, 509 U.S. at 592–93 (the court considers "whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue").

To be admissible under FRE 702, a witness who is qualified as an expert may testify in the form of an opinion or otherwise if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

I.     **MALKIEWICZ'S OPINIONS CONCERNING HOW USERS INTERACT WITH**
       ***NBA 2K* AND THE TATTOOS' IMPACT ON SALES SHOULD BE EXCLUDED**

       A.     **Malkiewicz Is Not Qualified To Testify as an Expert about How Frequently**
              **the Tattoos Are Depicted in *NBA 2K***

       Malkiewicz's opinions regarding the alleged frequency with which the Tattoos are

depicted in *NBA 2K* should be excluded because he is not qualified to offer opinions about how

users interact with *NBA 2K*.  Under FRE 702, a proposed expert's testimony is admissible only if

"the witness [is] qualified by 'knowledge, skill, experience, training, or education.'"  *Burgett v.*

*Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*,

527 F.3d 517, 528–29 (6th Cir. 2008)).  In particular, courts consider "whether [the witness's]

qualifications provide a foundation for a witness to answer a specific question."  *Burgett*, 579 F.

App'x at 376 (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  "The party

offering the expert's testimony has the obligation to prove the expert's qualifications by a

preponderance of the evidence."  *Burgett*, 579 F. App'x at 376 (citing *Sigler v. Am. Honda*

*Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008)).

       Here, Malkiewicz admits that he is "not a video game expert," not an "NBA basketball"

expert, "not an expert in tattoos," and "not a technical expert."  Ilardi Decl. Ex. A (Malkiewicz

Tr.) 263:4–7, 53:15–17, 265:6–7, 258:10–13.  Nevertheless, he offers specific testimony about

how *NBA 2K* users interact with the video game, including that: (1) "one would expect at least

one of the Accused Avatars to be used in 13 to 19 percent of games of randomly selected NBA

teams," *id.* Ex. B (Malkiewicz Rpt.) ¶ 90; (2) by assigning a "weighting value" to each team

based on the in-game ratings of the teams that the NBA Players are on, the "probability an

Accused Avatar is featured in an NBA 2K match is 23 percent across all Accused Games," *id.*

¶¶ 96–97; (3) "the Accused Avatars are likely to be selected an average of 66 percent more often

than the average avatar," *id.* ¶ 99; and (4) "consumers may alternatively be attracted to virtual

teams and avatars based on their real-world attributes," such as "Value Over Replacement Player (VORP), [which] represents the marginal productivity of each player" in real life, including that Mr. James has a VORP of 8.2.  *Id.* Ex. D (Malkiewicz Reb. Rpt.) ¶ 57.

As Malkiewicz has no specialized knowledge, skill, experience, training, or education that would render him qualified to opine on how actual video game users interact with *NBA 2K*, his opinions regarding how users interact with *NBA 2K*, including the above-cited testimony, should be excluded.  *See, e.g.*, *Popovich v. Sony Music Ent., Inc.*, No. 02 Civ. 359, 2005 WL 5990223, at *3 (N.D. Ohio May 9, 2005) (holding, in a dispute over the value of a logo on a music CD, that an expert who was qualified only "in the area of valuation" was "not an expert on the music industry," "not an expert on contract interpretation," "not a historian or a musicologist," "not an expert on marketing or advertising," and "not an expert on corporate operations or strategy," and excluding any such testimony).

**B.      Malkiewicz's Opinions about the Specific Relationship between the Tattoos and Take-Two's Sales Are Methodologically Unsound and Not Reliable**

Compounding the fact that he has no expertise in video games, Malkiewicz makes the further error of offering unreliable assumptions concerning the relationship between the NBA Players' ratings in *NBA 2K*,[1] the frequency with which the NBA Players are depicted in *NBA 2K*, and sales of *NBA 2K*.  But "an expert may not . . . merely offer 'assumptions' based on the record," because "[a]n expert whose conclusions are just 'assumptions' has not used a weak methodology; he has used no methodology at all."  *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 494 (S.D. Ohio 2020) (quoting *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001)); *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527

---

[1]    Players in *NBA 2K* have in-game numerical ratings assigned to them.  For example, in *NBA 2K21*, the 547 listed NBA players were all rated from 66 to 97.  Ex. E (Decl. and Expert Rpt. of Ian Bogost) ¶¶ 38–40.

