UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN, | |
| Plaintiff, | CASE No. 1:17-cv-02635 |
| vs. | Judge Christopher A. Boyko |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., | **PUBLIC REDACTED VERSION** |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY OF MICHAL A. MALKIEWICZ**

Now comes JAMES HAYDEN ("Plaintiff") and provides his Memorandum in

OPPOSITION to Defendants' Motion to Exclude Testimony, Argument or Evidence Regarding

the Expert Reports and Opinions of Michal A. Malkiewicz filed by 2K Games, Inc. and Take-

Two Interactive Software, Inc. ("Defendants" or, collectively, "Take-Two"). For the reasons set

forth herein, the Court should DENY Defendants' Motion.

I.      **SUMMARY OF PLAINTIFF'S RESPONSE**

Take-Two seeks to exclude three "categories" of opinions rendered by Plaintiff's damages expert, Michal Malkiewicz of Charles River Associates: (1) his opinions "as to the alleged frequency that users of [the Accused Video Games[1]] would view [the Asserted Tattoos[2]]"; (2) his opinion "that purports to apportion Take-two's profits attributable to the alleged infringement"; and (3) his opinion "that Take-Two's revenue from sales of virtual currency ("VC") should be included in his disgorgement figure."  Take-Two's Memorandum in Support of Its Motion to Exclude Testimony of Michal A. Malkiewicz (Dkt. No. 104-1) 1–2.

**First**, Mr. Malkiewicz is a *highly* qualified applied economist and damages expert, with impressive academic and professional credentials.  The inputs that he uses are well-researched, grounded in facts of this case and reliable public research, fully-disclosed and explained, and, most importantly, testable and rebuttable.  Moreover, contrary to Defendants' assertion, Mr. Malkiewicz does not even *offer* opinions about "how the average user interacts with [the Accused Video Games]." Dkt. No. 104-1 at 1. As to such first category, Defendants' Motion should be denied.

**Second**, Mr. Malkiewicz's disgorgement analysis is entirely consistent with the Copyright Act and more than satisfies the copyright owner's burden "to present proof **only** of the infringer's gross revenues." 17 U.S.C. § 504(b) (emphasis added). *Nothing* in the Copyright Act or Take-Two's cited authorities supports its assertion that Mr. Malkiewicz's analysis

---

[1]  The "Accused Video Games" are NBA 2K16, NBA 2K17, NBA 2K18, NBA 2K19, NBA 2K20, NBA 2K21, NBA 2K22 and NBA 2K Mobile. All of them were identified to Defendants in discovery and Plaintiff plans to move to amend the Complaint to add NBA 2K21 and NBA 2K22 to the others previously identified as infringing works in the Fourth Amended Complaint.

[2]  The "Asserted Copyrights" or "Asserted Tattoos" include: "Gloria" (Reg. No. VAu 1-263-888); "Lion" (Reg. No VAu 1-271-044); "Shoulder Stars" (Reg. No. VAu 1-270-802); "Fire D.G." (Reg. No. VAu 1-287-552); "Scroll D.G." (Reg. No. VAu 1-287-545); and "Brother's Keeper T.T." (Reg. No VAu 1-292-453).

"contravenes the Copyright Act's disgorgement analysis." Dkt. No. 104-1 at 2.  Take-Two's argument is a thinly-veiled attempt to shift its *own* burden to Plaintiff.  S*ee infra.* As to such second category, Defendants' Motion should be denied.

**Third**, under the Copyright Act, the owner of an infringed copyright need only prove the infringer's **_gross revenue._** Congress assigned to the *infringer* the burden to prove "the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Mr. Malkiewicz's opinions properly reflect Plaintiff's burden regarding Defendants' gross revenue "reasonably related" to the Accused Video Games, including that from the so-called "virtual currency" ("VC") that is earned, purchased, and redeemed therein as *part of* the Accused Video Games. As to its third category, Defendants' Motion should be denied.

