**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES HAYDEN, | ) | Case No. 1:17-cv-02635 |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| vs. | ) | |
| | ) | **PUBLIC VERSION—REDACTED** |
| 2K GAMES, INC. and TAKE-TWO | ) | |
| INTERACTIVE SOFTWARE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................... 1

II.  STATEMENT OF MATERIAL FACTS .............................................................. 3

III.  LAW AND ARGUMENT ..................................................................................... 7

  A.  Take-Two's copying is not fair use ................................................................... 7

    1.  Factor One: The Purpose and Character of the Use, Including Whether Such Use is of a Commercial Nature or is for Nonprofit Educational Purposes................................................. 8

      a)  Take-Two does not—and cannot—dispute that its copying is commercial ................ 9

      b)  Take-Two's copying is not transformative—Take-Two copied the Asserted Works precisely and in their entirety .......................................................................................... 11

    2.  Factor Two: The Nature of the Copyrighted Work ...................................................... 14

    3.  Factor Three: The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole ............................................................................................. 16

    4.  Factor Four: The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work ............................................................................................................... 17

  B.  Take-Two cannot show that its copying was authorized and there are many disputed issues of fact regarding the so-called "implied license." ............................................... 19

  C.  Take-Two's copying is not *de minimis* .............................................................. 24

  D.  The Lion and Brother's Keeper tattoos contain protectable original expression, which Take-Two admittedly copied ................................................................................... 28

  E.  Mr. Hayden is entitled to statutory damages and attorneys' fees ....................... 30

IV.  CONCLUSION .................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Cases**

*Alexander v. Take-Two Interactive Software, Inc.*, 489 F. Supp. 3d 812 (S.D. Ill. 2020) .................. passim

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d. Cir. 1994) ................................................ 18

*Balsley v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012) .......................................................................... passim

*Bell v. Willmott Storage Services, LLC*, 12 F.4th 1065 (9th Cir. 2021) ...................................................... 25

*Bouchat v. Baltimore Ravens Ltd. Partnership* , 737 F.3d 932 (4th Cir. 2013) .......................................... 14

*Byler v. Air Methods Corp.*, 823 Fed. Appx. 356 (6th Cir. 2020) ............................................................. 24

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...................................................................... 12

*Cotter v. Christus Gardens, Inc.*, No. 99-5996, 2000 U.S. App. LEXIS 33473 (6th Cir. Dec. 12, 2000).. 30

*Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086 (C.D. Cal. 2011) ............................................. 20

*Design Basics, LLC v. Petros Homes, Inc.*, 240 F. Supp. 3d 712 (N.D. Ohio 2017) .................................. 15

*ECIMOS, LLC v. Carrier Corp.*, 791 F.3d 616 (6th Cir. 2020) ......................................................... 24, 26

*Empire Medical Review Services, Inc. v. Compuclaim, Inc.*, 326 F. Supp. 3d 685 (E.D. Wis. 2018) ........ 23

*FenF, LLC v. Healio Health Inc.*, Case No. 5:08CV404, 2009 WL 10688713 (N.D. Ohio Sep. 4, 2009). 20

*Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821 (9th Cir. 2001) ................................................... 21

*Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183 (2021) ................................................................. 15

*Gordon v. Nextel Communications and Mullen Advertising, Inc.*, 345 F.3d 922 (6th Cir. 2003) ........ 24, 25

*Graham*, 448 F.3d at 609 ...................................................................................................................... 14

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ............................................ 15, 17

*Hiller, LLC v. Success Group Int'l Learning Alliance, LLC*, 976 F.3d 620 (6th Cir. 2020) ..................... 28

*Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998) ........................................................................ 19, 21, 30

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ......................................................................... 8

*Kohus v. Mariol*, 328 F.3d 848 (6th Cir. 2003) ...................................................................................... 7

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004) .......................... 13

*Malibu Media, LLC v. Pontello*, Case No. 13-12197, 2013 WL 12180709 (E.D. Mich. Nov. 19, 2013) .. 20

*Medical Mutual of Ohio v. Air Evac EMS, Inc.*, 341 F. Supp. 3d 771 (6th Cir. 2018) .............................. 24

*Monster Communications, Inc. v. Turner Broadcasting System, Inc.*, 935 F. Supp. 490 (S.D.N.Y. 1996) 14

*Murphy v. Lazarev*, 589 Fed. Appx. 757 (6th Cir. 2014) ........................................................................ 20

*Niemi v. Am. Axle Mfg & Holding Inc.*, No. 05-74210, 2008 U.S. Dist. LEXIS 25995 (E.D. Mich. Mar. 31, 2008) ........................................................................................................................................... 30

*Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56 (1st Cir. 2020) ............................................ 22

*Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996) ....... passim

*Pytka v. Van Alen Jr.*, Civ. A. No. 92-1610, 1992 WL 199833 (E.D. Pa. Aug. 11, 1992) ........................ 23

ii

*Reinicke v. Creative Empire LLC*, 38 F. Supp. 3d 1192 (S.D. Cal. 2014)......................................... 22

*Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997).................................... 28, 29

*Snap-on Business Solutions Inc. v. O'Neil & Associates, Inc.*, 708 F. Supp. 2d 669 (N.D. Ohio 2010)...... 7

*Solid Oak Sketches, LLC v. 2K Games, Inc.,* 449 F. Supp. 3d 333 (S.D.N.Y. 2020) .................... 13, 22, 28

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)...................................... 17

*Thomas v. Cohen*, 453 F.3d 657 (6th Cir. 2006)................................................... 7

*Viacom Intern. Inc. v. Fanzine Intern. Inc.*, 2000 WL 1854903 ........................................... 23, 24

*Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094 (6th Cir. 1984) ................................ 7

*Winfield Collection, Ltd. v. Gemmy Indus., Corp.*, 147 Fed. Appx. 547 (6th Cir. 2005) ................... 15, 16

*Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574 (6th Cir. 2007) ......................... passim

**Statutes**

17 U.S.C. § 106................................................................................................ 19, 25

17 U.S.C. § 107................................................................................................ 8, 13, 18

Plaintiff James Hayden ("Mr. Hayden") submits this brief in Opposition to 2K Games, Inc. and Take-Two Interactive Software, Inc.'s ("Defendants'" or, collectively, "Take-Two's") Motion for Summary Judgment ("Motion").

## I.    INTRODUCTION

Tattoos do not naturally appear on an individual's skin, like scars or freckles. Tattoos are works of art, created and inked by tattoo *artists* and represent the *artists'* expression. Like any visual work, tattoos may vary in subject matter and style, but *no* person—including no NBA player—bears a tattoo unless and until a tattoo artist has created and inked it. Tattoos are visual works of art and, like any other, are entitled to copyright protection under the Copyright Act.

James Hayden is an accomplished, well-known visual artist based in Cleveland, Ohio. Mr. Hayden made a name for himself through his expressive works of visual art, including tattoos and graphic murals. For twenty years, people have sought Mr. Hayden's work, traveling near and far to visit his tattoo studio. Mr. Hayden developed a reputation as a "go-to" tattoo artist among professional athletes, including some of the most notable players in the National Basketball Association ("NBA") (LeBron James, Kyrie Irving, and Shaquille O'Neil, to name a few). He has also been recognized in the media as one of the best tattoo artists in the country. (Dkt. # 33-1.) He is an accomplished artist, recognized for his talent.

The U.S. Copyright Act defines and protects the rights of creators of original works of authorship like tattoo artists. Mr. Hayden created, inked, and owns copyrights in the six tattoos he asserted in this case,[1] which he inked on LeBron James, Tristan Thompson, and Danny Green—all professional NBA players (the "NBA Players"). Take-Two has repeatedly re-created

---

[1] The "Asserted Works" are the *Gloria*, *Lion*, *Stars*, *Scroll*, *Fire*, and *Brother's Keeper* tattoos described *infra* at pp. 3–5.

the Asserted Works in their entirety in producing its NBA 2K video games[2] and distributed and

sold ██████████████████ *without* Mr. Hayden's authorization (express or implied). Take-

Two's much-professed devotion to "realism" in service of its ██████████████ commercial

enterprise does not somehow abrogate Mr. Hayden's rights. Defendants' copying is profoundly

**not** "fair."



Rather than pay Mr. Hayden to copy his works—█████████████████████████████

█████████████████████████████████—Take-Two chose to

knowingly infringe Mr. Hayden's rights. This is because Take-Two evidently disdains the work

and rights of tattoo artists (calling Mr. Hayden a mere "technician" and his works "common

tropes")[3] and believed ████████████████████████████████

██████████████████████████████████████████

████████████████████████████[4] Take-Two's palpable contempt for Mr.

