# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

JAMES HAYDEN,

    Plaintiff,

v.

2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC.,

    Defendants.

CASE NO. 1:17-cv-02635-CAB

**DEFENDANTS 2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF JAMES HAYDEN'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. IAN BOGOST**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................................... 2

ARGUMENT .................................................................................................................................. 4

    I.    DR. BOGOST'S TESTIMONY CONCERNING HOW USERS INTERACT WITH *NBA 2K* IS APPROPRIATE ..................................................... 4

        1.    Dr. Bogost's Testimony is Well Supported ................................................. 5

        2.    Dr. Bogost is Eminently Qualified to Offer his Opinions ........................... 6

    II.    DR. BOGOST'S OPINIONS CONCERNING OBSERVABILITY OF THE TATTOOS IN *NBA 2K* ARE PROPER AND RELIABLE ........................... 8

        1.    Dr. Bogost's Testimony Concerning the Tattoos is Proper ........................ 9

        2.    Dr. Bogost's Methods are Reliable ............................................................ 11

    III.    DR. BOGOST'S CALCULATION OF THE SIZE OF THE TATTOOS IN *NBA 2K* IS BOTH RELEVANT AND RELIABLE ......................................... 13

    IV.    DR. BOGOST IS QUALIFIED TO TESTIFY ABOUT THE LACK OF A MARKET FOR REAL-WORLD TATTOOS IN VIDEO GAMES .................... 15

CONCLUSION ............................................................................................................................. 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aluminum Co. of Am. v. Sperry Prods., Inc.*,
  285 F.2d 911 (6th Cir. 1960) ................................................................................................9

*Babb v. Maryville Anesthesiologists P.C.*,
  942 F.3d 308 (6th Cir. 2019) ..............................................................................................10

*Berry v. City of Detroit*,
  25 F.3d 1342 (6th Cir. 1994) ................................................................................................8

*Buck v. Ford Motor Co.*,
  810 F. Supp. 2d 815 (N.D. Ohio 2011) ................................................................................9

*Clay v. Ford Motor Co.*,
  215 F.3d 663 (6th Cir. 2000) ................................................................................................6

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .......................................................................................................4, 10

*In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*,
  348 F. Supp. 3d 698 (S.D. Ohio 2016) ...............................................................................11

*ECIMOS, LLC v. Carrier Corp.*,
  971 F.3d 616 (6th Cir. 2020) ..............................................................................................14

*In re Heparin Prod. Liab. Litig.*,
  No. 08 Civ. 600000, 2011 WL 1059660 (N.D. Ohio Mar. 21, 2011) .............................9, 15

*Holbrook v. Lykes Bros. S.S. Co., Inc.*,
  80 F.3d 777 (3d Cir. 1996) ...................................................................................................9

*Hutchinson v. Parent*,
  No. 12 Civ. 320, 2015 WL 1914794 (N.D. Ohio Apr. 27, 2015) .........................................7

*Jesa Enters. Ltd. v. Thermoflex Corp.*,
  268 F. Supp. 3d 968 (E.D. Mich. 2017) .............................................................................10

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
  474 F.3d 288 (6th Cir. 2007) ................................................................................................7

*Kopf v. Skyrm*,
  993 F.2d 374 (4th Cir. 1993) ................................................................................................9

*KSP Invs., Inc. v. United States*,
   No. 07 Civ. 857, 2008 WL 182257 (N.D. Ohio Jan. 17, 2008) ..........................................5, 11

*Lyngaas v. Ag,*
   992 F.3d 412 (6th Cir. 2021) ......................................................................................................14

*In re Nat'l Prescription Opiate Litig.*,
   No. 17 Civ. 2804, 2019 WL 3934597 (N.D. Ohio Aug. 20, 2019) .........................................11

*Newton v. Diamond*,
   388 F.3d 1189 (9th Cir. 2004) ....................................................................................................9

*Pride v. BIC Corp.*,
   218 F.3d 566 (6th Cir. 2000) ......................................................................................................8

*Responsive Innovations, LLC v. Hotlzbrinck Publishers, LLC*,
   No. 08 Civ. 1184, 2014 WL 1237632 (N.D. Ohio Mar. 25, 2014) ........................................7, 8

*Rheinfrank v. Abbott Lab'ys, Inc.*,
   680 F. App'x 369 (6th Cir. 2017) ................................................................................................8

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
   449 F. Supp. 3d 333 (S.D.N.Y. 2020) ................................................................................ *passim*

*United States v. Diaz,*
   876 F.3d 1194 (9th Cir. 2017) ..................................................................................................10

*United States v. L.E. Cooke Co.*,
   991 F.2d 336 (6th Cir. 1993) .....................................................................................5, 6, 11, 12

*United States v. Madison,*
   226 F. App'x 535 (6th Cir. 2007) ..............................................................................................15

*Williams v. Gen. Motors Corp.*,
   No. 03 Civ. 2060, 2007 WL 3232292 (N.D. Ohio Oct. 30, 2007) ...................................6, 7, 8

