# EXHIBIT B

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF OHIO
2             EASTERN DIVISION
3                - - - - -
4
        James Hayden,                    )
5                                        )
                Plaintiff,                )
6                                        ) Case No.
         vs.                             ) 1:17-CV-002635-
7                                        ) CAB
        2K Games, Inc. and Take-Two      )
8       Interactive Software, Inc.,      )
                                         )
9               Defendants.              )
10               - - - - -
11
12              Deposition of:
                IAN BOGOST, Ph.D.
13            Appearing Remotely from
              St. Louis County, Missouri
14
15  ** HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER **
16
17
                 August 30, 2021
18                 10:00 a.m.
19
20
21
22
          Reporter:  Kristin Wegryn, RMR, CRR
23             Appearing Remotely from
               Cuyahoga County, Ohio
24
25

Veritext Legal Solutions

www.veritext.com                                  888-391-3376

Page 28

1   A.   I, I would clarify that I know that that
2   information was communicated to me from the
3   developers.  The means by which I received it is
4   what I can't tell you sitting here today.
5   Q.   When you say "the developers," who does
6   that mean?
7   A.   Representatives of Take-Two.  I mean
8   Take-Two.
9   Q.   What representatives of Take-Two?
10  A.   I'm not sure how, how to answer.  I was
11  interested in this information in the preparation
12  of my report.  I, I requested it and received and
13  incorporated it.
14          The, the organizational structure of a
15  large company such as Take-Two or 2K Games wasn't
16  of particular concern to me so long as I received
17  the information I was after.
18  Q.   Was the information communicated to you
19  by counsel?
20  A.   As I said before, I can't tell you
21  sitting here today the means by which this
22  information was conveyed to me.
23  Q.   When were you first engaged in this
24  matter, Dr. Bogost?
25  A.   Are you asking when I -- when I signed a

1    television and smartphones.  I looked at the, the
2    available information on the height of the
3    players; I looked at data regarding the content
4    of the game disks and evaluated and drew
5    conclusions based on those and other factors
6    cited in my report.
7        Q.   Did you review each of the games?
8        A.   As I previously testified, I did review
9    the games in conjunction with the preparation of
10   the report.
11       Q.   Did you play each of the games?
12       A.   I, I did interact with each of the
13   games.  I'm not sure whether and how much
14   interaction I had as a player with 2K21 pending
15   our -- or in relation to our previous discussion
16   thereof.
17       Q.   Did you review each of the modes in each
18   of the games?
19       A.   To the best of my knowledge, I reviewed
20   each of the modes in each of the games.
21       Q.   For how long?
22       A.   I can't tell you sitting here today how
23   long I spent with each of the games.
24       Q.   Hours?
25       A.   I certainly wouldn't be surprised if it

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 141

1  were hours.
2  Q. In each of the games?
3  A. They're really big games. There's a lot
4  to look at.
5  Q. Is that a "yes"?
6  MR. SIMMONS: Objection. Asked and
7  answered.
8  A. Yes.
9  Q. Did you play through an entire My Career
10 season?
11 A. I don't know if I played through an
12 entire My Career season in each game or not, but
13 I certainly interacted with the My Career mode.
14 Q. Did you play online?
15 A. I don't recall which elements of online
16 play I engaged with.
17 Q. How large was the monitor or television
18 screen you used?
19 A. It was surely much larger than the
20 average, which I delineate in my report. The
21 television I had at home at the time was
22 somewhere between 65 and 80 inches, whereas the
23 average screen is much smaller than that.
24 Q. Did you play with LeBron James, Danny
25 Green, and Tristan Thompson?

