# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN,<br><br>  Plaintiff,<br><br>v.<br><br>2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC. ,<br><br>  Defendants. | CASE NO. 1:17-cv-02635-CAB |

**DEFENDANTS 2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF JAMES HAYDEN'S MOTION TO EXCLUDE THE EXPERT TESTIMONY <u>OF DR. NINA JABLONSKI</u>**

**TABLE OF CONTENTS**

**Page**

**PRELIMINARY STATEMENT** ....................................................................................... 1

**ARGUMENT** ...................................................................................................................... 3

    I.    DR. JABLONSKI IS QUALIFIED TO RENDER HER EXPERT OPINIONS. ............................................................................................................ 3

    II.    DR. JABLONSKI DOES NOT OFFER LEGAL OPINIONS. .............................. 7

    III.    DR. JABLONSKI'S OPINIONS HAVE A SUFFICIENT FACTUAL BASIS. ...................................................................................................................... 9

    IV.    DR. JABLONSKI'S OPINIONS ARE RELEVANT AND PROPER ................. 15

**CONCLUSION** ................................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arrowood Indem. Co. v. U.S. Fire Ins. Co.*,
   No. 10 Civ. 2871, 2016 WL 6610806 (N.D. Ohio Feb. 21, 2016) ...........................................7

*Babb v. Maryville Anesthesiologists P.C.*,
   942 F.3d 308 (6th Cir. 2019) ...................................................................................................8

*Battaglia v. United States*,
   No. 07 Civ. 778, 2010 WL 11561513 (N.D. Ohio Sept. 9, 2010) ............................................8

*Berry v. City of Detroit,*
   25 F.3d 1342 (6th Cir. 1994) ...................................................................................................8

*Bonner v. ISP Techs., Inc.*,
   259 F.3d 924 (8th Cir. 2001) ...................................................................................................9

*Cent. Transp., LLC v. Thermofluid Techs., Inc.*,
   No. 18 Civ. 80, 2020 WL 50393 (E.D. Tenn. Jan. 3, 2020) ...................................................12

*In re Com. Money Ctr., Inc.*,
   737 F. Supp. 2d 815 (N.D. Ohio 2010) ....................................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .................................................................................................................3

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006) ......................................................................................7

*First Tenn. Bank Nat'l Ass'n v. Barreto*,
   268 F.3d 319 (6th Cir. 2001) ................................................................................................2, 7

*Hutchinson v. Parent*,
   No. 12 Civ. 320, 2015 WL 1914794 (N.D. Ohio Apr. 27, 2015) .............................................3

*Jahn v. Equine Servs., PSC,*
   233 F.3d 382 (6th Cir. 2000) ...................................................................................................6

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
   474 F.3d 288 (6th Cir. 2007) ...........................................................................................3, 4, 5

*Kovach v. Wheeling & Lake Erie Ry. Co.*,
   No. 18 Civ. 2826, 2021 WL 3774900 (N.D. Ohio Aug. 25, 2021) ..........................................3

*KSP Invs., Inc. v. United States*,
 No. 07 Civ. 857, 2008 WL 182257 (N.D. Ohio Jan. 17, 2008)..................................................9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
 387 F.3d 522 (6th Cir. 2004) ................................................................................................15

*In re Nat'l Prescription Opiate Litig.*,
 No. 17 Civ. 2804, 2019 WL 3934490 (N.D. Ohio Aug. 20, 2019) ...........................................8

*In re Nat'l Prescription Opiate Litig.*,
 No. 17 Civ. 2804, 2019 WL 3934597 (N.D. Ohio Aug. 20, 2019) .........................................15

*Photographic Illustrators Corp. v. Orgill, Inc.*,
 953 F. 3d 56 (1st Cir. 2020)......................................................................................................7

*Responsive Innovations, LLC v. Hotlzbrinck Publishers, LLC,*
 No. 08 Civ. 1184, 2014 WL 1237632 (N.D. Ohio Mar. 25, 2014)............................................5

*Simpson v. Johnson & Johnson*,
 No. 20 Civ. 1237, 2020 WL 5630036 (N.D. Ohio Sept. 21, 2020) ..........................................8

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
 449 F. Supp. 3d 333 (S.D.N.Y. 2020)............................................................................1, 4, 5, 7

*Specht v. Jensen*,
 853 F.2d 805 (10th Cir. 1988) ..................................................................................................8

*Summerland v. Cnty. of Livingston*,
 240 F. App'x 70 (6th Cir. 2007) ...............................................................................................8

*United States v. L.E. Cooke Co.*,
 991 F.2d 336 (6th Cir. 1993) ..............................................................................................9, 15

*United States v. Langan,*
 263 F.3d 613 (6th Cir. 2001) ..................................................................................................12

