# EXHIBIT A

ATTORNEYS EYES ONLY

Page 1

1     UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF OHIO
3         EASTERN DIVISION
4             * * *
5  JAMES HAYDEN,
6       Plaintiff,
7    vs.              CASE NO. 1:17-cv-02635-CAB
8  2K GAMES, INC., et al.,
9       Defendants.
10            * * *
11      Deposition of NINA JABLONSKI,
12  Witness herein, called by the Plaintiff for
13  cross-examination pursuant to the Rules of Civil
14  Procedure, taken before me remotely, Stacey M.
15  Mortsolf, RPR, CRR, a Notary Public in and for the
16  State of Ohio, in State College, Pennsylvania, on
17  Wednesday, August 18, 2021, at 9:54 a.m.
18            * * *

ATTORNEYS EYES ONLY

Page 10

```
 1          Q.   Okay.  You said you reviewed your
 2   professional background in tattoos, and you've
 3   noted that that's copious.  What did you review
 4   exactly?
 5          A.   I reviewed my own background in
 6   the study of skin, which is extensive, and my
 7   study of tattoos as part of the study of skin
 8   in human evolution.
 9          Q.   What do you mean by you reviewed
10   your background?
11          A.   I reviewed my own history, when I
12   started studying skin, when I started studying
13   tattoos, and basically just refreshed my own
14   history.
15          Q.   Does that mean you looked at your
16   CV to assess when you began your study in skin?
17          A.   I consulted my CV only to look for
18   specific dates; for instance, when I had given
19   interviews about tattoos.
20          Q.   So you've given interviews about
21   tattoos in your past?
22          A.   Yes, I have.
23          Q.   About how many?
24          A.   Two of them are available widely
25   on the Internet, but I have given others, and I
```

Page 11

1  can't remember exactly how many I have given.
2  Many.
3          Q.   When you say -- when you say you
4  gave interviews, does that mean somebody
5  interviewed you?
6          A.   That is correct.
7          Q.   And are those interviews listed in
8  your expert report?
9          A.   One of them is listed.  Another of
10 the internet reports is not listed.  I noted
11 that that was actually absent.  And then many
12 of the other interviews are not listed because
13 they were casual interviews given as part of
14 podcasts over the years.
15         Q.   Can you describe the interview
16 that you said that's not listed in a way that
17 would help me find it if I looked on the
18 Internet?
19         A.   Yes.  It is a BBC interview from
20 2013.  It's called The Rise of the Text Tattoo.
21         Q.   Okay.  And then you said you've
22 given podcasts?  Let me rephrase that.  You
23 said you've been interviewed on podcasts in the
24 past, is that right?
25         A.   Yes.

1  and evolutionary is used in a very broad context
2  indeed.
3  BY MR. ALEXANDER:
4      Q.  What are some other aspects of
5  evolution besides -- strike that.  What other
6  aspects about evolution have you studied
7  besides the evolution of markings placed on
8  human skin?
9      MS. CENDALI:  Objection to form.
10 Overbroad.  You can answer.
11     THE WITNESS:  I've studied the
12 evolution of primate and human skeletons and
13 muscles and movement and feeding and skin as a
14 biological organ; for instance, how skin with hair
15 or without hair actually works.  I've studied the
16 evolution of skin as a sweating organ.  So
17 evolution is extremely broad here, and I've
18 studied many aspects of primate and human bodies,
19 including the cultural aspects that pertain to
20 human life and to their evolution.
21 BY MR. ALEXANDER:
22     Q.  Why don't you list anything about
23 tattoos in your major research interests?
24     MS. CENDALI:  Objection.
25 Mischaracterizes her CV.  Assumes facts not in

```
 1   evidence.  Form.
 2                THE WITNESS:  Because the evolution
 3   of human skin, skin pigmentation, and touch
 4   includes all of human skin as a canvas for social
 5   communication.  This really -- this is a very
 6   major topic, and everything about the evolution of
 7   skin involves social communication, including
 8   tattoos.
 9   BY MR. ALEXANDER:
10        Q.   It includes a lot of other things,
11   too, though, right?
12                MS. CENDALI:  Objection.  Overbroad.
13   Form.
14                THE WITNESS:  It includes other
15   things, but it's very important to note that
16   tattoos are the most salient form of human body
17   decoration because they are permanent.  So I have
18   great interest in tattoos because people invest
19   heavily in them.
20   BY MR. ALEXANDER:
21        Q.   Would you be surprised to know
22   that you only list the word tattoo twice in
23   your 48-page CV?
24                MS. CENDALI:  Objection to form.  You
25   may answer.
```

