**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES HAYDEN,<br><br>          Plaintiff,<br><br>v.<br><br>2K GAMES, INC. and TAKE-TWO<br>INTERACTIVE SOFTWARE, INC. ,<br><br>          Defendants. | CASE NO. 1:17-cv-02635-CAB |

**DEFENDANTS 2K GAMES, INC. AND TAKE-TWO**
**INTERACTIVE SOFTWARE, INC.'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF JAMES HAYDEN'S MOTION TO**
<u>**EXCLUDE THE EXPERT TESTIMONY OF DR. E. DEBORAH JAY**</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**PRELIMINARY STATEMENT** ........................................................................... 1

**FACTUAL BACKGROUND** ............................................................................... 3

**ARGUMENT** ..................................................................................................... 4

      I.      THE JAY SURVEY FOLLOWS ACCEPTED SURVEY
            METHODOLOGY ........................................................................ 5

           1.     Dr. Jay's Open-Ended Questions Were Properly Designed ...................... 5

           2.     Dr. Jay's Closed-Ended Questions Were Properly Designed. .................. 10

      II.     THE RESULTS OF THE JAY SURVEY SUPPORT DR. JAY'S
            CONCLUSIONS ........................................................................... 12

**CONCLUSION** .................................................................................................. 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A & M Records, Inc. v. Napster, Inc.,*
No. 99 Civ. 5183, 2000 WL 1170106 (N.D. Cal. Aug. 10, 2000)........................................6, 7

*Am. Home Prods. Corp. v. Procter & Gamble Co.*,
871 F. Supp. 739 (D.N.J. 1994) ....................................................................................9

*Balsley v. LFP, Inc.,*
691 F.3d 747 (6th Cir. 2012) ...............................................................................15

*Combe Inc. v. Dr. August Wolff GmbH & Co. KG Arzneimittel,*
382 F. Supp. 3d 429 (E.D. Va. 2019) ...............................................................10

*Coty, Inc. v. Excell Brands, LLC*,
277 F. Supp. 3d 425 (S.D.N.Y. 2017)..................................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).....................................................................................5, 13

*Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*,
661 F. Supp. 971 (S.D. Ohio 1987) ...................................................................12

*Healthpoint Ltd. v. Ethex Corp.*,
No. 01 Civ. 646, 2004 WL 6042867 (W.D. Tex. Aug. 5, 2004) .............................6

*Jacobs v. Fareportal, Inc.,*
No. 17 Civ. 362, 2020 WL 6587245 (D. Neb. May 29, 2020)................................9

*Johnson & Johnson–Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
No. 91 Civ. 960, 1991 WL 206312 (S.D.N.Y. Oct. 1, 1991) .................................9

*L & F Prods., a Div. of Sterling Winthrop, Inc. v. Procter & Gamble Co.*,
845 F. Supp. 984 (S.D.N.Y. 1994)........................................................................6

*LG Elecs. U.S.A., Inc. v. Whirlpool Corp.,*
661 F. Supp. 2d 940 (N.D. Ill. 2009) ...................................................................7

*Loussier v. Universal Music Grp., Inc.*,
No. 02 Civ. 2447, 2005 WL 5644439 (S.D.N.Y. Aug. 24, 2005) ...........................6

*Lucent Techs., Inc. v. Microsoft Corp.*
No. 07 Civ. 2000 (S.D. Cal.)...............................................................................12

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)................................................................9, 10

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*
    *Co.*,
    290 F.3d 578 (3rd. Cir. 2002) .....................................................................10

*Rocky Brands, Inc. v. Red Wing Shoe Co., Inc.*,
    No. 06 Civ. 275, 2009 WL 5125475 (S.D. Ohio Dec. 28, 2009) .............................5

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    449 F. Supp. 3d 333 (S.D.N.Y. 2020).......................................................... *passim*

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
    746 F.2d 112 (2d Cir. 1984).......................................................................12

*Vital Pharms., Inc. v. Monster Energy Co.*,
    No. 19 Civ. 60809, 2021 WL 3371942 (S.D. Fla. Aug. 3, 2021)...........................10

*Wells Fargo & Co. v. WhenU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003).........................................................12

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
    45 F. Supp. 3d 724 (N.D. Ohio 2014) (J. Boyko) ............................................5, 6

*Winchester Fed. Sav. Bank v. Winchester Bank, Inc.*,
    359 F. Supp. 2d 561 (E.D. Ky. 2004) ..............................................................6

**Other Authorities**

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) ............6, 8, 9, 12

Herbert Weisberg, et. al., *Questionnaire Construction, An Introduction to Survey*
    *Research, Polling, and Data Analysis* (Sage, 1996)..................................................6

Janice Ballou, *Open-Ended Question, Encyclopedia of Survey Research Methods*
    (Sage, Ed. Lavrakas, 2008) ......................................................................7

Mike Rappeport, *Design Issues for Controls, Trademark and Deceptive*
    *Advertising Surveys: Law Science and Design* (ABA, Eds. Diamond & Swann
    2012) ............................................................................................10

Robert M. Groves et. al., *Questions and Answers in Surveys, Survey Methodology*
    (John Wiley & Sons, 2009)......................................................................11

Defendants Take-Two Interactive Software, Inc. and 2K Games, Inc. (collectively, "Take-Two") respectfully submit this memorandum of law in opposition to James Hayden's ("Plaintiff") motion to exclude the expert testimony of Dr. E. Deborah Jay (the "Motion").

