# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN,<br><br>      Plaintiff,<br><br>vs.<br><br>2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC.,<br><br>      Defendants. | CASE No. 1:17-cv-02635<br><br>Judge Christopher A. Boyko<br><br>**PUBLIC REDACTED VERSION** |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE TESTIMONY, ARGUMENT OR EVIDENCE
REGARDING JUSTIN LENZO'S POTENTIAL MARKET OPINION**

Now comes Plaintiff, James Hayden ("Mr. Hayden"), and submits his OPPOSITION to the Motion to Exclude Testimony, Argument or Evidence Regarding the Justin Lenzo's Potential Market Opinion filed by Take-Two Interactive Software, Inc. and 2K Games, Inc. ("Defendants" or, collectively, "Take-Two"). For the reasons set forth below, Plaintiff respectfully asks that the Court DENY Defendants' request for relief.

I. **FACTUAL BACKGROUND**

Dr. Justin Lenzo is a renowned economics expert. In this case, Mr. Hayden served the Rebuttal Report of Dr. Justin Lenzo on July 1, 2021 (hereinafter "Dr. Lenzo's Report," Ex. A). Dr. Lenzo's Report was proffered in response to Take-Two's expert witness reports on certain economic issues related to Mr. Hayden's copyright infringement claims against Take-Two. Specifically, Dr. Lenzo opines on whether Take-Two benefits commercially from the reproduction of Mr. Hayden's copyrighted tattoo designs and whether there are economic impediments to the formation of a market for the licensing of tattoo designs. Dr. Lenzo ultimately concludes that Take-Two has commercially benefitted from its use of Mr. Hayden's copyrighted designs and that both a potential and nascent market already exists for licensing tattoo designs. Dr. Lenzo further opines that this nascent market could further develop into an actual market for licensing tattoo designs for reproduction in video games, should certain property rights be clarified. (Ex. A, ¶¶ 21-22).

Take-Two filed a motion to exclude Dr. Lenzo's expert testimony, arguments, and evidence regarding Dr. Lenzo's potential market opinion on October 25, 2021. (*See* Defendants' Motion to Exclude Any Testimony, Argument or Evidence Regarding Justin Lenzo's Potential Market Opinion (hereinafter, "Take-Two's Motion") Dkt. #103). Mr. Hayden files this Opposition to Take-Two's Motion and thereby asks the Court to deny Take-Two's Motion

II. **PLAINTIFF'S PRELIMINARY RESPONSE**

Take-Two seeks to exclude the expert testimony of Dr. Lenzo regarding his opinions on potential markets for licensing the re-creation of tattoos like those created by Mr. Hayden. Take-Two argues that Dr. Lenzo's opinion is inconsistent with copyright law and is thus unreliable and

1

likely to confuse the jury. This is not true. Dr. Lenzo's opinions are entirely consistent with the Copyright Act and jurisprudence regarding potential markets.

Take-Two argues that Dr. Lenzo's opinion should be excluded on two grounds: 1) a plaintiff's desire to license his own work does not create a potential market; and 2) a potential market cannot be established by a court finding that if a defendant's use is not fair, then a potential market will form because defendant has no choice but to license plaintiff's work. Take-Two's arguments incorrectly represent Dr. Lenzo's opinion and should be rejected.

First, Dr. Lenzo's potential market opinion was not offered exclusively in response to Take-Two's affirmative defense of fair use. Dr. Lenzo's potential market opinion applies more generally to Mr. Hayden's damages, as well as Take-Two's fair use defense. Further, Take-Two's Motion overstates the significance Dr. Lenzo attached to Mr. Hayden's willingness to license his copyrighted works, including to video game companies. Dr. Lenzo considered that among many factors in reaching his opinion on the potential market for such licenses.

Additionally, Take-Two's Motion incorrectly suggests that considering a potential licensing market, including for its infringing video games, is not relevant to the fourth fair use factor. The Sixth Circuit has rejected this "'circularity' argument… [which] was [also] rejected by the Second Circuit in *American Geophysical*." *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1387 (6th Cir. 1996). Particularly where "the copyright holder clearly does have an interest in exploiting a licensing market—and especially where the copyright holder has actually succeeded in doing so —'it is appropriate that potential licensing revenues for [the infringing use] be considered in a fair use analysis.'"." *Id*. (*quoting American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d. Cir. 1994)).[1] Thus, Dr. Lenzo properly

---

[1] *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, (6th Cir. 1996), a prominent case on fair use in this Circuit, is conspicuously absent from Take-Two's brief in support of its Motion.

