UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC.,<br><br>　　　　Defendants. | CASE No. 1:17-cv-02635<br><br>Judge Christopher A. Boyko |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE
TESTIMONY OF DR. H. TOLGA BILGICER**

Now comes JAMES HAYDEN ("Plaintiff") and provides his Memorandum in OPPOSITION to Defendants' Motion to Exclude Testimony, Argument or Evidence Regarding the Survey and Related Opinions of Dr, H. Tolga Bilgicer filed by 2K Games, Inc. and Take-Two Interactive Software, Inc. ("Defendants," collectively "Take-Two"). For the reasons set forth herein, the Court should DENY Defendants' Motion.

### I. SUMMARY OF PLAINTIFF'S RESPONSE

*First*, the Bilgicer survey was designed to fix critical flaws in the Jay Survey and the results are *highly* relevant to this case. One (of many) of the flaws in the Jay Survey is that Dr. Jay ignored the possibility that individuals may buy the Accused Video Games because they value accurate tattoos on *all* the NBA players, *including* the Asserted Copyrights on LeBron James, Tristan Thompson, and Danny Green—not just the tattoos on a particular player or two. As a result, and unlike Dr. Bilgicer's survey, Dr. Jay's survey is incapable of assessing this fact, which is undoubtedly relevant to both damages (*e.g.*, whether there is a reasonable connection between sales of the Accused Video Games and infringement and the value of the Asserted Copyrights) and Take-Two's fair use defense.

*Second*, Dr. Bilgicer's methodology is sound and has been accepted by many courts. Contrary to Take-Two's contention that "Dr. Bilgicer uses a methodology that has never been accepted by any court," Take-Two's Memorandum in Support of Its Motion to Exclude Testimony of Dr. H. Tolga Bilgicer (Dkt. No. 102-1) 2, surveys incorporating close-ended questions indisputably *have* been accepted in many courts. In fact, Dr. Jay uses close-ended question in her own survey. Furthermore, where appropriate, Dr. Bilgicer *did* give respondents the opportunity to respond "don't know," Rebuttal Expert Report of Dr. H. Tolga Bilgicer (Exhibit A) ¶¶ 54–63, and *did* incorporate a mechanism to filter out "noise." *See* Dkt. No. 102-1 at 2. Dr. Bilgicer's alleged lack of a "control group," *see id.* at 12, is misleading and is not dispositive—*even indicative*—of unreliability in the context of the Bilgicer Survey. Tellingly, in fact, Take-Two's own expert, Dr. Jay, did not use a so-called "control group" either. Deposition of Dr. Deborah Jay (Exhibit B) 7:23–8:1.

1

*Third,* Dr. Bilgicer's conclusions are *not* misleading and are consistent with reality, unlike the results of the Jay Survey. Moreover, the results of the Bilgicer Survey *plainly* support a conclusion that "tattoos on the NBA players is *a reason* that consumers purchased an NBA 2K game." Exhibit A at 26.

## II.    FACTUAL BACKGROUND

On May 20, 2021, Take-Two served the Initial Report of Dr. Deborah Jay ("Initial Jay Report"), in which she presented findings from a survey (the "Jay Survey") that she conducted. In response, on July 1, 2021, Mr. Hayden served the Rebuttal Expert Report of Dr. H. Tolga Bilgicer, in which Dr. Bilgicer presented findings from his own survey (the "Bilgicer Survey").

From the results of the Bilgicer Survey, Dr. Bilgicer concluded that "the realism of tattoos on the NBA players is *a reason* that consumers purchased [the Accused Video Games]." Ex. A at ¶ 64. *See also Id.* at ¶ 47. The Jay Survey, on the other hand, does not even purport to measure whether tattoos are *a reason* consumers buy the Accused Video Games.[1]

On August 13, 2021, Dr. Jay *improperly* submitted a supplemental report (the "Jay Supplement").

## III.    LAW AND ARGUMENT

Under *Daubert*, the "gatekeeper role involves two basic inquiries." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 489 (S.D. Ohio 2020) (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993)). "First, the court must assess whether the expert's testimony is relevant." *Id.* "Relevancy under the Federal Rules of Evidence is a lenient standard." *Id.* (citing *Daubert, 509 U.S. at 587).* "Evidence is relevant so long as it relates to a

---

[1] The Jay Survey was designed to identify the *main reasons* that consumers purchased the Accused Video Games, intentionally designed to not elicit *all* the reasons respondents bought the NBA 2K games or whether tattoos drove purchase decisions.

