UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN, | Case No. 1:17-cv-02635 |
| Plaintiff, | Judge Christopher A. Boyko |
| vs. | |
| | **REDACTED—PUBLIC VERSION** |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants. | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. E. DEBORAH JAY**

Plaintiff James Hayden respectfully submits this Reply in support of his Motion to Exclude the Expert Testimony of Dr. E. Deborah Jay ("Motion").

## I. Introduction

Dr. Jay's conclusions based on her survey results are mere speculation. She simply *cannot* conclude from her results that (1) "no consumers bought the relevant NBA 2K video games for the tattoos on LeBron James, Danny Green, or Tristan Thompson" or (2) "there is no link between the sales of the NBA 2K video games and their depiction of the tattoos on LeBron James, Danny Green, or Tristan Thompson." (Jay Report "Report", Dkt # 88-2, p. 8.) Her survey does not have this reach. Dr. Jay's opinions are thus not based on reliable methodology or on sufficient facts or data—they are misleading and should be excluded.

Dr. Jay's survey is carefully designed to *avoid* getting answers that identify the Asserted Tattoos as one of the reasons respondents bought the NBA 2K games. Dr. Jay's open-ended questions can only elicit top-of-the-mind, ▇▇▇▇ responses—not the level of detail or specificity required to know if player tattoos affect a purchasing decision. (*See* Jay Dep., Dkt. #

88-3, 84:25–85:6.) Dr. Jay no doubt knows this. Reputable survey academic literature (that Dr. Jay herself cites) warns that "[o]pen-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondents mind." (Diamond, *Reference Guide on Survey Research*, Dkt. # 88-2, p. 253.) Rather than squarely address this issue, Take-Two attacks a strawman, claiming Mr. Hayden "argues that Dr. Jay's survey is flawed and excludable merely because it asks open-ended question." (Opp. Br., Dkt. # 115, pg. 5.) This misses (avoids) the point. Dr. Jay's speculative conclusion is that "*no consumers* bought the relevant NBA 2K video games for the [Asserted Tattoos]." (Report, p. 8 (emphasis added).) However, to rule out the Asserted Tattoos as *a* reason consumers buy the NBA 2K games using open-ended questions, Dr. Jay's questions would have to elicit *all* the reasons consumers buy the games. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Jay Dep., Dkt. # 88-3, 111:15–23.)

      Rather, Take-Two and Dr. Jay play a shell game. They argue that, even though the open-ended questions cannot elicit all the reasons respondents buy the NBA 2K Games, the remaining survey questions fix this problem. They do not. For example, Dr. Jay asks respondents in a closed-ended question to select, from among over twenty options, the reasons they bought the NBA 2K games. But she *did not include "tattoos" as an option!* This is egregious. Take-Two contends that including "tattoos" would be "leading," (Opp. Br., 11–12.) but fails to explain why. Why would including "tattoos" be suggestive over the twenty other options in the list? It would not. There is, of course, a more straight-forward explanation for omitting "tattoos": respondents *would have chosen it*, which would have thwarted Take-Two's goal. (*See* Bilgicer Report, Dkt. # 84-4, ¶¶ 46–72.)

      Dr. Jay's remaining questions undermine the alleged purpose of the survey. They divert anyone that reported they had purchased the NBA 2K games because of *all* the tattoos to a dead-

2

end. Take-Two acknowledges this inevitable result but attempts to justify it because, according to Take-Two, these respondents are not relevant, as they bought the game because of the Asserted Tattoos *and* other tattoos. But this, again, misses (avoids) the point. If Dr. Jay's survey knowingly ignores this segment of respondents, *she cannot conclude that no consumers buy the NBA 2K video games because of the Asserted Tattoos*. In short, Dr. Jay's conclusions do not follow from her survey results—they are misleading, not based on the data in the survey, and should be excluded.

