# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN,<br><br>       Plaintiff,<br><br>vs.<br><br>2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC.,<br><br>       Defendants. | CASE No. 1:17-cv-02635<br><br>Judge Christopher A. Boyko<br><br>**PUBLIC VERSION** |

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DR. IAN BOGOST

Plaintiff James Hayden respectfully submits this reply memorandum in support of his Motion to Exclude the Expert Testimony of Dr. Ian Bogost (the "Motion to Exclude"). For the reasons set forth below, and in his Motion to Exclude, Plaintiff moves the Court to preclude Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively "Take-Two") from presenting, relying on, or otherwise submitting the opinions of Dr. Ian Bogost expressed in Sections III(C), III(D), and III(E) of his Expert Report and Declaration in this case.

## I. SUMMARY OF PLAINTIFF'S REPLY

On October 25, 2021, James Hayden filed his Motion to Exclude, in which he explained why Take-Two should be precluded from presenting, relying on, or otherwise submitting the opinions of Dr. Bogost concerning "ordinary gameplay" in the Accused Video Games,[1] the observability of tattoos in the Accused Video Games, or the tattoo licensing market. In response, Take-Two argues that Dr. Bogost's opinions are admissible because he submitted a similar report in a *different* litigation, Dkt. No. 113 at 1, because he is "eminently" qualified to offer the opinions contained in his report, *id.* at 6, and because his opinions will be helpful to the jury. *Id.* at 9.

Take-Two's arguments should be rejected for at least three reasons. ***First***, it is, of course, the role of *this* Court, as evidentiary "gatekeeper," *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), to make its own determination as to whether Dr. Bogost's expert opinions in *this* litigation are properly substantiated and would assist the trier of fact in *this* case. That Dr. Bogost was permitted to submit a report in a *different* dispute where, not insignificantly, the opposing party neglected to raise most of the evidentiary issues Mr. Hayden raises in his Motion to Exclude and failed to even depose Dr. Bogost, is not persuasive in this case, let alone dispositive.

***Second***, as explained in Mr. Hayden's Motion to Exclude, *none* of Dr. Bogost's asserted qualifications provide a reasonable foundation for him to testify concerning "ordinary" gameplay of the Accused Video Games or the tattoo licensing market. Take-Two does not deny that Dr. Bogost has *no* "real-world" experience with any of the Accused Video Games, *see* Dkt. No. 113

---

[1] The "Accused Video Games" are NBA 2K16, NBA 2K17, NBA 2K18, NBA 2K19, NBA 2K20, NBA 2K21, NBA 2K22 and NBA 2K Mobile. All of them were identified to Defendants in discovery and Plaintiff plans to move to amend the Complaint to add NBA 2K21 and NBA 2K22 to the others previously identified as infringing works in the Fourth Amended Complaint.

1

at 7–8, nor does it dispute his acknowledged lack of familiarity with video game developers licensing rights to include tattoos in video games. *See id.* at 15. Finally, Take-Two does not and cannot dispute that a given juror likely would have more *real-world* (*i.e.*, "ordinary") exposure to the Accused Video Games than Dr. Bogost. *See Id.* at 8.

*Third*, for the reasons set forth below, and in Mr. Hayden's Motion to Exclude, many of Dr. Bogost's opinions would *not* be helpful to a jury. Rather, they either aim to *replace* the jury or are directed to matters the jury can understand *without* need of an "expert." Moreover, even *if* his opinions were helpful, the appropriate inquiry in determining whether an expert's opinions meet the reliability threshold is not merely "helpfulness," but also whether "[the expert] employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field," *In re Heparin prod. Liab. Litig.*, No. 08 Civ. 600000, 2011 WL 1059660 at *5 (N.D. Ohio Mar. 21, 2011), a standard which the Bogost opinions fail to meet. The Court should exclude the testimony of Dr. Bogost as requested by Mr. Hayden.

**II.  ARGUMENT**

    **A.  Dr. Bogost's Testimony Concerning "Ordinary Gameplay" Should be Excluded**

As explained in Mr. Hayden's Motion to Exclude, "Dr. Bogost is neither qualified to render an opinion on what constitutes 'ordinary gameplay' in the Accused Video Games or how 'ordinary' players interact with the Accused Video Games, nor are his opinions based on sufficient facts or data to support same." Motion to Exclude (Dkt. No. 91) at 3.

