## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN, | CASE NO. 1:17-cv-02635-CAB |
| Plaintiff, | |
| v. | |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC. , | |
| Defendants. | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
## 2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S
## MOTION TO EXCLUDE ANY TESTIMONY, ARGUMENT OR EVIDENCE
## <u>REGARDING THE SURVEY AND RELATED OPINIONS OF H. TOLGA BILGICER</u>

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ........................................................................ 1

**ARGUMENT** .................................................................................................... 4

    I.    THE BILGICER SURVEY TESTED THE WRONG QUESTION...................... 4

    II.    THE BILGICER SURVEY IS METHODOLOGICALLY FLAWED ................. 7

        1.    The Bilgicer Survey Was Impermissibly Leading ..................................... 7

        2.    The Bilgicer Survey Encourages Guessing ................................................ 10

        3.    The Bilgicer Survey Does Not Include a Proper Control Question .......... 12

    III.    THE BILGICER SURVEY RESULTS DO NOT SUPPORT DR. BILGICER'S CONCLUSIONS............................................................................ 14

**CONCLUSION** .............................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Prods. Corp. v. Johnson & Johnson*,
    654 F. Supp. 568 (S.D.N.Y. 1987)............................................................................9

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*,
    No. 08 Civ. 7497, 2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ..............................7

*J & J Snack Foods, Corp. v. Earthgrains Co.*,
    220 F. Supp. 2d 358 (D.N.J. 2002) ..........................................................................4

*Kargo Glob., Inc. v. Advanced Mag. Publishers., Inc.*,
    No. 06 Civ. 550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ...........................7, 8

*Navarro v. Procter & Gamble Co.*,
    501 F. Supp. 3d 482 (S.D. Ohio 2020) ...................................................................8

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*
    *Co.*,
    290 F.3d 578 (3rd. Cir. 2002) ...............................................................................14

*Procter & Gamble Pharms., Inc. v. Hoffmann-La Roche Inc.*,
    No. 06 Civ. 34, 2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006) ...............................13

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) ................................................................................10

*Spangler Candy Co. v. Tootsie Roll Indus., LLC*,
    372 F. Supp. 3d 588 (N.D. Ohio 2019)...............................................................9, 10

*Toth v. 59 Murray Enters., Inc.*,
    No. 15 Civ. 8028, 2019 WL 95564 (S.D.N.Y. Jan. 3, 2019).............................10, 11

*Valador, Inc. v. HTC Corp.*,
    242 F. Supp. 3d 448 (E.D. Va. 2017) .....................................................................7

*Vital Pharms., Inc. v. Monster Energy Co.*,
    No. 19 Civ. 60809, 2021 WL 3371942 (S.D. Fla. Aug. 3, 2021)...........................14

*Wells Fargo & Co. v. WhenU.com, Inc.*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003)...............................................................7, 9

**Rules**

Fed. R. Civ. P. 702 ........................................................................................................15

**Other Authorities**

6 McCarthy on Trademarks and Unfair Competition § 32:172 (5th.) .........................................8

6 McCarthy on Trademarks and Unfair Competition §32:187 (5th ed.) ................................12, 13

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011)...................7, 12

Take-Two respectfully submits this reply memorandum of law in support of its motion to exclude Plaintiff's expert, H. Tolga Bilgicer.[1]

## <u>PRELIMINARY STATEMENT</u>

The Bilgicer Survey should be excluded because it uses a never-before-accepted, significantly flawed methodology designed to yield unreliable and irrelevant results.  The Jay Survey asked consumers why they purchased *NBA 2K* to determine, for damages purposes, the extent to which Take-Two's profits from sales of *NBA 2K* are attributable to the six Tattoos at issue in this case.  Esteemed survey expert Dr. Deborah Jay concluded that no profits were so attributable.  Dkt. 101-6.  Faced with the Jay Survey, Plaintiff had a problem—how could he *possibly* show that anyone bought *NBA 2K* for the six Tattoos, particularly when *NBA 2K* is not even *about* tattoos, the Tattoos are a tiny fraction of the gameplay and are difficult to observe, and two of the Tattoos are covered up by players' jerseys throughout the game?

