**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JAMES HAYDEN,<br><br>    Plaintiff,<br><br>v.<br><br>2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC.,<br><br>    Defendants. | CASE NO. 1:17-cv-02635-CAB |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S
MOTION TO EXCLUDE ANY TESTIMONY, ARGUMENT OR EVIDENCE
REGARDING JUSTIN LENZO'S POTENTIAL MARKET OPINION**

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................................... 1

**ARGUMENT**.................................................................................................................................. 3

    I.    LENZO'S POTENTIAL MARKET OPINION IS INCONSISTENT WITH COPYRIGHT LAW AND, THUS, UNRELIABLE AND LIKELY TO CONFUSE THE JURY ....................................................................................... 3

        A.    Lenzo Violates Fundamental Copyright Principles by Basing his Opinion on Plaintiff's Willingness to License............................................. 3

        B.    Lenzo Violates Fundamental Copyright Principles by Basing His Opinion on the Court Hypothetically Holding That Take-Two's Use Is Not Fair Use...................................................................................... 9

    II.    LENZO'S POTENTIAL MARKET OPINION IS NOT AN ACTUAL DAMAGES OPINION ...................................................................................... 12

**CONCLUSION** .......................................................................................................................... 12

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994) ........................................................................................... 5, 6

*Apple Inc. v. Corellium, LLC*,
   510 F. Supp. 3d 1269 (S.D. Fla. 2020) ............................................................................ 4

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) ............................................................................................... 4

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) ............................................................................................. 4

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) ......................................................................................... 4, 9

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) ............................................................................................. 4

*Bond v. Blum*,
   317 F.3d 385 (4th Cir. 2003) ............................................................................................ 4

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) .......................................................................................................... 9

*Castle v. Kingsport Publ'g Corp.*,
   No. 19 Civ. 92, 2020 WL 7348157 (E.D. Tenn. Dec. 14, 2020) .................................... 9

*Deltak, Inc. v. Advanced Sys., Inc.*,
   767 F.2d 357 (7th Cir. 1985) .......................................................................................... 12

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021) ...................................................................................................... 4

*Kane v. Comedy Partners*,
   No. 00 Civ. 158, 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003) .................................... 4

*Nunez v. Caribbean Int'l News Corp.*,
   235 F.3d 18 (1st Cir. 2000) .............................................................................................. 9

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ................................................................................... 1, 5, 6

*Reiner v. Nishimori*,
  No. 15 Civ. 241, 2017 WL 1545589 (M.D. Tenn. Apr. 28, 2017) ........................................... 9

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ............................................................................................. 9

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
  562 F.2d 1157 (9th Cir. 1977) ........................................................................................... 12

S*untrust Bank v. Houghton Mifflin Co.*,
  268 F.3d 1257 (11th Cir. 2001) ........................................................................................... 4

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) ............................................................................................ 4, 9

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ............................................................................................... 9

**Statutes**

17 U.S.C. § 107 ....................................................................................................................... 1

**Rules**

Fed. R. Civ. P. 26 .................................................................................................................... 8

Take-Two submits this reply memorandum of law in support of its motion to exclude any testimony, argument, or evidence regarding the market opinion of Justin Lenzo.[1]

