UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES HAYDEN,** | ) | CASE NO. 1:17CV2635 |
| | ) | |
| Plaintiff, | ) | SENIOR JUDGE |
| | ) | CHRISTOPHER A. BOYKO |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| **2K GAMES, INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**CHRISTOPHER A. BOYKO, SR. J.**:

This matter comes before the Court upon the Motion (ECF DKT # 91*SEALED & ECF DKT #92*PUBLIC VERSION) of Plaintiff James Hayden to Exclude the Expert Testimony of Dr. Ian Bogost.  For the following reasons, the Motion is granted in part and denied in part.

**I. BACKGROUND**

Plaintiff James Hayden filed his original Complaint on December 18, 2017.  His Fourth Amended Complaint was filed on August 19, 2019, alleging copyright infringement by Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.  Defendant Take-Two is a worldwide developer, publisher and marketer of interactive entertainment and video games.

Plaintiff alleges that he is the tattoo artist who inked the copyrighted Tattoos on NBA players Danny Green, LeBron James and Tristan Thompson, individuals depicted in Take-Two's popular basketball simulation series NBA 2K.

Ian Bogost, Ph.D., provided his Expert Report and Declaration on behalf of Defendants on May 27, 2021. (ECF DKT #91-2*SEALED). Dr. Bogost is a Professor and Director of Film & Media Studies and a Professor of Computer Science & Engineering at Washington University in St. Louis. Previously, he was the Ivan Allen College Distinguished Chair in Media Studies, Professor of Interactive Computing, Professor of Architecture, and Professor of Business at the Georgia Institute of Technology. He holds a Ph.D. from the University of California, Los Angeles. He is internationally recognized as a key figure in game studies, including design and criticism. He has published ten books on the history, structure, design, and role of video games and related digital culture.

In addition to his academic work, Dr. Bogost has personal experience in the video game industry. He is the co-founder of Persuasive Games, an award-winning video game studio. He also works as an independent game developer and his games have earned him multiple awards. Dr. Bogost has been named a Digital Games Research Association Distinguished Scholar and a Higher Education Video Game Alliance Lifetime Fellow.

Defendants retained Dr. Bogost to provide his opinion on these issues:

a). Is there any technical difference between reproducing the image of a person in a video game in comparison to a digital photograph, television program, or film;

b). To what extent are the tattoos that Plaintiff James Hayden ("Plaintiff") asserts that he inked on the NBA players LeBron James, Danny Green, and Tristan Thompson (the

"NBA Players") and that Take-Two has infringed (the "Tattoos") observable in the NBA 2K series;

c). How is NBA 2K generally played, and what would an average player see and hear in doing so;

d). Is there a market for licensing tattoos as they appear in real life for use in video games.

Dr. Bogost summarizes his opinions in this way:

First, there is essentially no difference between the replication of the NBA Players' images with a digital camera, whether for a static or motion picture, and the rendering of the NBA Players' likenesses in NBA 2K. Both involve making a digital file of electronic information to reproduce an image of the NBA Players.

Second, beyond digital photographs, video games have commonalities with other forms of audio-visual media, like films and television, such that many of the same factors that would be considered in determining whether something is observable in a film or show also would be considered in determining whether something is observable in a video game. Because video games are interactive computer programs, however, they have many additional numerous components that make any given element of the game even less likely to be observed.

Third, NBA 2K is a highly expressive video game that simulates the sport of basketball. As a result, an average player will see and hear a huge number of visual and auditory elements as he or she plays the game.

Fourth, whether considered in terms of NBA 2K's audio-visual display or the data contained in its computer program, NBA 2K is a massive video game. As a result, by any measure, the Tattoos are a fractional, fleeting part of NBA 2K. In fact, many times the players on whom the Tattoos are inked will not be among the players selected for a game, meaning that the Tattoos will never appear. Even when the Tattoos do appear, because the typical smartphone, computer or television screen is small compared to the actual size of a professional basketball player, the Tattoos will appear approximately 1.11–10.3% the size that they appear in real life. Each Tattoo also is only one of a plethora of other visual and auditory elements (including other tattoos) in

> NBA 2K. And the Tattoos are hard to observe due to their obstruction by other game elements, because they often appear out-of-focus, and because players on whom the Tattoos appear move quickly in the game. Any manipulation of NBA 2K to make the Tattoos more observable, in practice, is not typical of the average user and ultimately ineffectual.
>
> Fifth, each Tattoo would constitute 0.000496%–0.000515% of the data in NBA 2K16–2K20's computer program and 0.0006%–0.0015% of NBA 2K Mobile's computer program.
>
> Finally, there is no market for licensing the Tattoos for inclusion in a video game. This is clear from the fact that Plaintiff admits that he is not aware of any video game that has ever licensed rights to tattoos, including from Plaintiff himself. It also is supported by the fact that Take-Two's use—incidental, fleeting use on the players on which the Tattoos are inked to increase NBA 2K's realism—is not something that reasonably would be anticipated to be licensed for use in a video game. It also is supported by the fact that NBA players have been depicted with the tattoos they bear in real life in NBA 2K games since at least 2001, and the Tattoos were depicted in NBA 2K games for many years prior to Plaintiff bringing this lawsuit. Moreover, based on my understanding of the times that the NBA Players' images have been produced in photographs, television, or on merchandise, I am not aware of any instance in which they have licensed their tattoos separate from their image and likenesses. This is also consistent with my understanding that they have tattoos inked by other tattooists on their bodies, none of whom have contended that reproducing their images or likenesses in some audiovisual medium requires a license and payment to them.

