**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES HAYDEN,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>2K GAMES, INC. and TAKE-TWO<br>INTERACTIVE SOFTWARE, INC.,<br><br>　　　　　Defendants. | CASE NO. 1:17-cv-02635-CAB |

**SUPPLEMENTAL REPLY IN SUPPORT OF DEFENDANTS**
**2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

I.      **INTRODUCTION**........................................................................................ **1**

II.     **ARGUMENT** ............................................................................................. **4**

     A.     TAKE-TWO'S USE OF THE TATTOOS IS FAIR USE ..................................... 5

     B.     TAKE-TWO'S USE OF THE TATTOOS WAS AUTHORIZED...................... 10

     *C.*     TAKE-TWO'S USE OF THE TATTOOS IS *DE MINIMIS* .............................. 18

     D.     PLAINTIFF'S ATTEMPTS TO DISCOUNT THE NBA PLAYERS'
              DECLARATIONS ARE MERITLESS ................................................................. 18

**CONCLUSION** ........................................................................................... **20**

ii

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asset Mktg. Sys., Inc. v. Gagnon*,
  542 F.3d 748 (9th Cir. 2008) ................................................................11

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) .....................................................................5

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) .................................................................5, 8

*Balsey v. LFP, Inc.*,
  691 F.3d 747 (6th Cir. 2012) ..................................................................8

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ...................................................................7

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ...................................................................9

*Castle v. Kingsport Publ'g Corp.*,
  No. 19 Civ. 92, 2020 WL 7348157 (E.D. Tenn. Dec. 14, 2020) .............................7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................4

*Dawson v. Dorman*,
  528 F. App'x 450 (6th Cir. 2013) .............................................................19

*Durham Indus., Inc. v. Tomy Corp.*,
  630 F.2d 905 (2d Cir. 1980) ................................................................7, 8

*Effects Assocs., Inc. v. Cohen*,
  908 F.2d 555 (9th Cir. 1990) ..............................................................11, 17

*Foad Consulting Grp., Inc. v. Azzalino*,
  270 F. 3d 821 (9th Cir. 2001) ...............................................................12

*Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*,
  345 F.3d 922 (6th Cir. 2003) .................................................................18

*I.A.E., Inc. v. Shaver*,
  74 F.3d 768 (7th Cir. 1996) ...........................................................3, 11, 13

*Jackson v. Warner Bros. Inc.*,
    993 F. Supp. 585 (E.D. Mich. Aug. 29, 1997) ..........................................................5

*Johnson v. Jones*,
    149 F.3d 494 (6th Cir. 1998) ....................................................................11, 17

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ......................................................................5

*Mahavisno v. Compendia Bioscience, Inc.*,
    164 F. Supp. 3d 964 (E.D. Mich. Feb. 23, 2016) ..........................................3, 11

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..................................................................................4

*Murphy v. Lazarev*,
    589 Fed. App'x 757 (6th Cir. 2014) ..............................................................11

*Photographic Illustrators Corp. v. Orgill, Inc.*,
    953 F.3d 56 (1st Cir. 2020) ....................................................................13, 14

*Robert L. Stark Enterprises, Inc. v. Neptune Design Group, LLC*,
    No. 16 Civ. 264, 2017 WL 1345195 (N.D. Ohio Apr. 12, 2017) ..........................17

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    449 F. Supp. 3d 333 (S.D.N.Y. 2020) .................................................. *passim*

*Wilchombe v. TeeVee Toons, Inc.*,
    555 F.3d 949 (11th Cir. 2009) ....................................................................14

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................4

Fed R. Civ. P. 56(c)(1)(A) ................................................................................4

Pursuant to this Court's Order of April 14, 2022, Dkt. 146, Defendants Take-Two Games, Inc. and 2K Games, Inc. ("Take-Two") submit this supplemental reply brief in support of their Motion for Summary Judgment.  Dkt. 95.

## I.    INTRODUCTION

This Court ordered that Danny Green, LeBron James, and Tristan Thompson be deposed in a "quest for the truth."  Dkt. 146.  All three NBA Players have now been deposed, and their testimony confirms that there are no material facts in dispute as to any of Take-Two's defenses.[1] Not only did the NBA Players verify that the facts in their declarations are true, they even added more undisputed detail.  Among other things, each NBA Player testified █████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████.

