# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


JAMES HAYDEN,                    CASE NO: 1:17CV2635

        Plaintiff,

         v.

2K GAMES, INC., et al.,

        Defendants.

------------------------------



Deposition of JAMES HAYDEN

Cleveland, Ohio

Wednesday, October 30, 2019 - 9:04 a.m.








Reported by:

Angela Nixon, RMR, CRR

Job No.: 26345

1   single person you ever inked?

2   A.          No.

3   Q.          Just in the past -- this is 2019, approximately

4   how many people have you inked so far this year?

5   A.          I don't know.  It's hard to say.

6   Q.          Can you give me any approximation for how many

7   people a week, three a week, ten a week, 20 a week?

8   A.          Three.

9   Q.          And is it fair to say that you -- in your mind,

10  have you inked a lot of people in your career?

11              MR. MCMULLEN:  Objection.

12  A.          I don't know, in comparison I don't know.

13  Q.          Well, in -- from your point of view, do you think

14  you've only inked a few people, or are you thinking in 22

15  years you've inked a lot of people?

16              MR. MCMULLEN:  Objection.

17  A.          A nice amount.

18  Q.          So when a client comes in for a tattoo, can you

19  just walk me through the typical process you would go

20  through in deciding what to ink on that person?

21              MR. MCMULLEN:  Objection.

22  A.          Rephrase your question for me, please.

23  Q.          Sure.  So when someone comes in and says that

24  they'd like a too -- tattoo, can you walk me through how

25  the process works from when they walk in the door to when

1    they leave with their tattoo?

2    A.        It could be an extensive process, it could be

3    quick.  Somebody would usually come in with an idea and

4    we'd go from there.

5    Q.        Okay.  So if someone comes in with -- with an

6    idea, what would happen next?

7              MR. MCMULLEN:  Objection.

8    A.        In my case I would draw it on with a Sharpie, and

9    if they like it we do it.

10   Q.        And would they get to see the Sharpie design

11   before you inked it on them?

12   A.        Yes.

13   Q.        Would they get to approve the design before you

14   inked it on them?

15             MR. MCMULLEN:  Objection.

16   A.        Yes.

17   Q.        If you showed a client a Sharpie sketch, do they

18   ever say can you make some changes in it and redo it before

19   you ink it on them?

20   A.        Sometimes.

21   Q.        So does the client have the final say in the

22   tattoo that's inked on their body?

23   A.        Yes.

24   Q.        Is that because it's a -- it becomes a permanent

25   part of their body?

Page 31

1             MR. MCMULLEN:  Objection.

2    A.       Yes.

3    Q.       Would you agree that tattoos are personal?

4             MR. MCMULLEN:  Objection.

5    A.       I think so.

6    Q.       Tattooing's been around for a long time, right?

7    A.       Yes.

8    Q.       Am I right that a lot of modern tattoos are based

9    on prior designs?

10            MR. MCMULLEN:  Objection.

11   A.       No.

12   Q.       Have you ever heard of tribal tattoos?

13   A.       Yes.

14   Q.       What are tribal tattoos?

15   A.       It's just a style of tattooing.

16   Q.       What does the word tribal refer to?

17            MR. MCMULLEN:  Objection.

18   A.       Typically a dark design of some sort.

19   Q.       In your experience, does the term tribal often

20   refer to Maori or designs inspired from that culture?

21            MR. MCMULLEN:  Objection.

22   A.       I'm not sure.

23   Q.       Okay.  When -- is it true that people often get

24   tattoos depicting things that have personal significance to

25   them?

1          MR. MCMULLEN:  Objection.  Can you read that

2     question for us, please?

3               (Whereupon the court reporter read back the

4               previous question.)

5     A.        Sometimes.

6     Q.        Do people sometimes get tattoos to commemorate

7     life events -- events?

8     A.        Sometimes.

9     Q.        Do people sometimes get tattoos to honor

10    important people in their life?

11    A.        Sometimes.

12    Q.        Do people sometimes get tattoos of -- of quotes

13    that are important to them?

14    A.        Sometimes they do.

15    Q.        Would you agree that tattoos can be a form of

16    self expression --

17          MR. MCMULLEN:  Objection.

18    Q.        -- for the client?

19          MR. MCMULLEN:  Excuse me, I'm sorry, forgive me.

20    Can you read the question back?

21               (Whereupon the court reporter read back the

22               previous question.)

