# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

JAMES HAYDEN,

       Plaintiff,

  -vs-              CASE NO. 1:17CV2635

2K GAMES, INC., et al.,

       Defendants.

_____

Deposition of BERNARDINO TOVANCHE

Cleveland, Ohio

Wednesday, January 29, 2020 - 7:36 p.m.

Reported by:

Pamela S. Greenfield, RDR, CRR

Job No: 26860

1

2    DEPOSITION OF:  Bernardino Tovanche

3

4    DATE:  Wednesday, January 29, 2020

5

6    TIME:  7:36 p.m.

7

8    LOCATION:  McDonald Hopkins

9              600 Superior Avenue East

10             Suite 2100

11             Cleveland, Ohio 44114

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

 3   For the Plaintiff and the Witness:

 4   Calfee, Halter & Griswold, LLP

 5   Andrew Alexander, Esq.

 6   The Calfee Building

 7   1405 East Sixth Street

 8   Cleveland, Ohio 44114

 9   (216) 622-8200

10   Aalexander@calfee.com

11

12

13   For the Defendants:

14   Kirkland & Ellis LLP

15   Miranda Means, Esq.

16   Joshua L. Simmons, Esq.

17   601 Lexington Avenue

18   New York, New York 10022

19   (212) 446-4846

20   Miranda.means@kirkland.com

21   Joshua.simmons@kirkland.com

22

23   Videographer:

24   Raymond Andrews, Jr., CLVS, CTP, Videographer

25
```

```
 1                   I N D E X
 2                                      PAGE
 3  EXAMINATION
 4   BERNARDINO TOVANCHE
 5        BY MS. MEANS                     7
 6        BY MR. ALEXANDER               189
 7
 8            E X H I B I T   I N D E X
 9
10  EXHIBIT                              PAGE
11  Exhibit 1  Tovanche 000001-003,
12             Commercial Lease Agreement   17
13  Exhibit 2  Hayden 001944, Medical
14             History/Consent Form         17
15  Exhibit 3  11/14/12 Scene Magazine
16             "The Illustrated Man"
17             article                      31
18  Exhibit 4  subpoena                     65
19  Exhibit 5  Take-Two00000193-198,
20             Copy of Deposit              86
21  Exhibit 6  Take-Two 00002493,
22             photo of LeBron James        86
23  Exhibit 7  Take-Two 0000157-165
24             and 0000205-210 Copy of
25             E-File Application          108
```

1   E X H I B I T   I N D E X   C O N T I N U E D

2   EXHIBIT                                    PAGE

3   Exhibit 8  Take-Two 00002484

4              photo of LeBron James        108

5   Exhibit 9  5/20/08 Trademark Principal

6              Register3,429,884            117

7   Exhibit 10 Take-Two 00000148-156,

8              and 00000199-204, Copy

9              of E-File Application,       127

10  Exhibit 11 Take-Two 00002486,

11             photo of LeBron James        127

12  Exhibit 12 Take-Two 00000175-183

13             and 00000216-220, Copy

14             of E-File Application        141

15  Exhibit 13 Take-Two 00000166-174

16             and 00000211 through 205,

17             Copy of E-File Application   147

18  Exhibit 14 Take-Two 00000184-192

19             and 00000221-225, Copy

20             of E-File Application        151

21

22

23

24

25

```
 1                    THE VIDEOGRAPHER:  We're going

 2        on the record.  The time is 7:36 p.m.

 3        Today is January 29th, 2020.  We're at 600

 4        East Superior Avenue in Cleveland, Ohio, to

 5        take the deposition of Bernardino Tovanche

 6        in the case titled James Hayden versus 2K

 7        Games, Inc. et al. in the U.S. District

 8        Court, Northern District of Ohio, Eastern

 9        Division.  Case Number 1:17-CV-2635.

10                    My name is Randy Andrews,

11        videographer.  Court reporter is Pam

12        Greenfield.

13                    Counsel present please identify

14        themselves for the record.

15                    MS. MEANS:  My name is Miranda

16        Means.  I am counsel for the Defendants

17        Take-Two Interactive Software and 2K Games

18        and I'm accompanied by Josh Simmons who's

19        also counsel for defendants.

