UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| JAMES HAYDEN, | ) | CASE NO. 1:17CV2635 |
| | ) | |
| Plaintiff, | ) | SENIOR JUDGE |
| | ) | CHRISTOPHER A. BOYKO |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| 2K GAMES, INC. AND TAKE-TWO | ) | |
| INTERACTIVE SOFTWARE, INC., | ) | |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, SR. J.:**

This matter comes before the Court upon the Motion (ECF DKT #97*SEALED & #103* PUBLIC VERSION) of Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. to Exclude Testimony, Argument or Evidence Regarding Justin Lenzo's Potential Market Opinion. For the following reasons, the Motion is granted in part and denied in part.

### I. BACKGROUND

Plaintiff James Hayden filed his original Complaint on December 18, 2017. His Fourth Amended Complaint was filed on August 19, 2019, alleging copyright infringement by Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. Defendant Take-Two is

a worldwide developer, publisher and marketer of interactive entertainment and video games. Plaintiff alleges that he is the tattoo artist who inked the copyrighted Tattoos on NBA players Danny Green, LeBron James and Tristan Thompson, individuals depicted in Take-Two's popular basketball simulation series NBA 2K.

Dr. Justin Lenzo is a Vice President at Charles Rivers Associates ("CRA"), an international economics and finance consulting firm in Chicago, Illinois. He received a Ph.D. in Economics from Boston University in 2007. Dr. Lenzo taught business strategy courses at Northwestern University's Kellogg School, covering competitive advantage, strategic positioning and impediments to market exchange. At Boston University, he taught courses in market formation, the limits of markets, technological innovation, the development of property rights and the economics of intellectual property. Over the last twenty years, Dr. Lenzo's academic and consulting work has focused on applying economic theory and empirical methods to the study of real-world markets and industries.

Plaintiff retained Dr. Lenzo to evaluate: "(1) whether Defendants benefit commercially from the reproduction of the tattoo designs for which Mr. Hayden has registered copyrights and (2) whether there are substantial economic impediments to the formation of a market for licensing of tattoo designs." (Rebuttal Report, ECF DKT #97-3*SEALED at 5). For purposes of his evaluation, Dr. Lenzo reviewed legal filings, depositions and expert reports.

In his July 1, 2021 Report, Dr. Lenzo summarizes his opinions in two parts:

1. <u>Market position of the NBA 2K game franchise</u>

a. Defendants have successfully positioned the NBA 2K game franchise as a high-

quality franchise that attracts higher willingness-to-pay among consumers than average game franchises. Through this market position, Defendants earn above-average revenues, and likely profits, from sales of NBA 2K games than the market average.

b. A primary factor supporting NBA 2K's favorable market position is the realism of the simulation experience that Defendants have achieved and in which Defendants continue to invest.

c. Although not the only feature underlying the realism present in the franchise, the incorporation of basketball player tattoos on their respective avatars in the games contributes significantly. Ultimately, the presence of incremental costs to incorporating these tattoos indicates that Defendants expect their use to generate incremental revenues; and

d. The asserted tattoos that Mr. Hayden has inked on Mr. James likely contribute significantly more value to franchise than the average player tattoo featured in the games. There is also reason to believe that the asserted tattoos that Mr. Hayden has inked on Mr. Green and Mr. Thompson contribute more value than the average player tattoo featured in the games.

2. <u>Nascent market for licensing tattoo designs for reproduction in video games</u>

a. Tattoo artists already license their designs for reproduction in various contexts. There is no reason to believe, or evidence to suggest, that they would not be willing to license their designs for reproduction in video games.

b. Video game manufacturers already license various kinds of protected works for

reproduction in their video games. Because of the commercial benefit they receive from reproducing tattoo designs in their games, relevant video game manufacturers would be willing to purchase licenses if doing so were required to reproduce tattoo designs in video games.

c. There is no reason to believe, or evidence to suggest, that transaction costs would be high enough to impede a market for licensing tattoo designs for reproduction in video games.

d. The most likely reason for the lack of a market for licensing tattoo designs in video games is that video game producers that benefit from the reproduction of tattoo designs in their video games do not believe that they require licenses from tattoo artists for these reproductions (perhaps because they believe that tattoo artists have limited resources by which to enforce such rights). If video game producers begin to believe that such licenses are required, then a market for licensing tattoo designs in video games is very likely to form.

