# EXHIBIT A

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

Dale M. Cendali, P.C.
To Call Writer Directly:
+1 212 446 4846
dale.cendali@kirkland.com

601 Lexington Avenue
New York, NY 10022
United States

+1 212 446 4800

www.kirkland.com

Facsimile:
+1 212 446 4900

March 13, 2020

**Via Facsimile**

Hon. Jonathan D. Greenberg
U.S. District Court for the
Northern District of Ohio
801 West Superior Ave., Courtroom 10B
Cleveland, Ohio 44113
Fax: (216) 357-7134

Re: *Hayden v. 2K Games, et al.*, Case No. 1:17-cv-02635-CAB

Dear Judge Greenberg:

We represent Defendants Take-Two Interactive Software, Inc. and 2K Games, Inc. (collectively, "Take-Two") in the above-referenced litigation. We write in response to the March 6, 2020 letter faxed to this Court by counsel for Plaintiff John Hayden ("Plaintiff").

As discussed below, Take-Two respectfully requests that the Court deny Plaintiff's request for additional documents as it does not comply with the local rules for two, independent reasons. *First*, the requests were served such that their response was due after the close of fact discovery, which is not permissible under Local Rule 16.1. *Second*, Local Rule 37.1 required that Plaintiff raise all discovery disputes within ten days of the close of fact discovery, which he did not do. Nevertheless, Take-Two responded to the new requests, including by answering numerous new interrogatories, requests for admission, and requests for production, including producing new documents, to try and moot any disputes, but each of these local rules forecloses this Court from granting Plaintiff's request.

Take-Two also asks this Court to deny Plaintiff's requests for the additional reasons that each request is unreasonable in light of the discovery Plaintiff already has received, the burdens involved with their production, and the prior agreement that the parties reached with regard to the scope of discovery in this case. In particular, Plaintiff is now requesting discovery into matters that the parties specifically agreed would not be the subject of discovery when they appeared before the Court on November 12, 2019.

For these reasons, Take-Two requests that Plaintiff's requests be denied, fact discovery to end, and the parties ordered to proceed to expert discovery.

KIRKLAND & ELLIS LLP

Hon. Jonathan D. Greenberg
March 13, 2020
Page 2

**Plaintiff's Requests Should Be Denied As Untimely For Two, Independent Reasons**

Plaintiff's discovery disputes should be denied solely because Plaintiff failed to comply with the Northern District of Ohio Local Rules.

First, Local Rule 16.1(b)(6) states that the "'[d]iscovery cut-off' is the date by which all responses to written discovery shall be due according to the Federal Rules of Civil Procedure," and further states that, "Counsel must initiate discovery requests . . . sufficiently in advance of the discovery cutoff date so as to comply with this rule, and ***discovery requests that seek responses . . . after the discovery cut-off are not enforceable*** except by order of the Court for good cause shown." (emphasis added). Here, Plaintiff served the six sets of new discovery requests that form the basis of its dispute letter on January 31, 2020, such that Take-Two's responses were not due until March 2, 2020, 30 days after the fact discovery cutoff. *See* Fed. R. Civ. P. 33(b)(2), 34(b)(2)(A), 36(a)(3) (requiring parties to respond to interrogatories, requests for production, and requests for admission, respectively, within "30 days after being served"). As a result, Plaintiff's discovery requests raised in its dispute letter are "not enforceable." N.D. Ohio L.R. 16.1(b)(6); *see also, e.g.*, *Lieber v. Wells Fargo Bank, N.A.*, No. 1:16 Civ. 2868, 2017 WL 3923128, at *6 (N.D. Ohio Sept. 7, 2017) (denying motion to compel under Local Rule 16.1(b) where "Plaintiff did not specifically request [documents] until . . . after the discovery cutoff").

Second, Local Rule 37.1(b) states that "[n]o discovery dispute shall be brought to the attention of the Court, and no motion to compel may be filed, more than ten (10) days after the discovery cut-off date." By agreement of the parties and order of this Court, the discovery cut-off date in this case was January 31, 2020. Dkt. No. 43. Plaintiff is not permitted to raise his six new discovery disputes 35 days after that date. Accordingly, the local rule forecloses Plaintiff's attempt to raise his dispute belatedly to this Court. *See Lieber*, 2017 WL 3923128, at *6 (denying motion to compel filed "more than ten days beyond the discovery cut-off").

