# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES HAYDEN, CASE NO: 1:17CV2635

Plaintiff,

v.

2K GAMES, INC., et al.,

Defendants.

------------------------------

Deposition of JAMES HAYDEN

Cleveland, Ohio

Wednesday, October 30, 2019 - 9:04 a.m.

Reported by:

Angela Nixon, RMR, CRR

Job No.: 26345

A. No, not too much.
Q. But you've done that sometimes, though, right?
A. Yeah.
Q. Have you produced all communications with Mr. James, Mr. Green and Mr. Thompson?
A. I think so.
Q. Have you produced all communications with any representatives of them?
A. Yes.
Q. Have you ever spoken to Mr. James or any of his representatives about this lawsuit?
A. Randy Mims.
Q. Who's Randy Mims?
A. He's -- I think he's LeBron's agent, one of -- one of his agents.
Q. And when did you speak to Mr. Mims?
A. A few months ago.
Q. Did you reach out to him, did he reach out to you?
A. I reached out to him.
Q. Why?
A. It was regards to a contract with Warner Brothers.
Q. Did you have a conversation with him about this lawsuit?

Q. Is it your position that newspapers need a license from you to publish photographs of Mr. James showing his tattoos in their papers?

MR. MCMULLEN: Objection.

A. No.

Q. Why not?

A. There's a very distinct line between avatars and human form that's photographed.

Q. So you -- what is the very distinct line between avatars and human form or whatever?

A. Humans are humans. You walk, talk, move, feel, so on and so forth, where as an Avatar is a computer-generated image. And as far as these tattoos, these tattoos are -- are added to these computer-generated images.

Q. Well, let's -- let's keep asking you some things. Let me show you -- and I take it you never told any newspaper that they couldn't run pictures of the people you inked showing their tattoos, right?

MR. MCMULLEN: Objection.

A. Are the -- are the newspapers creating avatars?

Q. Have you ever told a newspaper that they couldn't run photographs showing the players you inked with their tattoos, yes or no?

MR. MCMULLEN: Objection.

A. No.
Q. And let me show you what's been marked as Exhibit 22. I'll represent to you that this is an image of Mr. -- that Mr. James posted on his Instagram account. Do people need your permission to post photographs of themselves showing their tattoos on social media?
MR. MCMULLEN: Objection.
A. No.
Q. Why not?
MR. MCMULLEN: Objection.
A. Say it again, I'm sorry.
Q. Why not?
MR. MCMULLEN: Objection.
A. He's in human form, he's not an avatar.
Q. So it's okay if his tattoos are shown because he's not an avatar?
A. Yeah.
MR. MCMULLEN: Objection.
BY MS. CENDALI:
Q. You do understand that when we're looking at Exhibit 22, that the -- the photograph of Mr. James on his Instagram account, that's not really Mr. James, right?
MR. MCMULLEN: Objection.
A. This is not really Mr. James?
Q. Well, what I mean is, it's a photograph of

was talking about television I wasn't talking about playing a video game on a television screen. My question to you is, is it your position that it -- that when a player appears on television playing basketball in an NBA game, or at a news conference about an NBA game, that they need your permission to be depicted with your tattoos?

MR. MCMULLEN: Objection, calls for a legal conclusion.

A. In regular life form, no, but in NBA 2K form, avatar form, yes.

Q. Okay. So in regular life, if I'm just tuning in a Cavs or Lakers or Raptors game, players that you would have inked playing would not need your permission, is that --

MR. MCMULLEN: Objection.

A. I don't know.

Q. Okay. Have you ever told a player that they needed your permission before appearing on television playing basketball?

A. No.

Q. Have you ever told the NBA that they needed your permission to depict players on television playing NBA games showing their tattoos?

A. No.

Q. Have you ever done anything to try to stop that?

A. These were designs that I currently have copyrights to that I -- I did on LeBron.

Q. And did you -- so these were -- which designs did you put on the shoes?

A. There was a lion on the front of the toe of, I think the right shoe, and then a crown, just like the one on his shoulder on the other -- left front of the shoe. It said family on one side of the shoe and loyalty just like the ones that are on the side of his body.

Q. So these were -- I'm trying to understand. These were additional tattoos that you had inked on LeBron, or were these part of the ones that you're already suing about?

A. There was -- there were some additional designs on the side of the shoes just like the side of his body, yeah.

Q. So the shoes didn't have pictures of Mr. James on them, they just had these images, parts of these designs?

A. Yes. Yes.

Q. And I take it that this agreement, Exhibit 26, had nothing to do with video games, right?

A. No, there's no avatar production in these video -- or video game production of this release here.

Q. Yeah, this was about the shoes?

A. Yes.

A. No, just the tattoos that I did.
Q. So that's my question. Did you, in doing these mannequins, did you ink tattoos that other people had inked on Mr. James, or just yours?
A. These are just my tattoos that I did on LeBron.
Q. Do you know if there were any tattoos that were visible in the area on the mannequins that somebody else had done?
A. Not that I know of.
Q. And were you paid $2,600 for preparing the mannequin for China, 1,300 for London, and 2,600 for WHQ?
A. Correct.
Q. And in order to do this, did you have to -- did you do this work in Cleveland, or did you have to fly somewhere?
A. I did it at -- I think this was done at the headquarters in Oregon, in Portland.
Q. So you flew out there and you -- did you use an air brushed paint that -- for the tattoos on the mannequins?
A. I used air brush and paint brushes.
Q. And then looking at what we'll mark as Exhibit 28, this is bearing Bates Number Hayden 1751. It appears to be an e-mail exchange of October 9th, 2009 from Mr. Patton to you. Do you recognize that as an e-mail you

got from him?
A. Yes.
Q. And in it it says, (Reading:) Listen, Nike would like to request your special services again for the air brushing of tattoos on a new LeBron mannequin. Do you see that?
A. Yes.
Q. And did you understand that Nike was contracting with you to air brush these designs on the mannequins?
A. Yes.
Q. And did you, in fact, enter into another mannequin project for them after the first one?
A. Yes, I did.
Q. So let's take a look at what's been marked as Exhibit 29, Hayden 388. Is that a picture of the -- one of the mannequins of Mr. James that you airbrushed tattoos on?
A. Yes.
Q. And under his arms it says what we do in life and echos in eternity, do you see that?
A. Yes, I do.
Q. Did you ink those phrases on Mr. James?
A. Yes.
Q. They're not part of this lawsuit, though, correct?
MR. MCMULLEN: Objection.

