**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JAMES HAYDEN,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>2K GAMES, INC. and TAKE-TWO<br>INTERACTIVE SOFTWARE, INC.,<br><br>　　　　　　Defendants. | CASE NO. 1:17-cv-02635-CAB |

**<u>DEFENDANTS' AMENDED TRIAL BRIEF</u>**

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................ 1

II.     STATEMENT OF FACTS .............................................................................. 1

      A.     THE NBA PLAYERS ........................................................................ 1

      B.     TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES ................................ 3

      C.     TAKE-TWO'S USE OF THE TATTOOS IN *NBA 2K* ....................... 4

      D.     PLAINTIFF AND THE MARKET FOR TATTOOS .......................... 6

III.     DISCUSSION OF CONTROLLING LAW ..................................................... 7

      A.     DIRECT COPYRIGHT INFRINGEMENT ................................... 8

      B.     INDIRECT COPYRIGHT INFRINGEMENT .................................. 13

      C.     FAIR USE DEFENSE ...................................................................... 13

      D.     IMPLIED LICENSE ........................................................................ 23

      E.     *DE MINIMIS* DEFENSE ................................................................ 25

      F.     FRAUD ON THE COPYRIGHT OFFICE .................................... 26

      G.     WAIVER/ESTOPPEL ..................................................................... 27

      H.     ACTUAL DAMAGES ..................................................................... 28

      I.     DISGORGEMENT OF PROFITS .................................................. 29

      J.     ATTORNEY'S FEES AND STATUTORY DAMAGES .................. 29

IV.     LIST OF PROPOSED WITNESSES ............................................................. 30

V.     NOTICE REGARDING PROPOSED USE OF DEPOSITION TESTIMONY ....... 32

VI.     INDEX OF PROPOSED EXHIBITS ............................................................. 33

VII.     ANTICIPATED EVIDENTIARY ISSUES ................................................... 33

VIII.     ESTIMATED TRIAL LENGTH .................................................................. 35

IX.     PROPOSED INITIAL VOIR DIRE QUESTIONS ....................................... 35

**X.      PROPOSED JURY INSTRUCTIONS** ................................................................................ **37**

**XI.     SPECIAL INTERROGATORIES AND VERDICT FORM** ....................................... **37**

**XII.    PRELIMINARY STATEMENT AND STIPULATIONS** ........................................... **37**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin,*
791 F.3d 247 (2d Cir. 2015) ................................................................. 9

*Aalmuhammed v. Lee,*
202 F.3d 1227 (9th Cir. 2000) ............................................................. 9

*Asset Mktg. Sys., Inc. v. Gagnon,*
542 F.3d 748 (9th Cir. 2008) .............................................................. 23

*Authors Guild, Inc. v. HathiTrust,*
755 F.3d 87 (2d Cir. 2014) ............................................................ 20, 21

*Authors Guild v. Google, Inc.,*
804 F.3d 202 (2d Cir 2015) ................................................................ 21

*Automated Sols. Corp. v. Paragon Data Sys., Inc.,*
No. 05 Civ. 1519, 2008 WL 2404972 (N.D. Ohio June 11, 2008) ........ 27

*Automated Sols. Corp. v. Paragon Data Sys., Inc.,*
No. 05 Civ. 519, 2006 WL 5903366 (N.D. Ohio June 30, 2006) .......... 11

*Bell v. Worthington City Sch. Dist.,*
No. 18 Civ. 961, 2020 WL 2905803 (S.D. Ohio June 2, 2020) ....... 19, 21

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605 (2d Cir. 2006) .......................................................... *passim*

*Blanch v. Koons,*
467 F.3d 244 (2d Cir. 2006) ........................................................... 14, 22

*Bouchat v. Balt. Ravens Ltd. P'ship.,*
737 F.3d 932 (4th Cir. 2013) ..................................................... 15, 16, 18

*Brod v. Gen. Publ'g Grp., Inc.,*
32 F. App'x 231 (9th Cir. 2002) ........................................................... 9

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994) .......................................................................... 14

*Carson v. Dynegy, Inc.,*
344 F.3d 446 (5th Cir. 2003) ............................................................. 27

*Castle v. Kingsport Publ'g. Corp.*,
No. 19 Civ. 92, 2020 WL 7348157 (E.D. Tenn. Dec. 14, 2020) ................................14, 17, 19

*Compass Homes, Inc. v. Trinity Health Grp., Ltd.*,
No. 13 Civ. 647, 2016 WL 3406054 (S.D. Ohio June 21, 2016) ............................................30

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
724 F.2d 1044 (2d Cir. 1983) ................................................................................................18

*Cotter v. Christus Gardens, Inc.*,
238 F.3d 420 (6th Cir. 2000) ................................................................................................28

*Durham Indus., Inc. v. Tomy Corp.*,
630 F.2d 905 (2d Cir. 1980) ................................................................................................18

*EarthCam, Inc. v. OxBlue Corp.*,
49 F. Supp. 3d 1210 (N.D. Ga. 2014) ....................................................................................30

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
122 F.3d 1211 (9th Cir. 1997) ................................................................................................10

*Est. of Smith v. Cash Money Recs., Inc.*,
253 F. Supp. 3d 737 (S.D.N.Y. 2017) ....................................................................................22

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
499 U.S. 340 (1991) ................................................................................................8, 9, 11

*First Nat. Bank of Akron v. Cann*,
503 F. Supp. 419 (N.D. Ohio 1980) ....................................................................................9, 29

*Foad Consulting Grp., Inc. v. Azzalino*,
270 F. 3d 821 (9th Cir. 2001) ................................................................................................24

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
139 S. Ct. 881 (2019) ................................................................................................10

*Gomba Music, Inc. v. Avant*,
62 F. Supp. 3d 632 (E.D. Mich. 2014) ....................................................................................27

*Google, LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021) ................................................................................................17, 19, 22

*Gordon v. Nextel Commc'ns. & Mullen Advert., Inc.*,
345 F.3d 922 (6th Cir. 2003) ................................................................................................25, 26

*Gottlieb Dev. LLC v. Paramount Pictures Corp.*,
590 F. Supp. 2d 625 (S.D.N.Y. 2008) ....................................................................................26

*Great Minds v. FedEx Office & Print Servs., Inc.*,
    886 F.3d 91 (2d Cir. 2018)........................................................................23

*I.A.E., Inc. v. Shaver*,
    74 F.3d 768 (7th Cir. 1996) ...............................................................23, 24

*Jedson Eng'g., Inc. v. Spirit Const. Servs., Inc.*,
    720 F. Supp. 2d 904 (S.D. Ohio 2010) ...................................................12

*Johnson v. Jones*,
    149 F.3d 494 (6th Cir. 1998) ............................................................23, 29

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...........................................................16, 19

*Kernel Recs. Oy v. Mosley*,
    694 F.3d 1294 (11th Cir. 2012) ..............................................................10

*Kohus v. Mariol*,
    328 F.3d 848 (6th Cir. 2003) ...........................................................11, 12

*Laureyssens v. Idea Group, Inc.*,
    964 F.2d 131 (2d Cir. 1992).....................................................................12

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ....................................................... *passim*

*LimeCoral, Ltd. v. CareerBuilder, LLC*,
    889 F.3d 847 (7th Cir. 2018) ...................................................................24

*Mahavisno v. Compendia Biosci., Inc.*,
    164 F. Supp. 3d 964 (E.D. Mich. 2016).................................................23

*Marano v. Metropolitan Museum of Art*,
    472 F. Supp. 3d 76 (S.D.N.Y. 2020).......................................................15

*Mason v. Montgomery Data, Inc.*,
    967 F.2d 135 (5th Cir. 1992) .............................................................29, 30

*MGM Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)...................................................................................13

*MiTek Holdings, Inc. v. Arce Eng'g. Co., Inc.*,
    89 F.3d 1548 (11th Cir. 1996) .................................................................26

*Monster Commc'ns., Inc. v. Turner Broad. Sys., Inc.*,
    935 F. Supp. 490 (S.D.N.Y. 1996)...........................................................15

*Murphy v. Lazarev*,
 589 F. App'x 757 (6th Cir. 2014) ......................................................................23

*Nason Homes, LLC v. Billy's Const., Inc.*,
 No. 14 Civ. 566, 2014 WL 2117535 (M.D. Tenn. May 21, 2014)..........................................26

*National Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*,
 15 F.3d 559 (6th Cir. 1994) ...........................................................13

*Navarro v. Procter & Gamble Co.*,
 501 F. Supp. 3d 482 (S.D. Ohio 2020) ......................................................28

*Photographic Illustrators, Corp. v. Orgill, Inc.*,
 953 F. 3d 56 (1st Cir. 2020).................................................................24, 25

*Polar Bear Prods., Inc. v. Timex Corp.*,
 384 F.3d 700 (9th Cir. 2004) ...............................................................28

*Premier Dealer Servs., Inc. v. Allegiance Adm'r, LLC*,
 No. 18 Civ. 735, 2022 WL 1604739 (S.D. Ohio May 20,.................................28, 29

*Psychopathic Recs., Inc. v. Anderson*,
 No. 08 Civ. 13407, 2009 WL 2591385 (E.D. Mich. Aug. 24, 2009) .............................10, 12

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
 606 F.3d 262 (6th Cir. 2010) ................................................................12

