**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| JAMES HAYDEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| 2K GAMES, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

CASE NO. 1:17-cv-02635-CAB

JUDGE CHRISTOPHER A. BOYKO

**PUBLIC VERSION—REDACTED**

## <u>OPPOSITION TO DEFENDANTS' OMNIBUS MOTION *IN LIMINE*</u>

# TABLE OF CONTENTS

I.      MIL No. 1: Telemetry Data ................................................................................. 1

II.     MIL No. 2: Mr. Hayden's Agreements Related to Reproducing his Art .............................. 3

III.    MIL No. 3: Take-Two's Licensing Practices........................................................... 8

IV.     MIL No. 4: Video Game Licensing Practices in Industry ..................................... 11

V.      MIL No. 5: Mr. Hayden's Knowledge About the Tattoo Industry ...................................... 13

VI.     MIL No. 6: Mr. Hayden's Actual Damages ......................................................... 14

VII.    MIL No. 7: Mr. Hayden's Communications with the NBA Players .................................. 15

VIII.   MIL No. 8: Take-Two's Recurrent Customer Spending, Including In-Game Spending and

        Virtual Currency ................................................................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008)...................................................5, 6

*Balsley v. LFP, Inc.*, 691 F.3d 747 (6th Cir. 2012).................................................................19, 20

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........................9

*Brown v. Weber*, No. 11 Civ. 1390, 2014 WL 11531797 (W.D. Tenn. July 11, 2014) ..............................................................................................................................................6

*Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994 (8th Cir.1986)............................................13

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985) ....................11

*Great Northern Ins. Co. v. BMW of N. Am. LLC*, No. 2:11-CV-1153, 2015 WL 3936229 (S.D. Ohio June 26, 2015) .......................................................................................12

*Hardesty v. Kroger Co.*, No. 16 Civ. 298, 2022 WE 742847 (S.D. Ohio Mar. 11, 2022) ......................................................................................................................................17

*Honeysett v. Williams*, No. 3:02 CV 7247, 2003 WL 25676462 (N.D. Ohio June 24, 2003) ......................................................................................................................................17

*In re Nat'l Prescription Opiate Litig.*, No. 18-OP-45032, 2022 WL 668434 (N.D. Ohio Mar. 7, 2022)..............................................................................................................13

*Manuel v. City of Chi.*, 335 F.3d 592 (7th Cir. 2003).................................................................6

*North Atlantic Operating Co., Inc. v. Hammad Enterprises, Inc.*, No. 19-60200-CIV-ALTMAN, 2020 WL 1286180 (S.D. Fla. Jan. 15, 2020)................................................15

*Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 13481 (6th Cir. 1996)...............................................................................................................................4

*Satija v. Permanent Gen. Assurance Corp. of Ohio*, No. 13 Civ. 82, 2014 WL 1664557 (N.D. Ohio Apr. 25, 2014)..........................................................................................19

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014).........................10

*United States v. Kerley*, 784 F.3d 327 (6th Cir. 2015) .................................................................13

**Statutes**

17 U.S.C. § 504(b) ................................................................................................................18, 19

Plaintiff, James Hayden, respectfully submits this Opposition to Defendants' (also collectively, "Take-Two's") Omnibus Motion *In Limine* ("MIL") (Dkt. # 211).

## I.      MIL No. 1: Telemetry Data

Take-Two's motion to exclude "any evidence, testimony, or argument that Take-Two withheld 'telemetry data' showing how often a video game player uses one of the NBA Players" should be denied. Take-Two claims that "the Court already held that this player-based telemetry data does not exist" (MIL, Dkt. #211, p. 1), but this Court made no such ruling. (*See*, *generally*, Order, Dkt. #50; *see also* Dkt. #187-1, Defendants' March 13, 2020 Letter.) Indeed, Take-Two conceded that telemetry data *does*, in fact, exist on a team-by-team basis. (Dkt. #187-1, March 13, 2020 Letter.) This dispute arose during discovery after Take-Two produced marketing materials highlighting the remarkable frequency with which NBA 2K users play with the LeBron James avatar every day. (*See, e.g.*, Ex. A-31 to Plaintiff's Opposition to Defendants' Motion for Summary Judgment, Dkt. #109-32, *e.g.*, "70,546 PEOPLE TRY TO OVERTHROW THE KING EVERY DAY.") Take-Two's 30(b)(6) witness, Jason Argent, testified that this information was based on ████████████████████████████████████████████████████████ ███████████████████████████████████████████ (Dkt. #187-2, Argent Dep., 209:19– 217:10.)[1] Mr. Hayden requested this data, either on a player-basis *or a team-basis* (for the teams on which the relevant NBA players play). (*See* Ex. A, Plaintiff's March 6, 2020 Letter, pp. 1–2.) Although Take-Two denied that the data exists on a player-basis, *it admitted* that it exists on a team basis, but refused to produce it, claiming it is too burdensome and not relevant. (Dkt. #187-1, pg. 4.) According to the Order, "this information is contained in a database, and *Defendants argue they are not required under the Federal Rules of Civil Procedure to create data*." (Dkt. #50,

