# EXHIBIT A



**Calfee, Halter & Griswold LLP**
Attorneys at Law

The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
216.622.8200 **Phone**
Calfee.com

aalexander@calfee.com
216.622.8234 **Direct**

March 6, 2020

VIA FACSIMILE (216-357-7134)
The Honorable Jonathan D. Greenberg
Carl B. Stokes U.S. Court House
801 West Superior Ave.
Cleveland, Ohio 44113

Re:   *Hayden v. 2K Games, Inc., et al.*, Case No. 1:17-cv-02635-CAB

Dear Magistrate Judge Greenberg:

We write to update the Court regarding the issues raised during the parties' telephone conference with the Court last Tuesday (February 25, 2020). (ECF No. 45.)

To start, as requested by Defendants' counsel, counsel for non-parties Jonathan Hayden and Bernardino Tovanche has completed its review of the non-parties' email repositories and has *re*confirmed that they have nothing further to produce in response to Defendants' subpoenas.

As to other discovery issues related to Plaintiff's follow-up discovery requests, Plaintiff identifies the issues listed below.

At the outset, Plaintiff notes that Defendants responded Monday evening to Plaintiff's follow-up discovery requests. Since then, Plaintiff and Defendants have exchanged multiple emails attempting to resolve several deficiencies in Defendants' responses. As of the time this letter is sent, Plaintiff is awaiting a response on two of the issues below:

   1. **RFP 32: Telemetry data showing the extent to which the NBA Players are used by users while playing the Accused Games, including without limitation: a) data as to the individual NBA Players; b) data as to the teams that include the individual NBA Players; and 3) the data that supports the claims made in TAKE-TWO_00000854.**

RFP 32 asks for the telemetry data that Defendants used to support the claims made in some advertisements they created related to LeBron James's popularity and usage in the accused games. These advertisements make claims based on the number of times users play with LeBron James, for example: "70,546 PEOPLE TRY TO OVERTHROW THE KING EVERY DAY" and "48,043 PEOPLE HAVE CARRIED LEBRON TO A CHAMPIONSHIP THIS YEAR." Mr. Argent, Senior VP of Operations of 2K Sports, testified this data comes from "telemetry data,"

The Honorable Jonathan D. Greenberg
*Hayden v. 2K Games, Inc., et al.*, Case No. 1:17-cv-02635-CAB
March 6, 2020
Page **2** of **4**

which Defendants collect "within the game—that would—that would be how many people were playing as or with LeBron in the game." He also stated that the telemetry data is "an incredibly deep data source that shows or – shows us how people are interacting with the game, every mode of the game, time played in each mode, et cetera" and that "we would probably have granular-level detail as it relates to LeBron." This testimony, along with the claims made in TAKE-TWO_00000854, contradicts Defendant's response to RFP 32, claiming that "relevant, non-privileged documents responsive to this request do not exist and that Take-Two does not track the frequency with which the NBA Players are selected or played by users of the Accused Games." Defendants have since clarified that they do keep data on a team basis, but have refused to produce this data for the teams the players at issue were on during the relevant time period. We ask that the Court order Defendants to produce this data, as it is relevant to Defendants' defenses, including its *de minimis* defense, and damages.

    2. **RFP 33**: **Communications with NBA Properties or NBA Players Association regarding the copyright issue identified in TAKE-TWO_00004104 or any other copyright issue.**

Defendants produced an email that mentioned a "copyright issue" that the NBA raised regarding a tattoo in the accused games. During her deposition, the author of this document explained that the NBA was concerned that a tattoo that Defendants had made for the game "looked too much like a character," but could not provide much other information. As this clearly appears to be a scenario where the NBA had concerns about copyright infringement regarding a tattoo in the game, Mr. Hayden served a follow-up discovery request for these communications. Defendants have refused to produce or even search for these communications on the basis that they claim they are not relevant. We ask that the Court order Defendants to produce the communications responsive to this Request.

    3. **RFP 36: Tattoo bug reports from 2015-present (see, e.g., TAKE-TWO_00004616)**

Take-Two produced an email regarding "tattoo bugs" that addressed several issues with the tattoos on the in-game avatars, including their observability in various game modes. During the deposition of one of Defendants' employees who was an author on the email thread, Mr. Hayden learned that these tattoo bug reports were a regular occurrence, typically during the summer before the games are released, including this past summer. Defendants, however, refuse to search for and produce all tattoo bug reports because they purportedly are not related to the players or tattoos at issue. This is improper. The tattoo bug email discussed in the deposition is highly relevant *both* because it discusses a player at issue *and* because Defendants' extensive efforts to correct tattoos, including to make them visible in the game, is relevant to its defenses and damages in this case. We ask that the Court order Defendants to produce documents responsive to this Request.

