# EXHIBIT G

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES HAYDEN,                    CASE NO: 1:17CV2635

       Plaintiff,

       v.

2K GAMES, INC., et al.,

       Defendants.
-------------------------------


Deposition of JAMES HAYDEN

Cleveland, Ohio

Wednesday, October 30, 2019 - 9:04 a.m.


Reported by:

Angela Nixon, RMR, CRR

Job No.: 26345

Page 82

1  show what he wanted the lion tattoo to look like?
2      MR. MCMULLEN: Objection. I'm sorry, go ahead.
3  A.  It was a reference card, like a playing card.
4      THE COURT: A what card?
5  A.  Playing, like a playing card.
6  Q.  Did he come into your shop with a playing card
7  that depicted a lion?
8  A.  Yeah.
9  Q.  And did he ask you to put -- ink that lion on
10 him?
11 A.  He said do something like this.
12 Q.  And did you say okay?
13 A.  Yes.
14 Q.  Did you know that one of Mr. James nicknames was
15 Lion?
16 A.  No.
17     MR. MCMULLEN: Objection.
18 BY MS. CENDALI:
19 Q.  So in inking the lion tattoo on Mr. James, you
20 tried to copy the playing card that he gave you, right?
21     MR. MCMULLEN: Objection.
22 A.  I didn't try to copy.
23 Q.  You didn't try to copy?
24 A.  I wanted to come up with my own design, style of
25 it.

Page 83

1  Q.  So just to be clear, did -- are you saying that
2  you didn't copy how the wings would be placed on the lion
3  from the playing card?
4      MR. MCMULLEN: Objection.
5  A.  Yes.
6  Q.  Are you saying that you didn't come up with the
7  idea of the lion's body position on the playing card?
8      MR. MCMULLEN: Can we hear that back, please?
9      (Whereupon the court reporter read back the
10        previous question.)
11     MR. MCMULLEN: Objection.
12 A.  I'm not saying that.
13 Q.  Isn't it true that you copied the body position
14 of the lion on the playing card when you inked the tattoo?
15     MR. MCMULLEN: Objection.
16 A.  I don't remember the playing card. I just
17 remember the tattoo.
18 Q.  Well, you knew that he came in and had the
19 tattoo --
20 A.  Uh-huh.
21 Q.  Excuse me. You knew that Mr. James came in and
22 showed you the playing card, and he said, according to you,
23 that he wanted a tattoo like this, right?
24     MR. MCMULLEN: Objection.
25 A.  Similar.

Page 84

1  Q.  Similar to this?
2  A.  Uh-huh.
3  Q.  And isn't it true that you copied the -- how the
4  wings were placed on the lion from the playing card?
5      MR. MCMULLEN: Objection.
6  A.  No.
7  Q.  Isn't it true that you copied how the wings
8  looked from the playing card?
9      MR. MCMULLEN: Objection.
10 A.  No.
11 Q.  Isn't it true you copied the facial impression of
12 the lion from the playing card?
13     MR. MCMULLEN: Objection.
14 A.  Not true.
15 Q.  Isn't it true you -- that you copied the idea of
16 the lion holding the shield from the playing card?
17     MR. MCMULLEN: Objection.
18 A.  Nope.
19 Q.  Did Mr. James tell you where on his body he
20 wanted the lion inked?
21 A.  Yes.
22 Q.  What did he tell you?
23 A.  On his chest.
24 Q.  Did he tell you what colors he wanted you to use?
25 A.  No, I can't remember.

Page 85

1  Q.  Did you have conversations with him about what
2  color ink to use?
3  A.  Possibly.
4  Q.  Did Mr. James tell you why he wanted to have the
5  lion on the playing card used?
6      MR. MCMULLEN: Objection.
7  A.  I can't remember why.
8  Q.  Do you think that the lion had some sort of
9  significance to him?
10     MR. MCMULLEN: Objection.
11 A.  Possibly.
12     MR. MCMULLEN: Counsel, we've been going for
13 almost two hours. Could I suggest that when we get to a
14 convenience spot here we may take a brief break?
15     MS. CENDALI: I want to do one more related
16 thing, then we'll take a break.
17     MR. MCMULLEN: Sure, okay.
18     THE WITNESS: Two hours already?
19     MR. MCMULLEN: Almost.
20     THE WITNESS: Wow.
21 BY MS. CENDALI:
22 Q.  I want to show you what's been marked as
23 Defendant's Exhibit 7.
24 A.  The Venetian.
25 Q.  Do you recognize that image of the lion with the

