# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| JAMES HAYDEN, | CASE NO. 1:17-cv-02635-CAB |
| Plaintiff, | |
| **v.** | |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants. | |

## DEFENDANTS 2K GAMES, INC. AND TAKE-TWO INTERACTIVE SOFTWARE, INC.'S <u>RESPONSE TO ORDER TO SHOW CAUSE</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................... 1

II.    ARGUMENT ............................................................................................. 3

     A.     Referral to the Copyright Office Will Show Plaintiff Has Not Met the Pre-Suit Registration Requirement .............................................................. 3

     B.     The Supplemental Registrations Would Not Have Been Granted Had the Copyright Office Been Notified of this Litigation ................................ 10

III.   CONCLUSION ........................................................................................ 13

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Feist Pub., Inc. v. Rural Tel. Serv. Co., Inc.*,
499 U.S. 340 (1991)............................................................................................2, 5, 6

*Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*,
No. 3:17 Civ. 42, 2019 WL 4647305 (S.D. Ohio Sept. 24, 2019).........................10

*Gomba Music, Inc. v. Avant*,
62 F. Supp. 3d 632 (E.D. Mich. 2014)..................................................................10

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
142 S. Ct. 941 (2022)..............................................................................................2

**Statutes**

17 U.S.C. § 103 ................................................................................................ *passim*

17 U.S.C. § 409 ................................................................................................5, 6, 7, 9

17 U.S.C. § 411 ................................................................................................ *passim*

17 U.S.C. § 508 ................................................................................................10

**Rules**

Local Rule 3.13(c)(2)........................................................................................1, 11

**Other Authorities**

Compendium of U.S. Copyright Office Practices (3d ed.), *available at*
https://www.copyright.gov/comp3/ ....................................................................10, 13

REPORT ON THE FILING OR DETERMINATION OF AN ACTION OR APPEAL REGARDING
A COPYRIGHT, *available at*
https://www.ohnd.uscourts.gov/sites/ohnd/files/AO121.pdf..................................11

Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively, "Take-Two") respectfully submit this response to the Order to Show Cause. Dkt. 217 (Ord.).

## I.    INTRODUCTION

A fundamental part of the copyright system is its reliance on applicants to make truthful and accurate disclosures of pre-existing works when applying for a copyright registration. This is critical. It enables the Copyright Office to determine whether the work is sufficiently original to register, and it allows the public to understand whether the claimed copyright has a more limited scope than the entire work.

This case presents these precise problems. Plaintiff James Hayden did not disclose to the Copyright Office that (1) the Brother's Keeper Tattoo on Tristan Thompson was copied from the Bible and the Sistine Chapel; (2) the Lion Tattoo on LeBron James was copied from the registered trademark of the Venetian Resort; (3) the Scroll Tattoo is comprised mainly of work by another tattooist to which Plaintiff merely added unauthorized shading and *de minimis* other material; and (4) the Fire Tattoo likewise is an unauthorized derivative work of a preexisting tattoo. These facts directly undermine Plaintiff's claim that the tattoos are original. As a result, when Plaintiff applied to register these tattoos without disclosing them, his material misrepresentations allowed him to obtain registrations in unauthorized derivative works and works that he did not independently create. Nor was this an innocent mistake—it is impossible for Plaintiff to assert that he was not aware of the very pre-existing sources that he copied to create the tattoos.

In addition to his lack of candor before the Copyright Office, Plaintiff violated Local Rule 3.13(c)(2) by failing to file form AO 121 when he commenced this litigation. As a result of Plaintiff's failure to follow the Local Rules, it appears that the Clerk of the Court did not transmit form AO 121 to the Copyright Office, notifying it that this litigation had been filed. Plaintiff

then applied for two supplemental registrations to address his material misrepresentations and alter the scope of what was covered by the original registrations. And, despite filing four complaints, he never filed form AO 121. As Plaintiff did not inform the Copyright Office of this litigation, the Copyright Office appears to have been unaware of this litigation or how granting supplemental registrations might impact it.

In light of Plaintiff's material misrepresentations, Take-Two agrees with the Court that a referral to the Copyright Office is required. Although Take-Two initially intended to request such a referral after trial as occurred in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941 (2022), Take-Two has no cause to object to the Court's immediate referral of this matter to the Copyright Office to resolve the issue and properly inform the Copyright Office of the litigation. In fact, due to the dispositive impact that the Copyright Office's decision may have, and in light of the efficiency and jurisdictional concerns raised by this Court about issuing an *advisory* decision, Take-Two now believes the better course is to refer these registration matters to the Copyright Office now and not conduct a trial until after the Copyright Office issues its decisions.

Take-Two also submits that, when the Court refers the matter to the Copyright Office, the Office will confirm that had it known of Plaintiff's many misrepresentations it would have refused to register these works. This is because, as described below, copyright protection requires independent creation and does not extend to unauthorized derivative works. *See Feist Pub., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 346 (1991); 17 U.S.C. § 103(a). If the Copyright Office makes such a finding, Take-Two also contends that Plaintiff cannot meet 17 U.S.C. § 411(a)'s requirement that his works be registered before commencing this lawsuit. Such a finding would dispose of most of the registrations in this case, leaving only two tattoos,

both of which were inked on LeBron James—the Gloria Tattoo and the Shoulder Stars Tattoo—which, as Take-Two explained, are unprotectable *scenes-a-faire*, consisting of common tropes in tattooing, short phrases, and public domain material. *See* Dkt. 112 at 10–11. Accordingly, as referral could have a significant impact on the scope of the forthcoming trial, Take-Two agrees that referral now is appropriate and efficient.

