# EXHIBIT 5

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES HAYDEN,** | ) | **CASE NO. 1:17CV2635** |
| | ) | |
| **Plaintiff,** | ) | **SENIOR JUDGE** |
| | ) | **CHRISTOPHER A. BOYKO** |
| **vs.** | ) | |
| | ) | **OPINION AND ORDER** |
| **2K GAMES, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**CHRISTOPHER A. BOYKO, SR. J.**:

This matter comes before the Court upon the Motion (ECF DKT #93*SEALED &
#94*PUBLIC VERSION) of Plaintiff James Hayden for Partial Summary Judgment and the
Motion (ECF DKT #95*SEALED & #101*PUBLIC VERSION) of Defendants 2K Games,
Inc. and Take-Two Interactive Software, Inc. for Summary Judgment. For the following
reasons, Plaintiff's Motion is granted in part and denied in part and Defendants' Motion is
denied.

## I. BACKGROUND

Plaintiff James Hayden filed his original Complaint on December 18, 2017. His
Fourth Amended Complaint was filed on August 19, 2019, alleging copyright infringement by

Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. (ECF DKT #33).
Defendant Take-Two is a worldwide developer, publisher and marketer of interactive
entertainment and video games. Defendant 2K Games sells and ships video games around the
globe, including the alleged Infringing Games. Take-Two's video games include the popular
basketball simulation series NBA 2K. The NBA 2K series is released annually and depicts
players from the NBA in its interactive simulations. Defendants' video games display and
allow players to control realistic avatars of over 400 NBA players.

Plaintiff does business as Focused Tattoos. Plaintiff is the artist who inked tattoos on
various individuals depicted with those tattoos in the NBA 2K series. Plaintiff asserts that he
obtained copyright registrations for six tattoos inked on Danny Green, LeBron James and
Tristan Thompson (the "Registered Tattoos").

Plaintiff's Registered Tattoos with the U.S. Copyright Office have the following dates
of registration and completion/publication (ECF DKT #93-5 through #93-10):

- "**Gloria**" (Reg. No. VAu 1-263-888), tattooed on LeBron James, completed in
2007 with the effective date of registration of September 6, 2016;

- "**Lion**" (Reg. No. VAu 1-271-044), tattooed on LeBron James, completed in
2008 with the effective date of registration of September 6, 2016;

- "**Shoulder Stars**" (Reg. No. VAu 1-270-802), tattooed on LeBron James,
completed in 2007 with the effective date of registration of September 6, 2016;

- "**Fire D.G.**" (Reg. No. VAu 1-287-552), tattooed on Danny Green, completed in
2012 with the effective date of registration of August 11, 2017; Supplementary
Registration including only the design, creation and placement of flames surrounding

-2-

and accenting character image and text and the addition of shading, accenting and design aesthetics to flames and character image (effective date July 30, 2019);

• "**Scroll D.G.**" (Reg. No. VAu 1-287-545), tattooed on Danny Green, completed in 2012 with the effective date of registration of August 11, 2017; Supplementary Registration including only design elements around the scroll, including the cloud designs, decorative spear head and character image around the edge of the scroll, and the shading in and around all elements (effective date July 30, 2019);

• "**Brother's Keeper T.T**." (Reg. No. VAu 1-292-453), tattooed on Tristan Thompson, completed in 2012 with the effective date of registration of August 11, 2017.

Plaintiff alleges unauthorized use by Defendants of his registered works in the accused games: NBA 2K16, 2K17, 2K18, 2K19, 2K20 and NBA 2KMobile. Plaintiff contends that his works are copied every time a game is played. It is undisputed that the realistic avatars of the NBA players in the accused games bear the physical features and likeness of each player, including their tattoos. In the Answer (ECF DKT #35 at ¶¶ 136, 142 & 147), Defendants admit that the accused games "include realistic depictions of NBA players including the tattoos that they have in real life." Plaintiff asserts that sales of these games have generated over $4.2 billion in revenue.

