UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
                        EASTERN DIVISION


JAMES HAYDEN,                    CASE NO: 1:17CV2635

          Plaintiff,

           v.

2K GAMES, INC., et al.,

          Defendants.

------------------------------



                Deposition of JAMES HAYDEN

                     Cleveland, Ohio

          Wednesday, October 30, 2019 - 9:04 a.m.










Reported by:

Angela Nixon, RMR, CRR

Job No.: 26345

```
 1    A.        Usually through Rich Paul, his agent.

 2    Q.        All right.  So let's go back to Exhibit 6, the

 3    lion tattoo.  Is this the next tattoo you inked on

 4    Mr. James?

 5    A.        I think so, yes.

 6    Q.        Okay.  When was that tattoo inked on him?

 7    A.        After his Olympics tour.  I think 2008.

 8    Q.        Okay.  How much did he pay you to ink this?

 9    A.        I can't remember.

10    Q.        You can't approximate at all how much it would

11    be?

12    A.        I can't approximate.

13    Q.        And you can't approximate what you would charge

14    me if I walked in today and wanted the same tattoo?

15    A.        Nope.

16    Q.        How many sessions did it take to ink the lion

17    tattoo on Mr. James?

18    A.        One.

19    Q.        Did it only take one session to ink the stars

20    tattoo too?

21    A.        Yes.

22    Q.        Were the same people present at this -- at this

23    session?

24    A.        I can't remember.

25    Q.        Did Mr. James bring anything into your shop to
```

1   show what he wanted the lion tattoo to look like?

2            MR. MCMULLEN:  Objection.  I'm sorry, go ahead.

3   A.       It was a reference card, like a playing card.

4            THE COURT:  A what card?

5   A.       Playing, like a playing card.

6   Q.       Did he come into your shop with a playing card

7   that depicted a lion?

8   A.       Yeah.

9   Q.       And did he ask you to put -- ink that lion on

10  him?

11  A.       He said do something like this.

12  Q.       And did you say okay?

13  A.       Yes.

14  Q.       Did you know that one of Mr. James nicknames was

15  Lion?

16  A.       No.

17           MR. MCMULLEN:  Objection.

18  BY MS. CENDALI:

19  Q.       So in inking the lion tattoo on Mr. James, you

20  tried to copy the playing card that he gave you, right?

21           MR. MCMULLEN:  Objection.

22  A.       I didn't try to copy.

23  Q.       You didn't try to copy?

24  A.       I wanted to come up with my own design, style of

25  it.

1   Q.      So just to be clear, did -- are you saying that

2   you didn't copy how the wings would be placed on the lion

3   from the playing card?

4          MR. MCMULLEN:  Objection.

5   A.      Yes.

6   Q.      Are you saying that you didn't come up with the

7   idea of the lion's body position on the playing card?

8          MR. MCMULLEN:  Can we hear that back, please?

9             (Whereupon the court reporter read back the

10             previous question.)

11          MR. MCMULLEN:  Objection.

12   A.      I'm not saying that.

13   Q.      Isn't it true that you copied the body position

14   of the lion on the playing card when you inked the tattoo?

15          MR. MCMULLEN:  Objection.

16   A.      I don't remember the playing card.  I just

17   remember the tattoo.

18   Q.      Well, you knew that he came in and had the

19   tattoo --

20   A.      Uh-huh.

21   Q.      Excuse me.  You knew that Mr. James came in and

22   showed you the playing card, and he said, according to you,

23   that he wanted a tattoo like this, right?

24          MR. MCMULLEN:  Objection.

25   A.      Similar.

Page 84

1    Q.        Similar to this?

2    A.        Uh-huh.

3    Q.        And isn't it true that you copied the -- how the

4    wings were placed on the lion from the playing card?

5              MR. MCMULLEN:  Objection.

6    A.        No.

7    Q.        Isn't it true that you copied how the wings

8    looked from the playing card?

9              MR. MCMULLEN:  Objection.

10   A.        No.

11   Q.        Isn't it true you copied the facial impression of

12   the lion from the playing card?

13             MR. MCMULLEN:  Objection.

14   A.        Not true.

15   Q.        Isn't it true you -- that you copied the idea of

16   the lion holding the shield from the playing card?

17             MR. MCMULLEN:  Objection.

18   A.        Nope.

19   Q.        Did Mr. James tell you where on his body he

20   wanted the lion inked?

