**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES HAYDEN, | CASE NO. 1:17-cv-02635-CAB |
| Plaintiff, | JUDGE CHRISTOPHER A. BOYKO |
| v. | |
| 2K GAMES, INC. and TAKE-TWO INTERACTIVE SOFTWARE, INC., | |
| Defendants. | |

**<u>DEFENDANTS' SECOND AMENDED TRIAL BRIEF</u>**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION...................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................ 1

        A.      LEBRON JAMES ......................................................................................... 1

        B.      TAKE-TWO'S *NBA 2K* VIDEO GAME SERIES ................................... 3

        C.      TAKE-TWO'S USE OF THE ASSERTED TATTOOS IN *NBA 2K*.................... 3

        D.      PLAINTIFF AND THE MARKET FOR TATTOOS ........................................... 5

III.    DISCUSSION OF CONTROLLING LAW ............................................................ 7

        A.      DIRECT COPYRIGHT INFRINGEMENT ..................................................... 7

        B.      INDIRECT COPYRIGHT INFRINGEMENT ..................................................... 11

        C.      IMPLIED LICENSE ..................................................................................... 12

        D.      WAIVER/ESTOPPEL ................................................................................. 14

        E.      *DE MINIMIS* DEFENSE .......................................................................... 15

        F.      FAIR USE DEFENSE ................................................................................. 16

        G.      ACTUAL DAMAGES................................................................................. 27

        H.      DISGORGEMENT OF PROFITS ................................................................. 28

        I.      ATTORNEY'S FEES AND STATUTORY DAMAGES ................................. 29

IV.     LIST OF PROPOSED WITNESSES ...................................................................... 30

V.      NOTICE REGARDING PROPOSED USE OF DEPOSITION TESTIMONY ....... 32

VI.     INDEX OF PROPOSED EXHIBITS ...................................................................... 32

VII.    ANTICIPATED EVIDENTIARY ISSUES ............................................................ 33

VIII.   ESTIMATED TRIAL LENGTH............................................................................. 35

IX.     PROPOSED INITIAL VOIR DIRE QUESTIONS ................................................ 35

X.      PROPOSED JURY INSTRUCTIONS.................................................................... 37

i

**XI.     SPECIAL INTERROGATORIES AND VERDICT FORM** ....................................... **37**

**XII.    PRELIMINARY STATEMENT AND STIPULATIONS** ........................................... **37**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*16 Casa Duse, LLC v. Merkin*,
   791 F.3d 247 (2d Cir. 2015) ................................................................................................9

*Aalmuhammed v. Lee*,
   202 F.3d 1227 (9th Cir. 2000) ............................................................................................9

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
   598 U.S. 508 (2023) ....................................................................................................17, 20

*Asset Mktg. Sys., Inc. v. Gagnon*,
   542 F.3d 748 (9th Cir. 2008) ............................................................................................12

*Authors Guild, Inc. v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) .............................................................................................25

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) ...............................................................................................25

*Bell v. Worthington City Sch. Dist.*,
   No. 18 Civ. 961, 2020 WL 2905803 (S.D. Ohio June 2, 2020) ...................................23, 25

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) ..................................................................................... *passim*

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) .......................................................................................16, 26

*Bouchat v. Balt. Ravens Ltd. P'ship.*,
   737 F.3d 932 (4th Cir. 2013) .......................................................................18, 19, 20, 22

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ....................................................................................................17, 20

*Carson v. Dynegy, Inc.*,
   344 F.3d 446 (5th Cir. 2003) ............................................................................................14

*Castle v. Kingsport Publ'g. Corp.*,
   No. 19 Civ. 92, 2020 WL 7348157 (E.D. Tenn. Dec. 14, 2020) ...............................17, 21, 24

*Compass Homes, Inc. v. Trinity Health Grp.*,
   No. 13 Civ. 647, 2016 WL 3406054 (S.D. Ohio June 21, 2016) .......................................29

iii

*Consumers Union of U.S., Inc. v. Gen. Signal Corp.*,
    724 F.2d 1044 (2d Cir. 1983)..................................................................22

*Cotter v. Christus Gardens, Inc.*,
    238 F.3d 420 (6th Cir. 2000) ................................................................27

*EarthCam, Inc. v. OxBlue Corp.*,
    49 F. Supp. 3d 1210 (N.D. Ga. 2014)....................................................29

*Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*,
    122 F.3d 1211 (9th Cir. 1997) ................................................................9

*Est. of Smith v. Cash Money Recs., Inc.*,
    253 F. Supp. 3d 737 (S.D.N.Y. 2017).....................................................26

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)..................................................................7, 8, 10

*First Nat. Bank of Akron v. Cann*,
    503 F. Supp. 419 (N.D. Ohio 1980)........................................................28

*Foad Consulting Grp. v. Azzalino*,
    270 F. 3d 821 (9th Cir. 2001) ................................................................13

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
    139 S. Ct. 881 (2019)..............................................................................9

*Google, LLC v. Oracle Am., Inc.*,
    141 S. Ct. 1183 (2021)................................................................. *passim*

*Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*,
    345 F.3d 922 (6th Cir. 2003) ................................................................15

*Great Minds v. FedEx Office & Print Servs., Inc.*,
    886 F.3d 91 (2d Cir. 2018)....................................................................12

*Halper v. Sony/ATV Music Pub., LLC*,
    No. 18-5915, 2019 WL 994524 (6th Cir. Feb. 15, 2019) ...........................9, 11, 22

*I.A.E., Inc. v. Shaver*,
    74 F.3d 768 (7th Cir. 1996) ................................................................12, 13

*Jedson Eng'g, Inc. v. Spirit Const. Servs., Inc.*,
    720 F. Supp. 2d 904 (S.D. Ohio 2010) ................................................10

*Johnson v. Jones*,
    149 F.3d 494 (6th Cir. 1998) ................................................................12, 29

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...................................................................19, 23

*Kernel Recs. Oy v. Mosley*,
    694 F.3d 1294 (11th Cir. 2012) ....................................................................9

*Kohus v. Mariol*,
    328 F.3d 848 (6th Cir. 2003) ...................................................................10, 11

*Larson v. Dorland*,
    No. 1:19 Civ. 10203, 2023 WL 5985251 (D. Mass. Sept. 14, 2023) ...............17, 20

*Laureyssens v. Idea Group, Inc.*,
    964 F.2d 131 (2d Cir. 1992)..........................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ................................................................ *passim*

*LimeCoral, Ltd. v. CareerBuilder, LLC*,
    889 F.3d 847 (7th Cir. 2018) .......................................................................13

*Mahavisno v. Compendia Biosci., Inc.*,
    164 F. Supp. 3d 964 (E.D. Mich. 2016).........................................................12

*Marano v. Metropolitan Museum of Art*,
    472 F. Supp. 3d 76 (S.D.N.Y. 2020)..............................................................18

*Mason v. Montgomery Data, Inc.*,
    967 F.2d 135 (5th Cir. 1992).........................................................................29

*MGM Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)....................................................................................11

*MiTek Holdings, Inc. v. Arce Eng'g. Co.*,
    89 F.3d 1548 (11th Cir. 1996) .....................................................................15

*Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*,
    935 F. Supp. 490 (S.D.N.Y. 1996)................................................................18

*Murphy v. Lazarev*,
    589 F. App'x 757 (6th Cir. 2014) ................................................................12

*National Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*,
    15 F.3d 559 (6th Cir. 1994) ........................................................................16

*Navarro v. Procter & Gamble Co.*,
    501 F. Supp. 3d 482 (S.D. Ohio 2020) .........................................................27

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ........................................................................17

*Photographic Illustrators, Corp. v. Orgill, Inc.*,
    953 F. 3d 56 (1st Cir. 2020)......................................................................13, 14

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ........................................................................28

*Premier Dealer Servs., Inc. v. Allegiance Adm'r, LLC*,
    No. 18 Civ. 735, 2022 WL 1604739 (S.D. Ohio May 20,................................27, 28

*R.C. Olmstead, Inc. v. CU Interface, LLC*,
    606 F.3d 262 (6th Cir. 2010) ........................................................................10

*Ragan v. Berkshire Hathaway Auto., Inc.*,
    91 F.4th 1267 (8th Cir. 2024) ........................................................................8

*Rainey v. Wayne St. Univ.*,
    26 F. Supp. 2d 963 (E.D. Mich. 1998)..........................................................28

*Red Label Music Publ'g, Inc. v. Chila Prods.*,
    388 F. Supp. 3d 975 (N.D. Ill. 2019) ..............................................................6

*Reinicke v. Creative Empire LLC*,
    38 F. Supp. 3d 1192 (S.D. Cal. 2014)............................................................13

*Sarl Louis Feraud Int'l v. Viewfinder Inc.*,
    627 F. Supp. 2d 123 (S.D.N.Y. 2008)........................................................19, 26

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ........................................................................23

*Sem-Torq, Inc. v. K Mart Corp.*,
    936 F.2d 851 (6th Cir. 1991) ........................................................................8

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
    709 F.3d 1273 (9th Cir. 2013) ........................................................................18

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    449 F. Supp. 3d 333 (S.D.N.Y. 2020)............................................... *passim*

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    No. 16 Civ. 724, 2016 WL 4126543 (S.D.N.Y. Aug. 2, 2016) ............................29

*Solid Oak Sketches, LLC v. 2K Games, Inc.*,
    No. 16 Civ. 724, 2018 WL 1626145 (S.D.N.Y. Mar. 30, 2018) ............................15

*Sony Corp. of Am. v. Univ. City Studios, Inc.*,
  464 U.S. 417 (1984) .................................................................................16, 25

