**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES HAYDEN, | ) | Case No. 1:17-cv-02635 |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| vs. | ) | |
| | ) | |
| 2K GAMES, INC. and TAKE-TWO | ) | |
| INTERACTIVE SOFTWARE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW ON DEFENDANTS' IMPLIED LICENSE
DEFENSE UNDER RULE 50(b) AND MOTION FOR A NEW TRIAL UNDER RULE 59**

## TABLE OF CONTENTS

I.    Introduction ...................................................................................................... 1

II.    Argument ......................................................................................................... 3

    A.   Legal Standard ........................................................................................ 3

    B.   The jury lacked sufficient evidence to find for Take-Two on its implied license defense ........................................................................................ 4

        1.    The implied license finding must cover the specific manner in which the Asserted Tattoos were eventually used ................................................... 4

        2.    Not only is there *no* evidence of Mr. Hayden's intent to grant a license allowing reproduction in video games, but the relevant evidence confirms precisely the opposite ........................................................................... 7

    C.   The Court erred by excluding material, relevant evidence related to Take-Two's implied license defense ................................................................ 12

        1.    Excluding PX-32, PX-26, and related testimony was error ........................ 14

        2.    Excluding evidence related to the Mannequin Project was error ................. 15

III.   Conclusion ...................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Take-Two Interactive Software, Inc. et al.*, Case No. 3:18-cv-00966-SMY
(S.D. Ill. 2022)...................................................................................................................8, 11

*Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008) ...................................6

*Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990)..................................................6

*Harrow Products, Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015 (6th Cir. 1995) .........................11

*Holmes v. City of Massillon,* 78 F.3d 1041 (6th Cir.1996) ..........................................................4

*I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996) .....................................................................6

*Ingram v. U.S.*, 360 U.S. 672 (1959) ...........................................................................................9

*Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998) ..................................................................5, 6, 7

*LimeCoral v. CareerBuilder*, 889 F.3d 847 (7th Cir. 2018) .......................................................6

*Logan v. Dayton Hudson Corp.*, 865 F.2d 789 (6th Cir. 1989) .................................................13

*MidlevelU, Inc. v. ACI Information Group*, 989 F.3d 1205 (11th Cir. 2021)...............................5

*Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718 (S.D. Ohio 2021)................................4

*Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, L.Ed.2d 105
(2000) ........................................................................................................................................3

*Super Sulky Inc. v. United States Trotting Ass'n.,* 174 F.3d 733 (6th Cir. 1999) .......................3

*Tompkin v. Philip Morris USA, Inc.,* 362 F.3d 882 (6th Cir. 2004)............................................4

*White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789 (6th Cir.2004) ..................................3

**Other Authorities**

17 U.S.C. §106...............................................................................................................................2

**Rules**

Fed. R. Evid. 401 .........................................................................................................................16

Federal Rule 59(a)(1)(A) ...............................................................................................................4

Federal Rule of Civil Procedure 50(b)...........................................................................................3

### I.    Introduction

At trial, Take-Two[1] elicited **_no_** evidence that Mr. Hayden intended to grant LeBron James, let alone a third-party like Take-Two, an implied license that would allow Take-Two to recreate the Asserted Tattoos[2] in video games.

In fact, the uncontradicted trial evidence shows the opposite. Thus, the jury's finding in favor of Take-Two's implied license defense is not and cannot be based on legally sufficient evidence under Federal Rule of Civil Procedure 50. The _only_ evidence of Mr. Hayden's intent comes from his own testimony, in which he expressly denies intending to grant a license that would allow copying the Asserted Tattoos in video games. Take-Two cannot point to any other record evidence demonstrating Mr. Hayden's intent. What is more, the uncontradicted record evidence shows that Mr. Hayden did not even _know_ Take-Two was copying the Asserted Tattoos in video games until 2013—six years _after_ he inked the Asserted Tattoos. In 2007 and 2008, when he inked the Asserted Tattoos on LeBron James, Mr. Hayden did not even know the NBA 2K video games _existed at all_. And LeBron James did not advise Mr. Hayden of that fact. Put simply, without knowledge, there can be no intent, _as a matter of law_. Nothing in the record contradicts Mr. Hayden's testimony that he never intended such an implied license or supports any different inference. Respectfully, this question should never have reached the jury.[3] This Court should find that there was no such implied license as a matter of law under Rule 50(b), as the jury's finding was not based on legally sufficient evidence.

---

[1] "Take-Two" refers collectively to Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc.

[2] "Asserted Tattoos" refers to Mr. Hayden's copyrighted tattoos registered as VAu 1-263-888 and VAu 1-270-802.

