**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES HAYDEN, | ) | Case No. 1:17-cv-02635 |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| vs. | ) | |
| | ) | |
| 2K GAMES, INC. and TAKE-TWO | ) | |
| INTERACTIVE SOFTWARE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF HIS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON DEFENDANTS' IMPLIED LICENSE DEFENSE UNDER RULE 50(b) AND MOTION FOR A NEW TRIAL UNDER RULE 59**

I. **Introduction**

The question this Court must answer in resolving James Hayden's Motion is simple: was there sufficient evidence in the record to conclude that Mr. Hayden intended to allow a video game company to recreate his Asserted Tattoos on digital avatars in video games (*i.e.*, the manner in which Take-Two eventually used the Asserted Tattoos). There is no evidence of this in the record.

Accordingly, in its Opposition,[1] Take-Two moves the goal posts and proposes to answer a different question: Did Hayden intend to allow the Asserted Tattoos to be shown "as part of Mr. James' likeness."

But this Court's jury instruction on implied license and this Circuit's binding case law requires evidence that the defendant's *particular use* was authorized. *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). Take-Two's Opposition barely considers its own particular use in video games. Take-Two, quite literally, *skips over* record evidence refuting its claim that its particular use was licensed. Instead, Take-Two focuses on altogether different hypothetical ways in which the Asserted Tattoos might be used (*i.e.*, television broadcasts, on merchandise, in commercials), but *not* the way Take-Two actually used them (*i.e.*, recreating, adapting, and distributing them in video games). Take-Two's attempt to obscure its particular use only highlights the utter absence of evidence supporting its defense. But this case is not about ABC or ESPN showing the Asserted Tattoos on a televised NBA broadcast, Warner Bros. showing the Asserted Tattoos on LeBron in Space Jam 2, or PepsiCo. showing the Asserted Tattoos on Ruffles Bags. Take-Two must show evidence that *its particular use* was authorized—recreating the Asserted Tattoos on digital avatars in video games.

---

[1] "Opposition" refers to Take-Two's Opposition to Plaintiff's Renewed Motion for Judgment as a Matter of Law on Defendants' Implied License Defense Under Rule 50(B) and Motion for a New Trial Under Rule 59 (Dkt. #353).

Take-Two also fails to rebut the fact that Hayden's case was materially prejudiced by excluding highly relevant evidence that would have undermined Take-Two's implied license defense. Take-Two resorts to mischaracterizing this evidence. But apparently conceding its relevance, Take-Two claims it was "cumulative" and that "given the overwhelming evidence supporting the jury's verdict, this new evidence could not have changed the outcome." (Opp., Dkt. #353, p. 3.) Such evidence would have changed the outcome and Hayden should not be deprived of his rightful opportunity to demonstrate that.

As set forth in Hayden's initial brief in support of his Motion (*see* Dkt. #345) and below, there is a *complete absence* of evidence supporting Take-Two's implied license defense. The excluded evidence would have demonstrated Take-Two knew it lacked the proper "approvals" to use Hayden's Asserted Tattoos. Excluding this evidence undermined Hayden's substantial right to rebut Take-Two's purported evidence on its implied license defense.

Hayden is entitled to judgment as a matter of law on Defendants' implied license defense and a new trial.

## II. Argument

### A. The jury lacked sufficient evidence to find for Take-Two on its implied license defense.

This Court does not have to weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury to acknowledge the complete void of evidence supporting a license to permit Take-Two's otherwise unauthorized use of the Asserted Tattoos in video games. (*See* Opp., Dkt. 353, p. 4.) There is no such evidence. The only evidence (as distinguished from Take-Two's clever arguments) related to Take-Two's particular use at issue (replication, adaption, and distribution in video games) shows Hayden did not even know about, let alone intend, such a use. Take-Two asks this Court to ignore that evidence and focus on what

2

Mr. Hayden purportedly said about *other* ways in which the Asserted Tattoos may be used. The fact that Take-Two has attempted to reframe the implied license analysis, focusing on different uses it never undertook, only highlights its utter lack of evidence. There is not even any reasonable inference from the evidence in the record that Hayden ever intended to allow anyone to recreate, adapt, or distribute the Asserted Works in video games. None of Take-Two's purported "five types of evidence showing that Plaintiff placed no limit on how Mr. James could show his own body with his tattoos" have anything to do with recreating the tattoos in video games.

