UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES HAYDEN,** | ) | CASE NO. 1:17CV2635 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| **2K GAMES, INC., et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**CHRISTOPHER A. BOYKO, J.**:

This matter comes before the Court upon Plaintiff's Renewed Motion (ECF DKT #344) for Judgment as a Matter of Law on Defendants' Implied License Defense under Rule 50(b) and Motion for New Trial under Rule 59. For the following reasons, Plaintiff's Motion is denied.

## I. BACKGROUND

Plaintiff James Hayden filed his original Complaint on December 18, 2017, alleging Copyright Infringement by Defendants 2K Games, Inc. and Take-Two Interactive Software, Inc. Defendants develop and market interactive video games such as the basketball simulation series "NBA 2K."

Plaintiff James Hayden has inked tattoos on LeBron James, an NBA player. Mr. James has been playing professional basketball for the NBA since 2003. In 2007 and 2008, Plaintiff inked two tattoos on James ("Gloria" and "Shoulder Stars") that are at issue in this lawsuit. Plaintiff subsequently obtained copyright registrations for the Asserted Tattoos.

The NBA 2K video games simulate NBA basketball games, including realistically

depicting James with the tattoos that he bears in real life.

The captioned case proceeded to trial with Plaintiff accusing six NBA 2K games of infringing his copyrights (NBA 2K16, NBA 2K17, NBA 2K18, NBA 2K19, NBA 2K20, and NBA 2K Mobile) by displaying the Asserted Tattoos. On April 19, 2024, the jury returned a unanimous verdict for Defendants, finding specifically that Defendants proved by a preponderance of the evidence their Implied License defense to Plaintiff's Copyright Infringement claim.

Plaintiff renews his Motion for Judgment as a Matter of Law pursuant to Fed.R.Civ.P. 50 and asserts that a reasonable jury would not have had a legally sufficient evidentiary basis to find for Defendants on the Implied License issue. Additionally, Plaintiff moves for a New Trial pursuant to Fed.R.Civ.P. 59 and further argues that the Court erroneously excluded relevant evidence showing that no implied license existed.

## II. LAW AND ANALYSIS

**Standard of Review**

**Judgment as a Matter of Law**

Fed.R.Civ.P. 50(b) permits a renewed motion for judgment as a matter of law and an alternative or joint request for new trial. The Court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law.

> Judgment as a matter of law will be granted only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Fed.R.Civ.P. 50(a)). The grant is appropriate only if, in viewing

the evidence in the light most favorable to the nonmoving party, "reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc*., 263 F.3d 595, 598 (6th Cir.2001). *Imwalle v. Reliance Medical Products, Inc*., 515 F.3d 531, 543 (6th Cir. 2008).

"The inquiry for resolving a motion for judgment as a matter of law pursuant to Rule 50 is the same as the inquiry for resolving a motion for summary judgment pursuant to Rule 56." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 794 (6th Cir. 2004). The Court must "review all of the evidence in the record in the light most favorable to the nonmoving party and determine whether there was a genuine issue of material fact for the jury." *Id*. (citing *Gray v. Toshiba*, 263 F.3d at 598; *Static Control Components, Inc. v. Lexmark Int'l, Inc*., 697 F.3d 387, 414 (6th Cir. 2012)("A renewed motion for a judgment as a matter of law following an adverse jury verdict 'may only be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences ... reasonable minds could come to but one conclusion in favor of the moving party.' ")(quoting *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005)).

It is only appropriate to grant a renewed motion for judgment as a matter of law where the Court finds that there is no "legally sufficient evidentiary basis" for a reasonable jury to find for the prevailing party on that issue. *White*, 364 F.3d at 794; *Static Control Components*, 697 F.3d at 414. In making this determination, all reasonable inferences must be drawn in favor of the prevailing party. *White*, 364 F.3d at 794 (citing *Reeves*, 530 U.S. at 133). The Court may not make credibility determinations or weigh the evidence, and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.; Static Control Components*, 697 F.3d at 414 ("We will not substitute our interpretation of the evidence for the

jury's, even if we would have reached a different conclusion.") (citing *Barnes*, 401 F.3d at 738).