(6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity" (quoting *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)).

Here, Malkiewicz makes several such unreliable assumptions.  ***First***, as described above, he presented four types of "statistical approximations."  Ilardi Decl. Ex. A (Malkiewicz Tr.) 252:16–23.  These statistical approximations were based on the assumption that there is a correlation between the NBA Players' ratings and the frequency with which they (and the Tattoos they bear) are depicted in *NBA 2K*.  *Id.* Ex. B (Malkiewicz Rpt.) ¶ 98 ("In essence, an avatar's rating is expected to directly impact the user's ease of play within the game, in turn increasing the probability that a user would choose a relatively higher-rated avatar compared to a lower-rated avatar.").  Yet, Malkiewicz acknowledged that he is not applying any accepted methodology to perform this analysis (nor would he have the basis to do so, as he admittedly has no expertise in video games), as he admitted it was possible that "there could be ***no correlation*** between how often a team is selected and how highly rated the players are."  *Id.* Ex. A (Malkiewicz Tr.) 262:20–263:3 (emphasis added).  He also admitted that he "cannot cite to any documents substantiating [his] hypothesis that players of *NBA 2K* choose teams based on their performance in real life and the quality of the players and ease of the play with team."  *Id.* 262:7–11.  Thus, although he presents statistics, for example, claiming that at least one of the NBA Players will appear in "23 percent" of all matches, and "66 percent more often than the average avatar," *id.* Ex. B (Malkiewicz Rpt.) ¶¶ 97, 99, he admitted that these are "a statistical calculation using, you know, ***assumptions***."  *Id.* Ex. A (Malkiewicz Tr.) 262:12–13 (emphasis added).  Other reasons for choosing to play *NBA 2K* with a particular team are equally, if not more likely; for example, a user may choose to play most frequently with their hometown team,

regardless of the players on that team.

**Second**, Malkiewicz assumed that other information showed that the NBA Players are more likely to be depicted in *NBA 2K* than a random NBA player, but did not perform any analysis of that information, and again, he does not have expertise in video games to make these inferences.  *See* Ilardi Decl. Ex. B (Malkiewicz Rpt.) ¶ 93.  This is improper as an expert may not merely point to evidence in the record and then assume the conclusion.  *See Navarro*, 501 F. Supp. 3d at 493–94 (although an expert may "rely on record facts to support their opinions . . . the expert must then use his or her expertise to build upon this factual foundation").

Here, Malkiewicz simply *cites* (1) *Plaintiff's* unsupported allegation in the Complaint that consumers "likely often choose" to "play with LeBron James or the Cleveland Cavaliers," Ilardi Decl. Ex. B (Malkiewicz Rpt.) ¶ 93; (2) the real-world success and popularity of the NBA Players, *id.* ¶¶ 25–35, 93; (3) articles about *NBA 2K* that appear in *Forbes* and a single Take-Two video from its online Video Blog discussing features in *NBA 2K18*, *id.* ¶¶ 87–88, 93; (4) Take-Two's emails, *id.* ¶ 93; and (5) unspecified "other qualitative characteristics."  *Id.*  He provides no methodology to conclude that these qualitative observations increase the likelihood that the NBA Players appear in *NBA 2K*; instead, he simply contends that these observations "suggest" that happens.  *Id.*

**Finally**, Malkiewicz compounds his error of assuming that the NBA Players will appear more than a random NBA player by also assuming that means that the increased appearance of the NBA Players increases Take-Two's sales of *NBA 2K*.  But an expert may not make an "unsubstantiated leap between facts in the record and his ultimate opinion."  *Navarro*, 501 F. Supp. 3d at 494–95 ("Chiagouris recounts P&G's experience with Navarro, and then leaps to the conclusion that Navarro's photographs had a positive impact on sales[,] . . . mak[ing] unfounded