## II.    FACTUAL BACKGROUND

On May 27, 2021, James Hayden served the Initial Report of Michal A. Malkiewicz. In it, Malkiewicz calculated that Take-Two's gross profits from sales of the Accused Video Games are ▮▮▮▮▮▮▮. Expert Report of Michal A. Malkiewicz (Exhibit A) 68. On the same day, Take-Two served the report of James Malackowski, who opined that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Expert Report of James Malackowski (Exhibit B) 4–5. On July 1, 2021, Mr. Hayden served the Rebuttal Expert Report of Michal A. Malkiewicz. In it, by correcting identified flaws in Malackowski's methodology and estimations, Malkiewicz concluded that Take-Two's profits from incremental sales of the Accused Video Games attributable to the Asserted Copyrights are a substantial portion of the ▮▮▮▮▮▮▮ Take-Two had realized from the realistic depictions of tattoos in the Accused Video Games. Rebuttal Report of Michal A. Malkiewicz (Exhibit C) 29.

## III.    LAW AND ARGUMENT

Under Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:

(a)  the expert's scientific, technical, or other specialized knowledge will ***help the trier of fact*** to understand the evidence or to determine a fact in issue;
(b)  the testimony is based on ***sufficient facts or data***;
(c)  the testimony is the product of ***reliable principles and methods***; and
(d)  the expert has ***reliably applied*** the principle and methods to the facts of the case."

Fed. R. Evid. 702 (emphasis added). Under *Daubert*, "the inquiry envisioned by Rule 702 is … a flexible one," with the focus "on principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595 (1993).

### A.  Mr. Malkiewicz is Eminently Qualified to Offer the Opinions in His Report

Take-Two argues that Mr. Malkiewicz is not qualified to offer opinions about "how the average user interacts with *NBA 2K*," Dkt. No. 104-1 at 1, or "as to the alleged frequency that users of the [the Accused Video Games] would view [the Asserted Tattoos] that appear on three NBA players—LeBron James, Danny Green, and Tristan Thompson …—in real life and in *NBA 2K*." *Id.*

#### 1.  *Mr. Malkiewicz is a Highly Qualified Applied Economist and Damages Expert*

Courts generally take a liberal approach to assessing an expert's qualifications. *See*, *e.g.*, *Navarro v. Procter & Gamble Co*., 2021 WL 868586, at *3 (S.D. Ohio Mar. 8, 2021) ("The qualification requirement is a liberal one"); *see also*, *e.g.*, *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *Olin Corp. v. Lamorak Ins. Co.*, 3332 F. Supp. 3d 818, 832 (S.D.N.Y. 2018). Furthermore, challenges to an expert's qualifications often go to weight and credibility, rather than admissibility. *See*, *e.g.*, *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 333 (6th

Cir. 2001) (Finding "no error" in district court's conclusion that "any weaknesses in [Defendant's expert's] background will go to the weight to be accorded to his opinion"); *See also*, *e.g.*, *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016); *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013), *cert denied*, 134 S. Ct. 1011 (2014).

Take-Two argues that Mr. Malkiewicz is "unqualified" but utterly fails to acknowledge or even address his extensive qualifications. As reflected in his professional resume attached to his Expert Report, Mr. Malkiewicz is a *highly* qualified applied economist and damages expert, whose experience and expertise includes the application of econometrics and statistics to intellectual property and complex business issues and disputes. Ex. A ¶ 1–8; *Id.*, Schedule 1. Mr. Malkiewicz holds multiple degrees from the University of Chicago, *id.* at ¶ 3, along with a degree from Johns Hopkins, *id.*, he has graduate level training in econometrics and statistics, *id.* at ¶ 5, he holds a Certificate in Forecasting Practice from the International Institute of Forecasters, *id.* at ¶ 3, and he has been retained as an expert to prepare statistical analyses in dozens of disputes in a variety of industries including, *inter alia*, software, healthcare, higher education, legal services, retail, and automobile. *Id.*, Schedule 1.

Take-Two claims that because Malkiewicz is not a "video game expert," his opinions are inadmissible. Dkt. No. 104-1 at 1; 5; 9. However, Take-Two's Motion ignores or dismisses the fact that Mr. Malkiewicz *is* qualified in the subject areas that form the basis of the opinions regarding damages which he actually renders. Moreover, an expert witness need not be qualified in *every* specific subject area related to his opinions. Indeed, as Take-Two itself concedes, *see id.* at 5, the pertinent inquiry is "whether [the witness's] qualifications provide a foundation for the witness to answer a specific question. *Id.* (citing *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (brackets in original). In sum, Mr. Malkiewicz's opinions in this case do not

require him to be a "video game expert," nor an "NBA basketball," "technical," or "tattoo" expert. Dkt. 104-1 at 5 (citing *Take-Two's **counsel's** questions* at Deposition of Michal Malkiewicz (Exhibit D) 263:4–7; 53:15–17, 265:6–7; 258:10–13).