Hayden, however, cannot excuse its willful infringement.

Take-Two goes to great lengths to ***re-create*** (not merely copy) the Asserted Works and

ensure that the re-creations are *exact* and *observable* in its Accused Games. The uncontroverted

facts demonstrate the substantial commercial value tattoos, including the Asserted Tattoos, add

to the Accused Games. Moreover, the factual record is replete with evidence undermining Take-

Two's affirmative defenses. This deep record of evidence, *at minimum*, creates many material

factual disputes that preclude summary judgment in Take-Two's favor. Take-Two's use is not

---

[2] The "Accused Games" in this case are NBA 2K16–NBA 2K22, and 2K Mobile. Take-Two disputes that NBA 2K21 and NBA 2K22 are at issue in this case and has excluded those games from its Motion. Take-Two has no basis to exclude these games from the case, even asserting in its Brief that "each version of *NBA 2K* is the same basketball simulation game, using the Tattoos in the same way in each edition." (Memorandum of Law ("Brief"), Dkt. # 95-1, p. 30 (internal quotations omitted).)
[3] Jablonski Report, Dkt. # 85-2, ¶ 33; Brief, p. 2.
[4] Take-Two personnel knew that their internal development team was recklessly misappropriating Mr. Hayden's IP rights, ███████████████████████████ (Ex. A-21.)

"fair"—Take-Two is exploiting Mr. Hayden's Asserted Works in a commercial entertainment product; Take-Two adds *nothing* to the Asserted Works that would make its use transformative. Nor is Take-Two's use *de minimis*. Each of the Asserted Works are appropriated *en toto* and observable and recognizable in each of the Accused Games. Finally, Mr. Hayden conveyed no implied license to the NBA Players that would allow them to sublicense the Asserted Works to a third-party video game developer for re-creation in a commercial entertainment product—indeed Mr. James's own management team has asked Mr. Hayden several times to release his rights to his tattoos for use in commercials and movies. Accordingly, Take-Two's motion for summary judgment should be denied.

## II.     STATEMENT OF MATERIAL FACTS

### *The Asserted Works*

From 2007 to 2012, James Hayden inked multiple tattoos on LeBron James, Tristan Thompson, and Danny Green. (Ex. A-36.) Mr. Hayden procured copyright registrations on six of these tattoos, which are asserted in this case. (Dkt. Nos. 93-5–10.)

Mr. Hayden created and inked the *Gloria* (2007), *Stars* (2008), and *Lion* (2008) tattoos on Mr. James over several sessions at his tattoo shop in Cleveland Ohio. (Ex. A-36.) Although Mr.



James provided the general ideas for *Gloria*, (i.e., he wanted his mother's name and a new lion) and *Lion* (he wanted "something similar" to a playing card he provided), Mr. James gave Mr. Hayden the artistic freedom to express these ideas as original tattoos. (Ex. B, Hayden Decl., ¶ 9; Ex. A-36.) Mr. Hayden conceived of the *Stars* tattoo with Mr. James's only instructing that he



3



wanted "to add something to his upper shoulder." (Ex. A-17, Hayden Dep., 74:2.) Mr. Hayden drew all three on Mr. James freehand with a marker then inked them. (Ex. A-36.).

Mr. Hayden created and inked the *Scroll* and *Fire* tattoos on Mr. Green in 2012. (*Id.*) Mr. Green gave Mr.



Hayden the artistic freedom to ink additional tattoos on his shoulder and inner arm, which already had tattoos on them. (*Id.*; Ex. B, ¶ 10.) Mr. Hayden free-handed the *Fire* tattoo with the tattoo gun, which consisted of expressive flames and other designs. (Ex. A-36.) For the *Scroll* tattoo, Mr.



Hayden conceived of and inked cloud-like designs and angels around the preexisting tattoo and added additional shading and other elements. (*Id.*)

Mr. Hayden created and inked the *Brother's Keeper* tattoo on Tristan Thompson in 2012. (*Id.*) Mr. Thompson requested a tattoo on his chest, and Mr. Hayden drew on the design for the *Brother's Keeper* tattoo freehand with a marker then inked it. (*Id.*) One of Mr. Hayden's inspirations was Michelangelo's ceiling mural in



the Sistine Chapel, but Mr. Hayden created the tattoo through his artistic decisions and actions embodying countless expressive elements. (Ex. B, ¶ 9.)

4

Indeed, all these tattoos required countless artistic decisions and actions, progressing from concept to execution.[5] The skill and unique style of Mr. Hayden in creating and applying these images on irregular, three-dimensional surfaces is manifested in all the Asserted Works.

When Mr. Hayden created and inked the Asserted Works, *none* of the Players mentioned that they appeared in video games or that they planned to authorize a third-party to re-create the tattoos in video games. (Ex. B, ¶ 27.) Nor did Mr. Hayden even *know* that avatars of the Players appeared in video games. (*Id.* at ¶¶ 27, 30; Ex. A-17, 51:9–12.) Mr. Hayden simply did not—and *could* not—grant the scope of implied license Defendants allege: authorizing the Players to sublicense the Asserted Works to *a third-party* to re-create the tattoos in video games.

### The Accused Games

Take-Two develops and sells NBA simulation video games called *NBA 2K*. Take-Two releases a new *NBA 2K* game each year that adds new features, gameplay, enhanced graphics, and updated rosters. (Ex. A-39.) Take-Two generates immense revenue from these games— indeed, ███████████████████████ (Ex. A-40, ¶ 114.[6]) Take-Two goes to great lengths and expense to accurately portray the NBA players, teams, and arenas. This includes generating digital avatars of each NBA player down to the last detail, including verbatim copies of tattoos on players. This is not incidental—████████████████████████████████ ███████████████████████████████████████████.[7]

---

[5] Ex. A-17, Hayden Dep., 57:8–60:12, 72:8–75:22, 81–89:22, 92:20–97:8, 98:21–102:4, 113:5–120:13, 122:16–124:19; Ex. A-18, Tovanche Dep., 179:24–181:2.; Ex. A-19, Jonathan Hayden Dep., 182:8–19; Ex. A-8, Thomas Dep., 170:1–172:17.

[6] *Citing* Ex. A-41, (TAKE-TWO_00006143–6153), other Take-Two documents, and publicly available documents (including SEC filings).

[7] Ex. A-42, Lenzo Report, ¶¶ 21, 40–63; *see also*, Ex. A-10, Stauffer Dep. 22:22–23:13; Ex. A-15, Malackowski Dep., 43:23-25, 45:1-3, 9-12, 48:24-25–49:1-5.; Ex. A-7, Argent Dep., 57:16–19, 260:3–261:9; Ex. A-12, Dawson Dep., 84:12–85:7.



This process results in each of the Asserted Works appearing in each of the Accused

Games exactly as created by Mr. Hayden.[10] Take-Two does not dispute that it copied each

---

[8] Brief, p. 9; Ex. A-34; Ex. A-23; Ex. A-22; Ex. A-12, Dawson Dep., 46:23–24; Ex. A-8, Thomas Dep., 88:22–91:5, 153:2–8, 184:7–195:7.
[9] Ex. A-12, Dawson Dep., 52:3-13; Ex. A-9, Friesch Dep., 30:4–36:22, 37:13-46:7; Ex. A-13, Zhang Dep., 43:16–47:20, 48:11-16, 55:4–57:10; Ex. A-8, Thomas Dep., 88:22–91:5, 148:8–149:8, 160:15–161:1, 223:1–234:18; Ex. A-23; Ex. A-25; Ex. A-43.
[10] See Ex. A-37, Defendants' Responses to Requests for Admission Nos. 46–93, 96, 102, 104; Answer, Dkt. # 35, ¶¶ 112, 120, 128, 135, 142; Ex. A-8, Thomas Dep., 159:22–160:5.