*Willis v. Allstate Ins. Co.*,
   No. 13 Civ. 60, 2014 WL 4804396 (S.D. Miss. Sept. 26, 2014) .............................................11

**Rules**

Fed. R. Evid. 704 .................................................................................................................................10

Take-Two respectfully submits this memorandum of law in opposition to Plaintiff's motion to exclude the expert testimony of Dr. Ian Bogost ("Motion").[1]

## PRELIMINARY STATEMENT

Take-Two's expert, Dr. Ian Bogost, is a world-renowned Professor at Washington University in St. Louis, video game industry scholar, and video game company founder. He has devoted his career to the study of video games and the video game industry. In this case, he offered detailed opinions regarding Take-Two's depiction of six Tattoos that appear on three NBA Players in *NBA 2K*. In his opening report, Dr. Bogost opined on video games in general, *NBA 2K* in particular, and Take-Two's use of the Tattoos in *NBA 2K*. He concluded that the average player of *NBA 2K* will see and hear a vast array of visual and auditory elements, and that "by any measure," the Tattoos are an insignificant part of *NBA 2K*. Dkts. 95-8–9 ("Bogost Decl.") ¶ 7. Dr. Bogost also concluded that there is no market for licensing the Tattoos for inclusion in a video game, and that Take-Two's fleeting use of the Tattoos in *NBA 2K* is not something that would be reasonably anticipated to be licensed. *Id.* ¶ 9.

Dr. Bogost is particularly well-suited to offer opinions regarding the depiction of tattoos in *NBA 2K*. In a highly similar case in which Dr. Bogost submitted a "report detailing information and opinions concerning video game features generally and certain aspects of NBA 2K, including" Take-Two's use of tattoos on three NBA players, including LeBron James, the Southern District of New York found his qualifications "well demonstrated" and that his "field of study qualifies him to opine on matters concerning video games and the market for video games." *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 352 (S.D.N.Y. 2020).

Tellingly, Plaintiff has not offered a video game expert. Instead, hoping to prevent this

---

[1] Capitalized terms not defined here were defined in Take-Two's motion for summary judgment. Dkt. 101-1.

1

Court from considering Dr. Bogost's unrebutted conclusions, Plaintiff argues that four of his opinions should be excluded. None of Plaintiff's arguments have merit. *First*, Plaintiff argues that Dr. Bogost's opinions concerning how users interact with *NBA 2K* should be excluded because he somehow is not qualified to offer them or they lack a sufficient factual basis. Both arguments are absurd. Dr. Bogost is an eminent video game scholar as well as someone with practical experience in creating and marketing video games. And his report is notable for how it sets forth the extensive and detailed factual basis for his opinions. *Second*, Plaintiff argues that Dr. Bogost's opinions regarding the observability of the Tattoos are legally improper and unreliable because a juror can determine observability without assistance. Yet, Dr. Bogost's testimony will be helpful for the jury to contextualize the Tattoos in the massive *NBA 2K* video game as it is not practical to play the entire video game, with near-endless possibilities, at trial.

*Third*, Plaintiff argues that Dr. Bogost's opinion that the Tattoos are a tiny portion of *NBA 2K* is irrelevant and unreliable. But his opinions are directly relevant to Take-Two's assertion that its use of the Tattoos is *de minimis* and fair. Plaintiff will be permitted to cross-examine Dr. Bogost on his well-founded factual basis at trial. *Fourth*, Plaintiff argues that Dr. Bogost is not qualified to opine on the market for licensing tattoos in video games because he lacks a "business or economics degree." But his opinions are not based on having an MBA. He has significant academic and practical experience in the video game industry. He even founded a video game company and has designed video games. As the *Solid Oak* court rightly noted, "Dr. Bogost ***need not be a trained economist*** to offer his opinions on factors affecting the market for video games . . . . Studies concerning the market for licensing certain copyrights for use in video games ***are well within Dr. Bogost's expertise***." 449 F. Supp. 3d at 352–53 (emphasis added).

## FACTUAL BACKGROUND

Dr. Bogost is a Professor and Director of Film & Media Studies and a Professor of

Computer Science & Engineering at the Washington University in St. Louis.  Declaration of Chris Ilardi ("Ilardi Decl.") Ex. A.[2]  He is "internationally recognized as a key figure in game studies, where [his] research has become canonical in the contexts of education, design, and criticism."  Bogost Decl. ¶ 11.  He also is a prolific writer, publishing "over 200 journal publications, articles, book chapters, and conference papers on videogames and digital culture," in addition to ten books.  *Id.* ¶¶ 11–12.  Dr. Bogost has been named a Digital Games Research Association Distinguished Scholar and a Higher Education Video Game Alliance Lifetime Fellow.  *Id.* ¶ 12.  And his articles, books, and games are routinely used by courses in game studies as it has "impacted the interactive entertainment industry and the arts."  *Id.* ¶ 13.