1        MR. SIMMONS: Objection. Vague and
2    ambiguous.
3        A.   If you're asking if I selected teams in
4    order to see teams including those players in
5    order to see how they were depicted in the games,
6    then I did.
7        Q.   And you were able to observe the capital
8    T Tattoos when you played with those players?
9        MR. SIMMONS: Objection. Calls for a
10   legal conclusion. Form. Mischaracterizes the
11   witness's testimony. Asked and answered.
12       A.   As my report rather clearly indicates, I
13   couldn't really see the portions -- the small
14   portions of the tattoos that plaintiff added to
15   existing tattoos or those that were hidden under
16   jerseys.
17           And my overall view is that any tattoos
18   in the game are difficult to see and that these
19   specific ones were particularly. So...
20       Q.   Did you attempt to look for the tattoos?
21       MR. SIMMONS: Objection. Vague and
22   ambiguous.
23       Q.   And by that, I mean, Dr. Bogost, of
24   course, the capital T Tattoos, as you define
25   them.

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 143

1  A. When you say "attempt to look for," what
2  do you -- what do you mean?
3  Q. What does that phrase mean to you?
4  A. It doesn't mean anything to me.
5  Q. Did you seek out the capital T Tattoos
6  when you played the games?
7  A. I'll say this.
8  MR. SIMMONS: Objection. I'm going to
9  say objection. Form.
10  A. My overall goal in evaluating the games
11  was to look for what the average player would
12  encounter in a typical ordinary experience of
13  playing the game.
14  I'm aware that the plaintiff has
15  indicated that there may be ways of manipulating
16  the pause screens or the replay mode to attempt
17  to zoom in on the action, as I discussed in my
18  report.
19  I think even in those cases, which I did
20  attempt to engage with, it's very difficult to
21  isolate any one specific element of the screen or
22  the character because of the way that those
23  interfaces behave, because they're not designed
24  to be tattoo-viewing tools and the game is not
25  designed to be a tattoo-viewing experience but a

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 158

1  changed the views in the game.  Again, my concern
2  was with the overall experience of play and the
3  visibility of different elements, especially the
4  tattoos in so doing.
5      Q.   How often do the Accused Video Games
6  show action replays?
7           MR. SIMMONS:  Objection.  Vague and
8  ambiguous.  Foundation.  Speculation and beyond
9  the scope of Dr. Bogost's report.
10     A.   Yeah.  I did not look at the frequency
11 of any one feature but rather the overall
12 experience of the game.
13          And, in particular, features such as the
14 replays were of limited concern as in relation to
15 the overall experience of play.
16     Q.   Do the players' tattoos appear in action
17 replays?
18          MR. SIMMONS:  Objection.  Form.
19     A.   When the players -- when an individual
20 player appears in the game, that individual
21 player appears in the game and whatever
22 appearance that player has, whatever was produced
23 by the creators and whatever is visible, based on
24 their angle to the camera, other things that are
25 between them and the camera and so on, would be

1  Q. May after-basket camera cuts zoom in on
2  individual players?
3  MR. SIMMONS: Objection. Form.
4  Foundation. Beyond the scope of the report.
5  A. Zoom in in what sense?
6  Q. Show a tighter picture of individual
7  players.
8  A. There are certainly portions of the game
9  that focus the camera at different levels of
10  zoom. That's also not really relevant to my
11  opinions because the total quantity of matches,
12  of teams, of individual elements, not to mention
13  the short duration of these cuts, and not to
14  mention the fact that even in these supposedly
15  zoomed-in or more-zoomed-in views, any individual
16  element is still difficult to see and moving
17  around. For all those reasons, the frequency of
18  such a feature was not of issue to me.
19  Q. The visibility of tattoos may be greater
20  when the camera zooms in on individual players,
21  correct, Dr. Bogost?
22  MR. SIMMONS: Objection. Vague and
23  ambiguous.
24  (Barking interruption.)
25  COURT REPORTER: Sorry. The dog that