*Wilchombe v. TeeVee Toons, Inc.*,
 555 F.3d 949 (11th Cir. 2009) ..................................................................................................7

*Williams v. Gen. Motors Corp.*,
 No. 03 Civ. 2060, 2007 WL 3232292 (N.D. Ohio Oct. 30, 2007) ...........................................3

**Rules**

Federal Rule of Evidence 702...........................................................................................................3

iii

Defendants Take-Two Interactive Software, Inc. and 2K Games, Inc. (collectively, "Take-Two") respectfully submit this memorandum of law in opposition to James Hayden's ("Plaintiff") motion to exclude the expert testimony of Dr. Nina Jablonski (the "Motion").

## PRELIMINARY STATEMENT

Dr. Nina Jablonski is an award-winning professor at The Pennsylvania State University, where she has spent decades researching, writing about, and lecturing on human skin, including the history, customs, and practices of tattooing. She has been recognized as an expert in tattoo practices by the Southern District of New York, which credited and relied on her testimony in a nearly identical case involving tattoos on players in *NBA 2K*. *See Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 352 (S.D.N.Y. 2020) (rejecting a motion to exclude Dr. Jablonski's expert opinions). For the present case, Dr. Jablonski again provides invaluable insight on tattoo industry practices and customs, and the ways in which Plaintiff's copyright claim represents a radical departure therefrom. Her testimony thereby assists the Court in assessing Take-Two's implied license and fair use defenses, for which tattoo industry standards are highly relevant, as well as issues of originality and authorship.

In her expert report, Dr. Jablonski describes five conclusions she reached in this case: (1) tattoos are vehicles for the personal expression of the tattooed person; (2) the tattooed person chooses and controls the content of the tattoo inked on his or her body; (3) it is customary in the tattoo industry that tattooists and clients expect and intend that after the client is inked, the client will show and allow others to show his or her tattoos without needing to return to the tattooist for permission; (4) Plaintiff's position that Take-Two needed separate permission from Plaintiff to show Danny Green's, LeBron James', and Tristan Thompson's tattoos in *NBA 2K* is inconsistent with tattoo industry standards; and (5) Dr. Jablonski is not aware of a market for licensing tattoos for use in video games and such a market would be contrary to tattoo industry customs. Dkt 95-

1

10 ¶ 3.  Tellingly, Plaintiff has not put forward a tattoo industry expert to refute *any* of these conclusions.  This is because, as a tattooist himself, Plaintiff knows that Dr. Jablonski's opinions correctly capture long-accepted industry practices and expectations.  In fact, as detailed below, Plaintiff *admitted* as much in his own deposition.  Faced with the obvious truth and compelling nature of her conclusions, Plaintiff tries to have them excluded.  His Motion should be denied.

*First*, Plaintiff argues that Dr. Jablonski is unqualified to offer her opinions on tattooing.  Plaintiff ignores Dr. Jablonski's decades of experience researching tattoos, including their history and proliferation, as well as recent tattooing practices and trends.  While Plaintiff confusingly tries to say that Dr. Jablonski's expertise is just on "the evolution of human skin," Pl.'s Mot. 2, that criticism makes no sense.  As Dr. Jablonski has repeatedly explained, her study of human skin *includes* tattoos.  As part of her work on human skin, Dr. Jablonski has researched and written about tattoos, interviewed tattooists and tattooed people, reviewed documentaries and ethnographic interviews about tattooing, and observed and visited tattoo parlors.  In fact, she previously researched and considered highly similar questions as an expert in *Solid Oak*.

*Second*, Plaintiff repeatedly misrepresents Dr. Jablonski's report by arguing that she offers opinions about legal rights and copyright ownership.  Dr. Jablonski *does not* opine on these issues—indeed, her report does not even mention copyright ownership.  *See generally* Dkt. 95-10.  Rather, her testimony concerns tattoo industry practices and customs, as well as tattooist's and tattooed people's expectations, not legal issues.

*Third*, Plaintiff contends that Dr. Jablonski's testimony is speculative and not based on sufficient facts and data.  Far from speculative, however, Dr. Jablonski's opinions are based on her research and knowledge as a tattoo industry expert, including her review of academic literature, documentaries, ethnographic interviews, observations of tattoo parlors, and interviews

2

with tattooists and tattooed persons. Dr. Jablonski's conclusions are also corroborated by documents and sworn testimony, including statements by (1) Plaintiff, (2) his colleague Bernardino Tovanche, (3) other professional tattooists, and (4) one of the tattooed people in this case, LeBron James.