1  A. My name is Nina Jablonski. Are
2  you seeking my home address?
3  Q. Yes, please.
4  A. I reside at 432 West Shadow Lane,
5  State College, Pennsylvania.
6  Q. And is that where your at today
7  for this deposition?
8  A. That is where I am at today.
9  Q. Is there anybody else with you in
10 the room where you're at?
11 A. No, there is not.
12 Q. Okay. So other than the
13 conversation that we've talked about today
14 related to your visits to tattoo shops, have
15 you interviewed any other tattoo artists?
16 A. I've interviewed and talked to
17 tattoo artists casually in various contexts all
18 over the place because some of them have taken
19 my classes. Some of them have called me up.
20 So there have been many different
21 conversations, not always, you know, in a
22 tattoo shop but that have been held in various
23 places and also with tattooed people too
24 numerous to mention.
25 Q. In the context of your research

1 related to tattoos -- strike that.  In the
2 context of your academic research related to
3 the subject matter about tattoos, have you
4 interviewed any tattoo artists?
5             MS. CENDALI:  Objection.  Asked and
6 answered.  Form.  You may answer.
7             THE WITNESS:  Yes.  The ones that I
8 referred to earlier and, you know, broadly when I
9 meet anyone who has -- who has had a tattoo or who
10 is a tattooist, I talk to them about what they're
11 doing, why they're doing it, and what their
12 motivations are and what their expectations are.
13 So I take the opportunities all the time, and
14 they're not necessarily planned.
15 BY MR. ALEXANDER:
16      Q.   Okay.  Can you estimate how
17 many -- strike that.  So setting aside the
18 conversations you've had with the tattoo
19 artists in the tattoo shops you've visited, can
20 you estimate how many of these casual
21 interviews you've had with tattoo artists?
22             MS. CENDALI:  Objection.
23 Characterization of casual.  Form.  Asked and
24 answered -- well, not asked and answered.  You may
25 answer.

ATTORNEYS EYES ONLY

Page 64

1  THE WITNESS: I would say dozens of
2  conversations that I've had with tattoo artists in
3  various contexts.
4  BY MR. ALEXANDER:
5  Q. Were any of these conversations
6  more than ten minutes?
7  A. Yes. Yes, they were.
8  Q. Any more than 20 minutes?
9  A. That is -- that's difficult for me
10  to recall, but, yes, a few of these were quite
11  long, especially when the tattoo artists were
12  my students.
13  Q. Okay. When you say quite long,
14  what do you mean by that?
15  A. Like the better part of an hour.
16  Q. Okay. Can you name one individual
17  that you had one of these longer conversations
18  with?
19  A. I cannot recall the name.
20  These -- this was -- there were actually a few
21  students who have taken the class that I offer
22  on skin at Penn State who have been tattoo
23  artists, and I've spoken to each of them at
24  length.
25  Q. And how many of them is that?