## PRELIMINARY STATEMENT

Plaintiff submitted a novel survey in this case that radically and repeatedly deviates from accepted survey procedure in numerous respects, including by asking questions designed to create bias, and encourage guessing with no control.  Dkt. 96.  Yet Plaintiff, in a remarkable about-face, moves to exclude the expert report and survey submitted by Take-Two's esteemed survey expert, Dr. E. Deborah Jay (the "Jay Survey"), by baselessly arguing that Dr. Jay's well-accepted methodology "defies well-known guidelines," Pl.'s Mot. to Exclude E. Deborah Jay ("Pl.'s Mot.") 1.  The transparent purpose of Plaintiff's motion is to create so much obfuscation on the subject of survey methodology and the relevant questions in this case that the Court will overlook the profound defects in the non-standard survey of Plaintiff's own expert, Dr. H. Tolga Bilgicer (the "Bilgicer Survey").

Ultimately, as this brief and Take-Two's Motion to Exclude Dr. Bilgicer's Survey and Testimony show, there is no true basis to criticize, let alone exclude, the Jay Survey.  The approach used by Dr. Jay (unlike that of Dr. Bilgicer) is wholly consistent with well-accepted survey principles applied by numerous courts.  Unlike Plaintiff's survey, Dr. Jay's survey followed standard, court-approved methodologies and amply meets the requirements of reliability and relevancy under Federal Rules of Civil Procedure 402 and 702.  In fact, *a nearly identical survey*, conducted by Dr. Jay in a highly similar lawsuit, was credited and relied on by the Southern District of New York in *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 342 (S.D.N.Y. 2020).  And unlike Plaintiff's survey, the Jay Survey properly tested the relevant question in this case, namely, whether consumers purchased *NBA 2K* because of the six

tattoos Plaintiff inked on Danny Green, LeBron James, and Tristan Thompson (the "Tattoos").

Plaintiff's arguments for excluding the Jay Survey are at odds with survey design standards, court-approved practices, and the relevant issues of this case. **First**, Plaintiff asserts that the Jay Survey questions were not properly designed, contending that Dr. Jay should not have asked open-ended questions in her survey at all. This ignores the extensive case law *favoring* the use of open-ended questions given their inherently non-leading nature. Plaintiff's other criticisms of the Jay Survey are equally misguided. For example, Plaintiff contends that Dr. Jay should have asked *additional* "probing" questions (beyond what she already included), when numerous cases have found that too much probing can be leading. Similarly, Plaintiff contends that the closed-ended questions in the Jay Survey included too many answer choices, when, in fact, providing too few choices would have been leading and unreliable. And Plaintiff criticizes the Jay Survey for not overtly mentioning tattoos, even though doing so plainly would also have been leading. The bottom line is that the Jay Survey gave respondents ample opportunity to identify the Tattoos as a reason they purchased the game.

**Second**, Plaintiff also asserts that the results of the Jay Survey are somehow unreliable and do not support Dr. Jay's conclusions. On the contrary, the results of the Jay Survey provide ample support for Dr. Jay's conclusions that no consumers bought *NBA 2K* because, despite having numerous opportunities to do so, no consumers identified any of the tattoos on Messrs. Green, James, and Thompson, let alone any of the six tattoos Plaintiff inked, at *any juncture* of the Jay Survey. Moreover, the Jay Survey, unlike the Bilgicer Survey, tested the right question, namely, whether respondents purchased *NBA 2K* for the Tattoos at issue in this litigation.

Because the Jay Survey is methodologically sound and yielded reliable results that support Dr. Jay's conclusions, Plaintiff's Motion should be denied.

## FACTUAL BACKGROUND

Dr. Deborah Jay has over 40 years of experience conducting surveys of all types, including more than 400 surveys in legal cases.  Dkt. 101-6.  She is routinely qualified by courts as an expert in survey methodology, *id.*, and, where she has been retained as an expert, she has never had a survey excluded from evidence.  Declaration of Miranda Means ("Means Decl.") Ex. A (Jay Tr.) 33:14–34:8.  Before founding her own survey research company, Jay Survey Strategics, Dr. Jay served for 23 years as President and CEO of Field Research Corporation, a highly respected opinion research firm.  Dkt. 101-6 at 10.  She has also served as the chair of the Council of American Survey Research Organizations, a trade association representing over 100 survey research companies, as well as the Standards Committee for the American Association for Public Opinion Research, a professional society of over 2,000 survey researchers.  *Id.* at 9–10.  And Dr. Jay has an extensive publication history on survey methodology.  *Id.* at 10, Appx. B.