2

considered Mr. Hayden's willingness to license his works and any factors affecting Take-Two's willingness to license same in reaching his conclusions.

Finally, Take-Two's Motion confounds and conflates a potential market for licensing with an actual market for licensing. Dr. Lenzo's Report clearly indicates that a nascent market for licensing copyrighted tattoo designs *already exists* and, if property rights were clarified in favor of the tattoo artists, then the potential market for licensing to video game makers, in particular, would likely become an actual market.

Dr. Lenzo's opinions are undeniably reliable and well-grounded in black-letter copyright law. Therefore, the Court should deny Take-Two's motion to exclude Dr. Lenzo's testimony.

### III. LAW AND ARGUMENT

Under FRE 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will **help the trier of fact** to understand the evidence or to determine a fact in issue;
(b) the testimony is based on **sufficient facts or data**;
(c) the testimony is the product of **reliable principles and methods**; and
(d) the expert has **reliably applied** the principle and methods to the facts of the case."

Fed.R. Evid. 702 (emphasis added). Under *Daubert*, "the inquiry envisioned by Rule 702 is … a flexible one," with the focus "on principles and methodology, not on the conclusions they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).

#### A. Dr. Lenzo's Potential Market Opinion Is Not Exclusively Tied To the Fair Use Analysis and Its Fourth Factor

It is important to recognize that Dr. Lenzo's opinion regarding a potential market, as fully described in the Rebuttal Expert Report of Dr. Justin Lenzo (hereinafter "Dr. Lenzo's Report" Ex. A), was not made *exclusively* to address the fourth fair use factor, as Defendants suggest. Indeed, Dr. Lenzo's opinion is *also* relevant to Plaintiff's claims for damages. Dr. Lenzo's

3

opinion was formed after a careful analysis and review of this case *in whole*. Indeed, it is worth noting that Defendants do not provide any reasons why Dr. Lenzo's analysis is flawed or unreliable as a matter of economic analysis.



Upon establishing liability, Mr. Hayden is entitled to his actual damages as a matter of law, 17 U.S.C. §504(a), and he has asserted a claim for same. (Dkt. # 33, ¶¶ 174, 180).

Part of Dr. Lenzo's assignment was to evaluate the economic opinions offered by Defendants' experts regarding "whether there are substantial economic impediments to the formation of a market for licensing of tattoo designs." (Ex. A, ¶ 9). Although Dr. Lenzo was not asked to offer an opinion on the *amount* of actual damages suffered by Mr. Hayden, his opinions addressing actual and potential markets for licensing rights to replicate and create derivatives of tattoos are certainly relevant to such actual damages, in addition to being relevant to the fourth fair use factor. Therefore, even if Dr. Lenzo's analysis of the potential market for replicating tattoos were excluded from consideration of the fourth fair use factor—and for the reasons set forth below, it should *not* be—his analysis would remain relevant to other issues in the case, and therefore should not be excluded.

## B. Dr. Lenzo's Potential Market Opinion Is Not Based Solely on Mr. Hayden's Willingness to License His Work

Take-Two alleges that Dr. Lenzo's potential market opinion "is *premised* on Plaintiff's own willingness to license the Tattoos for use in *NBA 2K*." (Dkt. #103, 2 (emphasis added)).

4

Take-Two further claims that Dr. Lenzo violates tenets of copyright law, "[B]y *basing* his potential market opinion on Plaintiff's willingness to license the Tattoos for Take-Two's use." (*Id.* at 6 (emphasis added)). Take-Two is incorrectly representing the weight Dr. Lenzo placed on his observation that Mr. Hayden appears willing to license his copyrighted works for use in video games. Contrary to what Defendants allege, Dr. Lenzo did not "premise" or "base" his potential market opinion simply on the fact that Mr. Hayden may be willing to license his copyrighted works for use in video games. Dr. Lenzo's Report shows, without question, that Mr. Hayden's willingness to license his copyrighted works is simply one factor among many considered when reaching his potential market opinion, specifically including his opinion that tattoo artists, generally, would be willing to license their tattoo designs for replication in video games. (*See* Ex. A, ¶¶ 75-84).