2

fact at issue and helps the jury determine that fact at issue." *Id.* (citing Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590-91). "Next, the Court must inquire whether the expert's testimony is reliable." *Id.* (citing *Daubert*, 509 at 589-90). "[A] reliable opinion requires that the expert use (1) a reliable methodology, and (2) base his or her opinion on reliable facts or data." *Id.* (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). "An expert's survey meets Daubert's reliability standards if the expert: (1) properly defines the "universe" of respondents; (2) selects a representative sample of that universe; (3) frames the questions in a clear, precise and non-leading manner; (4) uses competent interviewers who follow sound interview procedures and have no knowledge of the litigation or the purpose of the survey; (5) accurately reports the data; (6) analyzes the data in accordance with accepted statistical principles; and (7) assures the objectivity of the process." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 497–98 (S.D. Ohio 2020) (citing *Safe Auto Ins. Co. v. State Auto. Mut. Ins. Co.*, 2009 WL 3150328, at *2 (S.D. Ohio Sept. 30, 2009) (quoting *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 78 (W.D. Mich. 2006) aff'd, 502 F.3d 504 (6th Cir. 2007))).

### A. The Bilgicer Survey Results Are Relevant to This Case

Take-Two argues, summarily, that the Bilgicer Survey "asked the wrong question." Dkt. No. 102-1 at 1. However, it is the Jay Survey that asked the wrong question; the Bilgicer Survey was designed to *fix* critical flaws in the Jay Survey. In addition, the results of the Bilgicer Survey show that "the realism of tattoos on the NBA players is *a reason* that consumers purchased [the Accused Video Games]." Ex. A at ¶ 64, *see also id.* at ¶ 47. This conclusion is plainly relevant to multiple key issues in this case, for example, damages and fair use.

One of the glaring flaws of the Jay Survey is that it was designed to identify only the *main reasons* that consumers purchased the Accused Video Games, instead of focusing on

3

whether tattoos were *a* reason consumers bought the Accused Video Games, and purposefully avoided eliciting responses that *tattoos* were a reason for purchasing the game. *See,* Ex. A ¶ 19. Take-Two argues that Dr. Bilgicer asked "the wrong question," Dkt. No. 102 at 1, when, in fact, the Bilgicer Survey was designed to fix the errors in the Jay Survey that made *it* not relevant to any issues in the case (whether or not the Asserted Copyrights are the among the *main* reasons consumers buy the game is not relevant).

Another significant flaw of the Jay Survey is that Dr. Jay ignored the possibility that individuals may buy the Accused Video Games because they value accurate tattoos on *all* the NBA players; not just a particular one or two. This segment of consumers is undeniably relevant to the value of the Asserted Copyrights *and* Take-Two's fair use defense.

Take-Two asserts that "[g]iven that hundreds of NBA players have tattoos, Plaintiff's survey results tell us nothing about whether people bought *NBA 2K* for the tattoos Plaintiff actually inked." Dkt. No. 102-1 at 1–2. However, contrary to Take-Two's asserting, whether consumers purchased the Accused Video Games because they value accurate tattoos on *all* the NBA players, including LeBron James, Tristan Thompson, and Danny Green, is highly relevant, for example, to Mr. Hayden's damages under 17 U.S.C. § 504. Under 17 U.S.C. § 504(b), "the copyright owner is required to present proof *only* of the infringer's gross revenue" (emphasis added), and "[w]here there is a commingling of gains, [the infringer] must abide the consequences, unless he can make a separation of the profits so as to assure the injured party all that justly belongs to him." *Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012) (citing *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940)). It is thus Take-Two's burden to show that consumers purchased the Accused Video Games *exclusively* for reasons *other than* the Asserted Copyrights, *not* Mr. Hayden's burden to show that consumers purchased

4

the Accused Video Games *exclusively for* the Asserted Copyrights. Take-Two's attempt to narrowly target only consumers who purchased the Accused Video Games exclusively because of the particular tattoos on LeBron James, Danny Green, and Tristan Thompson is an inadequate attempt to "separat[e] the profits." *Id.* It simply ignores a meaningful segment of the population that buy the Accused Video Games because they value accurate tattoos on *all* NBA players, *including* LeBron James, Tristan Thompson, and Danny Green. In contrast, the Bilgicer Survey is a useful data point in determining the value of the Asserted Copyrights.