## II. Dr. Jay's conclusions go too far, are misleading, and would prejudice Mr. Hayden.

Dr. Jay submits three opinions that she derives from her survey results: (1) "consumers bought the relevant NBA 2K video games for numerous reasons, principally that they like basketball," (2) "no consumers bought the relevant NBA 2K video games for the tattoos on LeBron James, Danny Green, or Tristan Thompson," and (3) "there is no link between the sales of the NBA 2K video games and their depiction of the tattoos on LeBron James, Danny Green, or Tristan Thompson." (Jay Report, p. 8.) However, based on the survey responses and the survey design, Dr. Jay *cannot* affirmatively rule out the possibility that respondents bought the NBA 2K video games because of the Asserted Tattoos.

This undermines at least two of her conclusions. Take, for example, Dr. Jay's initial open-ended questions. They ask, "What were the <u>main reasons</u> why you bought an NBA 2K video game?" (A1) and "What were the <u>other reasons</u> why you bought an NBA 2K video game" (A2). ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*See, e.g.*, Jay Dep., Dkt. # 84-4, 111:15–23.) So Take-Two and Dr. Jay must resort to the other survey questions to fill the gap. But the remaining survey questions (B1, C1–C4) consist of a closed-ended question that—glaringly—fails to include "tattoos" as an option and a series of questions that, by design, exclude respondents that bought the game

3

because of *all* the NBA players' tattoos. This results in a survey carefully designed to *not* answer the question Dr. Jay purports to ask: do consumers buy the NBA 2K games because of the Asserted Tattoos? Dr. Jay's conclusions are thus highly misleading and should be excluded.

### A. Dr. Jay's initial open-ended questions do not rule out the Asserted Tattoos as a reason respondents bought the NBA 2K video games.

In Mr. Hayden's Motion, he laid out the reasons why Dr. Jay's initial open-ended questions fail to rule out the possibility that people bought the NBA 2K games for the Asserted Tattoos. (Motion, pp. 6–8.) The questions elicited vague, high-level responses that are simply inadequate in ruling out the Asserted Tattoos as reason for purchase. Take-Two's Opposition does not prove otherwise.

Take-Two's Opposition mischaracterizes Mr. Hayden's argument as an attack on open-ended questions *per se*. Take Two misses (avoids) the point. While open-ended questions may serve a legitimate purpose in some surveys, they do not (and could not) deliver what Dr. Jay needed to affirmatively conclude that respondents did not buy the NBA 2K games for the Asserted Tattoos. *That* is the point. Open-ended questions have shortcomings and are not appropriate for all purposes: "Open-ended questions are more appropriate when the survey is attempting to gauge *what comes **first** to a respondent's mind*[.]" (Diamond, Dkt. # 88-2, p. 253 (emphasis added).) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[1] (Jay Dep., 111:15–23.) Thus, based on these

---

[1] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ But as explained in Mr. Hayden's Motion and *infra* at pp. 8–10, these questions do not cure the deficiencies of the initial open-ended questions.

responses, she simply cannot conclude that the Asserted Tattoos played no role in customer purchase decisions. That is a bridge too far.

According to Dr. Justin Lenzo, a seasoned economist and survey expert, "Dr. Jay's tabulation does not (and cannot) distinguish between respondents who were not influenced by having tattoo designs in the game and those who were but did not make the effort to respond to a level of specificity that would indicate such influence." (Lenzo Report, Dkt. # 88-5, p. 24, fn. 116.) Take-Two's argument that "[b]ecause they were responding to open-ended questions, respondents *could* have mentioned 'tattoo realism'" (Opp. Br., p. 13) just begs the question. This is because respondents typically offered few reasons, and those reasons were often vague and ambiguous. (*See, e.g.*, Bilgicer Report, Dkt. # 88-4, ¶¶ 19–25.) Again, this is a recognized issue with open-ended questions. They are of "limited value" unless the interviewer can "probe or clarify unclear answers."[2] (Diamond, Dkt. # 88-2, at 263–264.) This problem surfaced repeatedly in the respondents' answers, for example, when respondents identified "graphics" as a reason for buying the NBA 2K games. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Jay Dep., 158:14–22.) Take-Two dismisses this valid concern, arguing that Dr. Jay did not "define graphics that way." (Opp. Br., p. 14.) But she did not define "graphics" *at all*. Dr. Jay would thus have had to probe further to confirm that these "graphics" responses did not encompass tattoos. She did not do so.