    *1.  Take-Two Misunderstands Mr. Hayden's Theory in this Case*

At the outset, Take-Two contends that "[Mr. Hayden]'s theory in this case is that people ordinarily play *NBA 2K* not because they want to play a basketball simulation game, but because

2

they want to pause the game, manipulate it to identify and focus on the [Asserted] Tattoos,[2] and then stare at them." Dkt. No. 113 at 5. Speaking in Take-Two's terms, "[t]hat is nonsense." *See Id*. Not only has Mr. Hayden *not* argued that *anyone* plays the Accused Video Games *exclusively* because they want to "pause the game, manipulate it to identify and focus on the [Asserted Tattoos], and then stare at them," *id.*, but the portion of Mr. Hayden's Motion to Exclude that Take-Two cites—page 12—does not even *remotely* support this overtly misleading pronouncement. On Page 12 of his Motion to Exclude, Mr. Hayden *actually* explains how Dr. Bogost's use of the term "fleeting" is contrary to the plain meaning of the term and is therefore misleading. As noted there, according to Merriam Webster, "fleeting" means "pass swiftly." *Id.* at 12. However, as further explained, Dr. Bogost stated at his deposition that an image that had been on his screen, *by his own admission*, for "at least a few minutes," Dkt. No. 91-3 (Bogost Tr.) 175:9–15, was "absolutely fleeting." *Id.* at 176:17. The reasons he cites for that characterization are, politely put, *noteworthy—i.e.*, because he "was looking at other things… looking at the window… where it's raining," and because other players of the game would be "looking at other things… talking to their friends… in the kitchen getting a drink… [or have] left the room to go to the bathroom." *Id*. at 177:12-25. *None* of his cited reasons has *anything* to do with the Accused Video Games or what actually appears *on the screen* when they are played. In no way does Mr. Hayden's criticism of Dr. Bogost's inexplicable use of the term "fleeting" support Take-Two's assertion that "[Mr. Hayden]'s theory is that people ordinarily play *NBA 2K*... because they want to pause the game, manipulate it to identify and focus on the [Asserted] Tattoos, and then stare at them." Dkt. No. 113 at 5. Nor is that the standard for "observability" in

---

[2] The "Asserted Tattoos" or "Asserted Copyrights" or "Asserted Works" include: "Gloria (Reg. No. VAu 1-263-888; "Lion" (Reg. No. VAu 1-271-044); "Shoulder Stars" (Reg. No. VAu 1-270-802); "Fire D.G." (Reg. No. VAu 1-287-552); "Scroll D.G." (Reg. No. VAu 1-287-545); and "Brother's Keeper T.T." (Reg. No. VAu 1-292-453).

3

the *de minimis* use context. *See Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 76 (2d Cir. 1997) (finding copyrighted work appearing out-of-focus and for mere seconds in a film was still with "sufficient observable detail for the 'average lay observer,' . . . to discern [the artist's] style" and thus not be *de minimis*).

> 2. *Dr. Bogost's Limited Personal Interaction with the Accused Video Games Does Not Support His Testimony Concerning "Ordinary Gameplay"*

Under Federal Rule of Evidence 702, an expert witness must be "qualified," *and* his testimony must be based on "sufficient facts or data." Fed. R. Evid. 702(b). *Even if* Dr. Bogost was qualified to testify about "ordinary gameplay" in the Accused Video Games (which he is not), his testimony is based entirely on unrelated facts that in no way support his conclusions about how "ordinary" players interact with the Accused Video Games.

As explained in Mr. Hayden's Motion to Exclude, Dr. Bogost offers sweeping testimony concerning "ordinary" gameplay in the Accused Video Games despite never interviewing a single *actual* player of the Accused Video Games. In its Response, Take-Two does not deny this. *See, e.g.*, Dkt. No 113 at 6. Instead, Take-Two argues that "there is no reason that [Dr. Bogost] must conduct interviews to support his opinions." *Id*. In making this self-serving argument, Take-Two conflates the requirement that expert testimony must be "the product of reliable principles and methods … reliably applied … to the facts of the case," Fed. R. Evid. 702(c)–(d), with the *additional* requirement that expert testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b). Expert testimony must be based on sufficient facts or data *and* must be the product of reliable principles and methods reliably applied to those facts or data.