Dr. Bilgicer's apparent solution was to devise a survey with three fatal flaws, each designed to mask the truth: that **no one purchased *NBA 2K* for the six Tattoos**.  **First**, as he admitted in his deposition and as Plaintiff does not dispute, Dr. Bilgicer decided not to test the question of whether consumers bought *NBA 2K* for the six Tattoos at all.  Rather, at best, the Bilgicer Survey tested whether consumers bought *NBA 2K* for realistic tattoos **generally**.[2]  This distinction matters because there are "high hundreds [or] single thousands" of tattoos in *NBA 2K*, Dkt. 96-7 (Malkiewicz Dep.) at 218:5–219:1, the vast majority of which Plaintiff did not ink and to which he has no rights.  Someone who purchases *NBA 2K* for realistic tattoos may not even be aware of what specific tattoos the three NBA Players have in real life (two of which are covered

---

[1]    Capitalized terms not defined herein were defined previously in Take-Two's opening brief.  Dkt. 102-1.

[2]    Plaintiff's survey did not even test whether consumers bought *NBA 2K* for "all" of the tattoos or the realism of "all" of the tattoos in the game, as he erroneously claims Dr. Jay did not do and should have done.

by the NBA Players' jerseys in the game) or would not notice or care if these tattoos were altered or removed from the game as long as other tattoos were included.  Indeed, each of the six Tattoos at issue includes unoriginal elements, standard tropes, or minor, unnoticeable additions to tattoos inked by other tattooists, such that consumers are unlikely to notice or care about them.

In his Opposition, Plaintiff argues that respondents who said they care about the realism of tattoos generally were necessarily "*including* the Asserted Copyrights" in their response, Opp. 1, but the Bilgicer Survey **did not test that question** (or ask which tattoos respondents were including in their responses).  Thus, there is no way to tell if *any* of those respondents were ascribing any value to the Tattoos at issue.  Nothing under copyright law gives Plaintiff any rights in tattoos he did not ink, and none of the other tattooists who inked the hundreds to thousands of other tattoos in the game are bringing a copyright claim here.  Thus, if presented to the jury, the Bilgicer Survey would be highly confusing and misleading because it does not actually provide any information on whether any profits from sales of *NBA 2K* are attributable to the alleged infringement of the six specific Tattoos at issue.

**Second**, the Bilgicer Survey, the first survey Dr. Bilgicer has ever submitted in a litigation, has multiple, significant methodological flaws that put it far out of step with standard survey practice.  It asked **only** closed-ended questions, and it was leading because it expressly mentioned tattoos and put them in the minds of respondents who may not have otherwise thought of or known about tattoos.  Plaintiff protests that courts sometimes accept closed-ended questions in surveys, but acceptable surveys are designed in a non-leading way and are often mixed with open-ended questions—here, Dr. Bilgicer exclusively used closed-ended questions and designed them to be leading.  And while Plaintiff points out that a question's leading effect may be mitigated by the use of a "Don't Know" option and a control, the Bilgicer Survey used **neither**

here.  In particular, as Plaintiff does not dispute, the Bilgicer Survey did not give respondents the opportunity to respond "Don't Know" to questions that asked them to assign numerical importance to different features in the game, forcing them to guess or assign a numerical value even if they did not know the answer.  And Dr. Bilgicer did not use a proper control question or control group to filter out noise, guessing, and leading in the Bilgicer Survey.  Plaintiff argues that Dr. Bilgicer used a control because he eliminated respondents who chose a fictitious feature in response to the *first* question in the Bilgicer Survey.  This is not a proper control and is inconsistent with accepted survey methodology.  At best, Dr. Bilgicer's highly unusual method only applied to the first question of the Bilgicer Survey; he had no mechanism whatsoever to control for guessing, leading, and noise in his remaining survey questions.  Particularly because Dr. Bilgicer used closed-ended questions that planted the idea of tattoos in respondents' minds and did not afford them a "Don't Know" option, there is a vital need for a control here.  Dr. Bilgicer's failure to use a proper control is grounds for exclusion.