## PRELIMINARY STATEMENT

One of the four factors that courts consider when determining fair use is the "effect of the use upon the potential market for or value of the copyrighted work." Mot. 1 (quoting 17 U.S.C. § 107(4)). As discussed in Take-Two's opening and reply summary judgment briefs, and as admitted by Lenzo, there is no actual market for depicting real-world tattoos in video games. Dkt. 101-1 (Defs.' Op. Mot. Summ. J.) at 18–19; Defs.' Rpl. Summ. J. 10–11; Dkt. 97-3 (Lenzo Rpt.) ¶ 64 ("Like Defendants' experts, I am also not aware of existing licenses for player tattoos in video games[.]"). As a result, Plaintiff hangs his hat on arguing that there is a potential market for such use. Courts, however, recognize that plaintiffs generally are willing to license the use at issue. Thus, as Plaintiff's own cited case explains, to avoid plaintiffs arguing that a potential market exists in every fair use case based on the circular premise that if they win the case then there would be such a market, the Sixth Circuit has restricted the potential market analysis to "derivative markets that are 'traditional, reasonable, or likely to be developed.'" *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1307 (6th Cir. 1996). There, however, is no evidence in this case that a traditional, reasonable, or likely to be developed market exists for depicting real-world tattoos in video games in connection with the people on whom they are inked in real life. Despite there being no such evidence, Plaintiff offers Lenzo as an expert to nevertheless argue that there is a potential market based on (a) Plaintiff's willingness to license and (b) the idea that, were this Court to ignore copyright principles and tattoo industry practices

---

[1] Capitalized terms not defined herein were defined previously in Take-Two's opening brief. Dkt. 103-1 ("Mot.").

1

to require such permission, Take-Two would then be willing to license. Take-Two's motion to exclude Lenzo explained that this approach violates Sixth Circuit law for two, independent reasons, neither of which Plaintiff refutes.

***First***, Lenzo's potential market opinion is based on plaintiff's own willingness to license the very use at issue: Take-Two's depiction of NBA Players with their real-world Tattoos in *NBA 2K*. As mentioned above, that violates a fundamental tenet of copyright law, and Plaintiff does not and cannot dispute it. Instead, he tries to argue that Lenzo's opinions are admissible because they are based on factors other than Plaintiff's willingness to license, relying on conclusory cites to and lengthy block quotes of Lenzo's report. A closer look at the alleged other factors that Plaintiff cites, however, reveals them all to be different iterations of saying the same improper thing: that Lenzo's potential market is based on Plaintiff's willingness to license. As a result, Plaintiff's arguments only serve to prove Take-Two's point.

***Second***, Lenzo's potential market opinion violates an additional fundamental tenet of copyright law: a potential market cannot be established by merely asserting that, if the court finds the defendant's use is not fair use, then a potential market will form because the defendant has no choice but to license the plaintiff's work. Again, circularly, that would be true in every fair use case. Yet, as Lenzo's report made clear, his opinion is that "if a Court ruling finds that Plaintiff's copyrights on the asserted tattoo designs are valid and infringed by Defendants," a potential market will be formed. Dkt. 97-3 (Lenzo Rpt.) ¶ 92. Plaintiff cannot and does not dispute the legal principle that Lenzo violated. Instead, he desperately tries to explain away Lenzo's repeated admissions that he based his opinion on this improper, circular rationale. In doing so, however, Plaintiff repeatedly contradicts himself and ultimately admits the very points he tries to refute.

Unable to refute Take-Two's arguments, Plaintiff contends that Lenzo's opinions are admissible because they are separately relevant to Plaintiff's actual damages theory. That makes no sense. When courts consider a hypothetical lost license fee as a measure of actual damages, they assume a counter-factual world where the parties are willing licensors and licensees. As such willingness is assumed, there is no need for an expert to opine on whether it would exist. As Lenzo's opinions violate black-letter copyright principles and are not relevant to either fair use or actual damages, they should be excluded.

## ARGUMENT

Plaintiff cannot hide from Lenzo's report. Specifically, Lenzo stated that it is his opinion that "whether a market for licensing tattoo designs for video games is likely or unlikely to form ***depends on*** the ***willingness of video game makers to license*** the designs, the ***willingness of tattoo artists to license*** their designs, and the degree to which high transaction costs would impede licensing transactions." Dkt. 97-3 (Lenzo Rpt.) ¶ 68 (emphasis added). In other words, the only component of Lenzo's analysis that is not explicitly premised on willingness to license is the associated transaction costs, and Plaintiff does not try to argue that a potential market opinion may be based solely on an analysis of transaction costs. As Lenzo's potential market opinion does not have a proper basis, it should be excluded as irrelevant and prejudicial.