(ECF DKT #91-2*SEALED at 5-7).

In moving to exclude, Plaintiff argues that Dr. Bogost offers an opinion on how "observable" the Tattoos are in Defendants' games based on a "contrived assessment" of how "ordinary" players interact with the game. Dr. Bogost repeatedly admits that he did not interview a single player of any of Defendants' games in order to arrive at his determination of "ordinary" interaction. Dr. Bogost intentionally ignores various game modes and features because they are not "ordinary" in his assessment. His opinion on how observable the Tattoos are in Defendants' games is not proper expert testimony; rather it is a factual issue for the jury

to decide.  In addition, Dr. Bogost ventures far outside his "video game" expertise and offers an opinion about the existence of a tattoo licensing market.

In opposition, Defendants argue that Dr. Bogost spent hours himself reviewing the six relevant games and explored each of the modes in each of the games.  Dr. Bogost's goal was to determine what the average player would encounter in a "typical ordinary experience" of playing the game.  In formulating his opinions, he also considered Take-Two's documents and deposition testimony by ten members of NBA 2K's creative and production teams, which revealed to him how playing NBA 2K mirrors the real world.  Dr. Bogost's analysis places the Tattoos in the context of the larger NBA 2K game and offers opinions on how observable they are in that context.  Dr. Bogost considered how often the Tattoos appear, their size, the average size screens on which NBA 2K is played, other audiovisual elements that may obscure their view, the camera's focus, the constant action and more.  Dr. Bogost calculated the percentage of the file size that includes the Tattoos and compared that number to the total size of the NBA 2K computer program.  Defendants contend that such a calculation is directly relevant to Defendants' *de minimis* use and fair use defenses and would undoubtedly be helpful to a lay juror.

## II. LAW AND ANALYSIS

**Expert Testimony**

Pursuant to Federal Rule of Evidence 702, an expert by virtue of knowledge, skill, experience, training or education may provide testimony to assist the trier of fact to understand the evidence or to determine a fact in issue if the expert testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and

the expert has applied the principles and methods reliably to the facts of the case.

The standard set in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) requires "that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses." *Redmond v. United States*, 194 F.Supp.3d 606, 615 (E.D. Mich. 2016) (citing *Daubert*, 509 U.S. at 591-93). "[E]xpert testimony is not admissible unless it will be helpful to the factfinder." *Redmond, id.* Expert testimony is not helpful when it is unreliable or irrelevant or "when it merely deals with a proposition that is not beyond the ken of common knowledge." *Id.* "The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

The objective of *Daubert*'s "gatekeeping" function is to ensure the reliability and relevancy of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The Supreme Court has held this "gatekeeping" obligation applies not only to scientific testimony, but to all expert testimony. *Id.* at 147. Courts are not required to hold a formal hearing on *Daubert* challenges. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir.1999). "[N]o matter how good" experts' "credentials" may be, they are "not permitted to speculate." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) *quoting Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

To reiterate, an expert may testify in the form of an opinion if it will assist the trier of

fact and if the testimony is the product of reliable principles and methods.  Federal Rule of Evidence 702; *Redmond*, 194 F.Supp.3d at 614-615.  The Court finds, upon consideration of Dr. Bogost's Report and Declaration, that his opinions are reliable, relevant and helpful to the factfinder **only in part.**

The Court agrees with Defendants that Dr. Bogost may testify as an expert on the mechanics of NBA 2K and how the video games relate to other audiovisual works.  Dr. Bogost's expertise in video game design supports allowing his opinion testimony on how the NBA 2K games operate and are played.

Dr. Bogost may testify about the file size of the Tattoos as they appear in the NBA 2K computer program and can compare that to the total file size of NBA 2K.

The Court is not persuaded by Defendants' protests that Plaintiff wants to "cherry-pick" the images, modes and views which the jury will see.  At trial, both sides will be able to present the games in the demonstrative manner they prefer.  Each side will have an opportunity to rebut the opponents' presentation; thus avoiding the risk of an expert testifying as to what the jurors can, or should, observe.

Dr. Bogost may not testify about what is observable to the "ordinary" user or what an "ordinary" user would likely notice.  Observability is "not beyond the ken of common knowledge" and is properly within the jury's sole purview.  The use of an expert's testimony in this context would dangerously lend greater weight to the interpretation of demonstrative evidence in the jurors' minds.

Clearly, Dr. Bogost is knowledgeable about the video game industry and the marketing of games.  However, he bases his conclusion that there is no market for licensing tattoos in

video games on his *understanding* that no other tattooists have sought to have their works licensed nor to be paid for their use; and that no one, including Plaintiff, has pursued a copyright infringement action against NBA 2K previously, even though the video games have been in existence since at least 2001. Because he offers speculation only, Dr. Bogost will not be permitted to opine on the market for licensing tattoos for use in video games.

### III. CONCLUSION

The Court is mindful of its gatekeeping function and of its obligation to ensure the reliability and relevancy of all expert testimony offered in this case. Therefore, the Motion (ECF DKT #91*SEALED & ECF DKT #92*PUBLIC VERSION) of Plaintiff James Hayden to Exclude the Expert Testimony of Dr. Ian Bogost is granted in part and denied in part, as outlined in this Opinion.

**IT IS SO ORDERED.**

**DATE: July 11, 2022**

                                                         s/Christopher A. Boyko
                                                         **CHRISTOPHER A. BOYKO**
                                                         **Senior United States District Judge**