In apparent acknowledgment that the NBA Players' testimony supports Take-Two's summary judgment motion, Plaintiff largely ignores Take-Two's fair use and *de minimis* use defenses in his Supplemental Opposition.  *See generally* Dkt. 156 ("Supp. Opp.").  It, however,

---

[1]    Capitalized terms not defined here were defined in Take-Two's opening, Dkt. 95-01 ("Br."), or reply briefs, Dkt. 135.

should not be overlooked that the NBA Players' testimony is consistent with and supports each of the fair use factors.  As to **Factor 1** (purpose and character of the use), the NBA Players verified ██████████████████████████████████████████████████████████

██████████████████████████████████████████████.  Plaintiff's purpose is, thus, different from Take-Two's purpose, which was to depict the NBA Players just as they look in real life in *NBA 2K*.  As to **Factor 2** (nature of the works), the testimony confirmed ██████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████  As to **Factor 3** (amount and substantiality), the NBA Players' testimony confirms that, █████████████████████████████████████████

███████████████████████████.  And Mr. Thompson confirmed that ███████████

███████████████████████████████████████████████████████  As to **Factor 4** (effect of the use on the potential market), the NBA Players' testimony is consistent with the lack of a market for Take-Two's use of the Tattoos: ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  Thus, as explained in Take-Two's prior briefs, *NBA 2K* makes fair use of the Tattoos.

Likewise, with regard to *de minimis* use, the NBA Players' testimony confirmed the undisputed facts that prove this dispositive defense.  What the Tattoos look like in *NBA 2K* is not in dispute—the games are in the record, Dkt. 95-17–21, so the Court can see for itself what the court in *Solid Oak Sketches, LLC v. 2K Games, Inc.* decisively concluded: tattoos, when they even appear in *NBA 2K* at all, are small and difficult to observe.  449 F. Supp. 3d 333, 347 (S.D.N.Y. 2020).  Two of the Tattoos are even covered.  Indeed, Mr. Thompson specifically

testified that ███████████████████████████████████████████

███████████████████ Thus, the undisputed facts show that Take-Two's use of tattoos in the game is *de minimis*.

Instead of addressing these defenses, Plaintiff focuses his Supplemental Opposition on the independent defense of license. Yet, consistent with Plaintiff's *own* testimony and the NBA Players' prior declarations, the NBA Players' deposition testimony verified that Take-Two's use of the Tattoos was authorized.[2] Messrs. Green, James, and Thompson each agreed during their depositions that ████████████████████████████████████████

███████████ Their testimony also confirms that there is no disputed issue of material fact that the NBA Players had an implied license from Plaintiff to do so. An implied license exists where "[1] a person (the licensee) requests the creation of a work, [2] the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and [3] the licensor intends that the licensee-requester copy and distribute his work." *Mahavisno v. Compendia Bioscience, Inc.*, 164 F. Supp. 3d 964, 968 (E.D. Mich. Feb. 23, 2016) (finding the existence of an implied license and citing the three-step test from *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)). Steps 1 and 2 are not in dispute, as the NBA Players confirmed what Plaintiff already admitted in his deposition: the Tattoos were created at the players' request.

As to the last step, the NBA Players also confirmed that █████████████████████

██████████████████████████████████████████████

████████████████████[3] ██████████████████████████████████

---

[2] Plaintiff's collateral attacks on the declarations are irrelevant and unavailing. *See infra* 16. The NBA Players have now testified ████████████████████████. This testimony alone establishes that Take-Two holds a license to the Tattoos as it confirmed ████████████.

[3] Plaintiff's post-hoc claim that he did not subjectively intend to license the Tattoos is not sufficient to create a dispute as to a material fact. Plaintiff cites no case in which a court relied on a party's declaration of private intent not to license a work to find a lack of an implied license. If that were the case, no license would ever be

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████ And every piece of evidence on how the tattoo industry operates is consistent with a license—none of the tattooists, including Plaintiff, required their clients to get permission to show their tattoos in media, and ████████████████████████████████████ These are precisely the kinds of undisputed facts that courts routinely find establish an implied license.  Thus, Take-Two respectfully requests that this Court find that its use of the Tattoos was authorized.

Plaintiff had every opportunity to discover the truth, and he did.  The NBA Players' sworn testimony shows that summary judgment should be granted for Take-Two and this case should be dismissed in its entirety.

## II.     **ARGUMENT**

In Take-Two's Motion, Take-Two identified "each claim or defense . . . on which summary judgment is sought," Fed. R. Civ. P. 56(a), and the materials that it "believes demonstrate the absence of a genuine issue of material fact."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden thus shifted to Plaintiff to establish that "that there is a genuine issue of material fact," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986), by "citing to particular parts of materials in the record," Fed R. Civ. P. 56(c)(1)(A).  The NBA Players' deposition testimony does not help Plaintiff meet his burden.  Rather than creating a dispute about the material facts identified by Take-Two, the NBA Players

---

implied as every plaintiff necessarily disputes the existence of a license in bringing a claim.  Rather, the key consideration is ***objective intent***, which Plaintiff's and the NBA Players' deposition testimony makes clear.

provided additional testimony confirming that those facts are not in dispute and that Take-Two is entitled to summary judgment on each of its defenses.  We address each defense in turn following the order of Take-Two's opening brief.