23          MR. MCMULLEN:  Objection to that question.  You

24    can answer if you're able.

25    A.        I don't know.

 1   you that you needed the permission of the person who

 2   tattooed you before photographs of you could be taken?

 3   A.          Rephrase that question if you could.

 4   Q.          Sure.  When you got your tattoos, did any

 5   tattooist ever tell you that you needed to get their

 6   permission before you appeared showing your tattoos in

 7   photographs or television or video games or anything?

 8             MR. MCMULLEN:  Objection.  You can answer if

 9   you're able.

10   A.          I don't remember.  I don't think so.

11   Q.          Have you ever sought permission from any

12   tattooist before posting pictures of yourself with your

13   tattoos?

14   A.          No.

15   Q.          Have you ever gotten the permission of any

16   tattooist before appearing in any videos or commercials

17   showing your tattoos?

18             MR. MCMULLEN:  Objection.

19   A.          Could you say that again?

20   Q.          Can you read it back?

21             (Whereupon the court reporter read back the

22             previous question.)

23   A.          No.

24   Q.          Have you appeared in videos or commercials

25   showing your tattoos?

Page 42

1   Q.          Am I right that after a person gets a tattoo they

2   can have that tattoo touched up by a different tattooist if

3   they want?

4               MR. MCMULLEN:  Objection.

5   A.          I guess so.

6   Q.          You don't try to prevent your customers from

7   doing what they want with their tattoos once they leave the

8   shop, right?

9               MR. MCMULLEN:  Objection.

10  A.          What do you mean prevent them?

11  Q.          Well, you don't tell customers that they need to

12  go back to you if they ever wanted to touch up or alter a

13  tattoo you inked, right?

14              MR. MCMULLEN:  Objection.

15  A.          Tell customers to do what?

16  Q.          You don't tell customers that they need to come

17  back to you if they ever wanted to touch up or alter a

18  tattoo you inked, right?

19              MR. MCMULLEN:  Objection.

20  A.          No, I'm not forcing clients to do that.

21  Q.          And they don't need your permission to alter or

22  touch up a tattoo you inked, right?

23              MR. MCMULLEN:  Objection, calls for a legal

24  conclusion.

25  A.          Okay, I don't know.

Page 43

1    Q.        Well, you don't tell them that, right?

2    A.        No.

3    Q.        And you don't tell tattoos -- excuse me, you

4    don't tell clients that they need your permission to have a

5    tattoo removed, right?

6              MR. MCMULLEN:  Objection.

7    A.        No.

8    Q.        And a client doesn't need permission from the

9    original tattooist to tattoo over a tattoo somebody else

10   inked, right?

11             MR. MCMULLEN:  Objection.

12   A.        I don't know.

13   Q.        Well, do you tell people you can't put a new

14   tattoo over an old tattoo without the permission of the

15   original tattooist, you ever tell that to people?

16   A.        I don't remember ever telling anybody that.

17   Q.        Isn't it true that because a tattoo is part of

18   someone's body, you expect when they leave your shop that

19   they're going to do whatever they want with it?

20             MR. MCMULLEN:  Objection.

21   A.        Say it again.  Rephrase that.

22             MS. CENDALI:  Can you say it back please.

23             (Whereupon the court reporter read back the

24             previous question.)

25             MR. MCMULLEN:  Same objection.

1   A.          Do I expect -- I don't know.  No, I guess, no.

2   Q.          Well, do you -- is once you tattoo someone often

3   the last time you see them?

4               MR. MCMULLEN:  Objection.

5   A.          Sometimes.

6   Q.          And do you ever say to your clients, hey, there

7   are limitations on what you can do with your tattoo, you

8   need to come back to me?

9               MR. MCMULLEN:  Objection.

10  A.          No.

11  Q.          I'll show you what's been marked as Exhibit 2.

12  Can you identify that document?

13  A.          Looks like some tattoos and some pictures of me.

14  Q.          Is that from your Instagram?

15  A.          Looks like it, yes.

16  Q.          Did you post that material?

17  A.          Yes.

18  Q.          Are these tattoos that you had inked?

19              MR. MCMULLEN:  Objection.

20  A.          Some of them.

21  Q.          Are some of them of other people's tattoos?

22  A.          Yes.

23  Q.          Why did you include images of other people's

24  tattoos?