20                    MR. ALEXANDER:  Andy Alexander

21        from Calfee, Halter & Griswold representing

22        Plaintiff James Hayden.

23                    THE VIDEOGRAPHER:  Would the

24        court reporter, please swear in the

25        witness.
```

1          BERNARDINO TOVANCHE, of lawful age, called

2     by the Defendants for the purpose of

3     cross-examination, as provided by the Rules of

4     Civil Procedure, being by me first duly sworn, as

5     hereinafter certified, deposed and said as

6     follows:

7          CROSS-EXAMINATION OF BERNARDINO TOVANCHE

8     BY MS. MEANS:

9  Q.  Good evening, Mr. Tovanche.

10  A.  Good evening.

11  Q.  Thank you for coming in.  I know it's late.

12          Could you please just state your name and

13     address for the record?

14  A.  Sure.  My name is Bernardino Tovanche.  4149

15     Brookside Boulevard, Cleveland, Ohio 44135.

16  Q.  And is Andrew Alexander representing you today?

17  A.  Yes.

18               MR. ALEXANDER:  Maybe I should

19          clarify on the record that in addition to

20          representing plaintiff in this matter, I am

21          also representing Bernardino Tovanche in

22          relation to the subpoena for deposition.

23  Q.  So I understand you came from work today?

24  A.  Yes.

25  Q.  Where do you currently work?

Page 8

```
 1   A.   I work at Charles Schwab.

 2   Q.   And what do you do there?

 3   A.   Inbound call center rep.

 4   Q.   So were you previously a tattooist?

 5   A.   Yes.

 6   Q.   And do you currently still tattoo people?

 7   A.   Yes.

 8   Q.   Where do you work currently as a tattooist?

 9   A.   Focused Tattoos in Cleveland Heights.

10   Q.   What's the address of that?

11   A.   1846 Coventry Road, Cleveland Heights, 44118.

12   Q.   So did you go in and tattoo anybody today?

13   A.   No.

14   Q.   Okay.  On a day-to-day basis, what kind of work

15        do you do as a tattooist?

16   A.   Just depends on what I have scheduled, what walks

17        through the door, what the customers are looking

18        for.

19   Q.   Well, maybe let's talk about the last day you

20        worked as a tattooist.  When was that?

21   A.   So let's see.  That would probably be, I'm trying

22        to think.  Sunday.

23   Q.   And how many clients did you see on Sunday?

24   A.   I saw one to two maybe.

25   Q.   So I've actually never been tattooed before so
```

1    bear with me a little bit.

2  A.  Yep.

3  Q.  When a client comes into your tattoo shop, what's

4      the first thing that happens?  Do they get any

5      information?

6              MR. ALEXANDER:  Objection.

7          Calls for speculation.

8  A.  So it just depends on the interaction.  Sometimes

9      they want to just consult; but generally speaking

10     I mean you would greet the, the client and then

11     you'd ask, you know, what they were doing there

12     and they'd say:  I want to get tattooed.  What

13     kind of ideas do you have, you know.

14 Q.  So do you find that a client typically comes in

15     with an idea of what they want?

16             MR. ALEXANDER:  Objection.

17         Vague.  Calls for speculation.

18 A.  It depends on the client.

19 Q.  Would you say that most clients already come in

20     knowing what they want?

21             MR. ALEXANDER:  Objection.

22         Vague.

23 A.  Not all the time.  Sometimes yes, sometimes no.

24 Q.  So when a client comes in with an idea of what

25     they want inked on them, do you typically work

Page 10

```
 1       with them to sketch out that idea?
 2   A.  When a client comes in with an idea, yes, we
 3       would work with them so we would basically see
 4       what kind of ideas they have and then work back
 5       and forth until a, a design was agreed upon.
 6   Q.  And would you say that a client typically knows
 7       where on their body they want a tattoo when they
 8       come in to see you?
 9                   MR. ALEXANDER:  Objection.
10           Incomplete hypothetical.  Calls for
11           speculation.
12   A.  For the most part, yes.
13   Q.  So when you work with a client to kind of sketch
14       out their idea, do you do that on paper?
15                   MR. ALEXANDER:  Same objection.
16   A.  That would depend artist to artist.
17           Are you asking me specifically or are you
18       asking in general?
19   Q.  Well, for you.  Do you usually sketch things out
20       on paper or do you work directly on the skin?
21   A.  I work, I work mostly on my iPad right now.
22   Q.  And then do you ever draw the tattoo out on the
23       person before you start inking it?
24   A.  Yes.  Many times because the -- when, when you
25       actually have to tailor something to the body,
```