In their Motion to Exclude (ECF DKT #97*SEALED), Defendants contend that Dr. Lenzo's Report is inconsistent with copyright law, unreliable and likely to confuse the jury. Dr. Lenzo's potential market opinion is founded upon Plaintiff's own willingness to license his copyrighted works and is based on improperly circular reasoning.

Plaintiff responds that Dr. Lenzo's potential market opinion applies more generally to Plaintiff's damages, as well as to Defendants' "fair use" defense. Defendants' Motion overstates the significance Dr. Lenzo attached to Plaintiff's willingness to license his copyrighted works, including to video game companies. Dr. Lenzo's analysis of a potential

licensing market is relevant and is not improperly circular. His opinions are reliable and grounded in copyright law.

## II. LAW AND ANALYSIS

**Expert Testimony**

Pursuant to Federal Rule of Evidence 702, an expert by virtue of knowledge, skill, experience, training or education may provide testimony to assist the trier of fact to understand the evidence or to determine a fact in issue if the expert testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has applied the principles and methods reliably to the facts of the case.

The standard set in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) requires "that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses." *Redmond v. United States*, 194 F.Supp.3d 606, 615 (E.D. Mich. 2016) (citing *Daubert*, 509 U.S. at 591-93). "[E]xpert testimony is not admissible unless it will be helpful to the factfinder." *Redmond, id.* Expert testimony is not helpful when it is unreliable or irrelevant or "when it merely deals with a proposition that is not beyond the ken of common knowledge." *Id.* "The proponent of expert testimony must establish all the foundational elements of admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

The objective of *Daubert*'s "gatekeeping" function is to ensure the reliability and

relevancy of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The Supreme Court has held this "gatekeeping" obligation applies not only to scientific testimony, but to all expert testimony. *Id.* at 147. Courts are not required to hold a formal hearing on *Daubert* challenges. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir.1999). "[N]o matter how good" experts' "credentials" may be, they are "not permitted to speculate." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) *quoting Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

To reiterate, an expert may testify in the form of an opinion if it will assist the trier of fact and if the testimony is the product of reliable principles and methods. Federal Rule of Evidence 702; *Redmond*, 194 F.Supp.3d at 614-615.

The Court finds, upon consideration of Dr. Lenzo's Report, that his opinions are reliable, relevant and helpful to the factfinder in part.

As a noted economist and specialist in marketing and business strategy, Dr. Lenzo is qualified to speak to the market position of the NBA 2K video game franchise; to the significance of the realistic simulation experience Defendants have achieved and in which they have chosen to invest; and to the valuable contribution provided by incorporating realistic player images, including their tattoos. Dr. Lenzo may opine that realism - in particular with respect to the audio-visual aspects of the game - is a primary driver of NBA 2K's successful market positioning, and therefore, a primary driver of the franchise's revenues and profits. (ECF DKT #97-3*SEALED at ¶ 41).

However, Dr. Lenzo's opinion about the popularity of Danny Green, Tristan Thompson and particularly, LeBron James; and Dr. Lenzo's attributing significantly more

value to Plaintiff's Tattoos on these three players in the NBA 2K franchise than to that of the average player tattoo is not helpful testimony. The popularity of NBA players and the frequency with which fans of the players may select these avatars or their teams are both matters well within the common knowledge of the average juror.

One of Defendants' primary arguments in this case is that their depiction of professional NBA players Danny Green, LeBron James and Tristan Thompson in NBA 2K together with the Tattoos that Plaintiff inked on them is "fair use." In making a "fair use" determination, one of the four factors that courts consider is the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).