Moreover, it should not be overlooked that Take-Two raised both of these issues on the parties' call with the Court on February 25, 2020, but Plaintiff does not address either issue in his letter. This is a tacit admission that Plaintiff failed to comply with either rule and for these reasons alone, his requests should be denied. Nor should it be ignored that on November 12, 2019, the parties agreed that "[t]he fact discovery deadline is extended to January 31, 2020 to allow reasonable follow up with regard to currently pending discovery or based on new information that comes to light." This agreement was intended as a compromise—Plaintiff sought to extend the discovery deadline for *all* of fact discovery by several months, whereas Take-Two asserted that such an extension was unnecessary and would result only in delay, further discovery disputes, and unlimited burdensome new requests for production. The compromise was that the deadline would be extended to allow for depositions and follow-up discovery specifically arising from those depositions or currently pending requests, but otherwise

# KIRKLAND & ELLIS LLP

Hon. Jonathan D. Greenberg
March 13, 2020
Page 3

not for new requests. Plaintiff did not comply when it served six sets of new requests for discovery. These requests are not targeted follow-up discovery; they are broad, related to documents or issues that Plaintiff has been aware of for months, and in some instances even retread issues that were already painstakingly negotiated and resolved before this Court.

**Take-Two Produced Thousands of Pages of Documents Before and After Plaintiff's Belated Requests**

At the time that Plaintiff served his six new sets of discovery requests, Take-Two already had (a) collected and produced documents from 21 custodians; (b) produced thousands of pages of documents, including emails, internal marketing documents, financial records, business plans, licensing agreements, and more; and (c) made eight employees available for depositions, including two 30(b)(6) witnesses.

Despite having already produced documents and witnesses to satisfy Plaintiff's prior requests and leaving aside the untimeliness of Plaintiff's requests, in an effort to resolve the Parties' disputes, Take-Two investigated and responded to Plaintiff's discovery requests within the time period set by the Federal Rules of Civil Procedure. To the extent that Plaintiff's new requests were not unduly burdensome, Take-Two provided the requested documents and/or information. Indeed, Plaintiff only raises five of its 11 new requests for production, one of its three new interrogatories, and none of the three new requests for admission. As to the remaining disputes, Take-Two responded with the information that was available without undue burden. Take-Two further responds to the specific issues Plaintiff raised below.

**Plaintiff's Requests are Moot, Unduly Burdensome, or Not Proportional to the Needs of this Case**

As discussed above, Plaintiff's requests should be denied due to Plaintiff's failure to comply with the local rules. They also should be denied as each request is moot, unduly burdensome, or not proportional to the needs of this case.

**RFP 32: Telemetry data showing the extent to which The NBA Players are used by users while playing the Accused Games, including without limitation: a) data as to the individual NBA Players; b) data as to the teams that include the individual NBA Players; and 3) the data that supports the claims made in TAKE-TWO__00000854.**

Telemetry data showing the extent to which LeBron James, Danny Green, and Tristan Thompson (the "NBA Players") are selected by users while playing the Accused Games does not exist. Take-Two's 30(b)(6) witness, Jeff Thomas, the Vice President of Sports Development who was in charge of development of the Accused Games, was designated to testify about the frequency with which the NBA Players appear in the Accused Games and any tools, scripts, or

KIRKLAND & ELLIS LLP

Hon. Jonathan D. Greenberg
March 13, 2020
Page 4

software used to collect such information. He explained at his deposition that the data sought by Defendants is not tracked:

> Q. [Y]ou do not track the frequency with which users of the accused games play with a particular NBA player, such as LeBron James; is that right?
>
> A. Yes, *we do not track that*.

J. Thomas Dep. Tr. at 296:1-4 (emphasis added). Plaintiff argues that the testimony of another witness, Jason Argent, nevertheless shows that Take-Two tracks player-level data. Mr. Argent is a Vice President of Basketball Operations, and he testified that he "do[esn't] know the exact detail or what the data would look like as it relates to" "how often somebody chooses to play with LeBron James," and at his deposition only stated what data he thought Take-Two "probably" had. J. Argent Dep. Tr. at 216:19-25. Jeff Thomas, on the other hand, did know the exact detail and what the the telemetry data would look like, and he gave this information to Plaintiff's counsel during his 30(b)(6) deposition on this topic.

Plaintiff's new request for data on a per-*team* basis is untimely and unduly burdensome. *First*, this request is based on a document produced in August 2019, more than five months before the fact discovery cut-off. Plaintiff provides no justification for waiting until the close of fact discovery to serve new requests concerning the document. *Furthermore*, Mr. Thomas explained that the data concerning how often a video game user chooses a particular NBA *team* is not relevant to Plaintiff's request because it cannot tell you how often a particular NBA *player* is used. That is because, for example, "there's no guarantee that LeBron James is on the Lakers when people are playing those teams." J. Thomas Dep. Tr. at 295:16-295:18. Plaintiff's request that Take-Two conduct a new search about irrelevant data supporting a document that they have had for over five months should be denied.