MR. MCMULLEN: Objection.
A. I don't know.
Q. You're not aware of any income that you've lost, correct?
A. I'm not sure.
MR. MCMULLEN: Objection.
BY MS. CENDALI:
Q. You don't know of any lost income as you sit here today, isn't that true?
MR. MCMULLEN: Objection.
A. My -- I don't know.
Q. You're not aware of any, correct?
MR. MCMULLEN: Objection.
A. I don't know.
Q. Can you point me to any lost income that you have suffered as a result of the players appearing in games?
MR. MCMULLEN: Objection.
A. I don't know if I've lost revenue from the players playing in the games, the video games.
Q. Could you please tell me what your factual basis is, if any, of any claim that you have lost revenue as a result of them appearing in the games?
MR. MCMULLEN: Objection.
A. I don't know.
Q. You're not able to provide any factual basis, is

that your testimony?
A. Right now I don't know.
Q. Okay. So you don't have -- right now you can't give me any facts relating to any lost income, is that true?
MR. MCMULLEN: Objection.
A. I don't know right now.
Q. Sir, if we have to resume your deposition we will.
A. I don't know.
Q. I'm asking you very clearly a question --
A. Uh-huh.
Q. -- are you aware of any lost income as a result of them appearing in the games, yes or no?
MR. MCMULLEN: Objection.
A. Let me think about this. How would I know what revenue I've lost?
Q. Somebody would -- would say I'm not doing a deal with you.
A. Maybe they -- maybe it's unspoken, maybe it's just not --
Q. Well, either you would know it or you don't know it. Do you know --
A. No, there's --
Q. -- of any facts --

A. It's a gray area, it's a very vague question.

Q. Move to strike as nonresponsive. It's obvious that you're being evasive.

My question is what you know. Do you know, sitting here today, of any lost income, do you have any facts with regard to any lost income as a result of these players appearing in the video game, either you know something or you don't?

MR. MCMULLEN: Objection.

A. I guess not, not right now.

Q. Have you lost any licensing opportunities as a result of Take-Two's depiction of the players in the game?

MR. MCMULLEN: Objection.

A. Licensing as in what?

Q. Any licensing whatsoever.

A. Not that I know of.

Q. How much money do you think Take-Two should pay you?

MR. MCMULLEN: Objection.

A. I'm not sure.

Q. Do you have any thoughts as to how much money you think Take-Two should pay you and why?

A. I'm not sure at this point, not right now.

Q. So you have -- so you can't answer about how much you think you should be owed; is that right?

MR. MCMULLEN: Objection.
A. A reasonable amount in conjunction with the use of those copyright designs.
Q. And what, in your mind, would be a reasonable amount?
A. I don't know --
MR. MCMULLEN: Objection.
A. -- at this time.
Q. Well, you've licensed other tattoos for $500, right, do you think $500 would be a reasonable amount?
MR. MCMULLEN: Objection.
A. I don't think so.
Q. Why?
A. Those designs weren't reproduced as avatars in -- in a video game.
Q. Some of those designs were reproduced in motion pictures, weren't they?
A. I don't know. I don't know how they reproduced them, I wasn't there.
Q. So you, sitting here today, cannot say -- speak to me at all about what you are -- think would be reasonable compensation in this case, is that right?
MR. MCMULLEN: Objection.
A. That's right.
Q. And you can't give me any facts that you believe

would justify a particular damages amount, is that right?

MR. MCMULLEN: Objection.

A. Currently not yet.

Q. Now, where were the computers located that -- that had the e-mails that you produced in this case?

A. Say it again, I'm sorry, I'm breaking this cord here.

Q. You said that -- you said that e-mails were produced in this case, is that right?

A. E-mails produced in this case?

Q. E-mails from your files were collected and produced in this case, correct?

A. Yes.

Q. So what was the process to obtain those e-mails?

A. Pass code and e-mail address.

Q. And did you give those pass codes to your attorneys?

A. Yes.

Q. Where physically were the computers?

MR. MCMULLEN: Objection.

A. Physically in my -- in my hand, my iPhone.

Q. So were all these e-mails from your iPhone?

A. Correct.

Q. So you don't have a laptop or other computer?

A. I do have a laptop.

sure whether this was it?

MR. MCMULLEN: Objection.

A. This -- this wasn't -- this doesn't look like the one from ten years ago.

Q. Okay. And can you describe for me what the one from ten years ago looked like?

A. I cannot. I don't remember what it looked like. Doesn't look like this, though, looked more like a -- like a regular playing card.

Q. You can't remember -- you can't describe what it looked like, but you knew it didn't look like this, is that your testimony?

MR. MCMULLEN: Objection.

A. Yes, basically.

Q. Now, besides your communications with Randy Mims, have you ever had communications with anyone else about this lawsuit?

A. No.

Q. Before you brought this lawsuit, did you discuss suing Take-Two from anyone other than your attorneys?

A. Ask -- ask me that question again.

Q. Sure. Before you brought this lawsuit, did you discuss the possibility of suing Take-Two with anyone other than your attorneys?

A. No.