*Rainey v. Wayne State Univ.*,
 26 F. Supp. 2d 963 (E.D. Mich. 1998)......................................................29

*Red Label Music Publ'g, Inc. v. Chila Prods.*,
 388 F. Supp. 3d 975 (N.D. Ill. May 30, 2019).......................................................6

*Reinicke v. Creative Empire LLC*,
 38 F. Supp. 3d 1192 (S.D. Cal. 2014)......................................................24

*Sandoval v. New Line Cinema Corp.*,
 147 F.3d 215 (2d Cir. 1998)...............................................................26

*Sarl Louis Feraud Int'l v. Viewfinder Inc.*,
 627 F. Supp. 2d 123 (S.D.N.Y. 2008)......................................................16, 22

*Seltzer v. Green Day, Inc.*,
 725 F.3d 1170 (9th Cir. 2013) ..............................................................19

*Sem-Torq, Inc. v. K Mart Corp.*,
 936 F.2d 851 (6th Cir. 1991) ................................................................9

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
   709 F.3d 1273 (9th Cir. 2013) ...................................................................15

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
   449 F. Supp. 3d 333 (S.D.N.Y. 2020)............................................. *passim*

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
   No. 16 Civ. 724, 2016 WL 4126543 (S.D.N.Y. Aug. 2, 2016) ...............30

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
   No. 16 Civ. 724, 2018 WL 1626145 (S.D.N.Y. Mar. 30, 2018) ............26

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
   464 U.S. 417 (1984)..............................................................................13, 21

*Stratton v. Portfolio Recovery Assocs., LLC*,
   770 F.3d 443 (6th Cir. 2014) ...................................................................27

*Stromback v. New Line Cinema*,
   384 F.3d 283 (6th Cir. 2004) .....................................................................9

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014)............................................................14, 17, 21

*TCF Inventory Fin., Inc. v. Northshore Outdoor, Inc.*,
   No. 11 Civ. 85, 2012 WL 2576367 (N.D. Ohio July 3, 2012)................28

*Thoroughbred Software Intern., Inc. v. Dice Corp.*,
   488 F.3d 352 (6th Cir. 2007) ...................................................................28

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n.*,
   953 F.3d 638 (9th Cir. 2020) ...................................................................20

*Wilchombe v. TeeVee Toons, Inc.*,
   555 F.3d 949 (11th Cir. 2009) .................................................................25

**Statutes**

17 U.S.C. § 101 ...............................................................................................9

17 U.S.C. § 102 ...............................................................................................9

17 U.S.C. § 102(a) .........................................................................................13

17 U.S.C. § 103(a) ...................................................................................10, 12

17 U.S.C. § 103(b) ...................................................................................10, 12

17 U.S.C. § 106.............................................................................................23

17 U.S.C. § 107 .................................................................................................13

17 U.S.C. § 201 ...................................................................................................9

17 U.S.C. § 411(b) ..........................................................................................8, 10

17 U.S.C. § 412 ............................................................................................29, 30

17 U.S.C. § 501 .................................................................................................23

17 U.S.C. § 504 ............................................................................................28, 30

17 U.S.C. § 504(c)(1) .........................................................................................30

**Rules**

Fed. R. Civ. P. 26 ..............................................................................................28

Fed. R. Civ. P. 26(a)(1) ................................................................................28, 34

Fed. R. Civ. P. 37(c)(1) ......................................................................................28

Fed. R. Civ. P. 50 ................................................................................................8

## I.       INTRODUCTION

Pursuant to the Court's February 1, 2023 order (Dkt. 202) and the Court's Civil Trial Order, Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively, "Take-Two") respectfully submit this amended trial brief.

## II.      STATEMENT OF FACTS

### A.       The NBA Players

Danny Green, LeBron James, and Tristan Thompson (collectively, the "NBA Players") are three professional National Basketball Association ("NBA") players who have been playing basketball for the NBA since 2003, 2009, and 2011, respectively.  Each of the NBA Players has multiple tattoos, many of which are not at issue in this litigation.  For each of them, their tattoos express something personal or meaningful.  Each NBA Player regularly appears in the media, including televised basketball games, showing their tattoos.  Six of the NBA Players' permanent tattoos (collectively, "Tattoos") are at issue in this case:

| Tattoo | Description | Photograph |
|---|---|---|
| "Gloria Tattoo" (Mr. James) | In 2007, at Mr. James' request, Plaintiff James Hayden ("Plaintiff") inked Mr. James' mother's name, "Gloria," alongside a crowned lion to cover up a pre-existing tattoo of a lion. |  |
| "Lion Tattoo" (Mr. James) | In 2008, at Mr. James' request, Plaintiff inked a lion on Mr. James' chest by copying a lion from a playing card from the Venetian Resort that was provided by Mr. James. Plaintiff did not disclose that the Lion Tattoo was copied from a playing card in his application to register the Lion Tattoo with the Copyright Office. |  |

1

| | | |
|---|---|---|
| "Shoulder Stars Tattoo" (Mr. James) | Following the Lion Tattoo, at Mr. James' request, Plaintiff inked five stars across Mr. James' left shoulder.  These five stars symbolize Mr. James's best friends. |  |
| "Fire Tattoo" (Mr. Green) | Around 2012, at Mr. Green's request, Plaintiff inked additional flames around a pre-existing tattoo (done by a different tattooist) of a basketball player with flames around his image.  Plaintiff did not disclose that a portion of the tattoo pictured was inked by another tattooist in his application to register the Fire Tattoo with the Copyright Office. |  |
| "Scroll Tattoo" (Mr. Green) | Later, at Mr. Green's request, Plaintiff inked clouds on Mr. Green's right inner arm, around a pre-existing scroll tattoo (done by a different tattooist) with the names of Mr. Green's brothers. Plaintiff did not disclose that a portion of the tattoo pictured was inked by another tattooist in his application to register the Scroll Tattoo with the Copyright Office. |  |
| "Brother's Keeper Tattoo" (Mr. Thompson) | Around 2012, at Mr. Thompson's request and in honor of Mr. Thompson's brother, Plaintiff inked the words "My Brother's Keeper" and an image of two fingers touching, on Mr. Thompson's chest.  The image of the two fingers touching is copied from Michelangelo's Sistine Chapel and the words are a Biblical reference.  Plaintiff did not disclose these references in his application to register the Brother's Keeper Tattoo with the Copyright Office. |  |

The Tattoos were each inked by Plaintiff with the direction, control, and approval of the NBA Players who bear them.  Each of the NBA Players paid Plaintiff for their Tattoos.  At the time that Plaintiff inked the NBA Players, he knew they were professional basketball players who would appear in media bearing their Tattoos.  Plaintiff did not enter into any written agreements

with the NBA Players, let alone any agreements related to copyright.  Plaintiff did not mention copyrights to any of the NBA Players, nor did he tell them that he would be claiming copyrights on the tattoos he had just permanently inked on their bodies.  And Plaintiff acknowledged that he did not tell the NBA Players they would need his permission to appear in video games, or *any* other media with the Tattoos.  Plaintiff has never told any of the NBA Players that they needed his permission to appear on television playing basketball either, nor has Plaintiff ever told the NBA it needs his permission to depict players on television in NBA games showing their tattoos or even attempted to stop the NBA from doing so.  Indeed, Plaintiff has never told *any* of his clients that there were any limitations on what the client could do with their tattoo.  And he never told any of his customers that they needed to get permission from them if they wanted their tattoo removed, covered up, or altered.

The NBA Players understood that they could display the Tattoos on their bodies and allow others to depict their likenesses with their Tattoos.  Plaintiff's own colleague, Bernardino Tovanche, agrees that clients do not need their tattooists' permission to display their tattoos in real life or in media.  As further confirmation, Plaintiff has tattoos and has never asked permission from a tattooist before appearing in photographs, videos, or commercials showing the tattoos on his body.  Plaintiff himself understood that customers did not need his permission to show their tattoos in at least some forms of media, including on social media.  Indeed, it is industry practice that once a tattoo has been inked on a client's skin, the tattooist exercises no control over it because the tattoo itself is part of the client's body.

### B.    Take-Two's *NBA 2K* Video Game Series

Take-Two creates *NBA 2K*, a series of basketball simulation video games.  *NBA 2K* is a realistic depiction of NBA basketball and includes a number of elements that appear in real world NBA basketball.  In *NBA 2K*, a player's typical experience will involve looking at the basketball

court in a manner similar to that of a television viewer or fan watching the game from the stands. Specifically, as plays occur, including shots, throw-ins, free-throws, substitutions, fouls, and other ordinary actions of the sport, the camera view adjusts accordingly, in a manner similar to the way a television broadcast of the sport might appear. *NBA 2K* allows users to play action-oriented bouts of simulated basketball alone against the computer or with other people. Users can choose from over 400 current and retired NBA players to form teams to play against other teams.

Other realistic visual elements include the movement and behavior of the crowd, the coaches, the referees, team members on the bench, and contextual events and situations like live and televised professional basketball. *NBA 2K* also includes auditory components such as realistic announcers and sportscasters, cheering crowds, buzzers, and other elements meant to mimic a real basketball game.