---

[1] Take-Two's plea to the Court to ignore Mr. Argent's testimony because it prefers that of another of its witnesses (*see* MIL, Dkt. 211, p.1., n.2) should not be countenanced.

pp. 2–3, emphasis added.) Although the Court denied Mr. Hayden's Motion to Compel on that basis, Take-Two's "law of the case" argument originally claimed (falsely) that this "Court already held that this telemetry data does not exist." (*See* Dkt. #171, p.1.) This time Defendants have artfully inserted "player-based" to qualify (but not correct) their prior misrepresentation. (MIL, Dkt. #211, p.1.) Take-Two's assertion of what the Court "held" is simply wrong and deserves no weight. Take-Two *admitted* telemetry information exists but refused to produce it. Take-Two's representation that this Court *held* that no player-based telemetry data exists is both untrue and beside the point.

Mr. Hayden intends to rely on Take-Two's marketing materials to demonstrate how frequently the 2K games are played and, in particular, how often the LeBron James avatar appears during gameplay. These issues are relevant to at least Take-Two's argument that their copying is *de minimis* and Mr. Hayden's profit-based damages. Moreover, Mr. Hayden intends to submit Take-Two's testimony that these marketing materials are based on its internal data. Given that Take-Two (1) testified that these marketing materials are, indeed, based on Take-Two's data, and (2) refused to produce that data, Take-Two should be precluded from attacking the evidentiary weight or accuracy of these marketing materials. And if Take-Two is allowed and does challenge these marketing materials, Mr. Hayden should be allowed to present evidence demonstrating that Take-Two refused to produce the very data substantiating these numbers. Accordingly, Take-Two's MIL should be denied, as (i) the law-of-the-case doctrine simply does not apply, and (ii) the fact that Take-Two declined to produce this data will be highly relevant if Take-Two attacks the accuracy or evidentiary weight of these marketing materials.

## II.      MIL No. 2: Mr. Hayden's Agreements Related to Reproducing his Art

Take-Two's motion to exclude evidence about Mr. Hayden's "agreements and projects" is a "Hail Mary" attempt to eliminate highly consequential evidence that refutes Take-Two's fair use and implied license defenses. Mr. Hayden's agreements show that many companies have sought and paid for his permission to display or recreate his artwork—they are thus highly relevant and pose no threat to confuse the jury. Take-Two's arguments about relevance ignore Sixth Circuit law, and its contentions about jury confusion are overblown, speculative, and more properly subject matter for cross-examination.

Mr. Hayden has created and inked tattoos on numerous celebrities throughout his career. Third parties regularly ask for his permission to display or reproduce (or have Mr. Hayden reproduce) those tattoos in a variety of contexts, including in movies, music videos, and commercials, and on mannequins, stunt doubles, and shoes. In most circumstances, these third parties compensate Mr. Hayden in exchange for his permission. These transactions demonstrate an *existing* market in which third-parties compensate (or at least seek permission from) Mr. Hayden in exchange for displaying or reproducing his tattoo artwork. And several of these transactions involve *LeBron James's own management team* procuring Mr. Hayden's permission to display or recreate the tattoos Mr. Hayden created and inked on Mr. James (including some of the Asserted Works in this case). (*See* Hayden Opp. to Mot. for Summ. J., p. 21.) Accordingly, these agreements are highly relevant to Take-Two's fair use and implied license defenses.

As this Court noted, in making a "fair use" determination, one of the four factors that courts consider is the "effect of the use upon the potential market for or value of the copyrighted work." (Summ. J. Op., Dkt. #193, p. 11.) Take-Two declares that these agreements are not relevant to that analysis, simply ignoring the text of the statute ("*potential* market") and applying

an overly strict interpretation of "market substitution," relying solely on out-of-circuit cases and ignoring directly on-point Sixth Circuit case law. (MIL, pp. 3–4.) According to the Sixth Circuit, where "the copyright holder clearly does have an interest in exploiting a licensing market—and especially where the copyright holder has actually succeeded in doing so—'it is appropriate that potential licensing revenues for []copying be considered in a fair use analysis.'" *Princeton University Press v. Michigan Document Services, Inc.*, 99 F.3d 13481, 1387 (6th Cir. 1996). Notably, the Sixth Circuit, in *Princeton University Press*, emphasized flexibility when assessing market substitution in the licensing context, observing that in the Supreme Court's *Harper & Row* decision, "there is no indication in the opinion that the challenged use caused any diminution in sales of President Ford's memoirs, [but] the Court found harm to the market for the licensing of excerpts." *Id.* at 1387–1389. Thus, evidence of Mr. Hayden's success in obtaining fees in exchange for his permission to reproduce or display his tattoo artwork is highly relevant under Sixth Circuit law in assessing the fourth fair-use factor.