The Honorable Jonathan D. Greenberg
*Hayden v. 2K Games, Inc., et al.*, Case No. 1:17-cv-02635-CAB
March 6, 2020
Page **3** of **4**

4. **Interrogatory No. 14: Identify the amount paid by Defendants to use music in the Accused Games each year and identify the royalty rates paid by Defendants to use such music, including the methods used to calculate royalty rates and payments.**

Mr. Hayden served a request for production of in-bound copyright licenses, including music licenses, on May 2, 2019 (RFP No. 7). Since then, Defendants have objected to producing such licenses because it claims it would be overly burdensome. On November 12, 2019, the parties conferred on this issue at the Court, during which Defendants counsel continued to object to producing the music licenses on burden grounds. As a compromise and in light of the possibility of obtaining information through less burdensome means, including deposition, Mr. Hayden agreed to forego his request for production of the music licenses. Mr. Hayden, however, never agreed to exclude this information from the case or that such licenses are not relevant.

Consistent with the spirit of the November 12 agreement, on October 25, 2019, Mr. Hayden noticed a 30(b)(6) deposition topic concerning third-party licenses related to using preexisting content. In light of Defendants' attempt to limit this topic only to licenses it has produced, the parties met and conferred and exchanged multiple emails. Counsel for Mr. Hayden explicitly noted that we intended to ask questions about music licenses. On January 20, we expressed our concern that Defendants appeared to be attempting to exclude any evidence related to the music licenses and that this was not in the spirit of the parties November 12 agreement. We further stated that if Mr. Thomas (the 30(b)(6) witness) was not prepared on this topic regarding the music licenses, we would seek the information through discovery requests. The day before Mr. Thomas's deposition, Defendants claimed that music licenses were "not within the scope of this case." Accordingly, Mr. Thomas was not prepared to testify as to even general information about the music licenses. For example, when asked, "How much does the company pay to use music in its game each year?" Mr. Thomas replied, "I have no idea." And when asked, "Do you know if there's a running royalty that's paid on music?" he replied, "I don't know."

In light of Mr. Thomas's failure to answer these questions, Mr. Hayden served Interrogatory No. 14, seeking the amount Defendants paid to use music in the games each year and the royalty rates paid to use such music. These requests are reasonable and are a significant compromise of what Mr. Hayden initially requested regarding music licenses. Defendants' refusal to respond to the Interrogatory, claiming that "the parties already agreed that music licenses are irrelevant and no discovery as to them is appropriate," is wrong and mischaracterizes the parties' November 12 agreement. Take-Two cannot just unilaterally exclude this relevant information from the case. We ask the Court to order Take-Two to answer Interrogatory No. 14.

5. **RFP 38: Exemplary licenses to use the likeness of any influencer in the Accused Games, including without limitation, Defendants' agreement(s) with Chris Brickley.**

During his 30(b)(6) deposition, Mr. Thomas testified that Defendants procure licenses to show influencer likenesses in the accused games. He further testified about Defendants' decision to remove certain tattoos from an influencer avatar (Chris Brickley) that implicated third-party IP rights (e.g., logos and celebrity faces). The nature of Defendants' agreement allowing it to show

The Honorable Jonathan D. Greenberg
*Hayden v. 2K Games, Inc., et al.*, Case No. 1:17-cv-02635-CAB
March 6, 2020
Page **4** of **4**

Chris Brickley's likeness in the accused games is highly relevant to the case, including to Defendants' defense that it has authority to reproduce Mr. Hayden's copyrighted works in the game. Defendants' response to this Request was simply that it "will not search for or produce documents responsive to this Request." We ask that the Court order Defendants to produce documents responsive to this Request.

As a related issue, during the deposition of one of Defendants' witnesses, Defendants clawed back and redacted a document related to issues concerning showing some of Chris Brickley's tattoos in the game described above. Mr. Hayden requested that Defendants produce non-privileged documents or communications sufficient to identify or describe the tattoos that were removed from the Chris Brickley in-game avatar. Defendants have flatly refused, claiming that they are not relevant. We ask that the Court order Defendants to produce documents responsive to this request.

> 6. **RFP 42: Documents showing or referring to the "Q-Score" of the NBA Players.**

During the 30(b)(6) deposition of Jason Argent, Mr. Hayden learned that Defendants track the popularity of NBA players, using a "Q-Score." For example, Mr. Argent testified that "[e]very year we review popularity, things like queue scores [sic], excitement, playing ability, things like that" in choosing a cover player. He further explained that "[a] queue score [sic] is a metric . . . gauge of popularity of athletes and celebrities." Defendant have refused to search for or produce documents showing the NBA Players' Q-scores because it has declared that they are "not relevant to any party's claim or defense." Player popularity, however, is relevant to Take-Two's defenses and damages in this case. We ask that the Court order Defendants to produce documents responsive to this Request.

Very truly yours,

Andrew Alexander

cc: Counsel of Record