22 (Pages 82 to 85)

```
                                           Page 214
 1   would justify a particular damages amount, is that right?
 2         MR. MCMULLEN:  Objection.
 3   A.    Currently not yet.
 4   Q.    Now, where were the computers located that --
 5   that had the e-mails that you produced in this case?
 6   A.    Say it again, I'm sorry, I'm breaking this cord
 7   here.
 8   Q.    You said that -- you said that e-mails were
 9   produced in this case, is that right?
10   A.    E-mails produced in this case?
11   Q.    E-mails from your files were collected and
12   produced in this case, correct?
13   A.    Yes.
14   Q.    So what was the process to obtain those e-mails?
15   A.    Pass code and e-mail address.
16   Q.    And did you give those pass codes to your
17   attorneys?
18   A.    Yes.
19   Q.    Where physically were the computers?
20         MR. MCMULLEN:  Objection.
21   A.    Physically in my -- in my hand, my iPhone.
22   Q.    So were all these e-mails from your iPhone?
23   A.    Correct.
24   Q.    So you don't have a laptop or other computer?
25   A.    I do have a laptop.

                                           Page 215
 1   Q.    Was that searched too?
 2   A.    All the e-mails were.
 3   Q.    By whom?
 4   A.    By my attorneys.
 5   Q.    Did you do -- did your lawyers search for the
 6   word LeBron?
 7         MR. MCMULLEN:  Objection.
 8   A.    I'm not sure.
 9   Q.    Did they search for the word Green?
10         MR. MCMULLEN:  Objection.
11   A.    I'm not sure.
12   Q.    Thompson?
13         MR. MCMULLEN:  Objection.
14   A.    I'm not sure.
15   Q.    Take-Two?
16         MR. MCMULLEN:  Objection.
17   A.    I'm not sure.
18   Q.    NBA 2K?
19         MR. MCMULLEN:  Objection.
20   A.    I'm not sure.
21   Q.    So you don't know what search terms they used to
22   find the documents that you produced, is that right?
23         MR. MCMULLEN:  Objection.
24   A.    Correct.
25   Q.    Have you ever exchanged e-mails with Mr. James,

                                           Page 216
 1   Mr. Green or Mr. Thompson?
 2   A.    Again, no.
 3   Q.    Have you ever exchanged texts with any of them?
 4   A.    No.
 5   Q.    I'd like to show you what's been marked as
 6   Exhibit 43.  Is Exhibit 43 a photograph of a Venetian
 7   playing card?
 8         MR. MCMULLEN:  Objection.
 9   A.    I don't know what this is.
10   Q.    Well, please look at Exhibit 43 and tell me
11   whether this includes the playing card that Mr. James
12   provided you with the lion on it.
13         MR. MCMULLEN:  Objection.
14   A.    This does not look like it.
15   Q.    Do you know for sure whether this was the one
16   that you saw or not?
17         MR. MCMULLEN:  Objection.
18   BY MS. CENDALI:
19   Q.    I just want to make clear, are you denying that
20   this was the card that he showed you, or do you not know
21   one way or the other?
22   A.    I don't know one way or the other.  This doesn't
23   look like it though.
24   Q.    But -- so just to be clear, is it your testimony
25   that this wasn't it, or is your testimony that you're not

                                           Page 217
 1   sure whether this was it?
 2         MR. MCMULLEN:  Objection.
 3   A.    This -- this wasn't -- this doesn't look like the
 4   one from ten years ago.
 5   Q.    Okay.  And can you describe for me what the one
 6   from ten years ago looked like?
 7   A.    I cannot.  I don't remember what it looked like.
 8   Doesn't look like this, though, looked more like a -- like
 9   a regular playing card.
10   Q.    You can't remember -- you can't describe what it
11   looked like, but you knew it didn't look like this, is that
12   your testimony?
13         MR. MCMULLEN:  Objection.
14   A.    Yes, basically.
15   Q.    Now, besides your communications with Randy Mims,
16   have you ever had communications with anyone else about
17   this lawsuit?
18   A.    No.
19   Q.    Before you brought this lawsuit, did you discuss
20   suing Take-Two from anyone other than your attorneys?
21   A.    Ask -- ask me that question again.
22   Q.    Sure.  Before you brought this lawsuit, did you
23   discuss the possibility of suing Take-Two with anyone other
24   than your attorneys?
25   A.    No.
```

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com