## II.    ARGUMENT

### A.    Referral to the Copyright Office Will Show Plaintiff Has Not Met the Pre-Suit Registration Requirement

Four of Plaintiff's copyright registrations, submitted on his behalf by his attorney, contain numerous material inaccuracies of which he undeniably knew because they relate to the origins of the material that he claims to have inked.   These inaccuracies have significant implications for this lawsuit.  Pursuant to 17 U.S.C. § 411(a), "no civil action for infringement of the copyright in any United States work shall be instituted until . . . registration of the copyright claim has been made in accordance with this title."  17 U.S.C. § 411(b)(1) provides that, if a certificate of registration contains inaccurate information, it satisfies the registration requirement *unless* "(a) the inaccurate information was included on the application for registration with knowledge that it was inaccurate; and (b) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(2) provides that, where knowingly inaccurate information is alleged, the court "shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration."  Take-Two contends that Plaintiff's copyright registrations contain knowingly inaccurate information and, thus, this Court is required to request that the Register advise it as to whether the inaccurate information would have caused the registrations to be refused.

Take-Two expects referral to the Copyright Office to show that the Office would have refused registration. ***First***, the Brother's Keeper Tattoo (Reg. No. VAu-001-292-453) on Tristan Thompson's chest was copied from Michelangelo's iconic Sistine Chapel fresco, "The Creation of Adam," with the phrase "my brother's keeper" copied from the Biblical story of Cain and Abel. A side-by-side comparison of Michelangelo's work with Plaintiff's is shown below.

 

The Sistine Chapel         Brother's Keeper Tattoo

Mr. Thompson himself explained that "The words 'My Brother's Keeper' are from the Book of Genesis and reference the story of Cain and Abel," and that "the image of the hand of God reaching out to touch the hand of man," is "part of the Sistine Chapel." Dkt. 101-04 (T. Thompson Decl.) ¶ 6; Dkt. 162-04 (T. Thompson Dep. Tr.) at 96:17–98:8. Mr. Hayden did not disclose that the Brother's Keeper Tattoo was copied from pre-existing sources when he registered it with the Copyright Office. *See* Dkt 101-49 (Copyright Application) at 74–87.[1] This is despite the fact that a copyright application requires disclosing: "if the copyright claimant is not the author, a brief statement of how the claimant obtained ownership of the copyright," "an identification of any preexisting work or works that it is based on or incorporates," and "any other information regarded by the Register of Copyrights as bearing upon the preparation or

---

[1] There is no supplemental registration for the Brother's Keeper Tattoo.

identification of the work or the existence, ownership, or duration of the copyright." *See* 17 U.S.C. § 409 (5), (9), & (10).

Take-Two submits that had this information been properly disclosed, the Copyright Office would have refused to register the work on two bases. As an initial matter, it does not meet the independent creation requirement for originality. *See Feist*, 499 U.S. at 346. Further, under 17 U.S.C. § 103(b), copyright protection does not extend to pre-existing material employed in a work, the My Brother's Keeper Tattoo is comprised entirely of such pre-existing material, and the selection of a Biblical phrase paired with a chapel fresco is not minimally creative. Pursuant to 17 U.S.C. § 411(b), the Copyright Office should be asked whether it would have refused to register the Brother's Keeper Tattoo had Plaintiff disclosed these pre-existing sources.

***Second***, the Lion Tattoo (Reg. No. VAu-001-271-044) on LeBron James was copied from a playing card from the Venetian Resort. *See* Dkt. 212-08 (Venetian Playing Cards); Dkt. 101-48 (Venetian Trademark Registration).

 


**Venetian Resort Logo**          **Lion Tattoo**

This is confirmed not only by comparing the two (as shown above), but by the testimony of both Mr. Hayden and Mr. James. Dkt. 101-21 (J. Hayden Dep. Tr.) at 81:25–82:8, 83:21–25, 116:20–117:2 (Q: "Did Mr. James bring anything into your shop to show what he wanted the lion tattoo to look like?" A: "It was a reference card, like a playing card." Q: "Did he come into

your shop with a playing card that depicted a lion?" A: "Yeah."); Dkt. 101-02 (L. James Decl.) ¶ 8 ("The picture of a lion holding a shield was on a deck of playing cards from the Venetian Resort that I brought with me to Mr. Hayden."); Dkt. 162-03 (L. James Dep. Tr.) at 116:11–23. Mr. Hayden did not disclose that the Lion Tattoo was copied from a pre-existing logo when he registered it with the Copyright Office. *See* Dkt 101-49 (Copyright Application) at 16–30.[2] This is despite the fact a copyright application requires disclosing: "if the copyright claimant is not the author, a brief statement of how the claimant obtained ownership of the copyright," "an identification of any preexisting work or works that it is based on or incorporates," and "any other information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright." *See* 17 U.S.C. § 409 (5), (9) & (10).

Take-Two submits that had this information been properly disclosed, the Copyright Office would have refused to register the work on the same two bases. It does not meet the independent creation prong of originality because it was copied. *See Feist*, 499 U.S. at 346. Moreover, under 17 U.S.C. § 103(a), copyright protection does not extend to unauthorized derivative works, and Plaintiff inked the Lion Tattoo using the Venetian hotel logo without permission. Pursuant to 17 U.S.C. § 411(b), the Copyright Office should be asked whether it would have refused to register the Lion Tattoo had Plaintiff disclosed it was copied from this pre-existing source.