Plaintiff moves for judgment in his favor on the issues of: (1) copyright ownership and (2) copying by Defendants of the works protected by his copyrights. Defendants argue that Plaintiff's Tattoos are not sufficiently original to qualify for copyright protection. Defendants assert defenses of fair use, *de minimis* use and implied license or authorization. In

addition, Defendants contend that Plaintiff is not entitled to certain remedies.

The Court has before it the parties' Cross Motions, Oppositions and Replies, as well as a Supplemental Opposition Brief and Supplemental Reply Brief.

## II. LAW AND ANALYSIS

### Summary Judgment Standard of Review

Summary judgment shall be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed.R.Civ.P. 56(c)(1)(A), (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court does not have the responsibility to search the record *sua sponte* for genuine

issues of material fact.  *Betkerur v. Aultman Hospital Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992).  The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

**Copyright Registration and Presumption of Validity**

To ultimately succeed on a claim of copyright infringement, a claimant must establish (1) ownership of a **valid** copyright, and (2) "copying of constituent elements of the work that are **original**."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc*., 499 U.S. 340, 361 (1991). (Emphasis added).

Pursuant to 17 U.S. C.§ 410:

(c) In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.  The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

This presumption of validity is rebuttable, and once the plaintiff introduces evidence of the registration within five years of publication, the burden shifts to the defendant to present evidence that the copyrights are invalid.  *Varsity Brands, Inc. v. Star Athletica, LLC*,

799 F.3d 468, 477 (6th Cir. 2015).

Plaintiff has provided uncontested registration certificates for the six Tattoos at issue here. (ECF DKT #93-5 through #93-10). In order to be afforded the presumption of validity, the applicable statute requires evidence of registration within five years of publication. Defendants contend that the works (Tattoos) were published on the date of their completion. Plaintiff does not concede that the works have been published.

The Copyright Act defines "publication" in relevant part as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending" or "[t]he offering to distribute copies or phonorecords to a group of persons for purposes of further distribution[.]" 17 U.S.C. § 101.

The Copyright Office explains that "publication" occurs where "the offeror"—the copyright owner or someone with their authority—"has completed all the steps necessary for distribution to the public, such that the only further action required is an offeree's action in obtaining a copy or phonorecord[,]" but not where distribution of copies "requires additional action by the offeror." U.S. Copyright Office, Compendium of U.S. Copyright Office Practices §§ 1902, 1906.1 (3d ed. 2021).

Copyright protection exists for "original works of authorship fixed in any tangible medium of expression," including "pictorial, graphic, and sculptural" works. 17 U. S.C. § 102(a). A work is "fixed" in a tangible medium of expression "when its embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101.

According to the Declarations of Plaintiff and of LeBron James, Danny Green and

Tristan Thompson, the six Tattoos were "fixed" once the process of inking the players' bodies was completed. Plaintiff declares: " I create body art to display on people." (ECF DKT #109-49). When James, Green and Thompson left Plaintiff's business premises, they believed the Tattoos were a permanent part of their bodies and likenesses which they could freely display to the public. (ECF DKT #95-2, #95-3, #95-4).

The Court finds that the six Tattoos are sufficiently permanent and not transitory. No additional action by the copyright owner is necessary. Therefore, the Court concludes that "publication" occurred on the date of completion for each of the six works.

Upon review of the Registrations, "Fire D.G.", "Scroll D.G." and "Brother's Keeper T.T." were registered within five years of their publication. The "Gloria", "Lion" and "Shoulder Stars" tattoos on LeBron James were registered well outside of the five-year period. Nevertheless, Plaintiff has provided sufficient evidence to prove ownership of the copyrights. Further, there has been no suggestion of misfeasance or fraud on the Copyright Office.

In the exercise of its discretion (17 U.S.C. § 410(c)), the Court accords the presumption of validity to all six of Plaintiff's Registered Tattoos.

**Original Works**

Copyright protection under the Copyright Act of 1976 extends only to "**original** works of authorship." 17 U.S.C. § 102(a). (Emphasis added).