21   A.        Yes.

22   Q.        What did he tell you?

23   A.        On his chest.

24   Q.        Did he tell you what colors he wanted you to use?

25   A.        No, I can't remember.

```
 1    Q.          Did you understand that Mr. Green was a

 2    professional basketball player when you inked him?

 3    A.          Yes.

 4    Q.          Let me show you what's been marked as Exhibit 9.

 5    Is Exhibit 9 a photograph of Mr. Green's arm showing a

 6    tattoo you inked on him?

 7    A.          Looks like it.

 8    Q.          Do you refer to that as the flame tattoo?

 9    A.          Yes.

10    Q.          Can you approximate what year you inked this on

11    him?

12    A.          I can't remember when I did this.

13    Q.          Was it after 2010 or earlier?

14    A.          Maybe after.  I can't remember.

15    Q.          But it was after you had inked Mr. James, right?

16    A.          Yes.

17    Q.          And it was -- and this was -- the flame tattoo is

18    the first one you inked on Mr. Green, correct?

19    A.          I don't know if it's the first one.  I'm not

20    sure.

21    Q.          What -- what do you think might have been the

22    first one?

23    A.          He has a few of them.  I don't know which one I

24    did first.  I'm not sure.

25    Q.          Okay.  But the point is, is it fair to say that
```

1   A.          The process is for me to use a Sharpie to produce

2   the image that I tattoo.

3   Q.          Okay.  So when Mr. -- did Mr. Green make an

4   appointment to have a tattoo inked on him with you?

5   A.          Yes.

6   Q.          Okay.  And when he came in, did he tell you what

7   he had in mind for this tattoo?

8               MR. MCMULLEN:  Objection.

9   A.          I think so.

10  Q.          What do you recall him saying?

11  A.          Make it look good.

12  Q.          Okay.  Did he say what he wanted you to do?

13  A.          No.

14  Q.          Did he say where he wanted the tattoo?

15  A.          Where it's pictured at.

16  Q.          Which is his left arm, is that right?

17  A.          Left upper shoulder.

18  Q.          Okay.  So was there already a tattoo on his left

19  upper shoulder?

20  A.          Yes.

21  Q.          What was on there originally?

22  A.          An outline form of this basketball player.

23  Q.          So he already had that basketball player inked by

24  somebody else, is that right?

25              MR. MCMULLEN:  Objection.

1    A.        Yes.

2    Q.        Do you know who that was?

3    A.        Who what was?

4    Q.        Who the tattooist was that inked him?

5    A.        No, I don't.

6    Q.        Did you then add to the tattoo that the first

7    tattooist did?

8    A.        Yes.

9    Q.        And did you add more shading and detail to the

10   original tattoo?

11   A.        Yes.

12   Q.        And did you ask the permission of the first

13   tattoo artist before doing that?

14   A.        No.

15   Q.        Did you think you needed to ask his permission?

16             MR. MCMULLEN:  Objection.

17   A.        No.

18   Q.        Why not?

19   A.        I don't know.

20   Q.        Did you think if it was okay with Mr. Green,

21   that's all you needed?

22             MR. MCMULLEN:  Objection.

23   A.        I guess so.

24   Q.        Is the basketball player depicted on the arm, did

25   you understand that to be a likeness of Mr. Green or some

1  the flame tattoo, how much did you charge Mr. Green for

2  that?

3  A.        I can't remember.

4  Q.        Can you approximate in any way how much?

5  A.        No.

6  Q.        It was some number under $600, but beyond that

7  you can't approximate, is that right?

8            MR. MCMULLEN:  Objection.

9  A.        Nope.

10  Q.       And if I came in today and wanted you to do the

11  same work, you couldn't approximate how much that would --

12  you would charge me, right?

13  A.        Not until I drew on you with a Sharpie.

14  Q.        So -- so when customers come in today and they

15  ask you to do tattoos, do you tell them you can't give them

16  a price quote -- quote until you draw the proposed design

17  on their arm?

18  A.        Right.

19            MR. MCMULLEN:  Objection.

20  BY MS. CENDALI:

21  Q.        Now, was the tattoo inked on Exhibit 9, the flame

22  one, done in one session?

23  A.        Yes.

24  Q.        And was the scroll tattoo in Exhibit 10 done in

25  one session?