*Southco, Inc. v. Kanebridge Corp.*,
  390 F.3d 276 (3d Cir. 2004) .......................................................................9, 11, 22

*Stratton v. Portfolio Recovery Assocs., LLC*,
  770 F.3d 443 (6th Cir. 2014) ......................................................................14

*Stromback v. New Line Cinema*,
  384 F.3d 283 (6th Cir. 2004) ......................................................................9

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) .........................................................................17, 20, 25

*TCF Inventory Fin., Inc. v. Northshore Outdoor, Inc.*,
  No. 11 Civ. 85, 2012 WL 2576367 (N.D. Ohio July 3, 2012) ...............27

*Teradyne, Inc. v. Astronics Test Sys., Inc.*,
  No. 20 Civ. 2713, 2023 WL 9284863 (C.D. Cal. Dec. 6, 2023) ...........17, 26

*Thoroughbred Software Intern., Inc. v. Dice Corp.*,
  488 F.3d 352 (6th Cir. 2007) ......................................................................28

*Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n.*,
  953 F.3d 638 (9th Cir. 2020) ......................................................................24

*Wilchombe v. TeeVee Toons, Inc.*,
  555 F.3d 949 (11th Cir. 2009) ....................................................................13

*Wilson v. Ancestry.com LLC*,
  653 F. Supp. 3d 441 (S.D. Ohio 2023) .....................................................21

**Statutes**

17 U.S.C. § 101 .....................................................................................................9

17 U.S.C. § 102 .....................................................................................................8, 16

17 U.S.C. § 106 .....................................................................................................12

17 U.S.C. § 107 .....................................................................................................16

17 U.S.C. § 201 .....................................................................................................8

17 U.S.C. § 202 .....................................................................................................21

17 U.S.C. § 411 .....................................................................................................1

17 U.S.C. § 412 ...................................................................................................................29

17 U.S.C. § 501 ...................................................................................................................12

17 U.S.C. § 504 ..............................................................................................................27, 29

**Rules**

Fed. R. Civ. P. 26 ..........................................................................................................27, 34

Fed. R. Civ. P. 37 ...............................................................................................................27

Fed. R. Civ. P. 50 .................................................................................................................7

**Other Authorities**

37 C.F.R. § 202.1 (2004) ................................................................................................9, 11

I.      **INTRODUCTION**

Pursuant to the Court's February 8, 2024 order (Dkt. 255) and the Court's Civil Trial Order, Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. (collectively, "Take-Two") respectfully submit this second amended trial brief.

II.     **STATEMENT OF FACTS**

A.      **LeBron James**

LeBron James is a professional National Basketball Association ("NBA") player who has been playing basketball in the NBA since 2003.  Mr. James has multiple tattoos, most of which are not at issue in this litigation.  Each of Mr. James' tattoos expresses something personal or meaningful to him.  Mr. James regularly appears in the media, including in televised basketball games, showing his tattoos.  Two of Mr. James' permanent tattoos (collectively, "Asserted Tattoos") are at issue in this trial[1]:

| Tattoo | Description | Photograph |
|---|---|---|
| "Gloria" | In 2007, at Mr. James' request, Plaintiff James Hayden ("Plaintiff") inked Mr. James' mother's name, Gloria, alongside a crowned lion to cover up a pre-existing tattoo of a lion, on Mr. James' right arm. |  |

---

[1]     Plaintiff's operative Complaint asserted copyright infringement claims based on six tattoos.  *See* Dkt. 251 (2d Summ. J. Op.) 2.  Take-Two moved for partial summary judgment on four of these tattoos, arguing that Plaintiff had failed to satisfy the Copyright Act's pre-suit registration requirement as to these four tattoos and further had committed fraud on the Copyright Office through his misrepresentations during the registration process.  Dkt. 247 (Defs.' 2d Mot. Summ. J.) 1.  On January 24, 2024, this Court granted Take-Two's motion and dismissed those four tattoos from the case on the grounds that Plaintiff had failed to meet 17 U.S.C. § 411(a)'s pre-suit registration requirement.  2d Summ. J. Op. 15–16.  The Court did not address Take-Two's fraud on the Copyright Office affirmative defense, *id.* at 15, and Take-Two reserves its right to assert that affirmative defense in the future as to these four dismissed tattoos.

1

| "Shoulder Stars" | In 2008, at Mr. James' request, Plaintiff inked five stars across Mr. James' left shoulder.  These five stars symbolize Mr. James' best friends. |  |
|---|---|---|

The Asserted Tattoos were each inked permanently on Mr. James' body by Plaintiff at Mr. James' direction, and with Mr. James' control and approval.  Mr. James paid Plaintiff for his tattoos.  At the time that Plaintiff inked Mr. James, he knew Mr. James was a professional basketball player who would appear in media bearing his tattoos, including the Asserted Tattoos that Plaintiff inked on Mr. James.  Plaintiff did not enter into any written agreements with Mr. James, let alone any agreements related to copyright.  Plaintiff did not mention copyrights to Mr. James, nor did he tell Mr. James that he would be claiming copyrights on the tattoos he had just permanently inked on Mr. James' body.  And Plaintiff acknowledged that he did not tell Mr. James that he would need Plaintiff's permission to appear in video games, or *any* media with the Asserted Tattoos.  Plaintiff has never told Mr. James that Mr. James needed his permission to appear on television playing basketball, nor has Plaintiff ever told the NBA it needs his permission to depict Mr. James on television in NBA games with Mr. James' tattoos visible or attempted to stop the NBA from doing so.  Indeed, Plaintiff has never told *any* of his clients that there were *any* limitations on what they could do with their tattoo.  And he never told any of his customers that they needed to get permission from him if they wanted their tattoo removed, covered up, or altered.

Mr. James understood that he could display the Asserted Tattoos on his body and allow others to depict his likeness with his Tattoos.  Plaintiff's own colleague, Bernardino Tovanche, agrees that clients do not need their tattooists' permission to display their tattoos in real life or in media.  As further confirmation, Plaintiff has tattoos and has never asked permission from a tattooist before appearing in photographs, videos, or commercials showing the tattoos on his body.

2

Plaintiff himself understood that customers did not need his permission to show their tattoos in at least some forms of media, including on social media.  Indeed, it is industry practice that once a tattoo has been inked on a client's skin, the tattooist exercises no control over it because the tattoo itself becomes part of the client's body.

**B.     Take-Two's *NBA 2K* Video Game Series**

Take-Two creates *NBA 2K*, a series of basketball simulation video games.  *NBA 2K* is a realistic depiction of NBA basketball and includes many elements that appear in real-world NBA basketball.  In *NBA 2K*, a player's typical experience will involve looking at the basketball court in a manner similar to that of a television viewer or fan watching the game from the stands.  Specifically, as plays occur, including shots, throw-ins, free throws, substitutions, fouls, and other ordinary actions of the sport, the camera view adjusts accordingly, in a manner similar to the way a television broadcast of the sport might appear.  *NBA 2K* allows users to play action-oriented simulated basketball games alone against the computer or with other people.  Users can choose from over 400 current and retired NBA players to form teams to play against other teams.

Other realistic visual elements include the movement and behavior of the crowd, coaches, referees, team members on the bench, and contextual events and situations like live and televised professional basketball.  *NBA 2K* also includes auditory components such as realistic announcers and sportscasters, cheering crowds, buzzers, and other elements meant to mimic a real basketball game.

**C.     Take-Two's Use of the Asserted Tattoos in *NBA 2K***

Take-Two obtained a license to portray Mr. James' likeness—of which the Asserted Tattoos are a part—in *NBA 2K* from the NBA and the National Basketball Players Association ("NBPA"), which were licensed to do so by Mr. James.  To serve its artistic purpose of simulating NBA basketball, Take-Two accurately and precisely replicates the likenesses of NBA players,

including Mr. James, including their height, build, skin, hair, facial features, and tattoos.  Plaintiff himself has admitted that Mr. James would not "look like" himself without his tattoos, and that "to depict the player realistically you would have to have his tattoos on him."  Hundreds of NBA players have been depicted in *NBA 2K* games with the tattoos they bear on their bodies in real life since at least *NBA 2K2*, which was released in 2001.

Mr. James was scanned into *NBA 2K* using a process called photogrammetry, which involves simultaneously taking hundreds of digital photographs of a player's body from different angles to create a resulting texture map or "skin."  Software then "wraps" the skin around a 3D model of that player, resulting in a realistic depiction similar to what would be captured by a digital camera.  The process captures a players' detailed likeness, from facial features, to build, to scars, stretch marks, moles, and anything else on the photographed skin.

The Asserted Tattoos appear only when Mr. James is depicted.  The Asserted Tattoos do not appear at all when the user does not select Mr. James' team.  When the Asserted Tattoos appear, given the average screen size on which *NBA 2K* is played, they appear smaller in *NBA 2K* than they do in real life and are often obstructed by clothing and armbands, out of focus, or difficult to notice among the rapid movements of the basketball game.  Thus, no matter the camera configuration or zoom, the ordinary player will perceive the Asserted Tattoos as a kind of visual noise creating realism in the environment and the character.  There are many other elements in the game, such that the Asserted Tattoos make up only a small fraction of the total playable computer program for *NBA 2K*.  Customers purchase *NBA 2K* for many reasons, including because they like basketball.  But there is no evidence whatsoever that any customers purchased *NBA 2K* for the two specific Asserted Tattoos on Mr. James's body.