[3] Notably, when this Court denied Mr. Hayden's Rule 50(a) motion, the proposed implied license jury instruction had not yet been amended to include the language embodying the proper standard, "including in the manner in which they were eventually used."

Moreover, evidence that was excluded at trial further demonstrates that neither Mr. Hayden nor Mr. James, the two sole principals in any implied license, nor even Take-Two—i.e., *no one* involved—believed that Take-Two had a license to replicate the Asserted Tattoos in video games. Even if the Court were to find the jury could *infer* Mr. Hayden intended to grant *an* implied license, there is absolutely *nothing* to suggest its scope could have extended to reproduction in video games (i.e., "the manner in which they were eventually used," as *required* by this Court's jury instruction) and the only affirmative evidence in the record is to the contrary.

Further, Mr. Hayden was not even given a fair opportunity to present all his evidence to the contrary. First, in an internal Take-Two email that was excluded at trial, 2K Games' President referenced Take-Two's copying as "a disregard for other people's ip". (PX-32.) Another participant in that email exchange, Take-Two's Senior President of Basketball Operations, described the issue in excluded deposition testimony as not "following an approval procedure." (Dkt. #292, Argent Dep. 303:24–304:5.) This evidence would have allowed the jury to conclude that Take-Two *knew* it did not have adequate "approval" (*i.e.*, a license) to use the Asserted Tattoos and, instead, simply disregarded Mr. Hayden's copyrights. Further, Mr. Hayden was precluded from testifying and submitting evidence related to a project in which Nike enlisted Hayden's permission and personal services to recreate the Asserted Tattoos on LeBron James mannequins for marketing purposes shortly after he inked the Asserted Tattoos. Instead of recreating the Asserted Tattoos on a LeBron James likeness (i.e., a mannequin) itself, which would have required a separate license from Mr. Hayden, Nike simply asked *Hayden*—the *sole* party with the *right* to create such derivative works (*see* 17 U.S.C. §106)—to recreate the tattoos. Hayden was prepared to testify that Mr. James knew about this arrangement, further supporting a conclusion that *neither* Mr. Hayden nor LeBron James understood that Mr. James could side-step

Mr. Hayden's exclusive right to recreate the Asserted Tattoos on a LeBron James likeness. The jury should not have been deprived the opportunity to consider such pivotal evidence.

Accordingly, as set forth more fully below, under either (and each) premise—*i.e.*, (1) this Court's finding of no implied license authorizing reproduction of the Asserted Tattoos in video games under Rule 50(b), and/or (2) this Court's ruling excluding critical evidence (specifically pertaining to the absence of such an implied license) that precluded Mr. Hayden's right to a fair trial—this Court should order a new trial under Rule 59.

## II. Argument

### A. Legal Standard

Under Federal Rule of Civil Procedure 50(b), a party is entitled to judgement as a matter of law with respect to a defense if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [defendant] on that issue[.]" In ruling on a Motion for Judgment as a Matter of Law under Rule 50(b), the court must review the evidence in the light most favorable to the party against whom the motion is made, drawing from that evidence all *reasonable* inferences in his favor. *Super Sulky Inc. v. United States Trotting Ass'n,* 174 F.3d 733, 737 (6th Cir. 1999). But the motion should be granted if reasonable minds could only conclude in favor of the moving party. *Id.* at 737.

This analysis is the same as the inquiry for resolving a motion for summary judgment under Rule 56. *White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789, 794 (6th Cir.2004) (en banc) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, (2000)). In this case, judgment as a matter of law must be granted to Mr. Hayden where there is no evidence in the record to support Take-Two's claim of implied license, such that "a reasonable jury could not

find an implied license exists." *Navarro v. Procter & Gamble Co*., 515 F. Supp. 3d 718, 780–781 (S.D. Ohio 2021) (granting summary judgment against implied license defense).

Under Federal Rule 59(a)(1)(A), a new trial may be granted in an action in which there has been a trial by jury "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Generally, there are three such situations: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.,* the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon,* 78 F.3d 1041, 1046 (6th Cir.1996). A party may be prejudiced, for example, by a district court erroneously admitting or excluding evidence, and a new trial may be granted if the evidence would have caused a different outcome at trial. *Tompkin v. Philip Morris USA, Inc.,* 362 F.3d 882, 891 (6th Cir. 2004).

**B.** The jury lacked sufficient evidence to find for Take-Two on its implied license defense.

There is no evidence in the record—*at all*—that Mr. Hayden intended to grant LeBron James or, through him, Take-Two a license to digitally recreate the Asserted Tattoos in video games. Thus, the jury's verdict finding an implied license *could not* have been based on sufficient evidence—none exists—or any proper inference therefrom.