*First*, Take-Two argues that Hayden testified that he knew Mr. James is "a star athlete" and "would appear in public and license his likeness for use in all kinds of media." (Opp., Dkt. #353, p. 6.) But this exaggerates and mischaracterizes Mr. Hayden's testimony. For example, when asked "when you went to basketball games, you saw T-shirts and other merchandise being sold with the players' images on them, right?", Hayden responded, "I can't remember that." (Tr. 83:17–20.) Mr. Hayden only testified that he knew that star athletes "sometimes" appear in commercials, advertisement, and other merchandise. (Tr., 83:5–13.) But Mr. James appearing as himself in commercials or advertising is one thing—Mr. James permitting a third-party *video game company* to *recreate*, *adapt*, and *distribute* the Asserted Tattoos on digital avatars in a video game is something completely different. The testimony Take-Two cites is not evidence

3

that Mr. Hayden ever intended to allow Mr. James to sublicense the Asserted Works for such use in *video games*.

In fact, Take-Two conspicuously *omits* Hayden's most relevant testimony from the same trial transcript pages it cited (*see* Opp., p. 6):

> **Q:** So you knew when you inked him that the Gloria and stars tattoos would be visible on TV and commercials, in ads and merchandise if he was wearing his basketball outfit, right?
>
> **A:** Possibly, but not in video games.

(Tr., 82:16–20.) Even if Mr. Hayden knew Mr. James would sometimes display his tattoos when he, himself, appeared in NBA games or in commercials and Mr. Hayden intended to impliedly licenses such foreseeable uses, this would not be a blanket license for Mr. James to freely allow any and all copying, manipulation, and distribution of the Asserted Tattoos by any party in any manner, despite Mr. Hayden's lack of knowledge. *See Crispin v. Christian Audigier, Inc.*, 839 F. Sup. 2d 1086, 1092 (C.D. Cal. 2011) (denying summary judgment on implied license defense where purported licensee used copyrighted tattoo design in a way the copyright holder did not know of at the time of creation and was not foreseeable to him). Put simply, it was Take-Two's burden to prove, with evidence, that Mr. Hayden *intended* that Mr. James allow video game companies to recreate, adapt, and distribute the Asserted Tattoos in video games. Not only did it fail altogether to do so, Take-Two did not present any evidence at trial that Mr. Hayden even *knew* this was a possibility when he inked the Asserted Tattoos.

*Second*, the fact that Mr. James testified that he had "final say-so" or that the Asserted Tattoos are "personal" to him says nothing about video game companies recreating, adapting, and distributing the Asserted Tattoos in video games. The uncontradicted record evidence shows

4

Mr. Hayden did not even know this was a possibility. (Tr., 54:2–4, 54:8–11, 54:17–55:7, 65:8–16.) And it is undisputed that Mr. James never warned Mr. Hayden that video game companies would be creating digital avatars of Mr. James in video games, let alone that the video game companies would also be *digitally recreating precise copies of Mr. Hayden's Asserted Tattoos*. Without knowledge, there is no intent, as a matter of law. *Ingram v. U.S.*, 360 U.S. 672, 678 (1959) ("Without the knowledge, the intent cannot exist.").[2]