**<u>New Trial</u>**

Fed.R.Civ.P. 59 provides the authority for a new trial and reads in pertinent part:

(a) In General.

(1) Grounds for New Trial. The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; . . .

"Generally courts have interpreted this language to mean that a new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d. 1041, 1045-46 (6th Cir. 1996), citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "The trial court should deny such a motion if the verdict is one that reasonably could be reached, regardless of whether the trial judge might have reached a different conclusion were he the trier of fact." *Walker v. Bain*, 257 F.3d 660, 670 (6th Cir. 2001).

A motion for a new trial will not be granted unless the moving party suffered prejudice. *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 514 (6th Cir.1998); *Erskine v. Consol. Rail Corp.*, 814 F.2d 266, 272 (6th Cir.1987). "Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Morales*, 151 F.3d at 514. "The burden of showing harmful prejudice rests on the party seeking the new trial." *Tobin v. Astra Pharm. Prods., Inc.*

993 F.2d 528 at 541 (6th Cir. 1993); see also *Erskine*, 814 F.2d at 272 ("In order to prevail on his motion for a new trial, plaintiff must show that he was prejudiced and that failure to grant a new trial is inconsistent with substantial justice.").

**<u>Sufficient Evidentiary Basis</u>**

In his Motion, Plaintiff contends that there was no legally sufficient evidentiary basis for the jury to have found that Plaintiff intended to grant a license allowing Defendants' copying of the Asserted Tattoos in video games. On the other hand, even if the Court were to find that the jury could infer an implied license, Plaintiff insists that nothing supports extending its scope to reproduction in video games.

Plaintiff testified (ECF DKT #332 at 54:21–55:7):

Q: Okay. Did the two of you ever discuss video games?
A: We've never had a discussion over video games, never.
Q: Did you ever discuss copyrights?
A: Never.
Q: Did you ever discuss your copyrights being recreated in video games?
A: No.
Q: Okay. Did Mr. LeBron—excuse me. Did Mr. James ever talk about that he was in video games?
A: No.

Plaintiff also testified (ECF DKT #332 at 54:8–11):

Q: And when—when you were 2007, 2008, creating these tattoos, did you know about NBA 2K?
A: No.
Q: Okay. When did you first learn about NBA 2K?
A: Not until 2013.

At ECF DKT #332 at 54:17-19, Plaintiff said:

Q. Did you intend or give permission to Mr. James to allow video game makers to use your copyright of tattoos?
A. Never intended that.

Plaintiff insists that he had no knowledge of the NBA 2K games when he inked tattoos on LeBron James; so, he could not have intended to grant an implied license for video game use.

However, the evidence at trial unquestionably showed that NBA players (including LeBron James) expressly gave the NBA and the NBA Players Association the right to license their likenesses.  In turn, those organizations had a written agreement to license those rights to Defendants for use in the NBA 2K video game franchise.  Moreover, the jury heard that LeBron James appeared in NBA 2K with his tattoos for years prior to the time he walked into Plaintiff's tattoo shop; that NBA 2K was widely disseminated around the world; and that Plaintiff was at least a casual basketball fan, who inked tattoos on a number of players who appeared in NBA 2K video games.

> At ECF DKT #332 at 80:1-4, Plaintiff further testified:
>
> Q. Now, when you got paid, you didn't tell Mr. James he needed your permission to let someone reproduce his likeness, right?
> A. We never had a discussion on that.
>
> Continuing at ECF DKT #332 at 84:17 *et seq*.:
>
> Q. Despite knowing that Mr. James was a star athlete, at no time of all the times that you inked Mr. James did you ever tell him that he needed your permission before appearing on television showing his tattoos, correct?
> A. We never had a discussion.
> Q. And you never told him he needed your permission before appearing in advertising showing his tattoos either, right?
> A. We never had a conversation about that.
>
> Further at ECF DKT #332 at 85:
>
> Q. And you never told him he needed your permission before appearing in merchandise showing his tattoos, right?
> A. We never had a discussion on that.
> Q. And you never told him he needed your permission before appearing in a movie showing his tattoos, right?