(or at least unsubstantiated) assumptions about the consequences of facts in the record."). Malkiewicz does precisely that, assuming that the increased frequency would have a nonspecific but positive impact on *NBA 2K*'s sales: He concludes that depicting real-life tattoos is a "valuable feature" of *NBA 2K*, Ilardi Decl. Ex. B (Malkiewicz Rpt.) ¶ 78, and that Take-Two's profits specifically attributable to depicting the six Tattoos account for a "substantial portion of" its total alleged profits attributable to depicting all real-life tattoos, *id.* Ex. D (Malkiewicz Reb. Rpt.) ¶¶ 54, 64.  Yet again, Malkiewicz lacks any expertise in video games that may allow him to offer such inferences, he performed no testing and applied no methodology to reach these conclusions, and he made no attempt to explain what his opinions would mean for damages in this case.  In fact, when asked at his deposition what a "substantial portion" meant, he defined it only as "significantly different from zero." *Id.* Ex. A (Malkiewicz Tr.) 217:12–14.  As Malkiewicz's opinions concerning the impact of the Tattoos on Take-Two's revenue are arguments, not expert opinion, and are divorced from any cognizable methodology, they are not reliable and should be excluded.  *Navarro*, 501 F. Supp. 3d at 496.

## II.  MALKIEWICZ'S OPINIONS CONCERNING ALLEGED PROFITS ATTRIBUTABLE TO REALISTIC DEPICTIONS OF TATTOOS SHOULD BE EXCLUDED

### A.  Malkiewicz's Disgorgement Analysis Is Contrary to the Copyright Act

Malkiewicz's opinions concerning the amount of profits attributable to depicting the Tattoos is based on unfounded methodologies for two independent reasons.  ***First***, his approach contradicts the three-step process set forth in the Copyright Act and should be excluded for that reason alone.  Assuming that infringement is established, 17 U.S.C. § 504(b) sets forth a three-step process to determine the amount of profits that are subject to disgorgement:

- ***First***, the alleged "infringer's gross revenue" is presented;

- ***Second***, its "deductible expenses" are subtracted; and

- ***Third***, "the elements of profit attributable to factors other than the copyrighted work"
  also are subtracted.

*See Navarro*, 501 F. Supp. 3d at 488 ("[O]nce the copyright owner has identified the appropriate
revenues, the burden shifts to the infringer to demonstrate what part, if any, of those revenues are
not profits attributable to the infringement.  The infringer can do so in two ways—***first*** by
pointing to the expenses it incurred in generating the revenues, ***and then second***, by allocating
any remaining amount (the profit) among infringing and non-infringing activity."  (emphasis
added) (citing *Balsley v. LFP, Inc.*, 691 F.3d 747, 767–69 (6th Cir. 2012)).

Take-Two is aware of no cases that permit a party to perform these steps in a different
order than the statute.  Yet, Malkiewicz does just that: *first* apportioning the value of the
copyrighted work—and notably, here, only *partially* apportioning—and *then* deducting
expenses.  *See supra* 3.  Closer analysis of Malkiewicz's novel approach reveals its
methodological flaw.  By first apportioning and then deducting, Malkiewicz fails to deduct
several categories of Take-Two's costs because he claims they "would have been expended by
Defendants with or without the benefit of incremental revenues from sales of Accused Games
attributable to realistic depictions of tattoos."  Ilardi Decl. Ex. D (Malkiewicz Reb. Rpt.) ¶ 49.
These include "costs associated with Internal Development, External Development, Marketing &
COOP, Marketing Team, and Publishing & G&A expense categories."  *Id.*  Yet, he deducted
these costs to determine Take-Two's profits in his opening report.  *Id.* Ex. B (Malkiewicz Rpt.)
Sch. 9. As Take-Two's expert Mr. Malackowski explains, "there are aspects of Internal
Development, Marketing Team and Publishing & G&A costs that vary with *NBA 2K* revenues or
profits," as well as "External Development," for which Malkiewicz does not account.  *Id.* Ex. F
(Malackowski Suppl. Rpt.) 10.  Moreover, Take-Two's game development costs that are

captured in its Internal and External Development *include* the incorporation of the Tattoos, and thus contribute to the depiction of the Tattoos.  *Id.*  As Malkiewicz's novel methodology is an improper attempt to hide these errors, it should be stricken.[2]