Furthermore, Take-Two's reliance on *Popovich v. Sony Music Ent., Inc.* to support its sweeping attack on Malkiewicz's "knowledge, skill, experience, training, [and] education," Dkt. No. 104-1 at 6, is misplaced, at best. In *Popovich v. Sony Music Ent., Inc.,* the court *actually* held that *even though* Plaintiff's valuation expert was "not an expert on the music industry," "not an expert on contract interpretation," "not a historian or musicologist," "not an expert on marketing or advertising," and "not an expert on corporate operations or strategy," he *could* rely on "additional matters" (matters *not* "specifically and tightly related to his valuation of Plaintiff's damages") that were "merely factual predicates on which [his] analysis is based." *Popovich v. Sony Music Ent., Inc.*, 2005 WL 5990223, at \*3 (N.D. Ohio May 9, 2005). The court did not, as Take-Two states, exclude "any such testimony."[3] Dkt. No. 104-1 at 6. Rather, it simply precluded *specific* opinions that clearly exceeded the scope of Plaintiff's expert's expertise.[4]

Mr. Malkiewicz is an expert economist skilled in applying econometrics and statistics including to products and issues relevant to this case. He was neither retained as a "video game expert" nor do his opinions require that he be one.  Perforce, the opinions presented in his Reports do *not* exceed the scope of his expertise.

---

[3] Admittedly, Take-Two does not even clearly define the scope of "any such testimony."
[4] *Popovich*, at \*3 ("Popovich may not rely on DiMattia to opine as to what the contracts mean, whether Sony intentionally breached them, what Popovich's historical significance was, what Sony's corporate strategy is, what the recent trends in the music industry are, or whether Sony's damage expert breached any ethical codes.")

2.  *Mr. Malkiewicz Does Not Offer Opinions About How the "Average User" Interacts with the Accused Video Games*

Contrary to Defendants' Motion, Mr. Malkiewicz was *not r*etained to offer, nor is he offering, opinions about "how the average user interacts with *NBA 2K*." Dkt. No. 104-1 at 1. *See also Id.* at 6. In fact, Mr. Malkiewicz never even uses the term "average user" (or "ordinary user" or "typical user") *anywhere* in his Initial or Rebuttal Reports (collectively, his "Reports"). In contrast, ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████ ███████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████ *See* Deposition of Ian Bogost, Ph.D. (Exhibit F) 180:6–13; 179:5–11; 186:11–18 (emphasis added).

Mr. Malkiewicz was retained as Plaintiff James Hayden's damages expert in this case and asked "to analyze monetary relief available to Mr. Hayden in the form of disgorgement damages and to quantify the amount of compensation owed by Defendants to Mr. Hayden, if any, for infringement of his copyrights." Ex. A at ¶ 9. Consistent with his assignment, Mr. Malkiewicz prepared a fully-explained, supported, and scientifically valid report of Defendants' gross revenue from their multiple infringements. In a limited portion of his Initial Report, Mr. Malkiewicz meticulously explains the *calculations* which *support* his conclusion that the accused avatars of Mr. James, Mr. Green, and Mr. Thompson "are more prominent than an average *NBA 2K* player avatar." Ex. A, heading at p. 49. His inputs are fully-disclosed, well-researched,

---

[5] Mr. Malkiewicz does use the term "average player" three times in the Reports. However, unlike Dr. Bogost, he uses this term ("average player") in reference to the average <u>NBA player</u> *not* the average player of the Accused Video Games.

grounded in facts of this case and reliable public research, and, most importantly, testable and rebuttable, should Take-Two take issue with them.