6

Asserted Work *precisely* and *in full* in developing each Accused Games.[11] While Take-Two may contest the *degree* to which the Asserted Works are "observable" in play of the Accused Games, it does not deny that *Gloria*, *Stars*, *Fire*, and *Scroll* can all be seen in their entirety in certain game modes (*e.g.*, when using the instant replay feature).[12]

## III.    LAW AND ARGUMENT

The Sixth Circuit has held that courts should only grant summary judgment in favor of copyright infringement defendants "sparingly." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003); *see also Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984) (same). Summary judgement is only appropriate in cases where there "is no genuine issue as to any material fact." *Snap-on Business Solutions Inc. v. O'Neil & Associates, Inc.*, 708 F. Supp. 2d 669, 675 (N.D. Ohio 2010). The burden rests on Take-Two, the moving party, to establish an *absence* of any genuine issue of material fact. *Id.* The court must "view[] the factual evidence and draw[] all reasonable inferences *in favor of the nonmoving party*," *id.* (*citing Thomas v. Cohen*, 453 F.3d 657, 660 (6th Cir. 2006)) (emphasis added), here, Mr. Hayden.

### A.    Take-Two's copying is not fair use.

Take-Two's copying is the antithesis of fair. Take-Two's unauthorized copying fails each of the factors set forth in the Copyright Act for determining fair use—factors that Take-Two misconstrues and misapplies in its brief supporting its Brief. At minimum, Take-Two relies on numerous facts in dispute. Thus, summary judgment is inappropriate, and Defendants Motion should be denied. First, Take-Two's use is unquestionably ***commercial***. Take-Two makes ▪▪▪▪▪▪▪▪▪▪▪ selling its Accused Games. Second, Mr. Hayden's Asserted Works are visual

---

[11] *Id.*

[12] *Id.*; *see also, e.g.*, Ex. A-9, Freisch Dep., 72:15–77:13, Ex. 4 (16:36); Ex. A-14, Jablonski Dep. 251:1–258:8, Exs. 9–14.

*artworks*—the *core* of what the Copyright Act protects. Third, Take-Two re-created and adapted **exact copies** of the Asserted Works **in full** in each of the Accused Games. And fourth, Take-Two's voluminous copying **impairs the value** of Mr. Hayden's work, depriving him of licensing fees to which he is entitled *and has received on numerous occasions from other parties.*

The Copyright Statute created the "fair use" exception to "preserve the potential future use of artistic works for purposes of teaching, research, criticism, and news reporting." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003); 17 U.S.C. § 107 ("criticism, comment, news reporting, teaching . . ., scholarship, or research."). In determining fair use, the Copyright Act (§ 107 ) provides four factors that courts are to consider:

1. The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2. The nature of the copyrighted work;

3. The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4. The effect of the use upon the potential market for or value of the copyrighted work.

Take-Two has the burden to prove its use was fair under these four factors. *See Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1390 fn. 5 (6th Cir. 1996). However, Take-Two notably *omits* the actual language of these factors in its Brief. Because the facts in this case do not support a fair use finding, and at the very least raise multiple issues of disputed material fact, Take-Two's summary judgment motion should be denied.

    1. <u>Factor One: The Purpose and Character of the Use, Including Whether Such Use is of a Commercial Nature or is for Nonprofit Educational Purposes.</u>

In assessing the first factor, courts look to whether the infringing work is "transformative" and whether it is for "commercial or noncommercial purposes." *Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 582 (6th Cir. 2007). Take-Two's

Accused Games are no doubt a commercial entertainment product. Take-Two does not contest this point. (Brief, p. 15.) Rather, Take-Two labels its verbatim copying as "transformative," using a contrived theory outside the scope of the Copyright Act's fair use exception. (*Id.*)

       a) *Take-Two does not—and cannot—dispute that its copying is commercial.*

Where the purpose of copying is to "profit from the exploitation of the copyrighted material without paying the customary price," the Sixth Circuit routinely finds no fair use. *Balsley v. LFP, Inc.*, 691 F.3d 747, 758 (6th Cir. 2012); *see also, e.g.*, *Zomba*, 491 F.3d at 582 and *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1383 (6th Cir. 1996) ("commercial exploitation of the copyrighted materials did not constitute fair use").

In its Brief, Take-Two glosses over its commercial purpose. Take-Two admits, however, that it makes verbatim copies, in full, of Mr. Hayden's Asserted Works in the Accused Games. (*See, e.g.*, Answer, Dkt. #35, ¶¶ 130, 138, 146; *see also infra* at p. 7, fn. 12.) ████████████ ████████████████████████████████████████████████████████ (Ex. A-40, pg. 5.[13]) Take-Two's copying is unquestionably commercial in nature.

Take-Two's sole basis for discounting the weight of this factor is its unfounded claim that "there is no link between the sales of the *NBA 2K* video games and their depiction of the tattoos." (Brief, p. 15.) But this is contradicted by the overwhelming facts, Take-Two's own claims, internal documents, and several expert witnesses' testimony.[14] Indeed, Take-Two *itself* argued to this Court that its "important new creative product [] *would not exist*" without the "use of the Tattoos." (Brief, p. 2, emphasis added.) At minimum, Take-Two's "no link" argument raises a substantial factual dispute, and therefore, Defendants' Motion should be denied.

---

[13] *Citing* Ex. A-41, TAKE-TWO_00006143–6153, other Take-Two documents, and publicly available documents (including SEC filings) and not including revenue for NBA 2K22.

[14] Exs. A-22–30; Ex. A-45, Bilgicer Rebuttal Report, ¶ 80; Ex. A-46, Malkiewicz Rebuttal Report; Ex. A-7, Argent Dep., 118:8–119:7; 260:15–261:9; Ex. A-15, Malackowski Dep., 43:23–25, 45:1–3, 45:9–12, 48:24–49:5.

Both parties agree that an essential value of Take-Two's Accused Games is their "realism."[15] ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Each of these assets—like Mr. Hayden's Asserted Works—contributes to the "realism" that Take-Two prizes so highly, as well as to the enormous profits it generates thereby. (Ex. A-42, ¶¶ 41–47.)

Indeed, Take-Two's copying and exploitation of the Asserted Works in the Accused Games is no different than with other IP assets, ████████████████████████

████████ (*Id.* at ¶¶ 48–52.) ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ This is because Take-Two's customers notice and demand it. For example, Twitter users have expressed their displeasure to Take-Two staff when the Accused Games are missing tattoos: "Players are very outdated and inaccurate . . . People are missing tattoos . . . ." (Ex. A-10, at Ex. 4.) Another Twitter user noted that "these small attention to details are very important . . . ." (*Id.*) ████████████████████████████

████████████████████████████████████████████████████

---

[15] Ex. A-42, Lenzo Report, ¶¶ 21, 40–63; *see also*, Ex. A-10, Stauffer Dep. 22:22–23:13; Ex. A-15, Malackowski Dep., 43:23-25, 45:1-3, 9-12, 48:24-25–49:1-5.; Ex. A-7, Argent Dep., 57:16–19, 260:3–261:9; Ex. A-12, Dawson Dep., 84:12–85:7.
[16] Ex. A-42, Lenzo report, ¶ 35; Ex. A-32; Ex. A-38; Ex. A-7, Argent Dep., 126:13–127:6; 313:1–11; Ex. A-11, Brody Dep., 176:11–20.



Take-Two's own words and documents contradict its claim that "there is no link between the sales of the *NBA 2K* video games and their depiction of the tattoos." Take-Two's sweeping pronouncement relies solely on one deeply flawed survey report from Dr. Deborah Jay. Mr. Hayden's survey expert, Dr. Bilgicer, identified a multitude of significant flaws in her survey. (Ex. A-45, ¶¶ 19–45; Jay Daubert Motion, Dkt. # 88.) In response, Dr. Bilgicer designed a similar survey that *corrected* Dr. Jay's errors and demonstrated there is indeed a link between Take-Two's sales and the tattoos it depicts in its games. (Ex. A-45, ¶¶ 46–80.) Take-Two knows this, which is why it devotes significant resources to ensuring their accuracy and observability. Take-Two's copying of the Asserted Tattoos is commercial in nature. At the very least there are substantial factual disputes on this issue. Take-Two's Motion should be denied.