In addition to his academic work, Dr. Bogost has personal experience in the video game industry.  He is the "co-founder of Persuasive Games, an award-winning videogame studio."  *Id.* ¶ 16.  He also works "as an independent game developer," and his games have "garnered multiple awards at independent game festivals, including as a finalist in the Nuovo category at the 2010 Independent Games Festival and as winner of the Vanguard and Virtuoso awards at the 2010 Indiecade festival," and have been "exhibited at 38 juried and invited art exhibitions."  *Id.*

Drawing on his decades of experience, Dr. Bogost will testify as an expert on the mechanics of *NBA 2K*, and how an ordinary user would encounter the Tattoos during gameplay.  *Id.* ¶ 2.  He opined on the expressive nature of video games and how they relate to other audiovisual works.  *Id.* ¶¶ 4–6.  His opening report contains a detailed analysis of *NBA 2K* as a computer program and as an audiovisual work.  *Id.* ¶¶ 7, 47–74.  Taking into account the massive size of *NBA 2K*, he explained that an ordinary user would not notice the Tattoos during ordinary gameplay, because the Tattoos often do not appear, and when they do, they are far smaller than

---

[2]  He previously was the Ivan Allen College Distinguished Chair in Media Studies, Professor of Interactive Computing, and Professor of Business at the Georgia Institute of Technology.  Bogost Decl. ¶ 1.

3

in real life, are depicted next to numerous other visual and auditory elements, and are difficult to observe. *Id.* ¶ 6. Dr. Bogost also analyzed the file size of the Tattoos as they appear in the *NBA 2K* computer program and compared that to the total file size of *NBA 2K* to determine that each Tattoo is no more than 0.000515% of the data in *NBA 2K*'s computer program. *Id.* ¶¶ 8, 108–14. Additionally, he analyzed the market for licensing the Tattoos for inclusion in a video game, determined that there is none and that Take-Two's use of the Tattoos is not something that reasonably would be anticipated to be licensed for use in a video game. *Id.* ¶¶ 9, 115–28.

Plaintiff did not offer an expert with video game industry experience. Instead, he offered two economics experts: Michael Malkiewicz to testify about the alleged frequency that *NBA 2K* users would view the Tattoos, and Justin Lenzo to testify about the likelihood of a market for licensing tattoos in video games forming. *See* Dkt. 99-2, Ex. B ("Malkiewicz Rpt."); Dkt. 97-2, Ex. A ("Lenzo Rpt."). Despite Plaintiff offering testimony from non-video game experts about the use of the Tattoos in *NBA 2K* and the market for video games, he now asks this Court to exclude testimony about these topics from the only video game expert in this case, Dr. Bogost.

## ARGUMENT

Dr. Bogost submitted two reports based on his wealth of academic and industry experience, and hours spent analyzing *NBA 2K*. His report in *Solid Oak* was admitted and used to grant summary judgment to Take-Two. 449 F. Supp. 3d at 352–53. Plaintiff dislikes his well-reasoned and well-supported opinions, but provides no valid basis to exclude them. To the extent Plaintiff disputes Dr. Bogost's opinions, he will have the opportunity to cross-examine him at trial. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

### I. DR. BOGOST'S TESTIMONY CONCERNING HOW USERS INTERACT WITH *NBA 2K* IS APPROPRIATE

Dr. Bogost's testimony regarding how users ordinarily interact with *NBA 2K* is well

4

supported and he is plainly qualified to offer such opinions. Plaintiff's apparent theory in this case is that people ordinarily play *NBA 2K* not because they want to play a basketball simulation game, but because they want to pause the game, manipulate it to identify and focus on the Tattoos, and then stare at them. *See, e.g.*, Mot. 12 (Plaintiff arguing that a static, made-for-litigation image of *NBA 2K* is not "fleeting"). Dr. Bogost thoroughly refutes this notion.

1. **Dr. Bogost's Testimony is Well Supported**

Plaintiff first argues that Dr. Bogost's opinions concerning how users interact with *NBA 2K* should be excluded as not "based on sufficient facts or data." Mot. 3–5. That is nonsense. His detailed report cited substantial facts and data supporting his opinions, which more than meets the standard that an expert's opinions have a "reasonable factual basis." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993); *KSP Invs., Inc. v. United States*, No. 07 Civ. 857, 2008 WL 182257, at *5 (N.D. Ohio Jan. 17, 2008) (factual basis goes to weight).

Dr. Bogost relied on both the evidence in the record regarding *NBA 2K* specifically and his deep understanding of how people interact with videogames generally based on his extensive experience in this industry. First and foremost, he spent "hours" reviewing "each of the [six] games," including exploring "each of the modes in each of the games." Ilardi Decl. Ex. B (Bogost Tr.) 140:17–141:8; Bogost Decl. ¶¶ 54–74 (describing review of *NBA 2K*'s simulation of basketball and all game modes). His "overall goal in evaluating the games was to look for what the average player would encounter in a typical ordinary experience of playing the game." Ilardi Decl. Ex. B (Bogost Tr.) 143:10–13. Notwithstanding that goal, he also artificially and purposely selected teams that have the NBA Players "to see how they were depicted in the games." *Id.* 141:24–142:6; *see also* Bogost Decl. App'x A.