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 175

1     MR. SIMMONS: Objection. Assumes facts
2  not in evidence, and foundation.
3     A.  I didn't make such a request. But,
4  also, it wouldn't have been relevant to my
5  opinions.
6     Q.  Dr. Bogost, look back at Exhibit
7  Number 5.
8     A.  Okay.
9     Q.  How long has that figure been on the
10  screen in front of you?
11     MR. SIMMONS: Objection. Form.
12     A.  Well, I mean, the answer is since you
13  introduced it into evidence, whenever that was.
14     Q.  A few minutes ago?
15     A.  At least a few minutes ago.
16     Q.  That image is not fleeting, is it,
17  Dr. Bogost?
18     MR. SIMMONS: Objection. Vague and
19  ambiguous. Mischaracterizes the documents.
20  Argumentative.
21     A.  It's just a category error. We are in a
22  totally different context here. You're
23  presenting an image artificially created for the
24  purpose of this deposition and comparing it to
25  the experience that a player would have in a

1   game. So I, I can't engage with the premise of
2   that question.
3           MR. MCMULLEN: Move to strike as
4   nonresponsive.
5       Q.  Dr. Bogost, can you answer my question?
6           MR. SIMMONS: Objection. Asked and
7   answered.
8           Can we have the question read back,
9   please.
10          COURT REPORTER: One moment.
11          (Record read by reporter as follows:
12          "Question: That image is not fleeting,
13          is it, Dr. Bogost?")
14          MR. SIMMONS: Objection. Vague and
15  ambiguous. Mischaracterizes the documents.
16  Asked and answered.
17      A.  The image is absolutely fleeting.
18      Q.  As it appears in Exhibit 5?
19      A.  Is Exhibit --
20          MR. SIMMONS: Objection.
21      A.  Is Exhibit 5 not the image in question?
22      Q.  Exhibit 5 is the image -- strike that.
23          MR. MCMULLEN: Can we pull up Exhibit 5
24  again, please.
25      Q.  Dr. Bogost, Exhibit 5 is the image of

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 177

1  the character from the 2K Games that you
2  identified as LeBron James that has been on the
3  screen for a number of minutes now.
4  　　　　Can you please answer my last question.
5  　　　　MR. SIMMONS: Objection. Asked and
6  answered. Foundation. You may answer.
7  　　A.　Okay. So, as I've already answered,
8  it's absolutely a fleeting image in exact -- in
9  exactly the same way as the -- as the imagery
10 that you might see in the game. Namely, this
11 image was brought up and I was looking at other
12 things. I was looking at the video feed. I was
13 looking at the window where it's -- where it's
14 raining.
15 　　　　This was not the focus of my attention,
16 and so even if you imagine that a player might do
17 whatever it is that you did in order to, to get
18 the screen into this configuration, maybe they
19 look at it for a moment and then they move on.
20 And if they don't move on, it's probably because
21 they're looking at other things. They're talking
22 to their friends. They're in the kitchen getting
23 a drink. They've left the room to go to the
24 bathroom.
25 　　　　So it's just -- it's just an artificial

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 178

1   representation of something that wouldn't take
2   place in ordinary use.  And if forced to make a
3   comparison between the actual experience of a
4   player of the game and my experience as a witness
5   looking at this exhibit, I think they're very
6   similar.
7       Q.   Dr. Bogost, would you agree that a
8   player of one of the Accused Video Games can see
9   an image of the sort depicted in Exhibit 5 here
10  for as long as they want in Edit Player mode?
11           MR. SIMMONS: Objection. Foundation.
12  Speculation.  Vague and ambiguous.  Beyond the
13  scope of the expert's report.
14      A.   I think it depends, but I also have no
15  basis on which answers any number of reasons why
16  that wouldn't be the case, not the least of which
17  is that that's not what players do at the game.
18  But even in the unlikely event that a player
19  configured a game to produce this exact view, any
20  number of other things might frustrate their
21  capacity to view it for as long as they want, as
22  you've asked, one of which is their television's
23  tendency to go dark or to otherwise kind of
24  timeout like an OLED TV would to avoid burn-in.
25           So we're just -- we're very -- to me,