*Finally*, Plaintiff's remaining catchall argument that Dr. Jablonski's opinions cover "improper subject matter" is baseless and confusing as to which opinions he is even talking about. Courts regularly rely on expert testimony like the opinions Dr. Jablonski offers with regard to custom and practice. Thus, the Court should deny Plaintiff's Motion.

## ARGUMENT

Dr. Jablonski opinions are well-reasoned and well-supported. Plaintiff's mere disagreement therewith is not grounds for exclusion; to the extent Plaintiff has any basis to dispute Dr. Jablonski's opinions, he will have the opportunity to cross-examine her at trial. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *Kovach v. Wheeling & Lake Erie Ry. Co.*, No. 18 Civ. 2826, 2021 WL 3774900, at *2 (N.D. Ohio Aug. 25, 2021).

### I. DR. JABLONSKI IS QUALIFIED TO RENDER HER EXPERT OPINIONS.

Pursuant to Federal Rule of Evidence 702, "[a]n expert may be qualified via their 'knowledge, skill, experience, training or education,' or a combination of these factors." *Hutchinson v. Parent*, No. 12 Civ. 320, 2015 WL 1914794, at *1 (N.D. Ohio Apr. 27, 2015) (finding expert was qualified based on "education and experience") (internal citations omitted); *see also Williams v. Gen. Motors Corp.*, No. 03 Civ. 2060, 2007 WL 3232292, at *1 (N.D. Ohio Oct. 30, 2007) (finding expert qualified based on admission as an expert by other courts); *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007) (finding expert's background left him "well-positioned to assist the trier of fact to make sense of" the evidence).

Dr. Jablonski readily meets this standard. She is the Evan Pugh University Professor of

Anthropology at The Pennsylvania State University, where she conducts research on the cultural meaning of human skin. Dkt. 95-10 ¶ 1. Over Dr. Jablonski's 30 years in academia, she has become a leading expert on human skin and the history, customs, and meaning of tattoos. *Id.* ¶¶ 5–6. In her book, Skin: A Natural History, she investigates the history of tattooing and the spread of tattooing across the globe. *Id.* ¶ 6. Since the publication of her book, she has continued to research tattoos, reviewing "newly published academic research on tattooing," "keeping up to date with new trends in tattooing including tattooing history via specialist web sites," *id*, interviewing tattooists and tattooed people, and visiting tattoo shops. Declaration of Miranda D. Means ("Means Decl.") Ex. A (Jablonski Tr.) 10:20–11:20; 62:12–64:3. Dr. Jablonski has given interviews on tattooing to numerous media outlets, including *BBC News Magazine*, *National Post*, and *Indlander*, as well as myriad lectures on the subject of skin decoration and tattooing to national and international audiences. Dkt. 95-10 ¶¶ 11–12. In addition to conducting her own interviews, she has consulted with other researchers and reviewed ethnographic interviews, documentaries, and videos about tattoos. Dkt 85-3 at 195:22–196:3; Means Decl. Ex. A (Jablonski Tr.) 242:22–243:6.

      Dr. Jablonski's expertise in tattoo customs and practices was recognized by the Southern District of New York in a highly similar copyright lawsuit concerning the realistic depiction of NBA players, including Mr. James, with their tattoos in *NBA 2K*. *Solid Oak*, 449 F. Supp. 3d at 352. The *Solid Oak* court cited her opinions on the history and the purpose of tattooing in support of its finding for summary judgment for Take-Two, including the fact that tattoos "reflect the personal expression of the person bearing the tattoo and are created for that purpose." *Id.* at 339–340. Moreover, the court soundly rejected the plaintiff's attempt to exclude Dr. Jablonski's testimony, finding that the record "amply demonstrates Dr. Jablonski's relevant body

4

of knowledge," including her "over 100 peer-reviewed scholarly contributions on skin." *Id.* at 352 (internal quotation marks omitted). It concluded that "Dr. Jablonski's knowledge of the tattoo industry is sufficiently specialized to permit the Court to conclude that her opinions will likely assist the trier of fact in arriving at the truth." *Id.* at 351–52.

Plaintiff insists that Dr. Jablonski is not qualified to opine on tattoos because she studies other aspects of anthropology (the study of human culture and customs), such as the "evolution of human skin." Pl.'s Mot. 7. But, as Dr. Jablonski repeatedly explained during her deposition, tattoos *are* part of her research on human skin. Means Decl. Ex. A (Jablonski Tr.) 10:1–8. The fact that Dr. Jablonski researches other areas of anthropology as well is inapposite; indeed, courts will admit experts with generalized knowledge even where they have *no* experience in a specific sub-field. *See*, *e.g.*, *Surles ex rel. Johnson*, 474 F.3d at 294 (expert's general background allowed him to render opinions about a specific industry). In *Responsive Innovations, LLC v. Hotlzbrinck Publishers, LLC*, for example, Your Honor concluded that just because an expert had "little or no experience in a subset of wireless communications . . . does not require his exclusion from testifying" where he had general knowledge based on "skill, experience, training, or education." No. 08 Civ. 1184, 2014 WL 1237632, at *3 (N.D. Ohio Mar. 25, 2014) (denying motion to exclude expert testimony). Dr. Jablonski's credentials are far stronger than in these cases because she *does* have extensive experience studying tattoos particularly, as they are a critical part of her research on human skin. *Supra* 4.[1]