1   asking his permission?
2   A.  That is correct.  I do not know.
3   Q.  And you don't know how common it
4   was for media companies to contact Mr. Hayden
5   and ask permission to display tattoos he's
6   inked, right?
7   MS. CENDALI:  Objection.  Overbroad.
8   Mischaracterizes her testimony.  Assumes facts not
9   in evidence.  Form.
10  THE WITNESS:  Yes.  I do not know how
11  often Mr. Hayden is contacted, but based on the
12  declarations of other tattooists, they are not
13  interested in having fees for images of their
14  tattoos paid to them.  They want their tattoos to
15  be freely visible when a tattooed individual is
16  photographed or appears on television or is
17  viewable on the street or in a sports arena or in
18  a video game because that's how they get -- that's
19  how the tattooist gains popularity and further
20  remuneration themselves.
21  BY MR. ALEXANDER:
22  Q.  If people respected their
23  copyrights on -- in the tattoos, wouldn't they
24  get remuneration in that respect?
25  MS. CENDALI:  Objection.  Calls for a

1  legal conclusion.  Form.  Foundation.  Tone.  You
2  may answer.
3              THE WITNESS:  It would create such an
4  unwieldy and awkward precedent because often
5  people have multiple tattoos or tattoos that were
6  inked by multiple individuals who sort of added to
7  images.  So, for instance, what happens if a
8  tattoo is only partly covered by one individual
9  and one individual has asked to license that part
10 of a tattoo?  This quickly becomes a wieldy absurd
11 and obstructive practice that would be incredibly
12 inhibitory to a tattooist's business and would
13 prevent people, regular people, from seeking to
14 get tattoos if they had to worry about how their
15 images were going to be reproduced and if they had
16 to seek permission from one part of a tattoo from
17 one person and another part from one person.  They
18 would quickly be entirely discouraged from getting
19 a tattoo at all.
20 BY MR. ALEXANDER:
21     Q.  Do you have any idea if Samsung
22 has ever contacted any other tattoo artists to
23 seek permission to display their tattoos in a
24 commercial?
25              MS. CENDALI:  Objection.  Overbroad.

1  Foundation.
2           THE WITNESS:  I am unaware if Samsung
3  has done this.
4  BY MR. ALEXANDER:
5       Q.  Are you aware of whether any media
6  company is -- well, strike that.  Do you have
7  any idea of whether any other media companies
8  have ever contacted any tattoo artists other
9  than Mr. Hayden to seek permission to show
10 their tattoos?
11          MS. CENDALI:  Objection.  Outside the
12 scope of her report about video games.  Overbroad.
13          THE WITNESS:  I am not aware that any
14 such representations have been made to other
15 tattooists.
16 BY MR. ALEXANDER:
17      Q.  And you haven't inquired into
18 that, have you?  You haven't researched that,
19 right?
20          MS. CENDALI:  Objection.  Overbroad.
21 Outside the scope of her expert report.
22          THE WITNESS:  I have not investigated
23 this because it is completely outside the bounds
24 of common expected practice, as I have stated
25 earlier.

1  BY MR. ALEXANDER:
2      Q.  But it exists?  I mean, you can't
3  deny that, right?
4          MS. CENDALI:  Objection.  Assumes
5  facts not in evidence.  Foundation.  Irrelevant to
6  video games.  Form.
7          THE WITNESS:  The existence of one
8  document by one tattooist does not indicate
9  anything of significance in this -- in this broad
10 category of phenomena that we are discussing.
11 BY MR. ALEXANDER:
12     Q.  You admit in your report you've
13 reviewed several documents that show that
14 plaintiff has entered into releases related to
15 tattoos, right?
16         MS. CENDALI:  What are you talking
17 about?  Do you have some page that we should be
18 looking at?
19         MR. ALEXANDER:  Footnote 50.
20         MS. CENDALI:  50 or 51?
21         MR. ALEXANDER:  No.  Five zero.
22         MS. CENDALI:  Is there a question?
23 I'm sorry.
24 BY MR. ALEXANDER:
25     Q.  You admit in your report that