On May 27, 2021, Dr. Jay submitted an expert report providing the results of a survey she conducted with a nationwide representative sample of individuals who bought *NBA 2K* (specifically, *NBA 2K16*, *NBA 2K17*, *NBA 2K18*, *NBA 2K19*, *NBA 2K20*, and *NBA 2K Mobile*). *Id.* at 1.[1]  The purpose of the Jay Survey was to determine the reasons for buying *NBA 2K*, and whether the tattoos on Messrs. Green, James, or Thompson were a reason why consumers bought *NBA 2K*.  *Id.*  After a set of screening questions, the Jay Survey posed two "open-ended questions" (questions that allow the respondent to type in an answer), asking respondents for their main reasons and other reasons for purchasing *NBA 2K*.  *Id.* at Appx. D, Qs. A1–A2.  The Jay Survey then asked closed-ended, multiple-choice questions asking respondents to give the main reasons and other reasons they purchased *NBA 2K*.  *Id.* at Appx. D, Qs. B1–B3.  Finally,

---

[1]  After Plaintiff belatedly disclosed the survey of Dr. Bilgicer, Dr. Jay also submitted a supplemental report (the "Jay Supplement") expressing her opinions in light of that newly disclosed evidence.  Dkt. 89-7.

respondents who answered that the "depiction of the NBA players' face, body or other aspects of their appearance," was one of the reasons they purchased *NBA 2K*, were asked additional follow-up questions to see which aspects of appearance and which specific players' depiction were a reason respondents purchased *NBA 2K*. *Id.* at Appx. D, Qs. C1–C4. These questions gave respondents another opportunity to identify the Tattoos as a reason they purchased the game.

In spite of numerous opportunities to do so, ***none*** of the 520 individuals interviewed identified the Tattoos, much less the portions of the six tattoos that Plaintiff actually inked, as a reason they bought *NBA 2K*. *Id.* at 24. From these results, Dr. Jay concluded that "(a) consumers bought the relevant *NBA 2K* video games for numerous reasons, principally that they like basketball, (b) no consumers bought the relevant *NBA 2K* video games for the tattoos on LeBron James, Danny Green, or Tristan Thompson, let alone the tattoos at issue in this case, and (c) there is no link between the sales of the *NBA 2K* video games and their depiction of the tattoos on LeBron James, Danny Green, or Tristan Thompson." *Id.*

These findings are consistent with a nearly identical survey that Dr. Jay conducted in connection with *Solid Oak*, which found that none of the respondents said that tattoos on Messrs. Green, James, or Thompson were a reason they bought *NBA 2K*. 449 F. Supp. 3d at 342. The Southern District of New York credited this survey in granting summary judgment for Take-Two, *id.*, noting that "[b]y examining whether [Take-Two] profited (and, consequently, Plaintiff lost potential revenue) from the Tattoos' inclusion in NBA 2K, Dr. Jay's report addresses questions relevant both to the 'commercial use' factor of [Take-Two's] fair use claim and to Plaintiff's potential damages," *id.* at 351 (denying motion to exclude survey).

## ARGUMENT

The Jay Survey is reliable and methodologically sound. While Plaintiff may not like the results thereof, mere disagreement with those results is not grounds for exclusion—to the extent

Plaintiff has any basis to dispute Dr. Jay's opinions, he will have the opportunity to cross-examine her at trial.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

## I.     THE JAY SURVEY FOLLOWS ACCEPTED SURVEY METHODOLOGY

In assessing the admissibility of surveys, courts in the Sixth Circuit consider whether the survey was conducted pursuant to accepted principles of survey research.  *See*, *e.g.*, *Rocky Brands, Inc. v. Red Wing Shoe Co., Inc.*, No. 06 Civ. 275, 2009 WL 5125475, at *2 (S.D. Ohio Dec. 28, 2009).  "[A] survey need not be perfectly conducted for testimony concerning its results to be admissible.  So long as the expert's testimony and the underlying survey have probative value after all the survey's deficiencies are taken into account, testimony concerning the results of the survey that meets the basic requirements of usefulness and reliability is admissible into evidence."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 753–54 (N.D. Ohio 2014) (J. Boyko).

Plaintiff does not identify any flaws in the methodology of the Jay Survey that warrant exclusion, and therefore his Motion should be denied.

### 1.     Dr. Jay's Open-Ended Questions Were Properly Designed

***First***, Plaintiff argues that Dr. Jay's survey is flawed and excludable merely because it asks open-ended questions.  Pl.'s Mot. 3, 6.[2]  Open-ended questions are repeatedly favored over and above closed-ended questions because of their reliability, including their lower risk of being leading.  *See Healthpoint Ltd. v. Ethex Corp.*, No. 01 Civ. 646, 2004 WL 6042867, at *4 (W.D.