In making this misleading assertion, Take-Two provides no explanation or analysis to support its accuracy. Instead, after a multi-page recitation of case law, Take-Two offers exactly one conclusory sentence on the matter: "Here, Lenzo violates this tenet by basing his potential market opinion on Plaintiff's willingness to license the Tattoos for Take-Two's use." Ilardi Decl. Ex. A (Lenzo Rpt.) ¶ 22." (Dkt. # 103, 6). That is the extent of Take-Two' "analysis" regarding its claim that Dr. Lenzo based his potential market opinion on Mr. Hayden's willingness to license his copyrighted works -- one sentence with a citation to paragraph 22 of Dr. Lenzo's Report. Take-Two neglects to acknowledge the scope of what paragraph 22 of Dr. Lenzo's Report actually says:

> Based on my review of the evidence and testimony in this case, my expertise and training as an economist, and my analysis of a nascent market for licensing tattoo designs for reproduction in video games, I find:

5

    a. Tattoo artists *already license their designs for reproduction* in various contexts. There is no reason to believe, or evidence to suggest, that they would not be willing to license their designs for *reproduction in video games*.

    b. Video game manufacturers already license various kinds of protected works for reproduction in their video games. Because of the commercial benefit they receive from reproducing tattoo designs in games, relevant *video game manufacturers would be willing to purchase licenses* if doing so were required to reproduce tattoo designs in video games.

    c. There is no reason to believe, or evidence to suggest, that transaction costs would be high enough to impede a market for licensing tattoo designs for reproduction in video games.

    d. The most likely reason for the lack of a market for licensing tattoo designs in video games is that video game producers that benefit from the reproduction of tattoo designs in their video games do not believe that they require licenses from tattoo artists for these reproductions (perhaps because they believe that tattoo artists have limited resources by which to enforce such rights).  If video game producers begin to *believe* that such licenses are required, then a market for licensing tattoo designs in video games is *very likely* to form.

(Ex. A, ¶ 22 (emphases added)).

    Take-Two further omits reference to Dr. Lenzo's thorough analysis in his Report that led to his opinion. In paragraphs 75 through 84, Dr. Lenzo carefully lays out the information he considered in forming his opinion, including:

- Mr. Hayden has already licensed some of his tattoo designs to be replicated and displayed in various contexts. For instance, Mr. Hayden licensed designs he

6

      inked on Mr. Colson Baker (a.k.a. Machine Gun Kelly or MGK) for use in television and motion picture. Mr. Hayden has also licensed his designs inked on recording artist Ms. Teyana Taylor and Mr. Marcus Johnson. (*See* Ex. A, ¶ 75).

- Mr. Haden has already licensed tattoo designs that he inked on Mr. LeBron James. Specifically, Mr. Hayden has licensed the designs inked on Mr. James for use in a soft-drink commercial and in the motion picture ▮▮▮▮▮▮ ▮▮▮▮▮▮ (*See id.* at ¶ 76).

- Tattoo artists—not only Mr. Hayden—have been willing to license their designs for reproduction as permanent tattoos, temporary tattoo products, clothing products, and face masks. (*See id.* at ¶ 78).

- Legal settlements that indicate a tattoo artist's willingness to allow their designs to be reproduced. Specifically, settlements between a tattoo artist and a restaurant included a license agreement for the tattoo design and an amicable settlement between tattoo artists Mr. S. Victor Whitmill's lawsuit against Warner Bros. Entertainment Inc. over a face tattoo design in the move *The Hangover Part II*. (*See id.* at ¶ 79). Mr. Hayden was not a party to either of these two lawsuits.

- Declarations by tattoo artists in a previous lawsuit against Defendants by Solid Oak Sketches, each indicating the tattoo artists believed it was necessary for Take-Two to obtain their permission or to compensate them for including their designs in the *NBA 2K* series. (*See id.* at ¶ 80).

- The fact that Mr. Hayden is not asserting any claims to restrict the conduct of Mr. James, Mr. Danny Green, and Mr. Tristan Thomson in how they publicly display their tattoos. (*See id.* at ¶ 83).