Moreover, Take-Two also fundamentally misunderstands Mr. Hayden's burden to demonstrate a "reasonable relationship" between gross revenues and infringement. In *Balsley*, the court explained:

> "Based on the plain language of the statute, we therefore reject Defendant's contention that it is Plaintiffs' burden to prove that Defendant profited from the [copyrighted work], or to prove which portions of [infringer's] profit, if any, are attributable to the [copyrighted work]. Plaintiffs have only one requirement: to prove Defendant's gross revenue. We agree with our sister Circuits in holding that this gross revenue number must have a reasonable relationship—***relevance, in other words***—to the infringing activity. By requiring that the gross revenue number put forth by the copyright owner has a reasonable relationship to the infringing activity, ***we do not raise the burden on copyright owners beyond that outlined by the plain language of the statute. It is merely an implicit, common-sense element of proving gross revenue***."

*Id.*, at 769-70 (emphasis added). The fact that "realism of tattoos on the NBA players is *a reason* that consumers purchased [the Accused Video Games]," Ex. A at ¶ 64, *see also id.* at ¶ 47, is *manifestly* relevant to whether Take-Two's gross revenue is reasonably related to the Asserted Copyrights.

Whether tattoos are a reason consumers buy the Accused Video Games is also relevant to Take-Two's fair use defense. Take-Two argues that "the first fair use factor weighs in favor of fair use" at least in part because "'there is no link between the sales of *NBA 2K* video games and their depictions of the tattoos' on the NBA Players." Take-Two's Memorandum in Support of Its

5

Motion for Summary Judgment (Dkt. No. 95) 15. The Jay Survey, which was designed to identify the *main reasons* that consumers purchased the Accused Video Games, *see* Ex. A ¶ 19, does not support such a broad conclusion, and the results of the Bilgicer Survey, which indicate that there *is* a link between the sales of the Accused Video Games and their depictions of tattoos is extremely relevant.

Thus, and especially in light of the "lenient" relevancy standard, *Navarro,* 501 F. Supp. 3d at 489 (citing *Daubert*, 509 U.S. at 587), the results of the Bilgicer Survey are relevant, and Take-Two's Motion should be denied.

### B. Dr. Bilgicer's Methodology Is Sound and Has Been Accepted by Many Courts

Take-Two also argues that the Bilgicer Survey was "leading and suggestive," Dkt. 102-1 at 7, on the basis that it incorporated closed-ended questions. *Id.* However, Take-Two ignores the fact that many courts have accepted surveys including closed-ended questions. *See, e.g., Navarro,* 501 F. Supp. 3d at 503; *Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp. 3d 588, 599 (N.D. Ohio 2019), appeal dismissed, No. 19-3227, 2019 WL 2564576 (6th Cir. May 10, 2019). In fact, Take-Two's expert, Dr. Jay, uses closed-ended questions in her own survey, *see* Expert Report of Dr. Deborah Jay (Exhibit C) Appendix D, at D-13, and actually *ignores* responses to open-ended questions! *See* Ex. A at ¶ 55 (citing Ex. C, at p. 8).

In determining whether the questions in the Bilgicer Survey were "leading," the appropriate inquiry is whether Bilgicer's questions "impermissibly suggested that there is a 'right answer.' " *Navarro*, 501 F. Supp. 3d at 502. Absolutely nothing in Dr. Bilgicer's questions suggests that there are "right answers" in the Bilgicer Survey. The multiplicity of response options (including "don't know" and "other" response options in the appropriate questions) and the very "constant-sum" methodology Dr. Bilgicer employs actually suggests to respondents that there *are not* "right answers" in the Bilgicer Survey. Moreover, the questions in the Bilgicer

6

survey are *far less* leading than closed-ended questions asking respondents to pick between just two options, *which courts have allowed. See Navarro,* 501 F.Supp.3d at 503 (holding that survey question asking respondents to pick between two options was "not so highly suggestive as to be a 'leading question.'")