Take-Two also claims that "[i]f by 'graphics' or 'realism' respondents meant the NBA players' appearance, they would have selected this option [in response to question B1] and then identified the three players' Tattoos in response to follow-up questions [C1–C4]." (Opp. Br., p.

---

[2] Take-Two dismissed this point made in the reputable *Reference Guide on Survey Research* because it is made in a section on mail surveys. (Opp. Br., p. 8, fn. 6.) But Take-Two does not dispute that the problem is equally applicable here, where Dr. Jay was unable to "probe or clarify unclear answers."

14.) But Dr. Jay's survey design prevents knowing this. Numerous respondents who identified "graphics" or "realism" in questions A1 and A2 *did* select the player appearance option in question B1, yet they were excluded because they did not buy the NBA 2K game because of the appearance of a *particular* player (*i.e.*, they bought the game because of the appearance of *all* the players, *see infra*, p. 9). (Ex. A,[3] *see* 1013941447; 1014349159; 1015411807; 1015679831; 1016390301.) Other respondents who identified "graphics" or "realism" in questions A1 and A2 even identified the depiction of LeBron James as a reason they bought the game. But they provided a vague response about "what features or aspects were important to depict," making it impossible for Dr. Jay to conclude that these respondents did *not* buy the NBA 2K games because of the Asserted Tattoos. (*Id.*, *see* 1014262671; 1018523181.)

Contrary to Take-Two's claim (Opp. Br., p. 14), purporting to affirmatively conclude from these responses that *no* respondents bought the NBA 2K games because of the Asserted Tattoos is simply *speculation*. As explained by Dr. Lenzo, "[m]any of the responses . . . are neither confirmatory nor contradictory to tattoo realism being an important contributor to overall sales of the games." (Lenzo Report, ¶ 60.)[4]

Moreover, the fact that Dr. Jay has used similar open-ended questions in other cases does not fix their shortcomings in *this* case. For example, in *Loussier v. Universal Music Group, Inc.*, Dr. Jay's open-ended questions directly asked about the subject matter in question—namely, which *songs* on an album drove customer purchase decisions. No. 02 Civ. 2447, 2005 WL

---

[3] Ex. A contains excerpts from the raw survey data provided by Take-Two from the Jay survey. Columns A1, A2, C1, C2, C3, and C4 provide the responses, if any, to the corresponding survey questions. Column B1_19 indicates whether the respondent selected the option "The depiction of the NBA players' face, body or other aspects of their appearance" in question B1.

[4] Take-Two responds to this criticism by claiming that "Plaintiff does not own rights in 'tattoo realism' generally, but rather, only claims to own copyrights in the six tattoos on three specific NBA players particularly." (Opp. Br. 13.) This misses the point—the responses to Dr. Jay's open-ended questions are neither confirmatory nor contradictory to tattoo realism being an important contributor to overall sales of the games *at any level*, including the six Asserted Tattoos in this case.

6

5644439, at *1 (S.D.N.Y. Aug. 24, 2005). The *Loussier* survey, for example, asked the following questions:

- "Did you purchase this CD for any particular song or songs?"
- "What song or songs did you mainly purchase this CD for?"

*Id.* Thus, there was no problem ruling out songs not identified as reasons for purchase. Here, Dr. Jay did not ask respondents if they "purchased the game for any particular tattoo" or "what tattoo or tattoos did you mainly purchase the NBA 2K game for?" This is a critical difference in the inferential power of the two surveys.

Likewise, the decision in *A & M Records, Inc. v. Napster, Inc.*, does not in any way validate Dr. Jay's methodology in this case. No. C9905183, 2000 WL 1170106 (N.D. Cal. Aug. 2000). Indeed, it does not even address the issues Mr. Hayden raises here. In *A & M*, the defendant challenged the surveyed population as being underinclusive. 2000 WL 1170106, at *3. The opinion provides no insight into the open-ended question methodology, let alone validate its use in this case.