Although "whether [a theory or technique] can be (*and has been*) tested" is "*a key question* to be answered in determining whether [it] is scientific knowledge that will assist the trier of fact," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 125 L. Ed. 2d 469 (1993)

4

(emphasis added), Take-Two argues that there is no *per se* prerequisite for admissibility that an expert "test his theories." *See* Dkt. No. 113 at 6. However, nowhere in his Motion to Exclude does Mr. Hayden contend that Dr. Bogost's testimony should be excluded for failure to "test his theories." Rather, as explained in Mr. Hayden's Motion to Exclude, Dr. Bogost's testimony concerning "ordinary gameplay" should be excluded because it is utterly devoid of a factual basis—*i.e.*, it is not based on *any* interviews or surveys of "ordinary" players or data from "ordinary" gameplay—and, thus, is plainly *not* "reasonable." *See Id.* at 6 (citing *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993).

In his Reports, Dr. Bogost explicitly offers numerous opinions about how *"ordinary"* players interact with *the Accused Video Games*, *see* Dkt. No. 113 at 3–4, yet Take-Two somehow maintains that the combination of Dr. Bogost's *personal* experience reviewing the Accused Video Games for litigation and his industry experience with *unrelated* video games provides a basis for this testimony. Simply put, Dr. Bogost cannot reliably extrapolate from his *personal* (and exclusively litigation-based) experience to support his grand pronouncements about how "ordinary" players interact with the Accused Video Games. Indeed, Dr. Bogost has no idea how "ordinary" players interact with or play the Accused Games. His opinions concerning "ordinary gameplay" should be excluded.

> 3. *Dr. Bogost's Unrelated Experience Does Not Qualify Him to Testify About "Ordinary Gameplay" or How "Ordinary Players" Interact with the Accused Video Games*

In addition to the plainly insufficient factual basis for Dr. Bogost's testimony concerning "ordinary gameplay," Dr. Bogost's qualifications do not provide a proper foundation for him to testify about how "ordinary players" interact with the Accused Video Games. Dr. Bogost has no experience with the Accused Video Games outside of the litigation context, he has never interviewed real-world players of the Accused Video Games *even within the litigation context*, and

5

he has *minimal* experience with sports-related video games even generally.³ Take-Two's argument that Dr. Bogost's *general* video game experience qualifies him to testify about how "ordinary players" interact with these specific Accused Video Games is even more tenuous given its own position that the Accused Video games are "complex," Dkt. No. 91-2 at ¶ 73, and "massive." Dkt. No. 113 at 9.

Take-Two contends that "the fallacy of Plaintiff's argument [that Dr. Bogost is not qualified to testify concerning *NBA 2K* because the terms 'NBA' and '2K' do not appear in his CV, and because he has not analyzed NBA 2K 'outside of the litigation context'] is shown … by the fact that none of Plaintiff's experts are video game experts with experience with *NBA 2K*, yet Plaintiff had them submit expert reports on this matter." Dkt. No. 113 at 8. ***First***, Mr. Hayden does not argue that Dr. Bogost is not qualified to testify concerning the Accused Video Games simply because the terms "NBA" and "2K" do not appear in his CV. Rather, Mr. Hayden explains that Dr. Bogost is not qualified to testify concerning "*ordinary gameplay*" in the Accused Video Games in part because he has no "real-world" experience with the Accused Video Games *as demonstrated by*, *e.g.*, the absence of terms like "NBA" and "2K" in his CV. And ***second***, Take-Two mischaracterizes the reports submitted by Mr. Hayden's experts. As explained in detail in Mr. Hayden's Oppositions to Take-Two's Motions to Exclude Testimony of Michal A. Malkiewicz and Dr. H. Tolga Bilgicer, the fallacy of Take-Two's *own* argument is that *none* of Mr. Hayden's experts offer unsupported testimony about "ordinary gameplay" or how "ordinary players" interact with the Accused Video Games (as evidenced by the fact that none of Mr. Hayden's experts *ever even use* the terms "ordinary gameplay," "average user," "ordinary user," or "typical user" *anywhere* in their reports).