**Third**, even in response to a survey that was designed to inflate the value respondents assigned to tattoos, respondents allotted them very little or no value.  The numbers speak for themselves, and Plaintiff does not dispute them.  Even under Dr. Bilgicer's slanted analysis, tattoos generally (not the six Tattoos at issue) accounted for, at *best*, less than 1% of the overall value of *NBA 2K*.  As the Bilgicer Survey was designed to *inflate* the value respondents ascribed to tattoos, the fact that consumers nonetheless valued tattoos at near-zero directly undermines Dr. Bilgicer's conclusion that consumers were buying *NBA 2K* for tattoos.  If anything, the Bilgicer Survey shows the opposite, revealing that tattoos were of marginal value to most consumers of *NBA 2K*.  Unable to refute the math of his own survey, Plaintiff argues against a straw man, contending that Dr. Bilgicer did not need to show that consumers bought *NBA 2K* "exclusively"

for tattoos.  Take-Two does not argue that Dr. Bilgicer needed to show that consumers bought *NBA 2K* "exclusively" for tattoos.  Rather, the problem with the Bilgicer Survey is that the results simply do not show that tattoos were even *a* reason consumers purchasing the *NBA 2K*.

## ARGUMENT

### I.    THE BILGICER SURVEY TESTED THE WRONG QUESTION

Although Plaintiff admits that there are hundreds to thousands of tattoos in *NBA 2K*, Dkt. 96-7 (Malkiewicz Dep.) at 218:5–219:1, Plaintiff's copyright claim undeniably concerns only six of them (two of which are covered up in the game), inked on three specific players—Messrs. Green, James, and Thompson, *see generally* Dkt. 33.  For evidence on consumers' reasons for purchasing *NBA 2K* to be relevant, it needs to tell us something about whether consumers were buying the game for these six Tattoos.  Mot. 5–6; *see also J & J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 370 (D.N.J. 2002) (finding a survey should not be "some inaccurate restatement of the issue, lest the survey findings inject confusion or inappropriate definitions into evidence, confounding rather than assisting the jury.").  Accordingly, Take-Two's highly experienced survey expert, Dr. Jay, devised a survey to test whether anyone purchased *NBA 2K* because of the six Tattoos at issue, and found that no one did.  Dkt. 102-3.  Dr. Bilgicer tested a different question entirely: whether consumers bought *NBA 2K* for "[h]ow realistic the tattoos on the NBA players are."  Dkt. 96-4, Appx. C.  The Bilgicer Survey never followed up on **which** tattoos respondents actually meant when they selected this option (all? some? six?), *id.*, even though there are hundreds to thousands of tattoos in the game that respondents could have meant to which Plaintiff has no rights, Dkt. 96-7 at 218:5–219:1.  Although Plaintiff insists that the Bilgicer Survey is relevant because the Court (and, by extension, the jury) should simply **assume**, without evidence, that these respondents were necessarily "including" the six Tattoos in their response, Opp. 5, by failing to follow up and

confirm whether this assumption is warranted, the Bilgicer Survey does not actually tell us whether or not any respondents ascribed any value to the six Tattoos.

Plaintiff cannot fairly claim that the value that respondents assigned to tattoos Plaintiff *did not* ink shows that they valued the six Tattoos he *did* ink. Indeed, as Take-Two explains in detail in its Opposition to Plaintiff's Motion for Summary Judgment, the Tattoos at issue here are unoriginal, copied from other sources, or represented very minor changes to tattoos inked by other tattooists. Dkt. 112. And two of the Tattoos at issue are actually covered-up by the NBA Players' jerseys in the game. This shows how unreasonable it is for Plaintiff to assume that respondents were necessarily "including" the six Tattoos at issue when they said that the realism of tattoos in *NBA 2K* was a reason they purchased the game. Presenting this evidence to the Court or the jury as though it says something about these six Tattoos would thus be highly misleading, confusing, and prejudicial, especially when coupled with the significant methodological issues discussed below. *See* Mot. 5–6.

As Dr. Bilgicer does not deny that he did not test the question of whether consumers bought *NBA 2K* for the six Tattoos Plaintiff actually inked, Dkt. 96-5 at 93:12–17, 97:8–21, 99:6–12, Plaintiff's Opposition improperly tries to shift the focus away from the Bilgicer Survey onto the Jay Survey. *First*, Plaintiff falsely argues that the Jay Survey tested only the "main reasons" consumers bought *NBA 2K*, and that the Bilgicer Survey was designed to "fix" that flaw by asking whether realism of tattoos was "a reason" consumers bought the game, Opp. 3–6. That is not true. Dr. Jay indisputably asked about both the *"main reasons" and the "other reasons"* consumers bought *NBA 2K*, and she went on to further probe respondents with closed-ended questions about why people purchased the game. Dkt. 102-3. Moreover, Plaintiff's argument is a straw man. Take-Two never asserts that Dr. Bilgicer should have asked for the