I. **LENZO'S POTENTIAL MARKET OPINION IS INCONSISTENT WITH COPYRIGHT LAW AND, THUS, UNRELIABLE AND LIKELY TO CONFUSE THE JURY**

   **A. Lenzo Violates Fundamental Copyright Principles by Basing his Opinion on Plaintiff's Willingness to License**

Take-Two's brief identified numerous courts throughout the country, including the Supreme Court, which have held that "it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the

3

very use at bar." Mot. 5 (collecting cases). These courts have repeatedly held that a plaintiff's mere desire to license his own work does not create a potential market. *Id.* at 5–6. Plaintiff does not even address most of the cases that Take-Two cited,[2] tacitly agreeing with this fundamental tenet of copyright law. *See* Opp. 4–9.

The only case cited by Take-Two that Plaintiff even acknowledges is *Blanch v. Koons*, Opp. 8, but Plaintiff's attempt to distinguish it fails. As Take-Two showed, in *Blanch*, the plaintiff "dearly wanted to" create a market for the use of her work in the defendant's art, but the Second Circuit held that desire did not create a cognizable market. Mot. 6 (citing 467 F.3d 244, 258 n.9 (2d Cir. 2006)). Plaintiff contends that the *Blanch* court held that factor four weighed in favor of fair use because, there, the "plaintiff never licensed any copyrighted work for use in graphic or other visual art and the value of the copyrighted work did not decrease." Opp. 8. He, however, misses the point. Despite the plaintiff's willingness to license the defendant, the Second Circuit made clear that "nothing in the record . . . suggest[ed] that there was a derivative market for [plaintiff] to tap into that is in any way related to [defendant's] use of her work." *Blanch*, 467 F.3d at 258 n.9. In other words, that willingness does not create a potential market for the defendant's use.[3]

---

[2] *See* Mot. 5–6 (citing *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014); *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1207 (2021); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614 (2d Cir. 2006); *Kane v. Comedy Partners*, No. 00 Civ. 158, 2003 WL 22383387, at *6 (S.D.N.Y. Oct. 16, 2003); and *Apple Inc. v. Corellium, LLC*, 510 F. Supp. 3d 1269, 1292 (S.D. Fla. 2020)).

[3] To be clear, the only question relates to the potential market for the ***use at issue***. A plaintiff cannot simply point to alleged licenses for ***other uses*** to show that an actual or potential market exists. *Bill Graham*, 448 F.3d at 614 (holding that although in other contexts fees had been paid for reproduction of images, "we do not find a harm to BGA's license market merely because DK did not pay a fee for BGA's copyrighted images"). For example, there are many actual markets for books. If a plaintiff could merely point to other licenses for books, every court finding fair use of a book should have concluded an actual market existed, but did not because the question relates to the ***use at issue***. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015) (no market harm from book search); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99–100 (2d Cir. 2014) (same); *Bond v. Blum*, 317 F.3d 385, 396–97 (4th Cir. 2003) (no market harm from submitting manuscript into evidence); S*untrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1274–76 (11th Cir. 2001) (no market harm

Ignoring most of the cases cited by Take-Two, Plaintiff relies heavily on *Princeton University Press v. Michigan Document Services, Inc.*, arguing that Take-Two's argument is "*itself* circular" and has been rejected by the Sixth Circuit. Opp. 11–13. Plaintiff misreads *Princeton*. There, the defendant was a "copyshop" that copied "copyrighted works of scholarship" and bound them into "coursepacks" for university students without permission from the copyright holder. *Princeton*, 99 F.3d at 1383. Notably, the market for this exact use already existed, as the Sixth Circuit noted that "most of the copyshops that compete with [defendant] in the sale of coursepacks pay permission fees for the privilege of duplicating and selling excerpts from copyrighted works." *Id.* at 1387. Thus, the court rejected the defendant's argument that "it is circular to assume that a copyright holder is entitled to permission fees and then to measure market loss by reference to the lost fees," noting that the plaintiff had "actually succeeded in" obtaining those fees for the exact use at issue there. *Id.*; *see id.* at 1388 ("A licensing market already exists here . . . ."). That is the opposite of the situation here where all of the witnesses agree that no such market exists.