### A.  Take-Two's Use of the Tattoos is Fair Use

With the NBA Players' testimony in the record, no reasonable finder of fact could determine that *NBA 2K* is not a fair use of the Tattoos.  Plaintiff's case suffers from a fatal flaw: the unavoidable fact that ***NBA 2K is not a substitute for the Tattoos***.  Br. 18; Dkt. 95-42 (Malkiewicz Tr.) 44:14–24; Dkt. 95-41 (Lenzo Tr.) 276:14–16.  The NBA Players' testimony does not change or contradict this fact, and this fact alone is case dispositive.  *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (affirming summary judgment on fair use, as use does not "serve as a substitute"); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014) (same); *see also Jackson v. Warner Bros. Inc.*, 993 F. Supp. 585, 591 (E.D. Mich. Aug. 29, 1997) (granting summary judgment on fair use where work was not a substitute).

Moreover, the NBA Players' testimony shows that each fair use factor supports a finding of fair use.  ***First***, with regard to the "purpose and character of the use," the works were used for different purposes.[4]  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (first factor favored fair use where works were used for "[different] purposes").  Each of the NBA Players confirmed ██████████████████████████████ ██████████████████████  Mr. Green testified ██████████████████████████ ████████████████████████████████████████████████████  Means Decl. Ex. A (Green Tr.) 138:14–16; 141:22–142:3.  Mr. James ████████████████████ ████████████████████████████████████████████████

---

██████████████████████████████████████████████████

██████████  *Id*. Ex. B (James Tr.) 23:25–24:7; 117:4–14.  Mr. Thompson ███████████

████████████████████████████████████████████████████

██████████████████████  *Id.* Ex. C (Thompson Tr.) 95:12–96:1.

     This personal expressive purpose is consistent with the fact that it was the NBA Players, not Plaintiff, who conceived of the tattoos they wanted and approved the designs therefor before they were inked.  Mr. James explained that ███████████████████████████ ████████████████  *Id*. Ex. B (James Tr.) 34:12–23.  Mr. Thompson said that ██████████ ████████████████████████████████  *Id.* Ex. C (Thompson Tr.) 46:23–47:23.  Mr. Green also ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████  *Id.* Ex. A (Green Tr.) 149:15–150:4.  Plaintiff himself confirmed this process during his deposition.  *Id.* Ex. D (Hayden Tr.) 29:22–32:5.  And Plaintiff agreed that the Tattoos as "expressive visual work[s]" communicating the ideas of the NBA Players on which they were inked.  Dkt. 109-49 (Hayden Decl.) ¶ 12; Br. 12.

     In sharp contrast with the Tattoos' original purpose of exhibiting the NBA Players' personal expression, Take-Two's purpose was to replicate the NBA Players exactly as they really look, from their physical appearance (hair, blemishes, skin color, size, etc.) down to their moves and skills.  Br. 8; *see also* Means Decl. Ex. B (James Tr.) 77:7–18 (███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████  Indeed, the

fact that, for two of the Tattoos (the Lion Tattoo and the Brother's Keeper Tattoo), the expressive

content is not even discernable because the tattoos are covered by jerseys, Br. 28–29,

demonstrates this ***different*** purpose.  *See Solid Oak Sketches*, 449 F. Supp. 3d at 348 (where

expressive content was "minimized" this supported fair use); *see also Bill Graham Archives v.*

*Dorling Kindersley Ltd.*, 448 F.3d 605, 609–611 (2d Cir. 2006) (use of images displayed at

angles and surrounded by other material was fair use).  This factor weighs in favor of fair use.

     ***Second***, with regard to the "nature of the work," it is not disputed that the Tattoos were

published by Plaintiff, 4th Am. Compl. (Dkt. 33) Exs. C–H, and the NBA Players' testimony is

consistent with Plaintiff's admission.  Means Decl. Ex. B (James Tr.) 31:13–20, 44:8–10, 56:8–

9; (███████████████████████████); Ex. C (Thompson Tr.) 63:21–23 (███████

███████████████████████████); Ex. A (Green Tr.) 167:2–22 (████████████

█████████████████████).  The fact the Tattoos were published (as opposed to

unpublished works, which get more protection) supports a finding of fair use.  *See Castle v.*

*Kingsport Publ'g Corp.*, No. 19 Civ. 92, 2020 WL 7348157, at *6 (E.D. Tenn. Dec. 14, 2020).