25  A.          Because I like them.

Page 48

1    they were.

2    Q.       You don't remember their names?

3    A.       No.

4    Q.       Other than yourself, was anyone else present who

5    was not with Mr. James?

6    A.       I think my brother was there, and I think Dino

7    was there, Bernadino Tovanche was there.

8    Q.       Anyone else?

9    A.       No.

10   Q.       And was Mr. James a professional basketball

11   player at that time?

12   A.       I think so.

13   Q.       Did you understand that he was playing for the

14   Cleveland Cavaliers?

15   A.       Yeah.

16   Q.       Isn't it true that he started playing with the

17   Cavs in 2003?

18   A.       I think so.

19   Q.       Do you recall that he was Rookie of the Year in

20   2004?

21   A.       I don't remember that.

22   Q.       Are you a basketball fan?

23   A.       From afar, yes.

24   Q.       Do you ever go to basketball games?

25   A.       Yes.

1   Q.        And you knew that LeBron James appeared in public

2   basketball games, right?

3   A.        NBA, ESPN, yeah.

4   Q.        I mean you knew that -- that -- that basketball

5   playing games are played in an -- in an arena and fans come

6   and watch them, right?

7   A.        Typically.

8   Q.        And you were one of those people, right?

9   A.        One of those people who what?

10  Q.        Would sometimes go to an arena and watch a Cavs

11  game?

12  A.        Sometimes.

13  Q.        And you knew that professional basketball games

14  are often on television, right?

15  A.        Sometimes they are.

16  Q.        And you knew that -- so when you inked Mr. James,

17  you knew that he was often on television, right?

18  A.        Yes.

19  Q.        And when you inked him you knew that he often

20  appeared in advertising and merchandise, right?

21            MR. MCMULLEN:  Objection.

22  A.        I didn't know that.

23  Q.        Did you ever -- when you went to a game did you

24  ever see T-shirts and things like that being sold with the

25  players' likenesses?

1   Q.       Did you understand that Mr. Green was a

2   professional basketball player when you inked him?

3   A.       Yes.

4   Q.       Let me show you what's been marked as Exhibit 9.

5   Is Exhibit 9 a photograph of Mr. Green's arm showing a

6   tattoo you inked on him?

7   A.       Looks like it.

8   Q.       Do you refer to that as the flame tattoo?

9   A.       Yes.

10   Q.       Can you approximate what year you inked this on

11   him?

12   A.       I can't remember when I did this.

13   Q.       Was it after 2010 or earlier?

14   A.       Maybe after.  I can't remember.

15   Q.       But it was after you had inked Mr. James, right?

16   A.       Yes.

17   Q.       And it was -- and this was -- the flame tattoo is

18   the first one you inked on Mr. Green, correct?

19   A.       I don't know if it's the first one.  I'm not

20   sure.

21   Q.       What -- what do you think might have been the

22   first one?

23   A.       He has a few of them.  I don't know which one I

24   did first.  I'm not sure.

25   Q.       Okay.  But the point is, is it fair to say that

1    last tattoo you inked on Mr. Green was?

2    A.        Symbols on the inside of the arm.

3    Q.        And when, approximately, did you ink that design?

4    A.        I can't remember.

5    Q.        Was it in the past five years?

6    A.        Yes.

7    Q.        Was it in the past two years?

8    A.        Past five.

9    Q.        Was that the last time you had any communications

10   with Mr. Green?

11   A.        No.

12   Q.        Is Mr. Green your friend?

13   A.        Yes.

14   Q.        When was the last time you had any communications

15   with Mr. Green?

16   A.        A few weeks ago possibly through Instagram.

17   Q.        Okay.  And what happened in that communication?

18   A.        Fire emojis, good shot.

19   Q.        I'm sorry, could you explain that?

20   A.        Emojis, fire, good shot.

21   Q.        Oh, so you were saying that he made a good shot

22   during your basketball game?