```
 1        it's, it's difficult to do it as a transfer
 2        sometimes so you have to basically draw it on
 3        sometimes because of size, things like that, just
 4        the way that it's forming to the body so you
 5        would have to use a marker.  It flows better, for
 6        better lack of words, with the body.
 7   Q.   So when you draw it out on your iPad first, does
 8        the client then approve the design?
 9                     MR. ALEXANDER:  Objection.
10        Calls for speculation.  Incomplete
11        hypothetical.
12   A.   Sometimes they, yeah, they like the design and
13        want to go with it.  Sometimes they want to add
14        to it or take away from it, depending, and they
15        give me ideas and we kind of just customize it to
16        what they like, so kind of like a process back
17        and forth.
18   Q.   And then when you actually, when you sometimes
19        draw it out on their body, do they have a chance
20        to make adjustments to it?
21                     MR. ALEXANDER:  Objection.
22        Vague.  Incomplete hypothetical.  Calls for
23        speculation.
24   A.   Well, any design once it's stenciled on the body,
25        we make sure that the client approves of it
```

```
 1      before we ink it so, yes, in that case if
 2      someone -- thing was drawn on the body, we'll, at
 3      that point we'd show it to the client, they would
 4      say yes, I'd like this or can we do this, can we
 5      move it up a little bit, can you change it this
 6      way and we just kind of tailor it to how, however
 7      they, you know, until they approve it.
 8  Q.  And that's because it's permanent, right?
 9              MR. ALEXANDER:  Objection.
10      Vague.  Ambiguous.
11  A.  The -- well, I mean that's because we have to
12      make sure that we're doing a good piece of
13      artwork on their body.
14  Q.  But would you say that a client has to approve
15      what they're getting on their body that's
16      permanent?
17              MR. ALEXANDER:  Objection.
18      Form.  Vague and ambiguous.
19  A.  Well, can you re -- can you say that again?
20  Q.  Yeah.  Let me back up.
21      So you work in permanent tattoos, right?
22              MR. ALEXANDER:  Objection.
23      Form.
24  A.  I suppose we can question permanence.  You know,
25      what's, what's really permanent?  That's a
```

Page 13

1      relative question.

2            I work in the tattoo industry and we create

3      body art.

4   Q. So earlier you said that you want to make sure

5      that the art is a good piece of art.

6            What would you say makes a piece of art good?

7                    MR. ALEXANDER:  Objection.

8      Incomplete hypothetical.  Calls for

9      speculation.

10  A. And that's, that's a relative question, too, but

11     that's okay.  I'll answer it.

12           Everyone has an idea of what a good piece of

13     art is.  You know, there's people all over and,

14     you know, you might agree with what their tattoo

15     looks like and that's, that's a great tattoo for

16     them and you might not say that's it's a great

17     tattoo for you so it's a relative question.

18           In terms of creating a good piece of art, I

19     mean it comes from the artist.  It comes from

20     their, their mind.  It comes from their years of

21     knowledge.  There's a lot that goes into it.

22     It's craftsmanship really, so it just kind of

23     really depends.  I mean everyone has an idea of

24     what a good piece of art might be; but if you're,

25     if you're asking me what makes a good piece of

1    art, I would say the, the artist, you know, the

2    way that they actually form it and we can go into

3    many details about tattoos and what makes a good

4    tattoo and what not, but, you know, if you want

5    to ask that question, we can go into that as

6    well; but in any case, in terms of art it's

7    really up to, you know, ultimately you want to

8    make sure that the client is satisfied with it

9    and you are, want to be satisfied with your piece

10   of work that you just created on, on their body.

11   Q.  So the process you described of like working with

12       the iPad --

13   A.  Uh-huh.

14   Q.  -- is that a process that other people at Focused

15       Tattoos use?

16   A.  Some do, some don't.  It just really depends and

17       varies on the artist because it goes from artist

18       to artist so...

19   Q.  And how many tattoo artists work there?

20   A.  So right now there are seven artists and two

21       apprentices.

22   Q.  And who are they?

23   A.  So artist-wise there is myself.  Jim.  There is

24       Noah.  Danielle.  Matt.  Donnie.  Quiz.

25   Q.  Do you remember last names of any of those

1      people?

2   A.  So Matt and Donnie are brothers.  Their last

3       names are Madda.  Danielle's last name is Stull.

4       Quiz's last name is Parker.  Let's see, who else

5       did I say.  Noah is Astrup.  A-S-T-R-U-P.  And

6       then we have two apprentices.

7   Q.  And who are the apprentices?

8   A.  Macey Thompson.  And then Jim's son is actually

9       an apprentice, Jim Junior.

10  Q.  Let's go back to what happens when a client walks

11      in your tattoo shop.

12          So do you ask for identification?

13  A.  Yes.

14  Q.  And that's because you can't tattoo someone under

15      the age of 18?

16                  MR. ALEXANDER:  Objection to

17      foundation.

18  A.  You, yeah, by law you have to ask for

19      identification so...

20  Q.  And do you have your clients sign anything when

21      they come in?

22  A.  Yes.

23  Q.  What do they sign?

24  A.  Consent forms.

25                  MS. MEANS:  We'd ask for the

Page 16

1           production of those consent forms.

2                        MR. ALEXANDER:  I'll consider

3           the request if you can point me to a

4           document request in the subpoena.

5      BY MS. MEANS:

6      Q.   And do you know what's contained in those consent

7           forms?

8      A.   So the consent form will have things like are you

9           allergic to anything, do you have any type of

10          diseases, anything that's going to preclude you

11          from, you know, getting tattooed, you know,

12          medications that you're taking.  It's going to

13          talk about, you know, have you eaten.  Things

14          like that.

15              Also it's going to say are you agreeing to

16          artist's interpretation of your artwork.

17     Q.   What does that mean, "Are you agreeing to

18          artist's interpretation"?

19     A.   Basically that the, that there is an agreed upon

20          design but that the artist at the end has freedom

21          with the tattoo so that's pretty much it.

22                        MS. MEANS:  I'm going to mark

23          for identification Exhibit 1, Deposition

24          Exhibit 1.

25                              -  -  -  -

Page 17