It is undisputed that no market for including tattoos in video games currently exists. Dr. Lenzo admits that he is not aware of examples where artists have licensed tattoo designs for use in video games. However, Dr. Lenzo has gleaned from the evidence that Defendants and other video game developers have licensed other "content," such as NBA-trademarked logos, player names and likenesses, sound recordings and synchronization of music and apparel.

Typically, jurors are consumers and not marketing professionals. Whether or not a market can potentially form for goods or services is a question for an economist. Thus, Dr. Lenzo is qualified to testify as he sets forth in his Report: "Markets occur when there exist value-creating transactions among economic actors and transaction costs are not too high such that these transactions are impeded." (ECF DKT #97-3*SEALED at ¶ 65). Also, "whether a market for licensing tattoo designs for video games is likely or unlikely to form depends on the willingness of video game makers to license the designs, the willingness of tattoo artists to

license their designs, and the degree to which high transaction costs would impede licensing transactions." (*Id*. at ¶ 68). Based upon the evidence he considered, Dr. Lenzo opines that tattoo artists would be willing to license their designs for reproduction in video games. Because of the commercial benefit they would receive from reproducing tattoo designs in their games, video game manufacturers would be willing to purchase licenses. And lastly, transaction costs would likely not be so high as to impede a market for such licensing.

Dr. Lenzo is qualified to discuss the likelihood of new markets forming. That is, he can opine as to when economic conditions are conducive, and when there are technological or institutional changes in the economic environment, often over the span of several decades.

However, Dr. Lenzo's lengthy discussion of Non-Fungible Tokens ("NFTs") is off-topic, speculative (as illustrated by his use of the word, "evidently") and irrelevant. Dr. Lenzo admits: "A technological explanation of what an NFT consists of and how it is exchanged is beyond the scope of this report." (ECF DKT #97-3*SEALED at ¶ 107).

The Court finds that Dr. Lenzo veers outside his area of expertise, moreover, when he states the following opinion:

> To the extent that the historical lack of a market for tattoo licensing in video games is driven by video game manufacturers' beliefs that licensing tattoo designs from tattoo artists is not necessary to reproduce these designs in their games, then clarification of property rights over reproductions of tattoo designs in favor of the artists would remove this impediment. Specifically, if a Court ruling finds that Plaintiff's copyrights on the asserted tattoo designs are valid and infringed by Defendants, then Defendants can no longer rationally believe that they do not require a license to reproduce Plaintiff's designs (subject to any appeal of the Court's ruling, of course). A Court ruling to this effect would remove the ambiguity over property rights in the context of this case and provide Plaintiff with the ability to exclude Defendants from reproducing the asserted designs. (ECF DKT #97-3*SEALED at ¶ 92).

This conclusion by Dr. Lenzo of an inevitable potential market is unreliable and would be dangerously misleading to the jury. Dr. Lenzo is overstepping and usurping the role of the Court as well as the factfinder. He is speculating about what is in people's minds and about what will occur if certain legal determinations are made.

Therefore, the Court excludes any testimony by Dr. Lenzo or argument regarding Dr. Lenzo's opinion that if this Court finds that Defendants' use is not "fair use," then a market is likely to develop.

### III. CONCLUSION

The Court has the critical obligation to ensure the reliability and relevancy of all expert testimony offered in this case. Therefore, the Motion (ECF DKT #97*SEALED & ECF DKT #103 *PUBLIC VERSION) of Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. to Exclude Testimony, Argument or Evidence Regarding Justin Lenzo's Potential Market Opinion is granted in part and denied in part, as outlined in this Opinion.

**IT IS SO ORDERED.**

**DATE: August 4, 2022**

 s/ Christopher A. Boyko
**CHRISTOPHER A. BOYKO**
**Senior United States District Judge**