**RFP 33: Communications with NBA Properties or NBA Players Association regarding the copyright issue identified in TAKE-TWO_00004104 or any other copyright issue.**

The communications with NBA Properties or the NBA Players Association that Plaintiff requests are not relevant to this case. The document to which Plaintiff refers, TAKE-TWO_00004104, is an email regarding an issue that the NBA raised with respect to a custom design that is placed on custom-made MyPlayer characters in *NBA 2K*; not a tattoo on a real-life NBA Player. C. Zhang Dep. Tr. at 121:9–122:2 ("Q. Is it correct that the ones that Custom Tattoo Design does do not appear on NBA players? … A. They -- the Custom Tattoo Design I -- are not on the NBA players. Q. What's the purpose of those tattoos? … A. They are part of the MyPlayer feature."). These designs do not appear on NBA players, let alone the three at issue in this case, and Take-Two has already searched for and produced documents concerning the three NBA Players at issue and their tattoos.

KIRKLAND & ELLIS LLP

Hon. Jonathan D. Greenberg
March 13, 2020
Page 5

Contrary to Plaintiff's description of the testimony of Take-Two's deponent, Corie Zhang, Ms. Zhang explained this to Plaintiff's counsel during her deposition.[1] Plaintiff argues that Ms. Zhang "could not provide much other information" other than than to say that "a tattoo that Defendants had made for the game 'looked too much like a character.'" Not so. As explained by Ms. Zhang, the "copyright issue" stated in the email references a custom design that was created by the vendor, Custom Tattoo Design, who had "created unique designs for [Take-Two] to use *but not on the NBA Players*." C. Zhang Dep. Tr. at 139:4–5 (emphasis added). Plaintiff's counsel knows this, as she asked numerous questions about it during Ms. Zhang's deposition, including: "So [Custom Tattoo Design] were the ones that were creating tattoos that actually don't exist on NBA players; is that right?" *Id.* at 139:1–3. This request does not relate to NBA basketball simulation, the NBA Players at issue, or any tattoos inked on people. As it is irrelevant, Take-Two requests that it not be required to search for and collect further emails concerning the issue.

**RFP 36: Tattoo bug reports from 2015-present (see, e.g., TAKE-TWO_00004616).**

Plaintiff's request for tattoo "bug reports" is belated and not proportional to the case. Take-Two already has searched for and produced documents concerning the NBA Players and their tattoos, which is why Plaintiff is in possession of an email concerning "tattoo bugs" in the first place. To the extent there were communications about tattoo bugs related to the tattoos of the three players at issue, they already were produced. Plaintiff appears to concede that, but now makes a much broader request, asking for tattoo bug "reports" regarding any game, tattoo, and player, for the past five years, *without limitation*. There are hundreds of NBA players in *NBA 2K*, many of which have multiple tattoos. It is undisputed that Plaintiff did not ink the overwhelming majority of those tattoos. Searching for all bug reports concerning any tattoos for the past five years would therefore be time consuming, burdensome, and not proportional to the needs of the case.

**Interrogatory No. 14: Identify the amount paid by Defendants to use music in the Accused Games each year and identify the royalty rates paid by Defendants to use such music, including the methods used to calculate royalty rates and payments.**

Plaintiff's request for an accounting of the amount of money paid to use music in the Accused Games and detailed explanation of the rates and methods used to determine those rates is both untimely and unduly burdensome. One of the focal points of the parties' November 12 meet and confer before the Court was the production and content of licenses, including music

---

[1] Ms. Zhang was questioned about the document bearing bate number TAKE-TWO_00004097–4103 (Zhang Ex. 18), which is an email string. TAKE-TWO_00004104 was produced as a separate document but is an earlier in time email that is contained within TAKE-TWO_00004097–4103.

## KIRKLAND & ELLIS LLP

Hon. Jonathan D. Greenberg
March 13, 2020
Page 6

licenses. They resolved that issue with a compromise as to which licenses would be produced and which would not. In particular, Plaintiff expressly stated that it "has agreed not to require production of music licenses related to the games." Had Plaintiff wanted the compromise to require Take-Two to nevertheless describe the content of each of those licenses, he could have raised it during the November 12 meet and confer. Thus, the scope of discovery with respect to licenses was resolved on November 12, 2019, and Take-Two promptly produced nearly 100 licenses. This burdensome task included complying with notice provisions in most of those agreements, which was usually oral and written, and required reaching out to dozens of companies, many of whom are international.