### C.    Take-Two's Use of the Tattoos in *NBA 2K*

Take-Two obtained a license to portray the NBA Players' likenesses—of which the Tattoos are a part—in *NBA 2K* from the NBA and the NBAPA, which were licensed to do so by the NBA Players. To serve its artistic purpose of simulating NBA basketball, Take-Two accurately replicates the likenesses of the NBA Players precisely, including their height, build, skin, hair, facial features, and tattoos. Plaintiff himself has admitted that the NBA Players would not "look like themselves" without their tattoos, and that, "to depict the player realistically you would have to have his tattoos on him." NBA players have been depicted in *NBA 2K* games with the tattoos they bear in real life since at least *NBA 2K2*, which was released in 2001.

The NBA Players are scanned into *NBA 2K* using a process called "photogrammetry," which involves simultaneously taking hundreds of digital photographs of a player's body from different angles to create a resulting texture map. Software then "wraps" the skin around a 3D model of that player, resulting in a realistic depiction similar to what would be captured by a digital

camera.  The process captures a players' detailed likeness, from facial features, to build, to scars, stretch marks, and moles to anything else on the photographed skin.

As the Tattoos appear only when the NBA Players are depicted, when the user does not select the NBA Players from the hundreds of available players, the Tattoos do not appear. Moreover, two of the Tattoos, the Lion Tattoo and the Brother's Keeper Tattoo, are covered by the NBA Players' jerseys in the game.  These tattoos thus do not appear in the games.  Even for the Tattoos that do appear, when they appear, given the average screen size on which *NBA 2K* is played, they appear smaller in *NBA 2K* than they do in real life and are often obstructed by clothing and armbands, out of focus, or difficult to notice among the rapid movements of the basketball game.  Thus, no matter the camera configuration or zoom, the ordinary player will perceive the Tattoos as a kind of visual noise creating realism in the environment and the character.  There are many other elements in the game, such that the Tattoos make up only a small fraction of the total playable computer program for *NBA 2K*.  Customers purchase *NBA 2K* for a number of reasons, including because they like basketball.  No customers purchased *NBA 2K* for the six specific Tattoos on the NBA Players.

Take-Two's purpose of creating realism and accuracy is distinguishable from Plaintiff's aims.  Plaintiff creates body art to display on people.  The NBA Players asked Plaintiff to ink certain images on their bodies as a form of personal expression and to represent people and things that are meaningful or significant in their lives.  By contrast, Take-Two includes the Tattoos in *NBA 2K* to achieve realism.  Although *NBA 2K* is a commercial video game, consumers do not buy *NBA 2K* for the Tattoos.  Rather, the evidence will show that consumers purchase the game for other reasons, including because they like basketball and sports.

### D.      Plaintiff and the Market for Tattoos

Despite the fact that NBA players have appeared with their tattoos in *NBA 2K* since at least 2001, no tattooist has ever demanded payment for tattoos in the game until Plaintiff.  None of the witnesses in this case, including Plaintiff's own experts, are aware of a market for tattoos in video games.  Plaintiff's expert, Dr. Lenzo, has not observed any market for tattoos having formed in the two decades *NBA 2K* has been depicting tattoos.  As a result, the Court has concluded that it "is undisputed that no market for including tattoos in video games currently exists."  *See* Dkt. 175 (Op. on Mot. to Exclude J. Lenzo) at 7.

Plaintiff admitted that he has never "licensed a tattoo for a video game" or been "approached" for a license for video games, and he is "not aware of any tattooist who has licensed tattoos for inclusion in a video game."  Indeed, prior to this lawsuit, he "never attempted to license tattoos for use in video games."  Jon Hayden, Plaintiff's brother and another professional tattooist, similarly could not remember any instance in which he told someone they needed his permission before appearing in a photograph or ever objected to an athlete being shown in media with tattoos he inked.  Other tattooists similarly have never heard of requiring permission to be depicted in media.  And Plaintiff testified that he does not know of any lost customers, revenue, income, or licensing opportunities from the depiction of the Tattoos in *NBA 2K*.  Plaintiff's personal willingness to license the Tattoos for this use is not sufficient to show there is a potential market. "[A] copyright holder can *always* assert some degree of adverse [e]ffect on its potential licensing revenues as a consequence of [the defendant's use] . . . simply because the copyright holder has not been paid a fee to permit that particular use."  *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 987 (N.D. Ill. May 30, 2019) (internal quotations and citations omitted).

Plaintiff asserts that his agreements relating to projects concerning tattoos in other media are evidence of a potential market.  This argument fails for several reasons.  As an initial matter,

to the extent Plaintiff has entered any licenses related to the depiction of people with their tattoos, these licenses were entered into *after* this litigation was brought, indicating they were entered into under the specter and threat of litigation, and do not represent normal market conditions. Moreover, some of these licenses are unsigned and it is unclear whether and under what terms they were entered into. As to the signed agreements that he has produced, three of Plaintiff's projects do not involve tattoos on people at all, most are litigation-focused *releases* related to the depiction of non-NBA Players with tattoos in commercials and on television/in movies, but not video games, and some of these were unsigned.

None of these projects involve Messrs. Green or Thompson, nor has Plaintiff produced any licenses related to tattoos on these two players despite the fact that they have appeared extensively in media with their tattoos. In the sixteen years since Plaintiff first inked Mr. James, Plaintiff has only produced three releases of rights related to the depiction of Mr. James with his tattoos in commercials and a movie, and four licenses related to the depiction of Mr. James in commercials and a movie. This is telling, as Mr. James was already a professional basketball player when Plaintiff inked him and has appeared extensively in media since he was first inked in 2007, indicating that obtaining licenses from Plaintiff is not a normal part of depicting him. All of these licenses *post-date this lawsuit*, indicating that they were entered into under the threat of this litigation. All are from almost a decade after Mr. James was first inked, years after Take-Two started showing Mr. James with his tattoos in video games. And none of these licenses even involve video games, and in fact, most expressly carve out video games as *not* the subject of the licenses.

## III.    DISCUSSION OF CONTROLLING LAW

The evidence will show that Take-Two is not liable because Plaintiff cannot prove the elements of his claim and because there is significant evidence supporting Take-Two's affirmative

defenses.  In particular, Take-Two anticipates that Plaintiff will not be able to make out an affirmative case of direct and indirect copyright infringement at trial, and that Take-Two will be able to move for judgment as a matter of law under Federal Rule of Civil Procedure 50.  On September 20, 2022, the Court issued a ruling on the parties' cross-motions for summary judgment.  *See* Dkt. 193 (Summ. J. Op.).  Take-Two submits the below discussion of the controlling law on issues that remain to be tried and briefly explains why it should prevail.[1]

### A.    Direct Copyright Infringement

In *Feist Publications, Inc. v. Rural Telephone Service Co.*, the Supreme Court held that "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  499 U.S. 340, 361 (1991); *see also* Summ. J. Op. 5 (citing *Feist*, 499 U.S. at 361).  Thus, for each act of infringement, Plaintiff must show he (1) owned a valid copyright in the Tattoo, and (2) that Take-Two copied protectable elements of the Tattoo.  *See Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004).[2]

With respect to the **<u>first element</u>**, to prove ownership of a valid copyright, Plaintiff needs to show that each Tattoo is (1) original to Plaintiff; (2) fixed in a tangible medium of expression;

---

[1]    At least one other court has determined that the depiction of NBA players, and their tattoos, in NBA 2K was permissible under the fair use defense, was authorized, and was a de minimis use.  *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 343–45 (S.D.N.Y. 2020).  Solid Oak involved highly similar facts to those at issue here, and, as explained further below, the reasoning applied in Solid Oak applies with equal force here.

[2]    The Court granted summary judgment to Plaintiff "only to the extent that he owns presumptively valid, protectable copyrights in the Tattoos."  Summ. J. Op. 9.  The Court did not address the second element, copying of protectable elements.  Moreover, although the Court found that the presumption of validity applies, it did not find that Take-Two would be unable to rebut this presumption at trial.  Thus, Take-Two understands that the question of whether Take-Two has successfully rebutted this presumption, including through evidence that Plaintiff copied pre-existing works.  Moreover, the Court has not yet decided Take-Two's fraud on the Copyright Office defense, which if proven means that Plaintiff has not met the registration requirement under 17 U.S.C. § 411(b).

(3) authored by Plaintiff; and (4) registered with the United States Copyright Office.  *See* 17 U.S.C. §§ 102, 201; *Feist*, 499 U.S. at 345; *Lexmark*, 387 F.3d at 534.  With regard to the first element of a copyright claim, the Court found that Plaintiff's copyrights in the Tattoos are presumptively valid.  Summ. J. Op. 9.

*First*, to be original and protectable, the work must have a "minimal degree of creativity." *Feist*, 499 U.S. at 348.  Plaintiff must also show that the work was "independently created," "as opposed to [being] copied from other works."  *Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d 851, 854 (6th Cir. 1991) (*citing Feist*, 499 U.S. at 345).  Although the Court found that the Tattoos met the low bar for creativity to be protectable, Summ. J. Op. 8–9, the Court did not find that the Tattoos were independently created.

*Second*, to prove fixation, Plaintiff must prove that each Tattoo was created in a tangible medium of expression and in a form that can be seen, heard, reproduced, or communicated for a period of more than transitory duration.  *See* 17 U.S.C. § 101 (definition of "fixed"); *Stromback v. New Line Cinema*, 384 F.3d 283, 301 (6th Cir. 2004).  Here, the Court found that the Tattoos were fixed "once the process of inking the players' bodies was completed."  Summ. J. Op. 7.