Notably, Take-Two made this same relevance argument in attempting to exclude Mr. Hayden's economic expert, Dr. Justin Lenzo. (*See* Take-Two *Daubert* Reply Br., Dkt. #137, fn. 3 ("A plaintiff cannot simply point to alleged licenses for ***other uses*** to show that an actual or potential market exists.") This Court, however, denied Take-Two's Motion with respect to Dr. Lenzo's opinion that relied on Mr. Hayden's agreements. (Lenzo *Daubert* Op., Dkt. #175, pp. 7–8.) This Court determined that Mr. Hayden's economic expert is permitted to testify about "the likelihood of new markets forming," and as a part of his analysis, "that tattoo artists would be willing to license their designs for reproduction in video games." (Lenzo *Daubert* Op., Dkt. #175, pp. 7–8.) In his report, Dr. Lenzo based this conclusion in part on Mr. Hayden's licensing history, including his agreements to license reproductions of the tattoos he inked on Machine

Gun Kelly, Teyana Taylor, Marcus Johnson, and LeBron James. Accordingly, this Court has already implicitly determined that those agreements are relevant and permitted Dr. Lenzo's testimony on their subject matter.

Moreover, the agreements related to the tattoos on LeBron James are extremely relevant to Take-Two's implied license defense. As previously noted in opposition to Take-Two's summary judgment motion, Take-Two's claim that the "Players understood that they could . . . allow others to depict their likenesses with their Tattoos" (Take-Two's Summ. J. Br., Dkt. #951, p. 6), is pointedly contradicted by Mr. James procuring Mr. Hayden's permission to display the tattoos in commercials and movies after he received his tattoos. (Hayden Summ. J. Opp. Br., Dkt. #109, p. 21.) Take-Two argues that these agreements are not relevant to Take-Two's implied license defense because "Mr. James is not a party," but that is a non-sequitur. The agreements are about the tattoos inked on Mr. James, and Mr. James's management team facilitated the agreements on several occasions. (*Id.*)

Take-Two's assertion that "the only projects and agreements involving the depiction of any of the Tattoos on any of the NBA Players ***post-date*** this lawsuit" (MIL, p.4) simply ignores the separate arrangements Nike made with Mr. Hayden in 2009—well ***before*** this lawsuit—to reproduce his tattoos on both shoes and on in-store mannequins in multiple locations and a licensing arrangement with Samsung related to LeBron James's tattoos executed in 2015. (Ex. B, HAYDEN_000342; Hayden Decl., ¶¶ 16, 20, Dkt. #109-49.)

Finally, Take-Two argues that the agreements are not relevant because they were not entered at the time the tattoos were created, citing the 9th Circuit case *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008). But *Asset Marketing* is about determining the *copyright holder's intent* by examining his conduct at the time the work was created and

delivered. *Id.* Mr. Hayden is citing the agreements related to Mr. James's tattoos to rebut Take-Two's claim that the *players* understood they could allow others to depict their Tattoos, making the reasoning of *Asset Marketing* clearly inapplicable.

Take-Two's remaining ground for excluding these agreements is that, even if they are relevant, they will purportedly confuse the jury. This is unsupported and purely speculative. Take-Two vaguely claims that if Mr. Hayden is allowed to testify about these agreements the trial may "devolve[e] into 'mini-trials,'" citing a Seventh Circuit case, *Manuel v. City of Chi.*, 335 F.3d 592, 597 (7th Cir. 2003), and a Tennessee case, *Brown v. Weber*, No. 11 Civ. 1390, 2014 WL 11531797, *1 (W.D. Tenn. July 11, 2014). But the issue in *Manuel* was whether to allow testimony that a certain individual was a "racist," which, in the court's view, had limited probative value and would have resulted in arguments about the truthfulness of those allegations (*i.e.*, "mini-trials"). *Manuel*, 335 F.3d at 597. And in *Brown*, the court found that the relevance of an officer's prior conduct with a TASER was "suspect," and would result in having to "ascertain the circumstances of each individual TASER discharge and determine whether each one was indicative of excessive force[.]" *Brown*, 2014 WL 11531797, at *1. Here, Take-Two has no (and has not identified any) basis to dispute the existence of the agreements, rendering its argument about "mini-trials" on same meaningless. Moreover, as explained above, the agreements have significant probative value in *this* case, distinguishing *Manuel* and *Brown*.

More specifically, the two Nike agreements (the shoes and mannequins) challenged by Take-Two are relevant because they are both instances in which Nike contracted with and paid Mr. Hayden to reproduce the same tattoos he inked on LeBron James on shoes and mannequins, rather than simply reproduce the tattoos without Mr. Hayden's permission. (Dkt. #187-3, Hayden

Dep., 178:11–179:25, 180:22–183:22 ("These were designs that I currently have copyrights to that I—I did on LeBron."); *see also*, Hayden Decl., Dkt # 109-49, ¶ 16.)