*Third*, the Scroll Tattoo (Reg. No. VAu-001-287-545) on Danny Green is an unauthorized derivative work, comprised primarily of elements inked by another tattooist. *See* Dkt. 95-22 (Hayden Dep. Tr.) at 99:13–100:7. As shown below, Mr. Green's arm before

---

[2] There is no supplemental registration for the Lion Tattoo.

6

Plaintiff inked the Scroll Tattoo already had a scroll with the names "Rashad," "Devonte," and "Dante" (left). Plaintiff merely added shading and illustrations around on the edges (right).

 

**Before**          **After**

There is no evidence in the record that Plaintiff had permission from the prior tattooist to create a derivative work of the pre-existing scroll on Mr. Green's body. When he had his lawyer apply to register the Scroll Tattoo, Plaintiff did not disclose this other author or limit his claim in the tattoo in any way. Dkt. 94-09 (Copyright Registration) at 1–3; Dkt. 101-49 (Copyright Application). This is despite the fact a copyright application requires disclosing: "if the copyright claimant is not the author, a brief statement of how the claimant obtained ownership of the copyright," "an identification of any preexisting work or works that it is based on or incorporates," and "any other information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright." *See* 17 U.S.C. 409 (5), (9) & (10). Midway through this lawsuit, Plaintiff applied for a supplemental registration that would include a limitation of claim consistent with these undisputed facts. This is further evidence that, when he applied for the original copyright registration, Plaintiff knowingly misrepresented to the Copyright Office that he created the tattoo in its entirety when he did not. Further, Plaintiff never disclosed—not in the application for the original registration or the supplemental registration—that the tattoo was based on material

created by *a different tattooist* from whom Plaintiff did not have permission to create a derivative work and, thus, the tattoo is not copyrightable. 17 U.S.C. § 103(a). Moreover, with regard to the supplemental registration, these are material changes, not minor clerical errors, and thus the supplemental registration should not have been issued in the midst of this lawsuit. *Infra* 10–13.

Take-Two submits that had this information been properly disclosed, the Copyright Office would have refused the original application and the supplemental registration. Pursuant to 17 U.S.C. § 411(b), the Copyright Office should be asked whether it would have refused to register the Scroll Tattoo had Plaintiff disclosed it was derived from another author's work.

**Fourth**, the Fire Tattoo (Reg. VAu-001-287-552) on Danny Green is an unauthorized derivative work, comprised primarily of elements inked by another tattooist. *See* Ex. A (Hayden Dep. Tr.) at 93:6–96:19. A side-by-side of Mr. Green's arm before and after Plaintiff inked the Fire Tattoo is shown below, illustrating how the entire basketball player, some of the flames, the text, and initials were already on Mr. Green's body before he was inked by Plaintiff, and Plaintiff merely added additional flames—the main portion of the tattoo was inked by a different tattoo artist.

 

**Before** **After**

Plaintiff testified that he did not ask the permission of the first tattooist, did not ask permission to modify the work, and did not think he had to ask permission from the tattooist so long as he had permission to modify the tattoo from Mr. Green. *See* Dkt. 101-21 (Hayden Dep.

Tr.) at 94:9–23. When he had his lawyer apply to register the Fire Tattoo, Plaintiff did not disclose this other author or limit the claim in any way. Dkt. 94-09 (Copyright Registration) at 1–3; Dkt. 101-49 (Copyright Application). This is despite the fact a copyright application requires disclosing: "if the copyright claimant is not the author, a brief statement of how the claimant obtained ownership of the copyright," "an identification of any preexisting work or works that it is based on or incorporates," and "any other information regarded by the Register of Copyrights as bearing upon the preparation or identification of the work or the existence, ownership, or duration of the copyright." *See* 17 U.S.C. 409 (5), (9), & (10). Midway through this lawsuit, Plaintiff applied for a supplemental registration that would include a limitation of claim consistent with these undisputed facts. This is further evidence that, when Plaintiff applied for the original registration, he knowingly misrepresented to the Copyright Office that he created the tattoo in its entirety when he did not. Further, Plaintiff never disclosed—not in the application for the original registration or for the supplemental registration—that the tattoo was based on material created by *a different tattooist* from whom Plaintiff did not have permission to create a derivative work and, thus, the tattoo is not copyrightable. 17 U.S.C. § 103(a). Moreover, with regard to the supplemental registration, these are material changes, not minor clerical errors, and thus the supplemental registration should not have been issued in the midst of this lawsuit. *Infra* 10–13.

Take-Two submits that had this information been properly disclosed, the Copyright Office would have refused the original application and the supplemental registration. Pursuant to 17 U.S.C. § 411(b), the Copyright Office should be asked whether it would have refused to register the Fire Tattoo had Plaintiff disclosed it was derived from another author's work.[3]

---

[3] Each of the inaccuracies described herein related to the Brother's Keeper Tattoo, Lion Tattoo, Fire Tattoo, and Scroll Tattoo, also bear on Take-Two's common law fraud on the Copyright Office defense. Even if the Court

**B.      The Supplemental Registrations Would Not Have Been Granted Had the
Copyright Office Been Notified of this Litigation**

In addition to the Copyright Office refusing to register the four tattoos discussed above

had it known the true facts concerning their creation, it also would have refused to issue

Plaintiffs' supplemental registrations for the Scroll Tattoo and Fire Tattoo if it had been aware of

this litigation.  The policy of the Copyright Office as set forth in the Copyright Compendium is

that "[i]f the U.S. Copyright Office is aware that there is actual or prospective litigation or an

adverse claim involving a basic registration, the Office may decline to issue a supplementary

registration until the applicant has confirmed in writing that the dispute has been resolved."