Defendants argue that Plaintiffs' Tattoos are not protected under Copyright Law. For example, Plaintiff claims ownership of works belonging to others: The "Brother's Keeper" Tattoo was copied from Michelangelo's Sistine Chapel fresco, "The Creation of Adam" and the accompanying quoted phrase is from the Bible story of Cain and Abel. The "Lion" Tattoo

-7-

is copied from the logo on a playing card from the Venetian Resort in Las Vegas which LeBron James provided to Plaintiff.  Moreover, Defendants contend that Plaintiff cannot claim ownership of common geometric shapes like stars or common elements like flames or clouds which are added to existing tattoos inked by a different artist.

"Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Feist*, 499 U.S. at 345.  Originality is both statutorily and constitutionally required for copyright protection.  *Feist*, 499 U.S. at 345–46 (quoting U.S. Const. art. 1, § 8, cl. 8).  To be original, a work must (1) have been "independently created by the author (as opposed to copied from other works)," and (2) "possess[ ] at least some minimal degree of creativity."  *Id*. at 345. "Some minimal degree of creativity," or "the existence of . . . intellectual production, of thought, and conception" is required for copyright protection.  *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 914-15 (7th Cir. 2007) (quoting *Feist*, 499 U.S. at 362).

In his Declaration (ECF DKT #109-49 at ¶ 9), Plaintiff states that the process from a client's idea to the end result requires "countless artistic decisions, including as to the precise shape, style, expression, shading, line thickness, density, color, and orientation on the shoulder, to name just a few, each carried out through countless artistic and creative acts. Inking a quality tattoo on a body requires significant perception, vision, dexterity, and skill, given a human body's irregular surface."

The Supreme Court has instructed that a work can be original, even if it is not "novel." The level of creativity required for originality is "extremely low" and "even a slight amount will suffice."  *Feist*, 499 U.S. at 345.  "The vast majority of works make the grade quite

-8-

easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id*.

With that guidance in mind, the Court finds that Plaintiff's works are original and entitled to protection. Therefore, Plaintiff's Motion for Partial Summary Judgment is granted only to the extent that he owns presumptively valid, protectable copyrights in the Tattoos. Now, the burden shifts to Defendants — whether there is actionable copying in light of their defenses.

**Defendants' Motion**

Defendants do not dispute that the NBA Players' tattoos are included on the bodies of the avatars in NBA 2K in order to accurately and realistically depict their likenesses. "Take-Two's purpose was to replicate the NBA Players exactly as they really look, from their physical appearance (hair, blemishes, skin color, size, etc.) down to their moves and skills." (Supplemental Reply Brief, ECF DKT #162 at 10). That constitutes factual copying; but Defendants argue that Plaintiff cannot establish actionable copying.

In their Motion for Summary Judgment, Defendants contend that the accurate and realistic depiction of the NBA players in the NBA 2K video games was fair use, implicitly authorized and *de minimis*.

**_De Minimis_**

Defendants argue that it is unlikely that the average user will choose the three players with the Copyrighted Tattoos. If these players indeed are selected, the display of the Tattoos is small and difficult to discern on rapidly-moving figures in a fast-moving game.

"To establish that a copyright infringement is *de minimis*, the alleged infringer must

demonstrate that the copyright of the protected material is so trivial 'as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying." *Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 924 (6th Cir. 2003). Courts consider "the amount of the copyrighted work that was copied, as well as the observability of the copyrighted work in the allegedly infringing work." *Id.*

Courts also look to "whether so much has been taken as would sensibly diminish the value of the original," and "whether the labors of the party entitled to copyright are substantially to an injurious extent appropriated by another author." *Mathews Conveyor Co. v. Palmer-Bee Co.*, 135 F.2d 73, 85 (6th Cir. 1943).

When dealing with visual images, courts measure observability through factors like "focus," "lighting,", "camera angles" and the "prominence" of the copied image within the infringing work. See *Ringgold v. Black Entertainment TV*, 126 F.3d 70, 75 (2d Cir. 1997). A *de minimis* defense will fail if substantial similarity between the copyrighted work and the infringing work is apparent to the "average lay observer." *Id.* at 77.

Defendants admit that their goals are accuracy and realism; so, the players' images are replicated to the highest degree possible. Whether the Tattoos are observable and whether the Defendants' replication diminishes the original works are questions of fact for the jury.