1    A.          Yes.

2    Q.          And who was present when the scroll tattoo in

3    Exhibit 10 is done?

4    A.          I don't remember.

5    Q.          Do you recall if there was anyone there other

6    than you and Mr. Green?

7    A.          I think customers in the shop maybe.

8    Q.          But no specific people you can recall?

9    A.          No.

10   Q.          And what about with Exhibit 9, the flame tattoo,

11   was anyone else there other than you and Mr. Green?

12   A.          No, I can't remember.

13   Q.          And with regard to the scroll tattoo, did -- what

14   did Mr. Green say to you about what he wanted that tattoo

15   to look like?

16               MR. MCMULLEN:  Objection.

17   A.          I can't remember the exact words, he wanted to

18   make it look good.

19   Q.          Well, did he tell you what -- anything about what

20   his general idea was for the tattoo?

21               MR. MCMULLEN:  Objection.

22   A.          No, not that I remember.

23   Q.          Well, when you inked the scroll tattoo on

24   Mr. Green, was there already some preexisting tattoo on his

25   arm?

```
 1                MR. MCMULLEN:  Objection.
 2    A.          Yes, the scroll was outlined, and the names were
 3    outlined.
 4    Q.          So the names Rashad, DeVonte and Donte, those
 5    were already inked on Mr. Green when you added the scroll,
 6    right?
 7    A.          The art work, yes.
 8    Q.          And did you understand that those were names of
 9    Mr. Green's family members?
10    A.          I think they -- yes.
11    Q.          Did you understand that those were his kids?
12    A.          The who?
13    Q.          That those were his children?
14    A.          No.
15    Q.          Who do you understand the names to be?
16    A.          I'm not sure who they are, I think his brothers.
17    Q.          And did he talk to you about those -- or his
18    brothers' names and he --
19    A.          I think so.
20    Q.          Did he give you the impression that he wanted to
21    honor his brothers by putting their names on his arm?
22                MR. MCMULLEN:  Objection.
23    A.          I guess so.
24    Q.          So did Mr. Green tell you that he wanted to
25    emphasize the names more by putting a scroll around them?
```

Page 112

1    A.         I forgot.

2    Q.         And how was it decided -- did Mr. Green say to

3    you what symbols he wanted inked on him?

4    A.         Yes.

5    Q.         What did he say?

6    A.         He told me what symbols he wanted.  I forgot what

7    symbols they were.

8    Q.         And then you did that then, correct?

9    A.         Yes.

10   Q.         Were there any other tattoos that you inked on

11   Mr. Green?

12   A.         I can't remember.

13   Q.         How did it come about that you first inked

14   Tristan Thompson?

15   A.         How did it come about?  He came into the shop to

16   get a tattoo.

17   Q.         It hadn't been set up in advance?

18   A.         I don't remember how it was set up.

19   Q.         Did you know Mr. Thompson before he came into the

20   shop?

21   A.         No.

22   Q.         Did anyone come in with him?

23   A.         I can't remember.

24   Q.         Let me show you what's been marked as Exhibit 11.

25   Is this a photograph of Mr. Thompson's front chest

Page 113

1    depicting a tattoo you inked on him?

2    A.        Looks like it.

3              MR. MCMULLEN:  Excuse me, counsel, did you say

4    this is Exhibit 11?

5              MS. CENDALI:  Yes, Defendant's Exhibit 11.

6              MR. MCMULLEN:  Thank you.

7    BY MS. CENDALI:

8    Q.        And did you ink the whole tattoo, or was there

9    any preexisting ink on him?

10   A.        I inked the whole tattoo.

11   Q.        And you understood -- was this tattoo inked in

12   2012?

13   A.        Maybe.

14   Q.        Was it approximately that time?

15   A.        I think so.

16   Q.        You understood that he was a professional

17   basketball player at that time, right?

18   A.        Yes.

19   Q.        And you knew that he had signed an $82 million

20   contract with the Cleveland Cavaliers, right?

21             MR. MCMULLEN:  Objection.

22   A.        I didn't know that.

23   Q.        Well, you knew he was a celebrity, right?

24             MR. MCMULLEN:  Objection.

25   A.        I didn't know that.

1          MR. MCMULLEN:  Objection.

2    A.          I can't remember that.

3    Q.          Do you remember talking to him about how his

4    brother Amari Thompson (phonetic) suffers from epilepsy?