Take-Two's purpose of creating realism and accuracy is distinguishable from Plaintiff's aims. Plaintiff creates body art to display on people at their request. Mr. James asked Plaintiff to ink certain images on his body as a form of personal expression and to represent people and things that are meaningful or significant in his life. By contrast, Take-Two includes the Asserted Tattoos in *NBA 2K* to achieve realism. Although *NBA 2K* is a commercial video game, consumers do not buy *NBA 2K* for the Asserted Tattoos. Rather, consumers purchase the game for other reasons, including because they like basketball and sports.

### D.   Plaintiff and the Market for Tattoos

Despite the fact that NBA players have appeared with their tattoos in *NBA 2K* since at least 2001, no tattooist has ever demanded payment for tattoos in the game until Plaintiff. None of the witnesses in this case, including Plaintiff's own experts, are aware of a market for tattoos in video games. Plaintiff's expert Dr. Lenzo has not observed any market for tattoos having formed in the two decades *NBA 2K* has been depicting tattoos. As a result, the Court has concluded that it "is undisputed that no market for including tattoos in video games currently exists." *See* Dkt. 175 (Op. on Mot. to Exclude J. Lenzo) 7.

Plaintiff even has admitted that he has never "licensed a tattoo for a video game" or been "approached" for a license for video games. Nor is he "aware of any tattooist who has licensed tattoos for inclusion in a video game." Indeed, prior to this lawsuit, he "never attempted to license tattoos for use in video games." Jon Hayden, Plaintiff's brother and another professional tattooist, similarly could not remember any instance in which he told someone they needed his permission before appearing in a photograph or ever objected to an athlete being shown in media with tattoos he inked. Other tattooists similarly have never heard of requiring permission to be depicted in media. And Plaintiff testified that he does not know of any lost customers, revenue, income, or licensing opportunities from the depiction of the Asserted Tattoos in *NBA 2K*. Plaintiff's personal

willingness to license the Asserted Tattoos for this use is not sufficient to show there is a potential market. "[A] copyright holder can *always* assert some degree of adverse [e]ffect on its potential licensing revenues as a consequence of the [defendant's use] . . . simply because the copyright holder has not been paid a fee to permit that particular use." *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 987 (N.D. Ill. 2019) (internal quotations omitted) (emphasis in original).

Plaintiff asserts that his agreements and projects concerning tattoos in other media are evidence of a potential market. This argument fails for several reasons. As an initial matter, to the extent Plaintiff has entered any licenses related to the depiction of Mr. James with his tattoos, all these licenses ***post-date this lawsuit***, indicating they were entered into under the specter of litigation and therefore do not represent normal market conditions. Moreover, some of Plaintiff's purported licenses are unsigned, and it is unclear whether and under what terms they were entered into. As to the signed agreements that he has produced, three of Plaintiff's projects do not involve tattoos on people at all, and most are litigation-focused ***releases*** related to the depiction of people other than Mr. James with tattoos in commercials and in movies, but not in video games.

In the seventeen years since Plaintiff first inked Mr. James, Plaintiff has only produced three releases of rights related to the depiction of Mr. James with his tattoos in commercials and a movie, and four licenses related to the depiction of Mr. James in commercials and a movie. All these purported licenses are dated ***almost a decade or more after*** Mr. James was first inked and first appeared in *NBA 2K* with his tattoos incorporated as part of his digital avatar. None of these agreements involve the rights at issue here—use of tattoos in video games—and in fact, most expressly carve out video games as ***not*** the subject of the agreements. Rather, the projects and agreements were for much more prominent uses of Mr. James' tattoos, in media lacking the audio

6

and visual noise central to *NBA 2K*'s realism.  The dearth of agreements for **any** media over such a long period of time is itself telling, as Mr. James was already a professional basketball player when Plaintiff inked him and has appeared extensively in media since he was first inked in 2007, indicating that obtaining licenses from Plaintiff is not a normal part of depicting him.  Indeed, all of Plaintiff's licenses were negotiated on Plaintiff's behalf by his counsel in this very case, indicating that they were entered into only under the threat of litigation.

## III.  DISCUSSION OF CONTROLLING LAW

The evidence will show that Take-Two is not liable because Plaintiff cannot prove the elements of his claim and because there is significant evidence supporting Take-Two's affirmative defenses.  In particular, Take-Two anticipates that Plaintiff will not be able to make out an affirmative case of direct and indirect copyright infringement at trial, and that Take-Two will be able to move for judgment as a matter of law under Federal Rule of Civil Procedure 50.  On September 20, 2022, the Court issued a ruling on the parties' cross-motions for summary judgment. *See* Dkt. 193 (1st Summ. J. Op.).  Take-Two submits the below discussion of the controlling law on the issues that remain to be tried and briefly explains why it should prevail.[2]

### A.  Direct Copyright Infringement

In *Feist Publications, Inc. v. Rural Telephone Service Co.*, the Supreme Court held that "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." 499 U.S. 340, 361 (1991); *see also* 1st Summ. J. Op. 5 (quoting *Feist*, 499 U.S. at 361).  Thus, for each act of infringement, Plaintiff must show he (1) owned a valid copyright in the Asserted Tattoo, and (2) that Take-Two

---

[2]    At least one other court has determined that the depiction of Mr. James, and his tattoos, in *NBA 2K* was permissible under the fair use defense, was authorized, and was a *de minimis* use.  *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 343–45 (S.D.N.Y. 2020).  *Solid Oak* involved highly similar facts to those at issue here, and as explained further below, the reasoning applied in *Solid Oak* applies with equal force here.

copied protectable elements of the Asserted Tattoo.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392–94 (2006).[3]

With respect to the **<u>first element</u>**, to prove ownership of a valid copyright, Plaintiff needs to show that each Asserted Tattoo is (1) original to Plaintiff; (2) fixed in a tangible medium of expression; (3) authored by Plaintiff; and (4) registered with the United States Copyright Office. *See* 17 U.S.C. §§ 102, 201; *Feist*, 499 U.S. at 345; *Lexmark*, 387 F.3d at 533–34.  With regard to the first element of a copyright claim, the Court found that Plaintiff's copyrights in the Asserted Tattoos are presumptively valid but that "[t]his presumption is rebuttable."  2d Summ. J. Op. 3. The standard for rebutting the presumption is not high.  *See, e.g.*, *Ragan v. Berkshire Hathaway Auto., Inc.*, 91 F.4th 1267, 1271 (8th Cir. 2024) (affirming judgment on the pleadings against purported copyright owner after finding presumption of validity rebutted).

*First*, to be original and protectable, the work must have a "minimal degree of creativity." *Feist*, 499 U.S. at 345.  Plaintiff must also show that the work was "independently created," "as opposed to [being] copied from other works."  *Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d 851, 854 (6th Cir. 1991) (*citing Feist*, 499 U.S. at 345).  Although the Court found that the Asserted Tattoos met the low bar for creativity to be protectable, 1st Summ. J. Op. 8–9, the Court did not find that the Asserted Tattoos were independently created.

---

[3]   The Court granted summary judgment to Plaintiff "only to the extent that he owns presumptively valid, protectable copyrights in the Tattoos."  1st Summ. J. Op.  9.  The Court did not address the second element of infringement, copying of protectable elements.  Moreover, although the Court found that the presumption of validity applies, it did not find that Take-Two would be unable to rebut this presumption at trial.  Indeed, in a subsequent summary judgment decision, the Court held that Plaintiff's registrations for four of the then-asserted six tattoos "are invalid and unenforceable." 2d Summ. J. Op. 15.  Thus, Take-Two understands that the question of whether Take-Two has successfully rebutted this presumption remains pending for trial.

**Second**, to prove fixation, Plaintiff must prove that each Asserted Tattoo was created in a tangible medium of expression and in a form that can be seen, heard, reproduced, or communicated for a period of more than transitory duration.  *See* 17 U.S.C. § 101 (definition of "fixed"); *Stromback v. New Line Cinema*, 384 F.3d 283, 301 (6th Cir. 2004).  Here, the Court found that the Asserted Tattoos were fixed "once the process of inking [Mr. James' body] was completed."  1st Summ. J. Op. 7.

**Third**, to prove authorship, Plaintiff must prove that he—not Mr. James—was the originator or mastermind of the Asserted Tattoos, controlling each work's creation and causing it to come into being.  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 260 (2d Cir. 2015); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000) ("[A]n author superintend[s] the work by exercising control.  This will likely be . . . the inventive or master mind who creates, or gives effect to the idea." (internal quotation omitted)).

**Fourth**, Plaintiff must prove that he registered copyrights in the Asserted Tattoos before he filed this lawsuit.  *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 888 (2019); *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012).

The "presumption of validity is rebuttable."  1st Summ. J. Op. 5–6; *see also* 2d Summ. J. Op. 3.  To rebut the presumption of validity, Take-Two need only "offer some evidence or proof to dispute or deny the plaintiff's prima facie case" and evidence that a work is "not original" is sufficient.  *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217–18 (9th Cir. 1997); *cf. Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 285 (3d Cir. 2004) (quoting 37 C.F.R. § 202.1 (2004)) (names are not copyrightable); *Halper v. Sony/ATV Music Pub., LLC*, No. 18-5915, 2019 WL 994524, at *3 (6th Cir. Feb. 15, 2019) (citing 37 C.F.R. § 202.1) ("words and short phrases" are not copyrightable); *Lexmark*, 387 F.3d at 535 (elements that are "standard, stock, or

that necessarily follow from a common theme or setting" are not protectable under the doctrine of *scènes à faire* doctrine (alterations omitted)).