**1.  The implied license finding must cover the specific manner in which the Asserted Tattoos were eventually used.**

The Court instructed the jury that "[i]n deciding if Defendants have proved by a preponderance of the evidence an implied license . . . the key question is whether the facts and circumstances demonstrate that Plaintiff intended that LeBron James could . . . allow others to display, copy and distribute these tattoos, ***including the manner in which they were eventually used***." (Tr., 834:9–16 (emphasis added).) Considering the way the Asserted Tattoos were eventually used (i.e., reproduced in video games) is critical because an implied license to use the

Asserted Tattoos in *some* manner is *not* a blanket license to use them however one wants. As the 11th Circuit put it, "[i]mplied permission to enter the front door to shop . . . does not imply permission to enter and throw a party." *See MidlevelU, Inc. v. ACI Information Group*, 989 F.3d 1205, 1218 (11th Cir. 2021); *see also Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998).

The need to assess an implied license's scope is not limited to the 11th Circuit. It is also found in binding Sixth Circuit precedent. In *Johnson v. Jones*, the Sixth Circuit affirmed summary judgment of no implied license because there was no evidence that "the copyright owners intended that their copyrighted works be used *in the manner in which they were eventually used*." 149 F.3d 494, 502 (6th Cir. 1998) (emphasis added). In *Johnson*, an architect authored architectural drawings for his client's "dream home," expecting that he would also serve as the contractor to build the home. *Id.* at 498. After contract negotiations between the architect and client broke down, the client hired another architect who copied the plans and used them to build the dream home. The client-defendant claimed she had an implied license to use the drawings. But the district court found—and the Sixth Circuit affirmed—that no implied license existed as a matter of law *because the defendant used the works in a manner the author never intended. Id.* at 502.

Plaintiff is aware of no binding law that would ignore whether the copyright owner intended to allow *the specific use at issue*, when considering the implied license defense. Take-Two has cited *no* case where an implied license was found for a use that the author never intended or even contemplated. That is the essence of the defense. In fact, the Sixth Circuit in *Johnson* distinguished two cases that Take-Two previously relied on, expressly on that basis: "In short neither *Effects* nor *Shaver* is factually similar to the case at hand. Most importantly, the facts in those cases amply demonstrate that *the copyright owners **intended** that their copyrighted*

*works be used **in the manner in which they were eventually used**.*"[4] *Id.* (emphasis added). Likewise, *LimeCoral v. CareerBuilder*, 889 F.3d 847 (7th Cir. 2018) and *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008), which Take-Two cited in response to Mr. Hayden's Rule 50(a) motion (Tr., 785:8–11), are similarly distinguishable. In *LimeCoral*, a graphics designer created and delivered graphic art with the explicit intention that the defendant use the graphics in connection with marketing on its website. *LimeCoral*, 889 F.3d at 848. The dispute was really about the website's continued use *in the same manner* after it stopped paying the graphic designer, *not* whether the defendant website used the work in a way the designer never intended. *Id.* at 849. The same goes for the facts and reasoning in *Asset Marketing Systems, Inc. v. Gagnon*. That dispute similarly involved a company *continuing* to use software after it stopped paying a license fee. *Asset Marketing*, 542 F.3d at 757. Those cases are simply inapposite. In contrast, the reasoning in *Johnson*—binding Sixth Circuit law—is directly applicable here, where Take-Two used Mr. Hayden's Asserted Tattoos in a way *he never intended* when he inked them on LeBron James.

The use at issue in this case is even further removed from Mr. Hayden's intent than the use at issue in *Johnson*, where the copyrighted architectural plans were used to build the *intended* house. In *Johnson*, the fact that the plans were used by a different entity rendered such use outside the scope of the implied license. Here, in contrast, not only was the eventual "user" (Take-Two) different than the recipient of the Asserted Tattoos (LeBron James) but, as further established below, the particular (infringing) use was indisputably *never* contemplated or intended by Mr. Hayden.

---

[4] Distinguishing *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) and *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996).

Mr. Hayden is thus entitled to judgment as a matter of law that Take-Two did not have rights under any implied license to copy and distribute Mr. Hayden's Asserted Tattoos in video games.

> **2. Not only is there *no* evidence of Mr. Hayden's intent to grant a license allowing reproduction in video games, but the relevant evidence confirms precisely the opposite.**

The trial record contains absolutely ***no*** evidence that Mr. Hayden intended to grant a license for third parties to digitally recreate his Asserted Tattoos in video games (*i.e.*, derivative works) or distribute them. The *only* evidence in the record confirms the opposite. Mr. Hayden testified at length about this issue. He expressly testified that he did not intend to give a license that would allow video game makers to copy the Asserted Tattoos in video games:

> **Q:** Did you intend or give permission to Mr. James to allow video game makers to use your copyright of tattoos?