Take-Two's attempt to distinguish *Johnson v. Jones*[3] and to align the facts in this case with the out-of-circuit cases *I.A.E.*, *Effects*, and *LimeCoral*[4] fail. Take-Two admits that the key distinguishing factor in *Johnson v. Jones* and the cases Take-Two relies on is that in *Johnson v. Jones*, the defendant did not use the copyrighted works "in the same manner" as the copyright holder intended when he delivered the works. That is also true here. Take-Two's claim that "Mr. James, the licensee, licensed his likeness including any tattoos on it to Take-Two and others ***before*** entering Plaintiff's studio, ***after*** Plaintiff inked the Asserted Tattoos, ***after*** Plaintiff inked the Asserted Tattoos, ***after*** Plaintiff reached out to Take-Two, and ***after*** Plaintiff filed this lawsuit" (Opp. p. 8) misses (avoids) the point. That says nothing about the only issue that matters here: *Mr. Hayden's* intent. When Mr. Hayden inked the Asserted Tattoos, he did not intend or expect them to be digitally recreated by video game makers in video games. There is nothing in the record that would support the claim that he did. Take-Two's use is thus *not* a continuation of

---

[2] Take-Two acknowledges Plaintiff's cite to *Ingram* (see Opposition p. 13), dismisses it with a parenthetical ("(criminal appeal)"), and then pointedly and completely *ignores* its obvious, compelling, and logically dispositive consequence for this case: absent knowledge of Take-Two's video games, Mr. Hayden literally *could not have* intended to grant a license authorizing use of his protected works therein. That fundamental, self-evident proposition succinctly stated by the Supreme Court in *Ingram*, taken alone, is a proper basis for granting Plaintiff's Motion.

[3] *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998).

[4] *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996); *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 2008); *LimeCoral v. CareerBuilder*, 889 F.3d 847 (7th Cir. 2018).

5

how Mr. Hayden ever intended the Asserted Tattoos to be used, aligning the facts here with *Johnson v. Jones*—there was no implied license.

*Third*, Take-Two's argument about tattoo-industry customs also misses the mark. There is no evidence in the record here that it is customary in the tattoo industry to allow video game makers to recreate tattoos. Take-Two, for example, cites Mr. Hayden's testimony about whether he has told his clients they cannot appear without his permission "on television playing—playing basketball" or "on merchandise like potato chip bags."[5] (Tr. 87:12–15, 88:4–11.) Take-Two also cites testimony about whether any tattoo artist ever told *Mr. Hayden* that he could not appear in video games without their permission. (Tr. 90:8–12.) But there is also no evidence to indicate that such tattoo artist understood Mr. Hayden would appear in video games or that he has, in fact, appeared in video games. He, like the vast majority of tattoo recipients, has not appeared in video games (which, of course, is a rare, unlikely occurrence). And whether or not it is customary in the industry that "when a client leaves a tattoo parlor, they can go about their life as they with without needing to run back to [the tattoo artist] for permission," is little help to Take-Two. As the court pointed out in *Alexander v. Take-Two*,[6] a case on all fours with this one, "there are some things for which no industry standard exists." Clients and their tattoos being recreated in video games is one such example. Take-Two's record citations fall well short of identifying evidence from which a jury could have reasonably inferred that it is customary in the tattoo

---

[5] Take-Two's attempt to erase the distinction between LeBron James, himself, appearing on television or in photographs from the digital avatar that Take-Two *creates* with "character artists" is not credible and ignores the conclusive evidence in the record demonstrating that Take-Two painstakingly *recreates*, *adapts*, *and distributes* the Asserted Works in its video games. (*See, e.g.*, Tr., 189:18–191:19, 192:17–193:2, 193:18–200:10, 284:18–288:21, 295:1–11, 22–296:3, 299:21–300:4, 301:10–17, 302:18–305:16, PX-0035, PX-0045, PX-0046, PX-0047, PX-0048, PX-0050.) What appears in the NBA 2K video games is indisputably not a transmission of the actual LeBron James, as in a photograph or televised broadcast.

[6] *Alexander v. Take-Two Interactive Software, Inc. et al.*, Case No. 3:18-cv-00966-SMY (S.D. Ill. 2022) (Ex. A to Hayden Brief in Support, Dkt. #345-1, 715:8–9.)