-6-

A. We never had a discussion about that.
Q. And you never told him he needed your permission before appearing in a video game showing the tattoos either, right?
A. We never had a discussion about video games.

The videotaped testimony of LeBron James was published to the jury at trial. In relevant portions, James testified as follows:

At ECF DKT #323 at 79:21-25:

A. Everything. From my tattoos to my ears piercing to my scars to everything that's been a part of my body for 37 years, if I decide to give it out or license it or let someone see it, that is my right.

At ECF DKT #323 at 105:2-4; 105-106, James testified:

A. I know every single thing that's on my body. And if someone decides to use that, I have to grant them permission.
\* \* \*
Q. Just to be clear, you understand that Mr. Hayden has never made any claim that you can't license your likeness, has he?
He's never communicated that to you, has he?
A. Yeah. Not to my knowledge.

At ECF DKT #323 at 125:19-22:

Q. And is it your understanding that Take-Two has your permission to use your likeness in the video games?
A. Correct.

Lastly, at ECF DKT #323 at 128:6-14, James testified:

Q. So at any time during the time that Mr. Hayden was inking you with these tattoos, did he ever say to you, "Well, you know, LeBron. If ever you're going to be in television or T-shirts or in a video game, you have to come to me for permission"?
A. No.
Q. Has any tattooist ever said anything like that to you?
A. No.

An individual named Alfredo Brody testified in person at trial; and both sides elicited testimony from him in support of their cases-in-chief. Brody was vice president of global

marketing for Defendants during the relevant time period. At pages 266-267 of the trial transcript (ECF DKT #333), Brody was questioned about the necessity of the tattooist's express permission to use the players' tattoos in the 2K video games: "Because, again, there really isn't a need. For 25 years, all stakeholders involved with this franchise operated under the premise that the likeness includes exactly how they look from head to toe. And those rights come from the players and the NBA."

On the pivotal question of Implied License, the Court instructed the jury as follows:

> First, Defendants claim that Plaintiff granted LeBron James an implied license to use Plaintiff's copyrighted works, "Gloria" and "Shoulder Stars," and that LeBron James granted those rights through the NBA and NBA Players Association to Defendants.
> An implied license is an unwritten license to use a work that is inferred from the circumstances and the conduct between the parties.
> There is no precise formula for determining whether an implied license exists, but, rather, you must examine the intent of Plaintiff from the totality of the circumstances.
> In deciding if Defendants have proved by a preponderance of the evidence an implied license, the key issue is intent at the time LeBron James left Plaintiff's premises, and the key question is whether the facts and circumstances demonstrate that Plaintiff intended that LeBron James could display, copy and distribute, and allow others to display, copy and distribute these tattoos, including the manner in which they were eventually used.

(ECF DKT #339 at 833:23-25; 834:1-16).

Viewing the evidence in a light most favorable to Defendants, giving Defendants the benefit of all reasonable inferences, and in light of the totality of the circumstances, the Court holds that a reasonable jury had a "legally sufficient evidentiary basis" to find that Defendants prevailed on their defense of Implied License. Thus, the Court denies Plaintiff's Renewed Motion for Judgment as a Matter of Law under Fed.R.Civ.P. 50(b) and the alternative Motion for a New Trial under Fed.R.Civ.P. 59 on the ground of insufficient evidence.

**Mannequin Project**

Plaintiff contends that he is entitled to a new trial under Rule 59 because he was erroneously barred from presenting material, relevant evidence showing that no implied license existed. Plaintiff argues that he was denied the opportunity to present the jury with evidence of a project with Nike in 2009, in which he was engaged to reproduce the Asserted Tattoos on a mannequin of LeBron James. This transaction predated the lawsuit by a number of years, and thus counters Defendants' suggestion that licenses or agreements were prompted by the threat of litigation. Had he been given the opportunity, Plaintiff could have shown the jury that Nike had no implied license to reproduce the Asserted Tattoos without his permission. Plaintiff would have offered his direct testimony on the Nike project and an exhibit (attached as Exhibit B) purporting to be a Purchase Order/Invoice between Plaintiff and Nike.