**Second**, in addition to approaching the calculation in the wrong order, he makes the additional error of apportioning revenue based entirely on the results of a survey conducted by Plaintiff's supposed survey expert, Dr. H. Tolga Bilgicer ("Bilgicer Survey").  Ilardi Decl. Ex. D (Malkiewicz Reb. Rpt.) ¶ 38.  For the reasons set forth in Take-Two's concurrently filed motion to exclude the Bilgicer Survey, including that it is methodologically flawed and offers misleading conclusions, that survey is not reliable.  Malkiewicz agreed that his calculation would be wrong if the Bilgicer Survey is wrong.  *Id.* Ex. A (Malkiewicz Tr.) 214:12–20.  Thus, his opinions that rely on it similarly should be excluded.

## B.  Malkiewicz's Partial Apportionment Analysis Is Improper

Setting aside the various methodological issues with the Bilgicer Survey, because Bilgicer asked the wrong questions to get the wrong answer—whether consumers bought *NBA 2K* for tattoos *generally*—the information from the Bilgicer Survey provides no basis at all for Malkiewicz to apportion profits attributable to the six Tattoos at issue in this case.  17 U.S.C. § 504(b) requires an apportionment of "the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b).  "In cases such as this where an infringer's profits

---

[2]      In his reports, Malkiewicz cited *ECIMOS, LLC v. Carrier Corp.* for the "general principle of proving a copyright infringer's profits."  Ilardi Decl. Ex. B (Malkiewicz Rpt.) ¶ 66 (citing 971 F.3d 616, 635 (6th Cir. 2020)); *id.* Ex. D (Malkiewicz Reb. Rpt.) ¶ 52 (opining "I understand that the burden of the plaintiff is only to establish the defendant's gross revenue from the infringing product. It is the infringer's burden, however, to prove 'deductible expenses and the elements of profit attributable to factors other than the copyrighted work.'" (quoting *ECIMOS*, 971 F.3d at 635)).  *ECIMOS*, however, affirmed a jury award where the jury was presented with a profit number after deducting expenses but before any apportionment.  *See ECIMOS*, 971 F.3d at 636. Thus, in that case, consistent with other cases of which Take-Two is aware, the plaintiff's expert provided testimony about total revenue, not incremental revenue.  *Id.*

are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment." *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 361 (6th Cir. 2007) (quoting *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828–29 (9th Cir. 1985)).

Here, Bilgicer admits that his survey that Malkiewicz relies on did not test "whether any specific tattoos were a reason consumers purchased the NBA 2K games." Ilardi Decl. Ex. G (Bilgicer Tr.) 93:12–17, 97:8–21. Instead, it only claimed to test whether consumers purchased *NBA 2K* for the tattoos on *all* of the NBA players. *Id.* To conduct his apportionment, Malkiewicz multiplied Take-Two's revenues by 1.06%, which he claims is "the average value of realism of tattoos factor" that the Bilgicer Survey determined to be the relative importance of *all* tattoos in *NBA 2K*. *Id.* Ex. D (Malkiewicz Reb. Rpt.) ¶ 38.[3] As Malkiewicz admits, he did nothing to account for the fact that this factor says nothing about the alleged value of the six Tattoos, and he did nothing on his own to assess the specific value of the six Tattoos. *Id.* Ex. D (Malkiewicz Reb. Rpt.) ¶ 38; *id.* Ex. A (Malkiewicz Tr.) 208:16–18 ("I did not assign a specific value to either the six tattoos collectively or each tattoo separately.").[4]

Malkiewicz did not even try to determine how many tattoos there are in *NBA 2K*; instead, he admitted that it "could be between high hundreds and single thousands." Ilardi Decl. Ex. A (Malkiewicz Tr.) 218:5–11, 18–19. Thus, conservatively estimating—using Malkiewicz's own

---

[3] Confusingly, Malkiewicz does not even appear to rely on the right number from the Bilgicer Survey, as even Dr. Bilgicer claimed only that the Bilgicer Survey found that the "relative importance of all of the tattoos in the game" is 0.99%, Ilardi Decl. Ex. G (Bilgicer Tr.) 228:15–21, but Malkiewicz applied 1.06%. *Id.* Ex. D (Malkiewicz Reb. Rpt.) ¶ 38, Schedule 3.0.