Under *Daubert*, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact [is] whether it can be and has been tested." *Daubert*, 509 U.S. at 593.  "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Id.* (*citing* E. Green & C. Nesson, Problems, Cases, and Materials on Evidence 649 (1983) and C. Hempel, Philosophy of Natural Science 49 (1966)). Not only has Mr. Malkiewicz tested his hypothesis three times, coming to the same conclusion each time, Ex. D at 262:17-19, but Take-Two is actually in the *best* position to dispute Mr. Malkiewicz's theory with information that is likely kept in the normal course of business but, inexplicably, was never produced by Defendants to Plaintiff in this case. *See* Ex. A at ¶ 9. *See also* Ex. C at ¶ 53.[6]

Furthermore, with particular respect to his Rebuttal Report, not only is Mr. Malkiewicz plainly qualified to offer the opinions therein, but his conclusion (drawn from the calculations explained in his Initial Report) that Take-Two's profits specifically attributable to depicting the six Asserted Copyrights account for a "substantial portion of" its total profits attributable to the realistic depiction of tattoos, Ex. C at ¶ 54, was proffered only *after* Take-Two *failed* (refused?) to meet its own burden of showing, from its gross revenue, "the elements of profit attributable to factors other than the copyrighted work." Fed. R. Evid. § 504(b).

[6] ████████████████████████████████████████████

Mr. Malkiewicz's opinions fall squarely within the scope of his expertise as an expert economist skilled in applying econometrics and statistics to intellectual property disputes; he is certainly qualified under the "liberal" Sixth Circuit standard.  Defendants' Motion should be denied.

### B.  Mr. Malkiewicz's Opinions Concerning Take-Two's Sales are Well-Founded, Based on Sound Methodology, and Reliable

Take-Two argues that Mr. Malkiewicz's testimony "about the specific relationship between the Tattoos and Take-Two's sales" is inadmissible because "it is based on the assumption that players with higher in-game and real-life rating will appear more frequently in *NBA 2K* than players with lower ratings." Dkt. No. 104-1 at 1 and 6. Take-Two also asserts that Mr. Malkiewicz "has done nothing to test this supposition," *id*. at 1–9, and that "Mr. Malkiewicz admitted that he 'cannot cite to any documents substantiating [his] hypothesis that players of *NBA 2K* choose teams based on their performance in real life and the quality of the players and ease of the play with team.' " Dkt. No. 104-1 at 7 (citing *Take-Two's **counsel** for the question* at Ex. D at 262:7–11) (brackets in original). In fact, however, Mr. Malkiewicz disclosed his methodology and hypotheses, supporting facts and calculations, and materials and documents he relied on including, for example, parts of Dr. Bilgicer's survey in which Dr. Bilgicer specifically asks survey respondents about their selections of players and teams when engaging in *NBA 2K* "playtime." Ex. C at ¶ 8. *See also, Id.*, Schedule 2.  Based on the foregoing and his detailed analysis, Mr. Malkiewicz *concludes*, not assumes, as Take-Two argues, "that the NBA Players will appear more than a random NBA player" and that "the increased appearance of the NBA Players increases Take-Two's sales of *NBA 2K*." Dkt. 104-1 at 8.

As is typical for economists and damages experts in cases such as this one, Mr. Malkiewicz played a number of the Accused Video Games; reviewed recorded playtime footage

and stills; considered gamer and professional reviews; considered various Take-Two marketing and consumer behavior studies prepared or commissioned by Take-Two in the normal course of business; considered responses to Dr. Bilgicer's survey; and considered public disclosures by Take-Two's management. *See* Ex. A, Schedule 2. *See also* Ex. C, Schedule 2. The information that Mr. Malkiewicz considered, which informed his assumptions and opinions, including his expert assessment of the value that can be attributed to Take-Two's copying of the Asserted Copyrights, is sufficiently reliable, is of the kind typically used by expert economists in cases such as this one, and, therefore, is sufficient under FRE 702 and *Daubert*.

Take-Two grossly mischaracterizes Mr. Malkiewicz's testimony when it asserts that "Malkiewicz acknowledged that he is not applying any accepted methodology to perform his analysis." Dkt. No. 104-1 at 7. Mr. Malkiewicz describes his methodology clearly, Ex. A at ¶¶ 89–99, and his statement that "[a]nything is possible," in response to Take-Two's counsel asking, "But there *could* be no correlation between how often a team selected and how highly rated the players are, right?" Ex. D at 262:20-263:3 (emphasis added), simply has *no relevance* to that methodology, as employed by Mr. Malkiewicz to perform his analysis.[7]

Additionally, Mr. Malkiewicz points out in his Initial and Rebuttal Reports that the frequency information regarding teams and players may *either* be reliably and scientifically approximated using probability theory and standard statistical frameworks (as he did) *or*

███████████████████████████████████████████████████████

███████████████████████   *See* Ex. A at ¶ 89. *See also* Ex. C at ¶ 53. ████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[7]By comparison, one surely would not say that a meteorologist who forecasts clear skies has not applied "any accepted methodology" simply because he acknowledges that it *could*, theoretically, rain.