> b) *Take-Two's copying is not transformative—Take-Two copied the Asserted Works precisely and in their entirety.*

In cases where a new work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message," courts may find the use "transformative" and thus more likely fair. *See Zomba*, 491 F.3d at 582 (*quoting Campbell v.*

---

[17] Ex. A-26 (emphasis added) ; *see also* Ex. A-27; *see also* Ex. A-8, Thomas Dep., 270:21–271:17.
[18] *See also*, Ex. A-7, Argent Dep., 260:3–261:9 (███████████████████████").

*Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). Verbatim or facsimile copies of a work, conversely, "add[] nothing new to the original and accordingly ha[ve] virtually no transformative value." *Id.* at 582; *see also Princeton Univ.*, 99 F.3d at 1389 and *Balsley*, *v. LFP*, Inc., 691 F.3d 747, 759 (6th Cir. 2012). "Where 'an original work is merely retransmitted in a different medium' . . . the work is not 'transformative.'" *Balsley*, 691 F.3d at 759.

Take-Two's verbatim reproductions of Mr. Hayden's Asserted Works add nothing new—the tattoos are not altered in any way and they do not contain any new expression, meaning, or message. Indeed, Take-Two takes great pains to insure they ***do not.***[19] Nonetheless, Take-Two argues that its purpose—to accurately portray the players—is somehow different than Mr. Hayden's purpose in creating and inking the tattoos. (Brief, p. 2, 12–13.) This is mere sophistry. Take-Two's purpose in "accurately portray[ing] the players" means (necessarily) accurately portraying the *tattoos*. Take-Two's purpose is to display the tattoos—copying them as precisely and accurately as possible—on the players' bodies. This is the *same* purpose Mr. Hayden had in creating and inking the tattoos. (Ex. B, Hayden Decl., ¶¶ 3, 12.)

The fact that Take-Two is re-creating the Asserted Works in a new entertainment product does not make its verbatim copying "fair." In *Zomba*, a karaoke company recreated copyrighted musical works using different musicians, added graphics, and sold the videos for karaoke entertainment. 491 F.3d 574, 578 (6th Cir. 2007). Despite such efforts to recreate accurate versions of the songs in a different entertainment product, which added graphics, the Sixth Circuit held the use was not transformative. Noting that "a facsimile recording of a copyrighted composition adds nothing new to the original and accordingly has virtually no transformative value," *Zomba*, 491 F.3d at 583 (internal quotations omitted), the Sixth Circuit held that the

---

[19] *See supra* at pp 5–7; Ex. A-9, Friesch Dep., 127:8–19, *see also*, 47:4–48:18; Ex. A-10, Stauffer Dep., 4:9–10; Ex. A-7, Argent Dep., 69:3–7, 70:9–20; Ex. A-8, Thomas Dep., 89:1–2.

12

defendant's copying "was performed on a profit-making basis by a commercial enterprise," and thus the first factor weighed against fair use. *Id.* at 583. The same reasoning applies here. Take-Two's claim that it should be allowed to re-create verbatim copies of Mr. Hayden's Asserted Works because its goal is to accurately portray the tattoos in a commercial entertainment product is *not* what Congress set forth in its fair use exception for "purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research." 17 U.S.C. § 107.

The non-binding case law[20] that Take-Two cites does not support its novel fair use theory. First, in *Solid Oak Sketches, LLC v. 2K Games, Inc.*, the Southern District of New York relied heavily on asserted facts that the plaintiff there, *notably*, did *not* dispute regarding the "size of the reproductions," "whether the expressive value of the reproduced material is minimized," and "the proportion of copied material." 449 F. Supp. 3d 333, 347 (S.D.N.Y. 2020). Take-Two cites no Sixth Circuit law in which these factors are considered in the transformative use analysis. However, even if considered, Mr. Hayden has developed a deep factual record that shows that these factors weigh in his favor and, at the very least, raise disputed issues of material fact. Indeed, as set forth below (*infra* at pp. 24–28), Mr. Hayden's Asserted Works are eminently observable and recognizable, thus these factors do *not* favor fair use here.

Moreover, Take-Two presented these very same arguments in *Alexander v. Take-Two Interactive Software, Inc.*, 489 F. Supp. 3d 812 (S.D. Ill. 2020), where they were *rejected*. Based on facts and circumstances in a tattoo case similar to those here, the Court in the Southern District of Illinois denied summary judgment on fair use, reasoning that: "there is a factual

---

[20] The only Sixth Circuit case Take-Two cites is *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004), for the proposition that the "first factor favored fair use where works were used for '[different] purposes'." Take-Two does not discuss the facts of *Lexmark*, and for good reason: they are simply not applicable to this case. The plaintiff in *Lexmark* asserted copyrights in functional computer code, which the court held was not copyrightable. These facts have no applicability to this case which involves copyrighted works of art.

13

dispute in this case as to Defendants' purpose in using the tattoo works." *Id.* at 822. The similar

facts in this case preclude a finding of fair use on summary judgment.

Take-Two's reliance on *Bill Graham Archives v. Dorling Kindersley Ltd.*[21] and *Bouchat

v. Baltimore Ravens Ltd. Partneship*[22] are also misplaced. In *Graham*, the accused work was a

"biographical work documenting the 30-year history of the Grateful Dead." *Graham*, 448 F.3d at

609. The court noted that "courts have frequently afforded fair use protection to the use of

copyrighted material in biographies" because such works are considered "forms of historic

scholarship, criticism, and comment." *Id.*[23] Similarly, the accused work in *Bouchat* was directed

to the kind of "commentary" cited in the preamble to § 107: historical documentaries. *Bouchat*,

737 F.3d at 944. In contrast, ████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████[24]

The first fair use factor thus weighs against a fair use finding. At the very *least*, like in

*Alexander*, there is a factual dispute as to the purpose of Defendants' infringement and the extent

of the size and use of the copyrights and therefore the Motion should be denied.

2.   Factor Two: The Nature of the Copyrighted Work

The second factor is "the nature of the copyrighted work." While "[t]he law generally

recognizes a greater need to disseminate *factual* works than works of fiction or fantasy," *Harper

---

[21] 448 F.3d 605, 609–611 (2d Cir. 2006).

[22] 737 F.3d 932, 944 (4th Cir. 2013).

[23] Take-Two's reliance on *SOFA Entertainment, Inc. v. Dodger Productions, Inc.*, is also distinguishable. The basis for that fair use finding was that the infringed work was a "a biographical anchor," noting the historical relevance of the Four Seasons' appearance on *The Ed Sullivan Show*. *Monster Communications, Inc. v. Turner Broadcasting System, Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) is similarly distinguishable: the court explained that the work "undeniably constitutes a combination of comment, criticism, scholarship and research, all of which enjoy favored status under § 107." (internal quotations omitted).

[24] *See,* Ex. A-10, Stauffer Dep., *e.g.*, 142: 13–23; Ex. A-12, Dawson Dep., 115:12–117:18; Ex. A-8, Thomas Dep., 180:4–11; Ex. A-15, Malackowski Dep., 48:24-25–49:1-5.

14

& Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 563 (1985) (emphasis added); *see also Balsley*, 691 F.3d at 759 (same), creative works enjoy "broader copyright protection as opposed to a factual work requiring broader dissemination." *Balsley*, 691 F.3d at 759; *see also Design Basics, LLC v. Petros Homes, Inc.*, 240 F. Supp. 3d 712, 722 (N.D. Ohio 2017).

Take-Two's analysis of this factor misapplies the law and raises multiple disputed issues of fact. The second factor looks to the *type* of work that is asserted: Is it fiction or non-fiction? Is it a movie or a news broadcast? In short, does it serve an artistic rather than a utilitarian function? *See Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1197 (2021). Mr. Hayden's tattoos undoubtedly serve an artistic function and thus have "broader copyright protection as opposed to a factual work." *See Balsley*, 691 F.3d at 759. As noted in *Alexander v. Take-Two*: "The art of creating a tattoo naturally entails creative and expressive efforts." 489 F. Supp. 3d at 822 (finding the second factor weighing against fair use).[25] The facts show that the second factor favors Mr. Hayden and at the very *least* raises a substantial disputed issue of fact. Thus, Take-Two's Motion should be denied.