In addition to devoting hours to reviewing the games, Dr. Bogost considered dozens of interrogatory responses; responses to requests for admission; eleven deposition transcripts and

their corresponding exhibits; thousands of documents that were produced in this case; public articles and other litigation documents; and recorded his findings throughout a detailed 62-page opening report and declaration. Bogost Decl. Ex. 2 (Materials Considered). The documents included admissions by Plaintiff regarding (a) how users interact with *NBA 2K*, Bogost Decl. ¶ 55 n.52 (players "walk, run, block, pass, steal, or shoot the ball"); (b) how "the NBA 2K basketball games simulate the sport of basketball," *id.* ¶ 48 n.36; and (c) what other auditory and visual elements a user may experience during gameplay, *id.* ¶¶ 61 n.57, 71. They also included Take-Two's documents and deposition testimony by ten members of *NBA 2K*'s creative and production teams, including how playing *NBA 2K* mirrors the real world. *Id.* ¶ 49–50. All of this evidence formed the basis of his opinions on how users interact with *NBA 2K*. *Id.* ¶ 3.

Plaintiff complains that Dr. Bogost did not interview players to inform his opinions. Mot. 4–5. This argument makes no sense. Leaving aside that he himself played the games for hours, *supra* 5, there is no reason that an expert must conduct interviews to support his opinions, and Plaintiff cites to no case holding as much. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 668 (6th Cir. 2000) (no requirement that an expert "test his theories"); *Williams v. Gen. Motors Corp.*, No. 03 Civ. 2060, 2007 WL 3232292, at *2 (N.D. Ohio Oct. 30, 2007) (no requirement that expert "perform his own independent tests or studies of his theories" where "conclusions are supported by rational explanations"). Dr. Bogost's factual basis was more than "reasonable," *L.E. Cooke*, 991 F.2d at 342, and at best, Plaintiff can try to cross-examine him regarding this basis at trial. *Clay*, 215 F.3d at 669.

2. **Dr. Bogost is Eminently Qualified to Offer his Opinions**

Despite Plaintiff's tacit admission that Dr. Bogost is generally qualified to testify about video games, he nevertheless argues that Dr. Bogost is not sufficiently qualified to opine about the "specific subject area" of his report that includes opinions concerning *NBA 2K* and ordinary

6

gameplay, specifically. Mot. 5–7. Plaintiff misses the mark again. "An expert may be qualified via their 'knowledge, skill, experience, training or education,' or a combination of these factors." *Hutchinson v. Parent*, No. 12 Civ. 320, 2015 WL 1914794, at *1 (N.D. Ohio Apr. 27, 2015). "'It is of little consequence to questions of admissibility' that an expert 'lacks expertise in the very specialized area'" if he has broader expertise. *Responsive Innovations, LLC v. Hotlzbrinck Publishers, LLC*, No. 08 Civ. 1184, 2014 WL 1237632, at *3 (N.D. Ohio Mar. 25, 2014) (quoting *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007)); *see also Williams*, 2007 WL 3232292, at *1–2 (general "automotive industry and mechanics" expert qualified in specialized area of "fuel system design for medium-duty trucks").

Here, Dr. Bogost has significant academic and industry experience with video games, having taught numerous courses, drafted articles and books, designed and developed his own video games, and founded a video game company. *Supra* 2. Applying his decades of experience, he spent hours thoroughly reviewing and playing *NBA 2K*. Ilardi Decl. Ex. B (Bogost Tr.) 140:17–141:8. He then formulated opinions about what someone playing *NBA 2K* will ***ordinarily*** see, not what someone would see when an attorney artificially presents a screenshot of *NBA 2K*. As the *Solid Oak* court unequivocally found, "Dr. Bogost's field of study qualifies him to opine on matters concerning video games." 449 F. Supp. 3d at 352.

Despite his clear qualifications, Plaintiff makes a series of unsupported arguments that are contrary to the law. ***First***, Plaintiff argues that Dr. Bogost is not qualified to testify concerning *NBA 2K* because the terms "NBA" and "2K" do not appear in his CV, and because he has not analyzed *NBA 2K* "outside of the litigation context." Mot. 6. But as *Solid Oak* and courts in the Sixth Circuit hold, Dr. Bogost need not have specific prior experience with a specific video game in issue to be qualified as a video game industry expert. *Solid Oak*, 449 F.