Unable to refute her qualifications, Plaintiff asserts that, even if Dr. Jablonski is generally

---

[1] Plaintiff points to Dr. Jablonski's CV, arguing that the number of times "tattoo" is mentioned compared with the word "monkey" is somehow relevant to the Court's analysis. Pl.'s Mot. 8. Tattoos are, as Dr. Jablonski explains in her report, part of her study of human skin and the use of human skin as a means of personal expression ("skin," incidentally, is mentioned in her CV over ***320*** times). Dkt. 95-10, Ex. A; Means Decl. Ex. A (Jablonski Tr.) 40:22–41:19 (describing tattoos as a "major topic" in the study of human skin).

5

an expert in tattoos, she needs specialized knowledge of tattooists' and clients' expectations related to "tattoo ownership and rights" to testify here.[2] Pl.'s Mot. 8–9.  This is a case of misdirection.  Dr. Jablonski does not opine on tattoo ownership or copyrights; her report, rather, discusses the customs and practices of the tattoo industry, and concludes that tattooists and clients expect that when clients leave the tattoo parlor, they are free to show and allow others to show the tattoos on their bodies without returning to their tattooists for permission.  *See generally* Dkt. 95-10.  This is based on Dr. Jablonski's extensive experience researching tattoos, and is corroborated by sworn testimony from tattooists and tattooed people describing their expectations about precisely this topic, *see* Dkt. 95-10, Exs. 3–8, including Plaintiff's own statements on the matter, *see, e.g.*, *id.* ¶¶ 62–65, nn. 52–58.  Indeed, Dr. Jablonski researched and discussed this specific issue before, having previously provided opinions in *Solid Oak*.

Plaintiff further argues that Dr. Jablonski needs specialized economic, marketing, or business expertise on "how copyright ownership of tattoos would affect the tattoo industry," as well as the market for licensing tattoos.  Pl.'s Mot. 11, 14.  This is further misdirection.  Dr. Jablonski does not opine on "copyright ownership," nor does she offer opinions on economics, marketing, or business; rather she uses her knowledge of tattooing practices to opine on how those practices would be impacted if clients needed to get permission to show the tattoos on their bodies, and how a market for licensing tattoos is inconsistent with those practices.  For instance, because the current expectation is that tattooed people can freely show their bodies with their tattoos, changes to that expectation would deter people from getting and showing tattoos, thereby harming the industry.  Dkt. 95-10 ¶¶ 61–69.  At most, any relative lack of experience with the

---

[2] Plaintiff also asserts that Dr. Jablonski needs first-hand experience tattooing or being tattooed to be qualified. There is no requirement that an expert personally participate in their subject to testify about it. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 389 (6th Cir. 2000) (lack of "hand-on familiarity" with subject was "not relevant" to ruling on admissibility of expert).

6

economics or marketing of tattoos would go to weight, not admissibility. *See First Tenn. Bank Nat'l Ass'n v. Barreto,* 268 F.3d 319, 333 (6th Cir. 2001) (finding unfamiliarity with some specific aspects of subject "merely affected the weight" of testimony "not its admissibility").

## II. DR. JABLONSKI DOES NOT OFFER LEGAL OPINIONS.

Dr. Jablonski provides expertise on tattoo industry standards, not "legal opinions," as Plaintiff contends, Pl.'s Mot. 4. Courts **regularly** credit expert testimony on industry standards. *See Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (relying on expert to establish industry standards supporting existence of a license); *see also Arrowood Indem. Co. v. U.S. Fire Ins. Co.*, No. 10 Civ. 2871, 2016 WL 6610806, at *2 (N.D. Ohio Feb. 21, 2016) (expert testimony on industry standards was proper, even where "ancillary to the ultimate legal conclusion"). Such testimony is relevant to the existence of an implied license. *See, e.g., Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (finding music industry practice determined implied license); *Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F. 3d 56, 65 (1st Cir. 2020) (holding "nature of the business" made it "obvious" plaintiff wanted defendant to use work, *i.e.*, license); *Solid Oak*, 449 F. Supp. 3d at 352 (finding Dr. Jablonski's opinions on "norms in the tattoo industry" were admissible).