ATTORNEYS EYES ONLY

Page 181

1 you've reviewed several documents that show
2 that plaintiff has entered into releases
3 related to tattoos, right?
4     A.   I have reviewed these releases,
5 yes.
6     Q.   And is your -- you know, as an
7 expert in the evolution of things and as an
8 anthropologist, wouldn't you agree that as
9 technology changes, sometimes customs and norms
10 also change?
11     MS. CENDALI: Objection. Foundation.
12 Overbroad. Confusion. Incomplete hypothetical.
13 You may answer.
14     THE WITNESS: Culture changes
15 rapidly, but expectations like this on the part of
16 tattooists and tattooed people have been part of
17 human culture for centuries, and it is extremely
18 unlikely that this particular understanding would
19 change because it would cause such a rupture in
20 the industry, such a sudden and irreparable change
21 in expectations on the part of what a tattooist
22 requests and expects and on the part of a person
23 seeking to get tattooed.
24     If permission had to be sought for a
25 prospective client to get permission of a

ATTORNEYS EYES ONLY

Page 182

1   tattooist to appear in various video portrayals of
2   themselves, they would no doubt object because
3   this would place undue limitations on them and, as
4   I indicated a few minutes ago, it is extremely
5   common for people to have multiple tattoos or
6   composite tattoos that were created by several
7   individuals.  So the idea that a tattooed person
8   would have to somehow keep straight all of these
9   permissions and tattooists would have to keep
10  straight all of these releases or licenses would
11  bring the entire industry to a grinding halt.
12              MR. ALEXANDER:  Move to strike as
13  nonresponsive.
14  BY MR. ALEXANDER:
15      Q.  Are you assuming as a basis for
16  your opinion in your report that Mr. Hayden is
17  asserting his copyrights against LeBron James,
18  Danny Green, or Tristan Thompson?
19              MS. CENDALI:  Objection.  Calls for
20  legal conclusion.  Incomplete hypothetical.  Form.
21              THE WITNESS:  Mr. Hayden is taking an
22  action against Take-Two Interactive as the
23  creators of NBA 2K.  He has not taken an action
24  against the tattooed individuals.
25  BY MR. ALEXANDER:

ATTORNEYS EYES ONLY

Page 242

1  these images of tattoos are being conceived of by
2  people as art.
3  BY MR. ALEXANDER:
4         Q.   Do you mean is she interested in
5  the tattoos as being conceived of as art or the
6  images of tattoos being conceived of as art?
7              MS. CENDALI:  Objection to form.
8  Compound.  Confusing.  You can answer.
9              THE WITNESS:  She is researching how
10 tattoos are depicted as art, how the process of
11 tattooing is depicted as art.  She's interested in
12 all aspects of the tattoo process, including the
13 creation of tattoos in artistic depictions.
14 BY MR. ALEXANDER:
15        Q.   Have you talked to her at all
16 about copyright?
17             MS. CENDALI:  Objection.  Outside the
18 scope.  You can answer.
19             THE WITNESS:  I have spoken to her
20 about copyright.
21 BY MR. ALEXANDER:
22        Q.   What did you talk to her about?
23        A.   I talked to her about how common
24 is it for tattooists to seek to copyright their
25 tattoos.

1  Q. And what did she say?
2  A. She said it's not common at all.
3  She had never -- she had never encountered this
4  in any of the many tattooists that she had
5  worked with or interviewed in the course of her
6  dissertation research.
7  Q. Was copyright law a primary
8  subject matter of her research?
9  MS. CENDALI: Objection to form. You
10 can answer.
11 THE WITNESS: Copyright law was not
12 an object of her study.
13 BY MR. ALEXANDER:
14 Q. How many tattoo artists did she
15 tell you she interviewed on the topic of
16 copyrighting the artist's tattoos?
17 MS. CENDALI: Objection to form. You
18 may answer.
19 THE WITNESS: I cannot recall how
20 many copied -- how many artists, tattooists, that
21 she spoke to in this connection. I know it was
22 more than two or three. She has done research
23 with many tattooists and with some of them she has
24 discussed this subject, but I don't know the
25 number.