---

[2]     Plaintiff intimates that Dr. Jay drew her conclusions in this case solely from the results of the first two open-ended questions in the survey (Qs. A1–A2), and tries to force the Court to look at the survey piecemeal.  Pl.'s Mot. 3–9.  This is improper.  Although the "most accurate" information was "captured in the first two open-ended questions, and then in the follow-up questions," Dr. Jay relied on the results of the entire Jay Survey in reaching her conclusions.  Means Decl. Ex. A (Jay Tr.) 111:21–113:17 (Q: "Are you confident that the respondents who answered the first two questions listed all the reasons they purchased the NBA 2K video games?" A: "Well, I asked follow-up questions, so I'm confident that I got the reasons why people purchased the video games.").  The Jay Survey should thus be considered as a whole.

5

Tex. Aug. 5, 2004) (finding open-ended questions are "considered to be less likely to undermine the reliability of a survey" than closed-ended questions); *L & F Prods., a Div. of Sterling Winthrop, Inc. v. Procter & Gamble Co.*, 845 F. Supp. 984, 998 (S.D.N.Y. 1994) (affording more weight to the results of open-ended questions than closed-ended questions). Consequently, open-ended questions are widely used in surveys like this one and are routinely admitted by courts. *See*, *e.g.*, *In re Whirlpool Corp.*, 45 F. Supp. 3d at 762 (J. Boyko) (admitting survey that contained open-ended questions); *Winchester Fed. Sav. Bank v. Winchester Bank, Inc.*, 359 F. Supp. 2d 561, 566 (E.D. Ky. 2004) (same).[3]

The reliability of Dr. Jay's open-ended questions is further evidenced by the fact that they are nearly identical to open-ended questions she asked in other cases where her surveys were admitted by the court. *See Loussier v. Universal Music Grp., Inc.*, No. 02 Civ. 2447, 2005 WL 5644439, at *1–2 (S.D.N.Y. Aug. 24, 2005) (finding survey that asked open-ended questions, including "What are the main reasons why you purchased this CD?" and "Are there any other reasons why you purchased this CD?" was admissible); *A & M Records, Inc. v. Napster, Inc.*, No. 99 Civ. 5183, 2000 WL 1170106 (N.D. Cal. Aug. 10, 2000), *aff'd* 239 F.3d 1004 (9th Cir. 2001) (citing Rpt. of E. Deborah Jay, 2000 WL 34744110 (N.D. Cal. Jun. 10, 2000) (finding survey probative that asked open-ended questions, including "What are the main reasons why you use Napster?" and "What are the other reasons why you use Napster?")); Dkt 101-6 at Appx. I (*Solid Oak* survey asked "What were the main reasons why you bought an NBA 2K video

---

[3]   *See also* Means Decl. Ex. C, Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) at 392 ("Reference Manual") ("The advantage of open-ended questions is that they give the respondent fewer hints about expected or preferred answers. Pre-coded responses on a closed-ended question, in addition to reminding respondents of options that they might not otherwise consider, may direct the respondent away from or toward a particular response"); Herbert Weisberg, et. al., Questionnaire Construction, An Introduction to Survey Research, Polling, and Data Analysis, 3rd. 77, 78 (Sage, 1996) ("Open-ended questions have the advantage of allowing respondents to express their thoughts and feelings in their own words instead of in words chosen by the researcher.").

game?" and "What were the other reasons, if any, you bought an NBA 2K video game?").

Not only are open-ended questions acceptable generally; they are, as Dr. Jay explains, "particularly appropriate" here "because the relevant NBA 2K games include many features and attributes, and it was not possible to list all of the reasons for buying an NBA 2K game in the closed ended-questions."  Dkt. 89-7 at 7, nn.4–5.  The open-ended questions at the beginning of the survey thus provided "opportunity or space for respondents to offer or add an answer that may not have been included in a closed-ended question," and are consistent with accepted survey practice.  *Id.* citing Janice Ballou, *Open-Ended Question, Encyclopedia of Survey Research Methods,* 547 (Sage, Ed. Lavrakas, 2008) ("When there is a wide range of answers expected to provide individual factual information, an open-ended structure can address the problem of having a list of more response choices than it is practical to include in a questionnaire.").