During his deposition, Dr. Lenzo also identified other factors he considered in reaching his opinion. For instance, when asked by counsel for Take-Two whether no market exists for licensing tattoo designs in video games, Dr. Lenzo stated, "There may be. I mean, I know Madden NFL has started to reincorporate these tattoos into their game again after having taken them out. And I know when they took them out, they said that we're concerned about copyright problems. So that suggests that there could be these transactions, but I don't observe any of them." (Ex. B, Deposition of Dr. Justin Lenzo, 273:2-15).[2]

---

[2] While not all details of EA's licensing of tattoo artists that inked their designs on NFL players are publicly known, it has been reported that, "[T]he NFL Players Association and ***EA required the tattoo artists that designed tattoos for***

7

Take-Two relies on its strained reading of a Second Circuit case, *Blanch v. Koons*, to support its contention that Dr. Lenzo's opinion is improper. In particular, Take-Two points to a phrase in one footnote in *Blanch* to pronounce that a potential market cannot be created even if the plaintiff "dearly wanted" to license her work. (Dkt. # 103, 5-6). However, Take-Two simply ignores what the Second Circuit actually said to support its holding in *Blanch*: "We have sometimes found that *the fourth factor favors the plaintiff even in the absence of evidence that the plaintiff has tapped, or even intends to tap, a derivative market. But nothing in the record here suggests that there was a derivative market for Blanch to tap into* that is in any way related to Koon's use of her work, even if she dearly wanted to." *Blanch v. Koons*, 467 F. 3d 244, 258 n. 9 (2d Cir. 2006) (emphasis added). Thus, the court found that the fourth factor weighed in favor of fair use because, *inter alia*, plaintiff never licensed any copyrighted work for use in graphic or other visual art and the value of the copyrighted work did not decrease. *Id.*

Here, in sharp contrast, Dr. Lenzo clearly indicates that a market for Mr. Hayden's copyrighted works *already exists*. (*See* Ex. A, ¶¶ 75-84). Dr. Lenzo explains that Mr. Hayden has *already* licensed his copyrighted work for use in graphic or other visual art, including for use in commercials, television shows, and movies. (*Id.* at ¶¶ 75-77). Dr. Lenzo also indicates that Mr. Hayden reached out to Take-Two about licensing his copyrights. (*Id.* at ¶ 77). Since Defendants are one of, if not the only, video game company that currently offers a realistic simulation NBA game, their decision not to license—*i.e.*, to instead continue *infringing*—Mr. Hayden's work left him with no market alternative.

---

*players to sign waivers giving the NFLPA and the video game company rights to reproduce the tattoos*… In Kaepernick's case, it helped that his tattoos were done by two artists, Nes Andrion of Endless Ink in Reno, Nevada, and Orly Locquiao of Humble Beginnings in San Jose, California. ***Kaepernick got the necessary permission from the artists*** and filed it with the NFLPA, who brought it to EA." https://www.espn.com/nfl/story/_/id/11036778/madden-15-feature-san-francisco-49ers-qb-colin-kaepernick-tattoos (emphases added).

Take-Two cites no applicable authority that would disqualify Dr. Lenzo's opinion relating to potential markets. Dr. Lenzo's opinion is based on his thorough consideration of multiple factors and variety of evidence. It is clear, in sum, that Dr. Lenzo did *not*, as Take-Two claims, "premise" his potential market opinion simply on Mr. Hayden's willingness to license his copyrighted works for use in video games. To claim otherwise is both incorrect and misleading.

C. **Take-Two Misrepresents Dr. Lenzo's Opinion Regarding a Potential Market That Is Likely to Develop Into an Actual Market**

Take-Two claims that Dr. Lenzo asserts that a potential market would form should the Court find no fair use because Take-Two might be willing to enter into a license with Plaintiff. (*See* Dkt. # 103, 8.) This is incomplete and misleading. Dr. Lenzo makes clear that a market for Mr. Hayden to license the rights to replicate and display his copyrighted tattoo designs *already* exists: "Mr. Hayden has voluntarily licensed some of his tattoo designs to be replicated and displayed in various contexts other than video games." (Ex. A, ¶ 75.) As noted above, he further identifies conditions under which a market for licensing tattoo designs in video games, in particular, "is very likely to form." (*Id*. ¶22.)

Take-Two also inaccurately claims, "Lenzo admitted at his deposition that, based on his improper approach, he did not 'have a specific recollection of any examples where markets did not form' and would say 'it's unlikely that … a market doesn't form' under his analysis." (Dkt. #103, 2). In fact, Dr. Lenzo's answer responded to a question from counsel for Take-Two regarding Dr. Lenzo's lectures as a teacher and his *complete* answer appears below:

> Q: Did you teach—did you teach any—let me ask a new question. As part of your lectures on market formation and copyright licensing, did you give any examples where markets did not form?
>
> A: I can't—I can't think—so I don't have a specific recollection of any examples where markets did not form and I would say it's unlikely that *I did because if* a market doesn't form, it's not something we observe historically.