Take-Two also specifically argues that Question 3 of the Bilgicer Survey was suggestive because it asked survey respondents to identify which items (identified as being relevant to player realism), if any, were a reason they bought the *NBA 2K* games and that Questions 3 and 4 of the Bilgicer Survey were "highly" suggestive merely by raising the subject of tattoos in a list of answer choices. Dkt. No. 102-1 at 8. *Even if* Question 3 informed some respondents of a connection between tattoos and the realism of NBA players they would not otherwise have made, *see* Dkt. No. 102-1 at 8*, it still* does not, in any way, suggest that "how realistic the tattoos on the NBA players are," Ex. A at ¶ 59, is in any way a "right answer." Respondents were asked to choose the reasons "for buying an NBA 2K game." *Id.* They were not asked to identify the items relevant to player realism, nor is the fact that the tattoos on player avatars are relevant to player realism even in dispute in this case (Take-Two admits that it is). Moreover, contrary to Take-Two's assertion that "[i]n *Wells Fargo & Co.*, the court found that a similar survey was improperly leading," Dkt. No. 102-1 at 8, the survey in *Wells Fargo & Co.,* is completely *dissimilar* to the Bilgicer Survey. In *Well Fargo & Co.*, "the plaintiffs offered a survey to gauge whether customers believed that certain online ads emanated from the Well Fargo website. *Navarro*, 501 F.Supp.3d at 502 (citing *Wells Fargo & Co. v. WhenU.com, Inc*., 293 F. Supp. 2d 734, 753, 767-68 (E.D. Mich. 2003)). The court found the survey misleading because the expert "improperly told respondents that pop up ads appear 'on' a website, thus suggesting the association he was trying to establish." *Wells Fargo & Co.,* 293 F. Supp. 2d at 753. Nothing in

Question 3 of the Bilgicer Survey suggests an association between "how realistic the tattoos on the NBA players are" and respondents' reasons "for buying an NBA 2K game." *See* Ex. A at ¶ 59.

Regarding Take-Two's assertion that merely raising the subject of tattoos in a list of answer choices is *per se* suggestive, as explained above, *many courts* have accepted surveys including closed-ended questions which (necessarily) raise relevant subjects. Tellingly, Take-Two does not cite to a single case to support its assertion that merely raising the subject of tattoos in the response options in Questions 3 and 4 is "highly suggestive." In fact, in a separate case in which Take-Two's own expert, Dr. Jay, was retained by a patent-owner plaintiff, she used closed ended questions to assess the relative value of a patented feature, calling out the feature name in the set of possible responses. (Dkt. No. 88-8.)

Furthermore, "a survey does not have to be perfect to be admissible," *Navarro*, 501 F. Supp. 3d at 499, and the inclusion of both "Other" and "Don't know" response options in Question 3 mitigates any possible suggestiveness. *See Spangler Candy Co.,* 372 F. Supp. 3d at 599 ("Because [Plaintiff's Expert] offered a "Don't Know/No Opinion" option for each closed-ended question, I conclude the questions were not unduly suggestive or guess-inducing.") The inclusion of a "don't know" response option in Questions 4 was unnecessary because only respondents who *did not* choose "Don't know" in Question 3 were shown Question 4, which asked respondents to assign 100 points among the options that *they selected* in Question 3. In fact, including a "don't know" response option in question 4 likely would have *caused* respondent confusion. The inclusion of a "don't know" response option in Question 2 was unnecessary for similar reasons.