Two separate survey experts, Dr. Justin Lenzo and Dr. H. Tolga Bilgicer, both concluded that Dr. Jay's open-ended questions (and the Jay Survey as a whole) lack the ability to "find association between the asserted tattoo designs and sales even if/when one exists." (Lenzo Report, ¶ 58, *see also* ¶¶ 59–63; *see also* Bilgicer Report, ¶¶ 19–25 ("the Jay Survey functions as a straw man—what it purportedly proves falls short of what Dr. Jay concludes.").) If Dr. Jay wanted the inferential power to affirmatively conclude that no consumers bought the NBA 2K games because of the Asserted Tattoos, she could have asked the question as she did in *Loussier* or as Dr. Bilgicer did in this case (for example, by using the word "tattoo"). (*See* Bilgicer Report, ¶¶ 46–79.)

**B. Dr. Jay's remaining questions do not rule out the Asserted Tattoos as a reason respondents bought the NBA 2K video games.**

As explained above, without follow-up questions, it is impossible to confirm from Dr. Jay's open-ended questions alone that "no consumer bought the relevant NBA 2K video games for the tattoos on LeBron James, Danny Green, or Tristan Thompson." (Report., p. 8.) Dr. Jay's online survey unquestionably did not allow interviewers to ask respondents follow-up questions if they gave high-level, ▅▅▅▅▅ answers. (*See* Jay Dep., 84:25–85:6.) So Take-Two tries to evade the issue by characterizing the subsequent pre-written questions in the Jay survey as "follow-up" questions, as if they clarify the responses to questions A1 and A2. (Opp. Br., pp. 8–9.) They do not—and that is by design.

For example, question B1 is a closed-ended question that asked respondents to identify, among over 20 options, the reasons they bought the NBA 2K games. This would work (*see* Bilgicer Report, ¶¶ 46–79), but Dr. Jay egregiously omitted "tattoos" as an option. This omission undermines the question completely and is so obviously critical that it could only have been by design. Accordingly, Take-Two mostly ignores this issue in its Opposition. Take-Two devotes one paragraph to it, claiming that including a "tattoo" option would be "leading." (Opp. Br., pp. 11–12.) But this excuse is not supported by any academic literature, case law, or common sense. Take-Two suggests that including "tattoo" would have "suggest[ed] to the respondents an answer that would not otherwise have occurred to them" or "may lead consumers to be reminded of that feature." (*Id.* at 12.) But Take-Two fails to explain why "tattoo" would be any more leading than any of the other 21 features Dr. Jay listed. Including a variety of options in a closed-ended question is precisely to prevent any one of them from being leading. By Take-Two's logic, any closed-ended question is inherently flawed and leading. But this is not the case. *See LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 954 (N.D. Ill. 2009)

8

("Properly-drafted closed-ended, multiple choice questions are not inherently leading simply because they provide respondents with an explicitly set of responses from which to choose."). Omitting any reference to "tattoos" in this question, of course, defeats the nominal purpose—which is what Dr. Jay (or more to the point, Take-Two) wanted. Indeed, by omitting tattoos from her 21-item list, Dr. Jay's obvious intent was to *avoid* finding out that tattoos were, in fact, a reason consumers bought the NBA 2K games.

Dr. Jay's remaining "follow-up questions" (C1–C4) also have serious problems that undermine her conclusions. In his Motion, Mr. Hayden explained in detail how questions C1–C4 operated to *exclude* any respondent that bought the NBA 2K games because of the tattoos on *all* the NBA players, which would, of course, include the Asserted Tattoos. Take-Two, *notably*, does not dispute this! Rather, Take-Two argues (in a one-paragraph response) that these consumers are "not relevant." (Opp. Br., p. 15.) How can this be? If some portions of consumers are buying the NBA 2K games because of all the tattoos in the game, including the Asserted Tattoos, then this directly contradicts Dr. Jay's conclusions that "no consumers bought the relevant NBA 2K video games for the tattoos on [the NBA Players]" and "there is no link between the sales of the NBA 2K video games and their depiction of the tattoos on LeBron James, Danny Green, or Tristan Thompson." (Report, p. 8.) These respondents are unquestionably *relevant* to—and would, in fact, *contradict*—Dr. Jay's conclusions.