---

³ In his deposition, Dr. Bogost could not provide a straightforward answer about his experience developing sports-related games. Instead, he quibbled about what "sports-related" means. Exhibit A (Bogost Tr.) 75:21–81:3.

Take-Two also argues that Dr. Bogost "need not have prior specific experience with a specific video game in issue to be qualified as a video game industry expert." Dkt. No. 113 at 7. It cites three cases in "support" of this assertion. The first—*Solid Oak Sketches, LLC v. 2K Games, Inc.*—plainly does not support such a broad statement. Although it isn't even clear exactly what Take-Two believes a "video game industry expert" *is* qualified to testify about, it apparently concedes that a "video game industry expert" is at least not automatically qualified to "opine on all aspect of every video game." *See* Dkt. No. 113 at 7. In *Solid Oak*, the court did not consider whether Dr. Bogost was qualified to testify concerning "ordinary gameplay" and Take-Two's implicit suggestion that *Solid Oak* supports its argument that general video game industry experience qualifies one to offer opinions concerning "ordinary gameplay" in a specific game is misplaced and misleading. The other cases cited by Take-Two—*Response Innovations LLC v. Hotlzbrinck Publishers LLC* and *Williams v. General Motors Corp.*—<u>are not even related to video games</u>.

### B. Dr. Bogost's Opinions Concerning the Observability of the Asserted Tattoos in the Accused Video Games Are Improper and Unreliable

As explained in Mr. Hayden's Motion to Exclude, Dr. Bogost's opinions concerning the observability of the Asserted Tattoos in the Accused Video Games are both (1) improper because they usurp the role of the jury as finder of facts, and (2) unreliable because Dr. Bogost intentionally ignores game modes and features that flatly contradict his conclusions.

### 1. Dr. Bogost's Opinions Concerning Observability of the Asserted Tattoos in the Accused Video Games Usurp the Role of the Jury

Take-Two argues that "Dr. Bogost's opinions on the observability of the Tattoos in [the Accused Video Games] will be helpful to the jury and are thus admissible." Dkt. No. 113 at 9. This argument is flawed for several reasons. ***First***, as Take-Two knows (but chose to ignore), "helpfulness" is not the *only* consideration. In the very case Take-Two cites for its assertion that

7

"helpfulness to the trier of fact remains the ultimate touchstone of reliability," Dkt. 113 at 9, the court considered *much* more than just "helpfulness." Indeed, the court even explained that the appropriate inquiry in determining whether an expert's opinions meet the reliability threshold is whether "[the expert] employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field." *In re Heparin prod. Liab. Litig.*, No. 08 Civ. 600000, 2011 WL 1059660 at *5 (N.D. Ohio Mar. 21, 2011).

*Second*, courts have consistently held that expert testimony that essentially tells the jury what legal result to reach *is neither* helpful *nor* admissible. *See, e.g.*, *United States v. Diaz*, 876 F.3d 1194, 1196–97 (9th Cir. 2017); *Jesa Enters. Ltd. v. Thermoflex Corp.*, 268 F. Supp. 3d 968, 973 (E.D. Mich. 2017); *Willis v. Allstate Ins. Co.*, 2014 WL 4804396, at *1 (S.D. Miss. Sept. 26, 2014).[4] And *third*, "[f]or an expert's testimony to be admissible under [Rule 702] it must be directed to matters within the witness' scientific, technical, or specialized knowledge and *not to lay matters which a jury is capable of understand and deciding without the expert's help.*" *Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 708 (6th Cir. 1989) (emphasis added) (citing *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988); *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055–56 (4th Cir. 1986); *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985); *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 685–86 (8th Cir. 1981)).[5]

---

[4] Take-Two's argument that these cases "are inapposite" is without merit. *See* Dkt. No. 113 at fn. 5. They are decidedly on point. *See United States v. Diaz,* 876 F.3d at 1197 ("[W]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."); *Jesa Enters. Ltd. v. Thermoflex Corp.*, 268 F. Supp. 3d at 973 ("Expert testimony that 'attempts to tell the jury what legal result to reach and which runs the risk of interfering with a district court's jury instructions, hardly can be view as being helpful to the jury.' "); *Willis v. Allstate Ins. Co.*, 2014 WL 4804396 at 1 ("[E]xpert witnesses are not permitted 'to tell the jury what result to reach' ").