"main reasons" consumers bought *NBA 2K*, nor is Take-Two suggesting that Dr. Bilgicer should have been testing whether tattoos were the "exclusive" reason people bought the game, Mot. 5–6.  Instead, the problem with the Bilgicer Survey is that it does not tell us anything about the specific six Tattoos that Plaintiff inked, which is significant, especially as two of them are covered-up and the remaining four are difficult to observe and lack originality.

**Second**, Plaintiff argues that the Jay Survey "ignored the possibility that individuals may buy *NBA 2K* because they value the tattoos on "all" of the players and that Dr. Bilgicer tested *that* possibility.  Opp. 4.  But Plaintiff does not have rights in the tattoos on "all" of the players, as he only inked six Tattoos on three specific players; Plaintiff does not own a copyright in realism of tattoos writ large.  And the Bilgicer Survey does not even ask about "all" of the tattoos in the game.  Dkt. 96-4, Appx. C.  Rather, it asks whether respondents bought *NBA 2K* for "[h]ow realistic the tattoos on the NBA players are."  *Id.*  It never follows up on **which** tattoos or **which** NBA players respondents meant, or whether they meant "all" of them or only some.  Plaintiff does not get to stand in for the other tattooists who inked the hundreds to thousands of other tattoos in the game, and those tattooists have not brought a copyright claim against Take-Two.  Thus, far from providing "a useful data point in determining the value of the Asserted Copyrights," Opp. 5, the Bilgicer Survey does not provide any data on the value of the six Tattoos to respondents.

**Third**, Plaintiff argues that the Bilgicer Survey is relevant to his burden of showing that there is a reasonable relationship between the alleged infringement and revenues from *NBA 2K*, and that this is also relevant to fair use.  Opp. 5–6.  But again, the Bilgicer Survey does not tell us one way or the other whether there is a relationship between the inclusion of the six Tattoos in *NBA 2K* and sales of the game because it never tests that question.  *Supra* 4–5.  In any event,

Plaintiff is by no means entitled to revenues from game elements he did not create, such as tattoos he did not ink.  *See*, *e.g.*, *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497, 2013 WL 5970065, at *2 (S.D.N.Y. Nov. 8, 2013) ("Damages only remotely or speculatively attributable to the infringement should be precluded.").[3]  To the extent that Plaintiff presents the Bilgicer Survey as though it necessarily includes the alleged infringement, even though he has no support for that assumption, the Bilgicer Survey is highly misleading and prejudicial.  As a result, the Bilgicer Survey should be excluded on this basis alone.

## II.    THE BILGICER SURVEY IS METHODOLOGICALLY FLAWED

Beyond failing to test the relevant question in this case, the Bilgicer Survey has three fatal methodological flaws that independently support excluding it from evidence.

### 1.    The Bilgicer Survey Was Impermissibly Leading

Surveys that ask leading questions are regularly excluded because the results of the survey are not reliable.  *See*, *e.g.*, *Kargo Glob., Inc. v. Advanced Mag. Publishers., Inc.*, No. 06 Civ. 550, 2007 WL 2258688, at *11–12 (S.D.N.Y. Aug. 6, 2007); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 465–66 (E.D. Va. 2017).  It is well accepted that merely asking about a feature or attribute, like Dr. Bilgicer does with tattoos, may lead consumers to be reminded of that feature or attribute.  Dkt. 89-7 at 24; Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) ("Reference Manual") at 392 (closed list of answer choices can "remind respondents of options that they might not otherwise consider.").  Similarly, surveys should not suggest answers that "would not otherwise have occurred to" respondents.  *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767–68 (E.D. Mich. 2003); *see* Mot 7–9.  Dr. Bilgicer did just that when he expressly "informed survey respondents that each of the answer choices for

---

[3]    Nor does the fact that, once a plaintiff can show this causal connection, the burden shifts to defendant to apportion profits, mean that Plaintiff is free to present highly misleading evidence on apportionment to the jury.

this question (including tattoos) was 'relevant to how realistic the NBA players are' and, therefore, should be valued," Dkt. 89-7 at 24.  The Bilgicer Survey is thus impermissibly leading and should be excluded.