Far from disagreeing with the cases cited by Take-Two, the *Princeton* court explicitly adopted the Second Circuit's approach to determining whether a potential market exists and rejected the circular opinion that Lenzo offers in his report. *Id*. at 1387–88 (citing *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)). The court held that "a copyright holder can *always* assert some degree of adverse [e]ffect on its potential licensing revenues as a consequence of [the defendant's use] . . . simply because the copyright holder has not been paid a fee to permit that particular use." *Id.* at 1387 (quoting *Am. Geophysical*, 60 F.3d at 930 n.17).

---

from parodic book). Here, the market is the market for depicting real-world people with their tattoos in a video game.

5

Thus, it would be improper to "automatically . . . conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, [because then] the fourth fair use factor would *always* favor the copyright holder." *Am. Geophysical*, 60 F.3d at 930 n.17.  Because in both *Princeton* and *American Geophysical* a market already existed, it was appropriate to consider lost potential licensing revenues in their respective fair use analyses.  *Princeton*, 99 F.3d at 1387; *American Geophysical*, 60 F.3d at 930 ("[S]ince there currently exists a viable market for licensing these rights for individual journal articles, it is appropriate that potential licensing revenues for photocopying be considered in a fair use analysis.").  But where, as here, no such market exists, it is not.  *See* Mot. 5–8 (collecting cases).

In violation of this law, Lenzo based his potential market opinion on Plaintiff's *willingness* to license the Tattoos for Take-Two's use.  Mot. 5–6.  Indeed, Plaintiff cannot hide from what Lenzo actually said: his report explicitly states that whether a market forms "depends on . . . the willingness of tattoo artists to license their designs."  Dkt. 103-03 (Lenzo Rpt.) ¶ 68.  Nevertheless, Plaintiff baldly asserts that "Dr. Lenzo did not . . . 'premise' his potential market opinion simply on Mr. Hayden's willingness to license his copyrighted works for use in video games."  Opp. 9.  Plaintiff's argument is unavailing for multiple reasons.  ***First***, although Plaintiff points to Paragraph 22 of Lenzo's report, which is a summary of his potential market opinion, Opp. 5–6, that page-long block quote only proves Take-Two's point, as all of the "factors" identified are based on a willingness to license.  For example, within that summary, Lenzo opines that, (1) "[t]here is no reason to believe, or evidence to suggest, that [tattooists] ***would not be willing to license*** their designs for reproduction in video games," and (2) that "video game manufacturers ***would be willing to purchase licenses***," and "[i]f video game

6

producers begin to *believe that such licenses are required*, then a market for licensing tattoo designs in video games is very likely to form." Opp. 6 (emphasis added; quoting Dkt. 97-3 (Lenzo Rpt.) ¶ 22). As to the former, that plainly violates the tenet that a potential market may not be based on a plaintiff's desire to license. As to the latter, as explained below, that violates another tenet that a potential market cannot be based on the circular reasoning that a potential licensee would be willing to license a work if a court found that a license was required. *Infra* 9.

*Second*, Plaintiff argues that Paragraphs 75 through 84 of Lenzo's report "lay[] out the information [Lenzo] considered in forming his opinion," and conclusorily asserts that these paragraphs demonstrate that Lenzo relied on other factors. Opp. 6–7. Not so. Those paragraphs all merely provide alleged support for Lenzo's opinions regarding plaintiff's willingness to license. Indeed, they all appear in the section of his report that is titled, "Analysis of *Artists' Willingness-to-Sell Tattoo Licenses* for Video Games." Dkt. 97-3 (Lenzo Rpt.) 31–35 (emphasis added). Moreover, Lenzo admitted that Paragraphs 75 and 76 are merely support for his opinion that "Mr. Hayden *has been willing to license* his tattoo designs for various uses." *Id.* at 31 (emphasis added). Likewise, Paragraphs 78 and 79 are about other tattooists' supposed "willing[ness] to license."[4]