     Moreover, the NBA Players' testimony confirmed ████████████████

███████████████████████████████████████████████

█████████████████████  *See Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905,

910 (2d Cir. 1980) (a work is not original if it is a "mere reproduction" of a prior work "in a

different medium").  Mr. James testified that ████████████████████████

███████████████████████████████████████████Means

Decl. Ex. B (James Tr.) 50:2–9.  This is consistent with Plaintiff's testimony that Mr. James

came into his "shop with a playing card depicting a lion" asking for something similar on his

chest.  Dkt. 95-44 (Hayden Tr.) 82:6–8, 83:21–25.  Likewise, Mr. Thompson testified during his

deposition that ███████████████████████████████████████

████████████████████████████████████ Means Decl. Ex. C (Thompson

Tr.) 96:20–98:8.  Again, Plaintiff himself confirmed that the Sistine Chapel and the Biblical

story were sources of inspiration for this Tattoo, so these pre-existing sources are not disputed.

Br. 28.

      Plaintiff focuses on this factor alone in his Supplemental Opposition, but his reliance is

misplaced for two, independent reasons.  How creative the Tattoos are is not a factual dispute;

the Tattoos are in the record and they speak for themselves.  Br. 5.  Two are indisputably copied

from pre-existing sources,[5] and the others consist of relatively basic elements like simple shapes

(stars, flames, clouds), short phrases, and a name in a typeface.[6] *See Durham,* 630 F.2d at 910.

In any case, the factor's analysis also is not as black and white as whether the work is "fictional"

or "factual," as Plaintiff posits.  Supp. Opp. 12.  In the very case that Plaintiff cites, the Court

found that works could have "varying degrees of creativity."  *Balsey v. LFP, Inc.*, 691 F.3d 747

(6th Cir. 2012).  And even taking Plaintiff to be correct that the Tattoos are somewhat creative,

that needs to be counterbalanced by the undisputed facts that the Tattoos were published by

Plaintiff, and that they were used for accuracy by Take-Two.  Br. 16.  Moreover, even when

fictionalized novels and other creative materials are used, this factor "has rarely played a

significant role in the determination of a fair use dispute."  *Authors Guild*, 804 F.3d at 220

(affirming grant of summary judgment).

      ***Third,*** with regard to the "amount and substantiality of the portion used," the NBA

---

[5]  The fact that Plaintiff may have added text to the pre-existing image, Supp. Opp. 13, does not change the fact that it was copied from a pre-existing work, which makes it on the less creative end of the spectrum, Br. 28.

[6]  Plaintiff's need to rely on Mr. James' testimony that ████████████████████ , Supp. Opp. 13, only highlights how little creativity the Tattoos have.  Means Decl. Ex. B (James Tr.) 56:23–58:20.

Players' testimony confirms that the amount used was reasonable in light of Take-Two's purpose to depict the NBA Players accurately.  Br. 17.  Mr. James and Mr. Green testified ████████ ████████████████████████████████████████ Means Decl.  Ex. B (James Tr.) 123:21–23 █████████████████████████████████████████████████████████; Ex. A (Green Tr.) 23:13–16 ████████████████████████████████ ████████████████████.  And Mr. Thompson explained █████████████████ ██████████████████████████ *Id.* Ex. C (Thompson Tr.) 24:18–25:7 (█████████████████████████████████ █████████████  Thus, this factor weighs in favor of fair use.

*Fourth*, with regard to the "effect of the use upon the potential market," the NBA Players' testimony is consistent with Plaintiff's *own* testimony that (a) he has never "licensed a tattoo for a video game," and he is not aware of any tattooist who has licensed tattoos for inclusion in a video game, Dkt. 95-22 (Hayden Tr.) 173:6–10; (b) prior to this lawsuit, he never attempted to license tattoos for use in video games, *id.* at 177:24–178:2; and (c) no one had ever approached him seeking permission to license tattoos he inked on real people for video games, *id.* at 178:3–6.[7]  And because the Tattoos appear digitally on NBA Players in a video game, they are no substitute for a tattoo on real human skin—which is what Plaintiff sells.

As the NBA Players explained, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████

---

[7]    This alone supports a finding of fair use.  *See Blanch v. Koons*, 467 F.3d 244, 258 (2d Cir. 2006) (fair use as copyright owner admitted that she "never licensed any of her photographs for" the use made by defendant).

 Means

Decl. Ex. B (James Tr.) 109:20–110:6, 119:2–17, 125:6–22, ████████████████████

████████████████████████████████████████████████████ *See Id.*

Ex. A (Green Tr.) 82:11–17 (████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ ); Ex. C (Thompson Tr.)

105:19–106:19 (confirming ████████████████████████████████████████████

████████████████████████████████ There is no evidence in the record of

the existence of such a market, and Plaintiff has not been able to raise a dispute on this point.

This factor weighs this factor in favor of fair use.