23   A.        Yes.

24   Q.        And do you comm -- communicate other than through

25   Instagram with Mr. Green via text or e-mails?

Page 106

1   A.        No, not too much.

2   Q.        But you've done that sometimes, though, right?

3   A.        Yeah.

4   Q.        Have you produced all communications with

5   Mr. James, Mr. Green and Mr. Thompson?

6   A.        I think so.

7   Q.        Have you produced all communications with any

8   representatives of them?

9   A.        Yes.

10  Q.        Have you ever spoken to Mr. James or any of his

11  representatives about this lawsuit?

12  A.        Randy Mims.

13  Q.        Who's Randy Mims?

14  A.        He's -- I think he's LeBron's agent, one of --

15  one of his agents.

16  Q.        And when did you speak to Mr. Mims?

17  A.        A few months ago.

18  Q.        Did you reach out to him, did he reach out to

19  you?

20  A.        I reached out to him.

21  Q.        Why?

22  A.        It was regards to a contract with Warner

23  Brothers.

24  Q.        Did you have a conversation with him about this

25  lawsuit?

Page 112

1    A.          I forgot.

2    Q.          And how was it decided -- did Mr. Green say to

3    you what symbols he wanted inked on him?

4    A.          Yes.

5    Q.          What did he say?

6    A.          He told me what symbols he wanted.  I forgot what

7    symbols they were.

8    Q.          And then you did that then, correct?

9    A.          Yes.

10   Q.          Were there any other tattoos that you inked on

11   Mr. Green?

12   A.          I can't remember.

13   Q.          How did it come about that you first inked

14   Tristan Thompson?

15   A.          How did it come about?  He came into the shop to

16   get a tattoo.

17   Q.          It hadn't been set up in advance?

18   A.          I don't remember how it was set up.

19   Q.          Did you know Mr. Thompson before he came into the

20   shop?

21   A.          No.

22   Q.          Did anyone come in with him?

23   A.          I can't remember.

24   Q.          Let me show you what's been marked as Exhibit 11.

25   Is this a photograph of Mr. Thompson's front chest

Page 113

1    depicting a tattoo you inked on him?

2    A.        Looks like it.

3              MR. MCMULLEN:  Excuse me, counsel, did you say

4    this is Exhibit 11?

5              MS. CENDALI:  Yes, Defendant's Exhibit 11.

6              MR. MCMULLEN:  Thank you.

7    BY MS. CENDALI:

8    Q.        And did you ink the whole tattoo, or was there

9    any preexisting ink on him?

10   A.        I inked the whole tattoo.

11   Q.        And you understood -- was this tattoo inked in

12   2012?

13   A.        Maybe.

14   Q.        Was it approximately that time?

15   A.        I think so.

16   Q.        You understood that he was a professional

17   basketball player at that time, right?

18   A.        Yes.

19   Q.        And you knew that he had signed an $82 million

20   contract with the Cleveland Cavaliers, right?

21             MR. MCMULLEN:  Objection.

22   A.        I didn't know that.

23   Q.        Well, you knew he was a celebrity, right?

24             MR. MCMULLEN:  Objection.

25   A.        I didn't know that.

Page 114

1    Q.        Well, you knew he was a famous basketball player,

2    right?

3              MR. MCMULLEN:  Objection.

4    A.        I didn't know that.

5    Q.        Did you think that Tristan Thompson was a famous

6    basketball player?

7              MR. MCMULLEN:  Objection.

8    A.        I think he is now.

9    Q.        And you don't think he was in 2012?

10             MR. MCMULLEN:  Objection.

11   A.        I don't know.

12   Q.        Well, you knew that he appeared on television,

13   right?

14             MR. MCMULLEN:  Objection.

15   A.        Yes.

16   Q.        So how much did Mr. Thompson pay you to ink

17   the my brother's keeper tattoo?

18   A.        I can't remember.

19   Q.        And other than it being less than $600, can you

20   approximate in any way how much you charged him?

21             MR. MCMULLEN:  Objection.

22   A.        No, I can't.

23   Q.        And if I came in today with my brother and asked

24   you to ink a tattoo on him like that, you couldn't give me

25   an estimate in advance, right?

1    Q.         I'm not asking if you've been there.  Are you

2    aware that that painting exists?