```
 1            (Thereupon, Defendants' Exhibit 1, Tovanche
 2            000001-003, Commercial Lease Agreement, was
 3            marked for purposes of identification.)
 4                      -  -  -  -
 5   A.  Is that for me or you?
 6   Q.  This is for me.  Oh, I'm sorry.  We can put that
 7       aside for now.
 8   A.  Okay.
 9                 MS. MEANS:  Let's mark Exhibit 2
10            as well.  We'll talk about that in a minute
11            but let's do this one first.
12                      -  -  -  -
13            (Thereupon, Defendants' Exhibit 2, Hayden
14            001944, Medical History/Consent Form, was
15            marked for purposes of identification.)
16                      -  -  -  -
17   Q.  So do you recognize this?
18   A.  Something similar.  Not really this one, though,
19       no.  No.  We use a different one.
20   Q.  So it says at the top "Focused Tattoo Medical
21       History/Consent Form," right?
22   A.  Yeah.
23   Q.  So is this an example of a consent form Focused
24       has used?
25   A.  I don't recognize this one.  It could have been.
```

Page 18

```
 1        I don't, I don't even know where you got this one
 2        because I, I don't even recognize the font but
 3        it's not one that I've used in the past
 4        necessarily.  I'm not even sure where you got
 5        that from.
 6   Q.   So this isn't one you're currently using?
 7   A.   I'm not sure what they're -- I use an iPad so I
 8        basically upload mine on my iPad right now so
 9        it's, mine is an actual app on mine, so right now
10        like my clients come in and they sign it on an
11        app.
12   Q.   And is that what everybody at Focused Tattoo
13        uses?
14   A.   No.  They'll, they'll use consent forms but to be
15        honest with you, I'm not sure what they're using.
16        I don't even know where you got that from, like I
17        said.
18            The one that I've used in the past is
19        different from this one.  I mean it's very
20        similarly worded, you know, but I don't recognize
21        this like font and the, the setup of it's
22        different.
23   Q.   Is there anything in here that's not in your
24        current consent form?
25   A.   I would have to have the other consent form right
```

Page 19

1     in front of me to answer that question.  I don't

2     know, but I will say that they are similar.

3  Q. Do you notice any differences that you can

4     identify?

5                    MR. ALEXANDER:  Objection.

6        Calls for speculation.

7  A. I, I can't say without seeing the other form.  I

8     don't know.

9  Q. And to be clear, this form doesn't mention

10    copyright, right?

11                   MR. ALEXANDER:  Objection.  The

12       document speaks for itself.

13 A. I don't see it saying copyright on here, but...

14 Q. Does your current consent form mention copyright?

15 A. The, are you speaking to me about my iPad consent

16    form?

17 Q. Yeah.  Does your iPad consent form mention

18    copyright?

19 A. I'd have to go take a look at it.  I'm not sure.

20 Q. So you don't remember?

21 A. I don't remember, no.

22 Q. Do you remember ever using a consent form that

23    mentioned copyright?

24 A. I don't remember.

25 Q. Okay.  So after the client comes in and signs or

Page 54

```
 1        the client wants tattooed on their body, is there