Plaintiff should be held to that agreement but is instead trying to undermine it. Plaintiff first sought 30(b)(6) testimony on all "terms of any agreements with third parties related to using preexisting content." Mr. Thomas was prepared on the nearly 100 agreements that Take-Two produced after the November 12 negotiation as well as licenses produced beforehand, but it was not reasonable to prepare on the detailed contents of unproduced licenses, as Plaintiff requested. Plaintiff then served Request for Production No. 37, which asked for "exemplary music licenses," but now concedes that request after being reminded of its express agreement not to request these licenses. Finally, Plaintiff served Interrogatory No. 14, which demands detailed information concerning the content of each and every music license. Plaintiff should be held to his agreement not to request these licenses, which should include describing the content of each music license.

Plaintiff's request is also moot. During the deposition of Take-Two's Vice President of Marketing, Alfie Brody, Plaintiff's counsel asked several questions about music licenses. Mr. Brody testified as to the amount of Take-Two's budget for the "licensing of in-game music," paid to all music labels for all of the music in the game. A. Brody Dep. Tr. at 176:12–177:1. Plaintiff's counsel chose not to ask follow-up questions concerning royalty rates and methods to calculate the same.

**RFP 38: Exemplary licenses to use the likeness of any influencer in the Accused Games, including without limitation, Defendants' agreement(s) with Chris Brickley.**

Plaintiff's request for influencer licenses is both untimely and unduly burdensome. As already explained above, the scope of discovery with respect to licenses was specifically negotiated before the Court on November 12, 2019, and Take-Two agreed to undertake a burdensome review and collection of nearly 100 additional licenses. It is publicly known that influencers appear in the *NBA 2K* video games, and Take-Two long ago produced copies of every Accused Game. Plaintiff failed to raise this demand as part of the compromise on November 12 and the time to raise this has passed.

KIRKLAND & ELLIS LLP

Hon. Jonathan D. Greenberg
March 13, 2020
Page 7

The documents that Plaintiff has requested also are irrelevant. Plaintiff claims that an agreement that allows Take-Two "to show Chris Brickley's likeness in the accused games is highly relevant to the case, including to Defendants' defense that it has authority to reproduce Mr. Hayden's copyrighted works in the game," but offers no explanation for this unfounded assertion. Take-Two produced the licenses in its possession that relate to the three NBA Players at issue, which are the agreements that provide authorization to depict those NBA Players. Plaintiff long ago agreed not to request the production of every license concerning every NBA player. Now, Plaintiff quizzically argues that although it does not need all NBA player licenses, it does need licenses concerning *non*-NBA players because they are "highly relevant to the case." This is left unexplained; Plaintiff's request should be denied.

Plaintiff's new, allegedly "related" request that Take-Two "produce non-privileged documents or communications sufficient to identify or describe the tattoos that were removed from the Chris Brickley in-game avatar" should also be denied as untimely and unduly burdensome. It comes significantly later than Plaintiff's other belated requests and is not tied to any old or new document request; it was made only via email on March 5, 2020, which Take-Two responded to that same day. Plaintiff faxed its letter to the Court the following day. Plaintiff also identifies no relevance to these documents that would justify Take-Two undertaking a new search, collection, review, and production, and Take-Two is aware of none.

**RFP 42: Documents showing or referring to the "Q-Score" of the NBA Players.**

Plaintiff's request for documents showing or referring to the "Q-Score" of the NBA Players is belated, overly broad, and not proportional to the case. To be clear, a Q-Score is not a metric that was created by Take-Two. It is a known metric that is used by marketing companies to measure awareness of, for example, an athlete. It is unclear what relevance this information has, but in any event, this is information that Plaintiff can find in a host of other ways, including through simple Internet searches. *See, e.g.*, Darren Rovell, *LeBron's Q Score Takes Huge Hit* (Sept. 14, 2010), https://www.cnbc.com/id/39170785 (public article discussing Q-Score of LeBron James). Even if this request were timely, which it is not, Plaintiff's demand should be rejected because it demands that Take-Two undertake a new collection and review of all emails and documents that refer to a Q-Score over a month past the close of fact discovery.

KIRKLAND & ELLIS LLP

Hon. Jonathan D. Greenberg
March 13, 2020
Page 8

                              Sincerely,

                              Dale M. Cendali, P.C.

cc: Counsel of record (via e-mail)