*Third*, to prove authorship, Plaintiff must prove that he is the inventor or mastermind of the original work, controlling the whole work's creation and causing it to come into being.  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 260 (2d Cir. 2015); *Aalmuhammed v. Lee,* 202 F.3d 1227, 1234 (9th Cir. 2000) ("[A]n 'author superintend[s]' the work by exercising control.  This will likely be . . . 'the inventive or master mind' who 'creates, or gives effect to the idea.'"); *see also Brod v. Gen. Publ'g Grp., Inc.*, 32 F. App'x 231, 235 (9th Cir. 2002) (finding that where a defendant exercised artistic control, including coming up with the idea for photograph taken by

plaintiff photographer and giving final approval, that defendant was in fact a co-author of the work).

**Fourth**, Plaintiff must prove that he registered copyrights in the Tattoos before he filed this lawsuit. *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 888–92 (2019); *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012). Even if Plaintiff can show he registered copyrights in the Tattoos before filing this lawsuit, the certificates do not satisfy the pre-suit registration requirement if the application contains inaccurate information that was included "with knowledge that it was inaccurate" and the "inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse the registration." 17 U.S.C. § 411(b).

The Court found that the "presumption of validity is rebuttable." Summ J. Op. 5–6. To rebut the presumption of validity, Take-Two need only "offer some evidence or proof to dispute or deny the plaintiff's prima facie case" and evidence that a work is "not original but copied from another's work" is sufficient. *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217-18 (9th Cir. 1997); *see* 17 U.S.C. § 103(a) ("protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully); *id.* § 103(b) (protection extends "only to the material contributed by the author of such works, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material"); *see Psychopathic Recs., Inc. v. Anderson*, No. 08 Civ. 13407, 2009 WL 2591385, at *2 (E.D. Mich. Aug. 24, 2009) ("As it does appear that the subject matter of each of [the] putative copyrights is a derivative work . . ., the Court agrees that he has no copyright protection or other rights in any of them"). A copyright may also be invalid if there is fraud on the copyright office, "[t]he knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitute

reason for holding the registration invalid and thus incapable of supporting an infringement action." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, No. 05 Civ. 519, 2006 WL 5903366, at *12 (N.D. Ohio June 30, 2006) (internal quotations omitted).

The evidence at trial will demonstrate that Plaintiff does not own valid copyrights in the Tattoos.  ***First***, the evidence will show that the presumption of validity has been rebutted because the Tattoos were copied from pre-existing works, including Michelangelo's Sistine Chapel and a playing card for the Venetian Hotel, or consisted of common *scenes-a-faire* elements in which copyright cannot subsist.[3]  ***Second***, the evidence will show that Plaintiff knowingly failed to advise the Copyright Office that the Tattoos were copied from pre-existing sources, or that he only inked a portion of the Tattoo pictured in the copyright registration, which might have occasioned a rejection from the Copyright Office.  And ***third***, the evidence will demonstrate that Plaintiff did not author the Tattoos, as he inked them at the direction and according to the instructions of the NBA Players, and it was they, not him, that exercised decision-making authority over what changes were made and what was included in the final Tattoos.  Thus, Take-Two will be able to rebut the presumption of validity and Plaintiff will be unable to prove ownership of a valid copyright in any of the Tattoos.

With respect to the **second element**, "[n]ot all 'copying' is actionable[.]" *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003).  Instead, a plaintiff must prove "copying of constituent elements of the work *that are original.*"  *Feist Publ., Inc.*, 499 U.S. at 361 (emphasis added).  This requires two steps: first, the fact-finder must determine "what aspects of the copyrighted work, if any, are protected," and second, "whether the second work involves elements that are substantially similar

---

[3]    The Court's Summary Judgment Order does not discuss whether the Tattoos were copied from pre-existing works and/or consisted of common *scenes-a-faire* elements.  Summ. J. Op. 7–9.  Take-Two understands this to be an open question.

to the protected elements of the original work." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 274–75 (6th Cir. 2010) (citing *Kohus*, 328 F.3d at 853–55; *see also Jedson Eng'g., Inc. v. Spirit Const. Servs., Inc.*, 720 F. Supp. 2d 904, 920 (S.D. Ohio 2010) (citing *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992)). "[P]rotection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully." 17 U.S.C. § 103(a); *see Psychopathic Recs.,* 2009 WL 2591385, at *2. Works copied from material in the public domain are not original—with regard to such derivative works, protection extends "only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b).  Under the doctrine of *scènes à faire,* elements that are "standard, stock, … or that necessarily follow from a common theme or setting" are not protectable. *Lexmark*, 387 F.3d at 535 (alterations omitted).  Thus, the Sixth Circuit filters these elements out of the substantial similarity analysis. *Kohus v. Mariol*, 328 F.3d at 848.

The evidence at trial will demonstrate that Take-Two did not copy protectable elements of the Tattoos.  The Tattoos are comprised of common tropes and themes, such as basic shapes (stars) and the name of LeBron James's mother.  Two of the Tattoos, the Lion Tattoo and the Brother's Keeper Tattoo, are covered by the NBA Players' jerseys.  Even zoomed-in, they cannot be seen in the game.  The evidence will also reveal that the Tattoos consist of unprotectable elements, such that any copying of them is not actionable.  And two of the Tattoos, the Lion Tattoo and the Brother's Keeper Tattoo were copied from other works and public domain material.  The evidence will show that Plaintiff contributed little material, if any, to these Tattoos, and that they should thus be filtered out of the substantial similarity analysis.  Moreover, two of the Tattoos are covered

by jerseys in *NBA 2K*.  Once these elements are filtered out and the works are compared, the evidence will show that the Tattoos are not substantially similar to *NBA 2K*.

## B.    Indirect Copyright Infringement

To show indirect copyright infringement, Plaintiff must show that Take-Two contributorily infringed by "intentionally inducing or encouraging direct infringement" and/or vicariously infringed by "profiting from direct infringement while declining to exercise a right to stop or limit it."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930–31 (2005).  The evidence at trial will show that there was no direct infringement of the Tattoos, such that Plaintiff will be unable to prove indirect infringement.

## C.    Fair Use Defense

Even if Plaintiff were to prove infringement, Take-Two would not be liable because, as the evidence at trial will show, Take-Two's limited use to accurately depict the NBA Players just as they appear in real life or on television qualifies as fair use.  Although copyright protection exists "in original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), "[t]his protection has never accorded the copyright owner complete control over all possible uses of his work."  *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 432 (1984).  To determine whether use qualifies as fair use, courts look to four factors: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.  The four enumerated factors are "not meant to exhaust the possible considerations."  Summ. J. Op. 11 (*citing National Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*, 15 F.3d 559, 560 (6th Cir. 1994)).  Moreover, the examples of fair uses listed in the preamble of 17 U.S.C. § 107 are not "an exclusive list."  *Id.*

Overall, fair use is an "open-ended and context sensitive inquiry." *Id.* (*citing Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006)).

        1.    <u>Purpose and Character of Use</u>

The first fair use factor requires consideration of two main sub-factors: (1) transformative use, and (2) commercial use. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578–79 (1994).

The Supreme Court has said that a work is transformative where, instead of "supersed[ing] the objects of the original creation," it "adds something new, with a further purpose or different character." *Id.* at 579 (internal quotation marks omitted); Summ. J. Op. 12. It can be "transformative in function or purpose [even] without altering or actually adding to the original work." *Castle v. Kingsport Publ'g. Corp.*, No. 19 Civ. 92, 2020 WL 7348157, at *5 (E.D. Tenn. Dec. 14, 2020) (quoting *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014)). Courts look to several considerations to determine whether a work is transformative. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609–11 (2d Cir. 2006). The evidence at trial will demonstrate that each of these factors weighs in favor of fair use.

<u>Different Purposes</u>. The first consideration is "whether the two works have different purposes." *Solid Oak*, 449 F. Supp. 3d at 347; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (first factor favored fair use where works were used for "[different] purposes"). At summary judgment, this Court found that "Defendants' purpose of creating realism and accuracy is distinguishable from Plaintiff's aims. . . . Plaintiff creates body art to display on people. The NBA Players ask Plaintiff to ink certain images on their bodies as a form of personal expression and to represent people and things that are meaningful and significant in their lives." Dkt. 193 (Summ. J. Op.) at 12. This is consistent with other courts that have held that using visual works to depict real world people or events is a different purpose than the work's original, expressive purpose, supporting a finding of transformativeness. For example, using

14

Grateful Dead concert posters as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events" was a different purpose from the posters' original "artistic expression and promotion[al]" value. *Bill Graham*, 448 F.3d at 609. Similarly, showing a logo "as part of the historical record" was different from the logo's original purpose "as the brand symbol for the team." *Bouchat v. Balt. Ravens Ltd. P'ship.*, 737 F.3d 932, 940 (4th Cir. 2013) (transformative to use, "not for its expressive content, but rather for its factual content" and as a "historical guidepost"); *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (using *Ed Sullivan Show* clip "as a biographical anchor" within the fictional musical *Jersey Boys* constituted transformative use). Likewise, in *Marano v. Metropolitan Museum of Art*, the court found that a photograph of *Van Halen* used to show what he "looks like in Performance" served a different purpose from its use as a historical artifact and exhibition object. 472 F. Supp. 3d 76, 84–85 (S.D.N.Y. 2020) (finding fair use). Status as a public figure weighs in favor of transformative purpose. *See Monster Commc'ns., Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (use of film footage depicting Muhammed Ali was transformative, due to his status as a "figure of legitimate public concern").