The remaining agreements Mr. Hayden entered into pertaining to tattoos he created and inked on LeBron James (stunt doubles, 72andSunny, Sprite, Space Jam 2, and Tonal) are all relevant to the fair use and implied license analysis, as described above. They evidence Mr. Hayden, as copyright owner, being paid for permission, to display or recreate in movies and commercials the tattoos he inked on LeBron James, including some of the Asserted Tattoos. (Hayden Decl., Dkt. # 109-49, ¶¶ 17, 20, 23–25.) Take-Two offers a variety of observations about these agreements but fails to explain why those facts would make the agreements not relevant or confusing to a jury. For example, Take-Two complains that some of the produced agreements were not signed (although Mr. Hayden confirmed in his sworn declaration that he was paid pursuant to the agreements), the agreements were about commercials and movies (not video games), and that some were entered into after the lawsuit was filed. But these are merely details on which Take-Two may choose to cross-examine Mr. Hayden—not reasons to exclude probative evidence.

The Teyana Taylor, Marcus Johnson, Tonal, House Party, and Pepsi agreements are also relevant to the fair use analysis as they evidence third parties seeking permission from Mr. Hayden to display the tattoos he inked in a television show, a movie, and in several commercials. (*Id.* at ¶¶ 21–22.)

The Machine Gun Kelly agreements are relevant because they are instances in which Mr. Hayden was paid in exchange for granting a movie producer the right to use the copyrighted tattoos he created and inked on the musical artist Machine Gun Kelly in several movies (entitled Blackbird, Roadies, and Captive State). (*Id.* at ¶¶ 18–19; *see also* Dkt. #187-3, Hayden Dep.,

7

186:14– 187:21, 190:9–191:21.) Although Mr. Hayden stated that he could not remember whether he signed the Blackbird agreement (Hayden Decl., ¶ 18), he was able to locate a signed version that he produced to Take-Two. (Dkt. #187-4, HAYDEN_001657.) And although the Captive State and Roadies agreements are not signed copies, Mr. Hayden confirmed in a sworn declaration the year of the Roadies agreement and that he was, in fact, paid pursuant to the agreement. Mr. Hayden also testified during his deposition that he believes the Captive State agreement was entered into and that he was paid $1,000. (Dkt. #187-3, Hayden Dep., 191:8–16.) Take-Two has not identified any facts that would contradict Mr. Hayden's testimony about these agreements, thus making it unlikely that these agreements would somehow necessitate confusing "mini-trials."

Accordingly, Mr. Hayden's agreements are important evidence, *both* showing the robust market for licensing his tattoos (including the *potential* market for licensing them specifically in video games), 17 U.S.C. 107, *and* contradicting Take-Two's claims about what the athletes understood about their rights in the Tattoos.

They should *not* be excluded.

## III.    MIL No. 3: Take-Two's Licensing Practices

The Court should deny Take-Two's motion to exclude evidence and argument relating to Take-Two's licensing of other works because, as the Court already found, this evidence is relevant to demonstrating the fourth fair use factor: a potential market for licensing tattoos to video game makers. Specifically, ruling on Take-Two's motion to exclude Plaintiff's expert testimony on a potential market, the Court found "evidence that Defendants and other video game developers have licensed other 'content,' such as NBA-trademarked logos, player names and likenesses, sound recordings and synchronization of music and apparel" was relevant to the

fourth fair use factor of whether a market can potentially develop for licensing tattoo designs for video games. (Dkt. #175, at 7–8.) These other licenses are one of several pieces of evidence Mr. Hayden is using to demonstrate a potential market, including also (i) others' willingness to license, (ii) commercial benefits of realism, and (iii) low transaction costs. (*See* Lenzo Rept., Dkt. #109-43, ¶¶ 75–84, 87–89, 95–101.) As such, it is highly relevant to Take-Two's fair use defense and should not be excluded.

The case law Take-Two cites in support of exclusion is inapposite. For example, in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614–15 (2d Cir. 2006), the court found that the fourth fair use factor (potential market) was not probative because the defendant's use was "transformatively different from their original expressive purpose." In its summary judgment opinion, this Court found that "reasonable jurors could disagree about whether – or to what extent – Defendants' use is transformative." (Dkt. # 193, at 13.) As explained in Mr. Hayden's motion for summary judgment, Take-Two's copying is purposefully and pointedly ***not*** transformative, as it is trying to reproduce the copyrighted works in whole as closely as possible for purposes of realism. (*See* Dkt. # 109, at 11-14.)  Indeed, this Court held that Defendants' purpose in copying the Tattoos is "realism and accuracy" (Opinion and Order, Dkt. #193, p. 12) and that "[t]he Tattoos are used in their entirety." (*Id*., p. 14.)

Moreover, while Take-Two argues that its use is transformative because the copyrighted works are "minimized" by other elements of the game (Dkt. #95-1, at 13–14), this same reasoning obviously applies to the other works Take-Two licenses (*e.g.*, music, logos, names and likeness, etc.) and thus cannot support its argument that the other licenses are irrelevant to showing a similar potential market for tattoo licensing in video games.

9

Take-Two's reliance on *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) is also misplaced. In *Swatch*, the court found the copyrighted material at issue, recordings of corporate earnings calls, were not created with any intention that they would ever be monetized, rather serving only to disseminate financial information to investors. *Id.* at 91–92. There was thus no reasonable expectation of a potential market and the court in *Swatch* never even addressed the relevance of other licenses as evidence of a potential market. This is not the case here. Thus, unlike in *Swatch*, it is reasonable to expect a potential market for licensing the copyrighted works in this case.