Compendium of U.S. Copyright Office Practices § 1802.9(G), *available at*

https://www.copyright.gov/comp3/ (hereinafter "Compendium")).  Circumstances where the

Office may decline to issue a supplementary registration include "if it seems likely that the

proposed change would be directly at issue in the litigation" or "the proposed change, correction,

or amplification may confuse or complicate the pending dispute."  *Id.*

Plaintiff never notified the Copyright Office of this litigation despite being required to do

so.  Pursuant to 17 U.S.C. § 508, courts must "send written notification to the Register of

Copyrights setting forth, as far as is shown by the papers filed in the court, the names and

addresses of the parties and the title, author, and registration number of each work involved in

the action."  17 U.S.C. § 508(a).  This Court effectuates this statutory directive by requiring that,

---

does not refer this issue or the Copyright Office indicates that it would nevertheless have issued the
registrations, the common law defense of fraud on the Copyright Office provides that a copyright is invalid
where: "(1)the application for the copyright is factually inaccurate; (2) the inaccuracies were willful or
deliberate; and (3) the Copyright Office relied on those misrepresentations."  *Freeplay Music, LLC v. Dave
Arbogast Buick-GMC, Inc.*, No. 3:17 Civ. 42, 2019 WL 4647305, at *7 (S.D. Ohio Sept. 24, 2019); *Gomba
Music, Inc. v. Avant*, 62 F. Supp. 3d 632, 642 (E.D. Mich. 2014) (allowing declaratory action for invalidity
based on fraud on the copyright office).  Unlike 17 U.S.C. § 411(b), the Copyright Office does not need to
inform the Court that it would have refused the registration nor that it would have done so for such
misrepresentations to constitute fraud.

"[i]n all cases involving copyright claims," the party filing the complaint "***must file*** an AO 121 Report on the Filing or Determination of an Action or Appeal Regarding a Copyright Form identifying the copyright registration number(s)." LR 3.13(c)(2) (emphasis added). That form is readily available on this Court's website. *See* REPORT ON THE FILING OR DETERMINATION OF AN ACTION OR APPEAL REGARDING A COPYRIGHT, *available at* https://www.ohnd.uscourts.gov/sites/ohnd/files/AO121.pdf. Despite this requirement, Plaintiff never filed the required form. As a result, it does not appear that the form was transmitted to the Copyright Office and, when Plaintiff applied for the supplemental registrations, the Copyright Office did not know that the original registrations were at issue in this litigation.

Had the Copyright Office been aware of this litigation, it would have refused to issue Plaintiff's supplemental registrations. As explained above, Danny Green already had pre-existing tattoos on his arms at the time that Plaintiff inked him, to which Plaintiff merely added shading and *de minimis* other material. *Supra* 6. Shortly before Plaintiff filed this litigation, he filed his registrations for copyrights in the Fire Tattoo and Scroll Tattoo along with the following deposit copies, showing the entirety of the Fire Tattoo and Scroll Tattoo. He did not indicate the material that he did not create, and he did not exclude it from his claim:




| Fire D.G. (*see* Dkt. 95-50 at 56) | Scroll D.G. (*see* Dkt. 95-50 at 70) |

Plaintiff then sued Take-Two for copyright infringement, asserting that he "created the following design on Mr. Green," indicating the entirety of the Fire Tattoo and Scroll Tattoo that are inked on Danny Green, asserting that he was the "author" of the designs, and claiming that each design was "an original work of authorship by HAYDEN." *See* Dkt. 1 (Compl.) ¶¶ 64–66, 67–69; *see also* Dkt. 3 (First. Am. Compl.) ¶¶ 65–67, 72–74 (same); Dkt. 12 (Sec. Am. Compl.) ¶¶ 66–68, 73–75 (same). In June 2019 (midway through this litigation), Plaintiff responded to an interrogatory by admitting that the Fire Tattoo and Scroll Tattoo were each based on material created by *a different tattooist*. *See* Ex. B (Pl.'s Obj. & Resps. to Take-Two's First Set of Interrogs.) at 8–9. Plaintiff then applied for supplemental registrations in which he excluded significant portions of each of the two tattoos. For the Fire Tattoo, he excluded "2-D artwork, Outline of character, outline of additional shapes, and text." *See* Dkt. 94-08 (Fire D.G. Suppl. Cert. of Reg.) at 6. For the Scroll Tattoo, he excluded "2-D artwork, Outline of scroll and text within the scroll." *See* Dkt. 94-09 (Scroll D.G. Suppl. Cert. of Reg.) at 6. As this Court found, what remained were only "the enhancements, accents, shading and other design elements surrounding existing tattoos (presumably by another artist)." Ord. 2. As Plaintiff is the person who inked the additions, he knew at the time that he filed his copyright registrations in the Scroll Tattoo and Fire Tattoo that he did not author the work that he was registering.[4]

The elements that Plaintiff excluded from his registration in the middle of this litigation were hotly disputed by the parties. Plaintiff's complaints accused Take-Two of infringing the entirety of the Scroll Tattoo and Fire Tattoo. Only after Take-Two propounded an interrogatory on Plaintiff asking him to explain the conception and creation of the Fire Tattoo and Scroll

---

[4] Even in his Fourth Amendment (and currently operative) Complaint, Plaintiff attaches only his original registrations for the Scroll Tattoo and the Fire Tattoo that do not indicate any material excluded from his copyright claim. *See* Dkt. 33 (Fourth Am. Compl.) Exs. F & G. Nor does he attach the supplemental registrations thereto.