## **Fair Use**

> Copyrights provide an incentive for the creation of works by protecting the owner's use of his or her intellectual creation, allowing creators to reap the material rewards of their efforts. However, because not every use of a work undermines this underlying rationale of copyright law, and because some uses of copyrighted works are desirable for policy reasons, the courts have long held that many uses of a copyrighted work do not infringe upon the copyright.

*National Rifle Ass'n of America v. Handgun Control Federation of Ohio,* 15 F.3d 559, 561

(6th Cir. 1994).

These "fair use" principles are codified in 17 U.S.C. § 107:

[T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.

"The four factors enumerated are especially relevant to the determination of whether fair use occurred, but they are not meant to exhaust the possible considerations." *National Rifle, id.*, citing *Harper & Row Publishers v. Nation Enter.*, 471 U.S. 539, 560 (1985). "Likewise, the purposes listed in the preamble are illustrations of the sorts of uses likely to qualify as fair uses rather than an exclusive list." *National Rifle*, 15 F.3d at 561, citing *Pacific and Southern Co. v. Duncan,* 744 F.2d 1490, 1494–95 (11th Cir.1984), cert. denied, 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985).

"Fair use is a mixed question of law and fact." *Harper & Row*, 471 U.S. at 560. In addition, fair use is an "open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

**Purpose and Character of Use**

For this first factor, the Court examines whether Defendants' use is transformative and

whether the use has a commercial purpose.

The Supreme Court instructs that a work is transformative where it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 37 (2d Cir. 2021).

Defendants assert that player accuracy, including accurate tattoos, is central to the realism of the NBA 2K video games. Defendants argue that they have created NBA 2K to be a virtual world which closely mirrors the real world, utilizing graphics, characters, gameplay and music. The Tattoos are just one of many visual features composing the simulated basketball games. The Tattoos in the video games are displayed in a reduced size. Since the players are shown at a fraction of their real-life size, the Tattoos are displayed proportionately smaller than their actual dimensions. Additionally, the Tattoos only appear on three players out of more than 400 players available in the games. In the instance of the "Lion" Tattoo and the "Brother's Keeper" Tattoo, they arguably do not appear in the games because they are covered by the players' jerseys. One of Defendants' experts, Dr. Ian Bogost, is prepared to testify that the Tattoos comprise only a fraction of the total file size of NBA 2K.

 Defendants' purpose of creating realism and accuracy is distinguishable from Plaintiff's aims. As previously noted, Plaintiff creates body art to display on people. The NBA Players ask Plaintiff to ink certain images on their bodies as a form of personal expression and to represent people and things that are meaningful and significant in their lives.

The other prong of the first fair use factor requires analysis of whether or not

Defendants' use is commercial. It is undisputed that Defendants' purpose in developing and marketing the NBA 2K video games is commercial; so, the use of the Tattoos in the games is commercial. However, Defendants contend that the evidence will show that consumers do not buy NBA 2K video games for the Tattoos.

Defendants insist that their use of Plaintiff's original work is transformative, *i.e.*, NBA 2K alters the original with "new expression." Defendants' ultimate purpose is realism; whereas Plaintiff created body art and imagery which hold personal meaning for the three NBA Players. Even if commercialism is conceded, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 578.

Plaintiff contests Defendants' characterization of the Tattoos' minimal size and relation to the whole video game. Plaintiff maintains that the Tattoos are accurately and prominently displayed and can be clearly viewed by the users of the NBA 2K video games. Plaintiff argues that the evidence will show that because consumers purchase the games for the Tattoos, Defendants are commercially benefitting from their infringement.

In assessing the fair use defense, reasonable jurors could disagree about whether – or to what extent – Defendants' use is transformative and what weight should be accorded to commercialism.

**<u>Nature of the Copyrighted Work</u>**

The second fair use factor requires the Court to consider the "nature of the copyrighted work," including whether (1) it is "expressive or creative ... or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational," and

(2) "the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Andy Warhol Found.*, 11 F.4th at 45.