5          MR. MCMULLEN:  Objection.

6    A.          I can't remember.

7    Q.          Did he say anything to you about how he wanted

8    this to refer to his brother and that he wanted to refer to

9    him taking care of his brother?

10   A.          No, I don't remember that.

11   Q.          So you don't know one way or the other if you had

12   a conversation with him about why he wanted my brother's

13   keeper tattooed on him?

14   A.          We had a conversation, but I just can't remember

15   what the conversation was about.

16   Q.          Are you aware that The Bible has the phrase my

17   brother's keeper in it?

18          MR. MCMULLEN:  Objection.

19   A.          I'm not.

20   Q.          Are you familiar with the story of Cain and Able?

21   A.          Yes.

22   Q.          Did you know that Cain replied at one point, am I

23   my brother's keeper?

24          MR. MCMULLEN:  Can we hear that back, please?

25                (Whereupon the court reporter read back the

1                previous question.)

2     A.        You saying it now refreshes my memory a bit.

3     Q.        So you didn't invent the phrase my brother's

4     keeper, right?

5               MR. MCMULLEN:  Objection.

6     A.        I don't know.

7     Q.        Well, you didn't -- you aren't the -- you weren't

8     the person who came up with the phrase my brother's keeper,

9     is that true?

10              MR. MCMULLEN:  Objection.

11    A.        I don't know.

12    Q.        Well, you either know or don't know.  Did you

13    come up and invent the phrase my brother's keeper or not?

14              MR. MCMULLEN:  Objection.

15    Q.        How could you not know that?

16              MR. MCMULLEN:  Objection.  Asked and answered.

17              MS. CENDALI:  Please, please stop objecting until

18    I'm done, counsel.  You keep -- are all over this

19    transcript objecting in the middle of my questions?

20              MR. MCMULLEN:  Respectfully, counsel, sometimes

21    you pause and trail off for a very long time before you

22    finish your question so it's hard to tell when you are

23    done.  I will try to do better if you will make your pauses

24    shorter.

25              MS. CENDALI:  I don't think the record is correct

1    Q.         Well, there's two fingers at the bottom that are

2    touching one another, right?  What conversations did you

3    have with Mr. Thompson about that?

4    A.         Thought it would look cool to draw those on

5    there.

6    Q.         Did Mr. Thompson suggest that that might be a

7    cool thing to have, and did you then draw it out?

8    A.         I think I suggested it.

9    Q.         Pardon?

10   A.         I think I suggested that.

11   Q.         Are you familiar with Michelangelo's Sistine

12   Chapel?

13              MR. MCMULLEN:  Objection.

14   A.         I'm familiar with it.

15   Q.         Are you familiar with the idea that Michelangelo

16   famously painted a portrait of God and Adam with their

17   fingers pointed at one another in the same kind of -- of

18   pose as reflected in Exhibit 11?

19              MR. MCMULLEN:  Objection.

20   A.         Am I familiar -- could you rephrase that?

21   Q.         Are you aware that Michelangelo, in the Sistine

22   Chapel, has a painting of God and Adam with their fingers

23   pointed at one another in much the same way?

24              MR. MCMULLEN:  Objection.

25   A.         I've never been there, to the Sistine Chapel.

1   original drawing was -- was with a marker on his body.

2   Q.          And did you make this drawing to guide you in

3   adding the tattoos to LeBron James' mannequins like the

4   other one?

5   A.          Could you say that again?

6   Q.          Did you make this drawing to help guide you in

7   adding the tattoos to the LeBron James' mannequins that

8   Nike had requested?

9   A.          Yes.

10  Q.          And now did you understand that copyright

11  registrations had been filed on your behalf in your name?

12  A.          Yes.

13  Q.          And do you understand that in order to get a

14  copyright registration, you, or someone on your half --

15  behalf, needed to sign a certification?

16  A.          As -- as I recollect.

17  Q.          Okay.  And looking at field 4a of Exhibit 13,

18  which is reflected on Page 161 of the document --

19  A.          What page is this?

20  Q.          Page 161.  Do you see where it says 4 Limitation

21  of Copyright Claim, do you see that section?