The evidence at trial will demonstrate that Plaintiff does not own valid copyrights in the Asserted Tattoos. ***First***, the evidence will show that the presumption of validity has been rebutted because the Asserted Tattoos consist of common, *scènes à faire* elements and a name, in neither of which can copyright subsist.[4]  And ***second***, the evidence will demonstrate that Plaintiff did not author the Asserted Tattoos, as he inked them at the direction and according to the instructions of Mr. James.  And it was Mr. James, not Plaintiff, who exercised decision-making authority over what changes were made and what was included in the final Tattoos.  Thus, Take-Two will be able to rebut the presumption of validity for both Asserted Tattoos, and Plaintiff will be unable to prove ownership of a valid copyright in either of the Asserted Tattoos.

With respect to the **<u>second element</u>**, "[n]ot all 'copying' is actionable."  *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003).  Instead, a plaintiff must prove "copying of constituent elements of the work ***that are original***."  *Feist Publ., Inc.*, 499 U.S. at 361 (emphasis added).  This requires two steps: first, the fact-finder must determine "what aspects of the copyrighted work, if any, are protected," and second, "whether the second work involves elements that are substantially similar to the protected elements of the original work."  *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 274–75 (6th Cir. 2010) (citing *Kohus*, 328 F.3d at 855); *see also Jedson Eng'g., Inc. v. Spirit Const. Servs., Inc.*, 720 F. Supp. 2d 904, 920 (S.D. Ohio 2010) (citing *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 140 (2d Cir. 1992)).  Under the "words and short phrases" doctrine, "*names, titles,* and slogans; familiar symbols or designs; [and] mere variations of typographic

---

[4]     The Court's Summary Judgment Orders do not discuss whether the Asserted Tattoos consist of common, *scènes à faire* elements.  *See* 1st Summ. J. Op.  7–9.  Take-Two understands this to be an open question of fact for the jury to decide.

ornamentation, lettering or coloring" are not protectable.  *Southco*, 390 F.3d at 285–86 (quoting 37 C.F.R. § 202.1 (2004)) (emphasis by court); *see also Halper*, 2019 WL 994524, at *3 (citing 37 C.F.R. § 202.1).  And under the doctrine of *scènes à faire,* elements that are "standard, stock, or that necessarily follow from a common theme or setting" are not protectable either.  *Lexmark*, 387 F.3d at 535 (alterations omitted).  Thus, the Sixth Circuit filters these elements out of the substantial similarity analysis.  *Kohus*, 328 F.3d at 855.  In the Court's second Summary Judgment Order, it recognized that there were "factual issues surrounding actionable copying."  2d Summ. J. Op. at 3.

The evidence at trial will demonstrate that Take-Two did not copy protectable elements of the Asserted Tattoos.  The Asserted Tattoos are composed of common tropes and themes, such as basic shapes (stars), popular animals (lion), and the name of LeBron James's mother, which of course Plaintiff did not create.  The lion in one of the Asserted Tattoos even was placed over an earlier lion that another tattooist had inked, demonstrating that lion tattoos are not original to Plaintiff.  These common tropes and themes are unprotectable elements, such that any copying of them is not actionable.  Once these elements are filtered out and the works are compared, the evidence will show that the Asserted Tattoos are not substantially similar to *NBA 2K*.

### B.     Indirect Copyright Infringement

To show indirect copyright infringement, Plaintiff must show that Take-Two contributorily infringed by "intentionally inducing or encouraging direct infringement" and/or vicariously infringed by "profiting from direct infringement while declining to exercise a right to stop or limit it."  *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  The evidence at trial will show that there was no direct infringement of the Asserted Tattoos, such that Plaintiff will be unable to prove indirect infringement.

### C.    Implied License

As the Copyright Act prohibits only unauthorized use, 17 U.S.C. §§ 106, 501, a "copyright owner waives the right to sue . . . for uses of copyrighted material that are authorized." *Great Minds v. FedEx Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018).

Additionally, copyright law recognizes that a license "may be granted orally, or may be implied from conduct." *Murphy v. Lazarev*, 589 F. App'x 757, 765 (6th Cir. 2014) (quoting *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998)).  Thus, courts regularly dismiss copyright claims on summary judgment where the use was authorized, even impliedly. *See*, *e.g.*, *Mahavisno v. Compendia Biosci., Inc.*, 164 F. Supp. 3d 964, 968–69 (E.D. Mich. 2016) (relying on *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)).  A license is implied when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *I.A.E.*, 74 F.3d at 776; *Solid Oak*, 449 F. Supp. 3d at 346 (implied license created where tattooist created tattoo at player's request).  As this Court held at summary judgment, "where the objective evidence leads to the conclusion that the copyright owner intended the defendant to use the copyrighted work, the copyright owner should not later be able to sue for copyright infringement for that use." 1st Summ. J. Op. 17 (quoting *Mahavisno*, 164 F. Supp. 3d at 968–69).

Objective intent is "manifested by the parties' conduct," "***at the time of the creation and delivery***" of the work.  *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008) (emphasis added).  When analyzing the third prong, courts consider, among other things:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during

the creation or delivery of the copyrighted material indicated that use of the material
without the creator's involvement or consent was permissible.

*Photographic Illustrators, Corp. v. Orgill, Inc.*, 953 F. 3d 56, 61 (1st Cir. 2020) (internal quotation
omitted).  The lack of any ongoing relationship, such as a contract requiring future involvement or
permission, supports an implied license.  *See Foad Consulting Grp. v. Azzalino*, 270 F. 3d 821,
329, n.12 (9th Cir. 2001) (license where there was no evidence of intent to exercise ongoing
control).  Courts will imply a license where there is no "conduct or written contract" that required
the plaintiff's "permission" or "future involvement" with the work.  *Reinicke v. Creative Empire
LLC*, 38 F. Supp. 3d 1192, 1200 (S.D. Cal. 2014).

Where a work is delivered without any limitations imposed at the time of delivery, the
license impliedly granted encompasses all of the rights of the plaintiff as the copyright holder.
*LimeCoral, Ltd. v. CareerBuilder, LLC*, 889 F.3d 847, 851 (7th Cir. 2018) (copyrighted work
conveyed without "a limitation imposed on the license at the time [the] work[] [was] delivered"
impliedly granted to defendant all of the rights of plaintiff as a copyright holder); *see also I.A.E.*,
74 F.3d at 777 (delivery of designs "without any warning that their further use would constitute
copyright infringement" supported finding of license).  This was critical in the *Solid Oak* decision,
where the court emphasized that the NBA players in that case, including Mr. James, "were neither
requested nor agreed to limit the display or depiction of the images tattooed onto their bodies."
449 F. Supp. 3d at 346 (tattooists did not limit use of tattoos even though they knew players were
likely to appear "in public, on television, in commercials, or in other forms of media"); *see also
Photographic*, 953 F.3d at 66 (lack of objection to use without express permission supported
summary judgment on implied license defense).

Industry practice may also serve as evidence of an implied license.  *See Wilchombe v.
TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (music industry practice determined

implied license); *Photographic*, 953 F.3d at 65 ("nature of the business" made it "obvious" plaintiff wanted defendant to use work, i.e., implied license).

The Court has already found that the evidence shows that Mr. James "requested the Tattoos, paid for them and left to go about [his life], without requiring further permission from Plaintiff to display his work on" his body, that Mr. James "gave the NBA and NBA Players Association the right to license [his] likeness[] (including the Tattoos) to third parties, which those organizations in turn licensed to Defendants," and that Mr. James has "appeared in NBA 2K since well before the Tattoos were registered and before this lawsuit was filed." 1st Summ. J. Op. 16. Thus, the only issue at trial is whether Mr. James' and Plaintiff's undisputed contemporaneous conduct, and evidence of industry practice, shows objective intent that Mr. James copy and distribute the Asserted Tattoos and whether there were any limitations imposed at the time the Asserted Tattoos were created. And the evidence at trial, including industry practice, will show such objective intent to copy and distribute the Asserted Tattoos.

### D.  Waiver/Estoppel

To prove waiver, Take-Two must show Plaintiff's voluntary, intentional relinquishment of a known right. *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 447 (6th Cir. 2014). Take-Two expects that the evidence at trial will demonstrate that Plaintiff voluntarily and intentionally relinquished his right to enforce copyrights in the Asserted Tattoos such that Take-Two could reasonably rely on Plaintiff's non-enforcement.

To prove estoppel, a defendant must show that (1) the copyright holder knew of the infringing conduct; (2) the copyright holder intended that the alleged infringer rely on his conduct or acted so that the alleged infringer had the right to believe it was so intended; (3) the alleged infringer was ignorant of the true facts; and (4) the alleged infringer detrimentally relied on the copyright holder's conduct. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003). Take-

Two expects that the evidence at trial will demonstrate that although Plaintiff was aware of *NBA 2K*, his actions caused Take-Two to rely on Plaintiff's inaction.

      **E.**    ***De Minimis* Defense**

Copying is not infringement where it is *de minimis*, specifically where "the amount of the copyrighted work that was copied, as well as the observability of the copyrighted work in the allegedly infringing work."  1st Summ. J. Op. 10 (quoting *Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 924 (6th Cir. 2003)).  "Observability is determined by the length of time the copyrighted work appears in the allegedly infringing work, as well as the prominence in that work as revealed by the lighting and positioning of the copyrighted work."  *Gordon*, 345 F.3d at 924; 1st Summ. J. Op. 10 ("When dealing with visual images, courts measure observability through factors like 'focus,' 'lighting,' 'camera angles,' and 'prominence.'").  Where protectable elements make up a fractional piece of the material, courts have found that such use is *de minimis*. *See MiTek Holdings, Inc. v. Arce Eng'g. Co.*, 89 F.3d 1548, 1560 (11th Cir. 1996) (no infringement as protectable elements "were not of such significance to the overall program to warrant an ultimate finding of substantial similarity"); *Gordon*, 345 F.3d at 924.