> **A:** Never intended that.

(Tr., 54:17–19.)  At the Rule 50(a) motion hearing, Take-Two brushed this evidence aside, claiming that "the standard here really is objective evidence of intent, not subjective intent, not Plaintiff's claims post hoc as to his intent at the time." (Tr., 782:5–8.) This misstates Sixth Circuit law. In *Johnson*, the Sixth Circuit expressly considered the copyright owner's testimony regarding his intent in finding no implied license as a matter of law. *Johnson*, 149 F.3d at 500. Moreover, it is not Mr. Hayden's burden to prove the *lack* of an implied license—it is *Take-Two's* burden to prove both that there *is* an implied license ***and—critically***—that such license authorized copying the Asserted Tattoos *in video games*. Take-Two has elicited no record evidence that would contradict Mr. Hayden's testimony.

Instead, at the oral hearing on Mr. Hayden's 50(a) motion, Take-Two suggested Mr. Hayden's deposition response, "I guess," to the question, "[i]s it fair to say that in the tattoo

industry, that when a client leaves the tattooist's parlor he or she can go about their life as they wish without needing to run back to the tattooist for permission[,]" is evidence that Mr. Hayden granted an implied license as to video games. (Tr., 784:10–13.) But such an inference is unreasonable and impermissible. First, the question is about the tattoo industry in general. This case is about one particular artist (Mr. Hayden) and one particular client (LeBron James). Undoubtedly, in the vast majority of instances in which tattoo artists ink clients, the tattoos are not subsequently recreated in video games.[5] It is unreasonable to infer Mr. Hayden's specific intent under these specific circumstances from his response to this very general question. Second, this question only refers to the "client" seeking "permission"—not a third-party. Here, Take-Two needed permission, not LeBron James. Third, the question was extremely vague— permission to do what? It is improper to infer from Mr. Hayden's response to this vague question that he intended to allow third parties to recreate the Asserted Tattoos in video games—a scenario he knew nothing about at the time.

There is no record evidence that Mr. Hayden even knew video games existed that depict NBA players' or LeBron James's tattoos. The only record evidence shows the *opposite*.

> **Q:** And when—when you were 2007, 2008, creating these tattoos, did you know about NBA 2K?
>
> **A:** No.
>
> **Q:** Okay. When did you first learn about NBA 2K?
>
> **A:** Not until 2013.

(Tr. at 54:8–11.)

> **Q:** And could you tell the jury the circumstances of when you first saw NBA 2K?

---

[5] In a very similar case, *Alexander v. Take-Two Interactive Software, Inc. et al.*, Case No. 3:18-cv-00966-SMY (S.D. Ill. 2022), Take-Two made a similar argument, but it was rejected because "there are some things for which no industry standard exists." (Ex. A, 715:8–9.)

**A:** My son and his cousins play basketball and he plays hockey, and they're into sports and play video games. Not real gamers but gamers. They're playing around. And they let me know that my tattoos are very prominent in this game, and they could see them clear and they loved it, they were very realistic. And that's when I first got witness of the infringement.

**Q:** Okay. And have you ever played NBA 2K?

**A:** No.

(*Id.*, 65:8–16.) Further, the evidence shows that LeBron James did not tell Mr. Hayden he would be appearing in video games with his tattoos when Mr. Hayden inked him:

**Q:** Okay. Did the two of you ever discuss video games?

**A:** We've never had a discussion over video games, never.

**Q:** Did you ever discuss copyrights?

**A:** Never.

**Q:** Did you ever discuss your copyrights being recreated in video games?

**A:** No.

**Q:** Okay. Did Mr. LeBron—excuse me. Did Mr. James ever talk about that he was in video games?

**A:** No.

(*Id.* 54:17–55:7.)

**Q:** Did you ever discuss with Mr. James about reproducing the tattoos in video games?

**A:** Never, no.

(*Id.*, 54:2–4.) Accordingly, the only evidence related to Mr. Hayden's intent about licensing the Asserted Tattoos in video games demonstrates he did *not* intend to grant one. Moreover, the only evidence in the record as to whether Mr. Hayden even *knew* about recreating the Asserted Tattoos in video games shows he did *not* know. Without knowledge, establishing intent is impossible, ***as a matter of law***. *Ingram v. U.S.*, 360 U.S. 672, 678 (1959) ("Without the

knowledge, the intent cannot exist.") The jury simply **could not** have relied on sufficient

evidence for its finding in favor of Take-Two on implied license. There is **none** in the record.