6

industry to impliedly license *video game makers to digitally recreate, adapt, and distribute, the tattoos in video games*. This situation simply falls outside any purported industry standard or custom.

*Fourth*, Take-Two pieces together snippets of Mr. Hayden's testimony to create a sentence that does not exist in the record, suggesting that Mr. Hayden's subjective intent was to allow third-parties to recreate the Asserted Tattoos on animations of Mr. James: "[Mr. Hayden] also agreed that Mr. James could 'show his tattoos off' 'in any movie he wants,' even 'in animated form[.]'" (Opp., p. 11.) But this "testimony" does not exist as presented. Mr. Hayden testified that "LeBron's free to do what he wants to do with his body," but LeBron James, himself (or his actual body), does not appear in the NBA 2K video games—Take-Two creates a simulation of Mr. James in the form of a digital avatar in its NBA 2K games. An accurate account of the testimony Take-Two constructed reinforces this point. In the movie Space Jam 2, Mr. Hayden licensed the use of the tattoos he created to Warner Brothers showing them in connection with the actual, real-life-LeBron James, but he expressly did *not* permit recreating the tattoos in animated form. (Tr., 122:6–15.) Mr. Hayden's subjective intent is clear from the record: Q: Did you intend or give permission to Mr. James to allow video game makers to use your copyright of tattoos? A: Never intended that. (Tr., 54:17–19.) Take-Two's attempt to brush aside Mr. Hayden's testimony (the only *direct evidence* of his intent in this case!) is wrong as a matter of law. *See Johnson*, 149 F.3d at 500 (considering copyright owner's testimony about his subjective intent in ruling that no implied license existed).

*Finally*, the fact that Take-Two copied the Asserted Works "to realistically depict Mr. James" is simply not relevant to *Mr. Hayden's* intent. Take-Two cites no authority that considers the infringer's *intent* or *purpose* in copying the works as the basis for finding an implied license

7

exists. This is not the law. Rather, the relevant question is whether Mr. Hayden intended to allow copying the Asserted Tattoos, specifically including, as the Court instructed the jury, in "the manner in which they were eventually used." (Tr., 834:9–16.) In this case, the manner in which the Asserted Works were eventually used was on digital avatars in video games. There is no record evidence that Mr. Hayden intended this use.[7]

In light of the complete absence of any evidence that Mr. Hayden intended that Mr. James authorize video game companies to recreate, adapt, and distribute the Asserted Tattoos on digital avatars in video games, Take-Two erects another straw man to try to knock down. Instead of citing any affirmative record evidence that supports its claim, Take-Two contests Mr. Hayden's own testimony about his intent. (Opp., p. 12.) Take-Two claims, citing case law from another circuit, that a purported licensor's subsequent statement "is 'not sufficient to negate all other objective manifestations of intent to grant [] an unlimited license." (*Id.*) But it is *not* Mr. Hayden's burden to *disprove* Take-Two's defense. Nevertheless, Mr. Hayden's testimony is manifestly relevant in assessing whether he intended to permit Take-Two's use. *Johnson*, 149 F.3d at 500. Even if the Court set Mr. Hayden's testimony aside altogether, the jury still had no evidence that he intended to permit Take-Two's use of his copyrighted works in video games. In the absence of any such evidence, its finding for Take-Two cannot be sustained.

Again, attempting to side-step its complete lack of proof, Take-Two tries to claim its use is the same as any other "audiovisual media involve[d] in digital recreations." (Opp., p. 13.) But this just is not the case. (*See, e.g.*, Tr., 189:18–191:19, 192:17–193:2, 193:18–200:10, 284:18–

---

[7] Take-Two's argument ("to realistically depict Mr. James") is even wrong as a matter of fact. Setting aside the instances when the Asserted Works are shown "realistically" in the game, Take-Two's own expert, Dr. Ian Bogost, testified about all the *wholly unrealistic* ways in which the Asserted Works are also used in the NBA 2K video games—*i.e.*, the "counterfactual realism" (!) that the Court asked him to explain to the jury (Tr. 585:14-21) and which he subsequently (if incomprehensibly) described as "realistic… just not factual" (Tr. 591:9-12). (*See also* Tr., 579:13–596:1.)