The Court also reviewed a related email thread (ECF DKT #109-50) which Plaintiff offered in opposition to Defendants' dispositive motion earlier in this litigation. It is dated October 9, 2009, and reads in part:

> Nike would like to request your special services again for the airbrushing of tattoos on a new LeBron mannequin. This one is going to be one-of-a-kind (for now) and will be in LeBron's iconic "Witness" pose with his hands extended out as if he's just thrown chalk in the air.
> The finished mannequin is scheduled to be placed in Niketown NYC when the basketball area is remodeled there the second week of November.
> Would you be willing and available to travel to Los Angeles around 11/4-11/5 to "tattoo" this one mannequin? As with the last couple of trips we'd pay your day rate plus travel expenses.

In his Reply Brief (ECF DKT #355 at 12), Plaintiff states: "By hiring Mr. Hayden to recreate the Asserted Works, Nike perforce secured Mr. Hayden's **permission to recreate the Asserted Works in which he owned copyrights.**" (Emphasis added). Indeed, this 2009

transaction occurred years prior to the lawsuit, but it is not the analogous situation that Plaintiff believes would have aided the jury in analyzing the Implied License defense.

Nike offered to pay Plaintiff for his services, *i.e.*, to paint his tattoo designs on a LeBron James figure for use in a Nike store.  This evidence does not reflect the grant of a license to copy Plaintiff's designs; rather, it represents an offer by Nike to pay Plaintiff for his time and for his artistic services.  The Court disagrees that Plaintiff was profoundly prejudiced by the exclusion of the 2009 Mannequin Project evidence.  The Court was not in error to exclude it originally at the motion-in-*limine* stage, nor upon reconsideration at final pre-trial nor when the issue was raised anew at sidebar during trial.  A new trial will not be granted unless the evidence would have caused a different outcome at trial, *Morales*, 151 F.3d at 514; and Plaintiff has not demonstrated that the verdict would have been otherwise if the Mannequin Project evidence were admitted.

**Plaintiff's Exhibits PX-32 and PX-26 and Related Deposition Testimony**

Plaintiff contends that he is entitled to a new trial because the Court precluded him from presenting email and deposition evidence to rebut Defendants' Implied License defense.  Plaintiff asserts that the Court erroneously barred him from offering (1) an email thread between Jason Argent (senior vice president of basketball operations) and 2K Games's president, David Ismailer, as well as related deposition testimony showing Defendants "disregard[ed]" Plaintiff's copyrights and lacked proper "approval" to use the Asserted Tattoos; and (2) an email from Argent to Brody, revealing that Defendants could not convince LeBron James to ask Plaintiff to drop his lawsuit.

In the December 2017 email exchange (Plaintiff's Trial Exhibit PX -32), Argent is

expressing to Ismailer his frustration with Jeff Thomas, a vice president of Visual Concepts, the subsidiary which copied the Asserted Tattoos: "I'm going to strangle Jeff soon." "He [] flippant. Doesn't care. We have created monsters." "But I don't want to assume we can get away with this forever." (ECF DKT #109-22).

Ismailer responds: "Monsters somehow generate enormous amounts of revenue . . ." "Is it disregard for other people's ip that's the issue here for this particular situation. That issue I can try to handle." (*Id.*)

Argent writes back: "To clarify . . . the issue here, as per my initial email before I got sidetracked, seems to be that they aren't taking security seriously enough." "We've had 4 leaks this year on NBA assets alone. Add into that the graffiti issue and tattoo issue etc and it's clear that there are no appropriate stopgaps on the VC side. And perhaps worse, we have no oversight." (*Id.*)

Plaintiff contends that this exchange evidences that Defendants' top executives were aware of the "disregard for other people's ip" within their organization; and in addition, is probative of whether or not Defendants believed their conduct was insulated by an implied license.

A look at the related deposition testimony of Jason Argent provides some context.