[4] Malkiewicz claimed in his deposition that he did not conduct a complete apportionment analysis because he did not "have certain information or [] was not given access to it." Ilardi Decl. Ex. A (Malkiewicz Tr.) 131:18–20. Yet, all that is required is a "reasonable approximation," not "mathematical exactness," *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 408 (1940), and Malkiewicz did not attempt to make a "reasonable approximation."

testimony—that there are 700 tattoos depicted on NBA players in *NBA 2K*, the six Tattoos in this case would comprise less than 1% of all such tattoos. If there were 1,500 tattoos—also within Malkiewicz's estimate—then the six Tattoos would comprise less than 0.5% of all such tattoos. And as Malkiewicz admitted, Plaintiff would not be entitled to any profits attributable to the depiction of any of the more than 99% of the tattoos in *NBA 2K* that he did not ink, all of which are included in the disgorgement calculation presented in his rebuttal report. *Id.* 114:13–16 (admitting "[i]f Mr. Hayden did not ink a tattoo that appears in NBA 2K, any profits associated with that tattoo should not be apportioned to Mr. Hayden's damages claim").

Moreover, Malkiewicz's apportionment also is wrong because it includes the two tattoos that he admits are not even "visible while Accused Avatars are wearing the vest-style NBA jersey." Ilardi Decl. Ex. B (Malkiewicz Rpt.) ¶ 86 n.218; *id.* Ex. A (Malkiewicz Tr.) 18:23–19:1 (admitting "some of the chest tattoos at issue in this case would be more or less obstructed"). He also admitted that two other tattoos were inked in part by other tattooists, and that the value of those portions must be apportioned out of Plaintiff's damages claim. *Id.* 122:16–123:1, 124:4–17. He did not do so. *Id.*

At bottom, Malkiewicz contends that "all of the characteristics of the game would . . . add up to the universe of value that a game brings to the defendants," *id*. 164:3–6, and seeks to tell the jury that Take-Two profited by a specific amount from the depiction of all realistic tattoos in *NBA 2K*, but did not remove the profits attributable to the depiction of more than 99% of those tattoos. His partial apportionment opinion should be excluded because it would erroneously invite the trier of fact to award Plaintiff a windfall of profits attributable to admittedly non-infringing tattoos, in contravention of 17 U.S.C. § 504(b).

III.   **MALKIEWICZ'S OPINIONS CONCERNING A PURPORTED RELATIONSHIP BETWEEN TAKE-TWO'S REVENUE FROM VIRTUAL CURRENCY AND THE DEPICTION OF THE TATTOOS SHOULD BE EXCLUDED**

Finally, Malkiewicz's opinion that Take-Two's alleged infringement is related to Take-Two's revenue from sales of VC is an attempt to inflate revenues and profits with sales that have nothing to do with the Tattoos.  This opinion must be excluded because it is not reliable.  "[A] plaintiff in a copyright case seeking disgorgement of profits must show a '*reasonable* relationship' between revenues and the act of infringement."  *Satija v. Permanent Gen. Assurance Corp. of Ohio*, No. 13 Civ. 82, 2014 WL 1664557, at *6 (N.D. Ohio Apr. 25, 2014) (quoting *Balsley*, 691 F.3d at 769).  "To show this reasonable relationship, the plaintiff must present 'non-speculative evidence . . . consistent with general damages principles.'"  *Satija*, 2014 WL 1664557, at *6 (quoting *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1280 (M.D. Fla. 2008)).  The non-speculative evidence "must include 'some causal link between the infringement and the particular profit stream before the burden-shifting provisions of [17 U.S.C.] § 504(b) apply.'"  *Satija*, 2014 WL 1664557, at *6 (quoting *Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.,* 338 F. App'x 329, 333 (4th Cir. 2009)).