████████████████, Mr. Malkiewicz designed reliable and replicable statistical analyses that he explained step-by-step in his Reports. As discussed above, the inputs that Mr. Malkiewicz uses are fully-disclosed, well-researched, grounded in facts of this case and reliable public research, and, most importantly, testable and rebuttable should Take-Two elect to assert a different view. If Take-Two wished to argue that there is no "relationship between the NBA Players' ratings in *NBA 2K*" and "the frequency with which the NBA Players are depicted in *NBA 2K,*" Dkt. No. 104-1 at 6, contrary to documents in the record and information in the public record, it had the opportunity to do so (and, indeed, will have the opportunity to do so again during Mr. Malkiewicz's cross-examination at trial). Similarly, if Take-Two would like to argue that the frequency and prominence with which various features or characteristics of the Accused Video Games (including realistic depiction of tattoos on the three Accused Avatars) appear is *unrelated* to the value consumers receive from the Accused Games, Take-Two is welcome to do that, as well (and, again, will have the opportunity to question Mr. Malkiewicz about it during his cross-examination at trial).

## C. Mr. Malkiewicz's Disgorgement Analysis is Accurate and Proper

1. *Revenue from Sales of Virtual Currency is More Than "Reasonably Related" to the Accused Video Games*

Take-Two argues that Mr. Malkiewicz's opinion that Take-Two's revenue from sales of virtual currency ("VC") should be included in a disgorgement analysis under the Copyright Act should be excluded as unreliable because such VC is "not related to the alleged infringement." Dkt. No. 104-1 at 2; 14. However, Take-Two's only basis for asserting that Mr. Malkiewicz's testimony concerning VC is unreliable is that he did *exactly* what the Copyright Act (and Sixth

---

[8] *See* Deposition of Jason Argent (Exhibit G) 214:1–222:16 ██████████████████████████████
████████████████████████████████████████████████████████

Circuit) requires! Under 17 U.S.C. § 504(b), "the copyright owner is required to present proof **only** of the infringer's gross revenues" (emphasis added). "***The infringer*** is required to prove … the elements of profit attributable to factors other than the copyrighted work." *Id.* (emphasis added). While Take-Two nominally acknowledges that the part of an infringer's gross revenues identified by the copyright owner need only bear a "reasonable relationship" to the alleged infringement, Dkt. No. 104-1 at 14 (citing *Satija v. Permanent Gen. Assurance Corp. of Ohio,* 2014 WL 1664557, at *6 (N.D. Ohio Apr. 25, 2014 (qouting *Balsely v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012))), it obviously misunderstands Sixth Circuit authority regarding the *meaning* of that term.  In *Balsley*, the court decided, (for the first time in the Sixth Circuit) whether a copyright owner's burden of proving gross revenue requires that he or she demonstrate some sort of relationship between the infringement and the gross revenue. 691 F.3d at 768. It explained:

> Based on the plain language of the statute, we therefore reject Defendant's contention that it is Plaintiffs' burden to prove that Defendant profited from the [copyrighted work], or to prove which portions of [infringer's] profit, if any, are attributable to the [copyrighted work]. Plaintiffs have only one requirement: to prove Defendant's gross revenue. We agree with our sister Circuits in holding that this gross revenue number must have a reasonable relationship—relevance, in other words—to the infringing activity. By requiring that the gross revenue number put forth by the copyright owner has a reasonable relationship to the infringing activity, ***we do not raise the burden on copyright owners beyond that outlined by the plain language of the statute. It is merely an implicit, common-sense element of proving gross revenue***.

*Id.*, at 769-70 (emphasis added).