Further, Take-Two's *scènes à faire*, argument—that "elements that are standard, stock, or that necessarily follow from a common these or setting are not protectable"— misconstrues the law. (Brief, p. 16 (internal quotations omitted).) The *scènes à faire* doctrine does not broadly exclude from copyright protection *all* expressions of common elements.[26] The Sixth Circuit rejected this argument in *Winfield Collection, Ltd. v. Gemmy Indus., Corp.*, 147 Fed. Appx. 547, 554 (6th Cir. 2005), explaining that although the *scènes à faire* doctrine may preclude copyrights for mere abstract ideas, such as a flowing cape, curled boots, black clothing, and a broom for

---

[25] *See also*, Ex. B, ¶¶ 8–12; Ex. A-18, Tovanche Dep., 179:24–181:2; Ex. A-14, Jablonski Dep., 28:5–10, 59:19–61:5.
[26] This would be absurd. Although flowers are a common theme among painters, Monet's water lily paintings are manifestly *not* uncopyrightable *scènes à faire*.

15

depicting a witch, this does *not* excuse the exact copying of a *particular expression* of a witch. *Id.* Here, Take-Two produced exact copies of Mr. Hayden's particular artistic expressions, which is not authorized under *scènes à faire. Id.* The facts and law clearly weigh against fair use under the second factor. *At the very least*, Take-Two's arguments on the second factor raise further material issues of fact in dispute that mandate denial of Take-Two's Motion.

3. <u>Factor Three: The Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole</u>

The more of what's taken, "the greater the affront to the interests of the copyright owner, and the less likely that a taking will qualify as a fair use." *Zomba*, 491 F.3d at 583; *see also Princeton Univ.*, 99 F.3d at 1389. "[C]opying an entire work militates against a finding of fair use." *Balsley*, 691 F.3d at 760. Factor three thus clearly weighs against fair use, as Take-Two re-created each Asserted Work in *full*.[27]

Take-Two's argument that the Asserted Works are small and hard to make out is verifiably *wrong*, as shown below on pages 24–28. At a minimum, its claims about the visual appearance of the Asserted Works (size, clarity, etc.) are plainly disputed factual issues, as simple visual examination of the games themselves show. (*Infra* at pp. 24–28.) Thus, again, Take-Two's Motion should be denied. Take-Two's backup argument relies on the contention that "depicting the Tattoos [in their entirety] was necessary to achieve Take-Two's purpose of creating a realistic game." Take-Two's contention is wrong. Otherwise, *every* act of slavish copying for devotion to "realism" would be shielded by fair use. That cannot be the law. Further, Take-Two's claim that it only copied what it needed to accomplish its purpose (realism) is

---

[27] Even for the *Lion* and *Brother's Keeper* tattoos, which are partially obstructed by the jerseys displayed on the avatars of Mr. James and Mr. Thompson, ███████████████████████████████████████████████ (Ex. A-34.)

16

contradicted by its own competing assertion that the Asserted Works are mere "visual noise." (Brief, pp. 3, 9, 14, 26.) If they were only "visual noise," Take-Two should not have to copy the Asserted Works in their entirety with crystal clarity. Take-Two cannot have it both ways.

As in *Alexander v. Take-Two*, where the court held, "wholesale copying does not preclude fair use *per se*, [but] it militates against a finding of fair use," 489 F. Supp. at 822, the third factor, here, also weighs against fair use. At the *very* least (again), there are disputed issues of fact that preclude summary judgment.

4.   Factor Four: The Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work

Because Take-Two's use is commercial, it is Take-Two's burden to prove its copying does not harm the potential market for Mr. Hayden's tattoos. *Princeton*, 99 F.3d at 1385. In fact, "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Balsley*, 691 F.3d at 760 (*quoting Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)). In this Circuit, "one need only show that if the challenged use 'should become widespread, it would adversely affect the potential market for the copyrighted work.'" *Princeton*, 99 F.3d at 1386 (quoting *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 568 (1985)). Take-Two has not met its burden to prove its copying will not harm the market for Mr. Hayden's Asserted Works. Thus, this factor also weighs against fair use. At the very least, there are disputed issues of material fact with respect to this factor.

First, there is, *in fact*, an existing market for licensing the Asserted Works. Numerous companies have paid Mr. Hayden to use tattoos he has created and inked on celebrities in commercials, movies, TV shows, and on mannequins.[28] (Ex. B, ¶¶ 15–25.) Take-Two dismisses

---

[28] https://vimeo.com/9797215 (last accessed 11/22/2021).

these *actual* instances of Mr. Hayden receiving licensing revenue from his works because "***none*** of them are for video games and many do not even concern tattoos inked on people." (Brief, pg. 10, fn. 8.) Limiting the "market" to video games has no basis—Take-Two's continuing infringement harms the value of the Asserted Works. And Take-Two's claim that "many do not even concern tattoos inked on people" is both confusing and wrong. (Ex. B, ¶ 26.)

Take-Two argues that the Court should not consider potential licensing revenue in factor four, but the Sixth Circuit has rejected this. Where "the copyright holder clearly does have an interest in exploiting a licensing market—and especially where the copyright holder has actually succeeded in doing so—'it is appropriate that potential licensing revenues for []copying be considered in a fair use analysis.'" *Princeton*, 99 F.3d at 1387 (quoting *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d. Cir. 1994)). Mr. Hayden has demonstrated he has an interest in licensing his works. (Ex. B, ¶¶ 15–26.)

Second, Take-Two's assessment is purposefully too narrow, ignoring the statute's mandate to consider the "*potential* market." 17 U.S.C. § 107 (emphasis added). Contrary to what Take-Two would have this Court believe, the test is not whether there *currently* exists a market in which Take-Two licenses Mr. Hayden's works (it infringes them instead) but, rather, whether Take-Two's infringements harm the *potential* market for licensing the works. Moreover, Take-Two ignores the circularity of its argument. If Take-Two (particularly if it *is the only video game company* that currently offers a realistic simulation NBA game) simply elects to continue infringing rather than licensing Mr. Hayden's copyrights, it can virtually *insure* no such market exists. Given Take-Two's ongoing, willful infringements, it is hardly surprising that there is presently no such "market" as Take-Two defines it. Yet such self-serving conduct obviously cannot transform infringement into fair use. As expert economist Dr. Justin Lenzo explained,

18

there is a nascent market for replication of Mr. Hayden's tattoos that would further develop if Take-Two were simply to acknowledge his rights. (Ex. A-42, Lenzo Report, ¶¶ 64–94.) Accordingly, factor four weighs against fair use. At the very least, there are disputed issues of fact about the market for and impact on the value of the Asserted Works and the extent to which Take-Two's infringement has harmed same such that summary judgment is precluded.

**B.** **Take-Two cannot show that its copying was authorized and there are many disputed issues of fact regarding the so-called "implied license."**

While Mr. Hayden did not, explicitly or impliedly, authorize Take-Two to replicate and adapt his Asserted Works in the Accused Games (Ex. B, ¶¶ 14, 27–30), Take-Two claims that (1) the Players authorized Take-Two to show their likenesses, including the Asserted Works, in the Accused Games and (2) Mr. Hayden *impliedly* authorized the Players to *sublicense* the Asserted Works to third-parties for reproduction in video games. The facts simply do not support Take-Two's claims; at a minimum, many are in dispute.

First, authorization to reproduce the Asserted Works can come *only* from Mr. Hayden. A copyright owner has the *exclusive* right to *authorize others* to reproduce, distribute, display, and prepare derivative works from the copyrighted work. 17 U.S.C. § 106. Take-Two's claimed authorization from the *Players* is simply not sufficient.[29]

Second, although courts have held under certain circumstances, a copyright holder may convey a non-exclusive implied copyright license, such an implied license is "*for a particular purpose.*" *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998) (emphasis added). Implied licenses are not the norm—they are only found "in narrow circumstances." *FenF, LLC v. Healio*

[29] ████████████████████████████████

*Health Inc.*, Case No. 5:08CV404, 2009 WL 10688713, at *4 (N.D. Ohio Sep. 4, 2009).[30] "The key to finding an implied license is in the intent of the copyright holder." *Murphy v. Lazarev*, 589 Fed. Appx. 757, 765 (6th Cir. 2014).