7

Supp. 3d at 352; *see also Responsive Innovations*, 2014 WL 1237632, at *3; *Williams*, 2007 WL 3232292, at *2. The fallacy of Plaintiff's argument is shown also by the fact that none of Plaintiff's experts are video game experts with experience with *NBA 2K*, yet Plaintiff had them submit expert reports on this matter. **Second**, Plaintiff argues that Dr. Bogost cites no "specific source to substantiate his opinions about what constitutes 'ordinary gameplay,'" Mot. 5, but he actually cites numerous sources, as detailed above. *Supra* 5. Moreover, it is based on his own expertise. **Third**, Plaintiff argues that Dr. Bogost's expertise does not qualify him "to opine on all aspects of every video game." Mot. 7. That is both wrong and a red herring. Dr. Bogost has demonstrated expertise to testify about *NBA 2K* consistent with the opinions in his report, and he does not seek to "opine on all aspects of every video game." *Id.* **Fourth**, Plaintiff argues, without any support, that it is "likely" that a "juror" would have more experience with *NBA 2K* than Dr. Bogost. Mot. 6. It is hard to imagine any juror bringing with them decades of experience in the video game industry and applying that experience to hours of review of each of the six accused *NBA 2K* games in this lawsuit, as Dr. Bogost has done. *Supra* 5. Plaintiff's arguments are replete with exaggeration and hyperbole but lack support.[3]

## II. DR. BOGOST'S OPINIONS CONCERNING OBSERVABILITY OF THE TATTOOS IN *NBA 2K* ARE PROPER AND RELIABLE

Dr. Bogost's opinions concerning the observability of the Tattoos in *NBA 2K* are proper and reliable. Yet again, Plaintiff tries desperately to prevent the jury from hearing and seeing a level-headed presentation of *NBA 2K* because it would prefer the jury to focus only on the

---

[3] Plaintiff's cited cases do not support his arguments as they involve experts who tried to testify in fields where they lacked experience, had no qualifications or formal training to offer their opinions, or merely claimed to be qualified. *See Rheinfrank v. Abbott Lab'ys, Inc.*, 680 F. App'x 369, 380 (6th Cir. 2017) (medical experts not qualified to testify about FDA labeling regulations, which was "an essentially technical, regulatory judgment"); *Berry v. City of Detroit*, 25 F.3d 1342, 1348–50 (6th Cir. 1994) (sheriff who admitted position required "no qualifications" and had none related to testimony); *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) ("a witness is [not] an expert simply because he claims to be"). Yet, here, Dr. Bogost has significant experience, as well as formal and practical training in video games.

Tattoos. Dr. Bogost's analysis places the Tattoos in the context of the larger *NBA 2K* game and provides opinions on how observable they are in that context. Plaintiff argues this is a legal conclusion, but that is not the law. Plaintiff even attacks Dr. Bogost's opinions as unreliable because he allegedly did not consider certain game modes or features, but that is simply false.

### 1. Dr. Bogost's Testimony Concerning the Tattoos is Proper

Dr. Bogost's testimony concerning the observability of the Tattoos in *NBA 2K* is proper expert testimony that will help the jury. As an initial matter, "[t]he subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). "Helpfulness to the trier of fact remains the ultimate touchstone of admissibility." *In re Heparin Prod. Liab. Litig.*, No. 08 Civ. 600000, 2011 WL 1059660, at *5 (N.D. Ohio Mar. 21, 2011) (quoting *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 784 (3d Cir. 1996)). "Doubts regarding usefulness should generally be resolved in favor of admissibility." *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 827 (N.D. Ohio 2011) (quoting *Aluminum Co. of Am. v. Sperry Prods., Inc.*, 285 F.2d 911, 916 (6th Cir. 1960)); *see Newton v. Diamond*, 388 F.3d 1189, 1196 (9th Cir. 2004) (crediting expert testimony that copied work was "simple, minimal and insignificant" to affirm *de minimis* use on summary judgment).

Dr. Bogost's opinions on the observability of the Tattoos in *NBA 2K* will be helpful to the jury and are thus admissible. *NBA 2K* is massive. Indeed, Dr. Bogost determined that in just the basketball simulation mode and considering only active players, there would be "$2.57 \times 10^{19}$ unique games worth of combinations of players, and the associated audiovisual distinctiveness." Bogost Decl. ¶ 79. That does not even consider "audiovisual changes in venue, costume, and other customizable options," nor does it factor in the differing audiovisual experience of other game modes, including "the ability to operate the business of basketball as an owner and manager," and the MyCareer "central story mode." *Id.* ¶¶ 67–68, 79. The Tattoos' observability

9

also needs to be considered in view of how often they may appear, *id.* ¶¶ 77–80, their size, *id.* ¶¶ 81–83, other audiovisual elements that accompany their depiction, *id.* ¶¶ 84–89, other elements that may obscure their view, *id.* ¶¶ 91–94, the camera's focus, *id.* ¶ 95, the constant action, *id.* ¶¶ 96–98, and more. Clearly, Dr. Bogost did not reach his conclusions "summarily," as Plaintiff argues, Mot. 8, but through a detailed review of the evidence. Bogost Decl. ¶¶ 75–107. Plaintiff wants the jury to consider only "gameplay footage" and "screenshots" that Plaintiff will cherry-pick, not the innumerable scenarios that impact the Tattoos' observability, to give the false appearance that the six Tattoos are a particularly prominent feature of *NBA 2K*. *Id.* Dr. Bogost's testimony is necessary to put the depiction of the Tattoos in the appropriate context.[4]