Consistent with the forgoing cases, in this case, Dr. Jablonski provided her expert opinions on tattoo industry customs and practices. Specifically, she explained that tattoos are important vehicles for the personal expression of tattooed persons and that, when people leave the tattoo parlor, they do not expect to have to go back and ask their tattooists for permission before they show or allow others to show their tattoos. Dkt. 95-10 ¶ 3. Evidently realizing that Dr. Jablonski's opinions are appropriate, Plaintiff either paraphrases them in a misleading way—such as *adding* the word "legal" where Dr. Jablonski did *not* use that word, Pl.'s Mot. 9—or simply takes them out of context. For example, Plaintiff misleadingly quotes the following

7

section of Dr. Jablonski's report by *excluding* the underlined portions thereof that make clear that she is talking about custom and practice, not copyright law: "This is **because the norm of the tattoo industry** is that tattooists do not seek to control their tattoos as they appear on their clients. **From the tattooist's perspective**, once tattooed, he or she intends that the client goes out into the world displaying that tattoos and the tattooist relinquishes all rights over the display and reproduction of the tattoos as it appears in real life." Dkt. 95-10 ¶ 65 (emphasis added). Plaintiff's cherry-picked quotes, Pl.'s Mot. 5, when placed in their proper context, are clearly about expectations and customs, not legal rights. *See Id.* ¶¶ 36–37, 67.

The mere fact that Dr. Jablonski occasionally uses the term "rights" does not render her report excludable. Courts have long recognized "that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible" and may "couch[]" factual testimony "in legal terms." *Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988); *see also Babb v. Maryville Anesthesiologists P.C.,* 942 F.3d 308, 317 (6th Cir. 2019) (admitting expert testimony about the "standard of care"). Here, Dr. Jablonski is not even referring to "rights" in the legal sense, she is referring to "the customs and practices of the tattoo industry," and "tacit or explicit expectation[s]" of tattooists and tattooed persons. Dkt. 95-10 ¶¶ 37, 61, 65. Plaintiff's motion to exclude the Jablonski Report on this basis should be denied.[3]

---

[3] The cases Plaintiff cites are inapposite. In *Berry v. City of Detroit*, the court held that an expert's opinion *may* "embrace[] an ultimate issue to be decided by the trier of fact," but it needs to be factual. 25 F.3d 1342, 1353 (6th Cir. 1994). In *Berry*, the expert concluded that certain facts meant that an officer had acted with "deliberate indifference," a legal element, and therefore the opinion constituted a legal conclusion. *Id.* By contrast, Dr. Jablonski explains industry practices but she *never* offers opinions on whether there was an "implied license" under the law. Dkt. 95-10 ¶¶ 33–45. The other cases Plaintiff cites involve conclusions the legal implications of facts, which is not what Dr. Jablonski opines on here. *See Summerland v. Cnty. of Livingston*, 240 F. App'x 70, 81 (6th Cir. 2007) (conclusion about whether there was "reasonable cause" was a legal conclusion); *Battaglia v. United States*, No. 07 Civ. 778, 2010 WL 11561513, at *4 (N.D. Ohio Sept. 9, 2010) (conclusion on whether consent was "legally effective" was a legal opinion); *Simpson v. Johnson & Johnson*, No. 20 Civ. 1237, 2020 WL 5630036, at *4–5 (N.D. Ohio Sept. 21, 2020) (conclusion on whether warning was legally adequate was a legal opinion); *In re Nat'l Prescription Opiate Litig.*, No. 17 Civ. 2804, 2019 WL 3934490, at *4 (N.D. Ohio Aug. 20, 2019) (opinions on what the law requires were legal opinions); *In*

8

Plaintiff also attempts to preclude Dr. Jablonski from testifying about whether Plaintiff "owns a valid copyright in the tattoos he inked" on the basis that this is a legal opinion. Pl.'s Mot. 6, 9. This is a strawman. Dr. Jablonski's report does not say that Plaintiff does not or cannot own copyrights in the Tattoos. *See generally* Dkt. 95-10. Plaintiff's counsel repeatedly pressed Dr. Jablonski to give him legal opinions during her deposition—at each juncture, counsel for Take-Two objected and clarified that Dr. Jablonski is not being proffered on this issue and is not a lawyer. Dkt. 85-3 at 75:23–76:23. Indeed, she testified: "I am an anthropologist interested in the meaning of tattoos, not in the legal status of tattoos." *Id.* at 245:15–246:4. It would be a bizarre outcome indeed if Plaintiff's own attempts to elicit legal opinions, which Dr. Jablonski did not propound and never claimed expertise in, rendered her opinions inadmissible.