**Second**, Plaintiff argues that open-ended questions should not have been used here because they only test the "main" reasons or "top of mind" reasons why consumers bought *NBA 2K*.[4]  Pl.'s Mot. 4, 6.  This of course ignores the fact that the Jay Survey, after asking respondents for their main reasons, asked respondents to describe their "***other reasons***" for buying *NBA 2K* (Q. A2), at which point they could list as many reasons as they wanted.  *See* Dkt. 101-6 at Appx. D.  And the Jay Survey did not stop there; it asked closed-ended and follow-up questions to give respondents further chances to identify the reasons they bought *NBA 2K* (Qs. B1, C1–C4).  *Id.*

In light of these additional questions, Plaintiff has no reason to suppose that respondents

---

[4]   In *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, a case Plaintiff cites on this point, the Plaintiff was moving to exclude the survey for *not* considering the results of the open-ended questions, and the court found that the issue boils down to "whether a given question is leading."  661 F. Supp. 2d 940, 954 (N.D. Ill. 2009).  Dr. Bilgicer's survey questions, as Take-Two explained in its motion to exclude that expert, *were* leading.  Dr. Jay's questions, by contrast, were not leading, and Plaintiff does not contend that they were.

did not disclose all of the reasons they purchased *NBA 2K* in response to the Jay Survey.[5]
Indeed, what Plaintiff contends are "vague" responses to the initial open-ended questions, Pl.'s
Mot. 7, such as "I like basketball," are precisely the type of responses one would expect for why
someone purchased a basketball video game; as Dr. Jay clarifies, "people often buy things for
very general reasons."  Means Decl. Ex. A (Jay Tr.) 111:25–113:17.  As a result, unsurprisingly,
32% of people said in response to the initial open-ended questions that they purchased *NBA 2K*
because they like basketball, sports, or sports video games.  Dkt. 101-6 at 5–6.  And 31%,
predictably, bought *NBA 2K* because it was fun, entertaining, or they like the gameplay.  *Id*.

If Dr. Jay were to follow Dr. Bilgicer's flawed methodology and ask only closed-ended
questions, her results would actually be over-inclusive and less reliable.  *See Coty, Inc. v. Excell
Brands, LLC*, 277 F. Supp. 3d 425, 462 (S.D.N.Y. 2017) (agreeing that "'closed-ended
questions' are generally disfavored").  As Dr. Jay explains, the closed-ended questions would
capture not only reasons for buying *NBA 2K*, but also "what people like about the games."
Means Decl. Ex. A (Jay Tr.) 111:25–113:17 (explaining how, when respondents are given a "list
of very specific responses," they think, "you must want to know what I like about the game, not
just why I bought it.").  Far from a "fatal flaw," Dr. Jay's decision to include these initial open-
ended questions makes the Jay Survey far more reliable than the Bilgicer Survey.

***Third***, Plaintiff argues that the Jay Survey should have included further probing questions
after the open-ended questions.  Pl.'s Mot. 5.[6]  This makes no sense, as Dr. Jay did ask additional

---

[5]    Plaintiff contends that because 19 respondents to Questions A1–A2 identified 3 or more reasons for purchasing
*NBA 2K*, this shows that respondents were only identifying their "main" reasons.  Pl.'s Mot. 7.  But Plaintiff
provides no evidence that purchasers would be expected to have three or more reasons for purchasing *NBA 2K*.

[6]    The section of the Reference Manual to which Plaintiff points regarding open-ended questions specifically
explains the downsides of "mail surveys," stating, "open-ended questions are generally of limited value ***on a
mail survey***."  *See* Means Decl. Ex. C (Reference Manual) at 405–06 (emphasis added).  On the next page,
where the Reference Manual discusses Internet surveys, it does not mention open-ended questions being a flaw
in that context.  *Id.* at 407.  Dr. Jay's survey is an Internet survey, not a mail survey, and thus does not have the
same limitations.

questions to follow-up after the initial two open-ended questions.  Dkt. 101-6 at Appx. D.  To the extent Plaintiff is contending that Dr. Jay should have asked *further* probing questions at the end of the Jay Survey, doing so would have been improper.[7]  *See Johnson & Johnson–Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, No. 91 Civ. 960, 1991 WL 206312, at *8– 9 (S.D.N.Y. Oct. 1, 1991), *aff'd*, 960 F.2d 294 (2d Cir. 1992) (discounting as too leading use of repeated probing questions); *Am. Home Prods. Corp. v. Procter & Gamble Co.*, 871 F. Supp. 739, 761 (D.N.J. 1994) (calling repeated probing questions "coercive").  And as Dr. Jay explained during her deposition, having an interviewer probe unclear answers live would be "biasing, leading, [and] not advisable."  Dkt. 88-3 at 84:7–23.

*Fourth*, Plaintiff argues that the Jay Survey is methodologically flawed because he should have been provided with "detailed" instructions on how responses were coded (*e.g.*, categorized for purposes of analysis).  Pl.'s Mot. 5.[8]  But Dr. Jay provided Plaintiff with the raw data for the Jay Survey, the codebook for the raw data, and the verbatim responses to the open- ended questions, so that he could see how respondents answered questions and even recode the responses.  Dkt. 101-6, Appxs. G–H; Means Decl. ¶ 2.  There is also no evidence that the survey was miscoded.  Plaintiff argues that one follow-up question response naming Mr. James' "physical characteristics" should have been coded as indicating that this person bought *NBA 2K* for the Tattoos.  Pl.'s Mot. 8.  There is zero indication this respondent meant tattoos, let alone the

---

[7]   Means Decl. Ex. C (Reference Manual) at 395 (noting "persistent continued requests for further responses to the same or nearly identical questions may convey  the idea to the respondent that he or she has not yet produced the 'right' answer.").