9

(Ex. B, 15:5-15 (emphasis added)). That is, Take-Two conveniently ignored the context of his answer (lectures), using ellipses to divert from the fact that Dr. Lenzo was discussing his *lectures* on market formation in the context of his *teaching*. In the exchange Take-Two quotes, Dr. Lenzo was not asked about and did not answer regarding his opinions in this case. Such a transparent attempt to mischaracterize Dr. Lenzo's testimony should not be countenanced.

Take-Two further incorrectly represents Dr. Lenzo's testimony by omitting critical parts of his statements and ascribing to *him* language that was *actually* used by counsel for Take-Two. Take-Two claims, "Even Plaintiff's expert Dr. Justin Lenzo readily admits that (i) he is 'not aware of existing licenses for player tattoos in video games,' … and (ii) *'no market has formed for licensing real-life tattoo designs for video games'* as no 'transactions are evident historically.' *Id*. Ex. B (Lenzo Dep.) 263:16-264:4." (Dkt. #103, 1 (emphasis added)).

With respect to point (i) above, Take-Two intentionally omitted the remainder of the sentence in Dr. Lenzo's Report, which is critical to his analysis: "Like Defendants' experts, I am also not aware of existing licenses for player tattoos in video games**;** *however, I discuss in this section why the lack of historical licenses is not dispositive to whether or not a market for licensing tattoos for video games can or will exist in the future*." (Ex. A, ¶ 64 (emphasis added)). Dr. Lenzo's Report was clear about circumstances in which markets may not form; he simply did not provide examples because if a market does *not* form, one (obviously) does not observe it. (*See* Ex. A, ¶¶ 65-68).

With respect to point (ii) above, the *actual* exchange with Dr. Lenzo (including the question posed by Take-Two's counsel, Chris Ilardi) was as follows:

> Q: And in the approximately two decades since NBA players have been depicted bearing real-life tattoos in NBA 2K, **no market has formed for licensing real-life tattoo designs for video games**, right?

10

> A: I have not observed evidence of transactions licensing tattoos for reproduction in a video game.
>
> Q: That means that no market has formed, right?
>
> A: So you know, whether—really the market exists if there are transactions. So yes, no market formation is evident historically because no transactions are evident historically.

(Ex. B, 263:16-264:4 (emphasis added)). As is apparent, Dr. Lenzo merely noted the absence of evidence of such a market *observable* to him and ***not,*** as Take-Two would have this Court *believe* he said, that no such market exists.

Further, Take-Two alleges that Dr. Lenzo's opinion results in a "logical fallacy" that is the result of impermissible circular reasoning. (Dkt. #103, 6-7). Take-Two argues that "a potential market cannot be established by merely asserting that, if the court finds the defendant's use is not fair, then a potential market will form because a defendant will have no choice but to license plaintiff's work." (*Id.* at 6). Defendants claim this creates a logical fallacy where a court would have to find past copying was not fair use at that time because a potential market was established for the first time in the court's later-in-time opinion, finding past use was not fair. (*Id.* at 6-7).

Of course, Take-Two's argument, as recognized but the Sixth Circuit in *Princeton University Press,* is *itself* circular and points to the logical fallacy created in the inverse. In other words, if potential licensees (like Take-Two) themselves adopt the posture that the use of another's copyrighted works is "fair," they will refuse to license the right to use same (as Take-Two has). Then, with no licensing transaction being observed, such parties will rely on their own refusal (like Take-Two) to argue there is no potential market and hence no harm to plaintiff (just as Take-Two does here), thereby seeking to have the use labeled as "fair." Take-Two's argument has been rejected by the Sixth Circuit:

11

> Congress has implicitly suggested that licensing fees should be recognized in appropriate cases as part of the potential market for or value of the copyrighted work, and it was primarily because of lost licensing revenue that the Second Circuit agreed with the finding of the district court in *American Geophysical* that "the publishers have demonstrated a substantial harm to the value of their copyrights through [Texaco's] [*i.e.*, the infringer's] copying." … Th[is] approach…is fully consistent with the Supreme Court case law.

*Princeton University Press,* 99 F.3d at 1387 (citations omitted). The *Princeton University Press* Court further explained, "The potential uses of the copyrighted works at issue in the case before us *clearly include the selling of permission to reproduce portions of the works for inclusion in [the infringing works]*." (*Id.* at 1388 (emphasis added)). Take-Two's boot-strapping argument should be rejected.