8

Second, Take-Two alleges that the Bilgicer Survey "encourages guessing" because "it did not include a 'don't know' option in response to key survey questions." Dkt. No. 102-1 at 9–10. However, the Bilgicer Survey *did* include a "don't know" response option in the appropriate questions. *See, e.g.,* Ex. A, Appendix C, at p. 6; 7. Questions 1 and 3 *explicitly* included "Don't know" response options and, as explained above, including a "don't know" response option in Questions 2 and 4 was unnecessary because only respondents who *did not* choose "Don't know" in Questions 1 and 3 were shown Questions 2 and 4, which asked respondents to assign 100 points among the options that *they selected* in Questions 1 and 3, respectively. Furthermore, *every respondent* was shown the set of instructions which invited the respondents "[i]f you do not know the answer to a question or do not have an opinion or belief, please indicate this. *See, e.g.,* Ex. A, Appendix C, at p. 5. Thus, for *every* question (even those for which including a "don't know" response option would have been plainly illogical), *every* respondent not only had the option, but was *encouraged* to indicate that he or she did not know the answer.

Take-Two also alleges that the Bilgicer Survey is "confusing or misleading." Dkt. No. 102-1 at 9. This argument rests entirely on Take-Two's puzzling belief that asking respondents to allocate 100 points to different features places "a high cognitive burden" on them. *Id.* at 9–10. Take-Two's only support for this argument is Dr. Bilgicer's own explanation for why he included a "don't know" response option for certain questions, *see* Deposition of H. Tolga Bilgicer (Exhibit D) 156:24–157:10, and the fact that Dr. Bilgicer instructed his programmers to "[f]orce the sum of points to be 100" *to make it easier* to allocate the 100 points. *See* Ex. A Appendix C.

9

Take-Two has not provided a single case to support its theory that "constant sum" methodology[2] is fundamentally unreliable. In fact, "constant sum" methodology is widely recognized as a reliable survey methodology in academic literature. For example, Columbia University Professor, Dr. Netzer, and Stanford University Professor, Dr. Srinivasan, used constant-sum methodology, as part of their survey approach, to measure consumers' preferences over different product attributes.[3] These academic researchers found that, by incorporating the constant sum methodology, their survey method achieved substantially and significantly *greater* predictive ability on consumers' preferences compared to previous approaches in academic literature.[4] Academic researchers have credibly utilized surveys incorporating constant-sum questions for an wide range of purposes, including:

- To predict consumers' brand choices;[5]
- To predict election outcomes;[6] and
- To examine the strategic orientation of firms.[7]

Questions 2 and 4 in the Bilgicer Survey are designed to determine respondents' reasons "for buying an NBA 2K game" *and* determine respondents' preferences across all response options (including "Other.") That is, the results "giv[e] a sense not only of respondents' relative preference across the options, but also the relative importance of the different options." Ex. A at

---

[2] "Constant sum" survey methodology involves survey respondents being asked to allocate a "constant sum" (i.e., 100) of points among a list of features or attributes.
[3] *See*, Exhibit E, Netzer Oded and Srinivasan V., "Adaptive Self-Explication of Multiattribute Preferences," *Journal of Marketing Research*, No. 48(1), Winter 2011, pp. 140-156.
[4] *See Id.* at p.140.
[5] Exhibit F, Reibstein, David J., "The Prediction of Individual Probabilities of Brand Choice," *Journal of Consumer Research* 5, No. 3, December 1978, pp. 163-168.
[6] Exhibit G, Parackal, Mathew, Phil Harris and Chris Rudd, "Election Forecasting: Development of the Constant Sum Scale to be Used in Telephone Surveys," *International Journal of Market Research* 51, No. 6, January 2009, pp. 735-750.
[7] Exhibit H, Deshpandé, Rohit, Amir Grinstein and Elie Ofek, "Strategic Orientations in a Competitive Context: The Role of Strategic Orientation Differentiation," *Marketing Letters* 23, No. 3, September 2012, pp. 629-643.

¶ 58. Unlike the Jay Survey, the Bilgicer Survey captures the "trade-off"[8] between respondents' "reasons for buying an NBA 2K game." By "[f]orcing the sum of points to be 100," the Bilgicer Survey not only *reduces* the cognitive burden on respondents, but also ensures that each "point" carries the same preferential weight in capturing said "trade-off." That is, "[f]orcing the sum of points to be 100," actually *improves* the accuracy of its results. It does not, as Take-Two contends, force respondents "to guess or randomly allocate points." *See* Dkt. No. 102-1 at 11.