Dr. Jay's main conclusions in her Report do not follow from the survey results. (*See* Bilgicer Report, ¶ 19; Lenzo Report, ¶¶ 58–63.) Allowing Dr. Jay to testify to a jury that "no consumers bought the relevant NBA 2K video games for the tattoos on LeBron James, Danny Green, or Tristan Thompson" and "there is no link between the sales of the NBA 2K video games and their depiction of the tattoos on LeBron James, Danny Green, or Tristan Thompson"

9

despite the survey not testing for these propositions would be highly misleading to the jury and prejudicial to Mr. Hayden. Dr. Jay's Report should thus be excluded.

### III. Dr. Jay's conclusion contradicts the record evidence.

The results of Dr. Jay's survey are indeed, as Take-Two puts it, "unsurprising." (Opp. Br., p. 12.) But that is not because customers do not care about realistic tattoos or the Asserted Tattoos. It is because Dr. Jay carefully crafted her survey to *avoid* eliciting such a response. In reality, there is ample evidence that realistic tattoos, including the Asserted Tattoos, are important to customers and contribute to NBA 2K sales. (*See, e.g.*, Malkiewicz Rebuttal Report, Dkt. # 98-11, ¶¶ 35–64.) This is reflected, for example, in Dr. Bilgicer's survey, which, after correcting several errors in Dr. Jay's survey, demonstrated that a meaningful number of customers (93 respondents) purchase the NBA 2K games because of realistic tattoos. (Bilgicer Report, ¶¶ 64–72.) This is also evident from the significant time and resources Take-Two devotes to accurately recreating all the NBA players' tattoos on their respective digital avatars. (*See, e.g.*, Opp. Br. to Mot. for Summ. J., Dkt. # 109, pp. 5–7, 10–11.) It would not make financial sense for Take-Two to expend these resources if there were no financial gain in return. (Lenzo Report, ¶¶ 49–51 ("Rational firms tend only to be willing to engage in activities with material incremental costs if there is a net benefit from those activities in terms of additional revenues.").) Dr. Jay's survey was designed to suppress the commercial link between tattoos and Take-Two's financial gain and is not a reliable basis for Dr. Jay's conclusions. Her Report should be excluded.

### IV. The court in *Solid Oak Sketches* did not consider the arguments presented in Mr. Hayden's Motion, nor was the Jay survey critiqued by a survey expert.

Take-Two also relies on the decision in *Solid Oak Sketches* that denied a motion to exclude Dr. Jay's opinion in that case. (Opp. Br., pp. 1, 4, 6, 10, 14.) That opinion should not be

10

relied on in this case for several reasons. *First*, the plaintiff's motion to exclude in *Solid Oak* failed to present, in its **one page** of briefing, *any* of the arguments Mr. Hayden raises here, including the fact that many of Dr. Jay's conclusions simply do not follow from the survey results. Accordingly, the *Solid Oak* opinion is unhelpful in addressing these issues. *Second*, Dr. Jay's survey was not critiqued by another survey expert—let alone two—in the *Solid Oak* case. So the court could not benefit from this expert rebuttal analysis. (*See* Bilgicer Report, ¶¶ 19–45; Lenzo Report, ¶¶ 58–63.) Thus, the *Solid Oak* opinion deserves no weight here.

V. **Conclusion.**

Dr. Jay carefully crafted her survey to avoid finding out if the Asserted Tattoos, or even tattoos in general, are a reason consumers purchase the NBA 2K games. So the fact that it succeeded and did not detect same *cannot* be the basis to affirmatively conclude that no consumers, in fact, buy the NBA 2K games because of the Asserted Tattoos. This conclusion is highly misleading. Two separate survey experts reviewed and analyzed Dr. Jay's methodology and results and agree that her survey lacks the power to make such a conclusion. For these reasons and all the reasons set forth above and in Mr. Hayden's Motion, Mr. Hayden respectfully requests that Take-Two be precluded from presenting, relying on, or otherwise submitting the opinions of Dr. Jay set forth in her Report.

Dated: December 17, 2021                    Respectfully submitted,

By: */s/ Andrew Alexander*
John S. Cipolla (Ohio Bar No. 0043614)
Daniel McMullen (Ohio Bar No. 0034380)
Andrew Alexander (Ohio Bar No. 0091167)
Dustin Likens (Ohio Bar No. 0097891)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
aalexander@calfee.com
dlikens@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

*/s/ Andrew Alexander*
One of the attorneys for Plaintiff