[5] Take-Two's suggestion that Mr. Hayden's reference to *In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litigation* is in any way improper, is, again, without merit. In *In re E.I. du Pont*, the Court *explicitly* stated that courts have "typically barred" expert testimony concerning a corporation's state of mind because expert testimony that

8

As explained in Mr. Hayden's Motion to Exclude, not only does Dr. Bogost's testimony concerning the observability of the Asserted Tattoos in the Accused Video Games essentially tell the jury what legal result to reach (*i.e.*, that Take-Two's use of the Asserted Tattoos in the Accused Video Games is *de minimis*), but it is also plainly directed to "lay matters which a jury is capable of understanding and deciding without [Dr. Bogost's] help." *See Andrews v. Metro North Commuter R. Co.*, 882 F.2d at 708. Take-Two's assertion that a jury is unable to decide how "observable" the Asserted Tattoos are in the Accused Video Games without Dr. Bogost's help is insulting to any respectable juror. Indeed, observability here is plainly a "lay matter" *See Ringgold*, 126 F.3d at 77 (holding that using a copyrighted work in a film is not *de minimis* if it is observable to the "average lay observer") (*quoting Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992). Moreover, Take-Two's corollary suggestion—that it would be misleading for Mr. Hayden to provide the jury with *actual* gameplay footage and stills from the Accused Video Games without the commentary of its "expert" is also nonsensical. Jurors can surely make their own judgments based on what *they* observe.

In response to Take-Two's apparent confusion surrounding Mr. Hayden's criticism of Dr. Bogost's testimony about the "size" of the player avatars in the Accused Video Games, *see* Dkt. No. 113 at 11, it is worth noting simply that his testimony is both irrelevant and misleading as illustrated in the example in footnote 3 of Mr. Hayden's Motion to Exclude. That example illustrates how NBA players actually often appear to be the same size (or larger!) in the Accused Video Games (as player avatars) as they do in real life. Dr. Bogost's testimony on this matter is flawed, irrelevant, and overtly misleading because he uses ambiguous language to describe his comparison between the *literal* size of player avatars in the Accused Video Games with the

---

"describes 'lay matters which a jury is capable of understanding without the expert's help' " is "improper." 348 F. Supp. 3d 698 at 718 (S.D. Ohio 2016) (citations omitted).

9

*actual* size of NBA players in real life. Dkt. No. 91-2 at 19–20. If anything, Dr. Bogost should have compared the *apparent size* of the player avatars in the Accused Video Games to the *apparent size* of the NBA players in real life (or at least should have been reasonably clear about what he was comparing).

       2. *Dr. Bogost's Methodology Improperly, and Without Explanation, Simply Ignores Undisputed Facts that Contradict His Opinions*

Take-Two also argues that Dr. Bogost's methodology is reliable even though he did not consider the "frequency" with which users of the Accused Video Games use the various game modes and features of the Accused Video Games, Dkt. No. 113 at 12, and that his use of the term "fleeting" is proper. *Id.* at 12–13. Take-Two's arguments are wrong. **First**, as explained in Mr. Hayden's Motion to Exclude, "Dr. Bogost intentionally *omitted* certain games modes and features that most prominently feature the Asserted Tattoos from his analysis." Dkt. No. 113 at 11 (emphasis in original). He also admitted that he didn't even consider the frequency or duration of time that a player bearing an Asserted Tattoos remans on screen "important" to his opinion on the *observability* (!) of the Asserted Tattoos. When asked about the prospect that "the asserted tattoos might appear on the screen hundreds of times during the course of a game," he pronounced that "the number of times that an appearance of anything in the game takes place *is not really relevant to my opinions*." Ex. A (Bogost Tr.) 248:6-22 (emphasis added). These astonishing admissions, which conspicuously undermine the reliability Dr. Bogost's methodology, go directly to the inadmissibility of his opinions concerning observability of the Asserted Tattoos in the Accused Video Games. And s*econd*, as explained above and in Mr. Hayden's Motion to Exclude, Dr. Bogost's use of the term "fleeting" is improper (at *best*, creatively misleading).