Plaintiff's arguments otherwise are inapposite.  ***First***, Plaintiff argues that in assessing whether a question is leading, the court needs to determine whether the survey "impermissibly suggested that there is a 'right answer,'" *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 502 (S.D. Ohio 2020), and that the Bilgicer Survey did not do that because it gave respondents a multiplicity of answer choices, rather than just two, Opp. 6–7.  This makes no sense.  A leading survey can cue respondents to identify the "'correct' ***answers***," 6 McCarthy on Trademarks and Unfair Competition § 32:172 (5th ed.) ("McCarthy"), and here, the survey cued respondents to pick tattoos—the fact that the respondent could also pick other options does not mean they were not led to *also* pick tattoos.  By putting tattoos in the minds of respondents who might not otherwise have thought of them, Dr. Bilgicer led respondents to choose this answer.  And *Navarro* does not say that including more than two answer choices makes a survey non-leading, nor does Plaintiff point to any cases that make that point.  Indeed, putting aside the answer choices, the "mere putting of a question," can be leading.  *Kargo Glob.*, 2007 WL 2258688, at *8.  Rather, what made the *Navarro* survey non-leading was the fact that the survey expert ***did not*** explicitly ask about the photograph he was trying to test, or draw attention to it.  501 F. Supp. 3d at 502–03.  Here, by contrast, Dr. Bilgicer explicitly drew attention to tattoos, a feature about which respondents may not have otherwise known.

***Second***, Plaintiff contends that even if Question 3 "informed some respondents of a connection between tattoos and the realism of NBA players," it is not leading because it does not suggest that the realism of the tattoo was a correct answer choice.  Opp. 7.  But Question 3 ***does***

suggest to respondents that tattoos is a correct answer choice.  As the court explained in *Wells Fargo*, a leading question in a survey suggests to a respondent something that would not otherwise have occurred to them.  293 F. Supp. 2d at 754, 768 (finding survey that improperly informed respondents of a connection between pop-ups and websites was leading).  As Dr. Jay explained, Question 3 is worded in such a way that it informs respondents that tattoos are in fact "'relevant to how realistic the NBA players are' ***and, therefore, should be valued***," meaning Dr. Bilgicer was indeed telegraphing to respondents that this was a correct option.  Dkt 89-7 at 24. [4]

**Third**, Plaintiff asserts that the Bilgicer Survey is not leading because courts have previously "accepted surveys including closed-ended questions," and that Dr. Jay also uses closed-ended questions in her survey.[5]  Opp. 6.  But rather than using a mix of closed-ended and open-ended questions, as Dr. Jay does, Dr. Bilgicer ***only*** asked closed-ended questions, which are "inherently suggestive and invite guessing."  *Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 581 (S.D.N.Y. 1987).  Even in *Spangler Candy Co. v. Tootsie Roll Industries, LLC*, on which Plaintiff heavily relies, the Northern District of Ohio expressly noted that closed-ended questions can be "leading and suggestive."  372 F. Supp. 3d 588, 599 (N.D. Ohio 2019).  *Spangler*, which did not exclude the survey at issue, is distinguishable, because there the court found that the leading nature of closed-ended questions was somewhat mitigated by the inclusion of a "control question" and a "Don't Know" option in response to ***every*** closed-ended question in the survey, and even then, the *Spangler* court found that the survey should be afforded "little to

---

[4]     In this regard, and contrary to Plaintiff's attempt to distinguish it, *Wells Fargo* is directly on point because the survey in that case "suggested to respondents a link between pop-up ads and websites."  293 F. Supp. 2d at 768.

[5]     Bizarrely, Plaintiff argues that Dr. Jay ignores responses to the open-ended questions in her survey.  Opp. 6. That is patently untrue, as she discusses those responses in detail in her report.  Dkt. 102-3.

no weight." *Id.*  In sharp contrast to the *Spangler* survey, Dr. Bilgicer **did not include a control in his survey** and left out a "Don't Know" option in response to key questions.  *Infra* 10–14.[6]

**Finally**, Plaintiff posits that a "survey does not have to be perfect to be admissible." Opp. 8.  But a survey **does** need to be reliable to be admissible.  And, as detailed in Take-Two's Motion, courts regularly exclude leading surveys, like the Bilgicer Survey, because they are not reliable.  *See* Mot 7–9.