Plaintiff even wrongly argues that Lenzo's opinions are based on declarations by three other tattooists, "each indicating the tattoo artists *believed it was necessary* for Take-Two to obtain their permission or to compensate them for including their designs in the *NBA 2K* series." Opp. 7 (citing Dkt. 97-3 (Lenzo Rpt.) ¶ 80) (emphasis added). Not only does this still concern the irrelevant issue of tattooists' willingness to license, but it also directly contradicts what these

---

[4] Of course, these all relate to use of designs in *uses not at issue* in this case, Opp. 8, and are thus not relevant. *Supra* 4. It also should not be lost that Plaintiff's documents are actually releases in which Plaintiff agreed not to sue for the use of designs, *not* licenses, as Plaintiff would have this Court believe. *See* Dkt. 101-1 at 10 n.8.

7

tattooists—and Lenzo—actually said. As Lenzo actually opined, "[t]hese three tattoo artists each stated in their declarations that they *did not* believe that Defendants required their permission to include reproductions of the tattoo designs they inked in NBA 2K games." Dkt. 97-3 (Lenzo Rpt.) ¶ 80 (emphasis added). In other words, these declarations actually show that a potential market *is not likely to develop*. Plaintiff's untruthful representation of Lenzo's report only serves to show how desperate he is to find something to salvage Lenzo's opinions.

*Third*, Plaintiff argues that Lenzo "identified other factors" during his deposition, but the only alleged "other factor[]" he identifies is Lenzo's deposition testimony that "*Madden NFL* has started to reincorporate these tattoos into their game again after having taken them out." Opp. 7. As an initial matter, Plaintiff cannot rely on this testimony because it was not disclosed in Lenzo's report, thereby violating Federal Rule of Civil Procedure 26. *See* Fed. R. Civ. P. 26(a)(2)(B) (witness's report "must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them"). Moreover, as Lenzo admitted, he based his post-report deposition statement on unidentified "press report[s]," has not "observe[d] specific licenses," and does not know whether any money has ever been paid to tattooists to include tattoos designs in Madden NFL. Declaration of Chris Ilardi, dated December 17, 2021, Ex. A (Lenzo Tr.) 274:9–275:10.[5] Lenzo's speculation during his deposition that one or more other tattooists may have been willing to release tattoo designs for *Madden NFL* both violates Rule 26 and is irrelevant as he is not aware of any actual licenses. Mot. 3.

---

[5] In a footnote, Plaintiff identifies an article on ESPN concerning the inclusion of NFL quarterback Colin Kaepernick's tattoos in an upcoming version of the *Madden NFL* video game. Opp. 7–8 n.2. Plaintiff does not contend that Lenzo considered this article and it was not cited in his list of materials considered. *Id.* Moreover, the article vaguely references that the player, Mr. Kaepernick, received "permission" from tattooists, not that the video game company paid the tattooists for a license, such that this lone article is not evidence of a market for licensing real world tattoos in video games.

### B. Lenzo Violates Fundamental Copyright Principles by Basing His Opinion on the Court Hypothetically Holding That Take-Two's Use Is Not Fair Use

As Take-Two explained, Lenzo also committed a logical fallacy that a potential market would form because Take-Two might be willing to enter into a license with Plaintiff if this Court finds its use is not fair use. Mot. 6–8. Yet again, Take-Two identified numerous cases that make clear this is not an appropriate methodology on which to base a potential market opinion because it relies on impermissible circular reasoning.[6] Plaintiff failed to address *any* of them, tacitly acknowledging that Take-Two is correct. *See* Opp. 9–14.