**B.**   **Take-Two's Use of the Tattoos was Authorized**

The NBA Players' testimony further confirms that, as a matter of law, Take-Two was

authorized to show the Tattoos in *NBA 2K*.  As an initial matter, it is undisputed that Take-Two

had an express license from the NBA Players, by way of the NBA and NBAPA, to accurately

depict their bodies with the Tattoos in *NBA 2K*.  Br. 21; Dkt. 95-31 (Thomas Tr.) 132:9–133:2;

Dkt. 95-45–46 (NBAPA Agreement); Dkt. 95-5 (NBAPA Agreement) ¶ 10.  Mr. James testified

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Means

Decl. Ex. B (James Tr.) 124:15–126:22, 106:11–16 (████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ ).

Mr. Green had ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*Id.* Ex. A (Green Tr.) 173:6–24, 133:11–21, (████████████████████████████



). And Mr. Thompson

*Id.* Ex. C (Thompson Tr.) 104:16–105:17; 106:20–107:13.

Moreover, the undisputed facts show that Plaintiff impliedly licensed the Tattoos to the NBA Players, as each of the three steps of the test for an implied license are met here. Plaintiff does not contest that the NBA Players "request[ed] the creation of a work" and Plaintiff "ma[de] [that] particular work and deliver[ed] it to" the players. *Mahavisno*, 164 F. Supp. 3d at 968–69; *I.A.E.*, 74 F.3d at 776; Br. 5–6. Consistent with Plaintiff's own testimony, Br. 5.

*See supra* 8; Means Decl. Ex. B (James Tr.) 32:22–33:7, 39:1–9; 48:10–51:3; 110:7–117:2 (

); Ex. A (Green Tr.) 143:5–148:24, 151:11–153:15 (

); Ex. C (Thompson Tr.) 97:24–100:7 (                                            ). Thus, the first two steps are satisfied here. *See Solid Oak*, 449 F. Supp. 3d at 346.

As to whether "the licensor intends that the licensee-requestor copy and distribute his work," *I.A.E.*, 74 F.3d at 776, courts look at **objective** intent, which is manifested "by the parties' conduct" at "the time of the creation and delivery" of the work at issue. *See, e.g., Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008).[8] Here, as the NBA Players' testimony

---

[8]  Plaintiff asserts that the three-step test for determining whether there is an implied license, as set forth in *I.A.E*, 74 F.3d at 776, should be given "no weight." Supp. Opp. 8, n.4. That makes no sense. This three-step test, originally laid out in *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990), is how courts in this Circuit routinely decide whether an implied license exists. *See, e.g., Mahavisno*, 164 F. Supp. 3d at 968–69. Even Plaintiff's own cases apply this test. *See, e.g., Murphy v. Lazarev*, 589 Fed. App'x 757 (6th Cir. 2014) (relying on *I.A.E.* in concluding that use of a work is not copyright infringement when there is an implied license); *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998) (deciding whether an implied license exists based on

has shown, the parties' conduct is not in dispute: the NBA Players requested the Tattoos, paid for them, and left without expecting to need to return for any purpose.  Br. 6, 22.  Mr. Thompson confirmed that ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████  Means Decl. Ex. C (Thompson Tr.) 98:9–99:8.  He explained ███████████

██████████████████████████████  *Id.* at 63:14–17 (████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ ).  Mr. Green ██████████████████████████████████████████████████████

████████████████████████████  *Id.* Ex. A (Green Tr.) 143:19–

144:10.  ████████████████████  Ex. B (James Tr.) 119:18–122:15.

This is consistent with Plaintiff's testimony that getting inked is a discrete occurrence, not an ongoing relationship, testifying that he never told any clients that "there are limitations on what you can do with your tattoo, you need to come back to me."  Means Decl. Ex. D (Hayden Tr.) 42:1–44:10, 120:19–24.  His conduct with his clients showed that he viewed tattoos as a one-time deal.  *See id.* at 42:1–44:10 (Q: "You don't tell customers that they need to come back to you if they ever want to touch up or alter a tattoo you inked, right?"  A: "No, I'm not forcing clients to do that." …Q: "You don't tell clients that they need your permission to have a tattoo removed, right?"  A: "No.").  The fact that getting the Tattoos was a discrete transaction executed at the players' request supports a finding of the existence of an implied license as a matter of law.  *See Foad Consulting Grp., Inc. v. Azzalino*, 270 F. 3d 821 (9th Cir. 2001) (license where architect hired for discrete task, not ongoing project).

---

"objective fact[s]" speaking to "intent").