3    A.         I think it exists through photographs maybe.

4    Q.         Okay.  And when you inked on Mr. Thompson these

5    two fingers to these two hands with their finger tips

6    touching, were you inspired by Michelangelo?

7              MR. MCMULLEN:  Objection.

8    A.         I'm not sure what I was inspired by at the time.

9    Q.         Were you aware at the time that you inked this

10   that Michelangelo's -- that Michelangelo had depicted hands

11   in a similar style?

12             MR. MCMULLEN:  Objection.

13   A.         Possibly.

14   Q.         Have you ever told anyone, at the time a tattoo

15   was inked, that the NBA players needed your permission

16   before their likeness could be shown with their tattoos?

17             MR. MCMULLEN:  Objection.

18   A.         Restate that question, please.

19   Q.         When you were inking the NBA players, Mr. Green,

20   Mr. Thompson, Mr. James, did you ever tell anyone that your

21   permission would be needed before their likeness could be

22   depicted showing their tattoos?

23             MR. MCMULLEN:  Objection.

24   A.         No.

25   Q.         Is Mr. Thompson a friend of yours?

1  sure how they're doing it.  I'd like to find out more about

2  that.  I'm a tattoo artist.

3  Q.        Right.  But you say that the problem you have

4  with avatars is that that's computer generated, I'm asking

5  you --

6  A.        My images are -- that I have copyrights to are --

7  are computer generated.

8  Q.        Right.  But are -- aren't computers used to

9  generate how people look in movies and photographs too?

10         MR. MCMULLEN:  Objection.

11  A.        I don't know.

12  Q.        You don't know?

13  A.        No, I don't know.

14  Q.        Have you ever asked a client to sign a copyright

15  agreement before you inked them?

16  A.        A client to sign a copyright agreement before I

17  ink them?

18  Q.        Yes.

19  A.        No.

20  Q.        Have you told the players involved in this case

21  that when you -- let me rephrase.

22         When you inked the tattoos on Mr. James,

23  Mr. Thompson and Mr. Green, did you tell the players that

24  you were claiming copyrights of the tattoos you put on

25  their bodies?

Page 156

1                MR. MCMULLEN:  Objection.

2    A.          No.

3    Q.          And when you inked Mr. Thompson, Mr. Green and

4    Mr. James, you didn't tell them that they would need your

5    permission to appear in video games showing their tattoos,

6    right?

7    A.          No.

8    Q.          Is it fair to say that in the tattoo industry,

9    that when a client leaves the tattooist's parlor he or she

10   can go about their life as they wish without needing to run

11   back to the tattooist for permission?

12               MR. MCMULLEN:  Objection.

13   A.          I guess so.

14   Q.          So I believe you said you've gone to NBA

15   basketball games and you've watched them on TV from time to

16   time, is that right?

17   A.          Yes.

18   Q.          And I -- I believe you said that you didn't

19   actually play the video games yourself at issue in this

20   case but that you watch others play them for you, to show

21   you what they look like, is that fair?

22               MR. MCMULLEN:  Objection.

23   A.          I've held the -- the thing before, but it's not

24   something I -- it's not in my bag.

25   Q.          But you looked into how the players were depicted

1   sure whether this was it?

2            MR. MCMULLEN:  Objection.

3   A.        This -- this wasn't -- this doesn't look like the

4   one from ten years ago.

5   Q.        Okay.  And can you describe for me what the one

6   from ten years ago looked like?

7   A.        I cannot.  I don't remember what it looked like.

8   Doesn't look like this, though, looked more like a -- like

9   a regular playing card.

10  Q.        You can't remember -- you can't describe what it

11  looked like, but you knew it didn't look like this, is that

12  your testimony?

13           MR. MCMULLEN:  Objection.

14  A.        Yes, basically.

15  Q.        Now, besides your communications with Randy Mims,

16  have you ever had communications with anyone else about

17  this lawsuit?

18  A.        No.

19  Q.        Before you brought this lawsuit, did you discuss

20  suing Take-Two from anyone other than your attorneys?

21  A.        Ask -- ask me that question again.

22  Q.        Sure.  Before you brought this lawsuit, did you

23  discuss the possibility of suing Take-Two with anyone other

24  than your attorneys?

25  A.        No.