 2        anything else that you ordinarily discuss with a
 3        client before you actually ink them?
 4                      MR. ALEXANDER:  Objection.
 5             Vague.  Form.  Calls for speculation.
 6   A.   Besides the idea of the tattoo and the consent
 7        form?  No, not, not really, no.
 8   Q.   Do you discuss how to take care of the tattoo?
 9                      MR. ALEXANDER:  Objection.
10             Vague.
11   A.   After the tattoo, yes.
12   Q.   Do you discuss anything else after you ink them?
13                      MR. ALEXANDER:  Objection.
14             Calls for speculation.  Incomplete
15             hypothetical.
16   A.   After we tattoo the customer, we give them their
17        aftercare instructions and that's pretty much it.
18        Just tell them how to take care of the tattoo and
19        that's that.
20   Q.   Have you ever told a client that he or she needed
21        your permission before appearing in a photograph
22        with a tattoo that you inked on the client?
23                      MR. ALEXANDER:  Objection.
24             Vague.  Calls for a legal conclusion.
25   A.   Have I ever?  No, I haven't.
```

Page 55

1   Q.  Have you ever told a client that he or she needed

2       to get your permission before appearing in a

3       video with a tattoo that you inked on a client?

4   A.  Have I ever --

5                   MR. ALEXANDER:  Objection.

6           Vague.

7   A.  Sorry.  Have I ever...  no.

8   Q.  And have you ever told a client that he or she

9       needed your permission before the client could

10      appear in a video game with a tattoo that you

11      inked on them?

12                  MR. ALEXANDER:  Objection.

13          Form.  Vague.  Calls for a legal

14          conclusion.

15  A.  I have not, no.

16  Q.  Have you ever told a client that he or she could

17      not let someone else reproduce their likeness

18      without your permission?

19                  MR. ALEXANDER:  Objection.

20          Calls for a legal conclusion.  Vague.

21  A.  I have not.

22  Q.  Have you ever had a client obtain a license from

23      you before displaying tattoos that you inked on

24      the client?

25                  MR. ALEXANDER:  Objection.

Page 56

```
 1              Calls for a legal conclusion.  Vague.
 2    A.  I have not.
 3    Q.  Have you ever heard anyone at Focused Tattoos
 4        tell a client that they needed permission before
 5        showing their tattoos in a video?
 6                    MR. ALEXANDER:  Objection.
 7            Calls for speculation.
 8    A.  I don't remember.
 9    Q.  Have you ever told -- heard anyone tell a client
10        that they needed the tattooist's permission
11        before appearing on Instagram?
12                    MR. ALEXANDER:  Objection.
13            Form.  Vague.
14    A.  I don't remember.  I'm not sure.
15    Q.  Do you remember anyone ever telling a client that
16        they needed permission for appearance in a video
17        game?
18                    MR. ALEXANDER:  Objection.
19            Calls for a legal conclusion.
20    A.  For appearance in a video game?  Yeah, I'm not
21        sure.
22    Q.  So why don't you tell clients that they need your
23        permission --
24                    MR. ALEXANDER:  Objection.
25    Q.  -- before appearing in any form of media?
```