<u>Size of the Reproductions</u>. It is well-recognized that when a work is shown at a reduced size, this favors transformativeness. *Solid Oak*, 449 F. Supp. 3d at 347 (finding tattoos appearing at 4.4% to 10.96% actual size in *NBA 2K* favored fair use). The Court has already found that "the Tattoos are a small part of a larger graphic display" and "they appear much smaller than in real life." Dkt. 193 (Summ. J. Op.) at 14. Likewise, in *Bill Graham*, the concert posters reproduced in the book were just small enough to "permit readers to recognize the historical significance of the posters," but not as large as the originals. 448 F.3d at 611. As the defendant "used the minimal image size necessary to accomplish its" purpose, the use was transformative. *Id.* Similarly, in

*Kelly v. Arriba Soft Corp.*, although the defendant "made exact replications of Kelly's images," they were "smaller [and] lower-resolution" making it less likely that they would substitute for the original works.  336 F.3d 811, 818 (9th Cir. 2003).

Minimizing Expressive Value.  The third consideration is "whether the expressive value of the reproduced material is minimized," which looks not only at size, but also the context in which the work appears and whether it minimizes the expressive value.  In *Solid Oak*, the court found that "myriad other auditory and visual elements" in *NBA 2K* "minimized" their expressive value. 449 F. Supp. 3d at 348.  Similarly, in *Bill Graham*, the book included a "prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book."  448 F.3d at 611.  Moreover, the images were "displayed at angles," such that the overall layout "ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain." *Id.*  Likewise, in *Bouchat*, the logo was "used only fleetingly and insignificantly . . . limiting its expressive value."  737 F.3d at 941.  And, in *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, the court noted that the argument for "transformative use is stronger" where a "three-dimensional, life-sized" work was reduced to a smaller, 2D image imbued with the defendant's own creative expression.  627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008).

Proportion of Copied Material.  The fourth consideration is "the proportion of copied material" in relation to the whole work.  *Solid Oak*, 449 F. Supp. 3d at 347.  In *Bill Graham*, the images totaled less than "one-fifth of one percent of the book."  448 F.3d at 611.  Likewise, in *Bouchat*, in the "vast majority of its appearances," the logo was "present for fractions of a second, and [could] be perceived only by someone who [was] looking for it."  737 F.3d at 940.

Commercial Use.  The Supreme Court has recognized that "many common fair uses are indisputably commercial," and whether a "use was a commercial endeavor . . . is not dispositive," particularly where the use is transformative.  *Google, LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021).  An attenuated link between a defendant's gain and its copying minimizes the weight to be given to this factor.  *Swatch*, 756 F.3d at 83.  As this Court recognized, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  Summ. J. Op. 13.

The evidence at trial will show that Take-Two's purpose was different from Plaintiff's purpose.  As this Court has already found, "Defendants' purpose of creating realism and accuracy is distinguishable from Plaintiff's aims."  Summ. J. Op. 12.  And the evidence will show that Take-Two used only so much of the Tattoos as necessary to accomplish its purpose.  The Tattoos comprised a small fraction of the overall work and the total file size of *NBA 2K*, they are displayed proportionally smaller than their actual dimensions, and their expressive value was minimized by the other elements in the game.  The evidence will also show that consumers do not buy NBA 2K for the Tattoos such that little weight, if any, should be accorded to commercialism.  Thus, Take-Two anticipates that the evidence will show that this factor favors fair use.

### 2.    Nature of the Copyrighted Work

The second fair use factor considers requires the Court to consider the "nature of the copyrighted work," including "whether the work was (1) 'factual or creative' and (2) published or unpublished."  *Castle*, 2020 WL 7348157, at *6; Summ. J. Op. 13–14.  This factor played a significant role in *Google v. Oracle*, in which the Supreme Court recognized that certain works are further from the core of copyright than others, and that "where copyrightable material is bound up with uncopyrightable material, copyright protection is 'thin.'"  141 S. Ct. at 1198.

17

The evidence will show that the Tattoos are far from the core of what copyright is designed to protect.  Tattoos are permanently inked on the skin of human beings and are therefore bound up in uncopyrightable material.  Moreover, the human beings on whom they are inked have rights of their own, including rights to show their bodies.  This is not the same situation as where someone buys a painting or some other piece of tangible property that separately carries a copyright.  Rather, the NBA Players specifically requested that these images be permanently inked on their skin, such that the images go where they do and are shown when they show their bodies.  The deeply personal nature of the work and the fact that they are inked on human beings, with autonomy and rights, such that they become part of that person's likeness, makes factor two particularly important in this case.  The evidence will show that the depiction of people with their tattoos implicates the individual freedoms and rights of those individuals, which makes the nature of the work further from the core of copyright and uniquely favors fair use here.

Moreover, copying from pre-existing works or using common elements is unoriginal.  A work is not original if it is a "mere reproduction of a [prior] work of art in a different medium." *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir. 1980).  Further, under the doctrine of *scènes à faire,* elements that are "standard, stock, or that necessarily follow from a common theme or setting" are not protectable.  *Lexmark*, 387 F.3d at 535 (alterations omitted).  Moreover, any creativity must be weighed against the realistic depiction of real-world subject matter.  *See Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) (copying plaintiff's work "in the interest of accuracy" did not weigh against fair use); *Bouchat*, 737 F.3d at 943 (where use is related to work's role as "historical facts, then the creative nature of the work matters much less than it otherwise would" (internal quotation marks omitted)).  As a result, any

copyright protection therein would be thin, at best, which weighs this factor in favor of fair use. 141 S. Ct. at 1198.

"Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred."  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013).  This is "a critical element of its 'nature'" as copying "even a substantial quantity of a published work may be within the fair use doctrine."  *Bell v. Worthington City Sch. Dist.*, No. 18 Civ. 961, 2020 WL 2905803, at *7 (S.D. Ohio June 2, 2020).   Where a work is widely disseminated, as is the case here, it favors fair use.  *Seltzer*, 725 F.3d at 1178 (image on Internet and L.A. streets); *Kelly*, 336 F.3d at 820 (photographs posted on the Internet); *Bell*, 2020 WL 2905803, at *8 (work's "widely published nature" weighs in favor of fair use).

Further, the Court has already decided that the Tattoos "were published once the NBA Players left Plaintiff's establishment with the Tattoos affixed to their bodies," and, therefore, "publication favors Defendants' position."  Summ. J. Op. 14.  The Court also held that the Tattoos are expressive rather than factual or informational.  *Id.*  That said, the evidence at trial will show that the Tattoos were not highly expressive or creative, such that any copyright protection therein is thin.  The evidence will show that the Tattoos were copied from pre-existing works and/or consist of common unprotectable elements, such as basic shapes.  Thus, Take-Two anticipates that the evidence will show that this factor favors fair use.

3.     Amount and Substantiality of the Portion Used

"The third factor asks whether the amount and substantiality of the portion of the work used was reasonable in relation to the purpose of the copying."  *Bell*, 2020 WL 2905803, at *8. For some purposes, "copying the entirety of a work is sometimes necessary to make a fair use of the image."  *Castle*, 2020 WL 7348157, at *7.  Moreover, courts consider whether the copied

material is "embedded" in a "larger, transformative" work.  *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n.*, 953 F.3d 638, 651 (9th Cir. 2020).

It is well-established that when images are reproduced in a "reduced size," the "visual impact of their artistic expression is significantly limited," which indicates that the use "is tailored to further [the defendant's] transformative purpose."  *Bill Graham*, 448 F.3d at 613.  The Court has already found that "the Tattoos are a small part of a larger graphic display" and "they appear much smaller than in real life."  Dkt. 193 (Summ. J. Op.) at 14.  Where the copyrighted work is displayed in its entirety but at "the minimal image size and quality necessary to ensure" that it can be recognized as a "historical artifact[]," this factor does not weigh against fair use.  *Id.*

The evidence at trial will further show that the Tattoos are two-dimensional images used to depict real life accurately, so using less than the whole would defeat Take-Two's purpose of realism.  *See Solid Oak*, 449 F. Supp. 3d at 345 (finding even when the tattoos are included in *NBA 2K*, "the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of rapidly moving figures of groups of player figures").  Moreover, the evidence will show that the Tattoos are just one small part of a much larger work composed of numerous other elements.  The evidence will also show that the Tattoos are hardly discernible during gameplay, among the many fast-moving images of players, their jerseys, officials, spectators, coaches and arenas.  And two are covered by the players' jerseys, just as they would be in real life.  Thus, Take-Two anticipates that the evidence will show that this factor favors fair use.

### 4.    Effect of the Use upon the Potential Market

The fourth factor considers "[w]hether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchases may opt to acquire the copy in preference for the original."  Summ J. Op. 14 (*citing Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir.