Finally, evidence of Take-Two's other IP licensing in its games is in no way prejudicial. Take-Two's only argument for prejudice is that it would be "legally wrong" for the jury to consider Take-Two's other IP licensing (among the other evidence discussed above) as evidence that Take-Two would be a willing licensee also for tattoos. (MIL, at10.) As explained above, however, Take-Two's cited case law never says it is "legally wrong," and this Court has already allowed it in denying Take-Two's motion to exclude Dr. Lenzo's expert testimony that cites Take-Two's willingness to license other IP as evidence that it would be a willing licensor. (*See* Dkt. # 175.) Moreover, Take-Two intends to rely on this same evidence as part of its damages case to meet its burden of showing profits not attributable to the infringement. *See*, *e.g.*, Malackowski Rept., Dkt. #95-7, Sch. 3.5.1. Notably, Take-Two explicitly singles out *some* in-bound IP licenses that it does *not* wish to exclude,[2] while simultaneously asserting it would be "legally wrong" for Mr. Hayden to present evidence of *other* in-bound IP licenses for which Take-Two pays. Allowing Take-Two to selectively introduce such evidence to demonstrate its authorization to depict NBA players or to mitigate damages while forbidding Mr. Hayden from

---

[2] See MIL, p10, n. 9: "[T]o be clear, [Take-Two] does not seek to exclude evidence of its agreements with the NBA and NBAPA that allow Take-Two to depict the NBA players."

using it to negate fair use would clearly be prejudicial. Accordingly, there is no proper

justification for excluding evidence of Take-Two's licensing of other intellectual property.

## IV.    MIL No. 4: Video Game Licensing Practices in Industry

The Court should deny Take-Two's motion to exclude evidence and argument relating to

other video games' licensing practices for the same reasons explained above for MIL No. 3: the

evidence is relevant to demonstrating the fourth fair use factor, as the Court has already

acknowledged in denying Take-Two's motion to exclude Mr. Hayden's expert, Dr. Lenzo.

The additional case Take-Two cites in support of this requested exclusion is no more

helpful than the others. In *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514

n.8 (9th Cir. 1985), the court found the license of other Broadway shows were not relevant to

proving the ***value*** of a potential license in that case. Fair use was not at issue (only damages) and

the Court never discussed whether the ***existence*** of licensing for other shows was relevant as

evidence that there is a potential market for licensing. Here, Mr. Hayden is not offering evidence

of other games' licensing to prove the value of a potential license, but rather only as evidence

demonstrating the potential market for tattoo licensing in video games.

Take-Two's request to exclude unfavorable deposition testimony is also misplaced. It was

***Take-Two*** that brought this material into the case by asking Mr. Hayden's experts about their

knowledge of other tattoo licensing in the video game industry. (Dkt. #187-5, Lenzo Dep., 273:2–

275:4; Dkt. #187-6, Malkiewicz Dep., 145:2–147:3.) In brief, Take-Two did not like the answers

it received during its depositions of Mr. Hayden's experts, and now seek to exclude those

unfavorable opinions. That is not a basis for exclusion. As an example, the Southern District of

Ohio has specifically held that an expert is "permitted to testify as to his own statements in the

context of his deposition," even if the material was not relied upon in forming his prior opinions

in the case. *Great Northern Ins. Co. v. BMW of N. Am. LLC*, No. 2:11-CV-1153, 2015 WL 3936229, at *10 (S.D. Ohio June 26, 2015). As in *Great Northern*, Plaintiff's experts here should be permitted to testify about this same material that is "within [their] general knowledge" as experts in the industry. *Id.* Mr. Malkiewicz specifically testified that his opinion on other tattoo licensing was "based on market research" (Dkt. #187-6, Malkiewicz Dep., 146:14), and thus he should be permitted to testify about these same statements at trial.

Take-Two's argument that testimony about other games' licensing is hearsay is also meritless. Under Rule 703, experts are permitted to rely on hearsay evidence so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Take-Two made no attempt to explain why it would be improper for Mr. Hayden's experts to rely on corporate press releases or market research to form opinions on licensing prospects in the industry.

Finally, there is no risk of prejudice that would outweigh probative information about licensing. Take-Two claims this evidence would "create confusing mini-trials regarding what other video game companies are doing about unrelated content." (MIL, at 12.) Not so. In its MIL, Take Two notably does not deny the existence of other tattoo license agreements for video games. Mr. Hayden will only offer expert testimony disclosed in its expert reports and explained at deposition. Take-Two will have the opportunity to examine Mr. Hayden's experts before the jury, and the jury will have the opportunity to appropriately weigh the testimony. And, again, Mr. Hayden is not introducing this evidence to prove the ***value*** of licenses in the industry, only their ***existence*** for purpose of showing no fair use. Thus, there is no reason to exclude this evidence that is clearly probative to show the potential market for licensing tattoos in video games.