Tattoo did he apply for supplemental registrations.  The significant changes that Plaintiff made in applying for his supplemental registrations, however, were not minor changes such as "spelling mistakes, clerical errors, or changes to the title of the work," which may be supplemented during litigation.  Compendium § 1802.9(G).  Rather, they were an attempt to carve out the pre-existing work of an entirely different tattooist or tattooists, despite the fact that Plaintiff was aware when he first applied for his copyright registrations that they were based on a pre-existing work.  *See* Dkt. 101-03 (Decl. of Danny Green) ¶¶ 6–7.  Thus, the Office should advise whether, had it been aware of this litigation, these "material changes bearing on authorship and originality would have resulted in a refusal of registration."  Ord. 3.

Further, even in Plaintiff's applications for the supplemental registrations, he did not disclose that the tattoos were unauthorized derivative works, making them not proper subject matter for registration.  *See supra* 6.  Had the Office been aware of this litigation when it reviewed the applications it would have also been aware that Plaintiff's registrations were for unauthorized derivative works.  Thus, and relatedly, the Office should be asked whether its knowledge of the pending litigation would have caused it to refuse the supplemental registrations as involving unauthorized derivative works.

## III.    CONCLUSION

For the foregoing reasons, Take-Two requests that this Court request that the Copyright Office indicate (a) whether the inaccuracies in Plaintiff's applications for copyright, if known, would have caused the Copyright Office to refuse registration for the Brother's Keeper Tattoo, the Lion Tattoo, the Scroll Tattoo, and the Fire Tattoo; and (b) whether the knowledge of this pending litigation and the material changes bearing on authorship and originality would have resulted in a refusal to issue the supplemental registrations for the Scroll Tattoo and the Fire Tattoo.

Dated: May 5, 2023

/s/ Dale M. Cendali

Dale M. Cendali (*pro hac vice*)
Joshua L. Simmons (*pro hac vice*)
Chris Ilardi (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com

Miranda D. Means (*pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Yungmoon Chang (*pro hac vice*)
Kirkland & Ellis LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4359
yungmoon.chang@kirkland.com

Matthew J. Cavanagh (0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Take-Two 2K Games, Inc. and*
*Take-Two Interactive Software, Inc.*

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


JAMES HAYDEN,                     CASE NO: 1:17CV2635

        Plaintiff,

         v.

2K GAMES, INC., et al.,

        Defendants.

------------------------------



Deposition of JAMES HAYDEN

Cleveland, Ohio

Wednesday, October 30, 2019 - 9:04 a.m.







Reported by:

Angela Nixon, RMR, CRR

Job No.: 26345

```
 1    A.          The process is for me to use a Sharpie to produce
 2    the image that I tattoo.
 3    Q.          Okay.  So when Mr. -- did Mr. Green make an
 4    appointment to have a tattoo inked on him with you?
 5    A.          Yes.
 6    Q.          Okay.  And when he came in, did he tell you what
 7    he had in mind for this tattoo?
 8                MR. MCMULLEN:  Objection.
 9    A.          I think so.
10    Q.          What do you recall him saying?
11    A.          Make it look good.
12    Q.          Okay.  Did he say what he wanted you to do?
13    A.          No.
14    Q.          Did he say where he wanted the tattoo?
15    A.          Where it's pictured at.
16    Q.          Which is his left arm, is that right?
17    A.          Left upper shoulder.
18    Q.          Okay.  So was there already a tattoo on his left
19    upper shoulder?
20    A.          Yes.
21    Q.          What was on there originally?
22    A.          An outline form of this basketball player.
23    Q.          So he already had that basketball player inked by
24    somebody else, is that right?
25                MR. MCMULLEN:  Objection.
```

Page 94

```
 1   A.         Yes.

 2   Q.         Do you know who that was?

 3   A.         Who what was?

 4   Q.         Who the tattooist was that inked him?

 5   A.         No, I don't.

 6   Q.         Did you then add to the tattoo that the first

 7   tattooist did?

 8   A.         Yes.

 9   Q.         And did you add more shading and detail to the

10   original tattoo?

11   A.         Yes.

12   Q.         And did you ask the permission of the first

13   tattoo artist before doing that?

14   A.         No.

15   Q.         Did you think you needed to ask his permission?

16              MR. MCMULLEN:  Objection.

17   A.         No.

18   Q.         Why not?

19   A.         I don't know.

20   Q.         Did you think if it was okay with Mr. Green,

21   that's all you needed?

22              MR. MCMULLEN:  Objection.

23   A.         I guess so.

24   Q.         Is the basketball player depicted on the arm, did

25   you understand that to be a likeness of Mr. Green or some
```

1    generic player?

2              MR. MCMULLEN:  Objection.

3    A.        I have no idea.

4    Q.        So how did it come about that flames were

5    included?