Plaintiff's work is, without question, expressive and creative rather than factual and informational. This aspect weighs in Plaintiff's favor. The parties dispute whether the Registered Tattoos are published; but the Court has made the determination for validity purposes that they were published once the NBA Players left Plaintiff's establishment with the Tattoos affixed to their bodies. Thus, publication favors Defendants' position.

## Amount and Substantiality of Use

This factor considers not only "the quantity of the materials used" but also "their quality and importance" in relation to the original work. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016) (quoting *Campbell*, 510 U.S. at 587). Admittedly, the Tattoos are a small part of a larger graphic display; they appear much smaller than in real life. Defendants insist that the Tattoos are hardly discernible during gameplay, among the many fast-moving images of players, their jerseys, officials, spectators, coaches and arenas. The Tattoos are used in their entirety; but the degree of observability is up to the jury, as is the importance of their use to the video game as a whole.

## Effect on Potential Market

The analysis of the fourth factor of fair use is: "Whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 222 (2d Cir. 2015).

Plaintiff bears the burden of showing that there is a potential market for the use of the Tattoos as they appear in Defendants' video games.  The relevant question is whether the infringement impacted the market for the copyrighted work itself.  *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) ("[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create."); *see also Campbell*, 510 U.S. at 590 (the question is "whether 'unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original.").

Defendants deny that there is a market for Plaintiff's Tattoos as they appear in the NBA 2K games and argue that their replication of the Tattoos on the player avatars in the games is no substitute for the originals.  "And because the Tattoos appear digitally on NBA Players in a video game, they are no substitute for a tattoo on real human skin—which is what Plaintiff sells."  (Supplemental Reply, ECF DKT#162 at 13).

Defendants' use of the entirety of the six Registered Tattoos weighs in favor of Plaintiff; but since a jury could find that the likelihood is less that someone might choose to acquire tattoos from Defendants' video games, rather than obtain tattoos from Plaintiff, that evidentiary weight is reduced.  The burden of proving a potential market remains with Plaintiff and genuine factual disputes are within the jury's purview.

**Implied Use or Authorization**

Defendants contend that their use of the Tattoos in the NBA 2K video games was authorized.  The Copyright Act prohibits only unauthorized use, 17 U.S.C. §§ 106, 501; so a

"copyright owner waives the right to sue . . . for uses of copyrighted material that are authorized."  *Great Minds v. FedEx Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018).

The evidence shows that the NBA Players requested the Tattoos, paid for them and left to go about their lives, without requiring further permission from Plaintiff to display his work on their bodies.  The NBA Players gave the NBA and NBA Players Association the right to license their likenesses (including the Tattoos) to third parties, which those organizations in turn licensed to Defendants.  The evidence further shows that Danny Green, LeBron James and Tristan Thompson  have appeared in NBA 2K since well before the Tattoos were registered and before this lawsuit was filed.

Although Plaintiff disputes any license or authorization, he acknowledges in his Declaration (ECF DKT #109-49) at ¶ 29:   "There are many ordinary examples in my clients' lives that may involve showing the tattoos I have created and inked that I would not take issue with, including appearing in public, on stage or in a game, or being photographed, or even appearing on television, for example."

In his Opposition Brief (ECF DKT #109 at 27) and in his Declaration (ECF DKT #109-49 at ¶ 27), Plaintiff counters that he did not know that digital avatars of the Players bearing copies of the Tattoos would appear in video games; the Players did not tell him that their digital avatars, including tattoos, would appear in video games; and they did not tell him that they intended to authorize third-parties to reproduce the Tattoos in video games. Therefore, Plaintiff insists that he did not intend to grant any such license.

"An implied license is an unwritten license to use a work that the court infers from the

-16-

circumstances and from the conduct between the parties." *Melanie Howard Music, Inc. v. Warner Brothers Records, Inc.*, No. 3:08-0979, 2009 WL 3784611, at *5 (M.D. Tenn. Nov. 10, 2009) (citing *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 398–99 (6th Cir. 2007)).