22  A.          Where are you at?

23  Q.          Page 161.

24  A.          Page Number 2.

25  Q.          Take-Two, Page 161.

 1   A.          So the page is here?

 2   Q.          Yes, that's the Bates numbered page.

 3   A.          All right.

 4   Q.          And do you see section 4, it says 4 Limitation of

 5   Copyright Claim, do you see that?

 6   A.          Yes.

 7   Q.          And do you see in section 4a it states (Reading:)

 8   Material excluded from this claim (material previously

 9   registered, previously published, or not owned by this

10   claimant), do you see that?

11   A.          I'm reading with you.

12   Q.          Okay.  Isn't it true that nothing was disclosed

13   on this form about the fact that you used a -- the playing

14   card that Mr. James brought in to create the lion tattoo?

15               MR. MCMULLEN:  Objection.

16   A.          Could you say that again, restate that?

17               MS. CENDALI:  Please read it back.

18                   (Whereupon the court reporter read back the

19                   previous question.)

20               MR. MCMULLEN:  I'll restate my objection.

21   A.          I want you to restate the question if you could.

22   Q.          Why can't you answer my question?

23   A.          I have a hard time understanding what you're

24   asking.

25   Q.          You didn't tell the copyright office when this

1   copyright application was submitted that the lion tattoo

2   had been based on the playing card that Mr. James brought

3   in, did you?

4            MR. MCMULLEN:  Objection.

5   A.       No, because I draw that tattoo on with a marker.

6   Q.       You didn't, in this form, do anything to tell the

7   copyright office that Mr. James had brought in a tattoo of

8   a lion and that he asked you to do something similar to

9   that, correct?

10           MR. MCMULLEN:  Objection.

11  A.       I guess not.

12           THE COURT REPORTER:  I'm sorry, what did you say?

13  A.       I guess not.

14  Q.       Is Kimberly Textoris one of the lawyers

15  representing you in this action?

16  A.       Yes.

17  Q.       And did she file your copyright registrations on

18  your behalf?

19  A.       Yes.

20  Q.       So let's take a look at what's been marked as

21  Defendant's Exhibit 14, a document that appears to be a

22  copyright registration baring Bates Numbers Take-Two 148

23  through 204.  And turning, if you would, to Page 200 of

24  that document.  Is that a drawing you made after the fact

25  to recreate the look of the star tattoo you inked on

1   BY MS. CENDALI:

2   Q.        Did you disclose anything to the copyright office

3   about the fact that the figure of -- in the flame tattoo

4   and the phrase I hold my own were not inked by you?

5            MR. MCMULLEN:  Objection.

6   A.        I don't know.

7   Q.        So turning to Page 176 of the document, which is

8   the second page of the document, is there anything in the

9   section on Limitation of Copyright Claim that discloses to

10  the copyright office that the drawing of the basketball

11  player and the phrase I hold my own and possibly the

12  initials D.G. were not inked by you?

13           MR. MCMULLEN:  Objection.

14  A.        I don't know.

15  Q.        You don't see anything listed, do you?

16           MR. MCMULLEN:  Objection.

17  A.        In Limitation of Copyright Claim?

18  Q.        Correct.

19  A.        No.

20  Q.        Let's take a look at what's been marked as

21  Exhibit 16, a document that appears to be another copyright

22  registration bearing the Bates Numbers Take-Two 166 through

23  215, and turning, if you would, to Page 212 of that

24  document, is that a photograph of what we've been calling

25  the scroll tattoo?

1    or Donte names, those were inked by somebody else, right?

2    A.        I think so.

3    Q.        And that was not disclosed to the copyright

4    office, correct?

5              MR. MCMULLEN:  Objection.

6    A.        I don't know.

7    Q.        You don't see anything on Page 2 of this

8    document, Bates Numbered Page 167, that says, under the

9    Limitation of Copyright Claim section, that disclosed that

10   you were modifying a preexisting tattoo, isn't that true?

11             MR. MCMULLEN:  Objection.

12   A.        I don't know.  The tattoos that are -- are copy

13   written are the tattoos I did on these athletes free hand.

14   Q.        Right.  And you never told the copyright office

15   that you added to somebody else's tattoo when you did the

16   scroll tattoo, yes or no?

17             MR. MCMULLEN:  Objection.

18   A.        I don't know how you want to phrase it.  I don't

19   know.

20   Q.        Well, you do know.  Where in this document on

21   Page 167 -- isn't it true that there's nothing on Page 167

22   of this document where you disclose to the copyright office

23   that you were not the person who inked the names?

24             MR. MCMULLEN:  Objection.

25   A.        Yes.