*Solid Oak* concluded that *NBA 2K*'s use of tattoos is *de minimis* as the "average game play is unlikely to include the players with the Tattoos and that, even when such players are included, the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of rapidly moving figures in groups of player figures;" that when tattoos "do appear during gameplay," they "are significantly reduced in size;" and that the "quick and erratic movements up and down the basketball court make it difficult to discern" tattoos.  449 F. Supp. 3d at 3445.  The court in *Solid Oak* further observed that "stopwatch-in-hand observations" often are decisive in *de minimis* use decisions.  *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2018 WL 1626145, at *4 (S.D.N.Y. Mar. 30, 2018).

The evidence at trial will show that *NBA 2K* makes a *de minimis* use of the Asserted Tattoos. In particular, the evidence will show that the Asserted Tattoos comprise a minuscule fraction of *NBA 2K*. And it will show that they are difficult to observe, significantly reduced in size and blurry.

      **F.**      **Fair Use Defense**

Even if Plaintiff were to prove infringement, Take-Two would not be liable because, as the evidence at trial will show, Take-Two's limited use to accurately depict Mr. James just as he appears in real life or on television qualifies as fair use. Although copyright protection exists "in original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102(a), "[t]his protection has never accorded the copyright owner complete control over all possible uses of his work." *Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 432 (1984). To determine whether use qualifies as fair use, courts look to four factors: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. The four enumerated factors are "not meant to exhaust the possible considerations." 1st Summ. J. Op. 11 (quoting *National Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*, 15 F.3d 559, 561 (6th Cir. 1994)). Moreover, the examples of fair uses listed in the preamble of 17 U.S.C. § 107 are not "an exclusive list." *Id.* Overall, fair use is an "open-ended and context-sensitive inquiry." *Id.* (quoting *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006)).

1.      Purpose and Character of Use

The first fair use factor requires consideration of two main sub-factors: (1) transformative use, and (2) commercial use.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578–79 (1994).

The Supreme Court has said that a work is transformative where, instead of "supersed[ing] the objects of the original creation," it "adds something new, with a further purpose or different character." *Id.* at 579 (internal quotation omitted); 1st Summ. J. Op. 12.  It can be "transformative in function or purpose [even] without altering or actually adding to the original work." *Castle v. Kingsport Publ'g. Corp.*, No. 19 Civ. 92, 2020 WL 7348157, at *5 (E.D. Tenn. Dec. 14, 2020) (quoting *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (alteration by court)); *see also Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 529 n.5 (2023); *Teradyne, Inc. v. Astronics Test Sys., Inc.*, No. 20 Civ. 2713, 2023 WL 9284863, at *17 (C.D. Cal. Dec. 6, 2023) ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function." (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (alteration by court)).  Courts look to several considerations to determine whether a work is transformative.  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609–11 (2d Cir. 2006).  The evidence at trial will demonstrate that each of these factors weighs in favor of fair use.

Further Purpose or Different Character.  The first consideration is whether the use bears a "further purpose or different character." *Warhol*, 598 U.S. at 528 (quoting *Campbell*, 510 U.S. at 579); *see also Lexmark*, 387 F.3d at 544 (first factor favored fair use where work was used for a "different purpose"); *Larson v. Dorland*, No. 1:19 Civ. 10203, 2023 WL 5985251, at *11 (D. Mass. Sept. 14, 2023) (different purpose where use of a work is to "'serv[e] a manifestly different purpose from the [work] itself.'" (quoting *Warhol*, 598 U.S. at 528) (alterations in original)); *Solid Oak*, 449 F. Supp. 3d at 347.  At summary judgment, this Court found that "Defendants' purpose

17

of creating realism and accuracy is distinguishable from Plaintiff's aims. . . . Plaintiff creates body art to display on people.  [Mr. James] ask[ed] Plaintiff to ink certain images on [his] bod[y] as a form of personal expression and to represent people and things that are meaningful and significant in" his life.  1st Summ. J. Op. 12.  This is consistent with other courts that have held that using visual works to depict real world people or events is a different purpose than the work's original, expressive purpose, supporting a finding of transformativeness.  For example, using Grateful Dead concert posters as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events" was "distinct" from the posters' original "artistic expression and promotional purpose." *Bill Graham*, 448 F.3d at 609–10.  Similarly, showing a logo "as part of the historical record" was different from the logo's original purpose "as the brand symbol for the team." *Bouchat v. Balt. Ravens Ltd. P'ship.*, 737 F.3d 932, 940 (4th Cir. 2013) (transformative to use, "not for its expressive content, but rather for its[] factual content" and as a "historical guidepost"); *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013) (using *Ed Sullivan Show* clip "as a biographical anchor" within the fictional musical *Jersey Boys* constituted transformative use).  Likewise, in *Marano v. Metropolitan Museum of Art*, the court found that a photograph of *Van Halen* used to show what he "looks like in [p]erformance" served a different purpose from its use as a historical artifact and exhibition object.  472 F. Supp. 3d 76, 84–85 (S.D.N.Y. 2020) (finding fair use), *aff'd*, 844 F. App'x 436 (2d Cir. 2021).  Status as a public figure weighs in favor of transformative purpose as well.  *See Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996) (use of film footage depicting Muhammed Ali was transformative, due to his status as a "figure of legitimate public concern").

<u>Size of the Reproductions</u>.  It is well-recognized that when a work is shown at a reduced size, this favors transformativeness.  *Solid Oak*, 449 F. Supp. 3d at 347 (finding tattoos appearing

at 4.4% to 10.96% actual size in *NBA 2K* favored fair use).  The Court has already found that "the Tattoos are a small part of a larger graphic display" and "they appear much smaller than in real life."  1st Summ. J. Op. 14.  Likewise, in *Bill Graham*, the concert posters reproduced in the book were just small enough to "permit readers to recognize the historical significance of the posters" while remaining "inadequate to offer more than a glimpse of their expressive value."  448 F.3d at 611.  As the defendant "used the minimal image size necessary to accomplish its" purpose, the use was transformative.  *Id.*  Similarly, in *Kelly v. Arriba Soft Corp.*, although the defendant "made exact replications of Kelly's images," they were "smaller [and] lower-resolution," making it less likely that they would substitute for the original works.  336 F.3d 811, 818 (9th Cir. 2003).

Minimizing Expressive Value.  The third consideration is whether the size of a work and the context in which it appears minimizes its expressive value.  In *Solid Oak*, the court found that "myriad other auditory and visual elements" in *NBA 2K* "minimized" any individual element's expressive value.  449 F. Supp. 3d at 348.  Similarly, in *Bill Graham*, the book included a "prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book."  448 F.3d at 611.  Moreover, the images were "displayed at angles," such that the overall layout "ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain."  *Id.*  Likewise, in *Bouchat*, the logo was "used only fleetingly and insignificantly, . . . limiting its expressive value."  737 F.3d at 941.  And, in *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, the court noted that the argument for "transformative use is stronger" where a "three-dimensional, life-sized" work was reduced to a smaller, 2D image imbued with the defendant's own creative expression.  627 F. Supp. 2d 123, 128 (S.D.N.Y. 2008).

Proportion of Copied Material.  The fourth consideration is "the proportion of copied material" in relation to the whole work.  *Solid Oak*, 449 F. Supp. 3d at 347.  In *Bill Graham*, the images totaled less than "one-fifth of one percent of the book."  448 F.3d at 611.  Likewise, in *Bouchat*, in the "vast majority of its appearances," the work at issue was "present for fractions of a second, and [could] be perceived only by someone who [was] looking for it."  737 F.3d at 940.

Commercial Use.  The Supreme Court has recognized that "many common fair uses are indisputably commercial," and whether a "use was a commercial endeavor . . . is not dispositive," particularly where the use is transformative.  *Google, LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021); *Warhol*, 598 U.S. at 531.  An "attenuated" link between a defendant's gain and its copying minimizes the weight to be given to this factor.  *Swatch*, 756 F.3d at 83.  As this Court recognized, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  1st Summ. J. Op. 13 (quoting *Campbell*, 510 U.S. at 578); *see also Larson*, 2023 WL 5985251, at *12 (finding transformative purpose "outweigh[ed] any potential unfairness from any commercial benefit").

The evidence at trial will show that Take-Two's purpose was different from Plaintiff's purpose.  As this Court has already found, "Defendants' purpose of creating realism and accuracy is distinguishable from Plaintiff's aims."  1st Summ. J. Op. 12.  The evidence will show that Take-Two used the Asserted Tattoos to create realism and accuracy in *NBA 2K*.  And the evidence will show that Take-Two used only so much of the Asserted Tattoos as necessary to accomplish this purpose.  The Asserted Tattoos comprise a small fraction of the overall work and the total file size of *NBA 2K*, they are displayed proportionally smaller than their actual dimensions, and their expressive value is minimized by other elements in the games.  The evidence will also show that consumers do not buy *NBA 2K* for the Asserted Tattoos such that little weight, if any, should be

accorded to commercialism.  Thus, Take-Two anticipates that the evidence will show that this factor favors fair use.

2.      Nature of the Copyrighted Work

The second fair use factor requires the Court to consider the "nature of the copyrighted work," including "whether the work was (1) factual or creative and (2) published or unpublished." *Castle*, 2020 WL 7348157, at *6 (internal quotation omitted); 1st Summ. J. Op. 13–14.  This factor played a significant role in *Google v. Oracle*, in which the Supreme Court recognized that certain works are further from the core of copyright than others, and that "where copyrightable material is bound up with uncopyrightable material, copyright protection is 'thin.'"  141 S. Ct. at 1198.