Lacking any evidence related to the actual license scope it needed to prove, Take-Two

relied on unrelated evidence, suggesting Mr. Hayden granted an implied license for *different*

uses. (*See, e.g.*, Tr. 782:13–17.) For example, Take-Two argued that Mr. Hayden "knew when he

inked Mr. James that he would appear with his tattoos on television" (*id.* at 783:1–3) and that "he

knew star athletes sometimes appear in commercials, movies, and merchandise like T-shirts,

posters and bobbleheads" (*id.* at 783:7–11). But *none* of those instances include *recreating the*

*tattoos in video games*. The most prevalent thing they do have in common, however, is that they

involve transmitting actual images of the real-life LeBron James.[6] There is overwhelming

evidence demonstrating that Take-Two's copying is *not* the same as Mr. James appearing in

photographs or on television.[7] And although Take-Two claimed that all these uses "aren't the

real life Mr. James" (*id.* at 783:10–11), this is incorrect and contradicted by the evidence.[8] Take-

Two submitted no evidence of entities other than itself that recreate the Asserted Tattoos on

avatars of LeBron James.[9]

---

[6] The one exception here is "bobbleheads," but Mr. Hayden's testimony on this is far from sufficient to even *suggest* that he knew the Asserted Tattoos would be recreated in video games. Take-Two counsel asked, "And you knew when you inked Mr. James that star athletes often appear on merchandise like T-shirts, posters, and bobbleheads, right?" (Tr., 83:10–12.) Mr. Hayden responded, "Sometimes they do, yeah." (*Id.* at 83:13.) But this tells us nothing relevant. There is no evidence that *any* athlete bobblehead has *ever* been created with accurate reproductions of tattoos on it, which would be necessary to connect the dots Take-Two wants to connect. It would be unreasonable to conclude from this testimony that Mr. Hayden knew and authorized third-parties to reproduce his Asserted Tattoos on bobbleheads or more importantly on video game avatars.

[7] Rather, Take-Two's process for depicting tattoos is complicated, time consuming, and painstaking. *See, e.g.*, Tr., 189:18–191:19, 192:17–193:2, 193:18–200:10, 284:18–288:21, 295:1–11, 22–296:3, 299:21–300:4, 301:10–17, 302:18–305:16, PX-0035, PX-0045, PX-0046, PX-0047, PX-0048, PX-0050.

[8] *See, e.g.*, Exs. VB–VI.

[9] The only other instance Mr. Hayden is aware of is the Mannequin Project discussed in more detail below, wherein Nike engaged Mr. Hayden to recreate the Asserted Tattoos on LeBron James mannequins.

Take-Two may also argue that the jury simply did not believe Mr. Hayden when he testified that he did not know about the NBA 2K games or tattoos being recreated in video games. (*See* Tr., 870:6–8.) But even accepting that, for the sake of argument, it still leaves Take-Two with *no affirmative evidence* that Mr. Hayden (1) *did* know about the games or (2) *intended* to grant an implied license to recreate the Asserted Tattoos in video games. To be sure, this is critical—it was Take-Two's evidentiary burden to prove the existence of an implied license. It was not Mr. Hayden's burden to disprove that defense. Even if Mr. Hayden was silent as to his knowledge about the NBA 2K video games, Take-Two cannot point to any evidence in the record that would support an inference that he *did* know. In *Alexander v. Take-Two Interactive Software, Inc. et al.*, Case No. 3:18-cv-00966-SMY (S.D. Ill. 2022), Take-Two made virtually the same argument, but it was rejected because "it is for the jury to decide [the tattoo artists'] credibility **based on evidence, not rank speculation**." (Ex. A at 718:15–21 (emphasis added).) Under Sixth Circuit law, "[t]he moving party need not support its motion with evidence disproving the nonmoving party's claim, but must only show—that is point out to the district court—that there is *an absence of evidence to support the nonmoving party's case*." *Harrow Products, Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1019 (6th Cir. 1995) (emphasis added).

The trial facts in *Alexander v. Take-Two Interactive Software, Inc.*, involving Take-Two recreating tattoos in a wrestling video game, are remarkably similar to this case. There, the court granted the tattoo artists' Rule 50(a) motion finding no implied license. *See Alexander v. Take-Two Interactive Software, Inc., et al.*, Case No. 3:18-cv-00966-SMY (S.D. Ill. Sep. 29, 2022) (Transcript of Jury Trial Proceedings, Day 4 of 5, relevant excerpts attached as Ex. A.) In finding no implied license as a matter of law, Judge Yandle explained that the issue is whether the tattoo artist "intended that Mr. Orton [a professional wrestler bearing the tattoos at issue] be able to

copy and distribute the work in a particular manner—which is the phrase that is also part of the standard—in a particular manner and whether she intended that third parties would be able to copy and distribute her work *in a particular manner*. That's the question." (Ex. A, 714:14–23 (emphasis added).) As it did here, Take-Two argued that "Plaintiff testified that she understood that Mr. Orton could do whatever he wanted with his tattoos," "that she intended that Mr. Orton show his tattoos on television," that "she did not give Mr. Orton any warning that the further use of Mr. Orton's tattoos would be copyright infringement," and that "Mr. Orton was appearing in video games since 2002 . . . so she could have known about them." (*Id.* at 717:5–10; 718:5–14.)