8

288:21, 295:1–11, 22–296:3, 299:21–300:4, 301:10–17, 302:18–305:16, PX-0035, PX-0045, PX-0046, PX-0047, PX-0048, PX-0050.) Take-Two is not filming LeBron James in an actual NBA game. Take-Two is not displaying a photograph of LeBron James for a potato chip commercial (a use that Mr. Hayden, in fact, *authorized in a licensing agreement*). Take-Two *recreates, adapts, and distributes the Asserted Tattoos on a digital avatar of LeBron James in video games*—a use that Mr. Hayden did not know about, expect, or even consider when he inked the Asserted Tattoos. Again, as the Supreme Court has held, without knowledge, there can be no intent. *Ingram*, 360 U.S. at 678. Take-Two tries to flip this complete lack of knowledge and foreseeability on its head and *presume* a "broad license" (Opp. p. 13) that would cover any future use of the Asserted Tattoos. But Take-Two cites to *no case law*—and certainly none in the Sixth Circuit—that allows such a sweeping inference.

Mr. Hayden created the Asserted Tattoos. He owns copyrights in the Asserted Tattoos. When he inked them, he did not forfeit any and all rights therein and empower Mr. James to authorize any and all future use of the Asserted Tattoos. Take-Two needed to elicit *evidence* that showed Mr. Hayden *intended* to allow Take-Two's eventual use. They have cited none. Mr. Hayden's Motion should be granted.

      B.  <u>The Court erred by excluding material, relevant evidence related to Take-Two's implied license defense.</u>

If the Court grants Mr. Hayden's Motion under Rule 50(b), a new trial is necessary to assess whether Take-Two met its burden in proving its other defenses and, if not, the damages Take-Two owes Mr. Hayden for its infringement. But even if the Court does not find in Mr. Hayden's favor on this ground, a new trial is necessary because Mr. Hayden was deprived of his substantial right to present evidence to rebut Take-Two's implied license defense when the Court excluded the evidence at issue in this Motion. If Mr. Hayden could have presented evidence of

9

and testified about the Nike mannequin project, the jury would have heard about a directly analogous situation involving the *licensed* use of his copyrighted works on a *physical* avatar of LeBron James which was undertaken *long before* the instant lawsuit. Such evidence emphatically refutes Take-Two's inaccurate and misleading assertions that companies respecting Mr. Hayden's copyrights by seeking licenses were only doing so because Mr. Hayden had filed a lawsuit and would thereby alter the jury's conclusion regarding an implied license. Similarly, if the jury could have heard that Take-Two, itself, knew it lacked the proper "approvals" to use Mr. Hayden's copyrighted works, the jury would not have found that Take-Two had an implied license. By excluding this essential evidence, Take-Two was allowed to put on a case as if it did everything "by the book"—that its permission from Mr. James was sufficient, that it could side-step or simply ignore Mr. Hayden's copyrights, and that the only reason big companies like Warner Bros, Sprite, and Pepsi sought Mr. Hayden's permission was because they "were *aberrations* motivated by a desire to not be sued rather than a belief in [Mr. Hayden's] rights." (Opp., p. 10 (emphasis added).) This narrative was a farce, but Mr. Hayden was precluded from his opportunity to tell the whole story. Under Federal Rule of Civil Procedure 59, he is entitled to a new trial that allows him to present this critical evidence.