At ECF DKT #292 at 292:14-24 Argent testified:

A. I -- I've reviewed these emails.
I don't recall what -- what exactly I was frustrated
with Jeff other than a series of leaks. So I don't
believe that there was necessarily a connection with the
tattoos. I don't recall.
Q. What were the leaks?
A. The NBA gives us assets, things like new

-11-

jerseys, that we're allowed to have months prior to them
being publicly released, and a couple of them had leaked.

At ECF DKT #292 at 298: 6-15:

A. I just want to be clear: This email thread is
about going back to what we talked about, the leaks. So
my point here that I'm trying to make is that we have to
tighten things up with them as it relates to leaks.
Q. So it's your position that this email at
10:18 p.m. has nothing to do with this lawsuit?
A. I think the lawsuit was the transition for me
to express my frustration about the leaks.

At ECF DKT #292 at 299: 3-7:
A. For example, the creation of marketing assets.
It was my opinion at the time that sometimes Visual
Concepts ran with visual assets that we didn't probably
have as tight of a approval process with the NBA as we
could have had.

At ECF DKT #292 at 303: 18-21:
A. Going back to my prior comments, we needed
more control, in my opinion, from the publishing side of
the business over the development side of the business
and as it relates to approvals and leaks, primarily.

To repeat the Court's standard of review: "Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004), citing *Morales*, 151 F.3d at 514. Considering the emails and the relevant deposition testimony in their totality, the Court is not convinced that admitting the evidence would have altered the verdict. Had the jury heard the suggested evidence in PX-32, they would have been required to speculate whether "disregard for other people's IP" referred to Plaintiff's copyrights and whether the tattoos mentioned were LeBron James's "Gloria" and "Shoulder

-12-

Stars" tattoos.

Plaintiff also argues that the Court erroneously excluded evidence of an email from Argent to Alfredo Brody (PX-26) and related deposition testimony. According to Plaintiff, the evidence reveals Defendants' frustration that LeBron James would not convince Plaintiff to drop the lawsuit and further demonstrates that Defendants lacked the authorization to copy and distribute the Asserted Tattoos in their video games. The March 31, 2018 email from Argent to Brody states in part: "I just can't believe that we are about to do a huge two year deal with LeBron and he won't call this Hayden **** and tell him to step off." (ECF DKT #109-21). Plaintiff contends that it would have been unnecessary to reach out for LeBron James's help if Defendants knew they had a license to use Plaintiff's tattoos. Plaintiff believes the jury should have been allowed to consider this key evidence.

As with PX-32, by presenting this email evidence in PX-26, Plaintiff would be asking the jury to improperly speculate about Defendants' motivation. Was it that Defendants had no implied license, or was it equally likely that Defendants were interested in avoiding costly litigation?

In addition, the jury heard and considered testimony on this issue from Alfredo Brody who testified in person at trial. Brody testified that he was asked to reach out to LeBron James through his team and ask for his help with this lawsuit. Brody contacted Maverick Carter, LeBron James's business manager.

At ECF DKT #333 at 214:13-23:

Q. So when you contacted Mr. Carter, do you recall what you wanted to say to him?
A. If I remember correctly, I was asked to ask him for

help, so the request was can LeBron help us with this.
Q. Okay.
And did Mr. Carter ever get back to you and offer that help?
A. He did not.
Q. And again, he's the business manager of Mr. James, correct?
A. That is correct.

The Court determines that exclusion of this email and deposition evidence was appropriate. The jury heard Brody's live testimony regarding Defendants' interest in convincing Plaintiff to back away from this litigation. The jury was capable of making whatever reasonable inferences they considered relevant to Defendants' Implied License defense. Plaintiff was not prejudiced by the decision to exclude PX-26; and it is unlikely that the admission of PX-26 would have changed the trial outcome.

## III. CONCLUSION

For these reasons, Plaintiff's Renewed Motion (ECF DKT #344) for Judgment as a Matter of Law on Defendants' Implied License Defense under Rule 50(b) and Motion for New Trial under Rule 59 is denied.

**IT IS SO ORDERED.**

**DATE: 8/22/2024**

/Christopher A. Boyko
**CHRISTOPHER A. BOYKO
United States District Judge**