For example, in *Satija*, the defendant depicted an allegedly infringing "General" character in advertisements, and plaintiff sought disgorgement of revenue from sales of defendant's advertised insurance products.  2014 WL 1664557, at *7.  The plaintiff's claim was "that use of the General character in advertisements encouraged consumers to purchase insurance."  *Id.*  The court found that the "tenuous link between the alleged infringement and revenue means that the amount of revenue reasonably related to the alleged infringement is inherently more speculative," and there was no basis to attribute a specific portion of defendants' revenue to its use of the "General" character.  *Id.*

Likewise, here, Malkiewicz provides no basis to attribute a specific portion of Take-

Two's revenue from sales of VC to its depiction of the Tattoos in *NBA 2K*.[5]  As Malkiewicz

admits, VC is an optional purchase that allows users who have already purchased *NBA 2K* "to

unlock certain aspects of the game" and unlock "specific features."  Ilardi Decl. Ex. A

(Malkiewicz Tr.) 188:10–11.  These features include "gain[ing] additional skills and attributes,"

obtaining "My Player accessories" and "acquir[ing] officially licensed gear from the NBA

store," among others.  *Id.* 194:1–3, 195:19–20, 195:25–196:6.  VC can be purchased, but it also

can be earned through game play.  *Id.* 197:20–25.  Regardless of whether a user buys or earns

VC, the Tattoos ***are already included*** in *NBA 2K* at the time that the game is purchased.  *Id.*

203:9–14.  Moreover, (a) VC does not depict the Tattoos, *id.* 204:11–17; (b) it cannot be used to

purchase the Tattoos, *id.* 189:8–11; and (c) it cannot be used to see the Tattoos more clearly, *id.*

201:16–202:2.  Thus, it has no connection to the Tattoos.  Despite this, Malkiewicz treats

revenue from Take-Two's sales of VC in the exact same manner as sales of the game itself.  *Id.*

189:16–190:12.  Malkiewicz presents no analysis tying depiction of the Tattoos to sales of VC,

instead simply offering the unsupported supposition that this is "the economics of video game

sales today."  *Id.* 190:8–9.  Malkiewicz thus should be precluded from offering any opinions

"about what revenue [from virtual currency] is reasonably related to or attributable to [Take-

Two's] use of the" Tattoos.  *Satija*, 2014 WL 1664557, at *7.

## CONCLUSION

For the foregoing reasons, Take-Two respectfully requests that the Court preclude the

testimony, argument or evidence by Malkiewicz consistent with the above analysis.

---

[5]    Any link between the Tattoos and Take-Two's revenue from VC is even more tenuous because Malkiewicz
relies on Take-Two's 10-K documents to determine how much revenue Take-Two makes from sources such as
VC as a percent of *all* of its games, and then extrapolates that percentage to *estimate* how much this revenue is
in *NBA 2K*.  Ilardi Decl. Ex. B (Malkiewicz Rpt.) Sch. 6; *id.* Ex. A (Malkiewicz Tr.) 220:17–25.

Dated:  New York, NY
        October 25, 2021                      /s/ Dale M. Cendali
                                              _____
                                              Dale M. Cendali (admitted *pro hac vice)*
                                              Joshua L. Simmons (admitted *pro hac vice*)
                                              Chris Ilardi (admitted *pro hac vice*)
                                              KIRKLAND & ELLIS LLP
                                              601 Lexington Avenue
                                              New York, New York 10022
                                              Telephone: (212) 446-4800
                                              dale.cendali@kirkland.com
                                              joshua.simmons@kirkland.com
                                              chris.ilardi@kirkland.com

                                              Miranda D. Means (admitted *pro hac vice*)
                                              KIRKLAND & ELLIS LLP
                                              200 Clarendon Street
                                              Boston, Massachusetts 02116
                                              Telephone: (617) 385-7500
                                              miranda.means@kirkland.com

                                              Matthew J. Cavanagh (OH 0079522)
                                              MCDONALD HOPKINS LLC
                                              600 Superior Avenue, East, Ste. 2100
                                              Cleveland, Ohio 44114
                                              Telephone: 216.348.5400
                                              Fax: 216.348.5474
                                              mcavanagh@mcdonaldhopkins.com

                                              *Attorneys for Defendants 2K Games, Inc. and
                                              Take-Two Interactive Software, Inc.*

16

## L.R. 7.1(F) CERTIFICATION

In accordance with Local Rule 7.1(f), I hereby certify that this case is on the standard track and that the foregoing memorandum complies with the applicable page limitation of 15 pages.

_/s/ Dale M. Cendali_____
*Attorney for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.*

1