Revenue from the sales of VC in the Accused Video Games *easily* exceeds this threshold of being *relevant* to Defendants' infringement through the Accused Video Games. In fact, VC is not just *relevant* to the infringing works*; it is an element of the Accused Video Games.* ██████

███████████████████████████████████████████, *see*, *e.g*., Deposition of James

Malackowski (Exhibit H) 133:23–134:5; 135:20–136:2, – ████████████████████

███████████████████████████████████████ *See Id.* at 128:6–

129:16. It has no utility, value or meaning *outside* the Accused Video Games. Put simply, VC is not just relevant to the Accused Video Games, it is *part of* the Accused Video Games.

Take-Two's contention that VC is not reasonably related because it cannot be used to purchase the Asserted Tattoos, Dkt. No. 104-1 at 2; 3, is laughably irrelevant.  Were that the standard, only revenue from sales confined to *verbatim* copies of infringed works could be subject to disgorgement under the Copyright Act.  That is not the law, 17 U.S.C. § 504, and Take-Two knows it. Furthermore, "any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff," *Balsley*, 691 F.3d at 769 (citing *Andreas v. Volkswagen of Am., Inc.,* 336 F.3d 789, 795 (8th Cir. 2003)), and "[w]here there is a commingling of gains, [the defendant] must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him.") *Id.* (citing *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940)).

Not only does Take-Two (tellingly) not cite *Balsley* in its memorandum*,* but its argument that the revenue from sales of VC is comparable to the revenue from sales of insurance products in *Satija* is pointedly misleading. In *Satija*, the court found that revenue from sales of defendant's insurance products had only a tenuous link to the allegedly infringing use of a "General" character *in advertisements* for defendant's advertised products. In sharp contrast, VC is earned, purchased, and redeemed *in and as part of the infringing works themselves* (the Accused Video Games). It has no purpose or use *other* than as part of the infringing works. Unequivocally, the revenue from the sales of VC is "reasonably related" to Take-Two's infringement of the Asserted Copyrights and Defendants' baseless attempt to exclude Mr. Malkiewicz's opinions based on his recognition of that fact should be rejected.

2. *Mr. Malkiewicz's Disgorgement Analysis is Consistent with the Copyright Act*

Take-Two also argues that Mr. Malkiewicz's disgorgement analysis is procedurally "contrary to the Copyright Act." Dkt. No. 104-1, heading at 9. As discussed above, under 17 U.S.C. § 504(b), "the copyright owner is required to present proof ***only of the infringer's gross revenue*** …" (emphasis added). Not only is it *per se **the infringer's*** burden to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted works, 17 U.S.C. § 504(b), but there is absolutely nothing in the Copyright Act or Take-Two's cited authorities to suggest that Mr. Malkiewicz's analysis was improper. In fact, Take-Two's own authorities *explicitly* contradict its assertions. *On the very same page of Navarro v. Procter & Gamble Co.* that Take-Two cites to this Court in support of its bald assertion that "17 U.S.C. § 504(b) sets forth *a **three**-step process,*" Dkt. No. 104-1 at 9 (emphasis added), the *Navarro* opinion *actually* states, *verbatim*, that "[t]he calculation of profit-based damages is *a **two**-step process.*" 501 F. Supp. 3d. 482 at 488 (citing *Balsley*, 691 F.3d at 767-69) (emphasis added). According to the <u>two-step</u> process set forth in *Navarro*:

- ***First***, "the copyright owner must identify the part of an infringer's gross revenues that bears a 'reasonable relationship' to the alleged infringement"; and

- ***Second***, "once the copyright owner has identified the appropriate revenues, the burden shifts to the infringer to demonstrate what part if any, of those revenues are not profits attributable to the infringement."

*Id.*

*Navarro* goes on to explain that the infringer can demonstrate what part of the revenues identified by the copyright owner are not profits attributable to the infringement in two ways, but *does not*, as Take-Two suggests, require that these "ways" be conducted in a particular order. *See Id*.

13

Disgorgement of profits is a form of equitable relief designed to deprive infringers of the proceeds of their wrongful conduct. *See Gavriles v. Verizon Wireless*, 194 F.Supp.2d 674, 681 (E.D. Mich. 2002) (citing *S.E.C. v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985)). Mr. Malkiewicz's analysis of Take-Two's profits is entirely consistent with this purpose in that it uses standard economic frameworks to assess and calculate the value to Take-Two of realistically depicting tattoos on player avatars in the Accused Video Games. It does so based on the economics of Take-Two's business and financial information produced by Take-Two in this case and disclosed by it to the Securities and Exchange Commission and investors, and is consistent with both the Copyright Act and the economic reality of Take-Two's unjust enrichment.