Take-Two must prove that (1) Mr. Hayden *intended* to grant the Players an implied license *and* (2) that the license's scope included the authority to permit third parties to recreate the Asserted Works in video games. *See Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086, 1093 (C.D. Cal. 2011) ("Where a license or its terms may be implied, finding there was an implied license does not end the inquiry. We must also ask what the scope of the license was, and whether [Defendant] exceeded it.") (internal quotations omitted). Take-Two cannot carry its burden—at minimum there is a material factual dispute precluding summary judgment.

Mr. Hayden's testimony is clear: "I did not intend to give any of the athletes, LeBron James, Danny Green, or Tristan Thompson, the right to authorize third-parties to recreate the Asserted Works in video games." (Ex. B, ¶ 27.) Thus, the Players *could not* have granted those rights to Take-Two. When Mr. Hayden created and inked the Asserted Tattoos, he did not even *know* avatars of the Players appeared in video games. (*Id.* at ¶¶ 27–30; Ex. A-17, 51:9–12.) And none of the Players told Mr. Hayden such avatars would be appearing in video games or that they planned to authorize third-parties to re-create and generate derivatives of the Asserted Works in video games. (Ex. B, ¶ 27.) Mr. Hayden has "never granted a blanket license to any client that would allow them to authorize a third-party to re-create [my] works in video games." (*Id.*)

Take-Two relies on misquoted deposition testimony to support its claim that Mr. Hayden intended to grant the Players a license. (Brief, p. 6.) In fact, Take-Two quotes its *own counsel*

---

[30] *See also, e.g.*, *Malibu Media, LLC v. Pontello*, Case No. 13-12197, 2013 WL 12180709, at *3 (E.D. Mich. Nov. 19, 2013) (same).

regarding the players' need to secure permission[31] as the entire basis for its implied license theory. (Ex. A-17, Hayden Dep., 156:8–13.) Although Mr. Hayden responded, "I guess so" to the question, he was not testifying that he granted the Players a license to authorize third-parties to replicate his Asserted Works in video games. (Ex. B, ¶ 29.) This inference is unwarranted. While Mr. Hayden understood that the Players would appear on television or be photographed, he never understood, intended, or would have allowed them to sub-license third-parties to re-create and generate derivatives of his Asserted Works in video games. (*Id.*) An implied license can only exist where "the copyright owners *intended* that their copyrighted works be used *in the manner* in which they were eventually used." *Johnson*, 149 F.3d at 502 (emphases added). Mr. Hayden's intent to license or lack thereof, including Take-Two's purported scope, alone presents a material factual dispute that precludes summary judgment.

Moreover, Take-Two's claim that the "Players understood that they could . . . allow others to depict their likenesses with their Tattoos" (Brief., p. 6), is contradicted by Mr. James's conduct after he received the tattoos. Mr. James's management team asked Mr. Hayden to *release* his rights in the tattoos he inked on Mr. James, *multiple times*, including before this case, so they could be used in advertisements and movies. (Ex. B, ¶¶ 20, 23–24; Ex. B-8.) These actions by Mr. James are undisputed and cast doubt on the accuracy of Mr. James's statements about his understandings when Mr. Hayden inked the Asserted Works and, again, at least raise a disputed issue of fact regarding Mr. James's declaration.

The cases Take-Two cites to support its implied license argument are easily distinguishable. In *Foad Consulting Group, Inc. v. Azzalino*, [32] and *Reinicke v. Creative Empire*

---

[31] Take-Two counsel's question, to which Mr. Hayden's counsel objected obviously called for a legal conclusion.
[32] 270 F.3d 821, 828 (9th Cir. 2001).

*LLC*,[33] the court relied on prior written agreements to infer implied license terms covering subsequent conduct between the parties. Further, in both cases, the copyright holders knew and contemplated that the alleged infringers would use the copyrighted work in the allegedly infringing manner.[34] In Mr. Hayden's case, however, there was no written agreement[35] suggesting any terms, and Mr. Hayden did not know the Players would purportedly allow Take-Two or any other third-party to re-create his Asserted Works in video games. (Ex. B, ¶¶ 27–30; Ex. A-17, Hayden Dep. 51:9–12.) The reasoning in those cases is not applicable here.

Moreover, contrary to Take-Two's claims, Mr. Hayden's relationships with the Players were ongoing, especially with Mr. James and Mr. Green. (Ex. B, ¶¶ 13, 20, 23–24.) Mr. Hayden inked multiple tattoos on each of the players over the course of multiple sessions. (*Id.*) And Mr. James's management team has *routinely* sought Mr. Hayden's permission to use his Asserted Works in various projects. (*Id.*) These facts cut strongly *against* any finding of an implied license and at least raise disputed issues of fact regarding any purported implied license and its scope.

Take-Two also relies on the *Solid Oak* opinion to suggest that Mr. Hayden's conduct supports an implied license to the Players. But Take-Two fails to apprise the Court of a *critical,* virtually dispositive fact in *Solid Oak* **not** present here: the *tattoo artists* in *Solid Oak* submitted declarations in support of Take-Two, stating that **they—the tattoo artists themselves**—"intended the Players to copy and distribute the Tattoos as elements of their likenesses." *Solid Oak*, 449 F. Supp. 3d at 346. In stark (and similarly dispositive) contrast, Mr. Hayden did **not** intend to grant such an unfettered license and right to sub-license to the Players here. (Ex. B, ¶ 27.)

---

[33] 38 F. Supp. 3d 1192, 1195 (S.D. Cal. 2014).
[34] *Id.*
[35] Take-Two also cites *Photographic Illustrators Corp. v. Orgill, Inc.*, in support of its implied license argument, but this case, like *Foad*, involves facts in which the copyright holder entered into an initial license that "is in writing, is highly detailed, and expressly contemplates sublicensing." 953 F.3d 56, 63 (1st Cir. 2020).

The reasoning in *Alexander v. Take-Two*—a case on all fours with this one—applies directly to this case. 489 F. Supp. 3d 812, 820 (S.D. Ill. 2020). In *Alexander* (like here), the tattoo artist "testified that she has never given permission to any of her clients to use copies of her tattoo works in video games . . . ." *Id.* The court denied summary judgment, reasoning that "the evidence raises a triable issue of fact as to the existence and scope of an implied license." *Id.* The same disputes are at issue here and make summary judgment inappropriate. *See Pytka v. Van Alen Jr.*, Civ. A. No. 92-1610, 1992 WL 199833 (E.D. Pa. Aug. 11, 1992) ("In addition to the existence of a license, the scope of any implied license would be a jury question and not for the Court to decide on summary judgment."); *see also Empire Medical Review Services, Inc. v. Compuclaim, Inc.*, 326 F. Supp. 3d 685, 699 (E.D. Wis. 2018) ("simply because CompuClaim had an implied license to use the [] source code in a certain way does not necessarily mean that it could use the software however it saw fit").

In sum, Defendants Motion regarding an "implied license" should be denied because at the very least it raises disputed issues of material fact. Mr. Hayden did not know that digital avatars of the Players bearing copies of the Asserted Works would appear in video games; the Players did not tell him that their digital avatars, including tattoos, would appear in video games; and they did not tell Mr. Hayden they would (purportedly) authorize third-parties to reproduce the Asserted Works in video games. Mr. Hayden did not intend to grant any such license.[36] And Mr. James has repeatedly acted as if no such license exists.