Plaintiff makes three other arguments, none of which have merit. ***First***, Plaintiff argues that Dr. Bogost's opinions are improper testimony concerning the "ultimate issue[]" of "whether the Asserted Tattoos are observable in the Accused Video Games." Mot. 8. Yet, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). The question on *Daubert* is whether the expert opines on "the ultimate question of ***liability***," *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (emphasis added), *i.e.*, whether Take-Two's use of the Tattoos was fair and/or *de minimis*. *See* Dkt. 101-1 at 11–15, 24–27. Here, Dr. Bogost offers no opinions on the ultimate question of liability but merely addresses the context in which consumers would encounter the Tattoos.[5] ***Second***, Plaintiff

---

[4] Despite seeking to exclude video game expert Dr. Bogost's testimony, Plaintiff offers opinions from an economics expert about the "prominence" of the Tattoos. Malkiewicz Rpt. ¶¶ 86–99. It is hard to imagine how an economics expert would be permitted to testify about the Tattoos' prominence, but a video game expert would not. Take-Two has thus moved to exclude Mr. Malkiewicz's opinions including because he is not a video game expert. Dkt. 104.

[5] Plaintiff's cases concerning experts testifying about "what legal result to reach," Mot. 8, are inapposite. In *United States v. Diaz*, the Ninth Circuit held that testimony by a medical expert's testimony that "adopted the language" of the relevant statute was *permissible* because "it is sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard." 876 F.3d 1194, 1197–98 (9th Cir. 2017); *see also Jesa Enters. Ltd. v. Thermoflex Corp.*, 268 F. Supp. 3d 968, 973 (E.D. Mich. 2017) (expert in a contract dispute whose opinions were "not grounded in the actual facts" of the case

10

contests Dr. Bogost's calculation that the Tattoos appear in *NBA 2K* as 1.11–10.3% of the size they appear in real life, as subject to lay observation and flawed. Mot. 10. Yet, Dr. Bogost's calculations analyzed information that a lay juror would not know, including the average size screens on which *NBA 2K* is played (not just the size of the screen that a juror would see at trial), the NBA Players' heights, and the portion of the screen that each player takes up during gameplay. Bogost Decl. ¶¶ 81–83.[6] *Third*, Plaintiff disputes Dr. Bogost's determination that the Tattoos play "no role in the plot of *NBA 2K*'s MyCareer mode," arguing that this has no relevance to "whether the Tattoos are *observable*," and that a jury can figure that out regardless. Mot. 10. Plaintiff is wrong. The fact that the Tattoos do not feature in the MyCareer mode, a mode that Plaintiff's expert Malkiewicz admitted as being important to users of *NBA 2K*, Malkiewicz Rpt. ¶¶ 45, 54, 107, directly bears on observability, the extent of the use, and apportionment, which a juror would not know.[7]

### 2. Dr. Bogost's Methods are Reliable

Dr. Bogost considered the entirety of *NBA 2K* to reach his opinions regarding observability. Nevertheless, Plaintiff argues that Dr. Bogost's opinions should be excluded as unreliable because he "considered only certain . . . game modes," Mot. 11, but that is plainly not

---

impermissibly sought to testify as to the ultimate issue in the contractual dispute, *i.e.*, whether "Plaintiff is entitled to [pre- and] post-termination commission[]"); *Willis v. Allstate Ins. Co.*, No. 13 Civ. 60, 2014 WL 4804396, at *2 (S.D. Miss. Sept. 26, 2014) (expert in contractual dispute sought to testify as to "legal conclusions which are irrelevant to any issue before the jury").

[6] Plaintiff also argues that Dr. Bogost should have considered the size of the Tattoos in the context of a very specific scenario of a fan at an NBA game sitting 100 feet from LeBron James and an *NBA 2K* user sitting at two times the diagonal screen measurement from their television. Mot. 10. It is hard to understand what point Plaintiff is trying to make, but in any event, it would at best go to the weight of Dr. Bogost's testimony, not its admissibility. *In re Nat'l Prescription Opiate Litig.*, No. 17 Civ. 2804, 2019 WL 3934597, at *2 (N.D. Ohio Aug. 20, 2019); *L.E. Cooke Co.,* 991 F.2d at 342; *KSP Invs.*, 2008 WL 182257, at *5.