### III. DR. JABLONSKI'S OPINIONS HAVE A SUFFICIENT FACTUAL BASIS.

Plaintiff's argument that Dr. Jablonski's opinions are not "based on facts and data," Pl.'s Mot. 9–15, which he bases in part on his own inaccurate rendition of those opinions, should be rejected. The Sixth Circuit has held that "[w]here an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded." *United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir. 1993); *KSP Invs., Inc. v. United States*, No. 07 Civ. 857, 2008 WL 182257, at *5 (N.D. Ohio Jan. 17, 2008). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).

***First***, Plaintiff argues that Dr. Jablonski's opinions on tattooists' and clients' expectations

---

*re Com. Money Ctr., Inc.*, 737 F. Supp. 2d 815, 838 (N.D. Ohio 2010) (opinions on "breach of duty" were inadmissible).

9

"related to tattoo ownership and rights" are not based on sufficient facts and data. Pl.'s Mot. 9. To be clear, Dr. Jablonski opines on what is customary in the tattoo industry, *i.e.*, that tattooists and clients expect and intend that after the client is inked, the client will show and allow others to show his or her tattoos without needing the tattooist's permission, Dkt. 95-10 ¶¶ 36–37, not "legal rights," Pl.'s Mot. 9. Dr. Jablonski's opinions are based on her extensive expertise in human skin and tattooing, including her decades researching "***more than 20 centuries of evidence***" about decorative tattooing practices. Dkt. 95-10 ¶ 33. Dr. Jablonski reaches her conclusions by drawing on her extensive knowledge-base, including her review of academic literature, documentaries, and ethnographic interviews on tattoos, observations of tattoo parlors, and interviews with tattooists and tattooed persons. *Supra* 4.

Her conclusions are further corroborated by depositions in this case, including the depositions of Plaintiff and his colleague, Bernardino Tovanche; her review of sworn testimony from other tattooists involved in multiple court proceedings involving tattoos; and her review of the declaration of LeBron James, who expressly explained his expectations about getting a tattoo. *See*, *e.g.*, Dkt. 95-10, Exs. 3–5 (Tattooist Decls.); 6 (James Decl.) ¶ 11 ("No tattooist has ever told me I needed their permission to be shown with my tattoos, even when it was clear I was a public basketball player."); 7 (Glatstein Decl.) ¶ 11; 8 (Alexander Tr.) 66:2–8 (Q: "Is it fair to say that when the client leaves your tattoo shop, it's your understanding they're free to go about their life without needing to go back to you for permission as to how they're depicted with their tattoos?" A: "Yes, ma'am."); Dkt. 101-22 at 182:3–19 (admitting he could not think of a scenario where a client would need permission from their tattooist before appearing in media). [4]

---

[4] Plaintiff asserts that Dr. Jablonski did not cite any academic articles, Pl.'s Mot. 10–11, but Dr. Jablonski cites numerous academic articles in her report, and a variety of other sources, described herein, which Plaintiff simply chose to ignore.

10

Plaintiff claims that Dr. Jablonski's opinions on tattooist and client expectations are based solely on "litigation-driven declarations from four tattoo artists in the *Solid Oak* case," Pl.'s Mot. 9–10. This is a complete mischaracterization, as Dr. Jablonski details a myriad of other sources for her conclusions in her extensive expert report, Dkt. 95-10, Ex. 2, and there was nothing improper about citing sworn testimony from other tattooists in a similar litigation. Plaintiff further asserts that Dr. Jablonski had only a "single" conversation with a tattooist that "touched on copyrights." Pl.'s Mot. 10. Plaintiff's suggestion that Dr. Jablonski needed to have spoken to more tattooists about "copyrights" or "legal rights," Pl.'s Mot. 9–10, is also inapposite because her opinions are not about copyright ownership. *Supra* 6. Moreover, Dr. Jablonski's views are based on far more than conversations with tattooists, including her decades researching tattoos, corroborated by documents and sworn testimony. *Supra* 4–5. The fact that Dr. Jablonski does not regularly discuss copyrights with tattooists is also hardly surprising, as Dr. Jablonski explains, given the novelty of a tattooist seeking to prevent his clients from being depicted with their own tattoos. *See* Dkt 85-03 at 115:14–24 ("The idea of such conversations arising is simply unheard of."). Plaintiff also confusingly argues that Dr. Jablonski does not have a factual basis because, when asked during her deposition if she knew Plaintiff's "state of mind," Dr. Jablonski said that she did not, Pl.'s Mot. 10. Obviously, Dr. Jablonski could not directly plumb Plaintiff's mind, but she had access to ample evidence of his beliefs, including his own sworn testimony which only corroborates her testimony and supports her conclusions about tattooist's expectations. Dkt. 95-10, Ex. 2. Plaintiff's criticisms do not warrant exclusion.