[8]   Plaintiff's cases are not to the contrary.  In *Malletier v. Dooney & Bourke, Inc.*, there were a number of methodological flaws that departed significantly from ordinary survey practice for Lanham Act damages surveys, not mere coding issues.  525 F. Supp. 2d 558, 608 (S.D.N.Y. 2007).  Likewise, in *Jacobs v. Fareportal, Inc.*, the survey at issue was flawed because it tested the wrong kind of confusion and was not representative of the marketplace. No. 17 Civ. 362, 2020 WL 6587245, at *10 (D. Neb. May 29, 2020) (noting that each flaw in isolation was not grounds for exclusion).  In contrast to these cases, the Jay Survey has been accepted before and follows a widely accepted methodology.

9

tattoos Plaintiff inked—Mr. James has myriad characteristics, and where consumers purchased *NBA 2K* for something specific about his appearance, they **said so**.  *Infra* 14.  Plaintiff's arguments about coding are, at most, cross issues.  *Malletier*, 525 F. Supp. 2d at 611–12 (finding questions of coding are "generally a question of weight . . . not admissibility.").[9]

## 2.   Dr. Jay's Closed-Ended Questions Were Properly Designed.

In addition to her first two open-ended questions, which yielded the "most accurate" results, Means Decl. Ex. A (Jay Tr.) 111:25–113:17, Dr. Jay asked closed-ended and follow-up questions designed to further test whether consumers purchased *NBA 2K* for the tattoos on Messrs. Green, James, and Thompson, Dkt. 101-6 at Appx. D, Qs. B1–B3, C1–C4.  This approach is consistent with accepted survey principles, including the survey in *Solid Oak*.  449 F. Supp. 3d at 351.  Dr. Jay's closed-ended questions were non-leading and gave respondents the opportunity to indicate if they did not know the answer, Dkt. 89-7 at 12,[10] in stark contrast to Dr. Bilgicer's leading approach.  Dkt. 102-1 at 7–11.  To ensure the accuracy of the survey, Dr. Jay included a fictitious feature, the "XTJ feature," as a control to measure the amount of noise in the survey.  Dkt. 101-6 at 4 n.9.[11]  This control, which Plaintiff's survey did not properly include, makes the Jay Survey far more reliable.

Each of Plaintiff's criticisms of the closed-ended and follow-up questions in the Jay

---

[9]   No matter how Dr. Jay coded the survey, <u>no one</u> said that the tattoos on Messrs. Green, James, and Thompson were a reason they purchased *NBA 2K*.

[10]   Take-Two strongly disagrees with Plaintiff's contention that Dr. Jay's Supplemental Report was untimely.  *See* Dkt. 66.  In any case, the Jay Survey speaks for itself.

[11]   In a footnote, without citing any case law on this point, Plaintiff contends that Dr. Jay's use of a control question was improper.  This is a transparent attempt to deflect from his own survey expert's utter failure to use any control, a fatal flaw in Dr. Bilgicer's survey.  Dr. Jay's use of a control question, including her method of subtracting the percentage who selected the control from the results, is widely accepted survey practice.  Mike Rappeport, *Design Issues for Controls, Trademark and Deceptive Advertising Surveys: Law Science and Design,* 217, 221 (ABA, Eds. Diamond & Swann 2012); *Combe Inc. v. Dr. August Wolff GmbH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 439 (E.D. Va. 2019) (subtracting percentage who selected control from total); *Vital Pharms., Inc. v. Monster Energy Co.*, No. 19 Civ. 60809, 2021 WL 3371942, at *22 (S.D. Fla. Aug. 3, 2021) (subtracting control rate from test group rate); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 591 (3rd. Cir. 2002) (same).

Survey are unsupported by the literature and law on survey methodology. ***First***, Plaintiff argues that Dr. Jay's initial closed-ended question (Q. B1), which asked respondents to select all of the reasons they bought *NBA 2K*, is improper because it includes 20 possible *NBA 2K* features as answer choices. Pl.'s Mot. 9. Plaintiff's sole citation for this contention merely states that surveys should avoid "excessive complexity," meaning that questions should not be structured such that they "prevent[] respondent[s] from inferring [their] intended meaning," including by providing "several possibilities" and "requirements" that a respondent needs to keep in mind at once. Means Decl. Ex. B (Groves, *Survey Methodology*) 228. For example:

> During the past 12 months, since January 1, 1987, how many times have you seen or talked to a doctor or assistant about your health? Do not count any time you might have seen a doctor while you were a patient in a hospital, but count all other times you actually saw or talked to a medical doctor of any kind.