Further, Take-Two misrepresents Dr. Lenzo's reasoning regarding potential markets: "Lenzo asserts ***a potential market would form*** because Take-Two might be willing to enter a license with Plaintiff if this Court finds its use is not fair use." (Dkt. # 103, 8 (emphasis added).) However, Dr. Lenzo's reasoning is not so limited. For example, Dr. Lenzo also notes that other entities have, *in fact*, paid to license Mr. Hayden's tattoos in other contexts. (Ex. A, ¶¶ 75-94). Dr. Lenzo further notes that companies like Take-Two "routinely license protected content for reproduction in their games" because of "the commercial benefit of realism in games like the NBA 2K series." (*Id.* at ¶¶ 85–89, section title.) Dr. Lenzo concludes that if ambiguities in tattoo artists' property rights are resolved in their favor, a market for licensing the Asserted Works in video games is *likely* to develop because 1) tattoo artists are willing to license their designs, 2) video game manufacturers are willing to license protected designs, and 3) transaction costs do not appear high enough to impede licensing transactions. (*Id.* at ¶ 102).

Take-Two's argument appears to be premised on conflating the ideas of an actual market and potential market. Defendants' experts have relied heavily on the apparent lack of an *actual*

12

market for video game licensing to conclude that a *potential* market does not exist. In paragraphs 92–94 of his Report, Dr. Lenzo clearly explains why the lack of evidence of such a market operating presently would *not* be dispositive of whether a *potential* market exists. Dr. Lenzo explains that the apparent (or at least purported) belief of video game manufacturers that they do not require a license is the reason no licensing transactions for the replication of tattoos in video games have been observed, despite economic conditions that favor the existence of such a market. (*Id.* at ¶ 92). As noted, Dr. Lenzo's rebuttal to Take-Two's experts, as articulated in his Report, is that if property rights were clarified in favor of the tattoo artists, then this *potential* market would become an *actual* market. (*Id.* at ¶¶ 92–93).

Take-Two's claim that Dr. Lenzo's reasoning is circular misses the ball. Dr. Lenzo's analysis on a potential licensing market would not result in copyright holder "always be[ing] considered a potential licensor" or a "potential market [] exist[ing] in every fair use case." (Dkt. #103, 2.) The Sixth Circuit has in fact rejected this position: where "the copyright holder clearly does have an interest in exploiting a licensing market—and especially where the copyright holder has actually succeeded in doing so—'it is appropriate that potential licensing revenues for []copying be considered in a fair use analysis.'" *Princeton*, 99 F.3d at 1387 (6th Cir. 1996) (quoting *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d. Cir. 1994)). Thus, Mr. Hayden's willingness to license his works (which he has succeeded in doing in the past) is highly relevant. And given Take-Two's willingness to license *other* IP to create its video games (*see* Ex. A, ¶¶ 85–86), it is also perfectly acceptable for Mr. Lenzo to consider *why* Take-Two is refusing to license *Mr. Hayden's* IP (*i.e.*, Take-Two's asserted belief that licensing is not necessary). As explained throughout this brief, Dr. Lenzo's opinions are not *solely* based on Mr. Hayden's willingness to license his works. And his opinion that Mr. Hayden

13

would be willing to do so is based on past success in doing so. This reasoning and factual analysis is highly relevant under Sixth Circuit law. *Princeton*, 99 F.3d at 1387.

Take-Two has simply not met its burden to show why Dr. Lenzo should be precluded from testifying about the potential market for replication of Mr. Hayden's tattoos. Dr. Lenzo's opinions fully conform with the Copyright Act and existing case law and Take-Two has not shown to the contrary. The Court should deny Take-Two's Motion.

## IV. CONCLUSION

For the foregoing reasons, James Hayden respectfully requests that the Court deny Take-Two's request for relief.

Dated: November 22, 2021                    Respectfully submitted,


                By: */s/ Dustin Likens*

John S. Cipolla (Ohio Bar No. 0043614)
Daniel McMullen (Ohio Bar No. 0034380)
Andrew Alexander (Ohio Bar No. 0091167)
Dustin Likens (Ohio Bar No. 0097891)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
aalexander@calfee.com
dlikens@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's Electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

>*/s/ Dustin Likens*
>One of the attorneys for Plaintiff