Take-Two specifically argues that the number of different features ("as many as ***nine***") respondents are required to allocate points among contributes to the purported "high cognitive burden" the Bilgicer Survey places on respondents. *See* Dkt. 102-1 at 10 (emphasis in original). However, in academic literature, it has been accepted that the number of attributes or features in a "constant sum" question is considered to be "large," only if it is ten or more.[9] In the Bilgicer Survey, Question 2 lists *at most* six features and Question 4 lists *at most* nine features (and this number is even lower for certain survey respondents depending on the attributes they selected in their previous answers). Accordingly, the number of features in Questions 2 and 4 *is not* "large," the Bilgicer Survey *does not* place a "high cognitive burden on respondents," *id.,* and it is neither confusing *nor* misleading.

Third, Take-Two argues that the Bilgicer Survey should be excluded *per se* because it "does not use a control." Dkt. No. 102-1, heading at 11. However, the Bilgicer Survey *does* use a control—Take-Two knows this. In fact, the Jay Survey uses the *exact same* control response option as the Bilgicer Survey! *See* Ex. C Appendix D, at D-13. In Question 1 of the Bilgicer

---

[8] On this topic, academic researchers note that "[a] common problem with the ratings approach is that it does not explicitly capture the trade-offs between attributes; it is easy for respondents to say that every attribute is important. The constant-sum approach overcomes this limitation." Netzer Oded and Srinivasan V., "Adaptive Self-Explication of Multiattribute Preferences," *Journal of Marketing Research*, No. 48(1), Winter 2011, pp. 140-156, at p. 141.

[9] "[W]hen the number of attributes is large ***(e.g., ten or more) (emphasis added)***, it becomes difficult for a respondent to divide a constant sum among all the attributes." Netzer Oded and Srinivasan V., "Adaptive Self-Explication of Multiattribute Preferences," *Journal of Marketing Research*, No. 48(1), Winter 2011, pp. 140-156, at p. 141.

Survey, respondents are asked to choose their reasons for buying an NBA 2K game from 11 response options including "The XTJ feature," "Other features … ," and "Don't know." *See, e.g.,* Ex. A ¶ 55. Respondents who selected "The XTJ feature," the *same* fictitious NBA 2K feature used in the Jay Survey as a control, were eliminated from the Bilgicer Survey. Take-Two suggests (citing completely irrelevant caselaw in the process[10]) that somehow normalizing for "noise" in the Bilgicer Survey would have been preferable to eliminating the very source of that "noise" in a multiattribute product survey, which is exactly what the Bilgicer Survey does.

Take-two seems to take particular issue with the lack of a "control group" in the Bilgicer Survey. Dkt. No. 102-1 at 12. However, Take-Two does not suggest that the Bilgicer Survey *should have* incorporated a "control group" nor does it describe a single method by which a "control group" even *could have* been used in the Bilgicer Survey to reduce "noise."[11] Furthermore, if Take-two's position is to be believed, Take-Two's *own expert*, Dr. Jay did not use a "control group" either! The Bilgicer Survey uses the exact same control question as the Jay Survey but applies it in a more acceptable way (the Bilgicer Survey eliminates the source of "noise" instead of manipulating results to "account for the effects of 'noise.' ") *See* Dkt. No. 102-1 at 11 (citing *Wells Fargo & Co.*, 293 F. Supp. 2d at 754.)

---

[10] Take-Two relies heavily on completely irrelevant sources discussing the importance of reducing "noise" in trademark "likelihood of confusion" surveys. None of these sources suggests that the control mechanisms for reducing "noise" in "likelihood of confusion" surveys are essential to, or even compatible with, a survey like the Bilgicer Survey. *See, e,g,* Ex. D 139:9-140:1 (**Q.** Okay. Isn't it true that when a survey expert asks a control question that control question results are subtracted from the test results to come to an appropriate – to account for the noise or whatever the control question is testing for? […] **A.** So the Shari Diamond source that you're looking at right now is *specifically **talking about a trademark dispute*** (emphasis added). And for – as I said before, for trademark disputes, it's sort of like a standard survey design, which is different than what we're dealing with here. ***And for those standard designs, again the most common way, as – which also says right here, a less common use of control methodology right here in this source that you're talking about for the trademarks*** (emphasis added)).