10

Because Dr. Bogost's opinions concerning observability of the Asserted Tattoos in the Accused Video Games used unreliable methods, and because they essentially *replace* (not help) the trier of fact and improperly invade "lay" issues and determinations with expert testimony, they should be excluded.

### C. Dr. Bogost's Estimates and Opinions Concerning the Size of the Asserted Tattoos in the Accused Video Games is Irrelevant, Unreliable, and Misleading

In his Motion to Exclude, Mr. Hayden explains why Dr. Bogost's testimony concerning the size of the files which store the data that generates the Asserted Tattoos in the Accused Video Game is improper expert testimony, irrelevant, and unreliable. Dkt. No. 91 at 13–15. In response, Take-Two argues that Dr. Bogost's calculation would be helpful to a lay juror, Dkt. No. 113 at 14–15, that the size of the texture files for the Asserted Tattoos is relevant to its *de minimis* use and fair use defenses,[6] *id*. at 13, and that Dr. Bogost need not personally review the texture files to determine their data sizes. *See Id.* at 14.

Again Take-Two is incorrect for many reasons. **First**, contrary to Take-Two's assertion that "the data includes file sizes in two different formats (Kilobytes and Gigabytes)," Dkt. No. 113 at 14–15, the reported file size data *actually* uses a single base unit—bytes.[7] Take-Two's suggestion that a juror would have difficulty understanding the difference between the prefix "Giga-" and the prefix "Kilo-" without the help of an expert is silly. By comparison, no one would argue that a jury is unable to understand the difference between a centimeter and a kilometer without the help of an "expert." Dividing two values of the same unit and converting

---

[6] In fact, Take-Two's reliance on such file size comparison to support those defenses is negated by its admitted copying of the Asserted Tattoos *in their entirety*. *See Bell v. Willmott Storage Services, LLC,* 12 F.4th 1065, 1079 (9th Cir. 2021) ("Wholesale copying or reproduction of another's protected work … **by definition cannot be *de minimis* copying**") (emphasis added).

[7] Take-Two's use of the term "format" to mean "unit" is a perfect demonstration of how confusing Dr. Bogost's testimony concerning file sizes is. Neither "Kilobytes" nor "Gigabytes" are file "formats." Rather, they are derived <u>units</u> of the same base measurement unit—bytes—which is commonly used to measure computer storage and memory.

11

the resulting quotient into a percentage is hardly "a process of reasoning which can only be mastered by specialists in the field." *See United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007).

*Second*, the fact that Dr. Bogost's testimony concerns file sizes rather than lines of code does not shield him from the fact that the Sixth Circuit has held that the *significance,* not *quantity*, of copied material is what matters. *See ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 630 (6th Cir. 2020); *See also Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 765 (S.D. Ohio 2021) (reiterating the Sixth Circuit's rejection of the lines-of-source-code valuation method in *ECIMOS*). Moreover, a comparison of data file sizes is *directly* analogous to the comparison of lines of code expressly rejected in *ECIMOS* and *Navarro*. Accordingly, for the same reasons set forth in those cases that rejected Take-Two's argument, using the relative file size of the data used to generate an image as a measure of the *value* of what has been copied in such image is both fundamentally flawed and potentially highly misleading to a lay jury, especially when presented by a so-called "expert."

*Third*, contrary to Take-Two's suggestion, Mr. Hayden does not argue that Dr. Bogost's opinions based on such file size comparisons are unreliable simply because he could not remember "exactly" who provided him with the texture file size data. Rather, Mr. Hayden's Motion to Exclude explains that Dr. Bogost's testimony concerning texture file sizes fails to meet the *Daubert* requirement that an expert's "knowledge" be premised on "good grounds." Instead of personally reviewing the texture files to determine their sizes, Dkt. No. 91-3 (Bogost Tr.) 26:24–27:4, Dr. Bogost relied implicitly on data he received from a source he could not identify, *id.* at 20:9–11, by a means he could not recall, *id.* at 42:22–43:1. The opaque source of

this information (Take-Two never produced or otherwise made these files available) makes it impossible to test the bases for Dr. Bogost's opinion, rendering same unreliable.