## 2.    The Bilgicer Survey Encourages Guessing

Critical questions in the Bilgicer Survey failed to include a "Don't Know" response option; this is a fatal flaw that alone warrants exclusion.  Mot. 9–11.  Questions 2 and 4 asked respondents to allocate points among up to **nine** and **six** features respectively such that the total points added up to 100 and did not provide them with a "Don't Know" option.[7]  If respondents did not know how they would allocate points in response to these questions, they were forced to guess/randomly allocate numbers that added up to 100 in order to move forward with the survey. This is a "fatal defect[]" in the survey.  *Toth v. 59 Murray Enters., Inc.*, No. 15 Civ. 8028, 2019 WL 95564, at *8 (S.D.N.Y. Jan. 3, 2019) (lack of "don't know" option was "fatal defect[]" where questions were confusing and misleading); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (survey that effectively required respondents to have an

---

6    Without naming the case, Plaintiff points to "a separate case" in which Dr. Jay included a product feature in an answer choice, Opp. 8, which Take-Two assumes is *Lucent Technologies, Inc. v. Microsoft Corp.*, wherein Dr. Jay included the name of the feature at issue in the survey about date-pickers.  No. 07 Civ. 2000 (S.D. Cal.).  As Dr. Jay explained, "[t]he purpose of that survey was completely different than the purpose of this survey," and by contrast to this case, there were "very few ways to enter the date of an appointment" rather than the "dozens and dozens of attributes and tendencies of players," such that including the name of the feature there was far less leading than it would be here.  Dkt 115-2 at 125:12–127:4.

7    Plaintiff argues that only "ten or more" attributes in a constant sum scale survey are large, Opp. 11, but he does not explain why nine, as opposed to ten, are easier for respondents.  Nor can Plaintiff point to a single case that has accepted a survey question requiring respondents to allocate 100 points across nine features.  In any event, the issue is not the difficulty of the question alone, it is the fact that respondents could not say they did not know the answer.

opinion even if they "did not have an opinion" by failing to give them the option to say "not sure" as a response was unreliable).

Plaintiff does not contest the fact that the inclusion of a "Don't Know" answer choice is critical, and that failing to include a "Don't Know" option leads to speculation and guessing, such that courts regularly exclude surveys that "fail[] to provide survey takers with an opportunity to indicate lack of knowledge or an instruction for participants not to guess." *Toth*, 2019 WL 95564, at \*8. Plaintiff also does not and cannot deny that Dr. Bilgicer did not include "Don't Know" as an option in response to Questions 2 and 4 of the Bilgicer Survey. Opp. 9. Instead, Plaintiff contends that including a "Don't Know" option in response to Questions 2 and 4 was "unnecessary" because a "Don't Know" option was included in response to Questions 1 and 3. *Id*. This argument makes no sense. Questions 1 and 3 asked for the reasons consumers bought *NBA 2K*. A respondent might ***know*** the reasons why they bought the game but ***not know*** how to allocate different points among those reasons, or not know how important each reason is to the respondent. Such a respondent would be ***forced to guess or randomly allocate numbers*** in response to Questions 2 and 4.[8]

Next, Plaintiff argues that Dr. Bilgicer's failure to include a "Don't Know" option in response to these questions is not an issue because the questions are not difficult or confusing. Opp. 9–10. But having to add points up to 100 among so many features, all while accurately reflecting the relative importance of each item, is an obviously difficult task. Dkt. 89-7 at 27–28. Dr. Bilgicer himself testified that if these questions were "complicated . . . technical questions,"

---

[8] Plaintiff also erroneously claims that all respondents were shown instructions stating, "[i]f you do not know the answer to a question or do not have an opinion or belief, please indicate this." Opp. 9. This instruction does not appear in screenshots that Dr. Bilgicer provided showing how the survey actually appeared to respondents. Dkt. 102-8. Therefore, it does not appear that respondents ever got this instruction. Even if they did—and there is no evidence that they did—Questions 2 and 4 did not provide them any ***way*** to indicate that they did not know the answer, so the instruction is toothless.