Unable to identify any case law that supports his position, Plaintiff talks in circles. In doing so, he repeatedly contradicts himself. As explained above, Take-Two showed that "Lenzo asserts a potential market would form because Take-Two might be willing to enter a license with Plaintiff if this Court finds its use is not fair use." Mot. 8; Opp. 12. Plaintiff contends that this "misrepresents Dr. Lenzo's reasoning," yet, in the very same paragraph, admits that, "Lenzo concludes that *if ambiguities in tattoo artists' property rights are resolved in their favor*, a market for licensing the Asserted Works in video games is *likely* to develop." Opp. 12 (first emphasis added); *see also id.* at 13 (arguing that "Dr. Lenzo's rebuttal to Take-Two's experts, as articulated in his Report, is that *if property rights were clarified* in favor of the tattoo artists, then this *potential* market would become an *actual* market" (first emphasis added)). And, as Lenzo's report makes clear, his view is that these "ambiguities" will be resolved in Plaintiff's favor if "a Court ruling finds that Plaintiff's copyrights on the asserted tattoo designs are valid and infringed

---

6 *See* Mot. 6–8 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994); *Castle v. Kingsport Publ'g Corp.*, No. 19 Civ. 92, 2020 WL 7348157, at *7 (E.D. Tenn. Dec. 14, 2020); *Reiner v. Nishimori*, No. 15 Civ. 241, 2017 WL 1545589, at *7 (M.D. Tenn. Apr. 28, 2017); *Swatch*, 756 F.3d at 91; *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 644–45 (4th Cir. 2009); *Bill Graham*, 448 F.3d at 615; and *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 25 (1st Cir. 2000)).

by Defendants." Dkt. 97-3 (Lenzo Rpt.) ¶ 92. In other words, Lenzo opines that if this Court finds that Take-Two's use is not fair use, then a market is likely to develop.

Plaintiff contends that other entities have "paid to license" Plaintiff's tattoos designs and that Take-Two and other video game developers have licensed other "protected content," Opp. 12, but these are not relevant because none are for the use at issue in this case. *Supra* 4. Further, with respect to Take-Two and other video game developers licensing *other* content, Plaintiff ignores that a market for using such other content in video games already exists. Dkt. 97-3 (Lenzo Rpt.) ¶¶ 85–86. For the reasons discussed above, it is irrelevant to whether a potential market exists for the use at issue here.

Take-Two also pointed out numerous admissions by Lenzo that illustrate the circularity of his opinions, which Plaintiff tries but fails to explain away. ***First***, Lenzo admitted at his deposition that "no market has formed for licensing real-life tattoo designs for video games" as no "transactions are evident historically." Mot. 1. Plaintiff runs from this admission because it shows both that there is no actual market for licensing real-life tattoo designs for video games and it shows that potential markets are not likely to be developed. Mot. 7–8 (collecting cases). Plaintiff contends that, notwithstanding Lenzo's admission, he "merely noted the absence of evidence of such a market observable to him." Opp. 11. Yet, at the same time, Plaintiff quotes Lenzo's admission that "***the market exists if there are transactions***. So, yes, no market formation is evident historically because ***no transactions are evident historically***." Opp. 11 (emphasis added). Thus, it is not clear what Plaintiff's dispute is. All parties agree that, as far as Lenzo is aware, no market has formed for licensing real-life tattoo designs for video games and no transactions are evident historically.

10

*Second*, Lenzo admitted in his report that he is "not aware of existing licenses for player tattoos in video games." Mot. 3. Again, this shows a lack of an actual market as well as why potential markets are not likely to be developed. Mot. 7–8 (collecting cases). Plaintiff complains that in identifying this admission, Take-Two omitted the remainder of the text from Lenzo's report, in which Lenzo summarily states that he discusses "why the lack of historical licenses is not dispositive to whether or not a market for licensing tattoos for video games can or will exist in the future." Opp. 10. Tellingly, Plaintiff does not then actually highlight a single such example. *Id.* That is because, as Take-Two explained, Lenzo's purported explanation for why no market has formed is merely Lenzo's circular opinion that no court has held that Take-Two requires a license. Mot. 6–8.