Fatally, Plaintiff did not enter into any written contracts with the NBA Players disclosing that the Tattoos could be used only with his future permission, nor did he tell the NBA Players when he inked the Tattoos that they needed his permission to show and allow others to show their bodies with their new tattoos.  Br. 4–7; Means Decl. Ex. D (Hayden Tr.) 155:14–156:13. The NBA Players' testimony supports this. ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ *Id.* Ex. A (Green Tr.) 95:18– 98:5. █████████████████████████████████████ *Id.* Ex. B (James Tr.) 81:17–22, 128:6–14 ██████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████████████████████ Ex. C (Thompson Tr.) 99:9–100:7, 109:18–23 (████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████ This is undisputed evidence of an implied license.  *See Solid Oak*, 449 F. Supp. 3d at 346 (license where tattooists did not limit use of tattoos even though they knew players were likely to appear "in public, on television, in commercials, or in other forms of media"); *see also Photographic Illustrators Corp. v. Orgill, Inc.*, 953 F.3d 56, 66 (1st Cir. 2020) (lack of objection supported summary judgment on implied license defense); *I.A.E.*, 74 F.3d at 777 (delivery of designs "without any warning that their further use would constitute copyright infringement" supported finding of license).

In addition to all of the foregoing undisputed evidence that an implied license exists, in determining intent, courts also can look to industry practice.  *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009).[9]  Every piece of evidence in the record concerning how the industry operates is consistent with an implied license:

- **James Hayden** - Plaintiff *never* sought permission to show tattoos on his *own* body, despite displaying them in media (including videos and commercials).  Means Decl. Ex. D (Hayden Tr.) 39:11–40:2, 42:1–5 (Q: "Have you ever gotten the permission of any tattooist before appearing in any videos or commercials showing your tattoos?"  A: "No." Q: "Have you appeared in videos or commercials showing your tattoos?" A: "Yes."). Plaintiff has never had a client sign a copyright agreement before he inked them.  *Id.* at 155:14–19.  He never told any of his clients that there were any limitations on what they could do with their tattoos, or that they needed to come back to him.  *Id.* at 44:6–10.

- **Bernardino Tovanche** - Bernardino Tovanche, Mr. Hayden's colleague and a tattooist himself, could not think of a scenario where a client of a tattooist had sought permission from the tattooist to appear in *any* form of media.  *Id.* Ex. E (Tovanche Tr.) 3–19. Indeed, he had never asked a client to sign a copyright agreement before he inked them either.  *Id.*  He had never told a client that they needed permission to appear in a photograph, a video, or a video game with a tattoo.  *Id.* at 54:20–56:2.  Nor had he told a client that he or she could not let someone else reproduce their likeness without Mr. Tovanche's permission.  *Id.*

- **Gary Glatstein** - Gary Glatstein, a tattooist who has inked famous athletes, attested to

---

[9]   Plaintiff asserts that because certain testimony of Dr. Jablonski has been excluded, there is no undisputed evidence in the record of industry practice.  Supp. Opp. 11 n.10.  This is false.  As described in the bullets herein, the evidence of numerous tattooists and clients alike indicates that requiring clients to get permission from their tattooists before they show their tattoos on their own bodies is not the industry practice.

the fact that in his experience, "[t]he [tattooed] client is free to walk down the street with the tattoo on display, to have the tattoo photographed, or to permit it to be included when the client is depicted on television, in an advertisement, or in other media.  The tattoo becomes part of his person and literally becomes part of his body.  Because of this, the client has the tattooist's permission to permit his depiction in these ways."  Dkt. 95-10 (Jablonski Decl.) Ex. 7 (Glatstein Decl.) ¶ 11.

- **Justin Wright** - Justin Wright, a tattooist in Akron, Ohio with over ten years of experience, said that when a client is tattooed they are "free to go about their business with the tattoo being seen or depicted as just another part of their body."  Dkt. 95-10 (Jablonski Decl.) Ex. 5 (Wright Decl.) ¶ 6.

- **Tommy Ray Cornett** - Tommy Ray Cornett, another experienced tattooist, explained that in his experience any athlete he inks is "free to use his likeness as he desires," which "includes the ability to let third parties depict him in various media, like video games."  Dkt. 95-10 (Jablonski Decl.) Ex. 5 (Cornett Decl.) ¶ 6.

- **Danny Green** - Mr. Green explained 

*Id.* Ex. A (Green Tr.) 144:13–145:4; 76:19–77:10.  Indeed,

[10] *Id.*

---

[10]  He went on,

*Id.*



███████████████████████████████████

█████████████████ *Id.* at 192:11–193:25.

- **LeBron James -** ███████████████████████████

  ███████████████████████████████████

  ████████████████████████████ *Id.* Ex. B (James

  Tr.) 79:20–25.

- **Tristan Thompson -** ████████████████████

  ████████████████████████████████

  ███████████████████████████████

  ████ *Id.* Ex. C (Thompson Tr.) 62:12–24.