2014).   This concern is "absent" where the copy and original do not compete.   *Bell*, 2020 WL 2905803, at *9; *see also Sony Corp.*, 464 U.S. at 450 ("[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create.").   Moreover, "any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work." *HathiTrust,* 755 F.3d at 99.   Copyright owners may not preempt exploitation of transformative markets merely by developing or licensing a transformative use themselves.   *Bill Graham Archives,* 448 F.3d at 614.

Fair use exists where the parties' works are not substitutes for each other.   *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir 2015) (fair use where use does not "serve as a substitute"); *HathiTrust*, 755 F.3d at 95 (fair use "must not excessively damage the market for the original by providing . . . a substitute"); *Solid Oak*, 449 F. Supp. 3d at 350 ("[U]se of the Tattoos in *NBA 2K* could not 'deprive the rights holder of significant revenues' because potential purchasers of the Tattoo designs are unlikely to 'opt to acquire the copy in preference to the original.'").

Courts warn that "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." *Swatch*, 756 F.3d at 91 (emphasis in original).   To "guard against this vice of circular reasoning," the factor four inquiry is limited "to a use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Id.* (internal quotation marks omitted).   "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder." *Bill Graham*, 448 F.3d at 614.

"Plaintiff bears the burden of showing that there is a potential market for the use of the Tattoos as they appear in Defendants' video games." Summ. J. Op. 15.

The fact that a market is unlikely to develop weighs in favor of fair use. *See Blanch*, 467 F.3d at 258 (admission that copyright owner had "never licensed any of her photographs for" the use made by defendant weighed in favor of fair use); *Est. of Smith v. Cash Money Recs., Inc.*, 253 F. Supp. 3d 737, 752 (S.D.N.Y. 2017) (fourth factor favored fair use where "Plaintiffs never attempted to establish a market for licensed derivative uses . . . until Defendants used the recording on the Album"); *Viewfinder*, 627 F. Supp. 2d at 136 (market harm "undermined by the fact that plaintiffs do not themselves sell or license photos of their designs to the media"); *Google*, 141 S. Ct. at 1208 (fair use where copyright would harm the public by increasing costs and creating other difficulties for the creation of new works).

This factor must also "take into account the public benefits the copying will likely produce," balancing any "dollar amounts likely lost" with the benefits from the "creative production of new expression." *Google*, 141 S. Ct. at 1206. Courts also consider whether allowing enforcement would risk limiting future creativity. *Id*. at 1208.

The evidence at trial will show that there is no market for Tattoos in video games, and that such a market is unlikely to develop. Plaintiff has never licensed Tattoos for use in video games, and Take-Two expects that none of the witnesses have ever heard of such a license. And the evidence will also show that *NBA 2K* is not a substitute for the Tattoos. So there is no cognizable market harm here. Moreover, the evidence at trial will show that allowing enforcement of copyrights in the Tattoos on the NBA Players will risk limiting future creativity, including by limiting the way Messrs. Green, James, and Thompson can be shown in various media. And the

evidence at trial will show that allowing the enforcement of copyrights in tattoos inked on people will hurt the public by limiting tattooed individuals' ability to show their bodies freely.

### D.    Implied License

As the Copyright Act prohibits only unauthorized use, 17 U.S.C. §§ 106, 501, a "copyright owner waives the right to sue . . . for uses of copyrighted material that are authorized." *Great Minds v. FedEx Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018).

Additionally, copyright law recognizes that a license "may be granted orally, or may be implied from conduct." *Murphy v. Lazarev*, 589 F. App'x 757, 765 (6th Cir. 2014) (quoting *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998)).  Thus, courts regularly dismiss copyright claims on summary judgment where the use was authorized, even impliedly.  *See*, *e.g.*, *Mahavisno v. Compendia Biosci., Inc.*, 164 F. Supp. 3d 964, 968–69 (E.D. Mich. 2016) (relying on *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)).  A license is implied when "[1] a person (the licensee) requests the creation of a work, [2] the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and [3] the licensor intends that the licensee-requestor copy and distribute his work." *I.A.E.*, 74 F.3d at 776; *Solid Oak*, 449 F. Supp. 3d at 346 (implied license created where tattooist created tattoo at player's request).  As this Court held at summary judgment, "where the objective evidence leads to the conclusion that the copyright owner intended the defendant to use the copyrighted work, the copyright owner should not later be able to sue for copyright infringement for that use." Summ. J. Op. 17 (quoting *Mahavisno*, 164 F. Supp. 3d at 968–69).

Objective intent is "manifested by the parties' conduct," "***at the time of the creation and delivery***" of the work. *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008).  When analyzing the third prong, courts consider, among other things:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts [] providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Photographic Illustrators, Corp. v. Orgill, Inc.*, 953 F. 3d 56, 61 (1st Cir. 2020).  The lack of any ongoing relationship, such as a contract requiring future involvement or permission, supports an implied license.  *See Foad Consulting Grp., Inc. v. Azzalino*, 270 F. 3d 821, 329, n.12 (9th Cir. 2001) (license where there was no evidence of intent to exercise ongoing control).  Courts will imply a license where there is no "conduct [or] written contract" that required the plaintiff's "permission" or "future . . . involvement" with the work.  *Foad Consulting Grp.,* 270 F.3d at 821; *Reinicke v. Creative Empire LLC*, 38 F. Supp. 3d 1192, 1200 (S.D. Cal. 2014) (implied license as no "conduct or written contract" required plaintiff's "permission" or "future involvement").

Where a work is delivered without any limitations imposed at the time the works were delivered, the license impliedly granted encompasses all of the rights of the plaintiff as the copyright holder.  *LimeCoral, Ltd. v. CareerBuilder, LLC*, 889 F.3d 847, 851 (7th Cir. 2018) (copyrighted work conveyed without "a limitation imposed on the license at the time [the] work[] [was] delivered" impliedly granted to defendant all of the rights of plaintiff as a copyright holder); *see also I.A.E.*, 74 F.3d at 777 (delivery of designs "without any warning that their further use would constitute copyright infringement" supported finding of license).  This was critical in the *Solid Oak* decision, where the court emphasized that the NBA players "were neither requested nor agreed to limit the display or depiction of the images tattooed onto their bodies."  449 F. Supp. 3d at 346 (tattooists did not limit use of tattoos even though they knew players were likely to appear "in public, on television, in commercials, or in other forms of media"); *see also Photographic*, 953 F.3d at 66 (lack of objection supported summary judgment on implied license defense).

Industry practice may also serve as evidence of an implied license. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (music industry practice determined implied license); *Photographic*, 953 F.3d at 65 ("nature of the business" made it "obvious" plaintiff wanted defendant to use work, *i.e.*, implied license).

The Court has already found that the evidence shows that "the NBA Players requested the Tattoos, paid for them and left to go about their lives, without requiring further permission from Plaintiff to display his work on their bodies," that "[t]he NBA Players gave the NBA and NBA Players Association the right to license their likenesses (including the Tattoos) to third parties, which those organizations in turn licensed to Defendants," and that "Danny Green, LeBron James and Tristan Thompson have appeared in NBA 2K since well before the Tattoos were registered and before this lawsuit was filed."  Summ. J. Op. 16.  Thus, the only issue at trial is whether the NBA Players' and Plaintiff's undisputed contemporaneous conduct, and evidence of industry practice, shows objective intent that the NBA Players copy and distribute the Tattoos and whether there were any limitations imposed at the time the Tattoos were created.  And the evidence at trial, including industry practice, will show such objective intent to copy and distribute the Tattoos.

### E.  *De Minimis* Defense

Copying is not infringement where it is *de minimis*, specifically where "the amount of the copyrighted work that was copied, as well as the observability of the copyrighted work in the allegedly infringing work."  *Gordon v. Nextel Commc'ns. & Mullen Advert., Inc.*, 345 F.3d 922, 924 (6th Cir. 2003); Summ. J. Op. 10.  "Observability is determined by the length of time the copyrighted work appears in the allegedly infringing work, as well as the prominence in that work as revealed by the lighting and positioning of the copyrighted work."  *Gordon*, 345 F.3d at 924; Summ. J. Op. 10 ("When dealing with visual images, courts measure observability through factors like 'focus,' 'lighting,' 'camera angles,' and 'prominence'").  Where protectable elements make

up a fractional piece of the material, courts have found that such use is *de minimis*.  *See MiTek*

*Holdings, Inc. v. Arce Eng'g. Co., Inc.*, 89 F.3d 1548, 1560 (11th Cir. 1996) (no infringement as

protectable elements "were not of such significance to the overall program to warrant an ultimate

finding of substantial similarity"); *Gordon*, 345 F.3d at 924.

      *Solid Oak* concluded that *NBA 2K*'s use of tattoos is *de minimis* as the "average game play

is unlikely to include the players with the Tattoos and that, even when such players are included,

the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of

rapidly moving figures in groups of player figures"; when tattoos "do appear during gameplay,"

they "are significantly reduced in size"; and the "quick and erratic movements up and down the

basketball court make it difficult to discern" tattoos.  449 F. Supp. 3d at 343–45.  The court in

*Solid Oak* further observed that "stopwatch-in-hand observations" often are decisive in *de minimis*

use decisions.  *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2018 WL 1626145,

at *4 (S.D.N.Y. Mar. 30, 2018) (citing *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 216

(2d Cir. 1998) (1.5 minutes is *de minimis* use), and *Gottlieb Dev. LLC v. Paramount Pictures

Corp.*, 590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008) (3.5 minutes is *de minimis* use)).