## V.        MIL No. 5: Mr. Hayden's Knowledge About the Tattoo Industry

The Court should deny Take-Two's motion to exclude Mr. Hayden from offering testimony about the tattoo industry. Obviously, Mr. Hayden has extensive personal experience as a longstanding tattoo artist and active participant in the industry, and on that basis he should be permitted to testify on what he observes and perceives about same. Take-Two's first argument, that Mr. Hayden's opinions were not disclosed pursuant to Rule 702 (MIL at 12), is irrelevant because Mr. Hayden is not testifying as an expert and does not need to.

Take-Two's second argument, that Mr. Hayden's testimony is improper under Rule 701 is equally misplaced. (MIL at 13.) Rule 701 expressly allows lay witnesses to provide opinion testimony that is "rationally based on the witness's perception" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." This Circuit has long held that "perceptions based on industry experience[] is a sufficient foundation for lay opinion testimony." *United States v. Kerley*, 784 F.3d 327, 338 (6th Cir. 2015) (quoting *Burlington N. R.R. Co. v. Nebraska*, 802 F.2d 994, 1004–05 (8th Cir.1986)); *see also In re Nat'l Prescription Opiate Litig.*, No. 18-OP-45032, 2022 WL 668434, at *37 n.68 (N.D. Ohio Mar. 7, 2022) (quoting same). As stated in his declaration, Mr. Hayden's opinions on the tattoo industry are based on his personal perceptions gleaned from 20 years of experience in the industry. (Hayden Decl., Dkt. # 109-49, ¶ 3.) These opinions are clearly within the ambit of Rule 701.

Finally, Take-Two asks that all of Mr. Hayden's opinions be excluded based on what Take-Two deems to be one "derogatory" statement that Take-Two's conduct in this case, in Mr. Hayden's personal view, shows an "utter disconnect with, and perhaps contempt for the art world." (MIL at 13; Hayden Decl., ¶ 11.) As an initial matter, the requested relief (total exclusion) far exceeds the alleged prejudice of the statement. Regardless, the challenged

13

testimony is a direct rebuttal to arguments Take-Two has made in this case alleging a lack of creativity in Mr. Hayden's work. (Hayden Decl. ¶ 11.) Mr. Hayden's testimony is relevant to rebut Take-Two's own pernicious claims that his work lacks creativity. As such, Mr. Hayden's experience-based opinions on the tattoo industry are admissible under Rule 701 and should not be excluded.

## VI.    MIL No. 6: Mr. Hayden's Actual Damages

Take-Two's motion to exclude evidence of actual damages should be denied. Although Mr. Hayden has not sought actual damages from Take-Two, Mr. Hayden has identified sufficient evidence on which a jury may rely to determine actual damages suffered by him (as well as the existence of a market and other factors refuting Take-Two's fair use arguments). Take-Two asked in its Interrogatory No. 14 to "DESCRIBE any harm suffered by HAYDEN as a result of TAKE-TWO'S conduct[.]" (Dkt. #187-7, Excerpt from Hayden Second Supp. To Defendants' First Set of Interrogatories.) In response, Mr. Hayden explained the basis for his actual harm:

> Hayden has established a reputation for inking some of the most recognizable tattoos in the industry. This reputation has allowed Hayden to establish a market and to be compensated for reproductions of these popular tattoos in various media. Take-Two's flagrant unauthorized copying of Hayden's copyrighted tattoos on the NBA player avatars in its NBA 2K games has harmed Hayden's ability to develop and profit from this market.

(*Id.*) Mr. Hayden also identified a number of documents in response to Interrogatory No. 14 that may evidence what Take-Two would have been willing to pay to license his Asserted Works for use in the Accused Games, including Take-Two's financial productions that identify the amount it has paid for "licensing" other IP in the Accused Games (*see, e.g.*, TAKE-TWO_00001663 (which was subsequently updated by Take-Two in TAKE-TWO_00006148)) and the amount Take-Two has paid artists to create custom tattoos for use in the game (TAKE-TWO_00003625). Further, Mr. Hayden incorporated his response to Take-Two's Interrogatory No. 10, which asked Mr.