6    A.        A red Sharpie and my hand, my art work, I just of

7    of -- just drew it on him.

8    Q.        Okay.  But did you have a conversation with

9    Mr. Green about whether to include flames around this

10   figure?

11   A.        After I drew it on him and he took a look in the

12   mirror.

13   Q.        Did he approve the tattoo before you inked it on

14   him?

15             MR. MCMULLEN:  Objection.

16   A.        Yes.

17   Q.        And it says hold my own in letters at the top,

18   correct?

19   A.        Yes.

20   Q.        Did you ink those on Mr. -- no, it says I hold my

21   own, am I reading it correctly now?

22   A.        Yes.

23   Q.        And was the phrase I hold my own already inked on

24   Mr. Green when you worked on him?

25   A.        Yes.

1    Q.        So -- and at the bottom where it says D.G., the

2    initials, was that already on the -- inked on Mr. Green

3    when you --

4    A.        I'd have to look at a previous tattoo, but I

5    don't know if I did that or if it was already there.

6    Q.        So what -- is it your best recollection that you

7    added the flames and the -- and more detailing to the body

8    of the basketball player, and that's what you did to create

9    this tattoo?

10             MR. MCMULLEN:  Objection.

11   A.        I created the flames and everything else, yeah,

12   with a Sharpie.

13   Q.        Well, the everything else -- I'm just trying to

14   find out what you did versus the original tattoo.  You

15   added more detail to the basketball player and you added

16   the flames, right?

17   A.        Yes.

18   Q.        Did you do anything else?

19   A.        Just what you said.

20   Q.        Okay.  And did you have a conversation with

21   Mr. Green as to why he wanted the -- the phrase I hold my

22   own inked on his body?  I know it had already been there,

23   but did you talk to him about --

24   A.        I can't remember if we did --

25   Q.        -- that phrase?

1    A.        Yes.

2    Q.        And who was present when the scroll tattoo in

3    Exhibit 10 is done?

4    A.        I don't remember.

5    Q.        Do you recall if there was anyone there other

6    than you and Mr. Green?

7    A.        I think customers in the shop maybe.

8    Q.        But no specific people you can recall?

9    A.        No.

10   Q.        And what about with Exhibit 9, the flame tattoo,

11   was anyone else there other than you and Mr. Green?

12   A.        No, I can't remember.

13   Q.        And with regard to the scroll tattoo, did -- what

14   did Mr. Green say to you about what he wanted that tattoo

15   to look like?

16             MR. MCMULLEN:  Objection.

17   A.        I can't remember the exact words, he wanted to

18   make it look good.

19   Q.        Well, did he tell you what -- anything about what

20   his general idea was for the tattoo?

21             MR. MCMULLEN:  Objection.

22   A.        No, not that I remember.

23   Q.        Well, when you inked the scroll tattoo on

24   Mr. Green, was there already some preexisting tattoo on his

25   arm?

```
 1               MR. MCMULLEN:  Objection.
 2    A.        Yes, the scroll was outlined, and the names were
 3    outlined.
 4    Q.        So the names Rashad, DeVonte and Donte, those
 5    were already inked on Mr. Green when you added the scroll,
 6    right?
 7    A.        The art work, yes.
 8    Q.        And did you understand that those were names of
 9    Mr. Green's family members?
10    A.        I think they -- yes.
11    Q.        Did you understand that those were his kids?
12    A.        The who?
13    Q.        That those were his children?
14    A.        No.
15    Q.        Who do you understand the names to be?
16    A.        I'm not sure who they are, I think his brothers.
17    Q.        And did he talk to you about those -- or his
18    brothers' names and he --
19    A.        I think so.
20    Q.        Did he give you the impression that he wanted to
21    honor his brothers by putting their names on his arm?
22               MR. MCMULLEN:  Objection.
23    A.        I guess so.
24    Q.        So did Mr. Green tell you that he wanted to
25    emphasize the names more by putting a scroll around them?
```

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES HAYDEN, | ) | |
| | ) | CASE NO. 1:17-cv-02635-CAB |
| Plaintiff, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | |
| | ) | |
| 2K GAMES, INC. et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF
INTERROGATORIES (1–15)**

Under the Federal Rules of Civil Procedure 26 and 33 and the Local Civil Rules for the

United States District Court for the Northern District of Ohio, Plaintiff James Hayden

("Hayden") objects and responds to Defendants' (2K Games, Inc. and Take-Two Interactive

Software, Inc.) (collectively ("Take-Two")) First Set of Interrogatories (Nos. 1–15) as follows:

**GENERAL STATEMENT**

Hayden's responses are made without in any way waiving or intending to waive but, on

the contrary, intending to preserve and expressly preserving:

(1) the right to raise all questions or relevancy, materiality, privilege, and admissibility into

evidence to any interrogatory or the answer thereto;

(2) the right to object on any grounds at any time to other interrogatories or other discovery

involving the information provided; and

(3) the right to make further answers or to supplement or revise answers, as Hayden's

investigation of the facts and the evidence pertinent to this action has not been completed.

Hayden's responses are each subject to his General Objections below. Further, each

response contains specific objections to the applicable interrogatory request. From time to time, a

9. Hayden objects to Take-Two's definitions, instructions, and interrogatories to the extent that they seek information or documents that are already in Take-Two's possession, custody, and control or are publicly available.