"Not only is the parties' conduct important, but also anything that colors that conduct, including the parties' expressions of intent, *Johnson v. Jones*, 149 F.3d 494, 500–01 (6th Cir. 1998), and the greater context that surrounds their agreement. *Jeffrey A. Grusenmeyer & Assoc., Inc. v. Davison, Smith & Certo Architects, Inc.*, 212 Fed.App'x 510, 514 (6th Cir. 2007) (noting that courts should examine the "totality of the circumstances")." *Navarro v. Procter & Gamble Company*, 515 F.Supp.3d 718, 769 (S.D. Ohio 2021).

"The key to finding an implied license is in the intent of the copyright holder. Like an express license, the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement." *Murphy v. Lazarev*, 589 Fed.App'x. 757, 765 (6th Cir. 2014)(internal citations and quotations omitted).

"In other words, where the objective evidence leads to the conclusion that the copyright owner intended the defendant to use the copyrighted work, the copyright owner should not later be able to sue for copyright infringement for that use." *Mahavisno v. Compendia Bioscience, Inc.*, 164 F. Supp.3d 964, 968-9 (E.D. Mich. 2016).

The jury will need to consider the evidence presented at trial and ascertain whether or not Plaintiff intended to authorize or license third-party use of his Registered Tattoos. Intent is a fact question.

**Availability of Certain Remedies**

In their Motion for Summary Judgment, Defendants contend that Plaintiff is not entitled to claim statutory damages and attorney's fees. Defendants point to the evidence showing that the first game accused of infringement, NBA 2K16, was released on approximately September 29, 2015, and that all of the Tattoos were in that game before this lawsuit was filed. Moreover, Plaintiff did not apply for Copyright Registrations in the Tattoos until September 2016 and August 2017.

The Copyright Act provides in pertinent part:

**17 U.S.C. § 504 Remedies for Infringement; Damages and Profits**

(a) In General.--Except as otherwise provided by this title, an infringer of copyright is liable for **either**--

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); **or**

(2) statutory damages, as provided by subsection (c).

\* \* \* \* \* \*

(c) Statutory Damages.--

(1) Except as provided by clause (2) of this subsection, **the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action**, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers

-18-

just.  (Emphasis added).

Defendants challenge only Plaintiff's entitlement to recovery of statutory damages. The applicable statute provides a copyright owner like Plaintiff with the option to elect his remedy at any time before final judgment.

On August 1, 2022, Plaintiff filed his Trial Brief (ECF DKT #170).  With regard to the damages sought, Plaintiff states:  "If Mr. Hayden prevails on his copyright infringement claim, he is entitled to recover "the copyright owner's actual damages *and* any additional profits of the infringer[.]"  17 U.S.C. § 504(a)."  (Emphasis in original).  Plaintiff confirms this damages option by providing proposed jury instructions on actual damages also.

The Court deems this to be Plaintiff's election of recovery under 17 U.S.C. § 504(c)(1).  Therefore, Defendants' argument that Plaintiff is not entitled to statutory damages is moot.

**Plaintiff's Motion for Leave to File Sur-Reply in Opposition**

On August 5, 2022, Plaintiff filed a Motion for Leave to File Sur-Reply (ECF DKT #176), in order to respond to an allegedly new and material misstatement of fact made by Defendants in their Supplemental Reply Brief.

The Court is capable of recognizing and disregarding any factual misstatements made in the parties' filings.  There is no need for further briefing.

Plaintiff's Motion for Leave is denied.

### III. CONCLUSION

For these reasons, the Motion (ECF DKT #93*SEALED & #94*PUBLIC VERSION) of Plaintiff James Hayden for Partial Summary Judgment is granted in part and denied in part

and the Motion (ECF DKT #95*SEALED & #101*PUBLIC VERSION) of Defendants 2K

Games, Inc. and Take-Two Interactive Software, Inc. for Summary Judgment is denied.

Plaintiff's Motion (ECF DKT #176) for Leave to File Sur-Reply is denied.


**IT IS SO ORDERED.**

**DATE: September 20, 2022**


     **s/Christopher A. Boyko**        
**CHRISTOPHER A. BOYKO**
**Senior United States District Judge**