The unique nature of the Asserted Tattoos strongly favors fair use because they are permanently inked into Mr. James' skin and thereby a part of his likeness, to which Mr. James owns the rights.  This is not the same situation as where someone fixes a portrait on a canvas or writes a manuscript on paper or some other piece of freestanding tangible property that is detached from a  person's body.  *See* 17 U.S.C. § 202 ("ownership of copyright . . . is distinct from any material object in which the work is embodied").  Rather, Mr. James specifically requested that these images be inked permanently ***on his skin***, such that the images go where he goes and cannot be separated from the real-life image of Mr. James.  Here, the works and the material object embodying the works—Mr. James' body—cannot be separated.

The deeply personal nature of the works and the fact that they are inked on a human being, with his own autonomy and rights, such that they became part of his persona and identity, makes factor two particularly important in this case.  Mr. James owns the right to display his persona, including his image, likeness, and distinctive appearance.  *See Wilson v. Ancestry.com LLC*, 653 F. Supp. 3d 441, 454 (S.D. Ohio 2023) (discussing Ohio's right of publicity law).  The evidence will show that when the Asserted Tattoos were inked permanently on Mr. James' body, they

became a visible part of Mr. James' protected persona and identity, and that if he were shown without them, the attempted depiction would not look like Mr. James.  The evidence also will show that the depiction of people with tattoos on their bodies, including Mr. James, therefore implicates the individual freedoms and rights of those individuals.  And the evidence further will show that preventing people who have had tattoos permanently inked on their bodies from showing their bodies in media without consent of the alleged owners of tattoo copyrights would significantly restrict those individual freedoms and rights, which makes the nature of the work further from the core of copyright and uniquely favors fair use here.  *Cf. Google*, 141 S. Ct. at 1202 (considering relevance of third parties when assessing factor two).

Moreover, because the Asserted Tattoos consist entirely of common elements such as someone's mother's name along with stars and a lion, they are entitled to only the thinnest of copyrights, if protectable at all.  Names are not protectable both because they lack creativity (indeed, here, Plaintiff did not independently create the name; it is Mr. James' mother's name) and because extending copyright protection to them would "interfere with the legitimate use of the [names] in question."  *Southco*, 390 F.3d at 286; *see also Halper*, 2019 WL 994524, at *3.  And under the doctrine of *scènes à faire*, elements that are "standard, stock, or that necessarily follow from a common theme or setting" are not protectable either.  *Lexmark*, 387 F.3d at 535 (alterations omitted).  Further, any remaining creativity must be weighed against the realistic depiction of real-world subject matter.  *See Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) (copying plaintiff's work "in the interest of accuracy" did not weigh against fair use); *Bouchat*, 737 F.3d at 943 (where use is related to work's role as "historical facts, then the creative nature of the work matters much less than it otherwise would" (internal quotation

omitted)).  As a result, any copyright protection therein would be thin, at best, which weighs this factor in favor of fair use.  *Google*, 141 S. Ct. at 1198.

In addition, "published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred."  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) (internal quotation omitted).  This is "a critical element of its nature" as copying "even a substantial quantity of a published work may be within the fair use doctrine."  *Bell v. Worthington City Sch. Dist.*, No. 18 Civ. 961, 2020 WL 2905803, at *7 (S.D. Ohio June 2, 2020) (internal quotation omitted).  Where a work is widely disseminated, as is the case here, it favors fair use.  *Seltzer*, 725 F.3d at 1178 (image on Internet and L.A. streets); *Kelly*, 336 F.3d at 820 (photographs posted on the Internet); *Bell*, 2020 WL 2905803, at *8 (work's "widely published nature" weighs in favor of fair use).

The Court has already decided that the Asserted Tattoos "were published once [Mr. James] left Plaintiff's establishment with the Tattoos affixed to" his body, and, therefore, "publication favors Defendants' position."  1st Summ. J. Op. 14.  Although the Court also held that the Asserted Tattoos are expressive rather than factual or informational, *id.*, the evidence at trial will show that the Asserted Tattoos were not highly expressive or creative, such that any copyright protection therein is thin.  The evidence will show that the Asserted Tattoos consist of common unprotectable elements, such as basic shapes and the name of Mr. James's mother.  And the evidence will show that the Asserted Tattoos became an inseparable part of Mr. James' likeness, such that enforcing copyright of them would restrict Mr. James' individual freedoms and rights.  Thus, Take-Two anticipates that the evidence will show that this factor favors fair use.

### 3.    Amount and Substantiality of the Portion Used

"The third factor asks whether the amount and substantiality of the portion of the work used was reasonable in relation to the purpose of the copying."  *Bell*, 2020 WL 2905803, at *8.

For some purposes, "copying the entirety of a work is sometimes necessary to make a fair use" of it. *Castle*, 2020 WL 7348157, at *7 (quoting *Bill Graham*, 448 F.3d at 613). Moreover, courts consider whether the copied material is "embedded into a "larger, transformative" work. *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n.*, 953 F.3d 638, 651 (9th Cir. 2020).

It is well-established that when images are reproduced in a "reduced size," the "visual impact of their artistic expression is significantly limited," which indicates that the use "is tailored to further [the defendant's] transformative purpose." *Bill Graham*, 448 F.3d at 613. The Court has already found that "the Tattoos are a small part of a larger graphic display" and "they appear much smaller than in real life." 1st Summ. J. Op. 14. Where the copyrighted work is displayed in its entirety but at "the minimal image size and quality necessary to ensure" that it can be recognized as a "historical artifact[]," this factor does not weigh against fair use. *Bill Graham*, 448 F.3d at 613.

The evidence at trial will further show that the Asserted Tattoos are two-dimensional images used to depict real life accurately, so using less than the whole would defeat Take-Two's purpose of realism. *See Solid Oak*, 449 F. Supp. 3d at 345 (finding even when tattoos are included in *NBA 2K*, "the display of the Tattoos is small and indistinct, appearing as rapidly moving visual features of rapidly moving figures of groups of player figures"). Moreover, the evidence will show that the Asserted Tattoos are just one small part of a much larger work composed of numerous other elements. The evidence will also show that the Asserted Tattoos are hardly discernible during gameplay, among the many fast-moving images of players, their jerseys, officials, spectators, coaches, arenas, and many other visual elements. Thus, Take-Two anticipates that the evidence will show that this factor favors fair use.

24

4.      Effect of the Use upon the Potential Market

The fourth factor considers "[w]hether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference for the original."  1st Summ. J. Op. 14 (quoting *Authors Guild, Inc. v. Google, Inc.*, 804 F.3d 202, 222 (2d Cir. 2015) ("*Google Books*")).  This concern is "absent" where, as here, the copy and original do not compete.  *Bell*, 2020 WL 2905803, at *9; *see also Sony*, 464 U.S. at 450 ("[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create.").  Moreover, "any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work."  *Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 99 (2d Cir. 2014).  And copyright owners may not preempt exploitation of transformative markets merely by developing or licensing a transformative use themselves.  *Bill Graham*, 448 F.3d at 614.

Fair use exists where the parties' works are not substitutes for each other.  *See HathiTrust*, 755 F.3d at 95 (fair use "must not excessively damage the market for the original by providing . . . a substitute"); *Solid Oak*, 449 F. Supp. 3d at 350 ("[U]se of the Tattoos in *NBA 2K* could not 'deprive the rights holder of significant revenues' because potential purchasers of the Tattoo designs are unlikely to 'opt to acquire the copy in preference to the original.'" (quoting *Google Books*, 804 F.3d at 223)).

Courts warn that "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." *Swatch*, 756 F.3d at 91 (emphasis in original) (internal quotation omitted).  To "guard against this vice of circular reasoning," the factor four inquiry is limited "to a use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets."  *Id.* (internal

25

quotation omitted).  "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder."  *Bill Graham*, 448 F.3d at 614 (internal quotation omitted) (emphasis in original).  "Plaintiff bears the burden of showing that there is a potential market for the use of the Tattoos as they appear in Defendants' video games."  1st Summ. J. Op. 15.

The fact that a market is unlikely to develop weighs in favor of fair use.  *See Blanch*, 467 F.3d at 258 (admission that copyright owner had "never licensed any of her photographs for" the use made by defendant weighed in favor of fair use); *Est. of Smith v. Cash Money Recs., Inc.*, 253 F. Supp. 3d 737, 752 (S.D.N.Y. 2017) (fourth factor favored fair use where "Plaintiffs never attempted to establish a market for licensed derivative uses . . . until Defendants used the recording on the Album"); *Viewfinder*, 627 F. Supp. 2d at 136 (market harm "undermined by the fact that plaintiffs do not themselves sell or license photos of their designs to the media").

This factor must also "take into account the public benefits the copying will likely produce," balancing any "dollar amounts likely lost" with the benefits from the "creative production of new expression."  *Google*, 141 S. Ct. at 1206; *see also Astronics*, 2023 WL 9284863, at *26.  Courts also consider whether allowing enforcement would risk limiting future creativity.  *Google*, 141 S. Ct. at 1208.

The evidence at trial will show that there is no market for tattoos in video games, and that such a market is unlikely to develop.  Plaintiff has never licensed the Asserted Tattoos for use in video games, and Take-Two expects that none of the witnesses have ever heard of such a license.  And the evidence will also show that *NBA 2K* is not a substitute for the Asserted Tattoos.  So, there is no cognizable market harm here.  Moreover, the evidence at trial will show that allowing

enforcement of copyrights in tattoos inked on people's bodies will risk limiting future creativity, including by restricting the way Mr. James can be shown in various media.  And the evidence at trial will show that allowing the enforcement of copyrights in tattoos inked on people where those people are being depicted as they look in real life will hurt the public by restricting tattooed individuals' ability to show their bodies freely, and thereby depriving video game players and the broader public of true and realistic depictions of their favorite celebrities and athletes.