But just like this case, Judge Yandle explained, "[t]he only evidence as to her intent came directly from Miss Alexander through her testimony, and there is nothing else." (*Id.* at 715:11–15.) The court then granted the plaintiff's 50(a) motion on implied license, holding "[t]here is not sufficient evidence from which a reasonable jury could conclude that Miss Alexander intended Mr. Orton to copy and distribute her works in the particular manner that he did through a third party license. It's not here." (*Id.* at 715:16–22.) This case is absolutely on point and the reasoning should be followed here. The jury had no evidence whatsoever on which to infer that Mr. Hayden intended to grant LeBron James a license that would allow him to permit a third-party (Take-Two) to copy and distribute the Asserted Works in video games. This Court should find no implied license as a matter of law and grant Mr. Hayden's Rule 50(b) motion.

### C. The Court erred by excluding material, relevant evidence related to Take-Two's implied license defense.

Mr. Hayden respectfully requests a new trial under Rule 59. Not only was there insufficient evidence for the jury to find that Take-Two had an implied license, which is an independent basis for a new trial, but Mr. Hayden was also barred from presenting material, relevant evidence showing no implied license existed. Excluding this evidence affected Mr.

Hayden's substantial right to rebut Take-Two's evidence and is thus cause for a new trial. *See Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989). Specifically, this Court precluded Mr. Hayden from submitting (1) an email thread between Take-Two's Senior Vice President of Basketball Operations, Jason Argent, and 2K Games's President, David Ismailer, and related deposition testimony that shows Take-Two "disregard[ed]" Mr. Hayden's copyrights and lacked proper "approval" to use the Asserted Tattoos[10]; (2) an email from Mr. Argent to Take-Two employee, Alfie Brody, showing Take-Two could not get LeBron James to ask Mr. Hayden to drop his lawsuit[11]; and (3) evidence related to a project in which Nike engaged Mr. Hayden to reproduce the Asserted Tattoos on mannequins, shortly after Mr. Hayden inked them on LeBron James and eight years before this lawsuit.

All this evidence would have informed the totality of the circumstances related to the alleged implied license (or lack thereof) between Mr. Hayden and LeBron James and the subsequent alleged sublicense between Mr. James and Take-Two. Mr. Hayden's and Mr. James's conduct shortly after the tattoos were inked in analogous circumstances—*i.e.*, recreating the Asserted Tattoos on a LeBron James likeness (mannequins versus digital avatars)—certainly reflects what their understanding was at the time the Asserted Tattoos were inked. Moreover, Take-Two's internal communications about whether it, in fact, had an adequate license from Mr. James to recreate the Asserted Tattoos in video games is also part of the story that the jury should have been allowed to hear. Excluding this evidence undermined Mr. Hayden's ability to adequately rebut Take-Two's allegations that it had an implied license to recreate the Asserted Tattoos in video games and warrants a new trial under Rule 59.

---

[10] (PX-32 and, Argent Dep., 286:9–288:7, 289:12–291:1, 291:12–21, 295:13 – 18, 296:3–25, 297:2–23, 298:1–2, 302:19–303:25, 304:2–16.)

[11] (PX-26 and Argent Dep., 225:24–226:23, 228:10–20, 22–229:7, 13–230:11.)

**1.  Excluding PX-32, PX-26, and related testimony was error.**

First, Mr. Hayden respectfully submits that it was error to prohibit him from presenting to the jury Plaintiff's Trial Exhibit No. 32[12] and the related deposition testimony of Jason Argent. As explained to the Court during Plaintiff's proffer (Tr. pp. 154-158), Exhibit 32 embodies email correspondence from December of 2017, shortly after this case was filed, between Mr. Argent, the witness in the barred deposition testimony, and David Ismailer, the President of 2K Games.