  *First*, the "Mannequin Project"[8] would have rebutted Take-Two's self-serving—but, again, factually incorrect and fundamentally misleading—tale that the only reason big, respectable companies like Warner Bros., Sprite, and Pepsi, acknowledged and honored Mr. Hayden's rights and sought licenses before copying his Asserted Works was because they were "motivated by a desire to not be sued rather than a belief in [Mr. Hayden's] rights." In fact,

---

[8] Take-Two mischaracterizes this Court's evidentiary ruling on the Mannequin Project as only an exclusion related to an "invoice" and a "video." (Opp. p. 18.) However, this Court excluded any evidence related to the Mannequin Project, prominently including Mr. Hayden's testimony. (*See* Dkt. #306, pp. 7–8; Dkt. #307.)

shortly after Mr. Hayden inked the Asserted Tattoos and nearly a decade before Mr. Hayden filed this lawsuit, Nike asked *him* for permission to recreate the Asserted Works on mannequins (rather, like Take-Two's digital recreations of Mr. James's likeness) and to do so himself (*i.e.*, rather than Nike or another artist doing so). Take-Two claims this was not relevant because it was not a "license," but that is not the case. A license is not confined to documents with that word in its title; rather, a license is "a permission, usually revocable, to commit some act that would otherwise be unlawful."[9] a By hiring Mr. Hayden to recreate the Asserted Works, Nike perforce secured Mr. Hayden's *permission* to recreate the Asserted Works in which he owned copyrights.

It is no small irony that Take-Two based its entire implied license *defense* on the proposition that a written agreement is not necessary to obtain a license (*i.e.*, an implied license) but then ignored that fact and used the argument to persuade the Court that, in the absence of a (presumably/apparently) written "license," evidence the Mannequin Project should be excluded. Mr. Hayden was profoundly prejudiced thereby.

Take-Two relied heavily on its repeated misrepresentation that entities only respect Mr. Hayden's rights because of this lawsuit. (Tr., 37:25–38:12, 876:23–877:1) while Mr. Hayden was *precluded* from offering dispositive evidence to the contrary. In short, Take-Two was able to craft its defense around and present to the jury an inaccurate and incomplete picture of the

---

[9] Black's Law Dictionary (11th ed. 2019), LICENSE. *See*
https://1.next.westlaw.com/Document/I01d8d2ef808511e4b391a0bc737b01f9/View/FullText.html?navigationPath=Search%2Fv1%2Fresults%2Fnavigation%2Fi0a89be2600000190705bae861a475482%3Fppcid%3Db1d9cf4bb5874852aa7ddfb98192696c%26Nav%3DBLACKS%26fragmentIdentifier%3DI01d8d2ef808511e4b391a0bc737b01f9%26parentRank%3D0%26startIndex%3D21%26contextData%3D%2528sc.Search%2529%26transitionType%3DSearchItem&listSource=Search&listPageSource=ca130acde0f02b39c777511960edce54&list=BLACKS&rank=32&sessionScopeId=4d4dd47effd5883b72dbbdcf5b610fc3efa87b6aa66c6fb670e8e51ca73e2606&ppcid=b1d9cf4bb5874852aa7ddfb98192696c&originationContext=Search%20Result&transitionType=SearchItem&contextData=%28sc.Search%29.

11

relevant evidence. Take-Two made this a central issue of the case, and Mr. Hayden was prohibited from presenting this critical evidence to the jury without a proper legal basis.

*Second*, PX-32, the barred email correspondence between Take-Two's senior executives, is not just, or even primarily, about "leaks." The entire email thread was initiated by an article about *this* lawsuit and plainly shows that Visual Concepts, the subsidiary directed with creating the NBA 2K games at issue, was operating with "no oversight," was not "focused on following an approval procedure," and that Take-Two knew it could not "get away with this [*i.e.*, such conduct] forever." (PX-32.) The email shows that Take-Two let Visual Concepts operate, "disregard[ing] . . . other people's ip" because Visual Concepts (a "monster") "generate[s] enormous amounts of revenue." (*Id.*) Take-Two tries to white-wash the exchange as if it has nothing to do with copying Mr. Hayden's Asserted Works without his permission, but the email plainly contradicts that claim and the jury should not have been precluded from hearing the evidence and reaching its own conclusion. Take-Two may have spun a *post hoc* story to deflect the import of its own admission that it lacked proper approvals in using Mr. Hayden's Asserted Tattoos, but Take-Two's rationalization and the legal error precipitated thereby should not deprive Mr. Hayden of the opportunity to submit this critical evidence to the jury.