In his Rebuttal Report (responding to documented deficiencies in the opinions presented by Take-Two's damages expert, Mr. Malackowski), Mr. Malkiewicz evaluates how much less revenue Take-Two would have generated from the sales of the Accused Games *without* realistic depictions of tattoos on player avatars (including copies of the six Asserted Copyrights at issue in this case). Next, Mr. Malkiewicz evaluates what costs Take-Two would have avoided had it *not* made these extra sales and generated revenues from the realistic depictions of tattoos on player avatars. The difference between the extra revenues that Take-two earned from the realistic depictions of tattoos on in-game avatars and the costs it would have avoided had it not made these extra sales is the actual economic measure of enrichment by Take-Two from the realistic depiction of tattoos on player avatars in the Accused Video Games.[9]

Thus, the opinions in Mr. Malkiewicz's Rebuttal Report represent an economically sound evaluation of Defendant's profits attributable to Take-Two's realistic depictions of tattoos on

---

[9] Given the specifics of this case, applying these steps in reverse, as Take-Two suggests, would be a mistake as a matter of logic, economics, and the financial reality (as explained by Mr. Malkiewicz in his deposition and Reports) associated with Take-Two's unjust enrichment in this case, and would not aid the trier of fact in assessing the magnitude of damages to which Mr. Hayden is entitled.

player avatars, including the Asserted Copyrights. Contrary to Take-Two's suggestion, Mr. Malkiewicz neither increased nor decreased Take-Two's profits correctly apportioned to include only those profits attributable to Take-two's realistic depictions of tattoos on in-game avatars. Instead, he calculated the profit that Take-Two *actually realized* from realistically depicting tattoos on in-game avatars.

Furthermore, with respect to Take-Two's arguments that in his rebuttal report, Mr. Malkiewicz "presented a brand new calculation of Take-Two's profits attributable to the depiction of the Tattoos in *NBA 2K,*" Dkt. No. 104-1 at 3, and that "[t]he resulting partial apportionment is therefore not reliable and has the propensity to mislead the jury," *id.* at 2, Take-Two again attempts (just as it did in its Opposition to Plaintiff's Motion to Exclude Untimely Disclosed Reports, Dkt. No. 66) to blame Mr. Malkiewicz for not meeting *Defendants'* own burden to provide a calculation of correctly and reliably apportioned profits. Mr. Malkiewicz's opinions (even when described by Take-Two as somehow "partial") about the value of realistic depictions of tattoos and the Asserted Copyrights are reliable, well-supported, fully-articulated, and timely disclosed *in rebuttal* to Take-Two's expert's flawed analysis.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff, James Hayden, respectfully requests that the Court deny Take-Two's request for relief.

Dated: November 22, 2021                    Respectfully submitted,


                                            By: */s/ Andrew Alexander*_____

                                            John S. Cipolla (Ohio Bar No. 0043614)

                                            Daniel McMullen (Ohio Bar No. 0034380)

                                            Andrew Alexander (Ohio Bar No. 0091167)

                                            Dustin Likens (Ohio Bar No. 0097891)

                                            CALFEE, HALTER & GRISWOLD LLP
                                            The Calfee Building
                                            1405 East Sixth Street
                                            Cleveland, Ohio 44114-1607
                                            Telephone: (216) 622-8200
                                            Facsimile: (216) 241-0816
                                            jcipolla@calfee.com
                                            dmcmullen@calfee.com
                                            aalexander@calfee.com
                                            dlikens@calfee.com

                                            *Of Counsel*

                                            Kimberly A. Pinter (Ohio Bar No. 0084277)
                                            CALFEE, HALTER & GRISWOLD LLP
                                            The Calfee Building
                                            1405 East Sixth Street
                                            Cleveland, Ohio 44114-1607
                                            Telephone: (216) 622-8200
                                            Facsimile: (216) 241-0816
                                            kpinter@calfee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's Electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

/s/ Andrew Alexander
One of the attorneys for Plaintiff