The fact that Mr. Hayden did not "limit explicitly the scope of [the Players'] use of the [tattoos]" does not convey such a license. *Viacom Intern. Inc. v. Fanzine Intern. Inc.*, 2000 WL 1854903, at *3. "[T]his approach would place the burden on the wrong party. Permission to use

---

[36] To whatever extent Take-Two claims benefit of an implied license, such benefit could *certainly* not extend beyond the filing of Mr. Hayden's Complaint in this case.

an object embodying copyrighted work does not imply permission to copy that work." *Id.* Thus, Mr. Hayden's "failure to place explicit limitations on use of [the Asserted Works] did not give rise to an implied license to use them" in Take-Two's video games. *Id.*; *see also, e.g.*, *Medical Mutual of Ohio v. Air Evac EMS, Inc.*, 341 F. Supp. 3d 771, 780 (6th Cir. 2018) and *Byler v. Air Methods Corp.*, 823 Fed. Appx. 356, 364 (6th Cir. 2020). Defendants Motion should be denied as to an implied license because, at the very least, it raises a plethora of disputed issues of fact.

### C.      Take-Two's copying is not *de minimis*.

Take-Two's claim that its infringing conduct is *de minimis* and produces merely "visual noise" is wrong and again raises disputed issues of material fact. Take-Two commits significant time and resources to ensure the tattoos are copied *en toto* and re-created in precise form in their games. (*Supra* at pp. 5–7.) Take-Two admits in its Brief that its "important new creative product [the Accused Games]" "would not exist" without copying the Asserted Works. (Brief, p. 2.) The facts demonstrate that Mr. Hayden's Asserted Works are copied in their entirety and are observable in the Accused Games.[37] At minimum, there are facts in dispute as to how long and how frequently the Asserted Works appear, the degree to which they are observable, etc., which clearly preclude granting summary judgment in Take-Two's favor.

Because the *de minimis* use defense overlaps with the "substantial similarity" requirement, *see Gordon v. Nextel Communications and Mullen Advertising, Inc.*, 345 F.3d 922, 924 (6th Cir. 2003),[38] courts ordinarily do not recognize the *de minimis* defense where the copying is "total" or "wholesale." *Bell v. Willmott Storage Services, LLC*, 12 F.4th 1065, 1079

---

[37] Exs. A-1–A-5, A-30, A-34; Ex. A-9, Friesch Dep., 72:2–77:12, Ex. 4 (16:36); Ex. A-10, Stauffer Dep. 70:13–20; 84:22–88:5, 89:1–3, 102:12–103:10, 119:2–141, Ex. 4; Ex. A-11, Brody Dep., 152–161; Ex. A-14, Jablonski Dep. 251:1–258:8, Exs. 9–14.
[38] *See also, e.g.*, *ECIMOS, LLC v. Carrier Corp.*, 791 F.3d 616, 629 (6th Cir. 2020).

(9th Cir. 2021). ("***Wholesale copying or reproduction of another's protected work . . . by definition cannot be de minimis copying***") (emphasis added).

There is ***no*** dispute that four of the Asserted Works (*Gloria*, *Shoulder Stars*, *Scroll*, and *Fire*) are all re-created precisely and appear in full in the Accused Games.[39] (*See supra* at pp. 5–7.) Tellingly, Take-Two did not even attempt to identify a single difference between Mr. Hayden's Asserted Works and the identical copies it re-created and adapted in its games.

If the Sixth Circuit considers even wholesale copying to be *de minimis* where the work's observability is so low as to fall below the substantial similarity threshold, *see Gordon*, 345 F.3d at 924, Take-Two's use also fails this standard. The Sixth Circuit in *Gordon*, found the use of dental illustrations *de minimis* because they "appear fleetingly [less than a second] and are primarily out of focus." *Id.* This is not the case here.

Four of Mr. Hayden's Asserted Works appear frequently, in their entirety, and with crystal clarity in the Accused Games. (Exs. A-1–A-5; Ex. A-9, Friesch Dep., 72:2–77:12, Ex. 4 (16:36).) Take-Two does not deny this. Instead, it attempts to disqualify these instances as not how an "ordinary user" would interact with the game. (Brief, pp. 3, 9, 25, 26 fn. 3, 16.) But Take-Two's "expert," Dr. Ian Bogost, who opined on "ordinary users" and what constitutes an "average game," (*id*) did not interview *a single user* of the Accused Games to arrive at his opinions—he came up with them out of thin air. (Ex. A-16, Bogost Dep., 179:5–11, 180:6–13, 186:11–18, 188:25–189:6.) Take-Two's other claims about the Asserted Works' observability are also unsupported and contradicted by the facts and at least raise disputed issues of fact.

---

[39] And although the views of *Lion* and *Brother's Keeper* works may be partially obstructed, there is no dispute that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Ex. A-34.) The very acts of copying and generating such derivatives are, of course, violations of Mr. Hayden's exclusive rights as copyright owner. 17 U.S.C. §106.

First, Take-Two claims that the Asserted Works "will not appear" "in the average game

of *NBA 2K*." (Brief, p. 25.) Take-Two, however, has no basis for what

constitutes "an average game." Rather, it simply claims that "the

Tattoos only appear in NBA 2K as they are inked on the NBA Players."

(*Id.*) But this does not mean the Asserted Works appear infrequently.

After all, three of the Asserted Works appear on LeBron James—one of

the most popular players in the NBA.[40] NBA 2K users "often" play with

Mr. James. (Ex. A-45, ¶ 75.) And Danny Green and Tristan Thompson



appear on the same teams as Mr. James in several of the Accused Games.[41] Take-Two's own

marketing materials tout how frequently its users play with LeBron James. (Ex. A-31.)

Second, Take-Two claims that "each quarter in *NBA 2K* lasts only a few minutes," but

this is misleading. (Brief, p. 26.) Take-Two allows users to set the length up to 12 minutes per

quarter. (Ex. A-47.) Take-Two also has an instant-replay feature and a character-editor mode that

allow users to zoom in on any player and see the Asserted Works for *however long the user

wants*.[42] Moreover, unlike a movie or commercial, the Accused Games are designed to be played

*repeatedly*. The analogy to a commercial (as in *Gordon*) is thus inapplicable here.

Third, Take-Two makes various unfounded claims about the general observability of the

Asserted Works in the Accused Games.[43] (Brief, p. 26.) For example, Take-Two claims that the

---

[40] *See* Ex. A-7, Argent Dep., 193:11–194:6.
[41] For example, LeBron James and Tristan Thompson appear on the starting lineups of the Cleveland Cavaliers for
NBA 2K16, 17, and 18 and LeBron James and Danny Green appear on the starting lineups of the Los Angeles
Lakers for NBA 2K20.
[42] *Instant Replay*: A-1: 9:59–15:08, A-2: 6:02–10:47, A-3: 4:28–7:43, A-4: 4:56–5:36, A-5: 6:52–8:02; *Character
Editor*: A-1: 0:05–2:35, A-2: 0:13–2:26, A-3: 0:13–2:19, A-4: 0:13–2:10, A-5: 0:11–2:40.
[43] ███████████████████████████████████████████████████ (Brief, p. 27.) In *ECIMOS, LLC v. Carrier
Corporation*, the Sixth Circuit rejected a similar *de minimis* argument based on lines of code, reasoning that "[w]hat
matters is not the quantity of code that was copied, but the significance of the code to the program, and—more
importantly—the inferences that can be drawn from the copying." 971 F.3d 616, 630 (6th Cir. 2020). Take-Two's
own expert, Mr. Malackowski, has expressly criticized this methodology. (*See* Dkt. # 98-6.)

Asserted Works appear smaller than they do in real life. (*Id.*) But this claim is dubious. (*See* Bogost Daubert Mot., Dkt. # 91.) As noted, users can zoom in on the tattoos to enlarge them. (Exs. A-1–A-5, *see* fn. 42.) Take-Two also claims the Asserted Works are "surrounded by a host of visual and auditory elements" and are sometimes obstructed from view, concluding they are "visual noise." (Brief, p. 26.) Take-Two has no basis for claiming how "the ordinary player" will see the Asserted Works. This is at minimum a factual dispute that should be left to the jury.