[7] Plaintiff cites *In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litigation* to argue that Dr. Bogost's opinions should be excluded as directed to lay matters, but that case just held an expert was not permitted to testify as to "motive," because courts typically leave state of mind to the jury. 348 F. Supp. 3d 698, 718 (S.D. Ohio 2016).

true, as he "reviewed each of the modes in each of the games." Ilardi Decl. Ex. B (Bogost Tr.) 140:17–141:8; Bogost Decl. ¶¶ 65–70. Plaintiff also argues that Dr. Bogost didn't "consider[]" certain game "features," Mot. 11, which is again not true, as he considered the entirety of the games. Plaintiff's real dispute is that Dr. Bogost did not consider the "frequency" that *NBA 2K* users use certain "features" to be ***relevant to*** the Tattoos' observability. Ilardi Decl. Ex. B (Bogost Tr.) 158:10–12 ("I did not look at the frequency of any one feature but rather the overall experience of the game."). As he explained, the frequency with which users of *NBA 2K* encounter elements such as "after-basket camera cuts," "action replays," "create-a-roster," and "edit player," Mot. 12, does not alter "the total quantity of matches, of teams, of individual elements," these "feature[s]" are short in duration, and "any individual element is still difficult to see." Ilardi Decl. Ex. B (Bogost Tr.) 160:10–18. To the extent Plaintiff has any basis to disagree with Dr. Bogost's consideration of these "features," he will be permitted at trial to cross-examine him, but it is not grounds for exclusion. *L.E. Cooke Co.,* 991 F.2d at 342 ("it is up to opposing counsel to inquire into the expert's factual basis.").

Plaintiff also criticizes Dr. Bogost for describing Take-Two's use of the Tattoos as "fleeting." Mot. 12–13. As Dr. Bogost described in his report, "when playing *NBA 2K* as designed," "any attempt to focus on the Tattoos [is] fleeting," and they "are used in a fleeting way." Bogost Decl. ¶¶ 100, 107. When Plaintiff's counsel presented Dr. Bogost with a static image of LeBron James and asked whether the image was "fleeting," Dr. Bogost explained that this was "an image artificially created for the purpose of this deposition and comparing it to the experience that a player would have in a game," which takes his use of the term, "fleeting," entirely out of context. Ilardi Decl. B (Bogost Tr.) 175:21–176:2. Dr. Bogost further explained that the static image is indeed fleeting in the context of *NBA 2K* because, in a real game of *NBA*

12

*2K*, the player may "look at it for a moment and then they move on." *Id.* 177:18–20.

### III. DR. BOGOST'S CALCULATION OF THE SIZE OF THE TATTOOS IN *NBA 2K* IS BOTH RELEVANT AND RELIABLE

In support of his opinions, Dr. Bogost calculated the percentage of the file size that includes the Tattoos and compared that number to the total size of the *NBA 2K* computer program. As he explained, the files within *NBA 2K* consist of two groups: "[t]he first group is the software code and instructions used to run the game," and "[t]he second group is the data upon which the procedural elements do their processing, sometimes called instantial elements," and include things such as 3-D models, textures, and related materials. Bogost Decl. ¶ 108. To depict the appearance of the NBA Players, *NBA 2K* utilizes texture files, which include all elements of the players' skin, including tattoos, and are "wrap[ped]" around the digital armatures of the NBA Players. *Id.* ¶¶ 23–24, 114. "High-resolution texture maps of everything in the game must be produced—for faces, shoes, court surfaces, and everything else in the game too." *Id.* ¶ 112. By comparing the size of the texture files that contain the Tattoos to the total amount of *NBA 2K*'s data, Dr. Bogost determined the total visual contribution of the Tattoos to *NBA 2K*. *Id.* ¶¶ 113–14. As the texture file includes all elements of the players' skin, he conservatively determined that at most, each Tattoo is 10% of the player's torso and arms, and reduced the contribution of each to one tenth of the total size of the texture file. *Id.* ¶ 114.

Plaintiff makes three arguments for why this opinion should be excluded. All fail. **First**, Plaintiff argues that Dr. Bogost's calculation is "utterly irrelevant to any fact or issue in this case." Mot. 13. Nonsense. Indeed, the size of the Tattoos is directly relevant to both of Take-Two's *de minimis* use and fair use defenses. *See Solid Oak*, 449 F. Supp. 3d at 348 (crediting fact that tattoos at issue in that case comprised "only 0.000286% to 0.000431% of the total game data"). Plaintiff's argument that a "single line of code" can produce an "endless" pattern misses

13

the point. Mot. 13. Source code and instantial assets (like the Tattoos) are different components, and the Tattoos' size relates to their "visual display" in *NBA 2K*. Bogost Decl. ¶ 113.[8]

*Second*, Plaintiff argues that Dr. Bogost's opinions are unreliable because the file size information he received was not based on "good grounds." Mot. 13. Yet, as Plaintiff acknowledges, Dr. Bogost testified that he received the factual information concerning the size of the *NBA 2K* computer program and the size of the texture files that contain the Tattoos from Take-Two's "representatives." Mot. 14; *see also* Ilardi Decl. Ex. B (Bogost Tr.) 28:1–3, 28:10–13. Plaintiff argues that the data is somehow unreliable because during Dr. Bogost's deposition, three months after submitting his report, he could not remember exactly who provided him the data, but does not dispute that it came from Take-Two. Mot. 13. Further, Take-Two's Vice President, Head of Global Sports Marketing at 2K Games, Inc., Alfredo Brody, submitted a declaration in this case confirming the same factual file size data. *See* Dkt. 101-5 ("Brody Decl.") ¶ 18. Plaintiff will be permitted the opportunity to cross-examine Take-Two's witnesses regarding the accuracy of the data, but that does not provide a basis for exclusion.[9]