**Second**, Plaintiff argues that Dr. Jablonski's opinions about how "copyright ownership would affect the tattoo industry" are not supported. Pl.'s Mot. 11. Again, this is a strawman, as Dr. Jablonski does not opine on copyright ownership. Rather, she describes three effects that

11

changing the "norm of allowing those whom are tattooed free rein over the tattoos that appear on their bodies" would have on the industry: (1) potential clients "would hesitate before being tattooed if they had to agree beforehand to seek permission to display or disseminate the image of their tattoo on their body," (2) one of the primary ways tattooists get business, through people seeing examples of their work, would be undermined if clients could not freely share their tattoos without getting tattooist permission first, and (3) others would be inhibited from freely depicting individuals with tattoos. Dkt. 95-10 ¶¶ 41–44. Far from speculative, Dr. Jablonski's opinions are based on her decades of experience studying tattoo practices and customs, bolstered by her conversations with tattooists and tattooed individuals, and her observations of tattooing practices, all of which she details in her report. This is sufficient under Rule 702. *Cent. Transp., LLC v. Thermofluid Techs., Inc.*, No. 18 Civ. 80, 2020 WL 50393, at *8 (E.D. Tenn. Jan. 3, 2020) (testimony based on more than "unsupported speculation" was admissible).

Knowing that Dr. Jablonski has a reasonable factual basis for these opinions, Plaintiff tries to move the goal posts. He opaquely argues that Dr. Jablonski's opinions do not "fit with the facts" of this case[5] because Dr. Jablonski's analysis concerns the impact of requiring tattooed people to get express permission to allow others to show their tattoos in media—he implies that, if his lawsuit were successful, only video game companies would be required to get permission to show tattoos. Pl.'s Mot. 12. This argument overlooks a major premise of Plaintiff's own claim, his contention that Messrs. Green, James, and Thompson did not have the right to license their own tattoos as part of their likenesses to Take-Two. Plaintiff hopes to usurp control of

---

[5] Plaintiff cites *United States v. Langan*, on this point. 263 F.3d 613, 623 (6th Cir. 2001). In that case, however, the court was considering whether expert testimony would be helpful in assessing an eyewitness identification. The court found that the testimony was unhelpful because a jury is generally aware of the hazards of witness identification. *Id.* at 624. This is totally different than the circumstances here, as Dr. Jablonski is providing testimony on tattoo industry standards and customs about which jurors, particularly those without tattoos or those who are unfamiliar with the industry, may not be aware.

these players' likenesses without directly suing them by contending that, even when they give a company permission to show their own bodies, they cannot be shown without Plaintiff's additional say-so. Dr. Jablonski's analysis of how the tattoo industry would be impacted if tattooed people were stripped of their unilateral ability to show and allow others to show themselves as they really look is therefore the precise scenario at issue in this case.

By purposefully ignoring the impact that his spurious copyright claim will have on tattooed people, Plaintiff unjustifiably disregards Dr. Jablonski's full opinions and testimony about how industry practices would be impacted if permission from tattooists was required before showing a person with their tattoos. Means Decl. Ex. A (Jablonski Tr.) 177:22–182:11.[6] Plaintiff misleadingly implies that Dr. Jablonski's *only* opinion about the impact of requiring permission from tattooists before showing tattoos in media is that it would create an "unwieldy bureaucracy" and record-keeping requirements for tattooists. Pl.'s Mot. 12. Not only is this a misrepresentation of Dr. Jablonski's opinions, which include three other impacts on the industry, *supra* 12, but there is ample factual support for this opinion, including Dr. Jablonski's research and review of ethnographic interviews, documentaries, YouTube videos that discuss documentation and recordkeeping, and observations of tattoo parlors. Dkt. 85-3 at 195:22–196:3.[7] Dr. Jablonski's opinions are therefore admissible.

---

[6] Plaintiff further argues that Dr. Jablonski's conclusions are illogical because most tattooists "do not ink professional athletes." Pl.'s Mot. 13. But Dr. Jablonski considered the impact on all tattooed persons, not just professional athletes. Strangely, Plaintiff also contends that Dr. Jablonski's finding that others would be inhibited from freely depicting individuals with tattoos if they were required to get permission from their tattooists lacks "factual support," because if Take-Two specifically were not permitted to show the tattoos, the tattoos will "still be shared in other forms of media." Pl.'s Mot. 13. Plaintiff again ignores the premise of his lawsuit: that Messrs. Green, James, and Thompson are not free to authorize others to show their own bodies with their tattoos. If showing individuals, even with their permission, risks inciting litigation, then at least some people will be inhibited from depicting them.