*Id.* By contrast to the obviously complicated question above, the Jay Survey asks a simple question: "Which of the following items, if any, were a reason why you bought an NBA 2K video game?" and followed it up with additional simple questions. Dkt. 101-6 at Appx. D, Q. B1. Respondents could take the time they need to choose applicable options—no need to mentally juggle multiple requirements at once. Moreover, as Dr. Jay explains, "NBA 2K video games include dozens of features and attributes [and] it would have been inappropriate" to include only a few of those features. Dkt 89-7 at 11. If Question B1 was difficult or confusing for respondents to answer, a significant percentage of respondents would have selected "Don't Know" in response; instead, a negligible percentage (2%) selected this response option. *Id.*[12]

   ***Second***, Plaintiff suggests that Dr. Jay should have included "tattoos" as an option in

---

[12]   The Bilgicer Report, which levies this criticism, also cites articles on the number of answer choices in "conjoint surveys," but during his deposition, Dr. Bilgicer conceded that Dr. Jay's survey is not a conjoint survey. Ultimately, Plaintiff's criticism on this point is disingenuous because the very survey that Plaintiff submitted in this case included almost *all* of the features that Dr. Jay includes in Question B1, Dkt. 96-4 (Bilgicer Rpt.).

Question B1 and criticizes her for not explicitly mentioning tattoos in the survey.  But to include tattoos as an option would have been leading.[13]  "A survey is not reliable if it suggests to the respondents an answer that would not otherwise have occurred to them."  *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767–68 (E.D. Mich. 2003); *see also Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (finding plaintiff could not rely on survey in part because it included an "obvious leading question"); *Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 661 F. Supp. 971, 983 (S.D. Ohio 1987) (refusing to consider survey that used leading questions).  Indeed, merely asking about a feature or attribute may lead consumers to be reminded of that feature, Dkt. 89-7 at 24, so including tattoos in a list of answer choices would have been highly suggestive.  *See* Means Decl. Ex. C (Reference Manual) at 392 (noting that closed-ended questions can "remind[] respondents of options that they might not otherwise consider").  The non-leading structure of the Jay Survey is an indicia of reliability, not grounds for exclusion.  And respondents were asked their reasons for purchasing *NBA 2K* up to **nine** times, including four open-ended questions, giving them plenty of opportunity to identify the Tattoos as a reason they purchased *NBA 2K*.  No respondents did.

## II.    THE RESULTS OF THE JAY SURVEY SUPPORT DR. JAY'S CONCLUSIONS.

The results of the Jay Survey support Dr. Jay's conclusion that no consumers bought *NBA 2K* for the tattoos on Messrs. Green, James, and Thompson, let alone the six tattoos Plaintiff inked.  Dkt. 101-6 at 8.  Respondents never mentioned the Tattoos at any point during the Jay Survey.  *Id.* at 6.  These results are unsurprising, given that *NBA 2K* is not about tattoos,

---

[13]    Plaintiff points to *Lucent Technologies, Inc. v. Microsoft Corp.*, wherein Dr. Jay included the name of the feature at issue in the survey about date-pickers.  Case No. 07 Civ. 2000 (S.D. Cal.).  But as Dr. Jay explained, "[t]he purpose of that survey was completely different than the purpose of this survey," and by contrast to this case, there were "very few ways to enter the date of an appointment" rather than the "dozens and dozens of attributes and tendencies of players," such that including the name of the feature there was far less leading than it would be here.  Means Decl. Ex. A (Jay Tr.) 125:12–127:4.

two of the tattoos are covered up by players' jerseys, and the remainder are blurry, faded, and difficult to see.  Dkt. 101-5, ¶¶ 13–14.

Still, Plaintiff insists that survey responses that contain absolutely no reference to tattoos at all, let alone the six tattoos at issue, should be read as supporting the conclusion that people bought *NBA 2K* because of these tattoos.  He asks this Court to find that because Dr. Jay, a survey expert with decades of experience conducting surveys, did not interpret these responses the way Plaintiff wants, her testimony should be excluded.  This is nonsense and steps far outside the Court's role under *Daubert* for two reasons.

***First***, Plaintiff asserts that Dr. Jay's conclusions are unreliable because the responses to the open-ended questions are "neither confirmatory nor contradictory of tattoo realism being a reason respondents bought" *NBA 2K*.  Pl.'s Mot. 6.  This framing is misleading.  Plaintiff does not own rights in "tattoo realism" generally, but rather, only claims to own copyrights in the six tattoos on three specific NBA players particularly.  Dkt. 33 ¶¶ 38–103.  This contention is also undermined by the very structure of Dr. Jay's well-crafted survey.  Because they were responding to open-ended questions, respondents *could* have mentioned "tattoo realism" if that is what they meant by, say, "I like basketball," or "I love NBA as a sport."  *See* Dkt. 101-6 at Appx. D.  They did not.  The fact that no one mentioned tattoos in response to these initial open-ended questions strongly demonstrates that they were not a reason people purchased *NBA 2K*.