[11] Neither the Bilgicer Survey nor Jay Survey even loosely resemble the clinical trial-style studies in which one might expect a "control group" to be incorporated.

Take-Two's perplexing attack on Dr. Bilgicer's understanding of how survey controls work, *see* Dkt. No. 102-1 at 12, is also wholly without merit, *especially* considering that he used the exact same control question as Dr. Jay. Tellingly, Take-Two *does not* directly challenge Dr. Bilgicer's qualifications under Federal Rule 702, but to name just a few of Dr. Bilgicer's many qualifications, *see* Ex. A ¶ 1–8, he holds an MBA from Istanbul Bilgi University (where he ranked second in his graduating class), an MA in Economics with Honors from Syracuse University, and a Ph.D. in Marketing from Columbia University in New York City. *Id.*

As explained herein, the Bilgicer Survey was neither leading nor suggestive, it in no way "encourages guessing," and it *does* use a control. Accordingly, Take-Two's Motion should be denied.

### C. Bilgicer Survey Results Are Consistent with Reality, Unlike the Jay Survey

Lastly, Take-Two argues that "Dr. Bilgicer's survey results do not support the conclusion that tattoos motivated sales of *NBA 2K*." Dkt. No. 102-1 at 15. Aside from asserting no legal basis to challenge the *conclusions* Dr. Bilgicer makes, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) ("the inquiry envisioned by Rule 702 is … a flexible one," with the focus "on principles and methodology, ***not on the conclusions they generate***" (emphasis added)), Take-Two misinterprets Dr. Bilgicer's conclusions *which are* supported by the results of the Bilgicer Survey and misunderstands the Copyright Act *which does not* require that a copyrighted work make up *any* particular portion of the value of the infringing work.

Dr. Bilgicer concluded, based on the results of the Bilgicer Survey, that "the realism on the NBA players is *a reason* that consumer purchased an NBA 2K game." Ex. A ¶ 64. *Nowhere* in his report does Dr. Bilgicer conclude, or even suggest, that the results of the Bilgicer Survey

13

support a conclusion that consumers purchased *NBA 2K exclusively for* tattoos. As explained above, it is Take-Two's burden to "make a separation of profits" and show that consumers purchased the Accused Video Games[12] exclusively for reasons *other than* the Asserted Tattoos.[13] Take-Two unquestionably believes its customers value accurate tattoos in the Accused Video Games. It expends considerable resources in ensuring that tattoos are accurate and observable. *See* Opposition to Motion for Summary Judgment (Dkt. No. 109). The results of the Bilgicer Survey, which suggest that tattoos "are *a reason* that consumer purchased an NBA 2K game" are consistent with this reality, unlike Dr. Jay's conclusion that Take-Two expends considerable resources on a feature that provides *zero* value.

## IV.    CONCLUSION

For the foregoing reasons, James Hayden respectfully requests that the Court deny Take-Two's request for relief.

---

[12] The "Accused Video Games" are NBA 2K16, NBA 2K17, NBA 2K18, NBA 2K19, NBA 2K20, NBA 2K21, NBA 2K22 and NBA 2K Mobile. All of them were identified to Defendants in discovery and Plaintiff plans to move to amend the Complaint to add NBA 2K21 and NBA 2K22 to the others previously identified as infringing works in the Fourth Amended Complaint.

[13] The "Asserted Copyrights" or "Asserted Tattoos" include: "Gloria" (Reg. No. VAu 1-263-888); "Lion" (Reg. No VAu 1-271-044); "Shoulder Stars" (Reg. No. VAu 1-270-802); "Fire D.G." (Reg. No. VAu 1-287-552); "Scroll D.G." (Reg. No. VAu 1-287-545); and "Brother's Keeper T.T." (Reg. No VAu 1-292-453).

Dated: November 22, 2021            Respectfully submitted,

    By: */s/ Andre Alexander*

John Cipolla (Ohio Bar No. 0043614)

Daniel McMullen (Ohio Bar No. 0034380)

Andrew Alexander (Ohio Bar No. 0091167)

Dustin Likens (Ohio Bar No. 0097891)

CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
aalexander@calfee.com
dlikens@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's Electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

> */s/ Andrew Alexander*
> One of the attorneys for Plaintiff