Dr. Bogost's testimony concerning the file size of the Assert Tattoos has been rejected by the Sixth Circuit, is improper, irrelevant, and based on unreliable data; it should be excluded.

### D. Dr. Bogost Lacks the Qualifications to Render Reliable Opinions About the Tattoo Licensing Market

As explained in Mr. Hayden's Motion to Exclude, Dr. Bogost is simply not qualified to testify about the tattoo licensing market in video games. In fact, as noted therein, Dr. Bogost could say only that he is "not familiar" with tattoo licensing in video games. Dkt. No. 91-2 at ¶ 116. In its Response, Take-Two first suggests that Dr. Bogost is automatically qualified to testify about the tattoo licensing market in this case simply because a *different court*, sitting in a *different circuit*, deciding the merits of a *different dispute* between *different parties* permitted Dr. Bogost to testify "concerning the market for licensing certain copyrights for use in video games." *See* Dkt. No. 113 at 15. However, as noted above, *this* Court is the "gatekeeper" in *this* case and makes its *own* informed determination as to whether Dr. Bogost's qualifications provide a reasonable foundation for his testimony. Moreover, in the *Solid Oak Sketches* case relied on so heavily by Take-Two, the plaintiff neglected even to raise *most* of the evidentiary issues in Mr. Hayden's Motion to Exclude and did not even depose Dr. Bogost.

Take-Two also argues that Mr. Hayden is "intentionally trying to twist Dr. Bogost's words." Dkt. No. 113 at 15. This vague allegation is wrong. Presumably,[8] Take-Two takes issue with Mr. Hayden's statement that "Dr. Bogost actually cites his *lack* of familiarity of a market for tattoo licensing in video games to support his unqualified conclusion that one does not

---

[8] Tellingly, Take-Two doesn't actually identify any specific statement(s) through which it believes Mr. Hayden is "trying to twist Dr. Bogost's words."

13

exists!" Dkt. No. 91 at 15 (emphasis in original). Not only did Mr. Hayden cite, *verbatim*, the portion of the Bogost Report that supports this statement, but also, just *one line* after accusing Mr. Hayden of "trying to twist Dr. Bogost's words," *Take-Two* makes *the exact same* observation. *See* Dkt. No. 113 at 15 ("[Dr. Bogost] has never once come across any video game developer licensing the right to tattoos for inclusion in a video game, which itself is evidence that such a market ***does not exist and is unlikely to develop***" (emphasis in original)). Furthermore, *even if* Dr. Bogost were qualified to testify about a licensing market with which he is "not familiar," Dkt. No. 91-2 at ¶ 116, his testimony is both based on insufficient data *and* the product of *un*reliable principles. For good (and obvious) reason, unless Dr. Bogost is claiming omniscience, his own "lack of familiarity" should not enable him to opine that no such market exists or is likely to develop. Such lack of knowledge could only be relevant if he investigated the issue (for example, interviewed or surveyed the relevant population (*e.g.*, tattoo artists or video game developers)). He did not.

Accordingly, Dr. Bogost's testimony about the tattoo licensing market should be excluded.

## III. CONCLUSION

For the foregoing reasons, Plaintiff, James Hayden, respectfully requests that the Court grant his Motion to Exclude the Expert Testimony of Dr. Ian Bogost.

14

Dated: December 17, 2021    Respectfully submitted,

By: */s/ Andrew Alexander*

John S. Cipolla (Ohio Bar No. 0043614)

Daniel McMullen (Ohio Bar No. 0034380)

Andrew Alexander (Ohio Bar No. 0091167)

Dustin Likens (Ohio Bar No. 0097891)

CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
aalexander@calfee.com
dlikens@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2021, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's Electronic Filing System to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's System.

                                                    */s/ Andrew Alexander*
                                                    One of the attorneys for Plaintiff