he would "expect" respondents to "click on 'don't know.'"  Dkt. 96-5 at 156:24–157:10.  Yet there was no "Don't Know" option to click on.  Plaintiff argues that Take-Two cannot show that the "'constant sum' methodology," like the one used in Questions 2 and 4, is "fundamentally unreliable," and that Questions 2 and 4 show the relative importance of different reasons people bought *NBA 2K*.  Opp. 10–11.  This is another straw man.  Take-Two does not argue that such questions are always unreliable, though Take-Two has been unable to identify a single case in the Sixth Circuit condoning constant sum surveys, and Plaintiff points to none.  But the problem is not only that these questions were complicated and difficult (having them add multiple responses up to 100), but that respondents were given ***no way to say that they did not know the answer to them***, so they were forced to guess.[9]

Plaintiff further argues that "[f]orcing the sum of points to be 100" would "reduce[] the cognitive burden on respondents."  Opp. 11.  But the fact that the survey had to be structured this way, forcing respondents to add their answers up properly, shows that Dr. Bilgicer did not expect that respondents would be able to easily add their answers up to 100.  And again, the issue is not just that these questions were difficult, it is that respondents could not say they did not know the answer, a point Plaintiff simply cannot refute.

### 3.    The Bilgicer Survey Does Not Include a Proper Control Question

As Take-Two explains in its Motion, it is essential that a survey include a control because "[e]very measure of opinion or belief in a survey reflects some degree of error," such as guessing, demand effects, or other sources of noise.  Reference Manual at 401.  Where a survey fails to use a proper control, it may be "excluded from evidence altogether."  McCarthy §32:187;

---

[9]    Plaintiff points to academic research on constant sum scales, stating that it is a "reliable survey methodology in academic literature."  Opp. 10.  Take-Two notes that while a survey might be acceptable in a particular academic setting, that does not mean that it has met the stringent standards courts apply to surveys for litigation.

*see also* Mot. 11–13. Dr. Bilgicer's failure to use a control is particularly egregious when coupled with the other problems in the Bilgicer Survey described herein. *See Procter & Gamble Pharms., Inc. v. Hoffmann-La Roche Inc.*, No. 06 Civ. 34, 2006 WL 2588002, at *23 (S.D.N.Y. Sept. 6, 2006) (finding closed-ended question can create biases that "can be mitigated through the use of a control question."). As the Bilgicer Survey did not use a proper control, it did not reliably filter out guessing, demand effects, and other sources of noise, and it should be excluded from evidence. Mot. 11–13.

Plaintiff argues that the Bilgicer Survey uses the "exact same" control as the Jay Survey, Opp. 11–12. That is demonstrably false. As Dr. Jay, a survey researcher with decades of experience conducting hundreds of surveys that were admitted in litigation, explains: a control question is a question that includes a fictitious feature among a list of possible answers and uses the results of that question to calculate the **rate** at which "respondents select features or attributes merely because the survey asked about those features or attributes." Dkt. 89-7 at 16–17. That rate is then subtracted from the percentage of respondents who selected other features or attributes in the survey. *See, e.g.*, McCarthy §32:187 ("[T]here is sometimes 'general background noise' in survey figures and a control is necessary to identify this … These must be filtered out through control questions ... The net rate of confusion is the raw confusion rate minus the rate produced by the control question."). Dr. Jay did this, but Dr. Bilgicer did not.

The first question of the Bilgicer Survey, Question 1, included a fictitious XTJ feature, but for anyone who selected this feature, they were terminated from the survey and could not complete the other questions therein. Dkt. 96-4, Appx. C. Eliminating people at the outset of a survey is not a control—as Dr. Jay explains, "[w]hen survey respondents who select the fictitious feature are excluded from the survey results before they can complete the entire survey, there is

13

no way to determine the percentage who selected the other features or attributes in the survey due to guessing, demand effects, or other sources of 'noise.'" Dkt. 89-7 at 16–17.  Once these respondents were eliminated, Dr. Bilgicer did not include a fictitious feature in Questions 2–10. Dkt. 96-5 at 127:10–13.  Dr. Bilgicer thus did nothing to eliminate noise in ***those questions***, which were the main questions that Dr. Bilgicer relied on in reaching his conclusions.  Dr. Bilgicer's methodology, for which he can point to no support in either the case law or the academic literature, goes squarely against accepted survey methodology on how to administer a proper control question.  *Vital Pharms., Inc. v. Monster Energy Co.*, No. 19 Civ. 60809, 2021 WL 3371942, at *22 (S.D. Fla. Aug. 3, 2021); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 591 (3rd. Cir. 2002) (same).