*Finally*, Lenzo admitted that he did not "have a specific recollection of any examples where markets did not form" and would say "it's unlikely that . . . a market doesn't form" under his analysis. Mot. 2. Thus, his methodology is flawed because it will ***always*** result in a potential market being formed. *Id.* Plaintiff argues that when Lenzo made this admission, he was only referring to his experience giving "lectures as a teacher." Opp. 9. Yet, Plaintiff also readily admits that Lenzo "did not provide examples because if a market does *not* form, one (obviously) does not observe it." *Id.* at 10. Thus, Plaintiff apparently does not dispute that Lenzo could not identify any examples of a market not forming, regardless of whether such examples were the subject of his lectures as a teacher. Tellingly, even months after Lenzo made this admission at his deposition, Plaintiff still has not identified any such examples where a market would not form when using Lenzo's methodology.

11

## II. LENZO'S POTENTIAL MARKET OPINION IS NOT AN ACTUAL DAMAGES OPINION

Faced with Take-Two's arguments, Plaintiff tries to shoehorn Lenzo's potential market opinion into the category of an "actual damages" opinion, arguing that his opinion is "*also* relevant to Plaintiff's claims for damages." Opp. 3–4. This makes no sense. Assuming, *arguendo*, that Plaintiff was permitted to seek "actual damages" in the form of a hypothetical lost license fee, Plaintiff's and Take-Two's willingness to license would be assumed. *See Deltak, Inc. v. Advanced Sys., Inc.*, 767 F.2d 357, 362 (7th Cir. 1985) (stating "principle that value of use 'amounts to a determination of what a willing buyer would have been reasonably required to pay to a willing seller for plaintiff['s] work'" (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir. 1977)). Thus, no expert is needed to explain "the willingness of video game makers to license the designs," and "the willingness of tattoo artists to license their designs," Dkt. 97-3 (Lenzo Rpt.) ¶ 68, particularly as Lenzo has no opinion on the alleged amount of damages that would be appropriate. Opp. 4 (admitting "Dr. Lenzo was not asked to offer an opinion on the *amount* of actual damages suffered by Mr. Hayden"). Plaintiff's attempt to recast Lenzo's irrelevant and prejudicial potential market opinion as an actual damages opinion should be rejected. In any case, to the extent it has any relevance to a hypothetical license, his opinions should be excluded as to fair use.

## **CONCLUSION**

For the foregoing reasons, Take-Two respectfully requests that the Court preclude any testimony, argument or evidence regarding or relating to Lenzo's potential market opinions.

12

Dated:  New York, NY
      December 17, 2021                         */s/ Dale M. Cendali*
                                                  Dale M. Cendali (admitted *pro hac vice)*
                                                  Joshua L. Simmons (admitted *pro hac vice*)
                                                  Chris Ilardi (admitted *pro hac vice*)
                                                  KIRKLAND & ELLIS LLP
                                                  601 Lexington Avenue
                                                  New York, New York 10022
                                                  Telephone: (212) 446-4800
                                                  dale.cendali@kirkland.com
                                                  joshua.simmons@kirkland.com
                                                  chris.ilardi@kirkland.com

                                                  Miranda D. Means (admitted *pro hac vice*)
                                                  KIRKLAND & ELLIS LLP
                                                  200 Clarendon Street
                                                  Boston, Massachusetts 02116
                                                  Telephone: (617) 385-7500
                                                  miranda.means@kirkland.com

                                                  Matthew J. Cavanagh (OH 0079522)
                                                  MCDONALD HOPKINS LLC
                                                  600 Superior Avenue, East, Ste. 2100
                                                  Cleveland, Ohio 44114
                                                  Telephone: 216.348.5400
                                                  Fax: 216.348.5474
                                                  mcavanagh@mcdonaldhopkins.com

                                                  *Attorneys for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.*

## L.R. 7.1(F) CERTIFICATION

In accordance with Local Rule 7.1(f), I hereby certify that this case is on the standard track and that the foregoing memorandum complies with the applicable page limitation of 15 pages.

        /s/ Dale M. Cendali
*Attorney for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.*