Plaintiff has offered no contrary evidence of industry practice.  Thus, it is undisputed.

Instead, Plaintiff protests that he subjectively "did not intend" to license the Tattoos to

the NBA Players.  Supp. Opp. 8.  He specifically argues that he did not know and could not have

foreseen that the Tattoos would be shown in a video game and that, as a result, there is no intent.

Supp. Opp. 10–11.  This is wrong for two reasons.  ***First***, it ignores the undisputed testimony of

what Plaintiff admittedly ***did*** know, which is that he was inking permanent tattoos on the bodies

of ***professional athletes***, people who, ███████████████████████████

██████████████████████ Means Decl. Ex. B (James Tr.) 119:13–17;

Ex. D (Hayden Tr.) 48:10–18, 50:1–18 (testifying he knew Mr. James played for the Cleveland

Cavaliers when he first inked him, and that Mr. James would sometimes appear on television),

91:1–3 (testifying he knew Mr. Green was a "professional basketball player" when he inked him,

and that he would be appearing in media showing his tattoos), 112:24–114:15 (testifying he

knew Mr. Thompson was a "professional basketball player" when he inked him and the he

- 16 -

appeared on television).  These professional athletes would inevitably go about their lives with their tattoos, making decisions about where to appear and show their bodies without Plaintiff's input, such as appearing in televised sporting events, commercials, photos on the Internet, and more, just as they had done before they were first inked.  Given the permanent nature of tattoos, Plaintiff has simply not put forward any facts showing he did not understand or expect that the Tattoos could and would appear anywhere the ***NBA Players themselves*** chose to appear. Knowing this, it is undisputed that he did not limit their rights to show their bodies in any way.

***Second***, Plaintiff has not pointed to a single case giving credence to evidence of subjective intent.  Even in *Johnson v. Jones*, on which Plaintiff almost entirely relies, the court considered objective intent, looking specifically at the existence of a contemporaneous unsigned contract.  *See* 149 F.3d at 501.[11]  Indeed, *Johnson* explicitly distinguishes its facts from the facts in *Effects*, where the party had "delivered the footage directly to the defendant, ***without ever mentioning the issue of ownership of the copyright***."  149 F.3d at 500.  Where there was no such mention, as is the case here, an implied license existed.  *Id.* at 500.  Likewise, the *Solid Oak* court agreed that this lack of a limitation on what the professional athletes could do with their tattoos showed intent.  449 F. Supp. 3d at 346 (implied license existed where players were "neither requested nor agreed to limit the display or depiction of the images tattooed on their bodies").  This is an *Effects* and *Solid Oak* situation, not a *Johnson* situation.  The undisputed conduct in this case shows that the use of the Tattoos in *NBA 2K* was authorized.

---

[11]   Plaintiff insists that, because the *Johnson* court considered the copyright holder's "testimony," this shows it was concerned with subjective intent.  Supp. Opp. 8–11.  He, however, ignores what the testimony was about: the plaintiff had claimed he had meant to object to an ownership provision drafted by another party, testimony which was confirmed by contracts showing lack of intent.  149 F.3d at 500.  Plaintiff also cites to *Robert L. Stark Enterprises, Inc. v. Neptune Design Group, LLC*, Supp. Opp. 8, but again, the court there looked at objective intent, including contracts and agreements, not the post-hoc declaration of subjective intent at issue here.  No. 16 Civ. 264, 2017 WL 1345195, at *10 (N.D. Ohio Apr. 12, 2017).  There are no such contracts here, and the evidence of contemporaneous conduct is undisputed.

**C.**     **Take-Two's Use of the Tattoos is *De Minimis***

The NBA Players' testimony also confirms that Take-Two's use was *de minimis*.  The alleged work and the accused work are not disputed, and therefore *de minimis* use is a legal question for the Court.  *See Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 924 (6th Cir. 2003) (affirming grant of summary judgment).  The NBA Players' testimony does not change the undisputed facts: the Tattoos (1) do not always appear in the game; (2) are depicted at 1.11–10.3% the size that they appear in real life; (3) are surrounded by other visual elements; (4) only comprise, at most, 0.00515% of the game data; and (5) may be obstructed from view, including by uniforms, other players, and referees.  Br. 25–27.  Two Tattoos were indisputably "obstructed by the jerseys."  Opp. 16 n.27.  And indeed, Mr. Thompson ██████  ████████████████████████████████████████████████████████████  Means Decl. Ex. C (Thompson Tr.) 24:18–25:7.  Take-Two is thus entitled to summary judgment on this defense.