      The evidence at trial will show that *NBA 2K* makes a *de minimis* use of the Tattoos.  In

particular, the evidence will show that the Tattoos comprise a fraction of *NBA 2K*.  And it will

show that they are difficult to observe, significantly reduced in size, blurry, and (for the Lion

Tattoo and the Brother's Keeper Tattoo), covered by the NBA Players' jerseys.

## F.    Fraud on the Copyright Office

      To prove the affirmative defense of fraud on the Copyright Office, Take-Two must show

the applications for copyright registration in the Tattoos are "factually inaccurate, that the

inaccuracies were willful and deliberate, and that the Copyright Office relied on those

misrepresentations." *Nason Homes, LLC v. Billy's Const., Inc.*, No. 14 Civ. 566, 2014 WL

2117535 at *4 (M.D. Tenn. May 21, 2014); *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, No. 05 Civ. 1519, 2008 WL 2404972, at *11 (N.D. Ohio June 11, 2008); *Gomba Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 642 (E.D. Mich. 2014).

The facts in this case will show that Plaintiff knew that the Brother's Keeper and Lion Tattoos copied from pre-existing works he did not author, specifically, a logo from a playing card for the Venetian Hotel and Michelangelo's famous "Creation of Adam" on the ceiling of the Sistine Chapel.  The evidence will also show that Plaintiff intended to mislead the Copyright Office by failing to disclose this information, and that the Copyright Office relied on those representations in issuing the registration.

### G.     Waiver/Estoppel

To prove waiver, Take-Two must show Plaintiff's voluntary, intentional relinquishment of a known right.  *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443 (6th Cir. 2014).  Take-Two expects that the evidence at trial will demonstrate that Plaintiff voluntarily and intentionally relinquished his right to enforce copyrights in the Tattoos.

To prove estoppel, a defendant must show that (1) the copyright holder knew of the infringing conduct; (2) the copyright holder intended that the alleged infringer rely on his conduct or acted so that the alleged infringer had the right to believe it was so intended; (3) the alleged infringer was ignorant of the true facts; and (4) the alleged infringer detrimentally relied on the copyright holder's conduct.  *Carson v. Dynegy, Inc.*, 344 F.3d 446 (5th Cir. 2003).  Take-Two expects that the evidence at trial will demonstrate that, although Plaintiff was aware of *NBA 2K*, his actions caused Take-Two to rely on Plaintiff's inaction.

## H.     Actual Damages[4]

"Damages are awarded to compensate the copyright owner for losses from the infringement, and profits are awarded to prevent the infringer from unfairly benefitting from a wrongful act." *Premier Dealer Servs., Inc. v. Allegiance Adm'r, LLC*, No. 18 Civ. 735, 2022 WL 1604739 (S.D. Ohio May 20, 2022); 17 U.S.C. § 504.  In some cases, actual damages may be calculated as the amount the copyright infringer would have paid the copyright owner to use the copyrighted material, often called a license fee.  *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 487 (S.D. Ohio 2020).  Actual damages may also be the "loss in the fair market value of the copyright." *Cotter v. Christus Gardens, Inc.*, 238 F.3d 420 (6th Cir. 2000).  "[A] plaintiff may not recover its full lost profits plus all of the defendant's profits, for this would constitute a forbidden double recovery." *Id.*

A plaintiff seeking actual damages "must prove the existence of a causal connection between the . . . alleged infringement and some loss of anticipated revenue." *Thoroughbred Software Intern., Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007).  If the relationship between the actual losses suffered and the use of the Tattoos is unduly speculative, Plaintiff is not entitled to actual damages.  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004). Moreover, if a plaintiff does not take reasonable actions to reduce damages and might have mitigated damages had the plaintiff taken such action, actual damages may be reduced by the

---

[4]     Plaintiff is not permitted to seek actual damages, as detailed in Take-Two's motion *in limine* No. 6.  This is because under Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Plaintiff was required to provide a computation of each category of damages claimed, as well as the documents or other evidentiary materials on which that computation is based.  Failure to do so precludes the party from using that information at trial.  Fed. R. Civ. P. 37(c)(1).  *See, e.g.*, *TCF Inventory Fin., Inc. v. Northshore Outdoor, Inc.*, No. 11 Civ. 85, 2012 WL 2576367, at *4 (N.D. Ohio July 3, 2012) (granting motion *in limine* "to preclude defendants from presenting damage evidence as to 'lost profits'" where "defendants did not provide TCF with a computation of alleged lost profits in their initial Rule 26 disclosures" and did not disclose a "'computation' of their alleged lost profits").  That said, Take-Two includes the law on actual damages herein out of an abundance of caution.

amount the plaintiff could have mitigated. *First Nat. Bank of Akron v. Cann*, 503 F. Supp. 419, 441 (N.D. Ohio 1980) (finding injured party "must use reasonable care to avoid loss").

The evidence at trial will show that Plaintiff did not incur any actual damages as a result of Take-Two's use of the Tattoos in *NBA 2K*.

## I.     Disgorgement of Profits

To recover Take-Two's profits, Plaintiff must present proof of Take-Two's "gross revenue." Damages must be based on "credible evidence, not speculation." *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 963, 971 (E.D. Mich. 1998). The Plaintiff also must show that the gross revenues "reasonable relationship" between the profits and the alleged infringement. Then Take-Two must show "deductible expenses" and "elements of revenue attributable to factors other than the copyrighted work." *Premier Dealer Servs.*, 2022 WL 1604739 at *2.

The evidence will show that customers purchased *NBA 2K* for many reasons, but no one bought the game for the Tattoos, and therefore none of the revenues are attributable to the alleged infringement. To the extent any profits from sales of *NBA 2K* can be attributed to the Tattoos, they are only a tiny fraction of profits, given that the Tattoos make up a miniscule fraction of total gameplay.

## J.     Attorney's Fees and Statutory Damages

Attorney's fees are available for a copyright holder who registered his work before any infringement commences. 17 U.S.C. § 412. Section 412 "leaves no room for discretion" and precludes this remedy so long as "***the first act in a series of acts*** constituting continuing infringement" occurred prior to registration. *Johnson*, 149 F.3d at 505–06 (emphasis added); *see also Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir. 1992) (Congress' intended remedies be denied "for all of that defendant's infringements . . . if one of those infringements

commenced prior to registration").[5]  That is because "when the same defendant infringes on the same protected work in the same manner as it did prior to the work's registration, the post-registration infringement constitutes the continuation of a series of ongoing infringements."  *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2016 WL 4126543, at *3 (S.D.N.Y. Aug. 2, 2016); *see also Compass Homes, Inc. v. Trinity Health Grp., Ltd.*, No. 13 Civ. 647, 2016 WL 3406054, at *9–11 (S.D. Ohio June 21, 2016)  (construction plans "alter[ed]," "converted . . . into computer-generated plans and further refined" from pre-registration plans were "continuing infringement");  *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1240 (N.D. Ga. 2014) (infringement of construction specification and new versions of it was continuing infringement), *aff'd*, 703 F. App'x 803 (11th Cir. 2017).

The evidence will show that the alleged infringement began before the Tattoos were registered, and thus attorneys' fees are unavailable.  Moreover, the Court found that Plaintiff elected to attempt to recover actual damages in lieu of statutory damages, Summ. J. Op. at 19, and thus, he may not seek statutory damages in this action.

## IV.    LIST OF PROPOSED WITNESSES

Pursuant to section 1 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc. provide the following list of proposed witnesses and a brief description of the subject matter of the testimony of each witness:

---

[5]    This is consistent with the fact that a plaintiff may collect only "***an*** award of statutory damages for ***all infringements*** involved in the action, ***with respect to any one work***, for which any one infringer is liable."  17 U.S.C. § 504(c)(1) (emphasis added).  As Section 504 includes all alleged infringements of a work, it "would be inconsistent to . . . read section 412 to treat each infringement separately."  *Mason*, 967 F.2d at 144.

1.      **Alfredo Brody** (appearing live): aspects of Take-Two Interactive Software, Inc.'s business, including its finances; Take-Two Interactive Software, Inc.'s *NBA 2K* game, including marketing channels, visual elements, and decisions.

2.      **Anton Dawson** (may appear live): aspects of Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game, including development, technical, and graphical aspects thereof.

3.      **Michael Stauffer** (may appear live): aspects of Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game, including its customers.

4.      **Nina Jablonski** (may appear live): expert testimony regarding aspects of tattoos, including their role as a form of self-expression and role in an individual's likeness.

5.      **Ian Bogost, Ph.D.** (appearing live): expert testimony regarding aspects of video games, including technical aspects and functions of Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game and video games with respect to other audiovisual works.

6.      **Deborah Jay** (appearing live): expert testimony regarding surveys performed to determine reasons why customers purchase Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game.

7.      **James Malackowski** (appearing live): expert testimony regarding the form and amount of appropriate compensation, if any, related to Plaintiff's allegations of copyright infringement.

8.      **LeBron James** (appearing by deposition designation): the personal meaning of Mr. James's Tattoos; the events surrounding the inking of Mr. James's Tattoos; Mr. James's expectations getting his Tattoos; Take-Two's authority to use Mr. James's likeness in *NBA 2K*.