Hayden to "DESCRIBE any license, release, covenant not to sue of any kind . . . entered into between HAYDEN and any PERSON CONCERNING the use of the ASSERTED WORKS[.]" (Dkt. #187-7, Excerpt from Hayden Second Supp. To Defendants' First Set of Interrogatories.) In response to that Interrogatory, Mr. Hayden identified several agreements, in which he was paid for his permission to reproduce or display his tattoos (HAYDEN_000342, HAYDEN_000596, HAYDEN_000253, HAYDEN_000346, HAYDEN_000805). (*Id.*) In fact, Mr. Hayden has produced several more agreements he has entered into in which he was paid to give permission to reproduce or to reproduce, himself, the tattoos he has inked. (HAYDEN_001600, HAYDEN_001751, HAYDEN_001941, HAYDEN_000483, HAYDEN_000740, HAYDEN_000792, HAYDEN_000238, HAYDEN_000010, HAYDEN_000312, HAYDEN_000596, *see* Exs. B-1–B-10 to Dkt. # 109-49.) Mr. Hayden intends to submit evidence to the jury of what Take-Two has been willing to pay to license *other* parties' IP for use in its game, along with what other parties have agreed to pay Mr. Hayden for licensing his tattoos. While Take-Two purports to exclude this evidence as related to actual damages, it is also clearly relevant to and sufficient to establish that a market exists for the licensing of Mr. Hayden's tattoos (specifically including a potential market for licensing them in video games), which is relevant to fair use. Take-Two has had this evidence for years now. *See North Atlantic Operating Co., Inc. v. Hammad Enterprises, Inc.*, No. 19-60200-CIV-ALTMAN, 2020 WL 1286180, *3 (S.D. Fla. Jan. 15, 2020) (holding that plaintiffs are not required to provide an expert to quantify actual damages). Accordingly, Take-Two's motion should be denied.

## VII.    MIL No. 7: Mr. Hayden's Communications with the NBA Players

Take-Two asks this Court to exclude "Plaintiff's undisclosed alleged communications with any of the NBA Players[.]" (MIL, p. 19.) Take-Two's basis is that Mr. Hayden purportedly

did not produce them during discovery (citing one interrogatory, three requests for production, and three lines of Mr. Hayden's deposition transcript) and because they are hearsay.

Take-Two's overbroad request is unwarranted. Mr. Hayden disclosed that he communicated with each NBA Player when he inked their tattoos, and such communications are highly relevant to issues in this case, including Take-Two's implied license defense and the validity of Mr. Hayden's copyrights. (Dkt. #187-8, Response to Interrogatory No. 1.) Mr. Hayden should obviously be allowed to testify about his communications with the NBA Players when he created and inked the Asserted Tattoos. Mr. Hayden also produced communications between him and Randy Mims (a member of LeBron James's management team) related to procuring releases from Mr. Hayden to use Mr. Hayden's tattoos in commercials and movies. (*See, e.g.*, Dkt. # 109-49, ¶ 23.) Mr. Hayden should also be allowed to testify about these communications.

Take-Two's real concern appears to be about a particular communication that *Danny Green* testified about in his *own* deposition, in which he revealed a dinner conversation he had with Mr. Hayden where he expressed support for Mr. Hayden's case. (*See*, Hayden Supp. Br. in Opp. to Summ. J., Dkt. # 156, pp. 5–6.) Mr. Green testified about this conversation when he was being cross-examined with respect to his statement in his declaration that "[n]either Mr. Hayden nor any tattooist has ever contacted me about this lawsuit." (Green Decl., ¶ 16, Dkt. # 101-3.) This statement that Mr. Green made in his declaration is false by *Mr. Green's* own admission. Mr. Green's admission also contradicts several other claims that he made in his declaration, such as, "[t]he fact that Mr. Hayden is now trying to stop others from showing me in media as I actually look, tattoos and all, is surprising to me." (*Id.* at ¶ 9.) Mr. Hayden has a right to use this

testimony at trial to impeach Mr. Green's contradictory statements that Take-Two may submit at trial as live testimony or through his declaration or deposition testimony.

Although Mr. Hayden did not identify this communication in his response to Take-Two's Interrogatory No. 4, it is hardly surprising that he did not initially remember it, as the communication may have occurred some five years ago. Further, Take-Two has in no way been harmed. Take-Two has now known about this communication since Mr. Green's deposition on June 29, 2022, and had an opportunity to ask Mr. Green about the communication during his deposition. Additionally, Take-Two will have an opportunity to cross-examine Mr. Hayden on the subject at trial.

Take-Two's reliance on *Hardesty v. Kroger Co.,* No. 16 Civ. 298, 2022 WL 742847 (S.D. Ohio Mar. 11, 2022), is misplaced. There, the court excluded documents that were not produced by the Defendants "three years after the Court's discovery deadline and three weeks before trial." *Id.* at *7-8. Here, however, Take-Two is asking the Court to exclude testimony from its *own* witness (elicited *during* discovery and more than a year *before* trial) that contradicts *that witness's* prior sworn statement, as submitted by Take-Two. Moreover, given that Take-Two learned of this conversation long before trial and has had the opportunity (for almost a *year*) to question Mr. Green about it, it *scarcely* constitutes what Take-Two decries as "a classic example of the prejudicial 'trial by ambush' tactic that Rule 37 is meant to prevent." (MIL, pp. 18–19.) Clearly, Take-Two has not been harmed. Precluding Mr. Hayden from impeaching Mr. Green with his own testimony would be manifestly unfair. *See Honeysett v. Williams*, No. 3:02 CV 7247, 2003 WL 25676462, at *4 (N.D. Ohio June 24, 2003) (denying motion to exclude because party "will have had ample time to digest and consider [evidence] prior to trial"). Accordingly, Take-Two's motion should be denied.

## VIII.  MIL No. 8: Take-Two's Recurrent Customer Spending, Including In-Game Spending and Virtual Currency

The Court should deny Take-Two's motion *in limine* to exclude evidence, testimony, or argument of Take-Two's revenues from sales of virtual currency ("VC").