10. Hayden objects to Take-Two's definitions, instructions, and interrogatories to the extent they require Hayden to invade the individual rights of his employees.

11. Hayden objects to the numbering of Take-Two's fifteenth interrogatory as "Interrogatory No. 14." Hayden will refer to Take-Two's fifteenth interrogatory as "Interrogatory No. 15" and count it as Take-Two's fifteenth interrogatory under the Federal Rules of Civil Procedure.

12. Hayden objects to the definition of "HAYDEN," "YOU," and "YOUR" as overbroad, vague, ambiguous, and unduly burdensome. Hayden further objects to Take-Two's definition of "HAYDEN," "YOU," and "YOUR" as overbroad to the extent it includes entities or persons who are not parties to this case, entities or persons over which Hayden has no control, including but not limited to former agents, employees, accountants, attorneys, and all other persons or entities acting or purporting to act on his behalf. Hayden will construe "you" and "your" to mean James Hayden.

13. Hayden objects to the definition of "ASSERTED WORKS" as overbroad and unduly burdensome to the extent it includes works no longer relevant to the case.

14. Hayden objects to the definition of "NBA PLAYERS" as overbroad and unduly burdensome to the extent it includes players no longer relevant to the case.

**INTERROGATORY NO. 1**

DESCRIBE the conception and creation of the ASSERTED WORKS, including without limitation (a) any works used or relied upon in the creation of the ASSERTED WORKS, (b) the

sources of inspiration for the ASSERTED WORKS, (c) the chronology of the ASSERTED

WORKS' creation, (d) the reasons that the ASSERTED WORKS were created, and (e) the NBA

PLAYERS' roles in creating the ASSERTED WORKS.

**RESPONSE:**

Hayden incorporates his General Statement and General Objections as if fully rewritten

herein. Hayden also objects to this interrogatory because it is overbroad and unduly burdensome;

for example, it requests information that is not relevant, including information about Hayden

tattoos that are not relevant to the claims or defenses in this case. Hayden also objects to this

interrogatory to the extent the vague and ambiguous terms and phrases "works used or relied

upon," "sources of inspiration," "chronology of the ASSERTED WORKS' creation," and "the

reasons" render this interrogatory not relevant to any claims or defenses in this case, overbroad

and unduly burdensome, or not proportional to the needs of the case. Hayden also objects to this

interrogatory for containing multiple subparts and objects to the extent any subpart exceeds the

allowed number of interrogatories under Fed. R. Civ. P. 33(a)(1).

Subject to and without waiver of the foregoing objections and its General Objections,

Hayden responds as follows:

*Gloria*

Hayden tattooed the Gloria tattoo, as described in paragraphs 45–51 in the Second

Amended Complaint (ECF No. 12) ("Complaint"), on LeBron James's right shoulder at

Hayden's tattoo shop, Focused Tattoos, on East 26th and St. Clair in Cleveland, Ohio. Several of

Hayden's satisfied former customers had recommended him to Mr. James. Mr. James came to

Hayden's tattoo shop and told Hayden that he wanted a better lion and his mother's name,

Gloria, tattooed on his arm to cover up an old tattoo of a lion. Hayden then freehanded a draft of

6

the Gloria Tattoo on Mr. James's right shoulder. Mr. James was satisfied with the draft and told Hayden to tattoo it as it was freehanded, which Hayden did. Mr. James had no suggested revisions or comments regarding the tattoo. Mr. James's status as an elite NBA player was one source of inspiration for the Gloria tattoo. Hayden independently conceived of and created many expressive elements of the Gloria tattoo, for example, the size, shape, shading, arrangement, proportions, and placement of each element, including the lion's appearance and facial expression, to create a unique and expressive tattoo that would aesthetically complement the shape and size of Mr. James's arm and be visually appealing.

*Lion*

Hayden tattooed the Lion tattoo, as described in paragraphs 52–58 of the Complaint, on LeBron James's chest in 2008 at Hayden's tattoo shop, Focused Tattoos, on East 26th and St. Clair in Cleveland, Ohio. Mr. James came to Hayden's shop and requested a lion tattoo on his chest. Hayden drew a draft of the Lion tattoo on Mr. James's chest and Mr. James approved. A playing card that Mr. James showed Hayden was one source of inspiration for the Lion tattoo. Hayden independently conceived of and created many expressive elements of the Lion tattoo, for example, the size, shape, shading, arrangement, proportions, and placement of each element, including the lion's appearance and facial expression, that would aesthetically complement the shape and size of Mr. James's chest and be visually appealing. Mr. James was satisfied with the draft and told Hayden to tattoo it as it was drawn, which Hayden did. Mr. James had no suggested revisions or comments regarding the tattoo.

*Shoulder Stars*

Hayden tattooed the Shoulder Stars tattoo, as described in paragraphs 59–65 of the Complaint, on LeBron James's left shoulder in 2008 at Hayden's tattoo shop, Focused Tattoos,

on East 26th an St. Clair in Cleveland, Ohio. Mr. James came to Hayden's shop and told Hayden that he wanted something on top of his shoulder. Mr. James's status as the team leader of the Cleveland Cavaliers was one source of inspiration for the Shoulder Stars tattoo. Hayden independently conceived of and created many expressive elements of the Shoulder Stars tattoo, for example, the size, shape, shading, arrangement, sequence, number, proportions, and placement of each element to create a unique and expressive tattoo that would aesthetically complement the shape and size of Mr. James's shoulder, be in balance with Mr. James's tattoo on his right shoulder, and be visually appealing. Hayden first drew the Shoulder Stars tattoo on Mr. James's shoulder with a marker, and Mr. James approved with no suggested revisions. Hayden then tattooed the Shoulder Stars on Mr. James the same day.