### G.    Actual Damages[5]

"Damages are awarded to compensate the copyright owner for losses from the infringement, and profits are awarded to prevent the infringer from unfairly benefitting from a wrongful act."  *Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, No. 18 Civ. 735, 2022 WL 1604739, at *2 (S.D. Ohio May 20, 2022) (quoting *Cotter v. Christus Gardens, Inc.*, 238 F.3d 420 at *3 (6th Cir. 2000)); 17 U.S.C. § 504.  In some cases, actual damages may be calculated as the amount the copyright infringer would have paid the copyright owner to use the copyrighted material, often called a license fee.  *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 487 (S.D. Ohio 2020).  Actual damages may also be the "loss in the fair market value of the copyright."  *Cotter*, 238 F.3d 420 at *3.  "[A] plaintiff may not recover its full lost profits plus all of the defendant's profits, for this would constitute a forbidden double recovery."  *Id.*

---

[5]    Plaintiff is not permitted to seek actual damages, as detailed in Take-Two's motion *in limine* No. 7.  This is because under Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Plaintiff was required to provide a computation of each category of damages claimed, as well as the documents or other evidentiary materials on which that computation is based.  Failure to do so precludes the party from using that information at trial.  Fed. R. Civ. P. 37(c)(1).  *See, e.g.*, *TCF Inventory Fin., Inc. v. Northshore Outdoor, Inc.*, No. 11 Civ. 85, 2012 WL 2576367, at *4 (N.D. Ohio July 3, 2012) (granting motion *in limine* "to preclude defendants from presenting damage evidence as to 'lost profits'" where "defendants did not provide TCF with a computation of alleged lost profits in their initial Rule 26 disclosures" nor subsequently disclose a "'computation' of their alleged lost profits").  That said, Take-Two includes the law on actual damages herein out of an abundance of caution.

A plaintiff seeking actual damages "must prove the existence of a causal connection between the . . . alleged infringement and some loss of anticipated revenue." *Thoroughbred Software Intern., Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007) (internal quotation omitted). If the relationship between the actual losses suffered and the use of the Asserted Tattoos is unduly speculative, Plaintiff is not entitled to actual damages. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 710 (9th Cir. 2004). Moreover, if a plaintiff does not take reasonable actions to reduce damages and might have mitigated damages had the plaintiff taken such action, actual damages may be reduced by the amount the plaintiff could have mitigated. *First Nat. Bank of Akron v. Cann*, 503 F. Supp. 419, 441 (N.D. Ohio 1980) (finding injured party "must use reasonable care to avoid loss").

The evidence at trial will show that Plaintiff did not incur any actual damages as a result of Take-Two's use of the Asserted Tattoos in *NBA 2K*.

## H.    Disgorgement of Profits

To recover Take-Two's profits, Plaintiff must present proof of Take-Two's "gross revenues." *Rainey v. Wayne St. Univ.*, 26 F. Supp. 2d 963, 971 (E.D. Mich. 1998) Damages must be based on "credible evidence, not speculation." *Id*. The Plaintiff also must show that the gross revenues bear a "reasonable relationship" between the profits and the alleged infringement. *Premier Dealer Servs.*, 2022 WL 1604739, at *6. Then Take-Two must show "deductible expenses" and "elements of revenue attributable to factors other than the copyrighted work." *Id*. at *2.

The evidence will show that customers purchased *NBA 2K* for many reasons, but no one bought the game for the Asserted Tattoos, and therefore none of the revenues are attributable to the alleged infringement. To the extent any profits from sales of *NBA 2K* can be attributed to the

Asserted Tattoos, they could be only a tiny fraction of profits, given that the Asserted Tattoos make up a miniscule fraction of total gameplay.

## I.     Attorney's Fees and Statutory Damages

Attorney's fees and statutory damages are available for a copyright holder **only if** he registered his work before **any** infringement commenced.  17 U.S.C. § 412.  Section 412 "leaves no room for discretion" and precludes this remedy so long as "**the first act in a series of acts** constituting continuing infringement" occurred prior to registration. *Johnson*, 149 F.3d at 505–06 (emphasis added); *see also Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir. 1992) (Congress' intended remedies be denied "for all of that defendant's infringements . . . if one of those infringements commenced prior to registration").[6]  That is because "when the same defendant infringes on the same protected work in the same manner as it did prior to the work's registration, the post-registration infringement constitutes the continuation of a series of ongoing infringements." *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2016 WL 4126543, at *3 (S.D.N.Y. Aug. 2, 2016); *see also Compass Homes, Inc. v. Trinity Health Grp.*, No. 13 Civ. 647, 2016 WL 3406054, at *9–11 (S.D. Ohio June 21, 2016) (construction plans "alter[ed]," "converted . . . into computer-generated plans and further refined" from pre-registration plans were "continuing infringement"); *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1240 (N.D. Ga. 2014) (infringement of construction specification and new versions of it was continuing infringement).

The evidence will show that the alleged infringement began before the Asserted Tattoos

---

[6] This is consistent with the fact that a plaintiff may collect only "**an** award of statutory damages for **all infringements** involved in the action, **with respect to any one work**, for which any one infringer is liable."  17 U.S.C. § 504(c)(1) (emphasis added).  As § 504 includes all alleged infringements of a work, it "would be inconsistent to . . . read section 412 to treat each infringement separately."  *Mason*, 967 F.2d at 144.

were registered, and thus both attorneys' fees and statutory damages are unavailable.  Moreover, the Court found that Plaintiff elected to attempt to recover actual damages in lieu of statutory damages, 1st Summ. J. Op. 19, and thus, he may not seek statutory damages in this action.[7]

## IV.    LIST OF PROPOSED WITNESSES[8]

Pursuant to section 1 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc. provide the following list of proposed witnesses and a brief description of the subject matter of the testimony of each witness:

1.    **Alfredo Brody** (appearing live): aspects of Take-Two Interactive Software, Inc.'s business, including its finances; Take-Two Interactive Software, Inc.'s *NBA 2K* game, including marketing channels, visual elements, and decisions.

2.    **Anton Dawson** (may appear live): aspects of Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game, including development, technical, and graphical aspects thereof.

3.    **Michael Stauffer** (may appear live): aspects of Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game, including its customers.

4.    **Nina Jablonski, Ph.D.** (may appear live): expert testimony regarding aspects of tattoos, including their role as a form of self-expression and role in an individual's likeness.

---

[7]    In Plaintiff's 2023 trial brief, Plaintiff purported to "reserve[] his rights to elect statutory damages before final judgment."  Dkt. 213 (Pl.'s 2d Trial Brief) 11.  But, when Take-Two previously moved this Court for summary judgment that Plaintiff is not entitled to statutory damages, *see* Dkt. 95-1 (Defs.' 1st Mot. Summ. J.) 29–30, the Court held that Plaintiff had already elected to recover actual damages and Take-Two's profits in lieu of statutory damages.  1st Summ. J. Op. 19.  Thus, it held that Take-Two's "argument that Plaintiff is not entitled to statutory damages is moot."  Should the Court reconsider its decision that Plaintiff already made his election, Take-Two reasserts that Plaintiff is not entitled to such a remedy.  Defs.' 1st Mot. Summ. J. 29–30.

[8]    Take-Two seeks to exclude all evidence related to Danny Green and Tristan Thompson from this case, as detailed in Take-Two's motion *in limine* No. 8.  Should this Court deny that motion, Take-Two reserves its right to introduce deposition testimony by these witnesses as described in its first amended trial brief.  *See* Dkt. 215 (Defs.' 1st Am. Trial Brief.) 32.

5.     **Ian Bogost, Ph.D.** (appearing live): expert testimony regarding aspects of video games, including technical aspects and functions of Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game and video games with respect to other audiovisual works.

6.     **Deborah Jay, Ph.D.** (appearing live): expert testimony regarding surveys performed to determine reasons why customers purchase Take-Two Interactive Software, Inc.'s business; Take-Two Interactive Software, Inc.'s *NBA 2K* game.

7.     **James Malackowski** (appearing live): expert testimony regarding the form and amount of appropriate compensation, if any, related to Plaintiff's allegations of copyright infringement.

8.     **LeBron James** (appearing by deposition designation): Mr. James' personal meaning behind the Asserted Tattoos; Mr. James' authorship of the Asserted Tattoos; the events surrounding the inking of the Asserted Tattoos on Mr. James' body; Mr. James' expectations getting the Asserted Tattoos inked on his body; Take-Two's authority to use Mr. James's likeness in *NBA 2K*.

9.     **James Hayden** (appearing live or by deposition designation): the events surrounding the inking of the Asserted Tattoos on Mr. James' body, including his conduct and communications with those players; the purpose of the Asserted Tattoos; his experience at Focused Tattoos and its practices.

10.     **Bernardino Tovanche** (appearing live or by deposition designation): the events surrounding the inking of the Asserted Tattoos on Mr. James' body; his experience at Focused Tattoos and its practices.

11.   **Jon Hayden** (appearing live or by deposition designation): the events surrounding the inking of the Asserted Tattoos on Mr. James' body; his experience at Focused Tattoos and its practices.