As expressly noted in their exchange, Messrs. Ismailer and Argent were discussing "the tattoo issue" (in addition to a second matter involving "leaks") and Argent expressed his clear frustration with Jeff Thomas, a Vice-President of subsidiary Visual Concepts, which copied the Asserted Tattoos, noting that "He [is] flippant. Doesn't care"; that 2K Games had "created monsters"; and acknowledging, "I don't want to assume *we can get away with this* forever" (emphasis added). In turn, Ismailer astutely inquired whether it's "a *disregard for other people's ip* that's the issue" (emphasis added). In response, Argent further acknowledged that "it's clear that there are no appropriate stopgaps on the VC [Visual Concepts] side. And perhaps worse, we have no oversight." In the designated deposition testimony of Mr. Argent, he further described his frustration that Visual Concepts personnel "weren't focused on following an approval procedure." (Argent Dep., 304:2–5.)

The foregoing exchange clearly evidences that top executives of Take-Two were aware of the apparent "disregard for other people's ip" within their organization and, more significantly, is clearly probative of their belief as to whether Take-Two enjoyed the benefit of any implied license insulating them from liability for copyright infringement and is evidence that they, in fact, did *not* follow any appropriate "approval procedure" for copying Mr. Hayden's

---

[12] PX-0032 (TAKE-TWO_00002611–2614; Dkt. #109-22).

Asserted Tattoos. Mr. Argent, who testified in the excluded deposition testimony as Take-Two's Rule 30(b)(6) corporate representative, clearly believed they did *not* have such license rights — "I don't want to assume we can get away with this forever."

Similarly, Plaintiff's Trial Exhibit No. 26[13] and the related deposition testimony of Mr. Argent, as proffered to the Court (Tr. pp. 158-161), sheds further light on Take-Two's awareness that no implied license shielded them from liability. In that Exhibit, an email from Mr. Argent to his colleague Alfie Brody, Mr. Argent explains that LeBron James won't call Mr. Hayden to "tell him to step off" (i.e., drop his lawsuit). Obviously, if an implied license existed authorizing Take-Two's copying and creation and distribution of derivative works, there would have been no need to tell Mr. Hayden "to step off." The fact that LeBron James was asked to and did not tell Mr. Hayden to drop the lawsuit, further demonstrates his understanding of their respective rights in the Asserted Tattoos.

Particularly in the absence of *any* evidence whatsoever that an implied license to reproduce and create derivative works based on Mr. Hayden's tattoos in Take-Two's video games existed, which was *Take-Two's* burden to prove in order to sustain its affirmative defense, the jury should have been permitted to see and hear the foregoing evidence that Take-Two itself did not believe any such implied license existed. Mr. Hayden respectfully submits that excluding such evidence manifestly prejudiced his opportunity to present his case and was error.

### 2. Excluding evidence related to the Mannequin Project was error.

Further, Mr. Hayden was denied the opportunity to present evidence to the jury of the project for which he was engaged by Nike in 2009, relatively soon after the Asserted Tattoos were created, to reproduce them in derivative works on mannequins (the "Mannequin Project").

---

[13] PX-0026 (TAKE-TWO_00001668; Dkt. #109-21.)

15

This evidence included Mr. Hayden's direct testimony and original Trial Exhibits (PX-0715,[14] PX-0722, Dkt. #267, the latter re-numbered as PX-052[15] in Amended Plaintiff's Exhibit Index, Dkt. #508). Preventing him from presenting this evidence was highly prejudicial and directly impaired his ability to disprove Defendants' implied license defense.

Defendants repeatedly sought to mislead the jury by suggesting that the various agreements that prominent (and responsible) companies—*e.g.*, Samsung, Sprite, PepsiCo, Tonal—had proposed and entered into with Mr. Hayden only followed the filing of this case and were prompted solely by the threat of litigation[16] (in the process, casually—and gratuitously—impugning Mr. Hayden's counsel, for good measure). The Mannequin Project proposed by Nike and entered into while Mr. Hayden was still creating tattoos for LeBron James and long before this lawsuit, prominently disproved that contention. Moreover, the excluded evidence would have helped to demonstrate that Mr. James, with whom Mr. Hayden had discussed the project, understood that *no* implied license entitled Nike to reproduce the Asserted Tattoos on avatars (in that case, physical rather than digital) of Mr. James without Mr. Hayden's permission.[17]

Furthermore, when Defendants sought to exclude evidence concerning Plaintiff's projects and agreements with third parties, which they acknowledged were presented as "a refutation of Take-Two's license defense," (Defendants' Omnibus Motion in Limine, Dkt. #454, p.2), the Court initially and appropriately ruled that Plaintiff could present "evidence of agreements concerning the use of the Asserted Copyrights"—*i.e.*, "the Shoulder Stars and Gloria tattoos on

---

[14] Attached as Exhibit B.

[15] https://vimeo.com/9797215

[16] Of course, the entire concept of markets for intellectual property licensing is predicated on the rights of intellectual property owners to enforce their rights against users of protected assets who fail to secure such rights via license.