*Third*, PX-26, an email in which Take-Two expressed its frustration in not being able to convince Mr. James to get Mr. Hayden to "step off" and drop the lawsuit, is another key evidentiary piece in telling the whole story. Not only does it tend to show that Mr. James did not believe he had the sole authority to give Take-Two the right to recreate the Asserted Tattoos on his digital avatar in its video games, it also shows Take-Two's instinct to resort to bully tactics in order to undermine Mr. Hayden's rights. In short, this email, like PX-32, shows that Take-Two knew it lacked the proper approval to recreate, adapt, or distribute the Asserted Works in its

video games. That Mr. Hayden was incorrectly prohibited from submitting this evidence to the jury further demonstrates why the Court must grant the instant Motion.

\* \* \*

In sum, Take-Two was permitted to tell its one-sided and inaccurate story about the facts of this case, while Mr. Hayden was prejudiced by being precluded from disproving Take-Two's misrepresentations with highly relevant evidence. The jury was left with Take-Two's inaccurate presentation—thus significantly impairing Mr. Hayden's substantial right to present his case at trial.

This Court should order a new trial under Rule 59.

### III. Conclusion

Take-Two's Opposition fails to identify any facts that would support the jury's finding that Mr. Hayden granted an implied license that would allow Take-Two to copy, adapt, and distribute the Asserted Works in video games—*i.e.*, the manner in which Take-Two eventually used them. Take-Two tries to avoid that inevitable conclusion (in essence conceding the point) by ignoring its own use and focusing on *different* uses that are not at issue in this case. But it is clear that the jury lacked any, let alone sufficient, evidence to find an implied license for *Take-Two*'s use. This Court should thus find as a matter of law that Take-Two failed to meet its burden in establishing its implied license defense and grant a new trial. This Court should also grant a new trial, as an independent ground, because Mr. Hayden was deprived of his substantial right in presenting critical evidence rebutting Take-Two's defense. Without this evidence, the jury did not hear the entire, accurate, story—and if it had heard the excluded evidence, it would not have found an implied license existed.

13

Dated: July 1, 2024                    Respectfully submitted,
                                       By: */s/ Andrew Alexander*
                                       John S. Cipolla (Ohio Bar No. 0043614)
                                       Daniel J. McMullen (Ohio Bar No. 0034380)
                                       Todd R. Tucker (Ohio Bar No. 0065617)
                                       Andrew W. Alexander (Ohio Bar No. 0091167)
                                       Josh A. Friedman (Ohio Bar No. 0091049)
                                       Dustin D. Likens (Ohio Bar No. 0097891)

                                       CALFEE, HALTER & GRISWOLD LLP
                                       The Calfee Building
                                       1405 East Sixth Street
                                       Cleveland, Ohio 44114-1607
                                       Telephone: (216) 622-8200
                                       Facsimile: (216) 241-0816
                                       jcipolla@calfee.com
                                       dmcmullen@calfee.com
                                       ttucker@calfee.com
                                       aalexander@calfee.com
                                       jfriedman@calfee.com
                                       dlikens@calfee.com


                                       *Of Counsel*

                                       Kimberly A. Pinter (Ohio Bar No. 0084277)
                                       CALFEE, HALTER & GRISWOLD LLP
                                       The Calfee Building
                                       1405 East Sixth Street
                                       Cleveland, Ohio 44114-1607
                                       Telephone: (216) 622-8200
                                       Facsimile: (216) 241-0816
                                       kpinter@calfee.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2024, a copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

 */s/ Andrew Alexander*
One of the attorneys for Plaintiff