There is ample evidence demonstrating that the Asserted Works are, in fact, observable and recognizable in the Accused Games. In-game footage clearly shows the Asserted Works are observable.[44] Take-Two's in-game features like "After Basket Cuts" and "Action Replays" zoom in on the players during (what Take-Two calls "ordinary') gameplay, making the Asserted Works observable.[45] Moreover, Take-Two built tools that allow users to zoom in and observe the Asserted Works for an indefinite period of time.[46] ██████████████████████████████
████████████████████████████████████████████████████████[47]

(Ex. A-9, Friesch Dep., 72:2–77:12, Ex. 4 (16:36).) All of the evidence cited above, and the video games themselves clearly raise disputed issues of fact regarding whether the use and re-creation of Mr. Hayden's Asserted Works in the games are *de minimis*.

Take-Two relies heavily on the *Solid Oak* decision, but the court there relied *solely* on evidence proffered by Take-Two, noting that "[w]hile Plaintiff previously asserted that NBA 2K

---

[44] Exs. A-1–A-5, A-30, A-34; Ex. A-9, Friesch Dep., 72:2–77:12, Ex. 4 (16:36); Ex. A-10, Stauffer Dep. 70:13–20; 84:22–88:5, 89:1–3, 102:12–103:10, 119:2–141, Ex. 4; Ex. A-11, Brody Dep., 152–161; Ex. A-14, Jablonski Dep. 251:1–258:8, Exs. 9–14.

[45] *See, e.g.*, A-1 (4:40, 5:13, 5:30, 6:00, 6:48, 7:40), A-2 (3:25, 4:06, 4:50, 5:03, 5:29, 5:52), A-3 (2:31, 2:44, 3:05, 3:26, 3:59, 4:22), A-4 (2:30, 2:36, 2:43, 3:06, 3:32, 4:16), A-5 (5:50, 6:14, 6:34, 6:50); *see also* Ex. A-8, Thomas Dep., 155:3–156:21.

[46] *Id.*; *see also*, Ex. A-7, Argent Dep., *e.g.*, 80:20–81:18, 98:18–100:20.

[47] Take-Two claims "the only evidence is that an ordinary user would not [use the instant replay feature]." (Brief. p. 3, fn. 3.) But this is not true. Dr. Bilgicer's survey demonstrates that 38.4% of users "often" use and 25.94% of users "always" use the instant replay feature. (Ex. A-45, Bilgicer Report, ¶¶ 73–74.) And of those users, 36.46% "often" use the Zoom In/Out feature. (*Id.*)

'employs the broad range of the video game's features to focus, angle the camera on, or make the subject tattoos more prominent' [], *Plaintiff has not proffered any evidence to support that proposition*." *Solid Oak*, 449 F. Supp. 3d at 345 (emphasis added). Mr. Hayden, however, has submitted ample evidence demonstrating this very proposition. (*See*, fn. 44.)

The decision in the *Alexander v. Take-Two* case is far more apposite. There, the court denied Take-Two's summary judgment motion on *de minimis* use, reasoning that Take-Two's "specific *de minimis* argument [is] unavailing. The defense has been successfully invoked to allow copying of a small and usually insignificant portion of the copyrighted works, not the wholesale copying of works in their entirety as occurred here." *Alexander*, 489 F. Supp. 3d 812; *see also Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 76 (2d Cir. 1997) (reversing grant of summary judgment on *de minimis* use of artwork in a film, despite "[t]he brevity of the segment and the lack of perfect focus" ). There are, at minimum, multiple disputed material facts as to the observability of the Asserted Tattoos in the Accused Games, precluding summary judgment for Take-Two on this issue.

**D.     The Lion and Brother's Keeper tattoos contain protectable original expression, which Take-Two admittedly copied.**

Take-Two misapplies 17 U.S.C. § 103(a) in claiming that the *Lion* and *Brother's Keeper* tattoos are purportedly unprotectable. (Brief., pp. 27–29.) Although a playing card and the Sistine Chapel offered inspiration for the *Lion* and *Brother's Keeper* tattoos, respectively, Mr. Hayden's copyrights protect "any original parts of the [tattoos] that did not incorporate copyright-protected content" from the sources of inspiration. *Hiller, LLC v. Success Group Int'l Learning Alliance, LLC*, 976 F.3d 620, 628 (6th Cir. 2020). Mr. Hayden's *Lion* and *Brother's Keeper* tattoos contain many original and expressive elements. (*See, e.g.*, Ex. A-17, Hayden Dep., 82:12–25.) A cursory look at the comparison Take-Two provides between the playing card

28

Take-Two claims Mr. Hayden referenced[48] clearly shows differences, including the lion's facial expression, the shield design, and the mane, to name a few. (Brief, p. 28; *see also, e.g.*, Hayden Dep., 82:12–84:18.) And even setting aside the depictions of the hands in the *Brother's Keeper* tattoo, Mr. Hayden inked many original, expressive elements. Proceeding from sources of inspiration to the creation of actual works of visual art manifested on irregular, three-dimensional surfaces necessitated the original and expressive authorship of the artist, Mr. Hayden. (Ex. B, ¶ 9.) Of course, Take-Two does not *deny* that it copied the *Lion* and *Brother's Keeper* tattoos in full when developing the Accused Games. Accordingly, Take-Two *necessarily* copied the protectable aspects of the *Lion* and *Brother's Keeper* tattoos. There is, at minimum, a disputed issue of fact that precludes summary judgment.

Moreover, Take-Two's argument that its verbatim copies are not substantially similar to the *Lion* and *Brother's Keeper* tattoos also fails—and, again, presents at least a disputed issue of fact. Mr. Hayden's distinctive style and the context in which Take-Two presents the Asserted Works (namely on digital avatars of Mr. James and Mr. Thompson) make them recognizable to anyone familiar with the tattoos, which is sufficient to satisfy the substantial similarity test. *Ringgold*, 126 F.3d at 77 (holding that a brief and out-of-focus depiction of an artwork was substantially similar due to the recognizability of the artist's style). ███████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ (Ex. A-14, Jablonski Dep. 251:1–258:8, Exs. 9–14.)[49] Accordingly, Take-Two's

---

[48] Mr. Hayden was shown the design that Take-Two references in its brief and Mr. Hayden denied that it was the design Mr. James provided him. (Ex. A-17, Hayden Dep., 81:25–87:19.)

[49] *See also*, Ex. A-8, Thomas Dep., 52:7–55:25 (█████████████████████████████████████████████ ████████████████████████████████████████████; *see* Brody Dep., Ex. 4)

summary judgment motion on the protectability and substantial similarity of these tattoos should be denied because they raise disputed issues of fact

      **E.**    **Mr. Hayden is entitled to statutory damages and attorneys' fees.**

Whether or not Mr. Hayden is entitled to statutory damages and attorneys' fees is an issue for the jury—not appropriate for summary judgement, as there are disputed issues of material fact, including as to whether producing and releasing the respective Accused Games represent "separate, distinct acts of infringement," *Cotter v. Christus Gardens, Inc.*, No. 99-5996, 2000 U.S. App. LEXIS 33473, at *26 (6th Cir. Dec. 12, 2000), or a "series of acts constituting continuing infringement." *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998) *See also Niemi v. Am. Axle Mfg & Holding Inc.*, No. 05-74210, 2008 U.S. Dist. LEXIS 25995, at *46 (E.D. Mich. Mar. 31, 2008) (denying motion for summary judgment precluding statutory damages because "there is a genuine issue of material fact whether Defendants' alleged post-registration infringement was continuing and ongoing or was separate and distinct from Defendants' alleged pre-registration infringement").

Although Take-Two does not dispute that each Accused Game includes verbatim copies of the Asserted Works, each Accused Game issued separately each year contains new elements, features, gameplay, graphics, etc. that is different when compared to every other Accused Game. (Ex. A-39.) Each game thus represents a *distinct* infringement or at the very lease raises disputed issues of fact as to whether they are separate, individual acts of infringement

## IV.    CONCLUSION

For the reasons set forth above, the Motion raises numerous issues of fact in dispute.  It should be denied.

Dated: November 22, 2021

Respectfully submitted,

By: */s/ Andrew Alexander*
John S. Cipolla (Ohio Bar No. 0043614)
Daniel McMullen (Ohio Bar No. 0034380)
Andrew Alexander (Ohio Bar No. 0091167)
Dustin Likens (Ohio Bar No. 0097891)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
aalexander@calfee.com
dlikens@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

/s/ Andrew Alexander
One of the attorneys for Plaintiff