*Third*, Plaintiff argues that Dr. Bogost's calculation is a simple matter of "arithmetic" that the jury can determine on their own. Mot. 14. Yet, "[h]elpfulness" is the "touchstone of admissibility." *In re Heparin*, 2011 WL 1059660, at *5. Here, the data includes file sizes in two

---

[8] *ECIMOS*, cited by Plaintiff, Mot. 13, is not to the contrary. There, the Court found that a plaintiff may not prove that its copying was *de minimis* based "**solely** on the fact that only a small number of lines of code were copied." *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 630 (6th Cir. 2020) (emphasis added). Here, by contrast, Dr. Bogost's testimony concerns the size of instantial assets, not lines of code. Moreover, *ECIMOS* does not stand for the proposition that an expert may not testify concerning the size of copied material as **one consideration** in his overall analysis.

[9] Plaintiff cites *Lyngaas v. Ag* to argue that Dr. Bogost's testimony should be excluded. Mot. 13. Plaintiff mischaracterizes *Lyngaas*. There, the underlying data was a computer-generated compilation of fax transmissions. 992 F.3d 412, 431 (6th Cir. 2021). During a bench trial, the court held that the compilation was not admissible evidence because the plaintiff was not able to authenticate the data. *Id.* As a result, the court precluded an expert from providing opinions regarding the successful number of fax transmissions because it had excluded the underlying data. *Id.* Here, no trial has taken place, and were a Take-Two witness required to authenticate the file size information, Take-Two would be able to provide that. *See* Brody Decl. ¶ 18.

different formats (Kilobytes and Gigabytes), which are divided and converted into small percentages. Such a calculation would undoubtedly be helpful to a lay juror unfamiliar with dividing numbers out to multiple decimal places. Other than the fact that Plaintiff does not like the results of such calculations, it is not clear why he is trying to burden jurors in this fashion.[10]

### IV. DR. BOGOST IS QUALIFIED TO TESTIFY ABOUT THE LACK OF A MARKET FOR REAL-WORLD TATTOOS IN VIDEO GAMES

"Studies concerning the market for licensing certain copyrights for use in video games are well within Dr. Bogost's expertise." *Solid Oak*, 449 F. Supp. 3d at 353. Nevertheless, Plaintiff argues otherwise, claiming that Dr. Bogost admits he is not familiar with the market for tattoo licensing in video games. Mot. 15. Plaintiff is plainly and intentionally trying to twist Dr. Bogost's words. As Dr. Bogost explained in his report, he is deeply familiar with the video game industry. Despite that familiarity, he has never once come across any video game developer licensing the right to tattoos for inclusion in a video game, which itself is evidence that such a market ***does not exist and is unlikely to develop***. Bogost Decl. ¶ 116. Nor does it matter that Dr. Bogost does not hold an "economics degree." Mot. 15. He has significant academic and industry experience, including founding a video game company. *Supra* 2. As the *Solid Oak* court found, "Dr. Bogost need not be a trained economist to offer his opinions on factors affecting the market for video games; [t]he law does not require such a narrow specialty as [Plaintiff] suggest[s]." *Solid Oak*, 449 F. Supp. 3d at 352–53 (internal quotation marks omitted).

### CONCLUSION

For the foregoing reasons, Plaintiff's Motion should be denied.

---

[10] *United States v. Madison*, cited by Plaintiff, is not to the contrary. 226 F. App'x 535, 544 (6th Cir. 2007). There, the issue was simply whether one number was bigger than the other. *Id.* Dr. Bogost's calculation is far more complicated and, thus, helpful.

15

| | |
|---|---|
| Dated:  New York, NY<br>November 22, 2021 | */s/ Dale M. Cendali*<br>Dale M. Cendali (admitted *pro hac vice*)<br>Joshua L. Simmons (admitted *pro hac vice*)<br>Chris Ilardi (admitted *pro hac vice*)<br>KIRKLAND & ELLIS LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>dale.cendali@kirkland.com<br>joshua.simmons@kirkland.com<br>chris.ilardi@kirkland.com<br><br>Miranda D. Means (admitted *pro hac vice*)<br>KIRKLAND & ELLIS LLP<br>200 Clarendon Street<br>Boston, Massachusetts 02116<br>Telephone: (617) 385-7500<br>miranda.means@kirkland.com<br><br>Matthew J. Cavanagh (OH 0079522)<br>MCDONALD HOPKINS LLC<br>600 Superior Avenue, East, Ste. 2100<br>Cleveland, Ohio 44114<br>Telephone: 216.348.5400<br>Fax: 216.348.5474<br>mcavanagh@mcdonaldhopkins.com<br><br>*Attorneys for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.* |

16