[7] Plaintiff argues that Dr. Jablonski should have conducted a "systematic survey of tattoo artists" on this point and bizarrely mocks her ethnographic research as "window-shopping." Pl.'s Mot. 13. Plaintiff cites no legal support for disregarding Dr. Jablonski's factual bases here.

13

***Third***, Plaintiff asserts that Dr. Jablonski's conclusions on the lack of a market for licensing the tattoos do not have a sufficient factual basis. Pl.'s Mot. 14. Dr. Jablonski explained that she is unaware of a market for licensing tattoos in video games, and that tattoo customs and practices make it unlikely that such a market will develop. Dkt. 95-10 ¶ 61. Again, her opinions are based on "years of studying the customs and practices of the tattoo industry and the ways that humans use tattoos for self-expression," and they, like her other opinions, are corroborated by testimony and documents. *Id.* ¶ 63. Numerous depositions, including Plaintiff's, confirm the obvious truth of Dr. Jablonski's conclusions. *See e.g.*, Means Decl. Ex. B (Hayden Dep Tr.) 173:6–12 (Q: Have you ever licensed a tattoo for a video game? A: No. Q: Do you know of any other tattooist who has licensed a tattoo for a video game? A: I don't know if there's any that have. Q: None that you know of? A: Not that I know of.); 120:19–24. (Q: When you were inking the NBA players, Mr. Green, Mr. Thompson, Mr. James, did you ever tell anyone that your permission would be needed before their likeness could be depicted showing their tattoos? A: No.). [8]

Dr. Jablonski is not required, as Plaintiff suggests, Pl.'s Mot. 14, to rely just on conversations with tattooists about a market for tattoos, as opposed to the myriad other kinds of research and evidence on which she relies, to render these opinions.[9] It makes sense why this

---

[8] Plaintiff points to certain releases he produced in this case, the majority of which are unsigned and none of which are copyright licenses. Dr. Jablonski provides a detailed analysis of these releases, and why they do not change her opinions. Dkt 95-10 ¶ 62 n.50.

[9] As with Plaintiff's other arguments, Plaintiff again mischaracterizes Dr. Jablonski's testimony and takes it out of context. Pl.'s Mot. 14. Dr. Jablonski never states that speaking to "tattoo artists or media companies" about "licensing tattoos in media" would be completely irrelevant to her report. The cited testimony, rather, was specific to video game developers. Dkt. 85-3 at 113:20–114:12 (Q: "Have you spoken with any video game publishers or developers besides the defendants in this case to ask them whether they've licensed a tattoo for use in a video game?" A: "No, I did not. It was completely irrelevant to my report…My report also describes how other tattooists have—including the plaintiff in this case—have indicated that they never sought to get any license for using an image of one of the tattoos that they placed on a body to have that image licensed in any way.").

14

topic would not have arisen in conversations with tattooists; contacting tattooists for permission to show people with their tattoos is "completely outside the bounds of common expected practice." Means Decl. Ex. A (Jablonski Tr.) 179:17–25. Recognizing the truth of her opinions, Plaintiff is simply trying to keep out of evidence opinions which hurt his case and to which he tellingly has no rebuttal. This is not a proper basis to exclude a qualified expert. *See In re Nat'l Prescription Opiate Litig.*, No. 17 Civ. 2804, 2019 WL 3934597, at *2 (N.D. Ohio Aug. 20, 2019) (challenge to accuracy of conclusions goes to weight, not admissibility (citing *L.E. Cooke Co.*, 991 F.2d at 342)). Plaintiff's Motion should be denied.

## IV. DR. JABLONSKI'S OPINIONS ARE RELEVANT AND PROPER

Finally, Plaintiff vaguely argues that all of Dr. Jablonski's "remaining" opinions are not relevant or not the proper subject of expert testimony. Pls.' Mot. 15. He asserts that an account of the history of tattooing and its processes has "nothing to do with this case," in spite of the fact that the purpose of tattoos is squarely relevant to the fair use defense. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (first factor favored fair use where works were used for "[different] purposes"). Plaintiff also argues that Dr. Jablonski's account of the reasons the NBA players got tattoos is improper because she cannot know their states of mind. Objective evidence and testimony is in the record that allows Dr. Jablonski to opine on this topic. Indeed, the Southern District of New York admitted highly similar testimony in *Solid Oak*. There is no reason to discount this testimony, and it is certainly not "improper" subject matter for an expert.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Exclude the Expert Testimony of Dr. Nina Jablonski should be denied.

15

Dated:  New York, NY
      November 22, 2021

/s/ *Dale M. Cendali*
Dale M. Cendali (admitted *pro hac vice)*
Joshua L. Simmons (admitted *pro hac vice*)
Chris Ilardi (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.*