Contrary to Plaintiff's implication that Dr. Jay only relied on the results of the initial open-ended questions, Pl.'s Mot. 5, 7, respondents were asked additional questions, including follow-up questions on what specific players and aspects of their appearance were important to depict.  Dkt. 101-6 at Appx. D, Qs. B1–B3, C1–C4.[14]  Although several respondents mentioned

---

[14]   To the extent Plaintiff is saying that these questions are insufficient because additional probing questions should have been asked in real time, Plaintiff's proposed methodology is seriously flawed.  *Supra* 8–9.

13

Mr. James, and one mentioned his appearance generally, these responses do not show that respondents purchased *NBA 2K* for the three tattoos Plaintiff inked on Mr. James (one of which is obscured by his jersey).  Indeed, where respondents had Mr. James' specific features in mind as reasons they purchased *NBA 2K*, they explicitly mentioned them (respondents mentioned his "tactics and style," "shots, celebrations, [and] movement[s]," "face and [] body type.").  *Id.* at Appx. H.  ***None*** of the respondents mentioned Mr. James' tattoos.

Plaintiff argues that respondents who said that "graphics" or "realism" were reasons that they bought *NBA 2K*, "leave[s] open" or "suggest[s]" that they bought the game for the Tattoos. Pl.'s Mot. 7–8.  "Graphics" does not "encompass" tattoos, nor did Dr. Jay define graphics that way, as Plaintiff claims.  Means Decl. Ex. A (Jay Tr.) 151:10–19 ("Typically quality of graphics goes to the pixelation, the precision…how good the picture is.").  And Plaintiff ignores the fact that these respondents were asked closed-ended questions that explicitly included the option "[t]he depiction of the NBA players' face, body or other aspects of their appearance."  Dkt. 101-6 at Appx. D, Q. B1.  If by "graphics" or "realism." respondents meant the NBA players' appearance, they would have selected this option and then identified the three players' Tattoos in response to follow-up questions.  No one did.  Far from "speculation," Pl.'s Mot. 8, Dr. Jay's conclusions are strongly supported by the Jay Survey, and should not be excluded.  *See Solid Oak*, 449 F. Supp. 3d at 351 (relying on the results of a nearly identical survey).

***Second***, Plaintiff argues both that the Jay Survey did not allow respondents to say that they purchased *NBA 2K* for "all" of the tattoos on all of the players in the game, Pl.'s Mot. 9–10, and that Dr. Jay did not consider a respondent who bought the game for tattoos generally as buying the game for the tattoos Plaintiff inked.  Pl.'s Mot. 11.[15]  This argument is doubly wrong.

---

[15]    Dr. Jay did not "ignore" this response to the Jay Survey.  She expressly includes it in her report.

First, if all of the tattoos in *NBA 2K* were a reason people purchased it, the survey provided them the opportunity to say so in response to the initial open-ended questions—no one did.  Second, and most importantly, this argument overlooks the fact that Plaintiff's claim concerns only six specific tattoos on three players.  Dkt. 33.  Two of these tattoos are covered by players' jerseys and the remainder are difficult to observe.  Dkt. 101-5 at ¶¶ 13–14.  The relevant question in this case is whether any consumers purchased *NBA 2K* for the tattoos that Plaintiff actually inked.  Hundreds of NBA players have tattoos—Plaintiff's expert estimated there are "high hundreds [or] single thousands" of tattoos in the game.  Dkt. 96-7 at 218:5–219:1.  Whether consumers purchased *NBA 2K* for other tattoos on other players is not relevant, as Plaintiff cannot recover revenues related to tattoos in which he has no rights and about which he does not allege infringement.  *See Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012) (finding copyright owner must demonstrate a "reasonable relationship" between gross revenues and the alleged infringement).  Dr. Jay's survey, unlike the Bilgicer Survey, properly tests the correct question: whether consumers purchased *NBA 2K* because of the Tattoos.[16]  No one did.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Exclude the Expert Testimony of Dr. E. Deborah Jay should be denied.

---

[16]  Dr. Jay began her follow-up questions by asking whether the depiction of any particular players was a reason respondents bought *NBA 2K*.  Dkt. 101-6 at Appx. D, Qs. C1–C2.  For respondents who identified any of the three players at issue, they were then asked which features were important to them.  *Id.* at Qs. C3–C4.  For respondents who did not buy the game for any particular player, the survey properly ended there.  Contrary to Plaintiff's suggestion that respondents were "precluded" from answering that all of the tattoos on all of the players were a reason they purchased *NBA 2K*, if respondents had purchased *NBA 2K* for this reason, they had the opportunity to say so in response to Questions A1–A2.  *Supra* 5–7.

Dated:  New York, NY
         November 22, 2021

/s/ Dale M. Cendali

Dale M. Cendali (admitted *pro hac vice*)
Joshua L. Simmons (admitted *pro hac vice*)
Chris Ilardi (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.*