Rather than pointing to case law supporting Dr. Bilgicer's flawed "control" (there is none), Plaintiff tries to distinguish the extensive case law explaining how a proper control should work by asserting that these cases are about likelihood of confusion, Opp. 12—but these cases explain how a control question works to eliminate noise in a survey, which is not something specific to a trademark case as opposed to any other case.  Plaintiff also argues that Take-Two takes "particular issue" with Dr. Bilgicer's lack of use of a control group.  *Id.*  That is another straw man.  Take-Two takes particular issue with Dr. Bilgicer's failure to use ***any*** control—if he used a proper control question rather than a control group, as Dr. Jay did, that would have been acceptable, but he does not do that.[10]

## III.    THE BILGICER SURVEY RESULTS DO NOT SUPPORT DR. BILGICER'S CONCLUSIONS

To be clear, even Dr. Bilgicer's conclusions about tattoos generally are not supported by

---

[10]    Plaintiff cites Dr. Bilgicer's credentials in trying to assert that Dr. Bilgicer understands how surveys work. Opp. 13.  Dr. Bilgicer's credentials are minimal, and during his deposition, he repeatedly struggled to define what a control is and answer basic questions about controls and their purpose.  Dkt. 96-5 at 114:19–115:1.

"sufficient facts or data." Fed. R. Civ. P. 702(b). Even with the methodological flaws described above, including the leading questions that encouraged guessing, and lack of a proper control, the results of the Bilgicer Survey show that, at most, "realism of [the] tattoos" generally represents less than 1% of the overall value of *NBA 2K*. Dkt. 96-5 at 224:3–9; Dkt 99-10 at 228:15–21. As the Bilgicer Survey was designed to *inflate* the value respondents ascribed to tattoos, the fact that consumers nonetheless valued tattoos at near-zero directly undermines Dr. Bilgicer's conclusion that consumers were buying *NBA 2K* for tattoos. As such, these results do not support Dr. Bilgicer's conclusions even with regard to tattoos generally.[11]

Faced with the low value consumers ascribed to tattoos by respondents, Plaintiff argues against a straw man, asserting that Take-Two is suggesting that the Bilgicer Survey needed to show that consumers purchased *NBA 2K* "*exclusively for* tattoos." Opp. 14.[12] Take-Two is not arguing that Dr. Bilgicer concluded, or should have tested, whether consumers bought *NBA 2K* "exclusively" for tattoos. Take-Two's argument is that, even under Dr. Bilgicer's slanted analysis, tattoos generally (not the six Tattoos at issue) accounted for, at *best*, less than 1% of the overall value of *NBA 2K*. This low figure belies Dr. Bilgicer's conclusion that consumers were buying *NBA 2K* for tattoos.

## **CONCLUSION**

For the foregoing reasons, Take-Two respectfully requests that the Court exclude any testimony, argument or evidence regarding or relating to the Bilgicer Survey.

---

[11]  As detailed in Take-Two's opening brief, Dr. Bilgicer's testimony is unsupported by Questions 5–10 of the Bilgicer Survey. These questions were not relevant, as none of them asked about the reasons consumers purchased *NBA 2K*. Mot. 15.

[12]  Citing nothing, Plaintiff also asserts that Take-Two "unquestionably" believes its customers value accurate tattoos, *id.*—the Bilgicer Survey itself flatly contradicts this point, as detailed above.

Dated:  New York, NY
       December 17, 2021

/s/ Dale M. Cendali
Dale M. Cendali (admitted *pro hac vice*)
Joshua L. Simmons (admitted *pro hac vice*)
Chris Ilardi (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and*
*Take-Two Interactive Software, Inc.*

## <u>L.R. 7.1(F) CERTIFICATION</u>

In accordance with Local Rule 7.1(f), I hereby certify that this case is on the standard track

and that the foregoing memorandum complies with the applicable page limitation of 15 pages.


   */s/ Dale M. Cendali*
*Attorney for Defendants 2K Games, Inc.*
*and Take-Two Interactive Software, Inc.*