**D.**     **Plaintiff's Attempts to Discount the NBA Players' Declarations are Meritless**

With the facts not in dispute, Plaintiff's Supplemental Opposition focuses on attacking the declarations themselves.  Plaintiff misses the forest for the trees.  The three NBA Players ██████████████████████████████████████████████████████████  ████████████████████.  *See*, *e.g.*, Means Decl. Ex. B (James Tr.) 107:11–128:14; Ex. A (Green Tr.) 135:24–178:20; Ex. C (Thompson Tr.) 93:19–108:1.  The players ██████████████  ██████████████████████████████████████████████████  ██████████████████████████████  Ex. B (James Tr.) 20:8.  Mr. Thompson said ████████████████████████████████████████████████  ██████████████████████.  *Id.*  Ex. C (Thompson Tr.) 26:25–27:2.  Mr. Green said ████████████████████████████████████████████  ██████████████████████  *Id.*  Ex. A (Green Tr.) 75:12–21.

Ignoring this, Plaintiff focuses on criticizing the creation of the declarations themselves;
the criticisms primarily boil down to chiding three busy professional athletes for ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Supp. Opp. 4–5. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Supp. Opp.

5.[12] The average person does not necessarily know what it means to be a "party" to a litigation

as opposed to a "third party." *See id.* (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮). The fact that extremely busy professional athletes ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[13]

Plaintiff also asserts that the declarations are "riddled with inaccuracies,"[14] which is

patently false.[15]  Plaintiff argues that Mr. Green's statement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[12] To be clear, and as Plaintiff well knows, Mr. Green's declaration was not obtained by subpoena.  Means Decl. ¶ 8.  Counsel for Take-Two did not represent to Mr. Green that his declaration was by subpoena or in any way involuntary.  *Id.* ¶ 9.  The confusion most likely lies in the fact that Mr. Green was recently subpoenaed by Plaintiff for his *deposition*, which was not voluntary.

[13] Plaintiff cites a single case for his suggestion that the declarations should be disregarded.  *Dawson v. Dorman*, however, was a malicious prosecution case involving an investigator's deliberate false testimony before a grand jury.  528 F. App'x 450, 452 (6th Cir. 2013).  There was evidence that the witness was a dishonest police officer, and had a history of fraud on his employer.  *Id.*  These extreme circumstances are, quite evidently, not present here.

[14] Plaintiff makes spurious claims that the NBA Players ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮ These players make tens of millions of dollars a year according to public records, Means Decl. Ex. F,
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* Ex. A (Green Tr.) 15:8–17:3, ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[15] Plaintiff also asserts that Mr. Green's declaration is unreliable because ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ Supp. Opp. 6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮. Means Decl. Ex. A (Green Tr.) 101:9–
104:9.  None of this testimony warrants disregarding his declaration.





Means Decl. Ex. A (Green Tr.) 74:11–17. Tellingly, during Plaintiff's deposition, he was asked about communications with Mr. Green, and he did not mention this dinner either. *Id.* Ex. D (Hayden Tr.) 105:9–106:6. Indeed, he testified that other than a conversation with Randy Mims, he did not have any communications with anyone else about this lawsuit. *Id.* at 217:15–18. According to Plaintiff's logic, disregarding his own declaration would also be appropriate.

In another odd example, Plaintiff claims Mr. Green █████████████████████████ █████████████████████████████████ Supp. Opp. 6. ████████████████████████████ *Id.* Ex. A (Green Tr.) 161:21–162:11. ███████████████████████████

████████████████████████████████ *Id.* (Green Tr.) 161:21–162:11.[16]

Ultimately, the declarations are in the record, are sworn, and the Court can consider them. As detailed above, the deposition testimony confirms and corroborates other evidence in this case, including Plaintiff's own testimony. There simply are no material facts in dispute.

## CONCLUSION

For the foregoing reasons and those in Take-Two's prior briefs, Take-Two respectfully requests that the Court grant its motion for summary judgment.

---

[16] Plaintiff similarly argues that Mr. Thompson's declaration should be ignored because, ████████████ ████████████████████████████ upp. Opp. 6. ████████ Br. 4. ██████ Means Decl. Ex. C (Thompson Tr.) 103:4–105:17.

Dated:  New York, NY
       July 22, 2022

/s/ Dale M. Cendali
_____

Dale M. Cendali (admitted *pro hac vice*)
Joshua L. Simmons (admitted *pro hac vice*)
Chris Ilardi (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.*

## **L.R. 7.1(F) CERTIFICATION**

In accordance with Local Rule 7.1(f), I hereby certify that this case is on the standard track, that the Defendants have received prior approval from the Court to file a supplemental reply memorandum in support of their Motion for Summary Judgment, and that the foregoing memorandum complies with the applicable page limitation of twenty (20) pages in length.

<div style="margin-left:40%">

*/s/ Dale M. Cendali*
*Attorney for Defendants 2K Games, Inc. and*
*Take-Two Interactive Software, Inc.*

</div>