31

9.    **Danny Green** (appearing by deposition designation): the personal meaning of Mr. Green's Tattoos; the events surrounding the inking of Mr. Green's Tattoos; Mr. Green's expectations getting his Tattoos; Take-Two's authority to use Mr. Green's likeness in *NBA 2K*.

10.    **Tristan Thompson** (appearing by deposition designation): the personal meaning of Mr. Thompson's Tattoos; the events surrounding the inking of Mr. Thompson's Tattoos; Mr. Thompson's expectations getting his Tattoos; Take-Two's authority to use Mr. Thompson's likeness in *NBA 2K*.

11.    **James Hayden** (appearing live or by deposition designation): the events surrounding the inking of the NBA Players' Tattoos, including his conduct and communications with those players; the purpose of the Tattoos; his experience at Focused Tattoos and its practices.

12.    **Bernardino Tovanche** (appearing live or by deposition designation): the events surrounding the inking of the NBA Players' Tattoos; his experience at Focused Tattoos and its practices.

13.    **Jon Hayden** (appearing live or by deposition designation): the events surrounding the inking of the NBA Players' Tattoos; his experience at Focused Tattoos and its practices.

## V.    NOTICE REGARDING PROPOSED USE OF DEPOSITION TESTIMONY

Pursuant to section 6 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc. provide notice that they intend to use the following depositions as trial evidence, and have attached as **Exhibit A** deposition designations for these witnesses:

1.    **James Hayden** - Take-Two intends to use James Hayden's personal deposition as evidence at trial to the extent that Plaintiff does not testify in person.

2.    **Jon Hayden** - Take-Two intends to use Jon Hayden's personal deposition as evidence at trial to the extent that Plaintiff does not call him to testify in person.

3.      **Bernardino Tovanche** - Take-Two intends to use Bernardino Tovanche's personal deposition as evidence at trial to the extent that Plaintiff does not call him to testify in person.

4.      **LeBron James** - Take-Two intends to use LeBron James's personal deposition as evidence at trial to the extent he does not testify in person.

5.      **Danny Green** - Take-Two intends to use Danny Green's personal deposition as evidence at trial, to the extent he does not testify in person.

6.      **Tristan Thompson** - Take-Two intends to use Tristan Thompson's personal deposition as evidence at trial, to the extent he does not testify in person.

## VI.    INDEX OF PROPOSED EXHIBITS

Pursuant to section 1 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc.'s index of proposed exhibits and a brief description of each exhibit is attached hereto as **Exhibit B**.

## VII.   ANTICIPATED EVIDENTIARY ISSUES

Pursuant to section 1 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc. provide the following discussion of evidentiary issues that they believe are likely to arise at trial:

1.      As set forth in its motion *in limine* no. 1, Take-Two anticipates that Plaintiff may argue that Take-Two withheld telemetry data that would show the frequency with which certain players are selected.  This should be precluded, as the Court already held telemetry data is not stored showing the frequency of the selection of certain players, and Plaintiff's motion to compel production was denied.

2.      As set forth in its motion *in limine* no. 2, Take-Two anticipates that Plaintiff may argue that certain of Plaintiff's projects and agreements with third parties involving different products and uses that are irrelevant, including because none of these projects and agreements

involve video games.  This evidence should be precluded because it is irrelevant and poses an undue risk for unfair prejudice.

3.  As set forth in its motion *in limine* no. 3, Take-Two anticipates Plaintiff may introduce evidence concerning Take-Two's licensing of different works for wholly different purposes that those at issue in this litigation, including trademarks, which are subject to different usage laws than copyrights.  This should be excluded because such evidence is irrelevant and poses an undue risk of unfair prejudice.

4.  As set forth in its motion *in limine* no. 4, Take-Two anticipates Plaintiff may introduce evidence concerning speculation about the possibility that other video game companies, including EA, have licenses or agreements that are not at issue in this Litigation.  Such agreements, if they exist, have not been produced in this case and there is no evidence regarding their terms or scope.  This should be excluded because such evidence is irrelevant and poses an undue risk for unfair prejudice.

5.  As set forth in its motion *in limine* no. 5, Take-Two anticipates Plaintiff may introduce undisclosed testimony concerning common practices in the tattoo industry and Take-Two's relationship to the tattoo and art industry.  This should be excluded, as Mr. Hayden is not qualified to offer expert opinions about what is common between tattooists and their patrons, and his testimony has not been disclosed.  Further, Mr. Hayden's statements about Take-Two's relationship with the tattoo and art industry should be excluded as prejudicial and irrelevant.

6.  As set forth in its motion *in limine* no. 6, Take-Two anticipates that Plaintiff may present evidence of actual damages.  This should be precluded as Plaintiff never disclosed a computation of actual damages as he was required to do by Federal Rule of Civil Procedure 26(a)(1)(A)(iii).

7.     As set forth in its motion *in limine* no. 7, Take-Two anticipates that Plaintiff may present evidence of undisclosed communications with the NBA Players.  This should be precluded, as Plaintiff did not produce any discovery concerning the alleged communications and represented that there had been no such communications.

8.     As set forth in its motion *in limine* no. 8, Take-Two anticipates that Plaintiff may present evidence of Take-Two's sales of virtual currency.  This should be precluded, as there is no causal link between Take-Two's sales of virtual currency and the alleged infringement.

## VIII.   ESTIMATED TRIAL LENGTH

Pursuant to the parties' Joint Statement Regarding Trial Length (Dkt. 78), Take-Two believes the trial can be completed in 5 to 7 trial days.

## IX.    PROPOSED INITIAL VOIR DIRE QUESTIONS

Pursuant to section 2 of the Court's Civil Trial Order, Defendants Take-Two Interactive Software, Inc. and 2K Games, Inc. ("Take-Two") submit the following proposed questions to be posed by the Court during voir dire to the entire jury panel.  Take-Two reserves the right to pose additional questions, to the extent permitted by the Court:

1.   Have you ever been a plaintiff or a defendant to a lawsuit?  If so, which were you and what was the nature of the lawsuit?  How was the matter resolved and were you satisfied with the outcome?

2.   Have you ever had any training, education, or experience in intellectual property (i.e., patents, trademarks, copyrights)?

3.   Do you own any copyright/patent/trademark registrations?

    (i)  If so, what do you have registered?

    (ii) Have you ever enforced your copyright/patent/trademark registration against anyone else?

4. Has anyone ever accused you of copyright/patent/trademark infringement?

5. Are you an artist or is someone close to you an artist?

6. Are you a tattooist or is someone close to you a tattooist?

7. Do you have any tattoos, or have you ever had any tattoos?

8. Have you ever played any sports video games?

9. Have you played any of the games in the *NBA 2K* series of video games?

10. Have any of you ever heard of or know the Plaintiff, James Hayden?

11. Have any of you heard of either of the Defendants, Take-Two Interactive Software, Inc. or 2K Games, Inc.?

12. Are you a fan of any of the following NBA basketball players: Danny Green, LeBron James, Tristan Thompson?

13. Have you ever owned your own business or otherwise been self-employed?

14. Has someone ever copied or taken credit for important work that you or someone close to you did?

15. Have any of you ever felt betrayed, mistreated or cheated in a business relationship or business deal?

16. Have you ever felt wrongly accused of something?

17. Have you ever been accused of copyright infringement?

18. Have you ever accused someone of copyright infringement?

19. Do you regularly post photos of yourself on social media?

20. Do you have friends who do?

21. Do you have any financial hardship that would prevent you from serving as a juror in this case?

22. Do you require medical treatment, condition, or medication that may interfere with your ability to serve on this jury?

23. Does anyone here feel like COVID has been especially burdensome or difficult for you, such that it would interfere with your ability to serve on this jury?

24. Does anyone here have any caretaker duties for an elderly, sick, or disabled person that might put you in a situation where you could be called away from trial?

## X.  PROPOSED JURY INSTRUCTIONS

Pursuant to sections 1 and 3 of the Court's Civil Trial Order, the parties conferred regarding proposed jury instructions and were able to agree upon some, but not all, proposed jury instructions.  Attached hereto as **Exhibit C** is a set of jury instructions that identify (1) the instructions that have been agreed upon by all the parties; (2) for disputed instructions, Take-Two's proposed instructions and authority therefor.

## XI.  SPECIAL INTERROGATORIES AND VERDICT FORM

Pursuant to sections 1 and 3 of the Court's Civil Trial Order, the parties conferred regarding their proposed special interrogatories and verdict forms but were unable to reach an agreement. As such, Take-Two's proposed special interrogatories and verdict form are attached hereto as **Exhibit D**.

## XII.  PRELIMINARY STATEMENT AND STIPULATIONS

Pursuant to section 4 of the Court's Civil Trial Order, an impartial, concise joint statement of the case, along with stipulations of fact, were filed with the Court.  *See* Dkts. 167–68.

Dated: New York, NY
      April 20, 2023

          */s/ Dale M. Cendali*
          Dale M. Cendali (admitted *pro hac vice*)
          Joshua L. Simmons (admitted *pro hac vice*)
          Chris Ilardi (admitted *pro hac vice*)

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Yungmoon Chang (admitted *pro hac vice*)
Kirkland & Ellis LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4359
yungmoon.chang@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and
Take-Two Interactive Software, Inc.*