As an initial matter, this Court already rejected Take-Two's motion to exclude Mr. Hayden's damages expert, Michael Malkiewicz, on the same grounds (*i.e.*, that he relied on VC revenue to arrive at Take-Two's gross revenue). (*See* Take-Two *Daubert* Mot., Dkt. # 99, pp. 14–15; Malkiewicz *Daubert* Op., Dkt. # 183, p. 7.) This Court declined to exclude Mr. Malkiewicz's opinion, in which he included VC in Take-Two's gross revenue, reasoning that "[t]he challenges Defendants assert regarding the inclusion of revenues from virtual currency . . . are all subjects for cross-examination . . . [and] the jury will be instructed that they can choose to believe all or part or none of any witness's testimony." (Malkiewicz *Daubert* Op., Dkt. # 183, p. 7.) For the same reasons, Take-Two's instant motion should be denied.

Indeed, Take-Two's revenues from in-game transactions and VC are properly considered part of Take-Two's gross revenue and are thus relevant and admissible evidence. (*See, e.g.*, Hayden Opp. to Malkiewicz *Daubert* Mot., Dkt. # 108, pp. 10–12.) It is Mr. Hayden's burden under the Copyright Act to identify Take-Two's gross revenue related to the Accused Games. *See* 17 U.S.C. § 504(b) ("the copyright owner is required to present proof only of the infringer's gross revenues"). It is then Take-Two's burden to "prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* All of Take-Two's bases for *exclusion* boil down to Take-Two arguing that VC transactions are not explicitly *attributable* to the copyrighted works, which is Take-Two's burden to prove at trial—not avoid through a motion *in limine*.

In any event, revenue from VC transactions undoubtedly meet the low threshold of being "reasonably related" to infringement because it comes directly from the Accused Games in which the Tattoos are used. VC is manifestly an element of the Accused Games—it can only be purchased or earned in the Accused Games, can only be redeemed in the Accused Games, and has no utility, value, or meaning outside the Accused Games. *See, e.g.*, *Balsley v. LFP, Inc.*, 691 F.3d 747, 770 (6th Cir. 2012) (finding it proper for the copyright plaintiff to use the gross profits of the entire magazine in which the copyrighted photo was used). Take-Two's MIL asks this Court to ignore the judgment of Congress reflected in the statutory language, *see* 17 U.S.C. § 504(b), and instead shift ***its*** burden of "apportionment" onto Mr. Hayden—this is improper. *See id.* at 769. Take-Two's reliance on *Satija v. Permanent Gen. Assurance Corp. of Ohio*, No. 13 Civ. 82, 2014 WL 1664557, at *6 (N.D. Ohio Apr. 25, 2014) is misplaced, as it does not support inverting the burden as Take-Two suggests. In *Satija*, the court found that revenue from an insurance company's insurance products only had a tenuous link to the allegedly infringing use of a cartoon character in its advertisements. Notably, in a footnote to the very sentence Take-Two quotes (in part) from *Satija* ("A plaintiff seeking profits must show 'some causal link between the infringement and the particular profit stream' …(internal citations omitted)") (MIL, p.20), the court further explains the burden-shifting provisions of 17 U.S.C. § 504(b): "The Sixth Circuit has declined to require a causal connection requirement only 'to the extent that such a label indicates a burden higher than the one outlined' in the *Balsley* opinion." *Satija,* 2014 WL 1664557, at *12, n. 51.

Without question, here there is at *least* "a 'reasonable relationship' between [Take-Two's VC] revenues and [its] acts of infringement." *See id*. at *11 (citing *Balsley v. LFP, Inc.,* 691 F.3d 747, 769 (6th Cir. 2012). Take-Two has unquestionably used Mr. Hayden's Tattoos in its

Accused Games, and Take-Two's recurrent consumer spending revenue (including VC-related revenue) is undoubtedly part of the gross profit for these games. Thus, both the facts and reasoning in *Balsley,* where the court allowed the gross profit for sales of the accused magazines because they included the copyrighted photograph, *Balsley*, 691 F.3d at 770, are clearly analogous.

For all the reasons stated above, Take-Two's MIL No. 8 should be denied.

Dated: May 4, 2023

Respectfully submitted,

By: */s/ Andrew Alexander*
John Cipolla (Ohio Bar No. 0043614)
Daniel McMullen (Ohio Bar No. 0034380)
Todd R. Tucker (Ohio Bar No. 0065617)
Andrew Alexander (Ohio Bar No. 0091167)
Josh A. Friedman (Ohio Bar No. 0091049)
Dustin Likens (Ohio Bar No. 0097891)
Brandon E. Brown (Ohio Bar No. 0097013)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
ttucker@calfee.com
aalexander@calfee.com
jfriedman@calfee.com
dlikens@calfee.com
bbrown@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio  44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2023, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's Electronic Filing System to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's System.

*/s/ Andrew Alexander*
One of the attorneys for Plaintiff