***Fire***

Hayden tattooed the Fire tattoo, as described in paragraphs 66–72 of the Complaint, on Danny Green's left shoulder in 2012 at Hayden's tattoo shop, Focused Tattoos, on Coventry Road in Cleveland, Ohio. Mr. Green wanted an additional tattoo on his left shoulder. Hayden came up with the idea to add flames to Mr. Green's shoulder, which was already tattooed with the player and words "I hold my own" shown in ¶ 66 of the Complaint.  After Hayden described the concept to Mr. Green, Hayden free-handed the flames with the tattoo gun directly onto Mr. Green's shoulder. Mr. Green's reputation as an elite NBA shooter was one source of inspiration for the Fire tattoo. Hayden independently conceived of and created many expressive elements of the Fire tattoo, for example, the size, shape, shading, arrangement, proportions, and placement of each element that would aesthetically complement the shape and contour of Mr. Green's shoulder and be visually appealing. Mr. Green did not have any revisions after the Fire tattoo was done.

***Scroll***

Hayden tattooed the Scroll tattoo, as described in paragraphs 73–79 of the Complaint, on Danny Green's right inner bicep in 2012 at Hayden's tattoo shop, Focused Tattoos, on Coventry Road in Cleveland, Ohio. Mr. Green wanted to add an additional tattoo to the scroll and wording, which was already tattooed on his right inner bicep. Hayden independently conceived of and created many expressive elements of the Scroll tattoo, for example, the size, shape, shading, arrangement, proportions, and placement of each element, including the cloud-like designs, to create a unique and expressive tattoo that would aesthetically complement the shape and contour of Mr. Green's arm and be visually appealing. Mr. Green did not have any revisions after the Fire tattoo was done.

***Brother's Keeper***

Hayden tattooed the Brother's Keeper tattoo, as described in paragraphs 80–86 of the Complaint, on Tristan Thompson's chest in 2012 at Hayden's tattoo shop, Focused Tattoos, on Coventry Road in Cleveland, Ohio. Mr. Thompson came to the shop and requested a tattoo on his chest. Mr. Thompson's role as a good teammate to the other members of his basketball team and Michelangelo's ceiling mural in the Sistine Chapel were among the sources of inspiration for the Brother's Keeper tattoo. Hayden independently conceived of many expressive elements of the Brother's Keeper tattoo, for example, the size, shape, shading, arrangement, proportions, and placement of each element to create a unique and expressive tattoo that would aesthetically complement Mr. Thompson's chest and be visually appealing. Hayden freehanded a draft of the Brother's Keeper tattoo onto Mr. Thompson's chest in marker. Mr. Thompson had no revisions and after Mr. Thompson approved, Hayden tattooed the Brother's Keeper tattoo onto Mr.

9

Thompson. Mr. Thompson did not have any revisions after the Brother's Keeper tattoo was done.

Hayden's investigation is on-going, and he will supplement his response to this interrogatory with further information and documents as they become available.

**INTERROGATORY NO. 2**

IDENTIFY all PERSONS with knowledge of the creation of the ASSERTED WORKS including without limitation any pre-existing materials used to create them.

**RESPONSE:**

Hayden incorporates his General Statement and General Objections as if fully rewritten herein. Hayden also objects to this interrogatory because it is overbroad and unduly burdensome; for example, it requests information not relevant to the claims or defenses in this case, including about Hayden tattoos that are not relevant to the claims or defenses in this case. Hayden also objects to this interrogatory to the extent the vague and ambiguous terms and phrases "with knowledge," "creation of," and "pre-existing materials used to create them" render this interrogatory overbroad, unduly burdensome, not relevant to any claims or defenses in this case, or not proportional to the needs of the case. Hayden also objects to this interrogatory because it requests information not in Mr. Hayden's possession, including the knowledge of other persons.

Subject to and without waiver of the foregoing objections and its General Objections, Hayden responds as follows:

- *Gloria*: James Hayden has knowledge of the creation the Gloria tattoo. Other people present during the tattoo session include LeBron James, Bruno (LeBron James's bodyguard), Jon Hayden (tattoo artist at Focused Tattoos), Bernardino Tavanche (tattoo artist at Focused Tattoos).

10

Dated: June 14, 2019

For Answers:

By: _James Hayden_

For Objections:

By: _/s/ Andrew Alexander_
Daniel McMullen (Ohio Bar No. 0034380)
Georgia E. Yanchar (Ohio Bar No. 0071458)
Andrew Alexander (Ohio Bar No. 0091167)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
E-mail: dmcmullen@calfee.com
gyanchar@calfee.com
aalexander@calfee.com


*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
E-mail:kpinter@calfee.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2019, a copy of the foregoing was served via email to the

following:

Dale M. Cendali (dale.cendali@kirkland.com)

David T. Movius (dmovius@mcdonaldhopkins.com)

Joshua L. Simmons (joshua.simmons@kirkland.com)

Matthew J. Cavanagh (mcavanagh@mcdonaldhopkins.com)


 /s/ *Andrew Alexander*
One of the attorneys for Plaintiff

29