## V.   NOTICE REGARDING PROPOSED USE OF DEPOSITION TESTIMONY[9]

Pursuant to section 6 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc. provide notice that they intend to use the following depositions as trial evidence, and have attached as **Exhibit A** deposition designations for these witnesses:

1.   **James Hayden** - Take-Two intends to use James Hayden's personal deposition as evidence at trial to the extent that Plaintiff does not testify in person.

2.   **Jon Hayden** - Take-Two intends to use Jon Hayden's personal deposition as evidence at trial to the extent that Plaintiff does not call him to testify in person.

3.   **Bernardino Tovanche** - Take-Two intends to use Bernardino Tovanche's personal deposition as evidence at trial to the extent that Plaintiff does not call him to testify in person.

4.   **LeBron James** - Take-Two intends to use LeBron James's personal deposition as evidence at trial to the extent he does not testify in person.

## VI.   INDEX OF PROPOSED EXHIBITS

Pursuant to section 1 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc.'s index of proposed exhibits and a brief description of each exhibit is attached hereto as **Exhibit B**.

---

[9]   Take-Two seeks to exclude all evidence related to the four dismissed tattoos, including all evidence related specifically to Danny Green and Tristan Thompson from this case, as detailed in Take-Two's motion *in limine* No. 8. Should this Court deny that motion, Take-Two reserves its right to introduce deposition testimony both by and about these tattoos, including deposition testimony by Messrs. Green and Thompson as described in Take-Two's first amended trial brief. *See* Defs.' 1st Am. Trial Brief. 33. In accordance with this reservation of right, Take-Two has conditionally designated deposition testimony related to the dismissed tattoos in its accompanying deposition designations.

## VII.   ANTICIPATED EVIDENTIARY ISSUES

Pursuant to section 1 of the Court's Civil Trial Order, 2K Games, Inc. and Take-Two Interactive Software, Inc. provide the following discussion of evidentiary issues that they believe are likely to arise at trial:

1.      As set forth in its motion *in limine* no. 1, Take-Two anticipates that Plaintiff may argue that Take-Two withheld telemetry data that would show the frequency with which certain players are selected.  This should be precluded, as the Court already held telemetry data is not stored showing the frequency of the selection of certain players, and Plaintiff's motion to compel production was denied.

2.      As set forth in its motion *in limine* no. 2, Take-Two anticipates that Plaintiff may introduce evidence of his purported projects and agreements with third parties involving different works and uses, none of which involve video games.  This evidence should be excluded because it is irrelevant and poses an undue risk of confusion and unfair prejudice.

3.      As set forth in its motion *in limine* no. 3, even if Plaintiff's purported projects and agreements are admitted, Take-Two anticipates that Plaintiff may introduce evidence as to their scope and purpose.  This evidence should be excluded because Plaintiff improperly withheld these facts during discovery under claims of privilege, and because to introduce such evidence now poses an undue risk of unfair prejudice.

4.      As set forth in its motion *in limine* no. 4, Take-Two anticipates Plaintiff may introduce evidence concerning Take-Two's licensing of different content for wholly different purposes than those at issue in this litigation, including trademarks, which are subject to different usage laws than copyrights.  This should be excluded because such evidence is irrelevant and poses an undue risk of confusing the jury and unfair prejudice.

5.      As set forth in its motion *in limine* no. 5, Take-Two anticipates Plaintiff may introduce evidence concerning speculation about the possibility that other video game companies, including EA, have licenses or agreements that are not at issue in this litigation.  Such agreements, if they even exist, have not been produced in this case and there is no evidence regarding their terms or scope.  This should be excluded because such evidence is irrelevant and poses an undue risk for unfair prejudice.

6.      As set forth in its motion *in limine* no. 6, Take-Two anticipates Plaintiff may introduce undisclosed testimony concerning common practices in the tattoo industry and Take-Two's relationship to the tattoo and art industries.  This should be excluded, as Mr. Hayden is not qualified to offer expert opinions about what is common between tattooists and their patrons, and his testimony has not been disclosed.  Further, Mr. Hayden's statements about Take-Two's relationship with the tattoo and art industries should be excluded as prejudicial and irrelevant.

7.      As set forth in its motion *in limine* no. 7, Take-Two anticipates that Plaintiff may present evidence of actual damages.  This should be precluded as Plaintiff never disclosed a computation of actual damages as he was required to do by Federal Rule of Civil Procedure 26(a)(1)(A)(iii).

8.      As set forth in its motion *in limine* no. 8, Take-Two anticipates that Plaintiff may present evidence relating solely to the four tattoos dismissed from this case, including evidence relating to Danny Green or Tristan Thompson, whose bodies bear three of those tattoos (but none of the remaining ones).  This evidence should be excluded because it is irrelevant, is likely to confuse the jury, and poses an undue risk of unfair prejudice.

9.      As set forth in its motion *in limine* no. 9, Take-Two anticipates that Plaintiff may present evidence of undisclosed communications with Mr. James.  This should be precluded, as

Plaintiff did not produce any discovery concerning the alleged communications and represented that there had been no such communications.

10. As set forth in its motion *in limine* no. 10, Take-Two anticipates that Plaintiff may present evidence of Take-Two's sales of virtual currency. This should be precluded, as there is no reasonable relationship between Take-Two's sales of virtual currency and the alleged infringement.

## VIII.  ESTIMATED TRIAL LENGTH

Pursuant to the parties' Joint Statement Regarding Trial Length (Dkt. 78), Take-Two believes the trial can be completed in 5 to 7 trial days.

## IX.  PROPOSED INITIAL VOIR DIRE QUESTIONS

Pursuant to section 2 of the Court's Civil Trial Order, Defendants Take-Two Interactive Software, Inc. and 2K Games, Inc. ("Take-Two") submit the following proposed questions to be posed by the Court during voir dire to the entire jury panel. Take-Two reserves the right to pose additional questions, to the extent permitted by the Court:

1. Have you ever been a plaintiff or a defendant to a lawsuit? If so, which were you and what was the nature of the lawsuit? How was the matter resolved and were you satisfied with the outcome?

2. Have you ever had any training, education, or experience in intellectual property (i.e., patents, trademarks, copyrights)?

3. Do you own any copyright/patent/trademark registrations?

    (i)  If so, what do you have registered?

    (ii) Have you ever enforced your copyright/patent/trademark registration against anyone else?

4. Has anyone ever accused you of copyright/patent/trademark infringement?

5.  Are you an artist or is someone close to you an artist?

6.  Are you a tattooist or is someone close to you a tattooist?

7.  Do you have any tattoos, or have you ever had any tattoos?

8.  Have you ever played any sports video games?

9.  Have you played any of the games in the *NBA 2K* series of video games?

10. Have any of you ever heard of or know the Plaintiff, James Hayden?

11. Have any of you heard of either of the Defendants, Take-Two Interactive Software, Inc. or 2K Games, Inc.?

12. Do you have strong negative feelings against LeBron James?

13. Have you ever owned your own business or otherwise been self-employed?

14. Have you ever felt wrongly accused of something?

15. Have you ever been accused of copyright infringement?

16. Have you ever accused someone of copyright infringement?

17. Do you regularly post photos of yourself on social media?

18. Do you have friends who do?

19. Do you have any financial hardship that would prevent you from serving as a juror in this case?

20. Do you require medical treatment, condition, or medication that may interfere with your ability to serve on this jury?

21. Does anyone here feel like COVID has been especially burdensome or difficult for you, such that it would interfere with your ability to serve on this jury?

22. Does anyone here have any caretaker duties for an elderly, sick, or disabled person that might put you in a situation where you could be called away from trial?

36

23. Often we naturally want to side with locals, and that is especially so in Cleveland, a city with perhaps more hometown pride than anywhere else.  In court, however, it's critical to view things with absolute impartiality.  Does anyone think they would have a difficult time ruling in favor of an out-of-state business in a suit brought by a Clevelander?

## X.    PROPOSED JURY INSTRUCTIONS

Pursuant to sections 1 and 3 of the Court's Civil Trial Order, the parties conferred regarding proposed jury instructions and were able to agree upon some, but not all, proposed jury instructions.  Attached hereto as **Exhibit C** is a set of jury instructions that identify (1) the instructions that have been agreed upon by all the parties; (2) for disputed instructions, Take-Two's proposed instructions and authority therefor.

## XI.   SPECIAL INTERROGATORIES AND VERDICT FORM

Pursuant to sections 1 and 3 of the Court's Civil Trial Order, the parties conferred regarding their proposed special interrogatories and verdict forms but were unable to reach an agreement. As such, Take-Two's proposed special interrogatories and verdict form are attached hereto as **Exhibit D**.

## XII.  PRELIMINARY STATEMENT AND STIPULATIONS

Pursuant to section 4 of the Court's Civil Trial Order, an impartial, concise joint statement of the case, along with stipulations of fact, are being filed concurrently with the Court.

Dated: New York, NY
      February 29, 2024

/s/ Dale M. Cendali
Dale M. Cendali (admitted *pro hac vice*)
Joshua L. Simmons (admitted *pro hac vice*)
Christopher T. Ilardi (admitted *pro hac vice*)
Joshua C. Berlowitz (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

Telephone: (212) 446-4800
dale.cendali@kirkland.com
joshua.simmons@kirkland.com
chris.ilardi@kirkland.com
josh.berlowitz@kirkland.com

Miranda D. Means (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, Massachusetts 02116
Telephone: (617) 385-7500
miranda.means@kirkland.com

Yungmoon Chang (admitted *pro hac vice*)
Kirkland & Ellis LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4359
yungmoon.chang@kirkland.com

Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
Telephone: 216.348.5400
Fax: 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Attorneys for Defendants 2K Games, Inc. and
Take-Two Interactive Software, Inc.*