[17]  Thus, the evidence in question clearly meets the relevance standard in tending to show the absence of such an implied license, which was manifestly consequential in determining the action. *See* Fed. R. Evid. 401.

Lebron James." (Order, 03/27/24, Dkt. #306, p.7.) Nike's Mannequin Project did represent just such an agreement concerning the use of the Shoulder Stars and Gloria tattoos Hayden created on Lebron James. When Defendants then mischaracterized the nature of the Nike Project in an oral motion presented to the Court at the final pre-trial conference (held in chambers on March 28, 2024), the Court held that "the Mannequin Project is excluded because it is not a license and is not relevant to the existence of a potential market for the licensing of Plaintiff's Asserted Copyright Tattoos."  (Dkt. #307.)

Plaintiff respectfully submits that this was error. Nike's agreement with Mr. Hayden *did*, in fact, include a license (i.e., legal permission) to reproduce the Shoulder Stars and Gloria tattoos, *in addition to* a services component for creating the derivative works on mannequins. Critically, Nike *could* not have lawfully engaged *anyone* to recreate those Asserted Tattoos on mannequins *without* a license from Mr. Hayden, the copyright owner. Depriving Mr. Hayden of the opportunity to *demonstrate* to the jury the critical difference between simply showing the Asserted Tattoos as they appear on Mr. James in, *e.g.*, a photograph and recreating derivative works from the Asserted Tattoos on an avatar (physical or digital) was highly prejudicial. It prevented Mr. Hayden's effort to help the jury understand that *no* implied license existed authorizing the reproduction of the Asserted Tattoos on digital avatars in Defendants' video games. Plaintiff further respectfully submits that excluding such evidence was error by precluding his opportunity to show the *limits* of any implied license the jury may have believed Mr. Hayden intended to grant when Mr. James left his shop.

* * *

The objective evidence—the totality of the circumstances—related to whether Mr. Hayden intended to license his rights in the Asserted Tattoos for recreation in video games

certainly includes this excluded evidence. The parties' conduct after the alleged transaction tells a story about what Mr. Hayden communicated to Mr. James and what Mr. James communicated to Take-Two, which claims the benefit of such license. This evidence of conduct is particularly important here, where Take-Two alleges that Mr. Hayden granted a license *implicitly*. But Mr. Hayden was unable to tell the full story. The full story demonstrates that neither Mr. James nor Mr. Hayden understood that third parties could freely copy the Asserted Tattoos on LeBron James' likenesses without Mr. Hayden's permission (*see* Mannequin Project evidence). The full evidence also demonstrates that Take-Two did not get adequate "approval" from LeBron James to allow Take-Two to recreate the Asserted Tattoos on digital avatars, and Take-Two *knew that*. (*see* PX-26 and PX-32 evidence). The playing field was thus not level—it was highly prejudicial to Mr. Hayden. Mr. Hayden respectfully submits that a new trial is warranted under Rule 59.

## III.    Conclusion

The record evidence is insufficient to support the jury's finding of an implied license. The jury had to find that Mr. Hayden intended the particular use in question—recreating the Asserted Tattoos in video games. But there is no evidence that Mr. Hayden intended that—he had no idea that could or was likely to happen. As in the *Alexander* case, this Court should find there was no implied license as a matter of law under Rule 50 and order a new trial under Rule 59. A new trial is also warranted under Rule 59 because Mr. Hayden was precluded from offering probative evidence rebutting Take-Two's implied license defense. Accordingly, Mr. Hayden respectfully requests that his motion be granted in full.

Dated: May 17, 2024

Respectfully submitted,

By: */s/ Andrew Alexander*

John S. Cipolla (Ohio Bar No. 0043614)
Daniel J. McMullen (Ohio Bar No. 0034380)
Todd R. Tucker (Ohio Bar No. 0065617)
Andrew W. Alexander (Ohio Bar No. 0091167)
Josh A. Friedman (Ohio Bar No. 0091049)
Dustin D. Likens (Ohio Bar No. 0097891)

CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
jcipolla@calfee.com
dmcmullen@calfee.com
ttucker@calfee.com
aalexander@calfee.com
jfriedman@calfee.com
dlikens@calfee.com

*Of Counsel*

Kimberly A. Pinter (Ohio Bar No. 0084277)
CALFEE, HALTER & GRISWOLD LLP
The Calfee Building
1405 East Sixth Street
Cleveland, Ohio 44114-1607
Telephone: (216) 622-8200
Facsimile: (216) 241-0816
kpinter@calfee.com

19

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2024, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

*/s/ Andrew Alexander*
One of the attorneys for Plaintiff
